Steve W. Berman (*pro hac vice*)
Mark S. Carlson (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:   (206) 623-0594
steve@hbsslaw.com
markc@hbsslaw.com

Rio S. Pierce, CBA No. 298297
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone:  (510) 725-3000
Facsimile:   (510) 725-3001
riop@hbsslaw.com

*Attorneys for Plaintiff*
Rearden LLC and Rearden Mova LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| REARDEN LLC, REARDEN MOVA LLC, California limited liability companies, <br><br> Plaintiffs, <br><br> v. <br><br> THE WALT DISNEY COMPANY, a Delaware corporation, WALT DISNEY MOTION PICTURES GROUP, INC., a California corporation, BUENA VISTA HOME ENTERTAINMENT, INC. a California corporation, MARVEL STUDIOS, LLC, a Delaware limited liability company, MANDEVILLE FILMS, INC., a California corporation, <br><br> Defendants. | Case No. 3:17-cv-04006-JST <br>           3:17-cv-04191-JST <br>           3:17-cv-04192-JST <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PURSUANT TO FRCP 12(b)(6)** <br><br> Date:       December 7, 2017 <br> Time:      2:00 p.m. <br> Judge:    Hon. Jon S. Tigar <br> Ctrm:     9 (19th Floor) |

REARDEN LLC and REARDEN MOVA LLC,

                                        Plaintiffs,

        v.

TWENTIETH CENTURY FOX FILM
CORPORATION, a Delaware corporation and
TWENTIETH CENTURY FOX HOME
ENTERTAINMENT LLC, a Delaware limited
liability company,

                                        Defendants.

REARDEN LLC and REARDEN MOVA LLC,

                                        Plaintiffs,

        v.

PARAMOUNT PICTURES CORPORATION, a
Delaware corporation, and PARAMOUNT HOME
ENTERTAINMENT DISTRIBUTION INC. a
Delaware corporation,

                                        Defendants.

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...........................................................................................................1

II.   FACTS .........................................................................................................................3

III.  ARGUMENT ................................................................................................................3

      A.    The complaint's allegations must be accepted as true, construed in a
            light most favorable to Rearden, and all reasonable inferences must be
            drawn in Rearden's favor. ...............................................................................3

      B.    Rearden alleged plausible claims that defendants infringed Rearden's
            copyright in the MOVA Contour program's output. .......................................4

            1.    Rearden alleged plausibly that it *owns* the copyright in MOVA
                  Contour output. ......................................................................................4

                  a.    Rearden alleged that the MOVA Contour program
                        performs substantially all of the operations in creating
                        the outputs. ...................................................................................4

                  b.    Allegations that the MOVA Contour program performs
                        substantially all of the operations to produce its output
                        plead a plausible claim that the author of the program is
                        the author of the output. ...............................................................5

                  c.    Defendants improperly attack Rearden's copyright
                        claim by challenging the truth of allegations with
                        alternative facts and adverse inferences. ......................................8

                  d.    Defendants' analogies to photographers, authors, and
                        artists, are inapposite here, where the MOVA Contour
                        output is created by the *program*, not the end user. ..................10

            2.    Rearden alleged plausibly that defendants *infringed* its
                  copyright in MOVA Contour output by creating derivative
                  works incorporated into their films. .....................................................12

      C.    Rearden alleged plausible claims that Disney directly infringed, and
            actively induced infringement of, the MOVA Contour patents. .................14

            1.    Disney directly infringed the MOVA Contour patents under 35
                  U.S.C. § 271(a). .....................................................................................14

                  a.    Allegations that Disney directed and controlled DD3's
                        conduct state a plausible claim for direct infringement
                        by Disney. ....................................................................................14

                  b.    Allegations that Disney "used" the patented MOVA
                        Contour system state a plausible claim of direct
                        infringement by Disney. ..............................................................15

2. Disney actively induced DD3's direct infringement under 35 U.S.C. §271(b)..................................................................17

    a. Rearden alleged facts from which the Court may reasonably infer that Disney had actual knowledge of the MOVA Contour patents..................................17

    b. Rearden alleged facts from which the Court may reasonably infer that Disney willfully blinded itself to infringement. ...............................................20

    c. Rearden alleged facts from which the Court may reasonably infer that Disney knew DD3 would infringe the MOVA Contour patents and intended the infringement. ..............................................22

D. Rearden alleged plausible claims that Defendants infringed the MOVA trademark..............................................................24

E. If the Court finds that the complaint fails in any respect to allege plausible claims, Rearden requests leave to amend..................................25

F. The Court should not stay Rearden's infringement cases against Defendants. ...........................................................25

IV. CONCLUSION ...............................................................26

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

CASES

4

*Broadcom v. Qualcomm,*
    543 F.3d 683 (Fed. Cir. 2008) ................................................................................ 23

5

6

*Akamai Technologies, Inc. v. Limelight Networks, Inc.,*
    797 F.3d 1020 (Fed. Cir. 2015) (*en banc*) .......................................................... 2, 15

7

*Arista Records, LLC v. Doe 3,*
    604 F.3d 110 (2d Cir. 2010) ................................................................................... 20

8

9

*Aristocrat Tech. Austl. Pty Ltd. v. Int'l Game Tech.,*
    709 F.3d 1348 (Fed. Cir. 2013) ............................................................................. 15

10

11

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...................................................................................... 3, 4, 20

12

*Atari Games Corp. v. Nintendo of America, Inc.,*
    1993 WL 214886 (N.D. Cal. 1993) ...................................................................... 5, 7

13

14

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................................... 20

15

16

*In re Bill of Lading,*
    681 F.3d 1323 (Fed. Cir. 2012) ............................................... 3, 18, 19, 22, 23

17

*BMC Res., Inc. v. Paymentech, L.P.,*
    498 F.3d 1373 (Fed.Cir.2007) .............................................................................. 15

18

19

*Boundaries Sols. Inc. v. CoreLogic, Inc.,*
    2014 WL 7463708 (N.D. Cal. Dec. 30, 2014) ..................................................... 21

20

21

*Boundaries Solutions Inc. v. CoreLogic, Inc.,*
    2014 WL 4954017. (N.D. Cal. Sept. 29, 2014) .................................................... 22

22

*Burrow-Giles Lithographic Co. v. Sarony,*
    111 U.S. 53 (1884) ................................................................................................. 10

23

24

*Centillion Data Systems, LLC v. Qwest Communications Int'l, Inc.,*
    631 F.3d 1279 (Fed. Cir. 2011) ...................................................................... 2, 16, 17

25

26

*Cisco Sys., Inc. v. STMicroelectronics, Inc.,*
    2015 WL 3488923 (N.D. Cal. 2015) ................................................................... 20

27

*Clifton v. Houghton Mifflin Harcourt Publ'g Co.,*
    152 F.Supp.3d 1221 (N.D. Cal. 2015) ................................................................. 20

28

PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS
Case No.: 3:17-cv-04006; 3:17-cv-04191; 3:17-cv-04192

iii

*Cook v. Brewer*,
   637 F.3d 1002 (9th Cir. 2011) .......................................................................... 4

*Delphix Corp. v. Actifo, Inc.*,
   2014 WL 4628490 (N.D. Cal. Mar. 19, 2014) ................................................. 20

*Design Data Corp. v. Unigate Enterprise, Inc.*,
   63 F.Supp.3d 1062 (N.D. Cal. 2014) .................................................................. 7

*Design Data Corp. v. Unigate Enterprise, Inc.*,
   847 F.3d 1169 (9th Cir. 2017). Dkt. 36 ...................................................... 7, 8, 9

*Elec. Arts, Inc. v. Textron Inc.*,
   No. C 12-00118 WHA, 2012 WL 3042668 (N.D. Cal. July 25, 2012) ................... 3, 24

*Exergen Corp. v. WalMart Stores, Inc.*,
   575 F.3d 1312 (Fed.Cir. 2009) ....................................................................... 20

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) ...................................................................... 5, 10

*Georgetown Rail Equipment Company v. Holland L.P.*,
   867 F.3d 1229 (Fed. Cir. 2017) ...................................................................... 17

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011) ...................................................................................... 21

*iSource Loans, LLC v. SunTrust Mortg., Inc.*,
   2014 WL 3730289 (E.D. Va. March 10, 2014) ............................................. 3, 19

*JDS Technologies, Inc. v. Avigilon USA Corp.*,
   2015 WL 3603525 (E.D. Mich. June 5, 2015) .................................................. 19

*Lifetime Industries, Inc. v. Trim-Lok, Inc.*,
   2017 WL 3908174 (Fed. Cir. 2017) ..................................................... 3, 18, 22, 23

*MDY Industries, LLC v. Blizzard Entertainment, Inc.*,
   616 F.Supp.2d 958 (D. Arizona 2009), vacated on other grounds, 629 F.3d 928
   (9th Cir. 2011) .......................................................................................... 5, 7

*Merck & Co. v. Danbury Pharmacal, Inc.*,
   873 F.2d 1418 (Fed. Cir. 1989) ...................................................................... 23

*Nat'l Council of La Raza v. Cegavske*,
   800 F.3d 1032 (9th Cir. 2015) ........................................................................ 25

*Neology, Inc. v. Kapsch Trafficcom IVHS, Inc.*,
   2014 WL 4675316 (D. Del. Sept. 19, 2014) ..................................................... 22

*NTP, Inc. v. Research in Motion, Ltd.*,
  418 F.3d 1282 (Fed.Cir.2005) .................................................................... 12

*Potter Voice Technologies, LLC v. Apple Inc.*,
  24 F.Supp.3d 882 (N.D. Cal. 2014) ........................................................... 22

*Script Security Solutions L.L.C. v. Amazon.com, Inc.*,
  170 F.Supp.3d 928 (E.D. Tex. 2016) ......................................................... 21

*Skinner v. Switzer*,
  562 U.S. 521 (2011) ............................................................................... 3, 4

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011), *cert. den'd*, __ U.S. __, 132 S.Ct. 2101 (2012) ............................ 4

*Straight Path IP Grp., Inc. v. Apple Inc.*,
  2016 WL 8729942 (N.D. Cal. Oct. 21, 2016) ............................................ 22

*Suprema, Inc. v. International Trade Com'n*,
  626 Fed.Appx. 273 (Fed. Cir. 2015) .......................................................... 21

*Torah Soft, Ltd. v. Drosnin*,
  136 F.Supp.2d 276 (S.D. New York 2001) ........................................ *passim*

*Unwired Planet, LLC v. Apple Inc.*,
  829 F.3d 1353 (Fed. Cir. 2016) ................................................................. 23

*Unwired Plant, LLC v. Apple Inc.*,
  2017 WL 1175379 (N.D. Cal. Feb. 14, 2017) ........................................... 21

*Usher v. City of Los Angeles*,
  828 F.2d 556 (9th Cir. 1987) ..................................................................... 4

*Vasudevan Software, Inc. v. TIBCO Software Inc.*,
  2012 WL 1831543 (N.D. Cal. May 18, 2012) ........................................... 22

*VBConversions, LLC v. Exida.com, LLC*,
  2014 WL 12560807 (C.D. Cal. Apr. 14 2014) ..................................... 13, 14

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
  824 F.3d 1344 (Fed. Cir. 2016) ................................................................. 23

*Wisconsin Alumni Research Foundation v. Apple, Inc.*,
  2017 WL 2438832 (W.D. Wis. June 6, 2017) ........................................... 15

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ................................................................. 4, 25

1

<b>STATUTES</b>

2

17 U.S.C. § 101 ............................................................................................................... 13

3

17 U.S.C. § 106(2) .......................................................................................................... 13

4

35 U.S.C. § 271(a) .................................................................................................. *passim*

5

35 U.S.C. § 271(b) ..................................................................................................... 2, 17

6

<b>OTHER AUTHORITIES</b>

7

Fed. R. Civ. P. 12(b)(6) ......................................................................................... *passim*

8

Rule 8(a)(2) ................................................................................................................ 3, 19

9

Rule 9(b) ........................................................................................................................ 20

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Rearden's complaints plead claims against defendants for their creation of derivative works from MOVA Contour output (copyright infringement), use of the MOVA Contour system and methods (patent infringement, against Disney MPG only), and use of Rearden's MOVA trademark in a manner that creates the false impression of Rearden's association with defendants' films (trademark infringement). These allegations must be taken as true, construed in Rearden's favor, and all reasonable favorable inferences must be drawn from them under Fed. R. Civ. P. 12(b)(6). Defendants challenge the sufficiency of the allegations. But many if not most of their arguments require the Court to weigh the evidence for and against the allegations, rely on unfavorable constructions of them, or urge the Court to draw unfavorable inferences from alternative "facts." While these arguments might be made on summary judgment, they cannot be considered here.

Defendants make two such arguments to attack Rearden's copyright claim. They argue that Rearden has not alleged that it *owns* the copyright in MOVA Contour output. Rather, they argue that unspecified contributions of the movie director or MOVA Contour system operator in creating MOVA Contour output greatly outweigh the contributions of the program, and therefore the end-user owns the copyright, not Rearden. But Rearden has alleged that the MOVA Contour program performs "substantially all of the operations" required to produce its output, and supports this allegation with many detailed factual allegations.[1] These allegations are sufficient to state a claim that the programmers (and thus Rearden, their assignee) own the copyright in the MOVA Contour program's output under *Torah Soft, Ltd. v. Drosnin*, 136 F.Supp.2d 276, 283 (S.D. New York 2001).

Defendants argue also that Rearden has not alleged that defendants *infringe* the copyright in the MOVA Contour output because the complaint does not allege that the MOVA Contour program's output appears in defendants' motion pictures. This argument ignores the allegations of the complaint and confuses infringement by *reproducing* a work with infringement by *making derivative works* from a work. It is true that the MOVA Contour output—Captured Surface and

---

[1] Dkt. 1 ¶¶ 42, 24-41, 43-56 (Disney); Dkt. 1 ¶¶ 43, 24-41 (Fox); Dkt. 1 ¶¶ 41, 22-29 (Paramount).

1    Tracking Mesh—are not copied into and displayed in their raw form in the films.  But the

2    infringement here is not *reproducing* the output, but rather making *derivative works* from it.  The

3    complaint alleges that defendants copied the movement and facial expressions captured in the

4    MOVA Contour output into CG heads that appear on characters in the films—in effect, making them

5    digital puppets of the output.[2]  The complaint alleges facts in detail showing how defendants create

6    derivative works from the MOVA Contour output.[3]  These allegations plead a plausible claim for

7    copyright infringement by creation of derivative works.

8         Disney's attack on Rearden's patent claims is similarly misguided.  It argues that Disney is

9    not liable for DD3's direct infringement under 35 U.S.C. § 271(a).  But Disney's right to direct and

10   control DD3 is a sufficient basis for direct infringement by Disney.  *Akamai Technologies, Inc. v.*

11   *Limelight Networks, Inc.*, 797 F.3d 1020, 1023 (Fed. Cir. 2015) (*en banc*) (*"Akamai V"*) ("An actor

12   is liable for infringement under § 271(a) *if it acts through an agent (applying traditional agency*

13   *principles) or contracts with another to perform one or more steps of a claimed method.*").  And

14   Disney directly infringed at least the system claims of the patents-in-suit by its use of the MOVA

15   Contour system. *Centillion Data Systems, LLC v. Qwest Communications Int'l, Inc.*, 631 F.3d 1279,

16   1285 (Fed. Cir. 2011) ("it is the customer-initiated demand for the service which causes the back-end

17   system to generate the requisite reports. This is 'use' because, *but for the customer's actions, the*

18   *entire system would never have been put into service.*").

19        And Disney argues that Rearden's allegations do not satisfy the requirement to plead notice

20   of the patent and intent to infringe required for active inducement under 35 U.S.C. § 271(b).  But

21   here, Rearden relies on detailed factual allegations—including *nine* intellectual property due

22   diligence investigations—that support the reasonable inference that Disney knew of Rearden's

23   patents and intended to cause DD3 to infringe them.[4]  Disney argues that Rearden must plead a litany

24   of factual details to state a claim for active inducement, but "who, what, where, when and how"

25        [2] Dkt. 1 ¶¶ 88-112, 120-127; 137-144 (Disney); Dkt. 1 ¶¶ 91-113 (Fox); Dkt. 1 ¶¶ 83-105__
26   (Paramount).

27        [3] Dkt. 1 ¶ 44-56, 88-112, 117-118, 134-135 (Disney); Dkt. 1 ¶¶ , 91-113, (Fox); Dkt. 1 ¶¶ 83-105, (Paramount).

28        [4] *See* pp. 17-18, *infra*

1   allegations are "not required under the general pleading standard of Rule 8(a)(2) that applies here."

2   *iSource Loans, LLC v. SunTrust Mortg., Inc.*, 2014 WL 3730289, at *3 (E.D. Va. March 10, 2014)

3   (rejecting defendant's contention that a patentee pleading inducement must "identify the specific

4   substance of these alleged 'communications,' how they were allegedly communicated[,] ... when

5   they were allegedly made, the names of the individuals […] who allegedly made them, or the names

6   of the individuals […] who allegedly received them."). It is sufficient to plead "enough 'fact[s] to

7   raise a reasonable expectation that discovery will reveal' that the defendant is liable for the

8   misconduct alleged." *Lifetime Industries, Inc. v. Trim-Lok, Inc.*, 2017 WL 3908174, at *6-7 (Fed.

9   Cir. 2017). And Rearden is entitled to rely on reasonable inferences supported by its factual

10  allegations. *See, In re Bill of Lading*, 681 F.3d 1323, 1340 (Fed. Cir. 2012).

11  Finally, defendants' attack on Rearden's trademark claims relies primarily on their

12  affirmative defense of nominative fair use, which "typically involves questions of law and fact, and

13  determination on a motion to dismiss is premature." *See Elec. Arts, Inc. v. Textron Inc.*, No. C 12-

14  00118 WHA, 2012 WL 3042668, at *5 (N.D. Cal. July 25, 2012). And they challenge the truth of

15  Rearden's factual allegations, but with one exception—a typographical error—their attacks have no

16  merit and are not appropriate on a motion to dismiss which must accept the allegations as true.

17  ## II.   FACTS

18  The facts that are material in a motion to dismiss under Rule 12(b)(6) are only the allegations

19  in the complaint. Rather than paraphrase or summarize them here, Rearden will address the factual

20  allegations in its arguments below, in their proper legal context.

21  ## III.   ARGUMENT

22  **A.   The complaint's allegations must be accepted as true, construed in a light most
    favorable to Rearden, and all reasonable inferences must be drawn in Rearden's favor.**

23  Rule 8(a)(2) "generally requires only a plausible 'short plain' statement of the plaintiff's

24  claim," showing that the plaintiff is entitled to relief. *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

25  "Detailed factual allegations" are not required, but "a complaint must contain sufficient factual

26  matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

27  556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim

1   has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

2   reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *Cook v. Brewer*,

3   637 F.3d 1002, 1004 (9th Cir. 2011).  This standard is not "akin to a probability requirement."

4   *Skinner,* 562 U.S. at 530, quoting *Iqbal*, 556 U.S. at 678.  In a motion to dismiss, the Court "will

5   'accept the plaintiffs' allegations as true and construe them in the light most favorable to

6   plaintiffs…." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009).  It must

7   draw all reasonable inferences in Rearden's favor.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561

8   (9th Cir. 1987).  And "[i]f there are two alternative plausible explanations, one advanced by

9   defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint

10  survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir.

11  2011), *cert. den'd*, __ U.S. __, 132 S.Ct. 2101 (2012).

12  **B.      Rearden alleged plausible claims that defendants infringed Rearden's copyright in the
            MOVA Contour program's output.**

13

14          **1.      Rearden alleged plausibly that it *owns* the copyright in MOVA Contour output.**

15                  **a.      Rearden alleged that the MOVA Contour program performs
                            substantially all of the operations in creating the outputs.**

16          Rearden alleges it owns the copyright for the MOVA Contour program,[5] that "[t]he authors

17  of the Contour Program created programming that performs several operations" that create "Skin

18  Texture," "Makeup Pattern," "Captured Surface," and "Tracking Mesh" outputs,[6] that these outputs

19  "were fixed in a tangible medium of expression when their embodiments were stored in non-volatile

20  computer memory and/or media such as CD, CD-R, DVD, or Blu-ray disks from which they may be

21  perceived, reproduced, or otherwise communicated for a period of more than transitory duration," [7]

22  and that "[t]he Contour Program performs substantially all of the operations required to produce the

23  Contour Program outputs," and "[g]iven identical facial motion capture inputs, the Contour Program

24  will produce identical outputs."[8]  Each of these allegations must be accepted as true.

25

26          [5] Dkt. 1 ¶¶ 116; 9 (Disney); Dkt. 1 ¶¶ 120, 61 (Fox); Dkt. 1 ¶¶ 105, 58 (Paramount).

            [6] Dkt. 1 ¶ 117 (Disney); Dkt. 1 ¶ 121 (Fox); Dkt. 1 ¶ 106 (Paramount).

27          [7] Dkt. 1 ¶ 117 (Disney); Dkt. 1 ¶ 121 (Fox); Dkt. 1 ¶ 106 (Paramount).

28          [8] Dkt. 1 ¶ 118 (Disney); Dkt. 1 ¶ 122 (Fox); Dkt. 1 ¶ 107 (Paramount).

1

        **b.**      **Allegations that the MOVA Contour program performs substantially all of the operations to produce its output plead a plausible claim that the author of the program is the author of the output.**

2

3        Defendants do not challenge Rearden's allegations that copyright protection subsists in the

4  MOVA Contour program's output, and for good reason.  This judicial district has recognized since at

5  least 1993 that courts often grant copyright protection to the output of computer programs when, as

6  here, the program's instructions generate audiovisual displays:

7                    "output" generated by a software program is often granted copyright protection.  Cases that grant protection to program output, however, usually

8                    arise where the program instructions generate an audiovisual display ….

9  *Atari Games Corp. v. Nintendo of America, Inc.*, 1993 WL 214886, at *3 (N.D. Cal. 1993).  And the

10  programmer's copyright subsists even though the output is partly determined by the end user's input:

11                    Audio-visual displays of computer games are subject to copyright protection, and a player's interaction with the software of those games does

12                    not defeat this protection even though the player's actions in part determine what is displayed on the computer screen.

13

14  *MDY Industries, LLC v. Blizzard Entertainment, Inc.,* 616 F.Supp.2d 958, 966-67 (D. Arizona 2009),

  vacated on other grounds, 629 F.3d 928 (9th Cir. 2011).

15

16        Instead, defendants challenge Rearden's allegations that it *owns* the copyright in the MOVA

  Contour program's output,[9] as the assignee of the authors of the MOVA Contour program.  More

17

  precisely, defendants argue that the MOVA Contour program output's author—and thus its owner—

18

  is the end user, either the director of the captured performance or the system's  operator (Digital

19

  Domain 3.0 ("DD3")), and not Rearden as alleged in the complaints (*Id.*).[10]  Dkt. 36 at 5-9.  But this

20

  argument fails under the applicable law and the facts alleged in the complaints.

21

        Whether the copyright in a program's output is owned by the programmer or the end user was

22

  decided in *Torah Soft, Ltd. v. Drosnin*, 136 F.Supp.2d 276, 283 (S.D.N.Y. 2001).  According to

23

  certain scholars, the Hebrew Bible is embedded with a code that foretells future events, which is

24

  revealed by finding words and phrases that appear at equidistant letter skips.  In *Torah Soft*,

25

26         [9] Dkt. 1 ¶¶ 118-119 (Disney); Dkt. 1 ¶¶ 122-123 (Fox); Dkt. 1 ¶¶ 122-123 (Paramount).

27        [10] Defendants implicitly concede by their reliance on *Garcia v. Google, Inc.,* 786 F.3d 733 (9th Cir. 2015) that a film actor cannot be the "author" of her or his performance in a film, and thus

28  cannot claim to own the copyright in the MOVA Contour output capture.  Dkt. 36 at 6.

1   Spielberg loaded the Torah into a database and wrote a computer program called Torah Soft that

2   searches the database and displays equidistant letter skips in a matrix format for any given word or

3   phrase input.  Drosnin purchased a copy of Torah Soft and published a book containing copies of

4   Torah Soft's output matrixes without Spielberg's authorization.

5          Spielberg sued Drosnin, claiming that reproduction of Torah Soft's matrix outputs infringed

6   his copyright in them.  Drosnin moved for summary judgment arguing that he, as the end user who

7   used Torah Soft to generate the matrix outputs, was the author of the outputs because he provided the

8   queries that the software used as input to create the matrixes.  *Torah Soft,* 136 F.Supp.2d at 282.  The

9   district court first dispensed with Drosnin's argument that the Torah Soft output matrixes were not

10  "works of authorship" because they are not "fixed" until after the end user inputs a word or phrase:

11              Here, Spielberg created the Software which, in response to an end-
                user's input of a particular term, sifts through the Database,
12              reorganizes it according to its algorithm, and then creates a matrix that
                displays that search term.  *Although the matrixes do not appear either*
13              *in the Software or the Database, they are "fixed" insofar as the output*
                *is repeatable whenever the input is identical.*
14
    *Torah Soft,* 136 F.Supp.2d at 283 (emphasis supplied).  The district court then ruled that where the
15
    software "does the lion's share of the work," the end user who supplies the input is not the author:
16
17              an end-user's role in creating a matrix is marginal.  Creating a matrix is
                unlike the creative process used in many computer art programs, which
18              permit an end-user to create an original work of art in an electronic
                medium.  It is fair to say that users of such programs often supply the
19              lion's share of the creativity to create the screen display.  By contrast,
                *an end-user of the [Torah Soft] Software merely inputs a word or*
20              *phrase which the software searches for in the Database.  Thus, the*
                *Software does the lion's share of the work.*  Indeed, Drosnin's inputs,
21              generally consisting of no more than a single word or phrase, would
                fail to meet the minimum threshold of originality.  *See infra* Part
22              III.B.2.  *In short, Drosnin is not the author of the matrixes.*

23  *Id.* (emphasis supplied).  The court granted summary judgment, but on the ground that Spielberg's

24  database and software lacked any creative expression—*an argument defendants do not make here*.

25         Here, Rearden alleges that the MOVA Contour program performs substantially all—the

26  "lion's share"—of the operations required to produce the outputs,[11] and supports that allegation with

27  _____

28      [11] Dkt. 1 ¶ 117-118 (Disney), 134-135; Dkt. 1 ¶¶ 117-118 (Fox); Dkt. 1 ¶¶ 106-107 (Paramount).

1   many detailed factual allegations describing precisely how the program creates the outputs.[12]   And

2   Rearden alleges that the programs output is fixed insofar as it is repeatable whenever the input is

3   identical.[13] These allegations are sufficient to plead a claim that Rearden owns the copyright in the

4   MOVA Contour program output under *Atari Games*, *MDY Industries*, and *Torah Soft*.

5         Defendants counter that the Ninth Circuit denies copyright protection to computer program

6   output, citing *Design Data Corp. v. Unigate Enterprise, Inc.*, 847 F.3d 1169 (9th Cir. 2017).  Dkt. 36

7   at 6.  But they misrepresent *Design Data* and its underlying district court ruling.  Design Data owned

8   a copyright in structural steel detailing software called SDS/2.  *Design Data Corp. v. Unigate*

9   *Enterprise, Inc.,* 63 F.Supp.3d 1062, 1063 (N.D. Cal. 2014).  SDS/2 permitted users to create

10  drawings of structural steel components.  *Id.*  And in so doing, it also created a directory of folders,

11  called "job files," which contained information related to the project, for example, text files detailing

12  errors and instructions to correct them.  *Id.* at 1063-64.  Design Data argued that when Unigate

13  obtained copies of structural steel component drawings and job files from contractors who used

14  SDS/2 to produce them, it infringed Design Data's copyrights in SDS/2's output.  *Id.* at 1067.

15        Unigate moved for summary judgment.  In considering whether the copyright in the software

16  extends to the program's output, the district court distinguished between the job files and the

17  drawings.  *Id.*  With respect to the *job files*, the district court ruled that they "are 'data' not covered

18  by the program's copyright."  *Id.* at 1068.  With respect to the *drawings*, however, the district court

19  observed that they "might be copyrightable" as screen displays that are audio visual products of

20  computer programs, but "the copyright protection that these displays enjoy extends only so far as

21  their expression is protectable."  *Id.*  Without further explanation, the district court held that Design

22  Data had "failed to raise a material question of fact to show that the files and images created by

23  SDS/2 at issue were themselves protected by the SDS/2 copyright."  *Id.* at 1068-69.

24        On appeal, the Ninth Circuit affirmed, but on different grounds.  It noted that Design Data's

25  ownership of a copyright in the SDS/2 program's output is supported by authorities that:

26

27        [12] Dkt. 1 ¶ 24-56 (Disney); Dkt. 1 ¶¶ 24-56 (Fox); Dkt. 1 ¶¶ -22-54 (Paramount).

28        [13] Dkt. 1 ¶ 118, 135 (Disney); Dkt.1 ¶¶ 135, 123 (Fox); Dkt. 1 ¶ 108 (Paramount).

1

2

3

4

> suggest that the copyright protection afforded a computer program may
> extend to the program's output if the program "does the lion's share of
> the work" in creating the output and the user's role is so "marginal"
> that the output reflects the program's contents.  4 NIMMER ON
> COPYRIGHT § 13.03[F] (quoting *Torah Soft Ltd. v. Drosnin*, 136
> F.Supp. 276, 283 (S.D.N.Y. 2001)).

*Design Data Corp. v. Unigate Enterprise, Inc.,* 847 F.3d 1169, 1173 (9th Cir. 2017).  And the

appellate court assumed, without deciding, that the *Torah Soft* rule applied.  *Id.*  But it concluded that

Design Data had *failed to carry its burden* to present evidence that SDS/2 performs "the lion's share

of the work" as required by the *Torah Soft* rule in a summary judgment opposition:

> Design Data did not present evidence establishing that SDS/2 "does the
> lion's share of the work" in creating the steel detailing files or that the
> user's input is "marginal." *Torah Soft*, 136 F.Supp.2d at 283.  Thus, the
> district court correctly rejected Design Data's argument that the SDS/2
> copyright protects the images and files that UE imported and distributed.

*Id.*

    In sum, *Design Data* does not support defendants here.  The issue in *Design Data* was the

sufficiency of Design Data's *proof* that it owned the copyright in its program's output on a motion

for summary judgment; not the sufficiency of Design Data's *allegations* to plead that it owned the

copyright in the output.  Nor did the Ninth Circuit reject the *Torah Soft* rule; rather, it assumed that

the *Torah Soft* rule applied for purposes of the appeal.  Nor did either court hold that the *drawings*

output by SDS/2—as distinct from the "job files"—are unprotectable data.  Dkt 36 at 7:3-7.  And

*neither* case supports the proposition that there is a "rule that the copyright in a piece of software

does not extend to the software's outputs," as defendants contend.  *Id.*, at 7:17-18.  To the contrary,

both cases support the proposition that at least under certain facts—not established by the plaintiff in

*Design Data*—the copyright in a computer program may extend to its output.

### c.    Defendants improperly attack Rearden's copyright claim by challenging the truth of allegations with alternative facts and adverse inferences.

    Defendants assume for purposes of argument that *Torah Soft* applies, but dispute the truth of

Rearden's factual allegation that "[t]he Contour Program performs substantially all of the operations

required to produce the Contour Program outputs...."[14] They contend, to the contrary, that "the

---

[14] Dkt. 1 ¶117.

author of those images [of the displayed Contour Program outputs] would be the person who directed or photographed the performance….” Dkt. 36 at 5-6.  They posit that it “is obvious from the face of the complaint [that] a person is directing the performance of another person (the actor) to make the various facial motions that determine the output.” *Id.* at 8.  They contend that in fact, “[t]he human contribution to the expressive components of the output file is substantial and performs ‘the lion’s share of the creativity’ in the facial motion capture,” and “cannot be deemed ‘marginal’ in any sense.” *Id.*  They argue that “any role in directing the actor’s facial performance” played by the system’s operator is attributable to DD3, not Rearden. *Id.* at n. 4.[15]

This argument rests on thin air.  None of defendants’ cited allegations refer to or imply “a person [] directing the performance” who in fact creates the outputs, rather than the Contour Program.[16] Defendants urge the Court to infer the presence of a director during the performance captures, and speculate about the role of the system operator, and then attribute the creation of the MOVA Contour outputs to their unspecified contributions. But a motion to dismiss under Rule 12(b)(6) tests the *allegations of the complaint*, not some hypothetical set of alternative facts posited by the moving party. And while the cited allegations do mention an actor, they focus on the MOVA Contour program’s generation of output, in particular the three-dimensional Captured Surface and Tracking Mesh, which are (1) distinct from the two-dimensional images of the actors’ performances captured by the MOVA Contour cameras, (2) generated by the Contour Program by *synthesizing* the *two dimensional* camera captures into *three-dimensional* Captured Surface and Tracking Mesh outputs after the actors’ performances and the directors’ work—if any—is done, and thus (3) created entirely by the MOVA Contour program without any contribution from the actors or directors.[17]

---

[15] In fact, the system operator’s only contribution to creation of the Captured Surface and Tracking mesh output from the performance capture input is to type-in the MOVA Contour program command lines or click on icons to start the processing that synthesizes the input into output.

[16] *See,* Dkt. 1 ¶¶ 28 (Contour Program produces outputs after facial performance capture); 35 (Contour Program creates a “Tracking Mesh” file); 37 (outputs can be used to animate a 3D model); 38 (same); 50 (Contour Program creates Makeup Pattern outputs of Brad Pitt’s performance); and 52 (Contour Program Brad Pitt outputs retargeted to animate a 3D model) (Disney); Dkt. 1 ¶¶ 28, 35, 37-38, 51, 53 (Fox); Dkt. 1 ¶¶ 26, 33, 35-36, 49, 51 (Paramount).

[17] Dkt. 1 ¶ 117(c) and (d) (Disney); Dkt. 1 ¶ 121 (Fox); Dkt. 1 ¶ 106 (Paramount).

1    Defendants also invite the Court to draw adverse inferences based on speculation about the

2    *relative* contributions of the Contour program and the unspecified contributions of the director,

3    operator, and the actors in creating output.  They urge the inference that "[t]he human contribution

4    cannot be deemed 'marginal' in any sense," and to the contrary, is "significant."  Dkt.36 at 8.

5    Defendants' invitation to speculate adversely on the allegations of the complaint is contrary to the

6    duty in deciding a Rule 12(b)(6) motion to accept the allegations as true, construe them in Rearden's

7    favor, and draw all reasonable favorable inferences.

8                   **d.    Defendants' analogies to photographers, authors, and artists, are
                        inapposite here, where the MOVA Contour output is created by the**

9                        ***program*, not the end user.**

10    Defendants also rely on analogies to photographers who make photographs, authors who use

11    Word to write books, and artists who use Adobe Photoshop to create digital art, to argue that the

12    director should be deemed to be the author of the MOVA Contour program's output, not Rearden as

13    alleged in the complaints.  Dkt. 36 at 6, 9.  But all three of these analogies are inapt here.

14    A photographer's creation of a photograph is not analogous to the MOVA Contour program's

15    creation of output.  Defendants rely on *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 61

16    (1884), in which the lithographer who made a famous lithograph of Oscar Wilde, sued an individual

17    who stole the plates and sold copies of the lithograph. The district court found copyright

18    infringement, and the Supreme Court affirmed, holding that allegations that the photographer

19    composed the photograph by "posing the said Oscar Wilde in front of the camera, selecting and

20    arranging the costume, draperies, and other various accessories in said photograph, arranging the

21    subject so as to present graceful outlines, arranging and disposing the light and shade, suggesting and

22    evoking the desired expression, and from such disposition, arrangement, or representation, made

23    entirely by plaintiff, he produced the picture in suit" stated a claim that the lithograph was

24    copyrightable and the lithographer is the author of that work.  *Id.*  And defendants cite *Garcia v.*

25    *Google, Inc.*, 786 F.3d 733, 744 (9th Cir. 2015), for the corresponding proposition that the writer-

26    director of a film is the author of an actor's performance, not the actor (just as Oscar Wilde was not

27    the author of the lithograph in *Burrow-Giles*).  *Id. at* 744.

28

But here, the work at issue is the *program's* output, in particular, the *three-dimensional* Captured Surface and Tracking Mesh. The MOVA Contour system takes *two-dimensional* camera captures as input, and the program then synthesizes them into *three-dimensional* outputs with subtlety and artistry, based on creative choices made by its programmers and embodied in its copyrighted software instructions.[18] A director may be the author of an actor's performance—when posed, arranged, lit, and filmed like the lithograph of Oscar Wilde or the performance of Garcia. But during MOVA Contour performance capture, the director cannot choose camera angles because the cameras are fixed in the MOVA Contour rigging;[19] there can be no "selecting and arranging the costume, draperies, and other various accessories," because the capture is of only the random patterns on the actor's face and neck;[20] and there can be no "arranging and disposing the light and shade," because the lighting is also fixed in the rigging, and a random pattern of glowing makeup applied to the actor's skin *eliminates* shadows for an evenly-lit random pattern.[21]

Similarly, defendants' argument that Rearden's claim is analogous to Microsoft claiming a copyright in a book by an author who used Word to write it, or Adobe claiming a copyright in the artwork by an artist who used Photoshop to create it are equally inapt. Generally, an author writes a book by typing every word into a Word document, and an artist creates a work of art by deciding on specific treatment of every pixel in a Photoshop file. But in neither case does their work provide input to software that synthesizes an original expression that is distinct from the author's or artist's input. Here, neither the actor nor the director create a Captured Surface or Tracking Mesh output. The actor performs, and a director may direct the performance, and two-dimensional glowing random patterns are captured. But the works at issue here are not the two-dimensional captures; rather, the works at issue are the *MOVA Contour program's output*, in particular, the *three-dimensional* Captured Surface and Tracking Mesh created entirely by the MOVA Contour program.

---

[18] *See,* Dkt. 1 ¶¶ 24-56 (Disney); Dkt. 1 ¶¶ 24-56 (Fox); Dkt. 1 ¶¶ 22-54 (Paramount).

[19] Dkt. 1 ¶¶ 27-28, 32, 46, 56-57 (Disney); Dkt. 1 ¶¶ 27-28, 32, 47, 58-59 (Fox); Dkt. 1 ¶¶ 29-30, 30, 45, 55-56 (Paramount).

[20] Dkt. 1 ¶¶ 24-41, 47, 51-54 (Disney); Dkt. 1 ¶¶24-41, 48, 52-55 (Fox); Dkt. 1 ¶¶ 22-39, 46, 50-54 (Paramount).

[21] Dkt. 1 ¶¶ 24-31, 50-54 (Disney); Dkt. 1 ¶¶ 24-31, 51-54 (Fox); Dkt. 1 ¶¶ 49-52 (Paramount).

1   The core distinction between defendants' analogies and the MOVA Contour program is the

2   degree to which the output is the product of the effort of the program's *user* versus the program

3   *itself.  Where the program does the "lion's share of the work" in creating the output*—as the

4   complaint alleges the MOVA Contour program does here—the copyright in the output belongs to the

5   programmer, not the end-user or the director.  *Torah Soft,* 136 F.Supp.2d at 283.

6   **2.     Rearden alleged plausibly that defendants *infringed* its copyright in MOVA
            Contour output by creating derivative works incorporated into their films.**

7   Defendants argue that "Rearden has not alleged that the actual CG characters copy or

8   incorporate any of the contents of the MOVA software code or outputs," that its allegations in

9   support of the derivative works infringement claim are "conclusory," and therefore it has failed to

10  plead that the CG characters or the movies that incorporate them "are derivative works of its

11  software code or the outputs."  Dkt. 36 at 1, 10-11.  But defendants are clearly wrong.  The

12  complaint includes detailed allegations explaining how the CG characters in defendants' films,

13  incorporate, and are therefore derived from, the MOVA Contour program's outputs.

14  The complaints detail the process by which a studio can take the Tracking Mesh output of the

15  MOVA Contour program corresponding to an actor's facial performance, and incorporate that output

16  into a three-dimensional model of a CG head.[22]  The Tracking Mesh captures facial *motion*:  "every

17  subtle motion of the human face is captured with sub-millimeter precision, producing outputs that

18  retain that precision and can be retargeted to any fictional CG head, bringing it to life."[23]  The

19  complaints include images showing how the Tracking Mesh "wireframe" is incorporated into a CG

20  character's head, so that the Tracking Mesh can drive the features of the CG head to animate it.[24]

21  The complaints then address the Ed Ulbrich TED Talk—of which defendants have asked the

22  Court to take judicial notice (Dkt. 37)—on how DD3 used the MOVA Contour program to create

23  outputs that animated the CG character of 87 year-old Benjamin Button, played by Brad Pitt, for

---

[22] Dkt. 1 ¶¶ 36-42 (Disney); Dkt. 1 ¶¶ 36-42 (Fox); Dkt. 1 ¶¶ 34-40 (Paramount).

[23] Dkt. 1 ¶ 39 (Disney); Dkt. 1 ¶ 40 (Fox); Dkt. 1 ¶ 38 (Paramount).

[24] Dkt. 1 ¶ 41 (Disney); Dkt. 1 ¶ 42 (Fox); Dkt. 1 ¶ 40. (Paramount).

Paramount's *The Curious Case of Benjamin Button*.[25]  Mr. Ulbrich explains how the Tracking Mesh output is created by the MOVA Contour program from 9:43-to a sequence beginning at 10:39.[26] And he explains and illustrates how the Tracking Mesh output drives the subtle motion of the CG face from 10:49 to a sequence beginning at 17:18.[27]  Mr. Ulbrich illustrates the CG character without and with the transfer of the MOVA Contour program's Tracking Mesh output at a sequence showing the 87 year-old CG Benjamin Button dancing, beginning at 3:44.  The sequence shows a snippet of the final take, followed by footage of the body actors used to play Button, followed tellingly by the "*dead head*" at 3:30—the CG head of 87 year-old Benjamin Button *without* the facial motion captured in the MOVA Contour Tracking Mesh output—followed by the same film sequence with the CG character's head animated by the MOVA Contour output juxtaposed with footage of Mr. Pitt's facial performance.

The motion captured in the MOVA Contour program's Tracking Mesh output is not only "substantially similar" to the motion incorporated into the CG character, the motion transferred has "sub-millimeter precision."[28] For each accused film, the complaints allege that the defendants "incorporated the outputs … into derivative works that were reproduced, distributed, displayed and performed … without authorization."[29]  And for each copyright count, the complaints allege that the defendants' films included CG characters that "incorporate some or all Contour Program outputs including Skin Texture, Makeup Pattern, Captured Surface, and Tracking Mesh outputs in their entireties, and the MOVA outputs are wholly and indivisibly merged in the derivative CG characters," and therefore "constitute 'derivative works' as that term is defined in 17 U.S.C. § 101 prepared in violation of Rearden MOVA's exclusive rights under 17 U.S.C. § 106(2)."[30]

---

[25] Dkt. 1 ¶¶ 44-53 (Disney); Dkt. 1 ¶¶ 45-54 (Fox); Dkt. 1 ¶¶ 43-52 (Paramount).

[26] Dkt. 1 ¶¶ 44-51 (Disney); Dkt. 1 ¶¶ 45-54 (Fox); Dkt. 1 ¶¶ 43-52 (Paramount).

[27] Dkt. 1 ¶¶ 52-53(Disney); Dkt. 1 ¶¶ 53-54 (Fox); Dkt. 1 ¶¶ 51-52 (Paramount).

[28] Dkt. 1 ¶¶ 22, 34-35, 39, 42, 117, 134 (Disney); Dkt. 1 ¶¶ 22, 34-35, 40, 43, 121 (Fox); Dkt. 1 ¶¶ 20, 32-33, 38, 41, 106 (Paramount).

[29] Dkt. 1 ¶¶ 93, 99, 105 (Disney); Dkt. 1 ¶¶ 95, 102, 111 (Fox); Dkt. 1 ¶¶ 92, 114 (Paramount).

[30] Dkt. 1 ¶¶ 123-124 (Disney); Dkt. 1 ¶¶ 127-128 (Fox); Dkt.1¶¶ 112-113 (Paramount).

1    Defendants' reliance on *VBConversions, LLC v. Exida.com, LLC*, 2014 WL 12560807 (C.D.

2    Cal. Apr. 14 2014) is also unavailing.  There, VBC asserted copyright claims for infringement of

3    versions 1.0, 2.0, and 2.19, 2.15 and 2.29 of the software, but failed to allege ownership of the

4    copyright in the latter three versions.  Exida moved to dismiss for lack of standing.  In its *opposition*

5    *papers*, VBC argued that it did not have to plead ownership of versions 2.19, 2.15 and 2.29 because

6    they were "patches," rather than "versions," and therefore constituted derivative works of versions

7    1.0 and 2.0.  But the district court rejected VBC's argument because it could "only consider

8    *allegations contained in the pleadings* for purposes of a motion to dismiss," and the *complaint* did

9    not allege that versions 2.19, 2.15 and 2.29 were "patches," or that they were derivative works.

10    *VBConversions,* 2014 WL 12560807 at *12.  *VBConversions* does not apply here.

11    **C.    Rearden alleged plausible claims that Disney directly infringed, and actively induced infringement of, the MOVA Contour patents.**

12

13    **1.    Disney directly infringed the MOVA Contour patents under 35 U.S.C. § 271(a).**

14    **a.    Allegations that Disney directed and controlled DD3's conduct state a plausible claim for direct infringement by Disney.**

15    Rearden alleged that it owns the MOVA Contour patents.[31]  It alleged that the MOVA

16    Contour system and methods that DD3 used is an embodiment of the claims.[32]  This allegation is

17    supported by allegations confirming that the MOVA Contour system and methods that DD3 used

18    meet each limitation of at least one claim of each patent-in-suit.[33]  And each count alleges that (1)

19    Disney "contracted with DD3 to use the patented MOVA Contour facial motion capture system and

20    methods for facial motion capture," (2) "had the right and ability to supervise the infringing

21    conduct," (3) "had an obvious and direct financial interest in the exploitation of" the MOVA Contour

22    facial motion capture system, and (4) "DD3's unauthorized use of the MOVA Contour facial motion

23    capture system for facial motion capture … constitutes an act of direct infringement of one or more

24

25    [31] Rearden alleges that it owns five patents – United States Patent Nos. 7,548,272 (the "'272 Patent"), 7,567,293 ("the '293 Patent"), 7,605,861 (the "'861 Patent"), 8,207,963 ("the '963 Patent"), and 8,659,668 (the "'668 Patent") (collectively, "the MOVA Contour patents").  Dkt. 1 ¶¶ 60, 150, 170, 191, 212, 235.

26

27    [32] Dkt. 1 ¶¶ 152, 174, 193, 214, 237.

28    [33] Dkt. 1 ¶¶ 154-156, 174-177, 195-198, 216-221, 39-240.

1   claims of the [MOVA Contour patents]."[34]  These allegations state a prima facie case of direct

2   infringement against Disney under section 271(a) based on Disney's "direction and control" of DD3.

3           "Direct infringement under § 271(a) occurs where all steps of a claimed method are

4   performed by *or attributable to* a single entity."  *Akamai Technologies, Inc. v. Limelight Networks,*

5   *Inc.*, 797 F.3d 1020, 1023 (Fed. Cir. 2015) (*en banc*) (*per curiam*) ("*Akamai V*") (emphasis

6   supplied), citing *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1379–81 (Fed.Cir.2007) ("A

7   party cannot avoid infringement, however, simply by contracting out steps of a patented process to

8   another entity. *In those cases, the party in control would be liable for direct infringement.*"). "An

9   actor is liable for infringement under § 271(a) *if it acts through an agent (applying traditional*

10  *agency principles) or contracts with another to perform one or more steps of a claimed method*."

11  *Akamai V*, 797 F.3d at 1023, citing *BMC*, 498 F.3d at 1380–81; *see also Aristocrat Tech. Austl. Pty*

12  *Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1362 (Fed. Cir. 2013) ("for a party to be liable for direct

13  patent infringement under 35 U.S.C. § 271(a), that party must commit all the acts necessary to

14  infringe the patent, *either personally or vicariously*.") (quoting *Akamai Technologies, Inc. v.*

15  *Limelight Networks, Inc.*, 692 F.3d 1301, 1307 (Fed.Cir.2012)).[35]

16          Rearden alleges that Disney contracted with and acted through DD3 to perform acts that

17  practiced all of the limitations of the claims in the patents-in-suit, subject to Disney's direction and

18  control DD3.  That is all that is necessary to plead direct infringement against Disney.  *Wisconsin*

19  *Alumni Research Foundation v. Apple, Inc.*, 2017 WL 2438832, at *6 (W.D. Wis. June 6, 2017).

20          **b.     Allegations that Disney "used" the patented MOVA Contour system state
                    a plausible claim of direct infringement by Disney.**

21          Disney also *used* the MOVA Contour system, thereby directly infringing at least the system

22  claims.  Rearden alleged that the MOVA Contour system was in the possession of DD3, Disney

23  contracted with—was a *customer* of—DD3 to provide facial performance capture services and

24

25

26  _____

    [34] Dkt. 1 ¶¶ 157-160, 178-181, 199-202, 222-225, 241-244.

27  [35] The issue in *Akamai V* and *BMC* was whether direct infringement under § 271(a) could be
    attributed to a single infringer when two or more actors perform different steps of a method claim,
    known as "divided infringement."  No issue of divided infringement is presented here, as DD3

28  practiced all limitations of the claims of the patents-in-suit subject to Disney's direction and control.

outputs, and the MOVA Contour system that DD3 used infringed the patents-in-suit.[36]  And it alleged Disney incorporated MOVA Contour output into CG characters in films that earned Disney over $1.2 billion domestically.[37]  These allegations state a claim that Disney "used" the MOVA Contour system, and thus infringed the asserted system claims under section 271(a) and *Centillion Data Systems, LLC v. Qwest Communications Int'l, Inc*., 631 F.3d 1279 (Fed. Cir. 2011).

In *Centillion*, the patents-in-suit claimed "a system for presenting information ... to a user ... comprising:" 1) storage for transaction records, 2) data processing for generating summary reports, 3) means for transferring the transaction records and summary reports to a user, and 4) personal computer data processing to perform processing on the transaction records.  *Centillion*, 631 F.3d at 1281.  Centillion sued Qwest, accusing its billing systems. Qwest's billing systems had two parts: Qwest's back office systems and client applications that a user could install on a personal computer. Customers who contracted for the accused products had electronic billing information made available monthly. The district court granted summary judgment of non-infringement, holding "an accused infringer must either practice every element or control or direct the actions of another that practices the element in question," and neither Qwest nor its customers "used" the accused system because neither controlled *both* its front (customer applications) and back (Qwest) ends.  *Id.,* at 1282.

The Federal Circuit reversed the district court, holding that Qwest's customers "used" the accused system as a whole "as a matter of law."  *Centillion*, 631 F.3d at 1285. It ruled that the district court correctly defined a directly infringing "use" under section 271(a) to require control over the system as a whole and obtaining a benefit from it.  *Id.,* at 1284.  But the district court erred in requiring *physical or direct* control of the accused system by the infringer:

> The district court erred, however, by holding that in order to "use" a system under § 271(a), a party must exercise physical or direct control over each individual element of the system. *The "control" contemplated in NTP is the ability to place the system as a whole into service.* In other words, the customer in *NTP* remotely "controlled" the system by simply transmitting a message.

---

[36] Dkt. 1 ¶¶ 88, 158-160; 179-181; 200-202; 223-225; 242-244.

[37] Dkt. 1 ¶¶1-2, 4, 43-44, 54, 73, 96, 102, 112-13.

1   *Id.*, at 1284, citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282 (Fed.Cir.2005) (emphasis

2   supplied).  The appellate court found that Qwest's customers "used" the accused system as a whole

3   under section 271(a) based on their subscription contracts and demand for the Qwest service:

4       it is the customer-initiated demand for the service which causes the

5       back-end system to generate the requisite reports. This is "use"
        because, *but for the customer's actions, the entire system would never*

6       *have been put into service. This is sufficient control over the system*
        *under <u>NTP</u>, and the customer clearly benefits from this function.*

7   *Id.*, at 1285 (emphasis supplied).[38]

8       Disney contracted with DD3 to provide a service (performance capture and output) that used

9   the accused system (MOVA Contour system) here, like Qwest's customers who subscribed to

10  Qwest's billing information service that used the accused systems in *Centillion*.  Disney thus

11  contracted for "the ability to place the [MOVA Contour] system as a whole into service."  But for

12  Disney's actions, "the entire system would never have been put into service," and Disney "clearly

13  benefit[ed] from this function."  These facts allege sufficient control over the MOVA Contour

14  system to state a plausible claim that Disney directly infringes by using the system under *Centillion*.

15      **2.**    **Disney actively induced DD3's direct infringement under 35 U.S.C. §271(b).**

16          **a.**    **Rearden alleged facts from which the Court may reasonably infer that**
                 **Disney had actual knowledge of the MOVA Contour patents.**

17      Rearden pleads a set of facts that collectively support the reasonable inference that Disney

18  knew of Rearden's patents.  Disney's knowledge may be reasonably inferred from the following

19  allegations collectively:

20  1. Three of the five patents-in-suit had issued by October 20, 2009, the '272, '293, and '861

21     patents.  Dkt. 1, Ex. 4, 5, and 2.

22  2. Between 2009 and 2012, Disney contracted with Rearden to provide performance capture
       services and outputs in four films released after 2010: *TRON: Legacy* (2010), *Pirates of the*

23     *Caribbean: Stranger Tides* (2011), *John Carter* (2012), and *The Avengers* (2012).  Dkt. 1 ¶
       71.  **Before contracting with Rearden, Disney performed routine *<u>intellectual property</u>***

24

25  _____

26     [38] *See also Georgetown Rail Equipment Company v. Holland L.P.*, 867 F.3d 1229, 1239-4 (Fed.
    Cir. 2017) ("The fact that the transmission from the front-end to the back-end in this case involves

27  'physically remov[ing] the hard drives with data ... and ship[ping] them overseas to Rail Vision
    [Europe Ltd.]' is of no consequence.  The intermediary steps are still 'put into service' as a result of
    Holland's front-end collection and request for processing, demonstrating Holland's ultimate control

28  of, and derivation of benefit from, the system.") (citing *Centillion*, 631 F.3d at 1285).

1        ***due diligence*** investigations of the MOVA Contour technology.  Dkt. 1 ¶ 72.

2     3.  A fourth patent-in-suit issued on June 26, 2012.  Dkt. 1 Ex. 6.

3     4.  Late in 2012 or early 2013, Rearden employee Greg LaSalle approached Disney and
        Industrial Light and Magic ("ILM") to solicit their interest in acquiring the MOVA Contour
4        assets, which included patents, copyrights, trademarks, and other intellectual property.  Dkt. 1
        ¶ 90.  **Disney and ILM began negotiations to purchase the MOVA Contour assets.**  *Id.*

5     5.  On February 20, 2015, Shenzhenshi Haitecheng Science and Technology Co., Ltd ("SHST")
6        filed its declaratory judgment action against Rearden, alleging ownership of the MOVA
        Contour assets describing them as "patented" and referencing the MOVA Contour patents.

7     **6.  Rearden issued a demand letter dated March 27, 2013 to LaSalle that stated he had**
8        **unlawfully taken possession of the MOVA Contour assets, including "intellectual**
        **property."** Dkt. 1 at 90.[39]  **LaSalle provided that letter to Disney and ILM, and after**
9        **conducting *intellectual property due diligence*, they dropped out of negotiations to**
        **acquire the MOVA Contour assets.**  *Id.*, ¶¶ 90, 94, 100, 106.

10     7.  The fifth patent-in-suit issued to Rearden on February 25, 2014.  Dkt. 1 Ex. 3.

11     8.  Between February, 2013 and July 21, 2014, Disney contracted with DD3 to provide facial
12        performance motion capture and outputs for *Guardians of the Galaxy* using the MOVA
        Contour system and methods.  Dkt. 1, ¶¶ 93, 96.  **Prior to contracting with DD3, on**
13        **information and belief, Disney performed an *intellectual property due diligence* on the**
        **MOVA Contour technology.**  Dkt. 1 ¶¶161, 162; 182-183; 203, 204; 226, 227; 245, 246.

14     9.  Between February, 2013 and April 13, 2015, Disney contracted with DD3 to provide facial
15        performance motion capture and outputs for *Avengers: Age of Ultron* using the MOVA
        Contour system and methods.  Dkt. 1, ¶¶ 99, 102.  **Prior to contracting with DD3, on**
16        **information and belief, Disney performed an *intellectual property due diligence* on the**
        **MOVA Contour technology.**  Dkt. 1 ¶¶161, 162; 182-183; 203, 204; 226, 227; 245, 246.

17    **10. In February, 2015, the Academy of Motion Picture Arts and Sciences gave a technical**
18        **award to the MOVA Contour technology, citing *Guardians of the Galaxy*.**  Dkt. 1 ¶ 73.

19     11. On April 1, 2015, Rearden filed counterclaims against SHST alleging that it owned the
20        MOVA Contour patents and that use of the by SHST's licensee, DD3, was infringing.

21     12. Between February, 2013 and March 17, 2015, Disney contracted with DD3 to provide facial
        performance motion capture and outputs for *Beauty and the Beast* using the MOVA Contour
22        system and methods.  Dkt. 1, ¶¶ 105, 113.  **Prior to contracting with DD3, on information**
        **and belief, Disney performed an *intellectual property due diligence* on the MOVA**
23        **Contour technology.**  Dkt. 1 ¶¶161, 162; 182-183; 203, 204; 226, 227; 245, 246.

          Rearden is not required to *prove* its inducement case at the pleading stage.  *In re Bill of*
24 *Lading*, 681 F.3d at 1339.  It is sufficient to plead "enough 'fact[s] to raise a reasonable expectation
25 that discovery will reveal' that the defendant is liable for the misconduct alleged."  *Lifetime*
26 *Industries, Inc. v. Trim-Lok, Inc.*, 2017 WL 3908174, at *6-7 (Fed. Cir. 2017).  And Rearden is

27

28       [39] Defendants have urged the Court to take judicial notice of the content of the demand letter.

1    entitled to rely on reasonable inferences supported by its factual allegations.  *See, In re Bill of Lading*,

2    681 F.3d at 1340 ("failure to draw all reasonable inferences in favor of the non-moving party" is

3    error.).  Here, it is reasonable to infer that Disney, one of the world's most sophisticated dealers in

4    intellectual property, knew of the MOVA Contour patents based on its alleged *eight* intellectual

5    property due diligence investigations of the MOVA Contour technology. And it is reasonable to

6    expect that discovery of the results of these investigations will reveal Disney's knowledge of the

7    patents and culpability for actively inducing infringement.  *See, JDS Technologies, Inc. v. Avigilon*

8    *USA Corp.*, 2015 WL 3603525, *2 (E.D. Mich. June 5, 2015) ("JDS alleges they are competitors,

9    that Avigilon is aware of JDS patents and technology from JDS' marketing, appearance at trade

10   shows, as well as prior publicized litigation involving the patented technology.  This is all that is

11   required to plead a claim for indirect or induced infringement.").

12        Disney rejects reasonable inferences, and argues that pleading active inducement requires a

13   litany of factual details—a "document alerting Disney" to the patents and infringement (Dkt. 36 at

14   12), details describing Disney's due diligence investigations (*Id.* at 13), Disney's appreciation of "the

15   specific importance of the specific patents to the infringement at issue (*Id.*), "*who* learned that these

16   specific patents covered the DD3 process" (*Id.* at 14), and "*when* the purported 'due diligence'

17   occurred."  *Id.*  Such "who, what, where, when and how" allegations are "not required under the

18   general pleading standard of Rule 8(a)(2) that applies here."  *iSource Loans, LLC v. SunTrust Mortg.,*

19   *Inc.*, 2014 WL 3730289, at *3 (E.D. Va. March 10, 2014) (rejecting contention that patentee

20   pleading inducement must "identify the specific substance of these alleged 'communications,' how

21   they were allegedly communicated[,] ... when they were allegedly made, the names of the individuals

22   [...] who allegedly made them, or the names of the individuals [...] who allegedly received them.").

23        Rearden alleges that Disney conducted *three* intellectual property due diligence investigations

24   before contracting with DD3 to provide performance capture services and output in three successive

25   movies, which occurred after the patents-in-suit issued (or at least four of the five patents in the case

26   of *Guardians*), and after *four* prior due diligence investigations before Rearden motion capture

27   engagements on other films and a *fifth* during negotiation to purchase the technology.  Disney

28   challenges allegations of its due diligence on DD3 because those allegations are made on information

and belief.  Dkt. 36 at 13.  But the *Twombly* and *Iqbal* "plausibility standard allows factual allegations made 'upon information and belief' where (1) 'the facts are peculiarly within the possession and control of the defendant,' or (2) 'where the belief is based on factual information that makes the inference of culpability plausible.'"  *Clifton v. Houghton Mifflin Harcourt Publ'g Co.*, 152 F.Supp.3d 1221, 1223-24 (N.D. Cal. 2015); *Cisco Sys., Inc. v. STMicroelectronics, Inc.*, 2015 WL 3488923, at *4 (N.D. Cal. 2015); *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).

Here, although Disney had contracted with Rearden four times previously for MOVA Contour performance capture and output, it did not notify Rearden when DD3 showed up with the same technology under the same MOVA brand—*after Disney had backed out of acquiring that same technology because it learned that LaSalle had acquired it improperly*—for the films at issue here. So the particulars of what Disney did in its due diligence investigations of DD3 are "peculiarly within the possession and control of [Disney]," and pleading on information and belief is proper. Disney relies on *Delphix Corp. v. Actifo, Inc.,* 2014 WL 4628490 (N.D. Cal. Mar. 19, 2014) for the proposition that allegations made "on information and belief" are never sufficient, but *Delphix* relied on *Exergen Corp. v. WalMart Stores, Inc.*,575 F.3d 1312, 1330 (Fed.Cir. 2009), which confirmed that such allegations are permissible *even under the more stringent Rule 9(b) pleading standard* when, as here, "essential information lies uniquely within another party's control, but only if the pleading sets forth the specific facts upon which the belief is reasonably based." *Id.*

And Disney cites district court cases that hold pleadings insufficient to state plausible claims of induced infringement based on the absence of a particular allegation in the context of the pleadings in those cases.  Space does not allow Rearden to distinguish them individually here. Collectively, none of Disney's cases have found unchallenged allegations of three intellectual property due diligence investigations, conducted against a backdrop of *five* previous investigations and other facts to be insufficient to support an inference of knowledge of the patents-in-suit.

> **b.     Rearden alleged facts from which the Court may reasonably infer that Disney willfully blinded itself to infringement.**

Disney argues that Rearden's "willful blindness" allegations are insufficient because Rearden did not allege "that Disney believed these patents existed," and did not allege that Disney

1  "took affirmative steps to avoid learning about them."  Dkt. 36 at 15.  But Rearden *did* allege that

2  Disney knew of the probability that the MOVA Contour technology was patented, based on its

3  negotiation with LaSalle to purchase it, and having backed out of those negotiations after receiving

4  Rearden's demand letter stating that LaSalle had improperly taken possession of Rearden

5  "intellectual property."[40]  And Rearden alleged that Disney affirmatively avoided calling Rearden—

6  with which it had contracted for MOVA Contour services *four times* in the past—regarding the

7  "intellectual property" that LaSalle was peddling.[41]  This is sufficient to state a claim for willful

8  blindness.  *Unwired Plant, LLC v. Apple Inc.*, 2017 WL 1175379, at *1 (N.D. Cal. Feb. 14, 2017)

9  ("deliberate avoidance in the face of credible allegations" may constitute "deliberate action."); *Script*

10  *Security Solutions L.L.C. v. Amazon.com, Inc.*, 170 F.Supp.3d 928, 937-38 (E.D. Tex. 2016)

11  ("Taking all inferences in Script's favor, it has pleaded that the defendant took an affirmative action

12  to avoid gaining knowledge of the patents in suit—ignoring all patents as a matter of policy.").

13      Disney cites *Global-Tech*, but in that case, the Supreme Court found it sufficient for willful

14  blindness that the defendant had researched the patentee's product, copied an overseas version of the

15  product and failed to inform its IP clearance counsel that it had copied the patentee's product.  *E.g.,*

16  *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 770-71 (2011).  Similarly, in *Suprema, Inc.*

17  *v. International Trade Com'n*, 626 Fed.Appx. 273, 280-81 (Fed. Cir. 2015), the Federal Circuit

18  found it sufficient that the accused inducer had conducted market research concerning the

19  complainant's products and was aware of two patents related to the patent at issue in the litigation.

20  Here, Rearden's allegations support the reasonable inference that Disney knew of the MOVA

21  Contour patents, and that Disney contracted with DD3 to *use that system* (analogous to copying the

22  patented product in *Global-Tech*), while avoiding the simple step that it could have taken to obtain

23  clarity concerning DD3's rights—contacting Rearden.

24      Disney's cases are inapposite.  While it may be true that there is no duty to "sniff out a

25  potential patent," Rearden alleges facts showing how Disney learned of Rearden's patents, more than

26  did the plaintiff in *Boundaries Sols. Inc. v. CoreLogic, Inc.*, 2014 WL 7463708 (N.D. Cal. Dec. 30,

---

27  [40] Dkt. 1 ¶¶ 71-73.

28  [41] Dkt. 1 ¶ 91.

1   2014).  *Neology, Inc. v. Kapsch Trafficcom IVHS, Inc.*, 2014 WL 4675316 (D. Del. Sept. 19, 2014)

2   says little concerning willful blindness.  And in *Vasudevan Software, Inc. v. TIBCO Software Inc.*,

3   2012 WL 1831543 (N.D. Cal. May 18, 2012), the complaint conclusorily accused the defendant of

4   "taking deliberate action to avoid a known risk."  *Id.*, at *18.  But here, Rearden alleges that Disney

5   "deliberately acted" by avoiding contacting Rearden.

6                c.      **Rearden alleged facts from which the Court may reasonably infer that
                         Disney knew DD3 would infringe the MOVA Contour patents and
7                        intended the infringement.**

8        As shown in section 2.a above, Rearden alleges sufficient facts to support the inference that

9   Rearden knew of the MOVA Contour patents.  Those allegations, combined with Rearden's

10  allegations that Disney contracted with DD3 to provide facial performance capture and output using

11  the MOVA Contour system, support the reasonable inference that Disney intended to cause DD3's

12  infringement. As in *In re Bill of Lading*, "common sense" applied to the alleged facts supports an

13  inference that Disney knew that DD3's use of the MOVA Contour system would infringe Rearden's

14  patents.  *In re Bill of Lading*, 681 F.3d at 1341-42; *Potter Voice Technologies, LLC v. Apple Inc.*, 24

15  F.Supp.3d 882, 888 (N.D. Cal. 2014) ("By identifying the direct infringer, the mechanism by which

16  Apple encouraged the infringement, and by stating that Apple intended for infringement to occur,

17  PVT properly states a claim for induced infringement."); *Boundaries Solutions Inc. v. CoreLogic,

18  Inc.*, 2014 WL 4954017. At *4 (N.D. Cal. Sept. 29, 2014).

19       Disney contends that Rearden must allege detailed facts to plausibly plead intent.  Disney's

20  primary support for this contention, *Straight Path IP Grp., Inc. v. Apple Inc.*, 2016 WL 8729942

21  (N.D. Cal. Oct. 21, 2016), is both inapposite (because Rearden alleges facts showing that Disney had

22  reason to know of the MOVA patents, which was the element missing in *Straight Path*) and suspect

23  in light of the Federal Circuit's repeated reversals of district court rulings requiring such specificity

24  at the pleadings stage.  *In re Bill of Lading*, 681 F.3d at 1341 ("DriverTech is essentially arguing

25  that, at the pleading stage, R+L must allege facts that prove all aspects of its claims, or at the very

26  least make those claims probable. But that is not what is required."); *Lifetime Industries,* 2017 WL

27  3908174, at *7–8.  *Lifetime Industries* involved a patented window seal specially developed for

28  recreational vehicles. *Id.* at *1. The district court dismissed an indirect infringement claim where the

1    plaintiff alleged that the Trim-Lok was aware of the patents and assisted in the manufacture of the

2    accused product, but did not allege other facts that established Trim-Lok's knowledge that the

3    activity was infringing. *See id*. at *7. The Federal Circuit reversed, concluding that Plaintiff's

4    allegations that Trim-Lok knew of the patent, and that the accused product was manufactured after it

5    acquired that knowledge, supported the inference that "Trim-Lok also knew of the infringement."

6         "Intent need not, and rarely can, be proven by direct evidence. It is most often proven by 'a

7    showing of acts the natural consequences of which are presumably intended by the actor.'" *Merck &*

8    *Co. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1422 (Fed. Cir. 1989).  The intent required for

9    induced infringement may be proven using circumstantial evidence. *In re Bill of Lading*, 681 F.3d at

10   1336.  Moreover, "[t]he requisite intent to induce infringement may be inferred from all of the

11   circumstances*." Broadcom v. Qualcomm*, 543 F.3d 683, 699 (Fed. Cir. 2008), citing *Water Techs.*

12   *Corp. v. Calco, Ltd.*, 850 F.2d 660, 669 (Fed.Cir.1988); *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,

13   824 F.3d 1344, 1347 (Fed. Cir. 2016).  "At the motion to dismiss stage, the knowledge-of-

14   infringement requirement is generally satisfied if the allegations establish that the defendant was on

15   notice of the patent itself and subsequently assisted in practicing the infringing method." *Lifetime*

16   *Industries*, 2017 WL 3908174, at *7–8.

17        Disney's argument that the *SHST* litigation renders a finding of specific intent "implausible"

18   improperly invites the Court to weigh the evidence.  Disney argues that the litigation bolsters its

19   position on intent, but Rearden contends that the litigation made public the facts concerning the

20   nature and ownership of the MOVA patents.  Thus, Disney invites the Court to improperly determine

21   which outcome is more plausible.  *In re Bill of Lading*, 681 F.3d at 1340; *cf Unwired Planet, LLC v.*

22   *Apple Inc*., 829 F.3d 1353, 1363 (Fed. Cir. 2016) ("The district court erred by basing summary

23   judgment on its own estimation of the objective strength of Apple's noninfringement defense. The

24   proper focus of indirect infringement analysis is on the subjective knowledge of the accused

25   infringer, and the district court's conclusion that Apple's non-infringement defenses were strong at

26   most created a factual question as to Apple's own subjective beliefs.").

27

28

1

**D.      Rearden alleged plausible claims that Defendants infringed the MOVA trademark.**

2          Rearden has alleged each defendant used the MOVA mark for each trademark infringement

3  claim: *Terminator Genisys* (usage by a Paramount employee in an interview about the technology[42]);

4  *Fantastic Four* (usage of the MOVA mark in a featurette about the film[43]); *Deadpool* (usage of the

5  MOVA mark in both the film's end credits and a promotional featurette[44]); *Guardians of the Galaxy*

6  (usage of the MOVA mark in the film's end credits[45]);  *Beauty and the Beast* (repeated use of the

7  MOVA mark by Disney employees and agents in connection with promotion of the film[46]).

8          Defendants' attack on Rearden's trademark claims relies heavily on their nominative fair use

9  affirmative defense.  But determining whether defendants have met their burden on nominative fair

10  use "typically involves questions of law and fact, and determination on a motion to dismiss is

11  premature."  *See Elec. Arts, Inc. v. Textron Inc.*, No. C 12-00118 WHA, 2012 WL 3042668, at *5

12  (N.D. Cal. July 25, 2012). This dispenses with most of defendants' trademark challenges.

13          Defendants' remaining challenges improperly attack the *truth* of Rearden's allegations that

14  they used the MOVA mark, cherry-picking certain examples. They correctly identify an error in

15  paragraphs 262-263 of the Disney complaint, which state that the mark was used in the credits of

16  *Beauty and the Beast* and *Guardians of the Galaxy*, when in fact it was used only in *Guardians*. But

17  otherwise, the factual record establishes that Rearden has alleged use of the MOVA mark for both

18  films. Disney's *Beauty and the Beast* Blu-Ray featurette contains visual and narrative descriptions of

19  MOVA technology "in connection with commercial advertising and promotion… of their *Beauty and*

20  *the Beast* film." which use the MOVA mark extensively.[47] And while defendants note that a *Beauty*

21  *and the Beast* promotional video released to USA Today does not contain the MOVA mark, Rearden

22  never alleged that the mark was used in the video. Similarly, defendants argue that there are no

23  references to the MOVA mark in the *Terminator Genisys* featurette, but Rearden never alleged that

24          [42] Dkt. 1 ¶ 95 (Paramount).

25          [43] Dkt. 1 ¶ 103 (Fox).

26          [44] Dkt. 1 ¶¶ 112-114, 141-143 (Fox).

          [45] Dkt. 1 ¶¶ 259, 262-3 (Disney).

27          [46] Dkt 1 ¶ 2-3 (Disney).

28          [47] Dkt. 1 ¶¶ 2, 260 (Disney).

1    there was. Rather, the relevant paragraph of Rearden's complaint references mention of the MOVA

2    mark by the *Terminator Genisys* visual effects supervisor in a promotional interview with his

3    description of the process of capturing Arnold Schwarzenegger's face.[48]

4         Defendants argue that there are no references to the MOVA mark on the *Terminator Genisys*

5    Facebook page.  But in fact, the Facebook page contains numerous references and visual images of

6    the reverse-aging process for Schwarzenegger,[49] and corresponding links concurrent with the release

7    of a *Wired* magazine promotional video made with Paramount that uses the MOVA mark,[50] or public

8    statements by Paramount personnel specifically using the MOVA mark.[51]

9         Defendants devote only one sentence to the core issue of false endorsement: asserting that for

10   one allegation (by the actor Dan Stevens, that MOVA was used to capture his facial performance in

11   *Beauty and the Beast*) "does not suggest to any 'reasonably prudent consumer in the marketplace'"

12   that Rearden sponsored or endorsed *Beauty and the Beast*." Dkt. 36 at 18. But this contention

13   presents a factual issue, and on a motion to dismiss, the Court must accept Rearden's allegations as

14   true and draw the reasonable inference that a consumer may be misled into believing Rearden was

15   associated with or endorsed the "MOVA" performance captures used in the film.

16   **E.    If the Court finds that the complaint fails in any respect to allege plausible claims,
          Rearden requests leave to amend.**

17        Even when the district court finds a complaint's allegations deficient, "[i]t is black-letter law

18   that a district court must give plaintiffs at least one chance to amend a deficient complaint, absent a

19   clear showing that amendment would be futile."  *Nat'l Council of La Raza v. Cegavske*, 800 F.3d

20   1032, 1041 (9th Cir. 2015); *Zucco Partners,* 552 F.3d at 989.

21   **F.    The Court should not stay Rearden's infringement cases against Defendants.**

22        Defendants' request that the Court stay the studio and gaming company cases are contingent

23   on the Court's decision to stay the SHST/VGH case.  That motion has been fully briefed, and any

24   stay should be denied for the reasons stated in Rearden's briefs in SHST/VGH.

25   _____

26   [48] Dkt. 1 ¶ 3 (Paramount)

     [49] Dkt 1 ¶ 96 (Paramount)

27   [50] Dkt. 1 ¶ 96, fn. 29 (Paramount)

     [51] Dkt. 1 ¶ 3 (Paramount)

28

1

## IV.    CONCLUSION

2          For the reasons stated herein, the Court should deny defendants' motion to dismiss Rearden's

3     complaint, and refuse to stay these cases.

4     DATED:  October 16, 2017              HAGENS BERMAN SOBOL SHAPIRO LLP

5
                                           By /s/ Steve W. Berman
6                                               Steve W. Berman

7                                          Steve W. Berman (*pro hac vice*)
                                           Mark S. Carlson (*pro hac vice*)
8                                          HAGENS BERMAN SOBOL SHAPIRO LLP
                                           1918 Eighth Avenue, Suite 3300
9                                          Seattle, WA 98101
                                           Telephone:  (206) 623-7292
10                                          Facsimile:   (206) 623-0594
                                           steve@hbsslaw.com
11                                          markc@hbsslaw.com

12                                          Rio S. Pierce, CBA No. 298297
                                           HAGENS BERMAN SOBOL SHAPIRO LLP
13                                          715 Hearst Avenue, Suite 202
                                           Berkeley, CA 94710
14                                          Telephone:  (510) 725-3000
                                           Facsimile:   (510) 725-_3001___
15                                          riop@hbsslaw.com

16                                          *Attorneys for Plaintiffs*
                                           Rearden LLC and Rearden Mova LLC

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on this 16th day of October, 2017, I electronically transmitted the

3 foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4 Notice of Electronic Filing to the CM/ECF registrants for this case.

5

6 DATED: October 16, 2017                          /s/ Steve W. Berman
                                                    Steve Berman
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28