UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REARDEN LLC, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>THE WALT DISNEY COMPANY, et al.,<br><br>    Defendants. | Case No. 17-cv-04006-JST<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**<br><br>Re: ECF No. 36 |
| REARDEN LLC, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>TWENTIETH CENTURY FOX FILM CORPORATION, et al.,<br><br>    Defendants. | Case No. 17-cv-04191-JST<br><br>Re: ECF No. 17 |
| REARDEN LLC, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>PARAMOUNT PICTURES CORPORATION, et al.,<br><br>    Defendants. | Case No. 17-cv-04192-JST<br><br>Re: ECF No. 17 |

Now before the Court are the consolidated motions to dismiss by all the defendants in these three consolidated cases. The Court will grant the motions in part and deny them in part.

**I.    BACKGROUND**

This action centers on the MOVA Contour Reality Capture Program ("MOVA Contour" or "MOVA"), which – as the name suggests – is a program for capturing the motion of the human

face to create images used in motion pictures. Unlike previous motion capture technologies, the MOVA Contour Program "precisely captures and tracks the 3D shape and motion of a human face to sub-millimeter precision." No. 17-cv-04006 JST ECF No. 1 ("Disney Compl.") ¶ 22; No. 17-cv-04191 JST ECF No. 1 ("Fox Compl.") ¶ 22; No. 17-cv-04192 JST ECF No. 1 ("Paramount Compl.") ¶ 20. The MOVA Contour system captures "an actor's performance frame-by-frame, and then creates original Contour Program output files based on the performance, frame-by-frame." Disney Compl. ¶ 27; Fox Compl. ¶ 27; Paramount Compl. ¶ 25. The output files can be used for many different applications, such as "retargeting" the actor's face onto another real or fictional face. Disney Compl. ¶ 33; Fox Compl. ¶ 36; Paramount Compl. ¶ 34.

In many ways, this case is the successor to an earlier litigation between Rearden **ETC.** Beginning in February 2015, Rearden LLC engaged in a dispute with Shenzhenshi Haitiecheng Science and Technology Company ("SHST") over the ownership of the physical equipment and intellectual property associated with the MOVA technology.[1] See Shenzhenshi, et al. v. Rearden, et al., No. 15-CV-00797 JST, ECF No. 1 (N.D. Cal. Feb. 20, 2015). SHST is a Chinese entity associated with Digital Domain 3.0 Inc. ("DD3"). See Shenzhenshi, et al. v. Rearden, et al., No. 15-CV-00797 JST, ECF No. 427 (N.D. Cal. Aug. 11, 2017). On August 11, 2017, this Court found that "VGH does not own the Mova Assets because Rearden owns them." See id. at 18.

Now, Plaintiffs Rearden LLC and Rearden Mova LLC (collectively, "Rearden") bring suit against movie studios who allegedly contracted with DD3 "to provide facial performance capture services and output files made with the patented MOVA Contour system and methods." Disney Compl. ¶ 93; Fox Compl. ¶ 95; Paramount Compl. ¶ 92. Rearden alleges that this technology was used in major motion picture films including *Beauty and the Beast*, *Deadpool*, and *Terminator: Genisys*. Disney Compl. ¶ 105; Fox. Compl. ¶ 111; Paramount Compl. ¶ 92.

## II.   REQUEST FOR JUDICIAL NOTICE

Pursuant to Federal Rule of Evidence 201(b), "[t]he court may judicially notice a fact that

---

[1] The Statement of Decision in that case includes a summary of the facts underlying the ownership dispute. See Shenzhenshi, et al. v. Rearden, et al., No. 15-CV-00797 JST, ECF No. 427 (N.D. Cal. Aug. 11, 2017).

United States District Court
Northern District of California

is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." On a motion to dismiss, the court may also "consider materials incorporated into the complaint" when "the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed issues as to the document's relevance." Coto Settlement v. Eisenberg, 593 F.3d 1031, 1038 (9th Cir. 2010). This is true even if "the plaintiff does not explicitly allege the contents of that document in the complaint." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005). The court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). However, courts "cannot take judicial notice of the contents of documents for the truth of the matters asserted therein when the facts are disputed." Cal. Sportfishing Prot. All. v. Shiloh Grp., LLC, No. 16-CV-06499-DMR, 2017 WL 3136443, at *5 (N.D. Cal. July 24, 2017); see also Lee v. City of Los Angeles, 250 F.3d 668, 689-90 (9th Cir. 2001) (courts may not take judicial notice of disputed facts stated in public records).

Defendants request the Court judicially notice ten exhibits that the complaint incorporates by reference: (1) the March 27, 2013 letter; (2) the *Beauty and the Beast* motion picture DVD/Blu-ray disc set containing a featurette titled "Beauty of a Tale;" (3) an article with an embedded video entitled "Watch the crazy way '*Beauty and the Beast*' turned Dan Stevens into a monster"; (4) the *Deadpool* motion picture DVD/Blu-ray disc set containing a featurette titled "From Comics to Screen . . . to Screen: MAGIC!"; (5) the *Fantastic Four* motion picture Blu-ray disc containing a featurette titled "Powering up: Superpowers of the *Fantastic Four*;" (6) an article titled "Fantastic Five"; (7) the *Terminator: Genisys* DVD/Blu-ray disc set containing a featurette titled "Upgrades: VFX of *Terminator Genisys*"; (8) an article titled "*Terminator Genisys*: Sheldon Stopsack—VFX Supervisor—MPC"; (9) a video titled "*Terminator Genisys*: Creating a Fully Digital Schwarzenegger"; and (10) a video titled "How Benjamin Button Got His Face." ECF No.

1  37.[2] Rearden does not oppose these requests. The court will take judicial notice of the materials included and referenced in Exhibits 1 to 10.

### III. LEGAL STANDARD

While a complaint need not contain detailed factual allegations, facts pleaded by a plaintiff must be "enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While this standard is not a probability requirement, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks and citation omitted). In determining whether a plaintiff has met this plausibility standard, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. Knievel, 393 F.3d at 1072. If the motion to dismiss is granted, the court should grant leave to amend "even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." Doe v. United States, 58 F.3d 494, 497 (9th Cir. 1995) (internal quotation marks and citation omitted).

### IV. DISCUSSION

#### A. Copyright Infringement

To establish copyright infringement Plaintiff must prove (1) ownership of a copyright, and (2) copying of protectable expression by Defendants. See Design Data Corp. v. Unigate Enter., Inc., 847 F.3d 1169, 1173 (9th Cir. 2017). Defendants generally argue that Rearden's copyright claims fail because Rearden "cannot show that the copyright in the software program extends to the output files; and even if it could, Rearden cannot show that the CG characters or the movies are

---

[2] Unless otherwise noted, all electronic case filing number citations are to documents filed in Rearden LLC, et al., v. The Walt Disney Company, et al., Case No. 17-cv-04006.

derivative works of the film." ECF No. 36 at 14.  Rearden responds that it plausibly alleges that the MOVA Contour program performs substantially all the operations in creating the output and that this is enough to plead a plausible claim that Rearden is the author of the output.  ECF No. 47 at 12-13.  Rearden also argues that the "complaint includes detailed allegations explaining how the CG characters in defendants' films, incorporate, and are therefore derived from, the MOVA Contour program's outputs."  Id. at 20.

The Ninth Circuit recently acknowledged that some authorities "suggest that the copyright protection afforded a computer program may extend to the program's output if the program 'does the lion's share of the work' in creating the output and the user's role is so 'marginal' that the output reflects the program's contents."  Design Data Corp. v. Unigate Enter., Inc., 847 F.3d 1169, 1173 (9th Cir. 2017) (quoting Torah Soft Ltd. v. Drosnin, 136 F. Supp. 2d 276, 283 (S.D.N.Y. 2001).  The program at issue in Design Data produced two and three dimensional drawings and models of structural steel components and generated files that contained information related to a project.  Design Data Corp. v. Unigate Enter., Inc., 63 F. Supp. 3d 1062, 1063–64 (N.D. Cal. 2014), aff'd in part, rev'd in part, 847 F.3d 1169 (9th Cir. 2017).  The plaintiff argued that the program's copyright extended to its outputs, including the files and images generated by the program.  Id. at 1067.  The district court held that the files and other documents produced by the program are not covered by the copyright and that the drawings might be copyrightable "but they are not automatically entitled to protection as the output" of the program.  Id. at 1169.

On appeal the Ninth Circuit left open the question of whether copyright extends to a program's output.  See id. at 1173. ("Assuming, without deciding, that copyright protection does so extend. . . .").  However, the Ninth Circuit concluded that even if copyright protection could extend to a program's output, the plaintiff did not present evidence establishing that the program "'does the lion's share of the work'…or that the user's input is 'marginal.'"  Id. (quoting Torah Soft, 136 F. Supp. 2d at 283).

In Torah Soft, the software at issue created a matrix in response to an end user's input of a particular term.  Torah Soft, 136 F. Supp. 2d at 283.  The Southern District of New York found

that the defendant—the program's user—was not the author of the copyright. Id. In its analysis, the court emphasized the end-user's role in creating the matrix:

> In addition, an end-user's role in creating a matrix is marginal. Creating a matrix is unlike the creative process used in many computer art programs, which permit an end-user to create an original work of art in an electronic medium. It is fair to say that users of such programs often supply the lion's share of the creativity to create the screen display. By contrast, an end-user of the Software merely inputs a word or phrase which the Software searches for in the Database. Thus, the Software does the lion's share of the work. In short Drosin [the defendant] is not the author of the matrixes.

Id.

Rearden argues that under Torah Soft, it has adequately alleged that it owns the copyright in the MOVA Contour program output. ECF No. 47 at 15. Assuming that a copyright in a computer program may extend to its output, Rearden must adequately plead that the MOVA Contour program does the "lion's share" of the creating and that the end-user's role in creating the final product is "marginal." See Torah Soft, 136 F. Supp. 2d at 283. Defendants argue that "a person is directing the performance of another person (the actor) to make the various facial motions that determine the output. ECF No. 36 at 17. They contend that "[t]he human contribution to the expressive components of the output file is substantial and performs the 'lion's share of the creativity' in the facial motion capture" and that "[t]he human contribution cannot be deemed 'marginal' in any sense." Id. Rearden argues that the allegations focus "on the MOVA Contour program's generation of output . . . , which are (1) distinct from the two-dimensional images of the actors' performances captured by the MOVA Contour cameras, (2) generated by the Contour program by synthesizing the two dimensional camera captures into three-dimensional Captured Surface and Tracking Mesh outputs after the actors' performance and directors work—if any—is done, and thus (3) created entirely by the MOVA Contour program without any contribution from the actors or directors." ECF No. 47 at 17.

The Court does not find it plausible that the MOVA Contour output is created by the program without any substantial contribution from the actors or directors. Unquestionably, the MOVA program does a significant amount of work to transform the two dimensional information

1  captured on camera into three dimensional Captured Surface and Tracking Mesh outputs. But this
2  cannot be enough, since all computer programs take inputs and turn them into outputs. See 17
3  U.S.C. § 101 ("A 'computer program' is a set of statements or instructions to be used directly or
4  indirectly in a computer in order to bring about a certain result."). Here, Rearden must allege that
5  the MOVA program has done the "lion's share of the work," and in particular "the lion's share of
6  the creativity" in creating the outputs. See Torah Soft, 136 F. Supp. 2d at 283.

7  Rearden has not met this burden. Here, unlike in Torah Soft, where the user merely inputs
8  a word into the program, MOVA Contour's user inputs a two dimensional camera capture that
9  may range from Dan Stevens' "facial expressions of all the scenes we had done on previous days"
10 to the "subtle and dynamic motions performed by the actor [Josh Brolin playing Thanos in
11 Guardians of the Galaxy)" to "Brad Pitt's 44-year-old face." Disney Compl. ¶¶ 2, 4, 36.
12 Defendants' role in creating the end-product is not so 'marginal' that the output reflects the
13 program's contents." See Design Data Corp, 847 F.3d at 1173 (internal citations omitted).

14 Rearden argues that the allegations "mention" an actor but focus on the MOVA Contour's
15 program's generation of output that is distinct from any actor's performance or directors' work.
16 ECF No. 47 at 17. However, Plaintiffs repeatedly acknowledge the actors' contributions
17 throughout the complaints. See, e.g., Disney Compl. ¶ 2 ("film's romantic hero, the Beast, was a
18 CG (computer graphics) character played by actor Dan Stevens, with every human subtlety of his
19 facial performance carried through to the animal-like CG face of the Beast by a unique Oscar-
20 winning visual effects ("VFX") technology ); Disney Compl. ¶ 35, Fox Compl. ¶ 35, Paramount
21 Compl. ¶ 33 ("For example, if the performer's expression causes the cheeks to bulge out from a
22 smile, the 3D points on the mesh tracking the cheek will bulge out in exactly the same 3D shape.
23 If the forehead furrows into wrinkles, then the 3D points on the mesh tracking the forehead will
24 furrow into wrinkles in exactly the same 3D shape.); Disney Compl. ¶ 44, Fox Compl. ¶ 45,
25 Paramount Compl. ¶ 43 ("effectively, we ended up with a [Contour Program output file] 3D
26 database of everything Brad Pitt's face is capable of doing); Fox Compl. ¶ 57 ("The four
27 photographs below are still frames of Contour Program output or derivative thereof. The
28 subtleties of the facial expressions of the performer were precisely captured with the Contour

7

systems and methods and then retargeted to a CG face, retaining the subtleties of the human performance…"); Paramount Compl. ¶ 31, Fox Compl. ¶ 33, Disney Compl. ¶ 33 ("The performer provides her or his facial performance"); Paramount Compl. ¶ 35, Fox Compl. ¶ 37, Disney Compl. ¶ 37 ("The result is a 3D model of the face of the second performer that is controlled by the motion of the first performer's face).

Therefore, Rearden has not alleged that the program "'does the lion's share of the work'. . . or that the user's input is 'marginal.'" See Design Data Corp, 847 F.3d at 1173. Rearden has not alleged ownership of the output. The Court dismisses the copyright claims without prejudice.

### B.     Patent Infringement

The MOVA assets are also the subject of several patents. Disney Compl. ¶ 60. Rearden alleges that DD3 directly infringed one of more of these patents when it used the MOVA system without authorization. Id. ¶ 60. It alleges that Disney "had actual knowledge of, or was willfully blind to, the '861 Patent [Patent No. 7,605,861]" and that Disney "had actual knowledge that Rearden regarded the MOVA Contour facial motion capture system and methods to be embodiments of the claims of the '861 Patent." Id. ¶¶ 160, 161. Rearden also alleges that Rearden actively induced DD3's infringement of the '861 Patent. Id. ¶ 164.

Under the patent law, one is liable for direct infringement if she "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent." 35 U.S.C. § 271(a). One who actively induces infringement of a patent is also liable as an infringer. 35 U.S.C. § 271(b). "Inducement requires a showing that the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent." Vita-Mix Corp. v. Basic Holding, Inc., 581 F.3d 1317, 1328 (Fed. Cir. 2009). "Intent can be shown by circumstantial evidence, but the mere knowledge of possible infringement will not suffice." Id.

Throughout the complaint, Rearden makes reference to Disney's "direct and actively-induced infringements." See, e.g., Disney Compl. ¶¶ 165, 166, 186, 207. However, in its complaint Rearden only alleges claims under 35 U.S.C. § 271(b) and not under 35 U.S.C. §

271(a). Disney Compl. ¶¶ 164, 185, 206, 229, 248. In the motion to dismiss, Defendants argue that Rearden has no basis to allege direct infringement. ECF No. 26 at 26. In response, Rearden argues that Disney "directly infringed the MOVA Contour patents under 35 U.S.C. § 271(a)." ECF No. 47 at 22. Disney responds to this argument on reply. See ECF No. 54 at 12. Disney generally argues that Rearden fails to allege either direct or induced patent infringement. See ECF No. 54 at 12. The Court address each potential basis of liability in turn.

### 1.  Direct Infringement Claim

"Direct infringement under § 271(a) occurs where all steps of a claimed method are performed by or attributable to a single entity." Akamai Techs., Inc. v. Limelight Networks, Inc., 797 F.3d 1020, 1022 (Fed. Cir. 2015) (internal citations omitted). Divided infringement describes a situation in which more than one actor is involved in practicing the steps of the claimed method. Id. Courts "must determine whether the acts of one are attributable to the other such that a single entity is responsible for the infringement." Id. (internal citation omitted).

The court will "hold an entity responsible for others' performance of method steps in two sets of circumstances: (1) where that entity directs or controls others' performance, and (2) where the actors form a joint enterprise." Id. "To determine if a single entity directs or controls the acts of another," the court will consider the "general principles of vicarious liability," whether the alleged infringer "acts through an agent (applying traditional agency principles) or contracts with another to perform one or more steps of a claimed method)," or if the "alleged infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance." Id. at 1022-1023 (citing BMC Res., Inc. v. Paymentech, L.P., 498 F.3d 1373, 1379–81 (Fed. Cir. 2007).

Rearden first argues that "[a]llegations that Disney directed and controlled DD3's conduct state[s] a plausible claim for direct infringement by Disney" under Akamai. See ECF No. 47 at 22-23. To support this claim, Rearden quotes selectively from Akamai. See ECF No. 47 at 23 ("An actor is liable for infringement under § 271(a) if it . . . contracts with another to perform one or more steps of a claimed method"). However, Akamai is inapposite. The Akamai court explained that "its divided infringement analysis applies '[w]here more than one actor is involved

in practicing the steps' of the asserted method claim." Finjan, Inc. v. Sophos, Inc., 244 F. Supp. 3d 1016, 1044 (N.D. Cal. 2017) (quoting Akamai, 797 F.3d at 1022).[3] However, as Rearden recognizes, "[n]o issue of divided infringement is presented here, as DD3 practiced all limitations of the claims of the patents-in-suit subject to Disney's direction and control." ECF No. 47 at 23 n.35. Rearden has not adequately alleged direct infringement under Akamai. See also Finjan, 244 F. Supp. 3d at 1044 (acknowledging that plaintiff's efforts to "show direct infringement by demonstrating that [defendant's] customers perform all of the steps of the method claims" is actually "an indirect infringement claim, not a divided direct infringement claim" and Akamai does not apply).

Next, Rearden argues that its "allegations that Disney 'used' the patented MOVA Countour system state a plausible claim of direct infringement" under Centillion Data Systems, LLC v. Qwest Communications Int'l, Inc., 631 F.3d 1279 (Fed. Cir. 2011). ECF No. 47 at 23-25. In Centillion, the Federal Circuit considered "what constitutes 'use' of a system or apparatus claim under § 271(a)" and "its application of the rules of vicarious liability." Centillion, 631 F.3d at 1283. The Federal Circuit acknowledged that "'courts have interpreted the term use broadly.'" Id. (quoting NTP, Inc. v. Research In Motion, Ltd., 418 F.3d 1282, 1316 (Fed. Cir. 2005)). The court held that "to 'use' a system for purposes of infringement, a party must put the invention into service, i.e., control the system as a whole and obtain benefit from it." Id. at 1284 (internal citation omitted). However, to use a system under Section 271(a), a party is not required to "exercise physical or direct control over each individual element of the system." Id. Instead, "the end user must be using all portions of the claimed invention." Id.

The system at issue in Centillion had two parts, one of which was "an on-demand function where a customer seeks particular and specified information by creating a query that the Qwest back-end system processes and provides a result for download (on-demand operation)." Id. at 1285. The court held that the on-demand operation was a "use" under Section 271(a) because the

---

[3] Rearden also acknowledges this. See ECF No. 47 at 23 n.35 (The issue in Akami "was whether direct infringement could be attributed to a single infringer when two or more actors perform different steps of a method claim, known as divided infringement.").

customer put the system as a whole into service. Id. The customer controlled the system "by creating a query and transmitting it to" the back-end system. Id. It made no difference that the back-end processing was physically possessed by defendant. Id.

Here, Rearden alleges that Disney is using the MOVA Countour system under Section 271(a) because Disney contracted with DD3 "to provide facial performance capture services and outputs." ECF No. 47 at 23-24. Rearden compares Disney to the customers who subscribed to the accused system in Centillion. Id. at 25. However, the customers in Centillion "used" the system under Section 271(a) because the customers initially created a query, which was transmitted to the back-end system. Centillion, 631 F.3d at 1285. Rearden merely alleges that Disney contracted with DD3 to provide a service. See ECF No. 47 at 25. Disney didn't "use" the MOVA system or interact with it in any way, and it would stretch the boundaries of the patent law past their breaking point to equate a contract to provide services with the use of a system under Section 271(a). Rearden does provide case law supporting the notion that a contract does not shield a party from liability in cases of divided infringement. See ECF No. 47 at 23. But, as discussed above, that is not a divided infringement case. See id. at n35.

Accordingly, any direct infringement claims are dismissed without prejudice. See Zixiang Li v. Kerry, 710 F.3d 995, 999 (9th Cir. 2013) ("Dismissal under Rule 12(b)(6) is proper only when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory.").

### 2. Active Inducement

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C § 271(b). "Induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement." Glob.-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 766, (2011). This requires knowledge of the existence of the patent that is infringed. Id. See also Grecia v. VUDU, Inc., No. C-14-0775-EMC, 2015 WL 538486, at *6 (N.D. Cal. Feb. 9, 2015). To satisfy the knowledge requirement, either actual knowledge or willful blindness is required. Glob.-Tech Appliances, Inc., 563 U.S. at 768. The patent holder must also "prove that once the defendants knew of the patent, they actively and knowingly aided and abetted another's direct

infringement." DSU Med. Corp. v. JMS Co., 471 F.3d 1293, 1305 (Fed. Cir. 2006) (internal quotation marks and citations omitted). Knowledge of possible infringement is not enough; "specific intent and action to induce infringement must be proven." Id.

A defendant is not required to "prove its case at the pleading stage." In re Bill of Lading Transmission & Processing Sys. Patent Litig., 681 F.3d at 1339. The Iqbal/Twombly standard "unquestionably applies" to allegations of induced infringement. See Lifetime Indus., Inc. v. Trim-Lok, Inc., 869 F.3d 1370, 1380 (Fed. Cir. 2017). To survive a motion to dismiss, the complaint must contain facts "plausibly showing that [the defendant] specifically intended [the direct infringer] to infringe [the patent-in-suit] and knew that the [direct infringer's] acts constituted infringement." Grecia, 2015 WL 538486, at *7 (quoting In re Bill of Lading Transmission & Processing Sys. Patent Litig., 681 F.3d 1323, 1339 (Fed.Cir. 2012)).

Rearden alleges that Disney contracted with Rearden to operate the MOVA Contour system in four films released in 2010, 2011, and 2012. Disney Compl. ¶ 71. Prior to contracting with Rearden, Disney "performed a routine intellectual property diligence . . . in part to verify that Rearden and/or Rearden controlled affiliates owned MOVA Contour Assets and technology and had the right to use them for the benefit of the studios." Id. ¶ 72. Rearden also notes that it wrote LaSalle a demand letter asserting that Rearden owned the MOVA assets and that LaSalle's failure to turn over the acquired IP was a violation of his Proprietary Information and Inventions Agreement ("PIIA"). Id. ¶ 90. Rearden alleges that LaSalle notified Disney of the letter and that as a result, Disney dropped out of the running to acquire the MOVA assets.[4] Id.

Disney contracted with DDR "to use the MOVA Contour facial capture system" in three motion pictures. Disney Compl. ¶ 162. Rearden alleges "[o]n information and belief, before contracting with DD3, Disney MPG performed an intellectual property due diligence in part to confirm DD3's right to provide facial performance capture services and digital output made using

---

[4] Rearden supports this allegation by citing LaSalle's testimony in the related case, Shenzhenshi, et al. v. Rearden, et al., Case No. 15-CV-00797 JST. LaSalle testified that telling Disney about the letter caused Disney to drop out of negotiations to license or acquire the MOVA technology. See Shenzhenshi, et al. v. Rearden, et al., Case No. 15-CV-00797 JST. ECF No. 169 (N.D. Cal. Dec. 12, 2016).

the patented MOVA Contour system and methods and copyrighted Contour Program. Based upon its due diligence, Disney MPG knew or should have known that DD3 did not have the right to offer or provide facial performance capture services and output files made using the patented MOVA Contour system and copyrighted Contour Program." Disney Compl. ¶ 90. Rearden alleges that Disney's knowledge of the patents and knowledge or willful blindness to DD3's lack of authorization from any entity that could have owned MOVA confirms Disney's "specific intent to induce DD3" to infringe Rearden's patents by contracting with DD3 to use the MOVA Contour facial motion capture system. Disney Compl. ¶¶ 163, 184, 205, 228, 247. And, Rearden alleges that that DD3's unauthorized use of the MOVA Countor program in the *Guardians of the Galaxy*, *Avengers: Age of Ultron*, and *Beauty and the Beast* motion pictures constitutes an act of direct infringement of one or more claims of the '861, '293, '272, '668, '963 patents. See id. ¶¶ 160, 181, 202, 225, 244.

Rearden is not required to "prove its case at the pleading stage," and the court must draw all reasonable inferences in Rearden's favor. In re Bill of Lading Transmission & Processing Sys. Patent Litig., 681 F.3d at 1339-40. Plaintiff alleges that Disney conducted intellectual property due diligence before contracting with both Rearden and DD3, and it negotiated with LaSalle to purchase the MOVA technology.[5] Assuming the truth of these allegations, it is not an unreasonable inference that Disney became aware of Rearden's patents, and continued to be aware that the MOVA technology was patented when it contracted with DD3. The allegations are inarguably thin, but they are enough to survive a motion to dismiss.

Further, it is not unreasonable to infer that by contracting with DD3 to use the MOVA Contour facial motion capture system, Disney intended and acted to induce infringement. Rearden alleges that after Disney learned of the patents, Disney "assisted or directed" in the infringement by contracting with DD3 to provide facial performance motion capture and outputs. See Disney Compl. ¶ 162. This is sufficient to plead intent to infringe. See Lifetime Indus., Inc.

---

[5] The Court has its doubts that Disney actually engaged in the kind of intellectual property due diligence with either Rearden or DD3 that plaintiff alleges, but nonetheless concludes that the allegation survives an Iqbal/Twombly challenge.

v. Trim-Lok, Inc., 869 F.3d at 1380.[6]

The Court acknowledges Disney's contention that "[i]t took more than a year of litigation and a bench trial before this Court concluded that Rearden, and not DD3, owned the rights to MOVA. It makes no sense to claim that Disney must have reached that conclusion based on an unspecified IP diligence or the Demand Letter (assuming Disney even received a copy)." ECF No. 36 at 26. This is one plausible explanation for Disney's actions. However, Rearden has alleged plausible inferences and "[n]othing in Twombly or its progeny allows a court to choose among competing inferences as long as there are sufficient facts alleged to render the non-movant's asserted inferences plausible." In re Bill of Lading Transmission & Processing Sys. Patent Litig., 681 F.3d at 1340. "That alternative inferences from those facts [are] also reasonable [does] not render the complaint deficient." Id.

The Court also acknowledges Disney's arguments that Rearden has not alleged every factual detail about how Disney became aware of the patents. See ECF No. 36 at 21-24. However, the plaintiff may "plead facts 'alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible.'" Kelsey K. v. NFL Enterprises, LLC, 254 F. Supp. 3d 1140, 1143 (N.D. Cal. 2017) (quoting Soo Park v. Thompson, 851 F.3d 910, 928–29 (9th Cir. 2017)).

Therefore, the Court finds that Rearden has sufficiently alleged active inducement. The motion to dismiss the indirect inducement claims is denied.

**C.     Trademark Infringement**

"To prevail on its claim of trademark infringement, the [plaintiff] must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion, thereby infringing upon the State's rights to the mark." Dep't

---

[6] Rearden attributed the following quotation to the Federal Circuit: "At the motion to dismiss stage, the knowledge-of-infringement requirement is generally satisfied if the allegations establish that the defendant was on notice of the patent itself and subsequently assisted in practicing the infringing method." See ECF No. 47 at 31. This quote was taken from a Northern District of Illinois case. See Sonrai Sys., LLC v. AMCS Grp. Inc., No. 16 C 9404, 2017 WL 4281122 at *7 (N.D. Ill. Sept. 27, 2017).

14

of Parks & Recreation for State of California v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1124 (9th Cir. 2006). When the defendant "uses a trademark to describe the plaintiff's product, rather than its own, we hold that a commercial user is entitled to a nominative fair use defense provided he meets the following three requirements: First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." New Kids on the Block v News America Pub., Inc., 971 F.2d 302, 308 (9th Cir. 1992). The burden is on the plaintiff to show that the defendant's conduct fails to meet at least one of the three requirements. LifeScan, Inc. v. Shasta Techs., LLC, No. 12-CV-06360-JST, 2013 WL 12201564, at *5 (N.D. Cal. May 21, 2013).

Nominative fair use analysis usually "involves questions of law and fact, and determination on a motion to dismiss is premature. An exception exists where simply looking at the work itself, and the context in which it appears, demonstrates how implausible it is that a viewer will be confused into believing that the plaintiff endorsed the defendant's work." Elec. Arts, Inc. v. Textron Inc., No. C 12-00118 WHA, 2012 WL 3042668, at *5 (N.D. Cal. July 25, 2012) (internal quotation marks and citations omitted).

Here, Defendants defend themselves against Rearden's individual trademark claims by asserting fair use and/or disputing the truth of Rearden's factual allegations. See ECF No. 36 at 27-29. The Court will address each claim individually.

### 1. Claims Against Disney

#### a. MOVA Service Mark in the *Guardians of the Galaxy* Credits

Rearden alleges that Disney used Rearden's MOVA service mark on the credits for *Guardians of the Galaxy*.[7] Disney Compl. ¶¶ 259, 262, 263. Disney argues that "the credits used 'Mova' to describe a company, not a technology—a use that could not create a likelihood of

---

[7] Rearden's complaint also alleges that the MOVA mark was also used in the credits of *Beauty and the Beast*. Compl. ¶¶ 262-63. Rearden now acknowledges that this was an error. ECF No. 47 at 32. Any trademark infringement claims supported by the alleged use of the MOVA mark in the *Beauty and the Beast* credits are dismissed with prejudice.

confusion that Rearden sponsored the movie." ECF NO. 36 at 28.  Disney also argues that this is nominative fair use because MOVA is the name of a technology.  Id.  Rearden argues that nominative fair use typically is not decided on a motion to dismiss.  ECF No. 32 at 35.

Rearden has alleged that the MOVA mark is exclusively associated with Rearden.  Disney ¶ 257.  It is plausible that a viewer might believe that Rearden endorsed *Guardians of the Galaxy* after watching the film's credits and seeing the MOVA mark.  Dismissal at this stage of the proceedings is therefore premature.

### b. MOVA Service Mark in the *Beauty of the Beast* Featurette

Rearden alleges that Disney used the MOVA service mark "in commerce in their *Beauty of the Beast* featurette in connection with commercial advertising and promotion of their Beauty and the Beast film."  Disney Compl. ¶ 260.  Disney argues that the featurette does not use the MOVA trademark.  ECF No. 36 at 28.  Rearden argues that the featurette "contains visual and narrative descriptions of the technology."  ECF No. 47 at 32.  Disney responds that "describing the technology without referring to the mark is not using the mark."  ECF No. 54 at 18.

To prevail on a trademark infringement claim, Rearden must show that Disney used the Rearden trademark.  See New Kids on the Block, 971 F.2d at 308.  Rearden has not alleged that Disney used the mark in the featurette.  The trademark may include more than a distinct word, for example, the Ninth Circuit has explained that under the nominative fair use doctrine "a soft drink competitor would be entitled to compare its product to Coca-Cola or Coke, but would not be entitled to use Coca-Cola's distinctive lettering."  Id. at 308, n.7.  However, Rearden has only alleged that the featurette contains visual and narrative descriptions of the technology.  ECF No. 47 at 32.  Rearden has not alleged that Disney used the trademark in the featurette.  Therefore, any trademarks claims relying on the featurette are dismissed without prejudice.

### c. MOVA Service Mark in the Commercial Advertising and Promotion of *Guardians of the Galaxy* and *Beauty and the Beast*

Rearden alleges that Disney, acting directly or through entities subject to its control, used Rearden's MOVA service mark "in connection with commercial advertising and promotion of its *Guardians of the Galaxy* and *Beauty and the Beast* film including press releases, press

1  conferences, and other advertising and promotional activities." Disney Compl. ¶¶ 261, 264.
2  Rearden references a press conference where Dan Stevens, the actor portraying Beast, states that
3  the facial capture "was done separately using a technology called MOVA." Disney Compl. ¶ 2.
4  Disney argues that Steven's use of MOVA is protected as nominative fair use. ECF No. 36 at 27.
5  For the reasons discussed above, the Court finds that this particular nominative fair use analysis is
6  premature. It is not implausible that a viewer will be confused into believing that Rearden
7  endorsed *Beauty and the Beast*. See Elec. Arts, Inc., 2012 WL 3042668, at *5. Thus, the motion
8  to dismiss with regard to this specific allegation is denied.

### 2. Claims Against Fox

#### a. MOVA Service Mark in the *Deadpool* Credits

Rearden alleges that Fox used the MOVA Service mark in the credits of *Deadpool*. Fox Compl. ¶ 141. Fox argues that this use is nominative fair use. ECF No. 36 at 28. For the reasons discussed above, this particular nominative fair use analysis is premature. See Elec. Arts, Inc., 2012 WL 3042668, at *5.

#### b. MOVA Service Mark in the Commercial Advertising and Promotion of *Fantastic Four*, Including the Featurette

Rearden alleges that Fox "acting either directly or in concert with entities subject to their supervision and control, used Rearden's MOVA service mark in commerce in connection with commercial advertising and promotion of their *Fantastic Four* film, including at least the Blu-ray featurette." Fox Compl. ¶ 142. Fox concedes that "[t]he word appears in a few images, in the bottom of the corner of the screen, within the context of speakers in the video describing the MOVA technology" but argues that this is nominative fair use. ECF No. 29 at 30. Fox argues that this is fair use because it is referencing the technology, not Fox's products. ECF No. 36 at 28. Rearden alleges that "Rearden Mova's MOVA service mark has acquired secondary meaning indicating that Rearden is the exclusive origin of the MOVA Contour facial performance capture technology and services." Fox Compl. ¶ 140. It is not implausible that a viewer will be confused into believing that Rearden endorsed *Fantastic Four*. Therefore, dismissal at this stage is premature. See Elec. Arts, Inc., 2012 WL 3042668, at *5.

Rearden also alleges that Fox used the MOVA Service Mark in "connection with commercial advertising and promotion of their *Fantastic Four* film." Rearden references an article with comments made by a Visual Effects Supervisor about a "MOVA session." Fox Compl. ¶ 103. Fox argues that this is nominative fair use. ECF No. 36 at 29. Given the context of this comment, it is not implausible that a viewer will be confused into believing that Rearden endorsed *Fantastic Four*. Thus, the motion to dismiss with regard to this specific allegation is denied.

### c.  MOVA Service Mark in the *Deadpool* Featurette

Rearden alleges that Fox used the MOVA service mark in the promotional Blu-Ray featurette for *Deadpool*. Fox. Compl. ¶¶ 112, 143, 144. Fox concedes that "a visual effects supervisor referred to 'MOVA,' and that a 'MOVA" mark briefly appears in the Blu-ray featurette." ECF No. 36 at 28. Fox argues that these are nominative fair uses because the visual effects supervisor was referencing the technology and not Fox's products. Id. For the reasons discussed above, dismissal at this stage is premature. See Elec. Arts, Inc., 2012 WL 3042668, at *5.

### 3. Claims Against Paramount

Rearden alleges that Paramount "acting either directly or in concert with entities subject to their supervision and control, used Rearden's MOVA service mark in commerce in connection with commercial advertising and promotion of their *Terminator: Genisys* film," including promotional materials, press interviews and social media posts. Paramount Compl. ¶¶ 126-127. The complaint includes three specific allegations.

First, Rearden alleges that Paramount used the mark when Sheldon Stopstack, a VFX Supervisor, stated that "we had the opportunity to do a MOVA performance capture with Arnold Schwarzenegger himself." Compl. ¶ 95. Paramount argues that this is nominative fair use because Stopsack "simply used 'MOVA' as the name for the technology." ECF No. 29 at 30. Rearden alleges that "Rearden Mova's MOVA service mark has acquired secondary meaning indicating that Rearden is the exclusive origin of the MOVA Contour facial performance capture technology and services." Paramount Compl. ¶ 125. As discussed above, it is not is not

18

implausible that a viewer will be confused into believing that Rearden endorsed *Terminator: Genisys*. Dismissal at this stage is premature. See Elec. Arts, Inc., 2012 WL 3042668, at *5.

Second, Rearden alleges that Paramount used the mark in promotional materials provided to the press for videos including: "*Terminator Genisys*: Creating a Fully Digital Schwarzenegger." Compl. ¶ 126. Paramount concedes that the video refers to MOVA, but argues that "the statement in the video is WIRED's not Paramount's, and the references to MOVA in any event would be nominative fair use." ECF No. 36 at 29. Rearden alleges that the video's MOVA references stem from output stills that were labeled with "MOVA" by Paramount. Compl. ¶ 96. Paramount does not dispute this argument on reply, but repeats its nominative fair use argument. ECF No. 54 at 18. As discussed above, a nominative fair use analysis at this stage is premature. See Elec. Arts, Inc., 2012 WL 3042668, at *5.

Finally, Rearden alleges that Paramount used the MOVA service mark in "promotional social media pages." Paramount Compl. ¶ 126. Paramount argues that the only example provided does not include "MOVA" at all. ECF No. 26 at 29. Rearden argues that "the Facebook page contains numerous references and visual images of the reverse-aging process for Schwarzenegger, and corresponding links concurrent with the release of a WIRED magazine promotional video made with Paramount that uses the MOVA mark, or public statements by Paramount personnel specifically using the MOVA mark."[8] However, as discussed above, to prevail on a trademark infringement claim, Rearden must show that Paramount used the trademark. See New Kids on the Block, 971 F.2d at 308. Rearden has not sufficiently alleged that Paramount used the trademark in its social media pages. Any trademarks relying on this claim are dismissed without prejudice.

## CONCLUSION

The copyright infringement claims against all Defendants are dismissed without prejudice. The direct infringement claims against Disney are dismissed without prejudice. The motion to

---

[8] The Complaint contains a link to the *Terminator Genisys* Facebook page. See Paramount Compl. ¶ 127. This page is constantly being updated with new content and the Court was not able to find the exact content cited by Rearden in its argument. The Court encourages Rearden to provide screen shots of any specific uses of the trademark in any future proceedings.

dismiss the active inducement claims is denied.  The trademark claims infringement claims relying on the *Beauty and the Beast* credits, *Beauty and the Beast* featurette, and the *Terminator Genisys* Facebook pages are dismissed.  Dismissal of any of the other trademark infringement claims at this stage is premature.

**IT IS SO ORDERED.**

Dated: February 21, 2018

_____
JON S. TIGAR
United States District Judge