# EXHIBIT 1

1 | Steve W. Berman (*pro hac vice*)
Mark S. Carlson (*pro hac vice*)
2 | HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
3 | Seattle, WA 98101
Telephone: (206) 623-7292
4 | Facsimile: (206) 623-0594
steve@hbsslaw.com
5 | markc@hbsslaw.com

6 | Rio S. Pierce, CBA No. 298297
HAGENS BERMAN SOBOL SHAPIRO LLP
7 | 715 Hearst Avenue, Suite 202
Berkeley, CA 94710
8 | Telephone: (510) 725-3000
Facsimile: (510) 725-3001
9 | riop@hbsslaw.com

10 | *Attorneys for Plaintiff*
Rearden LLC and Rearden Mova LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| REARDEN LLC, REARDEN MOVA LLC, California limited liability companies,<br><br>Plaintiffs,<br><br>v.<br><br>THE WALT DISNEY COMPANY, a Delaware corporation, WALT DISNEY MOTION PICTURES GROUP, INC., a California corporation, BUENA VISTA HOME ENTERTAINMENT, INC. a California corporation, MARVEL STUDIOS, LLC, a Delaware limited liability company, MANDEVILLE FILMS, INC., a California corporation,<br><br>Defendants.<br><br>REARDEN LLC and REARDEN MOVA LLC,<br><br>Plaintiffs,<br><br>v. | Case No. 3:17-cv-04006-JST<br>            3:17-cv-04191-JST<br>            3:17-cv-04192-JST<br>            3:17-cv-04187-JST<br><br>**DECLARATION OF STEPHEN G. PERLMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO ISSUE THIRD PARTY SUBPOENAS** |

| | |
|---|---|
| 1 | |
| 2 | TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware corporation and TWENTIETH CENTURY FOX HOME ENTERTAINMENT LLC, a Delaware limited liability company, |
| 3 | |
| 4 | |
| 5 | Defendants. |
| 6 | REARDEN LLC and REARDEN MOVA LLC, |
| 7 | Plaintiffs, |
| 8 | v. |
| 9 | PARAMOUNT PICTURES CORPORATION, a Delaware corporation, and PARAMOUNT HOME ENTERTAINMENT DISTRIBUTION INC. a Delaware corporation, |
| 10 | |
| 11 | |
| 12 | Defendants. |
| 13 | REARDEN LLC, REARDEN MOVA LLC, California limited liability companies, |
| 14 | |
| 15 | Plaintiffs, |
| 16 | v. |
| 17 | CRYSTAL DYNAMICS, INC., a California corporation, SQUARE ENIX INC., a Washington Corporation, |
| 18 | |
| 19 | Defendants. |

DECLARATION OF STEVEN G. PERLMAN IN SUPPORT OF
PLAINTIFFS' MOTION FOR LEAVE
TO ISSUE THIRD PARTY SUBPOENAS
Case No.: 3:17-cv-04006-JST, 3:17-cv-04191-JST, 3:17-cv-04192-JST, 3:17-cv-04187-JST

I, Stephen G. Perlman, declare as follows:

1. I am Chief Executive Officer of the plaintiff Rearden LLC, which controls the plaintiff Rearden Mova LLC. I have personal knowledge of the facts stated in this declaration, and could testify with respect to those facts under oath if called upon to do so.

2. A major technology focus of Rearden from its 1999 founding to this day is "performance motion capture," a production technology typically used to create a 3D animated character in a movie or a videogame that moves exactly like a human performer. In 2000, Rearden began offering motion capture services for movies and videogames (through wholly-owned subsidiaries Rearden Studios and then MOVA LLC) using existing commercial "marker-based" motion capture systems that could capture and track body ("skeletal") motion. But there was no known technology at that time that could capture and track the subtleties of human facial motion in a realistic, life-like manner.

3. Over the next five years, Rearden's technical team conceived and perfected a technology that precisely captures and tracks the 3D shape and motion of a human face to sub-millimeter precision, producing photorealistic results. Rearden branded the technology Contour Reality Capture, and offered it to the videogame and motion picture industries.

4. The Contour system includes over 60 half-terabyte drives in over thirty-five Contour computers. The Contour computers control the lighting and camera shutters of the Contour apparatus, capture an actor's performance in grayscale and color two-dimensional video works, and process the grayscale captures into three-dimensional works as well as perform other functions related to the Contour systems operation. Other Contour computers are used for business, promotion, R&D, further data processing, and other purposes.

5. Greg LaSalle was an employee of Rearden or Rearden-controlled companies who operated the Contour system and managed aspects of Rearden's performance motion capture business under my supervision. Ken Pearce was an employee of Rearden or Rearden-controlled companies who processed Contour output works and worked with Mr. LaSalle. Rearden or a

Rearden-controlled company provided each with a computer for use in its performance motion capture business.

6. Between 2006 and August, 2012, Rearden-controlled entities Rearden Studios LLC and then MOVA LLC offered performance motion capture services and works to the motion picture and videogame industries. In the ordinary course of business, we generated documents such as trade show promotional images, video demonstrations, and brochures; photo and video records of Contour shoots; bid sheets to solicit business on motion picture and videogame projects; contracts for performance motion capture; and related correspondence and communications. These files were stored on the hard drives of the Contour computers and the Rearden computers used by Messrs. LaSalle and Pearce, and on other Rearden digital storage media.

7. Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by Paramount Pictures and/or their agents ("Paramount") for *The Curious Case of Benjamin Button* (2008) and *Transformers: Dark of the Moon* (2011).

8. Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by Universal Studios and/or their agents in *The Incredible Hulk* (2008) and *Snow White and the Huntsman* (2012).

9. Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by 20th Century Fox and/or their agents ("Fox") in *Percy Jackson and the Olympians: The Lightning Thief* (2010).

10. Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by Sony Pictures and/or their agents in *The Amazing Spider-Man* (2012).

11. Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by Warner Brothers Studios and/or their agents in *Harry Potter and the Deathly Hallows*, Part 1 (2010) and Part 2 (2011), *Green Lantern* (2011), *Jack the Giant Slayer* (2013), and *Gravity* (2013).

12. And Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by defendants The Walt Disney Company and Walt Disney Motion Picture Group and/or their agents ("Disney") in *TRON: Legacy* (2010), *Pirates of the Caribbean: On Stranger Tides* (2011), *John Carter* (2012), and *The Avengers* (2012) (including defendant Marvel).

13. Data, files, and business records related to Rearden's work on the above films were stored on the Contour computers, LaSalle and Pearce's Rearden computers, and on other Rearden digital storage media.

14. At some point in the Fall of 2012, Messrs. LaSalle and Pearce formed a plan to take possession of the Contour system, intellectual property, and other assets, for themselves. When Rearden learned of the plan, Pearce's employment was terminated. LaSalle denied knowledge of the plan and thereby escaped termination, but as I now know, he continued to work secretly on it.

15. LaSalle has testified that from "September of 2012… [u]ntil sometime in April of 2013" he spoke to "The CTO of the Walt Disney Company," "[s]omebody at Industrial Light and Magic, and the president of Digital Domain" about "potential partnerships or acquistions of [the] Mova [Assets]." Ken Pearce testified that "after October 2nd[, 2012] – [he] talked with ILM and Disney about the Mova assets." LaSalle testified that his "discussions with Digital Domain, Industrial Light and Magic and Walt Disney" were exclusively "about licensing or acquiring [the Mova asset]." Former DD3 Chairman Seah Ang testified that in "early 2013", then DD3 CEO Ed Ulbrich told him that "Mova is for sale and … if we don't take this asset, this asset will soon go to our competitor … Industrial Light & Magic, and also Disney." On February 1, 2013, Pearce emailed Disney's Chief Technical Officer, Andy Hendrickson, to set up a conference to discuss Disney acquiring "all the MOVA assets (patents, software, etc.)." Hendrickson had been talking internally at Disney "about MOVA," and agreed to confer with LaSalle on February 14, 2013.

16. Also on February 14, 2013, LaSalle informed me that he intended to take possession of the Contour system, and intellectual property, and other assets for himself. On March 27, 2013, Rearden's attorneys wrote LaSalle a demand letter (the "Rearden Demand Letter") asserting that

DECLARATION OF STEVEN G. PERLMAN IN SUPPORT OF
PLAINTIFFS' MOTION FOR LEAVE
TO ISSUE THIRD PARTY SUBPOENAS - 3
Case No.: 3:17-cv-04006-JST, 3:17-cv-04191-JST, 3:17-cv-04192-JST, 3:17-cv-04187-JST

1  LaSalle was in unauthorized possession of Rearden's "performance motion capture intellectual

2  property." LaSalle testified that when he showed the Rearden Demand Letter to Disney, Disney and

3  its subsidiary Industrial Light and Magic backed out of negotiations to acquire or license the Contour

4  technology.

5        17.    LaSalle further testified that he then negotiated a transaction with Digital Domain 3.0,

6  Inc. ("DD3"), in which he purported to sell the Contour system and associated intellectual property

7  to an alleged affiliate company called Shenzhenshi Haitiecheng Science and Technology Co., Ltd.

8  ("SHST") in May 2018, who then licensed the Contour system and intellectual property back to

9  DD3, and Messrs. LaSalle and Pearce became employees of DD3 responsible for operating a

10 performance motion capture business using Rearden's Contour system, methods, and program.

11 When LaSalle and Pearce left Rearden's employment, they took their Rearden computers and all

12 data stored on them with them. They and/or accomplices also took all of the physical assets,

13 including Contour apparatus, computers, disk drives, and related equipment from a storage unit and

14 delivered them to DD3's Los Angeles studios.

15       18.    Between 2013 and through at least the Preliminary Injunction Order in mid-2016,

16 DD3, acting through LaSalle and Pearce, solicited and contracted for facial performance capture

17 projects with at least the defendants in this case. DD3 solicited and entered contracts with Disney for

18 facial performance capture using the Contour system, methods, and program for *Guardians of the*

19 *Galaxy*, *Avengers: Age of Ultron*, and *Beauty and the Beast*. It solicited and entered contracts with

20 Fox for *The Fantastic Four*, *Night at the Museum: Secret of the Tomb*, and *Deadpool*. It solicited

21 and entered contracts with Paramount for *Terminator: Genisys*. And it solicited and entered

22 contracts with Crystal Dynamics and/or its agents ("Crystal") for *Rise of the Tomb Raider*.

23       19.    In the performance of its contracts with Disney, Fox, Paramount, and Crystal, DD3

24 would necessarily have created Contour capture and processed works that, based on my knowledge

25 and experience, would have consisted of many terabytes of files. For example, a single 76-second

DECLARATION OF STEVEN G. PERLMAN IN SUPPORT OF
PLAINTIFFS' MOTION FOR LEAVE
TO ISSUE THIRD PARTY SUBPOENAS - 4
Case No.: 3:17-cv-04006-JST, 3:17-cv-04191-JST, 3:17-cv-04192-JST, 3:17-cv-04187-JST

"take" of performer Dan Stevens on June 14, 2016[1] resulted in Contour computers storing over 40 gigabytes of capture data on their disk drives. 25 takes of that duration would result in over one terabyte of data, and Contour was used for far more than 25 takes in *Beauty and the Beast* alone. These files would have been stored at least initially on the hard drives of Rearden's Contour computers.

20. DD3's alleged affiliate, SHST, filed a declaratory judgment action against Rearden and various other Rearden entities called *Shenzhenshi, et al. v. Rearden, et al.*, NDCA Case No. 15-797 (the "SHST Case"), alleging that it had acquired the Contour Assets by assignment on May 8, 2013. Rearden defended the action and filed counterclaims.

21. On June 17, 2016, Rearden was granted a preliminary injunction that required the defendants and their related entities, including DD3, to cease using the Contour system, methods, and program, and place all of the physical assets at issue (called the "MOVA Assets") into storage pending resolution of the ownership claims in the SHST Case. DD3 allegedly placed all the MOVA Assets into crates, and on July 7, 2016, Rearden sent a team that included a Rearden engineer who co-invented Contour technology, a videographer, and an attorney, to observe and record on video the transport of the crates from DD3's Los Angeles studios into a storage unit. While DD3 allowed a visual inspection of the unpacking of the crates, which the videographer recorded on video, DD3 did not allow the Rearden engineer to inspect the software and files on the Contour computers and disk drives in the crates.

22. On July 14, 2016, Rearden filed a Motion to Show Cause to allow Rearden to inspect the software and files on the Contour computers and disk drives in storage. On July 22, DD3 filed a declaration purporting to verify its compliance with the injunction. And DD3 resolved the Motion to Show Cause by stipulating that the Contour software and files were on the computers and disk drives in storage, provided that Rearden agreed to not inspect the Contour computers and disk drives. The MOVA Assets were moved again to a storage unit, with a Rearden videographer recording this

---

[1] Forensically-recovered still frames from this particular take are shown in the Amended Disney Complaint Case 3:17-cv-04006-JST ECF No. 63 p. 25.

DECLARATION OF STEVEN G. PERLMAN IN SUPPORT OF
PLAINTIFFS' MOTION FOR LEAVE
TO ISSUE THIRD PARTY SUBPOENAS - 5
Case No.: 3:17-cv-04006-JST, 3:17-cv-04191-JST, 3:17-cv-04192-JST, 3:17-cv-04187-JST

second move as well. A key to the storage unit was placed in escrow pending resolution of the ownership of the MOVA Assets.

23. After trial in the SHST Case, the Court ruled on August 11, 2017 that Rearden owned the MOVA Assets, and ordered their return to Rearden "forthwith." But DD3 did not comply until October, 2017.

24. In the interim, on August 30, 2017, Rearden's attorneys in the SHST Case wrote to DD3's attorneys, putting DD3 on notice that "all documents and things related to the MOVA Assets remaining in the possession, custody, or control of DD3, or any person or entity subject to DD3s control, should be preserved by DD3 until they are transferred to Rearden." A true and correct copy of that letter is attached to this declaration as Exhibit A.

25. DD3's attorneys responded to the letter on September 7, 2017, which was after the Court ordered the return of the MOVA Assets to Rearden, but before DD3 had complied. A true and correct copy of that letter is attached to this declaration as Exhibit B. He represented that "DD3 will of course comply with all legal obligations related to the preservation of evidence and property that is in dispute."

26. When DD3 finally released the escrow key to the storage unit to Rearden in October, 2017, Rearden immediately sent engineers to pick up the MOVA Assets in the storage unit and drive them back to the Bay Area. DD3 then notified Rearden that it had "forgotten" to place some of the MOVA Assets into storage, including disk drives. Rearden picked up the equipment from DD3's studios and brought it back to the Bay Area as well. Rearden immediately began inspecting the MOVA Assets, but upon inspection, Rearden found that the computers, hard drives, and almost all (99.9%) of the files on computers or other storage media had been completely deleted, and the disk drives that DD3 had "forgotten" to place in storage were completely blank. The disk drives of some Contour computers had been removed entirely. Further, metadata on Contour disk drives that had been deleted showed modification dates at least as late as June 29, 2016, twelve days after the June 17, 2016 Injunction Order, evidencing that the Contour computers were not only in use, but had modified files on their disk drives as of that date. This is in direct contradiction to the July 22, 2016

1  declaration by DD3 President O.D. Welch, where he represented that DD3 had crated all of Rearden's assets long prior to June 29, 2016, and they had remained crated until they were put in storage in response to the Injunction Order.

27. DD3's deletion of Rearden's data was on a massive scale. Out of terabytes of Contour data that had been stored on the Contour disks, only about 8 gigabytes—less than $1/1000^{th}$ of the data, and far less than even a *single* 76-second (40 gigabyte) Contour capture—remained on the disks after they were returned to Rearden. The deleted files included not only post-theft Contour data, but also *all of Rearden's pre-theft Contour data* from 2012 and earlier. In fact, none of the MOVA Asset storage media included even a copy of the Contour program's source or executable code, which DD3 had stipulated it had put into storage to avoid Rearden's motion to inspect the Contour disks. Rather, in response to Rearden's demand, DD3 "found" a copy of the Contour source code on an internal DD3 server, which it had apparently retained in violation of the Court's injunction. The Contour system includes over 60 half-terabyte disk drives in over 35 separate computers. Deleting so much data stored on so many computers had to be a substantial and deliberate undertaking by DD3

28. The Contour system was fully operational when it captured Dan Stevens on June 14, 2016. But, before it was returned to Rearden, DD3 destroyed the Contour software, its data, its R&D records, its business records, and promotional records, the results of over a decade of Rearden R&D, promotional, sales, and production work.

I declare that the foregoing is true and correct under penalty of perjury.

Executed this 2nd day of April, 2018 in Palo Alto, California.

                                             */s/    Stephen G. Perlman*
                                                         Stephen G. Perlman

# EXHIBIT A

# Turner Boyd

Jennifer Seraphine

650 265.6018
seraphine@turnerboyd.com

Via Email jmakoff@vallemakoff.com

August 30, 2017

Jeffrey Taylor Makoff
Valle Makoff LLP
388 Market Street, Suite 1300
San Francisco, CA 94111

Re: **MOVA Contour Property and Document Preservation Notice**

Dear Jeff:

Since at least September 26, 2013, Digital Domain 3.0, Inc. ("DD3") has purported to be the exclusive perpetual licensee of the "MOVA Assets" (defined below), originally through Shenzhenshi Haitiecheng Science and Technology ("SHST") and subsequently through Virtue Global Holdings ("VGH"). SHST and VGH successively claimed to own the MOVA Assets, and pursued those claims in declaratory judgment actions against Rearden LLC, et al. in *Shenzhenshi Haitiecheng Science and Technology Co., Ltd., et al. v. Rearden LLC, et al.*, Case No. 15-cv-00797-JST ("SHST Litigation"). DD3 has offered and sold services using the MOVA Assets without authorization from Rearden.

The MOVA Assets include "the MOVA® Contour® Reality Capture ('MOVA' or 'MOVA Contour') technology, and related hardware and software, source code, patents and patent applications, trademarks, copyrights, trade secrets, domain names, business records, and various physical goods." Order Granting Preliminary Injunction in SHST Litigation, D.I. 188, at 15. The MOVA Assets also include "derivative works thereof," *i.e.*, derivative works derived from the MOVA Assets.

Attached hereto is the District Court's Statement of Decision in the SHST Litigation, entered on August 11, 2017 (D.I. 427). Therein, the District Court ruled that "VGH does not own the Mova Assets because Rearden owns them." *Id.* at 18. The District Court further ordered that "Rearden may take possession of the Mova Assets *forthwith.*" *Id.* (emphasis supplied).

Jeffrey Taylor Makoff
August 30, 2017
Page 2

Pursuant to the District Court's order, Rearden hereby demands *forthwith*, transfer of the MOVA Assets in DD3's possession, custody or control, or in the possession, custody or control of persons or entities subject to DD3's control (including but not limited to Gregory LaSalle and/or Kenneth Pearce), to Rearden. Please provide the following documents and things to our offices, or contact me to discuss the best manner in which to transfer any items for which that is not practicable.

### A. MOVA Asset "Hardware"

All physical assets related to the MOVA Assets, including but not limited to all lighting, rigging, cameras, computers, servers, physical storage media (such as hard drives, solid-state disks, portable disk drives, CDs, CDRs, DVDs, Blu-rays, portable USB drives, and any other storage media, *etc.*).

### B. MOVA Asset "Software, Source Code"

All software, source, and object code related to the MOVA Assets, including but not limited to the Contour program and all output files created by the Contour program while in the possession, custody or control of SHST, VGH or DD3, whether stored on DD3's premises or stored elsewhere.

### C. MOVA Asset "Patents and Patent Applications"

All documents related to any patent applications and assignments thereof related to the MOVA Assets, including without limitation applications and assignments filed by DD3, SHST, or VGH that relate to the MOVA Assets.

### D. MOVA Asset "Trademarks"

All documents related to any trademarks, trademark applications, or assignments filed by DD3, Shenzhenshi, or VGH that relate to the MOVA or Contour registered trademarks. These include, without limitation, all documents and things that reflect, refer, or relate to the MOVA or Contour registered trademarks and/or the MOVA arches trade dress (**mova**), including signage, business cards, stationary or file templates, and clothing or other attire bearing the MOVA or Contour marks or the MOVA arches trade dress.

### E. MOVA Asset "Copyrights"

All documents related to any copyright registrations, applications, or assignments filed by DD3, Shenzhenshi, or VGH that relate to the MOVA Assets.

### F. MOVA Asset "Trade Secrets"

All documents that reflect, refer, or relate to any MOVA Asset trade secret, including but not limited to all manuals or instructions for the use of the MOVA Assets.

Jeffrey Taylor Makoff
August 30, 2017
Page 3

### G. MOVA Asset "Domain Names"

Transfer of control and hosting of mova.com and all other MOVA Asset-related domain names, including, but not limited to, mova.co, mova.com, movacontour.com, movacontour.net, movacontour.tv, realitycapture.com, realitycapture.net, realitycapture.org, realitycapture.tv, and any other domain names that relate to the MOVA Assets.

### H. MOVA Asset "Documents" and "Business Records"

All documents that were provided to DD3 in connection with its purported license of the MOVA Assets from SHST/VGH, including without limitation all documents between Rearden, MO2, and/or Greg LaSalle on the one hand and attorneys representing Rearden and/or MO2 on the other hand (including without limitation Alan Kalin), and all emails sent from, or received to, any MOVA Asset domain name, including without limitation, mova.com, and all MOVA Asset domain name website files.

All business records related to the MOVA Assets, including but not limited to all MOVA-related trade show, conference, and award materials; all MOVA-related website materials; all MOVA-related marketing and sales materials; all MOVA-related press materials, releases, briefings and publications; and all documents that reflect, refer, or relate to the MOVA Assets.

### I. MOVA Asset "Derivative Works"

All documents and things, including all source code, object code, and digital files, related to any derivative work related to the MOVA Assets, including but not limited to all source code, object code, digital files and documentation related to the so-called "Direct Drive" technology and service offering. Also, all documents and things, including without limitation all digital files, relating to the creation or animation of any image, video, motion picture, video game, virtual human, or visual effects using MOVA Asset output files.

### J. Preservation of Remaining MOVA Asset Documents and Things

In addition to the above, DD3 has been subject, by virtue of its relationship to SHST/VGH, to the pending preliminary injunction order in the SHST Litigation, and additionally SHST/VGH's counsel in the SHST Litigation has stated that DD3 may seek to intervene in the SHST Litigation. Accordingly, all documents and things related to the MOVA Assets remaining in the possession, custody, or control of DD3, or any person or entity subject to DD3s control, should be preserved by DD3 until they are transferred to Rearden.

Jeffrey Taylor Makoff
August 30, 2017
Page 4

Sincerely,

Jennifer Seraphine
Turner Boyd LLP

# EXHIBIT B

Case 3:17-cv-04006-JST Document 78-2 Filed 04/02/18 Page 17 of 19

**Valle Makoff** LLP   388 Market Street, Suite 1300   415 986 8001 *main phone*
San Francisco, California 94111   415 986 8003 *main fax*
www.vallemakoff.com

Jeffrey T. Makoff
jmakoff@vallemakoff.com

September 7, 2017

**VIA E-MAIL <seraphine@tunerboyd.com>**

Jennifer Seraphine, Esq.
Turner Boyd
702 Marshall St Ste 640
Redwood City, CA 94063-1826

      Re:    <u>MOVA Contour Property and Document Preservation Notice</u>

Dear Jennifer:

      I am responding on behalf of Digital Domain 3.0, Inc. ("DD3") to your August 30, 2017 letter. I have analyzed DD3's position and concluded that DD3 must act only at the direction of VGH, as the licensor of MOVA to DD3, or directly from the Court. I have reviewed the Court's Statement of Decision dated August 11, 2017. While the SOD indicates Judge Tigar has decided to grant certain relief to Rearden, it is subject to review and is not directed at DD3. I have conferred with VGH's counsel, who advises me that VGH likely will appeal and seek immediate relief in the nature of a stay pending appeal. I note that the MOVA Assets already are in an escrow, the terms of which contemplate that the circumstances for a "joint" release may not exist and in that situation the escrow property will be distributed in accordance with an Order of the Court directed to the escrow agent.

      With regard to the specifics of your letter, DD3 will of course comply with all legal obligations related to the preservation of evidence and property that is in dispute. The bulk of that issue, insofar as the MOVA Assets are concerned, is addressed through the escrow.

      DD3 does not have control over any documents and/or business records that Mr. LaSalle may possess in his personal capacity. DD3 no longer employs Mr. Pearce, and has no control over any documents and/or business records he might have. Moreover, I have been told that Messrs. LaSalle and Pearce personally and voluntarily cooperated during discovery in the litigation. I presume you will address any current concerns to them.

DD3 is not aware of any "patents and patent applications", "trademarks," "copyrights," and "domain names" that have not been disclosed. To the extent you are seeking an immediate legal transfer of such items, I refer to my comments in the first paragraph.

You will have to be clearer on what "trade secrets" you have in mind. To the extent you allege trade secrets in software, source code or anything in physical form, those are in escrow.

I do not read the Court's Statement of Decision to require the marshaling or production of "documents" or "business records" that do not constitute part of the MOVA Assets.

With respect to "derivative works," your letter claims that DD3's Direct Drive is a derivative work. The technology behind what is now known as Direct Drive was developed before Original MO2 acquired the MOVA Assets and before DD3 attempted to in-license MOVA. Given that DD3 gained access to MOVA only after developing Direct Drive, Direct Drive cannot be a derivative work of MOVA. Nor are the "image, video, motion picture, video game, virtual human, or visual effects" identified in your letter. I do not see any finding in the Court's SOD to the effect that Direct Drive is a derivative work, or that Direct Drive is owned by Rearden or is encompassed by the SOD.

I am open to alternate perspectives and would be pleased to discuss this with you. My challenge in advising DD3 is to protect DD3's interests, which includes not violating any obligation to VGH or the Court, or any duty undertaken by DD3 under the escrow agreement. I have determined that the safest course is to respond to direct instructions from our licensor, or if a direct instruction is provided by the Court to such a direct instruction.

Sincerely yours,

Jeffrey T. Makoff