1  JEFFREY T. MAKOFF (Bar No. 120004)
   jmakoff@vallemakoff.com
2  VALLE MAKOFF LLP
   388 Market Street, Suite 1300
3  San Francisco, California 94111
   Telephone: (415) 986-8001
4  Facsimile: (415) 986-8003

5  Attorneys for Interested Non-Party
   DIGITAL DOMAIN 3.0, INC.

6  **UNITED STATES DISTRICT COURT**

7  **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

8  **SAN FRANCISCO DIVISION**

9

10 REARDEN LLC, REARDEN MOVA, LLC,           Civil Action No. 3:17-cv-04006-JST
   California limited liability companies,                      3:17-cv-04191-JST
11                                                              3:17-cv-04192-JST
                Plaintiffs,                                     3:17-cv-04187-JST
12
          v.
13
   THE WALT DISNEY COMPANY, a              **DECLARATION OF GREG LASALLE**
14 Delaware corporation, WALT DISNEY       **IN SUPPORT OF NON-PARTY**
   MOTION PICTURES GROUP, INC., a          **DIGITAL DOMAIN 3.0, INC.'S**
15 California corporation, BUENA VISTA     **OPPOSITION TO PLAINTIFFS'**
   HOME ENTERTAINMENT, INC., a             **MOTION FOR LEAVE TO ISSUE**
16 California corporation, MARVEL STUDIOS, **THIRD PARTY SUBPOENAS**
   LLC, a Delaware limited liability company,
17 MANDEVILLE FILMS, INC., a California
   corporation,
18
                Defendants.
19
   REARDEN LLC AND REARDEN MOVA
20 LLC,

21       Plaintiffs,

22       v.

23 TWENTIETH CENTURY FOX FILM
   CORPORATION, a Delaware corporation
24 and TWENTIETH CENTURY FOX HOME
   ENTERTAINMENT LLC, a Delaware
25 limited liability company,

26       Defendants.

27

28

LASALLE DECL. IN SUPPORT OF NON-PARTY DD3'S OPP. TO MOT. FOR LEAVE;
NOS. 17-CV-04006, 17-CV-04191, 17-CV-04192, 17-CV-04187

| | |
|---|---|
| REARDEN LLC AND REARDEN MOVA LLC, | |
| Plaintiffs, | |
| v. | |
| PARAMOUNT PICTURES CORPORATION, A Delaware corporation, and PARAMOUNT HOME ENTERTAINMENT DISTRIBUTION INC., a Delaware corporation. | |
| Defendants. | |
| REARDEN LLC AND REARDEN MOVA LLC, | |
| Plaintiffs, | |
| v. | |
| CRYSTAL DYNAMICS, INC. a California corporation, SQUARE ENIX INC., a Washington corporation, | |
| Defendants. | |

I, Greg LaSalle, declare:

1. I am currently employed by Digital Domain 3.0, Inc. ("Digital Domain" or "DD3") in Los Angeles, California. I make this declaration in connection with Digital Domain's opposition to Rearden's request for leave to serve third-party subpoenas before fact discovery begins in these cases. The statements contained in this declaration are based upon my personal knowledge. If called as a witness in this proceeding, I could and would testify under oath as set forth below.

2. From the time it was under development until June or July of 2016, I worked with the technology and system that the Plaintiffs in this case are now calling "Contour." Originally, "Mova" was a company and "Contour" was the facial performance motion capture technology it offered. But the company Mova never offered any other products of significance, and we stopped using the name Contour. The industry has commonly referred to the facial performance motion capture technology as MOVA for many years.

3. I helped develop MOVA, used it to perform facial performance motion capture, and managed the MOVA business for OnLive LLC and then DD3.

4. I have read and am familiar with Mr. Perlman's April 2, 2018 declaration in this matter.

5. I understand that there is ongoing litigation between a corporate affiliate of DD3 referred to as VGH and Rearden regarding the status of MO2, LLC and MOVA. I understand that in that litigation the Court stated DD3 cannot use MOVA and that MOVA belongs to one of the entities controlled by Mr. Perlman. I also understand that there is no final judgment in that dispute.

6. In paragraph four of his declaration, Mr. Perlman states that the MOVA system includes over thirty-five "Contour computers." He then states that "[t]he Contour computers" are used to operate the MOVA system but that "other [ancillary] Contour computers are used for business, promotion, R&D, further data processing, and other purposes." In fact, there are several categories of computers that were associated with MOVA when it was at OnLive. Approximately 35 "capture computers" were used to operate MOVA for facial performance motion capture. Employees who worked on MOVA at OnLive were assigned OnLive "workstations" that they used to do their work, including Ken Pearce and myself. These workstations were not the primary place

1

LASALLE DECL. IN SUPPORT OF NON-PARTY DD3'S OPP. TO MOT. FOR LEAVE;
NOS. 17-CV-04006, 17-CV-04191, 17-CV-04192, 17-CV-04187

on which data was stored. Instead, the workstations were used to, for example, process data (such as MOVA output data) that was primarily stored on "MOVA servers." Finally, business data for MOVA, such as contracts and financial information, were kept at another location.

7. In 2012, when OnLive exited the MOVA business, OnLive (or OL2, a kind of successor to OnLive) placed what are now called the "MOVA Assets" into storage. I was directly involved in that effort. The capture computers were placed into storage. So too were some of the employee workstations, including the workstations assigned to Ken Pearce and myself, but not, for example, the workstations of employees who stayed at OnLive or OL2, because those employees continued to use their workstations. Some, but not all, of the MOVA servers were also placed into storage. I do not recall why some of them were placed into storage and not others. The business data for MOVA that was kept at another location was not placed into storage, and my understanding is that it remained with OnLive or OL2.

8. The MOVA Assets that were transferred to DD3 in 2012 or 2013 included the capture computers, whatever employee workstations had been placed into storage, and some MOVA servers. Other MOVA servers were retained by OL2. However, before any of those computers were taken from storage, or possibly before they were placed into storage, I ensured that any output files were deleted. As explained below, this was because some MOVA contracts required such data to be deleted and it was therefore standard practice at OnLive to remove the capture data on or about when a job was complete. I also worked with OnLive or OL2 to erase the stored MOVA servers before they were transferred to DD3. As I recall, this was because of a combination of security concerns on the part of OnLive or OL2. At DD3, the computers DD3 used to manage the MOVA business never belonged to OnLive, OL2, or any of the Perlman companies. Finally, although DD3 received the employee workstations in 2012, it did not use them. DD3 employees who worked on MOVA were given DD3 workstations. DD3 recycled the workstations retrieved from OnLive or OL2's storage. DD3 also received certain files, such as the MOVA source code, that OnLive or OL2 had separately placed into storage.

9. Therefore, by June or July of 2016, when DD3 placed the MOVA Assets into storage, the only computers that would have had anything resembling the data they had when last

used at OnLive were the capture computers.

10. In paragraph six of his declaration, Mr. Perlman states that certain files were kept on "Contour computers" (discussed above) and others were kept on "Rearden computers used by Messrs. LaSalle and Pearce." That last part appears to refer to the OnLive workstation assigned to me (and to the one assigned to Mr. Pearce) as . discussed above. While at OnLive, I was also assigned an Onlive laptop to use when I travelled or was on location. When I left OnLive I was given permission by Charlie Jablonski, CEO of OnLive or OL2, to keep it as a personal computer. It had been administered by OnLive or OL2, so before it became my personal computer they wiped the data and restored it to its factory state.

11. To my knowledge and recollection, all of the projects listed in paragraphs 7 through 12 of Mr. Perlman's declaration were performed by OnLive, LLC or its subsidiaries—not Rearden. Mr. Perlman repeatedly states or implies that capture data, including output files, related to those projects was destroyed. He is correct. This was the standard practice at OnLive and I took that practice with me to DD3. Many of our contracts with customers require us to delete or return the raw capture data and other capture outputs from our systems once the work product is delivered to the customer. Other contracts require us to delete that data on demand. None of the contracts require us to keep that data, and throughout my time working with MOVA (at OnLive and at DD3), it has been my practice to delete it. This avoided the expense of storing and maintaining it and allowed me to streamline administration of the MOVA business by removing the need to distinguish between projects requiring immediate deletion and those that did not. It also ensured that the capture computers were ready for the next project, and had ample space to store captured data.

12. In paragraph 19 of his declaration, Mr. Perlman refers to output files that would have been generated by DD3's use of MOVA. In paragraph 26 he complains that this data was not present on the drives that DD3 put into storage, and then escrow, and that are now in the possession of Mr. Perlman. As explained above—and as with the similar files created by OnLive's use of MOVA—all such data would have been deleted on or soon after the completion of the project for which it was generated. But even if that material had not been deleted, it would not have been put into storage in June or July of 2016 because it was not a MOVA Asset. As I understood it at the

1  time, the material that was to go into storage were the MOVA Assets, which were limited to the

2  material that had come to DD3 from OnLive and its successors. Any output files generated by DD3

3  did not come from OnLive and were therefore not MOVA Assets.

4        13.     In paragraph 26 of his declaration, Mr. Perlman asserts that I and my colleagues at

5  DD3 forgot to place certain MOVA Assets into storage and that Mr. Perlman's representatives

6  retrieved those items directly from DD3's studios. The material that was retrieved included lighting

7  equipment and cables. Mr. Perlman asserts that it also included disk drives, but my recollection is

8  that it did not. However, if any drives were given to Mr. Perlman's representatives, they would not

9  have contained any output files because of the reasons discussed above.

10        14.     In paragraph 26 of Mr. Perlman's declaration, he states that metadata on the drives

11  retrieved in October 2018 shows that some of them were modified on June 29, 2016. In that

12  paragraph, Mr. Perlman refers to a July 22, 2016 declaration of DD3 president O.D. Welch. Mr.

13  Perlman says that in Mr. Welch's declaration, Mr. Welch asserted that the MOVA Assets had been

14  crated "long prior" to June 29, 2016. I am familiar with Mr. Welch's declaration, and what Mr.

15  Welch actually wrote was that "[a]s of June 24, 2016, all physical assets which are part of MOVA

16  were packed in crates…[and t]hose creates remained packed and at our facility until arrangements

17  were finalized between the DD3 lawyers and lawyers for the Defendants to move them to the

18  storage unit which Defendants had selected." When Mr. Welch stated that "the crates remained

19  packed" after June 24, he may not have been aware , or may have forgotten, that I had reviewed the

20  crated material. Around that time (the end of June, 2016), DD3 was collecting the MOVA Assets

21  and putting them in crates, as Mr. Welch described. For a portion of that time, I was not at the DD3

22  facility, either because of personal or work travel. When I returned to the facility, after June 24,

23  2016, I inspected what DD3 had crated and made sure that output files and other data that did not

24  qualify as MOVA Assets were deleted from the devices in the crates. Consistent with the metadata

25  that Mr. Perlman refers to, I did this work on or about June 29, 2016.

26        15.     In paragraph 27 of his declaration, Mr. Perlman asserts that DD3 did not place

27  source code into storage. In June or July of 2016, I personally placed a hard drive containing what

28  MOVA source code we had into a crate that went into storage. Nonetheless, in the face of Mr.

Perlman's assertion that there was no source code, and motivated by my concern that somehow all of the source code for MOVA has been lost or destroyed, I struggled to find a surviving repository of source code. During the course of my efforts, I spoke with an internal systems expert at DD3 to seek if there was any way we might possibly recover the data we had deleted from DD3's source code management system, which is the system we used to store the MOVA source code. It was determined that doing so would not be possible. Together, however, we recalled that when DD3 first obtained MOVA, we temporarily stored the source code in a secondary system outside of our source code management system. This was a dormant system not actively used, and when we were complying with the preliminary injunction and purging DD3's systems of copies of the source code we forgot about it. Fortunately, we were able to recover the files from that system and make them available (again) to Mr. Perlman. Around that same time and as part of the same effort, we also contacted Mr. Pearce and learned that Mr. Pearce had certain MOVA scripts and other files on his DD3 workstation. We were able to make available to Mr. Perlman any such files that dated back to on or around 2012 (or earlier). After these files were provided to Mr. Perlman, the copies were purged from the secondary system and the workstation, and thus the whole of DD3.

16. Mr. Perlman's paragraph 27 concludes with an assertion that the deletion of files from the hard drives provided to his representatives was "substantial and deliberate." I was deliberate in my efforts to help DD3 comply with the June 2016 preliminary injunction that required DD3 to stop using the MOVA Assets and to place into storage, for eventual transfer into escrow, all hardware and software within the scope of the MOVA Assets that DD3 could locate. I did that to the best of my abilities. As part of that effort, I took care to delete from the stored computers and drives any material that was not a MOVA Asset as the term was explained to me, including any output files that DD3 had generated and any new source code or scripts that were original to DD3 (DD3 had developed and used MOVA for years at this point, and I understood that Mr. Perlman was entitled to the original files, but not DD3's improvements and not DD3's and DD3's customers' work). As best I could, I helped place all of the original files, and all of the original equipment, into storage.

17. DD3 has not, to my knowledge, deleted or modified any of the MOVA-related

material, including business records, in its possession, from the time that the MOVA Assets went into escrow until now. As explained above, the MOVA Assets have been transferred and purged from DD3, but I understand that DD3's business records related to the period when it operated the MOVA business remain intact on DD3's systems.

I declare under penalty of perjury that the foregoing statements are true and correct. Executed this 6th day of June 2018 at Los Angeles, California.

_____
Greg LaSalle