1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| REARDEN LLC, REARDEN MOVA LLC, California limited liability companies,<br><br>Plaintiffs,<br><br>v.<br><br>THE WALT DISNEY COMPANY, a Delaware corporation, WALT DISNEY MOTION PICTURES GROUP, INC., a California corporation, BUENA VISTA HOME ENTERTAINMENT, INC. a California corporation, MARVEL STUDIOS, LLC, a Delaware limited liability company, MANDEVILLE FILMS, INC., a California corporation,<br><br>Defendants. | Case No. 3:17-cv-04006-JST<br>3:17-cv-04191-JST<br>3:17-cv-04192-JST<br>3:17-cv-04187-JST<br><br>**JOINT AMENDED CASE MANAGEMENT STATEMENT**<br><br>**Case Mgmt. Conf.:  July 25, 2018** |
| REARDEN LLC and REARDEN MOVA LLC,<br><br>Plaintiffs,<br><br>v.<br><br>TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware corporation and TWENTIETH CENTURY FOX HOME ENTERTAINMENT LLC, a Delaware limited liability company,<br><br>Defendants. | |

JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1

1

REARDEN LLC and REARDEN MOVA LLC,

                                    Plaintiffs,

        v.

PARAMOUNT PICTURES CORPORATION, a
Delaware corporation, and PARAMOUNT HOME
ENTERTAINMENT DISTRIBUTION INC. a
Delaware corporation,

                                    Defendants.

REARDEN LLC, REARDEN MOVA LLC,
California limited liability companies,

                                    Plaintiffs,

        v.

CRYSTAL DYNAMICS, INC., a California
corporation, SQUARE ENIX INC., a
Washington Corporation,

                                    Defendants.

        The parties in these four cases have met and conferred pursuant to Rule 26(f) and the Local

Rules of this Court.  The parties submit this joint amended case management statement in accordance

with the Standing Order for All Judges of the Northern District of California for the contents of such

statements.  Where the parties have disagreements, they have noted their respective positions under

sub-headings within the particular category.

## I.        JURISDICTION AND SERVICE

        This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question

jurisdiction), and § 1338 (trademark and copyright jurisdiction). Venue is appropriate in this judicial

district for Plaintiffs' claims under 28 U.S.C. § 1400(a) (copyright infringement) and U.S.C.

§ 1391(b)(1), and (c)(2) (trademark infringement).

        No parties to the First Amended Complaints remain to be served.

JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                                          2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.   FACTS

### A.   Plaintiffs' Position

1.   Plaintiffs' Position on the Facts

Rearden LLC owns Rearden Mova LLC (collectively "Rearden" or "plaintiffs").  Rearden Mova owns a technology called CONTOUR® Reality Capture, developed by Rearden.  Contour technology includes a patented apparatus comprising an array of cameras and white and ultraviolet lights, controlled by computers running a copyrighted Contour program to capture the facial performance of an actor wearing phosphor-based makeup that displays a glowing random pattern under ultraviolet light.  The Contour program captures two-dimensional grayscale videos of the glowing random patterns on the performer's face and neck, which it later processes into three-dimensional output works called Captured Surface and Tracking Mesh.  The Tracking Mesh work can be retargeted to animate computer-generated ("CG") heads of characters in films and videogames.

The Contour program is the subject of United States Copyright Registration No. TXu001977151.  The Contour systems and methods are claimed in United States Patent Nos. 7,605,861 (the "'861 Patent"), 8,659,668 (the "'668 Patent"), 7,548,272 (the "'272 Patent"), 7,567,293 (the "'293 Patent"), and 8,207,963 (the "'963 Patent").  And the MOVA® trademark is the subject of United States Trademark Registration No. 3,843,152.

The Contour apparatus, program, and intellectual property were stolen by rogue former Rearden employee Greg LaSalle.  Mr. LaSalle purported to secretly sell them to a Chinese company, which later purported to transfer them to another company registered in the British Virgin Islands, which then purported to license them to a motion picture visual effects company called Digital Domain 3.0 ("DD3").  In a related declaratory judgment case between the Chinese company and Rearden (*Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No. 15-797), which was tried in 2016, this Court entered a statement of decision on August 11, 2017 that Rearden had at all material times been the owner of the Contour technology, apparatus, program, intellectual property, and all other related assets.

JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                    3

1    The complaints allege that the defendants contracted, directly or indirectly, with DD3 to

2    provide facial performance capture services in the accused films and video game identified in the

3    complaints.  In performing the contracts, DD3 used the Contour program, system, and methods, to

4    generate Contour program output works that were received by defendants under the terms of their

5    contracts with DD3, all subject to defendants' direction and control.  Defendants used the Contour

6    output works to animate computer-generated ("CG") characters that appeared in the accused films

7    and game.

8    Rearden asserts claims for vicarious and contributory copyright infringement based on

9    defendants' inducement of DD3 to copy the Contour program from permanent storage into computer

10   RAM each time that DD3 used the Contour apparatus to capture facial performances and process the

11   captures into Contour output works, as more specifically alleged in the First Amended Complaints.

12   And Rearden pleads claims under the Lanham Act based on defendants' use of the MOVA mark and

13   related words, terms, names, symbols or devices under 15 U.S.C. § 1125(a), as more specifically

14   alleged in the First Amended Complaints.

15          2.      Plaintiffs' Response to Defendants' Argument for Bifurcated Discovery

16   Defendants seek to bifurcate these four cases, limiting discovery in the first phase to the

17   issues of the "causal nexus" between their infringements of the Contour program and their film

18   profits generated because of the infringements, and "what films should be in the case."  They

19   contemplate a summary judgment motion, to be followed at last by general discovery.  Their

20   proposed "causal nexus" summary judgment motion is a pipe dream, as explained further below.

21   And bifurcation along these vague lines will result only in successive waves of discovery requests,

22   document searches and productions, and duplication of depositions in each of the successive phases,

23   and almost certainly multiple discovery motions over the permissible bounds of phased discovery.

24   Discovery can be managed in a less costly and more efficient manner by proceeding with general

25   discovery after the Further Case Management Conference, as previously contemplated by the Court.

26   If defendants have summary judgment motions they wish to file, they may do so when they believe

27   the motions are ripe subject to any limitations on the number of dispositive motions.

28

JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                                              4

### a.    Copyright Infringement Claims

Defendants argue that "Rearden has stated it seeks to recover what the copyright cases call 'indirect profits'"—which is *false*, Rearden has stated no such thing.  From this false premise, they argue that Rearden must make a factual showing of a "causal nexus" between defendants' infringements and defendants' profits from the movies they made by infringing Rearden's copyright before recovering damages for defendants' infringements.  They conclude that it is impossible for Rearden to make the required showing.  As discussed below, the "cause nexus" requirement pertains only to the burden of proof on damages, and puts the damages cart before the liability horse.  Moreover, all three of the premises in defendants' argument are false or faulty.  Bifurcating discovery is a bad idea, and defendants' argument fails to justify it.

### (1)    The Causal Nexus Rule Affects when the Burden of Proof Shifts in a Copyright Damages Case.

After proving infringement, the plaintiff in a copyright case is entitled to recover its "actual damages" and "any profits of the infringer that are attributable to the infringement…."  17 U.S.C. § 504(b).  To establish the infringer's profits, the plaintiff bears the burden of proving only "the infringer's gross revenue," and the defendant bears the burden of proving its expenses and apportionment.  *Id.*  The Ninth Circuit has repeatedly affirmed that the Copyright Act permits the recovery of both direct and indirect profits from the defendant.  *Polar Bear Productions, Inc. v. Timex Corp.,* 384 F.3d 700, 710 (9th Cir. 2004); *see, e.g., Frank Music Corp. v. Metro-Goldwyn-Mayer,* 772 F.2d 505, 517 (1985). But when the plaintiff seeks indirect profits, the plaintiff must offer proof not only of gross revenue, but also of a "causal nexus" between the infringement and the indirect revenue before the burden shifts to the defendants to prove their expenses and apportionment.  *E.g.*, *Polar Bear*, 384 F.3d at 711.  While this issue may be amenable to resolution on summary judgment, the burden on the non-moving party is not heavy, as discussed below.

### (2)    Defendants' Profits on Films Made by Infringing Rearden's Copyright are not Indirect

"Direct profits are those generated by selling an infringing product," *Mackie v. Rieser,* 296 F.3d 909, 914 (9th Cir. 2002), while "[i]ndirect profits cases typically involve a defendant using a

JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1

5

copyrighted work to sell another product" (*Polar Bear*, 384 F.3d at ___; *Mackie*, 296 F.3d at ___).

*Fahmy v. Jay-Z*, 835 F.Supp.2d 783, 796 (C. D. Cal. 2011).  But in cases in which the infringement "was not separate from the product ultimately sold but rather came as part of that product," where "the copyrighted image was not simply contained in an advertisement for the product; it was an integral part of the product itself," the product profits may be direct rather than indirect.  *Garcia v. Coleman*, 2009 WL 799393, *3-4 (N.D. Cal. 2009).  Here, defendants' infringements of the Contour copyright was part of the process of *making* the accused films.  It follows that at least some portion of the films' profits are directly attributable to defendants' infringements.

> **(3)     Even if Indirect, Defendants Profits on Films Made by Infringing Rearden's Copyrights bear a Causal Nexus with the Infringements**

Rearden contends that defendants used the copyrighted Contour software to animate CG characters that appeared in them.  And it contends that the infringements at least partially caused the film profits that defendants generated as a result of the infringement.  To defeat a motion for summary judgment on the issue of "causal nexus," a copyright plaintiff "must proffer some evidence to create a triable issue regarding whether the infringement at least partially caused the profits that the infringer generated as the result of the infringement."  *Garcia*, 2006 WL 2583609 at *1, quoting *Mackie*, 296 F.3d at 911.  And the plaintiff may meet its burden with only circumstantial evidence. *Polar Bear*, 384 F.3d at 712; *Charter Sch. Capital, Inc. v. Charter Asset Mgmt Fund, L.P.*, 2016 WL 5921062, *2 (C.D. Cal. 2016).

As just one example, the Disney defendants' *Beauty and the Beast* film, Rearden has cited evidence in the First Amended Complaint of a causal nexus between the Contour infringements and the profits from the films.  Disney used its unauthorized use of Contour to promote the film in its *Beauty of a Tale* featurette, which it provided to *USA Today* (Dkt. 63 ¶ 122) and included in its DVD, Blu-Ray, and streaming distributions of the film (Dkt. 63 ¶ 124).  The film's director, Bill Condon, extolled Contour's contribution to the success of the film at a promotional press conference in Paris:

> [The Beast] was at the emotional center of the movie, who was the romantic hero of the movie, who was going to be a CG character…and it was this new process

JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1

6

[Contour] which—you know usually its dots like this [pointing to his face] and then animators fill in the dots—but actually captured every pore of Dan [Stevens]'s skin and that's why so much of him, this great performance, comes through….

Dkt. 63 ¶ 2.  And Stevens's co-star Emma Watson, credited Contour with the film's success at the same Paris promotional press conference:

I'm so pleased that we did it the way we did it because when you see Beast on screen there is something so human about him…[Contour] really captures the subtlety of Dan's facial expression and the performance that he gives…I don't think the world has seen anything like it before.  I think it's really unique to our film.

*Id.*  These facts, once established in a deposition and supplemented by expert testimony, would be sufficient to discharge Rearden's burden on summary judgment.

### (4)    Defendants Exagerate the Scope of Discovery

Defendants resort to hyperbole, warning the Court that Rearden seeks to "open the floodgates to an extraordinarily broad and burdensome discovery campaign," costing "millions of dollars on Rearden's wide-ranging discovery expedition."  They then solemnly intone that Rearden proposed that each defendant should have to sit for one 30(b)(6) deposition, and that Rearden proposed to reserve the right to depose up to ten officers or employees of defendants, warning that Rearden could take as many as *99 fact depositions* (emphasis in original).  But the Court should note that this was Rearden's opening position prior to the Rule 26(f) conference, and Rearden expected that defendants would negotiate in good faith towards limits that the parties could all agree on.[1]  Instead, defendants took the position that Rearden should have only ten depositions in total for all four cases, and declined to negotiate further.  When Rearden's counsel pointed out that there are eleven defendants, so Rearden could not even depose all defendants under defendants proposal, much less DD3, LaSalle, Pearce, or any other individual who dealt with defendants on behalf of DD3 and witnessed the infringement, and invited defendants to negotiate deposition limits, defendants refused to

---

[1] Indeed, Rearden's counsel expressly informed defendants' counsel in the Rule 26(f) conference that it was unlikely that ten officer and director depositions would be needed for each defendant, and the ten deposition limit was suggested only to avoid repeated motions for additional depositions.  But they fail to disclose this to the Court in their tattle tail on the Rule 26(f) conference.

JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                                        7

negotiate and insisted that the limit should be ten in total for all cases.  Apparently, they were interested only in tattletaling on Rearden's opening negotiation position, and not at all in discharging their duty to discuss and negotiate discovery limits in good faith.

And if Rearden had sued each defendant individually, the Federal Rules of Civil Procedure would have *presumptively* allowed ten depositions in each case, for a total of *110 depositions*.  Why should Rearden be limited to a *tenth* of the presumptive deposition limit simply because defendants conspired to together to infringe Rearden's copyrights?  It is not unreasonable for Rearden to expect to take the deposition of each defendant.  Nor is it unreasonable for Rearden to expect to depose directors such as Bill Conden, and actors such as Emma Watson, and others in the *seven* accused films and one accused video game who were witnesses to the infringements and publicly admitted the causal link between those infringements and defendants' profits.

If defendants did not like Rearden's proposed discovery limits, they should have been prepared to negotiate them in good faith as Rearden invited them to do and as Rule 26(f) requires.  Rather, they proposed a blanket ten deposition limit that would not even have permitted Rearden to depose each of the defendants, declined to negotiate in good faith, and now run to the Court claiming that *plaintiffs* are being unreasonable.

### (5)      Defendants Other Arguments do not Justify Bifurcation

Defendants argue, like Crystal Dynamics, that in one accused film no Contour footage was used, despite the fact Contour capture sessions were used in the Blu-ray featurette promoting that film.  But if this is so, they like Crystal may file a summary judgment motion after discovery.   This alleged "fact" does not justify bifurcating the four cases.

They argue that in three accused films, the infringing use of Contour was diminimus. But this is an *apportionment* argument—how much of the profit is attributable to the infringement—not a justification for bifurcating the four cases.

They argue that in *Beauty and the Beast*, DD3 performed "almost all" of the *captures* in the United Kingdom, and therefore there is not infringement of United States copyright law.  Beyond implicitly conceding that at least some *captures* were performed in the United State (raising the issue

JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                                          8

1    of apportionment, again), defendants ignore the fact that *processing* captures also constitutes Contour

2    copyright infringement—the Contour program is used to process raw captures—and those

3    infringements almost certainly occurred within the United States.  This argument too is no

4    justification for bifurcating the four cases.

5         Defendants assert that no Contour captures or processing occurred for *Guardians of the*

6    *Galaxy* within the three year statute of limitiations.  But this again raises an issue for summary

7    judgment after discovery, not a justification for bifurcating discovery.

8         They remind the Court that it has ruled that the Contour copyright does not extend to Contour

9    output works.  That the Court so ruled is not disputed, and does not justify bifurcating the four cases.

10        Defendants assert that DD3's contract fees for Contour *captures* were "a small fraction" of

11   the overall fees DD3 was paid for each film—again ignoring DD3's infringing use of Contour to

12   process raw captures that defendants had selected for further processing.  And under defendants'

13   proposal, Rearden would not even be permitted to probe this assertion in discovery limited to the

14   "causal nexus."  Rearden has reason to believe that DD3 billed defendants up to seven figures for at

15   least some, if not all, of the seven accused films, which is sufficient to justify this case even without

16   the so-called "indirect profits" that defendants rely on to justify bifurcation.

17        Finally, defendants note that a character (Colossus) that appears in an accused film by virtue

18   of Contour capture and processing also appears in a non-accused film that allegedly did not use

19   Contour.  Even if this representation is true, it is irrelevant as to the accused film and certainly does

20   not justify bifurcation.

21              **b.    Trademark Claims**

22        Defendants draw rusty swords, trotting out their tired trademark factual defenses that were

23   rejected by the Court in their first motion to dismiss.  They argue that Rearden's damages would not

24   be "worth the cost of discovery or motion practice."  But Rearden has sought, among other damages,

25   the cost of corrective advertising, a reasonable royalty, and disgorgement of profit attributable to

26   infringement, which collectively could be substantial.  And Rearden has sought equitable relief, in

27   the form of impoundment and destruction of infringing copies and an injunction banning further

28   JOINT CASE MANAGEMENT STATEMENT
     Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
     3:17-cv-04192-JST; 3:17-cv-04187-JST
     39336855.1                                                    9

1    distribution of infringing.  The trademark claims are not exclusively about damages.  These

2    arguments do not justify bifurcation.

3    **B.      Studio Defendants'[2] Position**

4         **1.      Copyright Infringement Claims**

5         Having survived the Studios' motions to dismiss based on allegations that the Court

6    described as "unquestionably thin,"[3] Rearden seeks to open the floodgates to an extraordinarily broad

7    and burdensome discovery campaign.  Before the parties and multiple non-parties are forced to

8    spend millions of dollars on Rearden's wide-ranging discovery expedition, it makes sense to focus

9    on what this case actually is about and how discovery can be tailored so the parties can have a clear-

10   eyed view of what this case is worth to them.  Rearden claims in its extended argument (written in

11   response to the position herein) that the Studio Defendants want to put "the damages cart before the

12   liability horse."  P.5, *supra*.  The Studio Defendants actually propose an early, efficient period of

13   discovery and motion practice on the issue that really matters:  whether Rearden can seek the profits

14   from the Studios' movies.  Ninth Circuit case law and other district court cases make it clear that

15   critical question is particularly appropriate for resolution on motion, which makes sense, since the

16   parties should know early on how much cases like these are worth fighting over.

17        The only allegedly infringing act in issue is the loading, by third-party special-effects vendor

18   Digital Domain 3.0 ("DD3"), of MOVA Contour software into the RAM of computers that DD3

19   alone operated.  Rearden has no claim of copyright ownership to the output file or to anything that is

20   done with the output file or the ultimate images that appear on screen.  Rearden nevertheless takes

21   the position that its sole allegation of infringement justifies 10 months of discovery concerning not

22   only DD3's loading of the software into RAM, but everything that was done with any output file—as

23   to which Rearden has no copyright interest—through to the production, marketing, and box-office

24   and home-entertainment revenue for seven motion pictures.  Indeed, Rearden proposes that each

25

26        [2] The "Studio Defendants" are the defendants in Nos. 3:17-cv-04006-JST ("Disney Defendants"), 3:17-cv-04191-JST ("Fox Defendants"), and 3:17-cv-04192-JST ("Paramount Defendants").

27        [3] June 18, 2018 Order at 8:23 (No. 3:17-cv-04006, Dkt. 85).

28   JOINT CASE MANAGEMENT STATEMENT
     Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
     3:17-cv-04192-JST; 3:17-cv-04187-JST
     39336855.1                                                    10

1    "party" be subject to its own 30(b)(6) deposition, and depostions of up to 10 other officers and

2    employees.  Because Rearden has named nine separate entities in the three cases against the Studios,

3    Rearden's proposal would allow for up to *99 fact depositions* with no showing of cause—just from

4    the parties in these three Studio cases.

5            And, Rearden wants discovery to come not just from itself, the Studios, and DD3, but from

6    numerous non-parties involved in the creative process, "including directors, performers, and crew, as

7    well as any non-party visual effects companies that received and used Contour output works."

8    Section VIII.A, *infra*.[4]  Rearden's statement in response to the Studio Defendants' positon confirms

9    that Rearden intends to seek the depositions of Bill Condon (director of *Beauty and the Beast*),

10   Emma Watson (who played "Belle"), and many other non-parties.  P.8, *supra*.

11           Moreover, Rearden wants to pursue burdensome and intrusive discovery regarding the

12   Studios' revenues and profits from each movie, including, "without limitation," the Studios'

13   "budgets, sales and revenue figures, gross receipts, costs and expenses, profits," and more.  *See*

14   Section X.A, *infra*.

15           The following facts, once established (which can be done expeditiously), will show the

16   absence of any link between DD3 loading MOVA Contour software into computer RAM and the

17   movie profits that Rearden seeks:

18       •    One of the movies, *Fantastic Four*, did not include any footage of an actor whose

19            facial motions are alleged to have been captured using MOVA Contour.

20       •    In three of the movies, the character in question appears on screen for mere seconds of

21            90-minute-plus movies:  *Avengers: Age of Ultron* (character "Thanos" appears in the

22            closing credits, for just over *four seconds* of the movie's 140 minutes); *Guardians of*

23            *the Galaxy* (Thanos appears on screen for *39 seconds* of the movie's two hours);

24

25           [4] A news report following the Court's Order cited Rearden's counsel as stating:  "Rearden will
     now seek evidence from the defendants and third parties, including actors and actresses who
26   performed in the films, to prove whether the studios knew DD3 was using stolen technology during
     the film production process."  https://www.courthousenews.com/disney-studios-cant-dodge-claims-
27   over-stolen-technology/.

28   JOINT CASE MANAGEMENT STATEMENT
     Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
     3:17-cv-04192-JST; 3:17-cv-04187-JST
     39336855.1                                                    11

1   *Night at the Museum: Secret of the Tomb* (talking bust of Augustus Caesar appears on

2   screen for *11 seconds* of the movie's 97 minutes).

3   •   In the case of at least one movie, *Beauty and the Beast*, DD3 performed almost all of

4       its facial motion captures outside the United States (specifically, in England).  This is

5       significant because DD3's copying of MOVA Contour outside the United States

6       cannot give rise to a claim for infringement or any damages under the U.S. Copyright

7       Act.  *See Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, (9th Cir. 1994)

8       (en banc) ("the United States copyright laws do not reach acts of infringement that

9       take place entirely abroad").  Rearden quotes statements by the director and an actor

10      in the movie, pp. 6-7, *supra*, but ignores that they were discussing the entire

11      performance (in which Rearden has no copyright) and that the heart of the motion-

12      capture scanning was done in England and therefore is not actionable here.

13  •   In the case of at least one movie (*Guardians of the Galaxy*), DD3 loaded MOVA

14      Contour into computer RAM more than three years before Rearden filed its

15      complaint.  Rearden's claim as to this movie, and others as discovery may reveal, will

16      be barred by the Copyright Act's three-year statute of limitations.  17 U.S.C. § 507(b).

17  •   The alleged infringement consists *only* of the copying of MOVA Contour Software

18      into RAM.  As this Court held in its first dismissal order, Rearden cannot allege

19      ownership—and therefore cannot allege infringement—over the output of the

20      software program or any work alleged to be a derivative work of those output files.[5]

21      Rearden says the limits of its copyright claim is "not disputed," p.9, *supra*, but ignores

22      that this fact significantly limits its copyright interest in these cases.  The output files

23      themselves are simply mathematical points that other software programs then use to

24      plot and animate digital movements.  The output files are far from the finished

25      product that appears on screen.  Visual-effects creators and animators must invest

26

27      [5] Feb. 21, 2018 Order at 8:7-8 (No. 3:17-cv-04006, Dkt. 60).

28  JOINT CASE MANAGEMENT STATEMENT
    Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
    3:17-cv-04192-JST; 3:17-cv-04187-JST
    39336855.1                                          12

1    countless hours, again using non-MOVA Contour software, to create computer

2    graphics that ultimately can be used for the faces of characters that appear on the

3    movie screen.  The MOVA Contour software running in RAM is none of that.  It is a

4    computer program sitting in memory chips.  Rearden asserts repeatedly that the

5    software must be loaded not just to scan the actor's face but to "process raw

6    captures."  *See* pp. 8-9, *supra*.  The "processing" Rearden mentions is not any of the

7    artistry in creating the face that appears on screen.  All of that comes later.  And

8    whether for scanning or processing, the **only** <u>alleged infringement is DD3 copying the</u>

9    <u>software program into RAM.</u>

10   •    The contract fees paid to DD3 for facial motion capture services—which included

11   much more than just the loading of software into RAM—were a small fraction of the

12   overall special effect services DD3 provided to the Studios.  Rearden claims it "has

13   reason to believe that DD3 billed defendants up to seven figures for at least some, if

14   not all, of the seven accused films."  Page 9, *supra*.  But that only proves the Studio

15   Defendants' point about the limited value of the MOVA Contour facial scans.  DD3's

16   facial-scanning work was done for tens of thousands of dollars—which was a small

17   percentage of dollars DD3 was paid for **all** of its special-effects services, which

18   includes imaginary sets and graphic animation that have **nothing** to do with MOVA

19   Contour.

20   •    One of the characters in issue (Colossus, in *Deadpool*) appears in the sequel to the

21   original (*Deadpool 2*), and there was no use of MOVA Contour in connection with

22   the creation of the character in the sequel.[6]

23

24

25       [6] Rearden's factual summary contains a number of inaccurate statements, including that Disney
         "entered [into] negotiation with LaSalle to purchase or license the Contour intellectual property and
26       assets," and that Disney "receiv[ed] a copy of Rearden's demand letter."  Discovery regarding the
         Studio Defendants' alleged "knowledge" that DD3 was using unlicensed software can wait until after
27       the first phase of discovery, should these cases ever reach a second phase.

28   JOINT CASE MANAGEMENT STATEMENT
     Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
     3:17-cv-04192-JST; 3:17-cv-04187-JST
     39336855.1                                        13

1    What all this means is that Rearden's copyright claims are of minimal value.  Under the

2    Copyright Act, a successful copyright plaintiff can elect one of two types of damages:  statutory

3    damages or actual damages.  17 U.S.C. § 504(a).  The available statutory damages here are trivial in

4    comparison to the cost of litigating.  Even if it prevailed on its infringement claims, Rearden at most

5    would be entitled to a single statutory award against each Studio.  It matters not how many times

6    MOVA Contour was copied into RAM; a successful copyright plaintiff can obtain only a single

7    statutory award for each work infringed by a specific infringer.  *See id.* § 504(c)(1); *Friedman v. Live*

8    *Nation Merchandise, Inc.*, 833 F.3d 1180, 1189-90 (9th Cir. 2016) ("The number of awards available

9    under this provision depends not on the number of separate infringements, but rather on (1) the

10    number of 'works' infringed and (2) the number of separate infringers.").  Here, there is only one

11    allegedly copyrighted work (the MOVA Contour software program), and one alleged infringer

12    (DD3).  The available statutory damages against each Studio therefore would be in a statutorily

13    prescribed range of $750-$30,000, 17 U.S.C. § 504(c)(1), which could not possibly justify Rearden's

14    proposed discovery campaign.[7]

15    Alternatively, a copyright plaintiff can seek actual damages, which are "actual damages

16    suffered by" the plaintiff or "profits of the infringer that are attributable to the infringement."  *Id.*

17    § 504(b).  Rearden's only claimed loss would be the value of a license to use the MOVA Contour

18    software.  The standard license fees for motion-capture work are a miniscule part of a movie's

19    special-effects budget, and trivial in comparison to the costs of litigating this case as Rearden

20    proposes to do.  And no Studio made any money at all—much less a "profit"—from DD3 allegedly

21    using software without a license.

22    Rearden has stated it seeks to recover what the copyright cases call "'indirect profits—

23    revenue that has a more attenuated nexus to the infringement.'"  *Mackie v. Reiser*, 296 F.3d 909, 914

24

25

---

26    [7] The upper-limit range is increased to $150,000 in the case of "willful" copyright infringement.
17 U.S.C. § 504(c)(2).  But Rearden is not going to be able to show that any Studio acted willfully,

27    and even if it could, a $150,000 upper limit on damages would not justify continued litigation.

28    JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                                    14

(9th Cir. 2002).  Specifically, Rearden wants a cut of the profits from the seven movies in issue.[8]
After having reviewed the Studio Defendants' submission, Rearden has claimed that it actually seeks
direct profits.  Pp. 5-6, *supra*.  That is simply incorrect, as Rearden's discussion of its profits theory
makes clear.  The alleged infringement here was DD3's loading of MOVA Contour software into
RAM.  The MOVA Contour sitting in a computer's RAM was not the part of any movie and has no
direct causal connection to any consumer's decision to pay money to see a movie.  Rearden is
seeking to claim profits from independent works (movies) that do not include any MOVA Contour
software, on the basis that those movies have character faces that were animated through a long,
labor-intensive process that itself is alleged to be many-times derivative of output files as to which
Rearden admits it has no copyright interest.  P.9, *supra*.  It is difficult to imagine a clearer case of
indirect profits.

As the targeted discovery the Studios propose will show, Rearden will not be able to make
the factual showing required for it to have any claim to any part of the profits from those movies.
The Ninth Circuit has been clear that, in order to claim indirect profits, the copyright owner must do
more "than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally
sufficient relationship to the infringement."  *Polar Bear Prods., Inc. v. Times Corp.*, 384 F.3d 700,
711 (9th Cir. 2004).  The copyright owner must offer non-speculative evidence showing a "legally
sufficient causal link" between the infringement and profits generated indirectly from that
infringement; where the infringer's profits are only "remotely and speculatively attributable to
infringement," the copyright owner cannot recover indirect profits.  *Mackie*, 296 F.3d at 915-16.
"This rule of reason 'obviates a good deal of mischief' in claiming profits beyond what might be
attributable to the infringement."  *Polar Bear Prods.*, 384 F.3d at 711 (quoting 4 Nimmer on
Copyright § 14.03[B], at 14-39)).

What is really at issue in this case, therefore, is Rearden's claim for indirect profits against
each Studio.  And the critical issue, therefore, will be whether Rearden can carry its burden of

---

[8] According to Rearden's own table, *See* Section X.A, *infra*, two of the movies in question
(*Fantastic Four* and *Terminator: Genisys*) *lost* tens of millions of dollars.

JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                                                15

showing a causal link between the act of MOVA Contour being loaded by DD3 into computer RAM and people paying to see the Studios' movies.  This issue is particularly appropriate for resolution on an early motion, as the Court's ruling on the motion likely will narrow the case and put it in a posture for early resolution.  The Ninth Circuit and other courts have made clear that the causal link question is amenable to resolution on motion.  *See, e.g., Mackie*, 296 F.3d at 916 (affirming grant of summary judgment on indirect profits claim); *New Show Studios, LLC v. Needle*, No. 2:14-cv-01250-CAS, 2016 WL 5213903, at *9 (C.D. Cal. Sept. 20, 2016); *Thale v. Apple, Inc.*, No. C-11-03778-YGR, 2013 WL 3245170, at *7-9 (N.D. Cal. June 26, 2013) (granting summary judgment to defendant on plaintiff's claim for indirect profits).

For these reasons, the Studios respectfully submit that the most efficient way for the parties to know what is really at stake—and to define the propose scope of discovery—is for discovery to be bifurcated, with initial discovery (fact and expert) and an early motion on the causal-link question. Specifically, the parties can and should conduct targeted discovery on

(1) which movies are actually in this case, and to what extent were the results of DD3's facial motion capture services even involved with screen time (whether facial motion picture scans by DD3 actually were used in the creation of any on-screen characters; and which loading of software is outside the three-year statute of limitations); and

(2) whether Rearden can show the required causal link between the loading of software and the Studios' profits.

Rearden claims that this limited discovery will be duplicative of discovery in the broad campaign that Rearden says it wants to undertake, but Rearden fails to show how this is so.  The discovery the Studio Defendants propose is narrow and targeted.  It does not require discovery of what transpired on the set.

Once the initial discovery is done, the parties can quickly brief and present the causal-link question for resolution on an early motion.  Rearden's complaint that this will cause "delay," p.26, *infra*, rings hollow.  The SHST/Rearden litigation was filed in February 2015.  Rearden was more than content to litigate that case for almost 18 months before filing its claims against the Studio

JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                                          16

1   Defendants (and later dropping its copyright infringement claims against the alleged direct copyright

2   infringer), with a meritless claim of copyright over the output files.  Moreover, the Crystal Dynamics

3   case is poised for its own early motion, so there is nothing inefficient about having the cases against

4   the Studios proceed through an early phase of limited discovery and an early motion that has the

5   potential to greatly narrow this case.

6         The bottom line is that the Studio Defendants' proposal is far more efficient than plunging

7   into sprawling discovery.  Once the parties know what movies are in issue and whether Rearden can

8   raise a triable question, both sides can assess the relative value of this case and be in a position to

9   resolve it—before proceeding to costly and burdensome discovery on the specific motion capture

10  sessions, the elements of secondary copyright liability, financial information, and the like.

11        **2.        Trademark Infringement Claims**

12        Rearden's trademark infringement claims have no value and cannot justify the expansive

13  discovery Rearden proposes.  Any uses of the word "MOVA" by the Studios were minor, not

14  actionable by virtue of the nominative fair use defense, and not worth the cost of discovery or motion

15  practice (and certainly not in the initial phase of discovery).

16        In the Disney case, Rearden contends that Dan Steven used the word MOVA during a press

17  interview about *Beauty and the Beast* simply to describe the technology.  His statement did not

18  suggest that Rearden sponsored or endorsed the motion picture.  Likewise, the use of word "MOVA"

19  in the ending credits of *Guardians of the Galaxy* was simply a reference to the name of a technology

20  used in making the motion picture and did not suggest that Rearden sponsored or endorsed the

21  motion picture.

22        In the Fox case, Rearden points to the appearance of the word MOVA in the ending credits of

23  *Deadpool*.  This was simply a reference to the name of a technology used in the motion picture and

24  did not suggest that Rearden sponsored or endorsed the motion picture.  When the visual effect

25  supervisor in *Deadpool* used the term MOVA, the supervisor was doing so to reference the

26  technology not to suggest that Rearden sponsored or endorsed the movie.  Similarly, the appearance

27

28  JOINT CASE MANAGEMENT STATEMENT
    Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
    3:17-cv-04192-JST; 3:17-cv-04187-JST
    39336855.1                                                         17

of "MOVA" in a few images in the *Fantastic Four* featurette within the context of speakers describing the technology did not suggest that Rearden sponsored or endorsed the motion picture.

With respect to *Terminator: Genisys* (Paramount Defendants), Rearden points to an interview with a visual effects supervisor, who said only that the production team "had the opportunity to do a MOVA performance capture." That reference did not suggest that Rearden sponsored or endorsed the movie. Use of the mark in a YouTube video posed by WIRED Magazine cannot be attributed to the Paramount Defendants.

## C.   Crystal Dynamics Defendants' Position

There are currently no pending trademark claims asserted against Crystal Dynamics or Square Enix. With respect to the copyright claims, the MOVA Contour technology was not used, nor authorized to be used in *Rise of the Tomb Raider*. As a result, Plaintiffs' copyright claims fail. And even assuming arguendo that captures were used to promote the game, Rearden has not made such an allegation in its complaint. And if Plaintiff's claims were not dismissed on this basis, they would suffer the same flaws as pointed out by the Studios.

Rearden responds that even if it were true, contrary to Crystal's admissions, that Contour was not used in the game sequences, this fact would not defeat Rearden's copyright claim. Crystal or Square, or both, authorized the use of Contour to capture performances by Camilla Luddington as Lara Croft for *Rise of the Tomb Raider*. That capture is an admitted fact. Even if the captures were used only to *promote* the game, for example, Rearden would still have a viable copyright infringement claim against Crystal and Square Enix. Legal issues

## D.   Plaintiffs' Position

### Copyright Issues:

Are defendants vicariously liable for DD3's direct infringements of Rearden's exclusive rights in the Contour program pursuant to 17 U.S.C. § 106?

Are defendants liable for contributory infringement of Rearden's exclusive rights in the Contour program pursuant to 17 U.S.C. § 106?

JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                                     18

1   Pursuant to 17 U.S.C. § 504, what is the measure of Rearden's actual damages and additional
2   profits of defendants that are attributable to their copyright infringements?

3   What is the measure of full costs and reasonable attorneys fees to be awarded under 17
4   U.S.C. § 505?

5   **Trademark Issues:**

6   Are the Studio defendants liable to Rearden for using Rearden's MOVA mark in a manner
7   that is likely to cause confusion, mistake or deception as to the affiliation, connection, or association
8   with Rearden, and/or as to the origin, sponsorship, or approval by Rearden of the facial motion
9   capture services and Contour output works used in the motion pictures under 15 U.S.C. §
10   1125(a)(1)?

11   Pursuant to 15 U.S.C. § 1117(a), what is the measure of damages to Rearden attributable to
12   the Studio defendants' infringements of Rearden's MOVA trademark, and what portion of
13   defendants' profits are attributable to their infringements?

14   Is Rearden entitled to a permanent injunction prohibiting defendants from using Rearden's
15   MOVA trademark, and prohibiting the distribution of motion pictures in any medium bearing the
16   MOVA trademark without Rearden's authorization pursuant to 15 U.S.C. § 502?

17   Is Rearden entitled to an order of impoundment and destruction of all infringing copies of
18   motion pictures bearing Rearden's MOVA trademark pursuant to15 U.S.C. § 1118?

19   Were the Studio defendants' trademark infringements willful, in reckless disregard, or in
20   willful blindness to Rearden's trademark rights, and shall the Court order enhanced damages, costs,
21   and attorney's fees pursuant to 15 U.S.C. § 1117?

22   Do the Studio defendants' trademark infringements and/or litigation conduct present an
23   exceptional case, and shall the Court award Rearden their costs and attorney's fees pursuant to 15
24   U.S.C. § 1117(a)?

25   **E.      Studio Defendants' Position**

26   The following are among the questions of law in dispute in this case.

27   **Copyright Issues**:

28   JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                                    19

- Whether any alleged copying of MOVA Contour into computer RAM by DD3 took place within three years of Rearden filing suit, 17 U.S.C. § 507(b) (three-year statute of limitations for copyright claims).

- Whether Rearden can establish the "causal link" between DD3's loading of MOVA Contour software into RAM and the Studios' movie revenues that would be required before Rearden can claim any indirect profits as damages.

- Whether DD3's loading of MOVA Contour software into computer RAM infringed any exclusive right under copyright that Rearden is entitled to claim.

- Whether Rearden's knowledge of the Studios' hiring of DD3 to perform facial motion capture work and failure to make the claim that DD3 had no right to use MOVA Contour software equitably estops Rearden from claiming that the Studio Defendants are responsible for DD3's alleged infringement.

- Whether Rearden can establish the necessary elements for its claims of contributory copyright infringement (each Studio's knowledge of and material contribution to such infringement) and vicarious liability (each Studio's right and ability to supervise DD3's alleged infringing conduct in loading MOVA Contour software into computer RAM and direct financial benefit flowing from that activity).

**Trademark Issues**:

- Whether, under 15 U.S.C. § 1114, the Disney Defendants, Fox Defendants, or Paramount Defendants infringed the MOVA trademark or whether the uses that form the basis of the trademark claims are nominative fair use.

- What damages, if any, Rearden can claim based on fleeting references to "MOVA."

### III.   MOTIONS

There are no pending motions.

The Studios intend to bring an early motion on the ground that Rearden is unable to establish the causal link between DD3's allegedly infringing loading of MOVA Contour software into computer RAM and each Studio's revenues from the movies in issue.

JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                                    20

In addition to the above motion identified by the Studio Defendants (which could apply to Crystal Dynamics and Square Enix, *mutas mutandi*), Crystal Dynamics and Square Enix intend to renew their motion for summary judgement on the issue of whether the MOVA Contour technology was used or authorized to be used in *Rise of the Tomb Raider*.

## IV.   AMENDMENT OF PLEADINGS

Rearden filed First Amended Complaints in the above-referenced cases.

Defendants are answering the First Amended Complaints on July 18, 2018.

## V.   EVIDENCE PRESERVATION

The parties have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information ("ESI Guidelines").  On February 26, 2018, the parties met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps to preserve evidence relevant to the issues reasonably evident in this action.

The parties are negotiating a [Proposed] Stipulated Order re Discovery of Electronically Stored Information.

**A.    Plaintiffs' Position**

Plaintiffs sent a draft ESI order to defendants one week prior to the Rule 26(f) Conference, because Fed. R. Civ. P. 26(f) requires the parties to discuss ESI discovery limits in the conference. The draft incorporated the NDCA Model ESI Order, and filled blanks with terms that have been negotiated and jointly presented by both sides in other litigation our firm has had in the Northern District of California.  Neither defendant was prepared to discuss it at the conference, and they now contend that they cannot respond until after the Further Case Management Conference.  Accordingly, plaintiffs will present their draft—*with any terms the parties can agree to prior to the CMC*—on July 24 for the Court's consideration.

**B.    Defendants' Position**

Rearden is making a mountain out of a molehill regarding a proposed ESI Order.  Rearden sent Defendants' counsel a proposed ESI order with eight pages of highly detailed proposals regarding the production formats for documents, required metadata fields, and requirements for the

JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                                                 21

1   scope of electronic searches.  These are all topics for the parties to discuss, but doing so requires the

2   input of technical personnel at each of multiple different clients.  Rearden is wrong that the

3   Defendants were not "prepared to discuss" the ESI order at the conference.  Both Defendants raised

4   questions about several of Rearden's proposals, including Rearden's proposal that ESI going back to

5   2005 be preserved.  Rearden's counsel said he would provide further information in response to

6   those questions, but to date has not done so.

7          Defense counsel continue to discuss Rearden's proposals with their clients to determine what

8   is feasible and what requires clarification.  The Defendants are endeavoring to complete that process

9   and concluding the meet-and-confer with Rearden's counsel, but that process likely will not be

10  completed by the July 25 Case Management Conference.  In the unlikely event any party needs to

11  raise an issue with the Court, they can do so with complete information.

## VI.    DISCLOSURES

13         The parties have agreed to exchange Rule 26(a)(1)(A) initial disclosures by August 3, 2018.

## VII.    DISCOVERY

15         The parties agree that it is advisable to consolidate the cases for purposes of pretrial

16  discovery.  Beyond that, the parties have different positions regarding the scope of discovery that

17  should be permitted at this juncture.

## A.    Plaintiffs' Position

19         The scope of discovery is expected to encompass documents, data files, video and audio

20  recordings, photographs, and things in the parties' possession, custody, or control relating at least to

21  Rearden, Steve Perlman, Greg LaSalle, Ken Pearce, DD3, the Contour technology (program, system,

22  and methods referred-to by defendants as "MOVA"), the Contour intellectual property (copyright,

23  patents, and the MOVA trademark) including the extent of defendants' knowledge thereof,

24  defendants' Contour performance capture sessions and receipt or distribution of Contour output

25  works, defendants' knowledge of the *Shenzhenshi Haitiecheng Science and Technology Co., Ltd., et*

26  *al. v. Rearden LLC, et al.*, Case No. 3:15-cv-00797-JST case ("SHST Case"), all aspects of

27  defendants' use of Contour and Rearden's MOVA trademark, defendants' intellectual property due

28  JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                                22

diligence with respect to Contour, Rearden, and DD3 (including Disney's due diligence and internal and external discussions relating to acquiring or licensing the Contour assets), and the relationships between defendant entitites.

Non-party discovery is expected to encompass documents, data files, video and audio recordings, photographs, and things relevant to the issues identified above in the possession, custody, or control of at least DD3, Greg Lasalle, Ken Pearce, and participants in defendants' Contour facial performance capture sessions including directors, performers, and crew, as well as any non-party visual effects companies that received and used Contour output works.  Non-party depositions are expected to include representatives of DD3, Messrs. LaSalle and Pearce, actors, directors, and crew who were present for or participated in Contour performance captures, and visual effects company representatives who received and used Contour output works.

Without limitation, discovery will be needed on at least the following subjects:

1.      The evidence relating to the elements of plaintiffs' vicarious and contributory copyright infringement claims and their trademark claims.

2.      The evidence relating to the elements of defendants' factual and other defenses.

3.      The evidence relating to the elements of plaintiffs' requests for equitable relief.

4.      The evidence relating to the quantum of plaintiffs' damages, including but not limited to plaintiffs' lost profits, defendants' marketing, projections, advertising, budgets, sales and revenue figures, gross receipts, costs and expenses, profits, and the portion of defendants' profits attributable to their infringements.

5.      The evidence relating to the elements of plaintiffs' willful infringement claim.

Limitions and modifications of the discovery rules are set forth in the Joint Rule 26(f) Report and joint proposed orders attached as exhibits thereto.

JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                                    23

1

**B.      Studio Defendants' Position**

2      The Studio Defendants believe the party and non-party discovery that Rearden proposes to

3  take is highly disproportionate to the likely needs of what is at issue in this case.  The Studio

4  Defendants' position is that the parties should conduct discovery for an initial period on two issues:

5  (1) which movies are actually in this case, and to what extent were the results of DD3's facial motion

6  capture services even involved with screen time (whether facial motion picture scans by DD3

7  actually were used in the creation of any on-screen characters; and which loading of software is

8  outside the three-year statute of limitations); and (2) whether Rearden can show the required causal

9  link between the loading of software and the Studios' profits.

10      Once the parties know whether any of Rearden's claims for indirect profits can proceed past

11  the causal-link requirement, the parties can decide whether the benefits and risks of the case justify

12  the costs of discovery on remaining issues.  Those remaining issues would include:

13   • Discovery on each Studio's knowledge of the alleged infringement by DD3, including

14      discovery to test Rearden's claim that each Studio conducted "intellectual property due

15      diligence" of DD3.

16   • Rearden's conduct in making it appear that DD3 or LaSalle owned the MOVA Contour

17      technology.

18   • Discovery on each Studio's alleged contribution to DD3's claimed infringement.

19   • Each Studio's legal right and practical ability to supervise DD3's loading of MOVA Contour

20      software into computer RAM.

21   • Whether any Studio obtained a direct financial benefit from DD3's loading of MOVA

22      Contour software into computer RAM.

23   • Rearden's knowledge of DD3's engagement with the Studios on the motion pictures in issue,

24      and what Rearden did in response to that knowledge.

25   • Each Studio's use (or not) of the "MOVA" mark.

26   • Each Studio's other defenses (including nominative fair use) to Rearden's claims.

27   • Any non-party discovery relevant to the above issues.

28
JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                          24

1   **C.      Crystal Dynamics and Square Enix Position**

2           In addition to the above, Crystal Dynamics and Square Enix also believe Plaintiffs' request

3   for discovery is disproportionate and should be directed only to whether the MOVA Contour

4   technology was used or authorized to be used in *Rise of the Tomb Raider*.  Rather than advance

5   through a protracted discovery phase, Crystal Dynamics and Square Enix propose having discovery

6   taken on this narrow issue within three months upon which they would file a renewed early motion

7   for summary judgment.

8           Rearden regards bifurcation as inappropriate for the reasons set forth above.

9   Notwithstanding, Rearden intends to focus initial discovery efforts with respect to Crystal and

10  Square Enix on the admitted Contour captures of Ms. Luddington, defendants' authorization of those

11  captures, the use, if any, they made of them, and related issues.  Rearden believes that counsel should

12  cooperate to prioritize this discovery without the need for the Court to micro-manage the discovery

13  process.

14                                 **VIII.   RELATED CASES**

15          This Court has ruled that the above-captioned cases are related to *Shenzhenshi, et al. v.*

16  *Rearden, et al.*, NDCA Case No. 15-797.

17                                 **IX.      RELIEF**

18  **A.      Plaintiffs' Position**

19          Rearden seeks damages, including actual damages, a reasonable royalty, and a disgorement

20  of defendants' profits attributable to their infringements; injunctive relief prohibiting further

21  distribution, performance, and display of the accused films and video game; and impoundment and

22  distruction of all copies of the accused films and video game.  Quantification of Rearden's damages

23  will be based in significant part on information and documents in defendants' exclusive possession,

24  custody, and control, and on the opinions of experts not yet identified.  Rearden reserves the right to

25  amend these disclosures during or after discovery to conform to the evidence.

26

27

28  JOINT CASE MANAGEMENT STATEMENT
    Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
    3:17-cv-04192-JST; 3:17-cv-04187-JST
    39336855.1                                                          25

1    The following table is derived from financial information for the accused films reported at the

2    www.the-numbers.com website, and will serve as a data point for Rearden's damages estimates in

3    this Joint Case Management Statement:

4

| Motion Picture | Domestic Sales (including DVD and Blu-ray) | Production Budget | Profit |
|---|---|---|---|
| *Beauty and the Beast* | 561,947,379 | 160,000,000 | 400,947,379 |
| *Avengers: Age of Ultron* | 538,892,605 | 330,600,000 | 208,292,605 |
| *Guardians of the Galaxy* | 466,605,223 | 170,000,000 | 296,605,223 |
| *Deadpool* | 458,045,512 | 58,000,000 | 400,045,512 |
| *Night at the Museum: Secret of the Tomb* | 141,273,920 | 127,000,000 | 14,273,920 |
| *Fantastic Four* | 69,287,154 | 120,000,000 | <50,712,846> |
| *Terminator: Genisys* | 115,512,232 | 155,000,000 | <39,487,768> |
| **TOTAL** | **2,351,564,025** | | |

### 1.    Copyright Infringement Claims

Rearden seeks its actual damages and a disgorgement of defendants' profits attributable to

their copyright infringements.

The studio defendants' profits (considering only domestic sales according to publicly-

available information), exceed $1.3 billion.  Defendants bear the burden of proving their costs and

the apportionment of their profits to the infringement, so other than taking into account each film's

budget as a measure of costs, Rearden has not attempted to quantify these factors.  Financial

information on gross sales for *Rise of the Tomb Raider* is not publicly-available.

### 2.    Trademark Infringement Claims

Rearden seeks damages measured by a reasonable royalty for the use of its MOVA

trademark, defendants' profits attributable to the infringements, and the cost of corrective

advertising.

JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                                    26

1    The studio defendants' profits based upon publically-available information are provided in

2    the table above.  As noted above, financial information on gross sales for *Rise of the Tomb Raider* is

3    not publicly-available.

4    The studio defendants' profits (considering only domestic sales according to publicly-

5    available information), exceed $1.3 billion.  Defendants bear the burden of proving their costs and

6    apportionment of their profits to the infringement, so other than taking into account each film's

7    budget as a measure of costs, Rearden has not attempted to quantify these factors.  Financial

8    information on gross sales for *Rise of the Tomb Raider* is not publicly-available.

9    The cost of corrective advertising will be quantified by expert opinion, but Rearden has not

10   identified an expert at this time.  Rearden is unable to quantify this cost at this time.

11   **B.    Studio Defendants' Position**

12   The only damages claim of value in these cases is Rearden's claim for indirect profits.  *See*

13   Section I.B, *supra*.  As discussed, the Studios do not believe Rearden will be able to show the

14   required causal link between DD3's loading of MOVA Contour software into computer RAM and

15   any revenues from any of the movies in issue.

16   If there were trademark damages in this case—and the Studios believe there are none—

17   Rearden at most would be entitled to a minimal license fee for the fleeting appearance of "MOVA"

18   in any end credits for any credits that actually include the word.

19   **C.    Crystal Dynamics' Defendants' Position**

20   In addition to the above, Crystal Dynamics and Square Enix respond that Plaintiffs are not

21   entitled to any damages because the MOVA technology was not used in *Rise of the Tomb Raider*.

22                   **X.    SETTLEMENT AND ADR**

23   Rearden and the studio defendants have agreed to table ADR discussions pending the Court's

24   ruling on defendants' motions to dismiss.  They revisited ADR discussions with the Court's ADR

25   department in March of this year.

26

27

28   JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                                27

Rearden and Crystal Dynamics/Square Enix have participated in a full-day mediation, but were unable to reach a settlement of Rearden's claims.  Rearden will revisit ADR with Crystal and Square in light of the Court's order denying their motion for summary judgment.

## XI.     CONSENT TO MAGISTRATE JUDGE FOR ALL PURPOSES

The parties do not consent to have a magistrate judge conduct all further proceedings including trial and entry of judgment.

## XII.     OTHER REFERENCES

This case is not suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

## XIII.    NARROWING OF ISSUES

Plaintiffs have voluntarily dismissed their claims for patent infringement under 35 U.S.C. § 271(b) and (g) pursuant to Fed. R. Civ. P. 41(a)(1).

**A.     Plaintiffs' Position**

Plaintiffs do not agree with the Defendants' bifurcation proposals.  For the reasons stated above, defendants are not likely to prevail on their proposed summary judgment motion, and so bifurcating discovery will only serve to further delay this case (already one year since the complaints were filed), and cause duplicative discovery with successive waves of discovery requests and deponents who will have to be re-deposed.  The parties should proceed to general discovery, and defendants may bring their summary judgment motion when they believe it is ripe.

**B.     Studio Defendants' Position**

For reasons explained above, the Studio Defendants contend that bifurcating discovery and an early motion on which movies are in issue (and to what extent) and the causal-link issue will almost certainly narrow the issues and enable the parties to have meaningful settlement discussions.

**C.     Crystal Dynamics and Square Enix's Position**

Bifurcating discovery on the issue of whether MOVA Contour technology was used in *Rise of the Tomb Raider* or authorized to be used in the game and a renewed motion for summary judgement on this issue will narrow the issues.

JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                                  28

1

### XIV.   EXPEDITED TRIAL PROCEDURE

2       The parties do not believe that this case is suitable for handling under the Expedited Trial

3  Procedure of General Order No. 64 Attachment A.

### XV.    SCHEDULING

5       The parties are negotiating a proposed Scheudling Order.  Prior to the July 25 Further Case

6  Management Conference, the parties will submit proposed Scheduling Order with their respective

7  timetables for this case.

### XVI.   TRIAL

9       The above-captioned cases will be tried to a jury.  The parties disagree on whether there

10 should be a consolidated trial or separate trials, and reserve their respective positions.

11      Plaintiffs believe a single trial will take ten court days.  Multiple trials will require the

12 presentation of substantially duplicative evidence in each trial, such that each trial will take seven to

13 eight court days.

14      Defendants believe that while it is appropriate to consolidate the cases for discovery

15 purposes, any trials will have to be separate and limited to the facts relevant to the parties to each

16 specific case.  Defendants believe that each trial should take around five court days.

### XVII.  DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS

18      Each party has filed the "Certification of Interested Entities or Persons" required by Civil

19 Local Rule 3-15.

### XVIII. PROFESSIONAL CONDUCT

21      All attorneys of record for the parties have reviewed the Guidelines for Professional Conduct

22 for the Northern District of California.

### XIX.   OTHER MATTERS

24      No other matters were discussed by the parties.

25

26

27

28
JOINT CASE MANAGEMENT STATEMENT
Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
3:17-cv-04192-JST; 3:17-cv-04187-JST
39336855.1                                              29

1    DATED:  July 18, 2018                    HAGENS BERMAN SOBOL SHAPIRO LLP

2

3

4                                            By:      /s/ Mark S. Carlson
                                                      MARK S. CARLSON
5
                                             *Attorney for Plaintiffs*
6

7

8    DATED:  July 18, 2018                    MUNGER, TOLLES & OLSON LLP

9

10

11                                           By:      /s/ Kelly M. Klaus
                                                      KELLY M. KLAUS
12
                                             *Attorneys for Studio Defendants*
13

14

15                                           DUANE MORRIS LLP

16
     Dated: July 18, 2018               By:      /s/ Karineh Khachatourian
17                                            Karineh Khachatourian
                                              Daniel T. McCloskey
18
                                              Attorneys for Defendants,
19                                            SQUARE ENIX, INC. and CRYSTAL
                                              DYNAMICS, INC.
20

21

22

23

24

25

26

27

28   JOINT CASE MANAGEMENT STATEMENT
     Case No.:  3:17-cv-04006-JST; 3:17-cv-04191-JST;
     3:17-cv-04192-JST; 3:17-cv-04187-JST
     39336855.1                                    30