1  KELLY M. KLAUS (SBN 161091)
   kelly.klaus@mto.com
2  BLANCA F. YOUNG (SBN 217533)
   blanca.young@mto.com
3  TERESA A. REED DIPPO (SBN 315960)
   teresa.reeddippo@mto.com
4  MUNGER, TOLLES & OLSON LLP
   560 Mission Street, 27th Floor
5  San Francisco, California 94105-2907
   Telephone:    (415) 512-4000
6  Facsimile:    (415) 512-4077

7  GINGER D. ANDERS (*pro hac vice*)
   ginger.anders@mto.com
8  MUNGER, TOLLES & OLSON LLP
   601 Massachusetts Ave. NW, Suite 500 East
9  Washington, DC 20001-5369
   Telephone:    (202) 220-1100
10 Facsimile:    (202) 220-2300

11 GLENN D. POMERANTZ (SBN 112503)
   glenn.pomerantz@mto.com
12 ERIN J. COX (SBN 267954)
   erin.cox@mto.com
13 JOHN L. SCHWAB (SBN 301386)
   john.schwab@mto.com
14 MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue, 50th Floor
15 Los Angeles, California 90071-3426
   Telephone:    (213) 683-9100
16 Facsimile:    (213) 687-3702

17 *Attorneys for Defendants*

18              UNITED STATES DISTRICT COURT

19             NORTHERN DISTRICT OF CALIFORNIA

20                    OAKLAND DIVISION

| | |
|---|---|
| 21  REARDEN LLC et al., | Case Nos.    4:17-cv-04006-JST |
|              Plaintiffs, |                   4:17-cv-04191-JST |
| 22         vs. | **NOTICE OF MOTIONS AND MOTIONS** |
| 23  THE WALT DISNEY COMPANY et al., | **FOR SUMMARY JUDGMENT ON** |
|              Defendants, | **CAUSAL NEXUS ISSUE** |
| 24  REARDEN LLC et al., | |
|              Plaintiffs, | Judge:    Hon. Jon S. Tigar |
| 25         vs. | Date:    To be set |
| 26  TWENTIETH CENTURY FOX FILM | Time:    To be set |
| 27  CORPORATION et al., | Ctrm.:    6 (2nd Floor) |
|              Defendants. | |
| 28 | |

**NOTICE OF MOTIONS AND MOTIONS FOR SUMMARY JUDGMENT**

To Plaintiffs Rearden LLC and Rearden MOVA LLC ("Rearden") and their counsel of record:

PLEASE TAKE NOTICE that on a date to be scheduled by further Court Order, or as soon thereafter as the matter may be heard, in Courtroom No. 6 of the above-captioned Court, located at 1301 Clay Street, Oakland, CA 94612, all defendants in Case No. 4:17-cv-04006-JST (The Walt Disney Company, Walt Disney Motion Pictures Group, Inc., Buena Vista Home Entertainment, Inc., Marvel Studios, LLC, and Mandeville Films, Inc.) (collectively, "Disney"), and both defendants in Case No. 4:17-cv-04191-JST (Twentieth Century Fox Film Corporation and Twentieth Century Fox Home Entertainment LLC) (jointly, "Fox") (Disney and Fox are referred to collectively as "Defendants" or "Studios"), will and hereby do move the Court for an Order granting Defendants partial summary judgment on Rearden's First and Second Causes of Action against Disney, and Rearden's First Cause of Action against Fox.  Specifically, Defendants move for an Order holding that Rearden may not obtain as damages under 17 U.S.C. § 504(b) any portion of the Studios' profits from the at-issue motion pictures (the "Motion Pictures")— so-called "indirect profits"—on the ground that Rearden as a matter of law cannot establish a causal nexus between the alleged copyright infringement and those profits.

These Motions are based upon these Notices of Motions and Motions; the attached Memorandum of Points and Authorities[1]; the contemporaneously filed Declarations of Vincent Cirelli, Joe Conmy, Danielle Costa, Darren Hendler, Todd Isroelit, Gregory LaSalle, Patrick Ledda, Hao Li, Mike Mulvihill, Erik Nash, Jonathan Rothbart, Mimi Steele, and Teresa Reed Dippo; all other materials supporting these Motions and the Reply brief filed or manually lodged in support thereof; all pleadings on file in this matter; and any other materials or arguments the Court may receive at or before the hearing on these Motions.

---

[1] Defined terms in these Notices of Motions and Motions (e.g., "Rearden" or "Studios") are also used in the accompanying Memorandum of Points and Authorities.

1   DATED:  October 14, 2020          MUNGER, TOLLES & OLSON LLP

2

3

4                                     By:   _____/s/ Ginger D. Anders_____

                                            GINGER D. ANDERS

5                                     *Attorneys for Defendants*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

-2-

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................1

BACKGROUND .....................................................................................................................3

I.     THE LEGAL FRAMEWORK FOR REARDEN'S INDIRECT PROFITS CLAIM ...........3

II.    PROCEDURAL HISTORY UNDERLYING THIS MOTION ........................................5

III.   FACTUAL BACKGROUND ......................................................................................5

       A.    The First, And Only, Step Involving The Alleged Infringement:  Temporary
             Copies Of MOVA Software Code Are Created In RAM....................................6

       B.    The Next Step—Producing The Tracked Mesh—Requires Human
             Involvement .................................................................................................6

       C.    The Next Step—Creating The Facial "Rig"—Does Not Involve Copies Of
             MOVA Software Code ....................................................................................8

       D.    Innumerable Additional Steps (None Of Which Involve Copies Of The
             MOVA Software Code) Are Required To Create The CG Character.....................10

       E.    Countless Additional Steps Are Required To Complete A CG Character—
             And An Entire Motion Picture .......................................................................13

ARGUMENT .......................................................................................................................14

I.     REARDEN CANNOT SATISFY ITS BURDEN TO SHOW A CAUSAL NEXUS
       BETWEEN THE INFRINGEMENT AND MOTION PICTURE REVENUES.................15

       A.    Rearden Cannot Show A Causal Nexus Because Consumers Decide To See
             A Particular Motion Picture For Innumerable Reasons ...........................................15

       B.    Rearden's Causal Nexus Claim Is Even More Speculative Than The Claims
             Rejected In *Mackie* And *Dash*, Because No Consumer Ever Saw (Or Could
             See) The Ephemeral Copies Of MOVA Software Residing In RAM.....................16

       C.    Rearden Cannot Show Causation Because The Use Of The MOVA
             Software Was A Preliminary Step In An Elaborate Process Of Creating A
             Motion Picture ..............................................................................................17

II.    REARDEN'S CAUSAL NEXUS THEORIES ARE BASED ON SPECULATION
       AND A MISUNDERSTANDING OF NINTH CIRCUIT LAW .......................................19

       A.    References To "MOVA" In Interviews, Articles, And Depositions
             Describing Particular Shots Do Not Establish A Causal Nexus .............................20

       B.    Rearden Cannot Base Its Claim On DD3's "Use" Of MOVA.................................21

       C.    Rearden Cannot Skip To The Apportionment Stage.................................................23

1

**TABLE OF CONTENTS**
(Continued)

2

Page

3

III.    IN ADDITION TO BEING BASED ON SPECULATION, REARDEN'S
        INDIRECT PROFIT CLAIMS FOR TRACK 1 MOTION PICTURES FAIL DUE

4       TO THE DE MINIMIS (OR NONEXISTENT) APPEARANCE OF CG
        CHARACTERS WHOSE DEVELOPMENT INVOLVED ANY USE OF MOVA ..........23

5

CONCLUSION ...................................................................................................................24

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................................14

*Apple Computer, Inc. v. Microsoft Corp.*,
35 F.3d 1435 (9th Cir. 1994).........................................................................................22

*Bouchat v. Baltimore Ravens Football Club, Inc.*,
346 F.3d 514 (4th Cir. 2003)...........................................................................................4

*Complex Systems, Inc. v. ABN Ambro Bank N.V.*,
2013 WL 5970065 (S.D.N.Y. Nov. 8, 2013) ................................................................19

*Computer Associates International, Inc. v. Altai, Inc.*,
982 F.2d 693 (2d Cir. 1992) ..........................................................................................22

*Dash v. Mayweather*,
731 F.3d 303 (4th Cir. 2013) ................................................................................. *passim*

*IBM Corp. v. BGC Partners, Inc.*,
No. 10 Civ. 128 (PAC), 2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013).......................4

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) .........................................................................................22

*LivePerson, Inc. v. [24]7.ai, Inc.*,
2018 WL 5849025 (N.D. Cal. Nov. 7, 2018)...........................................................14, 15

*Lowry's Reports, Inc. v. Legg Mason, Inc.*,
271 F. Supp. 2d 737 (D. Md. 2003) ..........................................................................17, 18

*Mackie v. Reiser*,
296 F.3d 909 (9th Cir. 2002)................................................................................. *passim*

*New Show Studios, LLC v. Needle*,
No. 2:14-cv-01250-CAS, 2016 WL 5213903 (C.D. Cal. Sept. 20, 2016) ....................4

*Orgel v. Clark Boardman Co.*,
No. 92-2, 1960 WL 8025 (S.D.N.Y. Nov. 29, 1960) ...................................................18

*Point 4 Data Corp. v. Tri-State Surgical Supply & Equipment, Ltd.*,
No. 11 CV 726 (CBA) (RLM), 2012 WL 3306575 (E.D.N.Y. Aug. 13, 2012) ...........19

*Polar Bear Productions, Inc. v. Timex Corp.*,
384 F.3d 700 (9th Cir. 2004)................................................................................. *passim*

1

## **TABLE OF AUTHORITIES**
### (Continued)

2

**Page**

3

*Soremekun v. Thrifty Payless, Inc.*,
    509 F.3d 978 (9th Cir. 2007) ......................................................................................15

4

5

*Thale v. Apple, Inc.*,
    No. C-11-03778-YGR, 2013 WL 3245170 (N.D. Cal. June 26, 2013) ......................4

6

**FEDERAL STATUTES**

7

17 U.S.C. § 102(b) ............................................................................................................21, 22

8

17 U.S.C. § 106 ..........................................................................................................................6

9

17 U.S.C. § 504(b) ..............................................................................................................3, 23

10

17 U.S.C. § 504(c) ..........................................................................................................1, 22

11

35 U.S.C. § 101 ......................................................................................................................22

12

35 U.S.C. § 154(a)(1) ...............................................................................................................2

13

35 U.S.C. § 284 ......................................................................................................................22

14

**FEDERAL RULES**

15

Fed. R. Civ. P. 56(a) ..............................................................................................................14

16

**LEGISLATIVE MATERIALS**

17

H.R. Rep. No. 1476, 94th Cong., 2d Sess. 54, *reprinted in* 1976 U.S.C.C.A.N. 5659 ...................22

18

**OTHER AUTHORITIES**

19

Goldstein on Copyright ..........................................................................................................22

20

Nimmer on Copyright ....................................................................................................3, 4, 23

21

6 William F. Patry, *Patry on Copyright* (2010) ...............................................................4

22

23

24

25

26

27

28

# INTRODUCTION

Rearden has the substantial burden of establishing with non-speculative evidence a causal nexus between the alleged infringement (the copying of MOVA code into computer random access memory ("RAM")) and revenues the Studios earned from the Motion Pictures.  Countless components contribute to the production of a major motion picture like each at issue here, and many factors influence the decisions of consumers to see it.  It is difficult to imagine any plaintiff establishing a causal nexus between a software tool used behind the scenes in the production process and motion picture revenue sufficient to entitle the plaintiff to an award of indirect profits.  Rearden cannot do so here.  Its remedy, if any, is not a portion of any Motion Picture's profits but the recovery of lost revenue—most accurately measured by what Rearden charged customers for MOVA services or vendors for a license—or statutory damages under 17 U.S.C. § 504(c).

Rearden cannot allege that the Motion Pictures directly infringe Rearden's copyright because the Court rejected Rearden's claim to have a copyright in any MOVA "output files." Rearden's copyright claim is therefore limited to secondary infringement based on a narrow infringing act:  copying by visual effects vendor Digital Domain 3.0 ("DD3") of pieces of MOVA software code into RAM while recording facial performances and processing recorded data into the output files.  Neither the temporary copies of code nor the output files appeared in any Motion Picture or were ever visible to anyone who saw any Motion Picture or any advertisement for the same.  Rearden cannot show that the copies of code, which are temporary mechanical byproducts of the software's use, caused consumers to choose to see the Motion Pictures.

There are limitless reasons why consumers pay to see any particular motion picture, including (among many others) stars, script, costumes, and music.  It is highly speculative to say which of these factors lead people to pay to see a motion picture, but at least these are things that consumers actually see visually or hear aloud.  Rearden has no evidence that consumers decided to see any of the Motion Pictures at issue here because a third-party vendor, months (or more) before the Motion Picture's release, made temporary RAM copies of software that no consumer saw.

Rearden tries to resurrect claims this Court already dismissed by posting images of actors with facial makeup next to the completed heads of computer-generated ("CG") characters, thereby

attempting to suggest that MOVA magically transformed each actor into a CG character and so

drove consumers' purchasing decisions.[1]  In fact, MOVA plays a vanishingly small, principally

time-saving role in the long and complex process of animating a CG character's facial movements

in certain scenes.  The MOVA software's only role is to record an actor's facial movements and

process computer data on their geometric coordinates over time.  Other non-MOVA software is

required to port the facial movements to a CG model, and graphic artists invest countless hours

fine-tuning those movements to better match the CG character's face (particularly when the CG

character's face is not proportionate to the actor's) and creating all the other elements that go into

the face, including eyes, tongue, skin, hair, and many others.  And even the completed *face*, which

is far removed from software residing in RAM, is just one part of one character, which itself is just

one part of a scene, which is just one part of the motion picture customers pay to see.  DD3's

copying of MOVA software has no causal nexus to the Motion Pictures' profits.

Rearden's indirect profits claim confuses liability under patent and copyright law.

Rearden's claim is not based on DD3's *copying* of the MOVA software into RAM through a

routine computer operation, but on the *use* of that software, which is protected (if at all) by patent

law.[2]  Had Rearden maintained and proved its patent claims, rather than dismissing them,[3]

Rearden might have been able to seek damages based on the use of the software.  But Rearden's

remedies under patent law would not include claims to the Motion Pictures' profits.  Instead,

damages would be limited to a reasonable royalty or perhaps amounts saved by DD3's use of

MOVA relative to the use of another software tool or no facial motion capture technology at all—

which is presumably the reason Rearden dismissed its patent claims.

The Ninth Circuit has said that eliminating meritless indirect profits claims "'obviates a

good deal of mischief.'"  *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir.

---

[1] *See* First Amended Complaint ("FAC") ¶¶ 37–42 (Mar. 6, 2018), Dkt. 63.  References to docket entry numbers in this Motion are to Case No. 17-CV-04006.  Corresponding entries (with different docket entry numbers) are in Case No. 17-CV-04191.

[2] Patent law provides liability for the unauthorized making, *using*, or selling of a product or process covered by the claim(s) of a patent.  35 U.S.C. § 154(a)(1).

[3] Dkt. 93.

2004) (quoting 4 Nimmer on Copyright § 14.03[B], at 14–39).  Rearden's indirect profits claim is

mischief in the extreme.  The Court should dismiss Rearden's claim for indirect profits.

## BACKGROUND

## I.     THE LEGAL FRAMEWORK FOR REARDEN'S INDIRECT PROFITS CLAIM

Section 504(b) of the Copyright Act authorizes the recovery of actual damages or "profits

of the infringer that are attributable to the infringement."  17 U.S.C. § 504(b).  The law recognizes

two types of profit claims.  Direct profits come from the sale of the infringing copy.  *Mackie v.*

*Reiser*, 296 F.3d 909, 914 (9th Cir. 2002).  Here, direct profits would be (at most) the amounts that

DD3 invoiced for using MOVA.  DD3's invoices (including out-of-pocket costs) were for sums

that would not justify the expense of this litigation.[4]

Rearden thus seeks "indirect profits," i.e., "revenue that has a more attenuated nexus to the

infringement."  *Mackie*, 296 F.3d at 914.  The alleged infringing act is the creation of an

unauthorized copy of MOVA software code residing in computers that third-party vendor DD3

operated.  Based on that act—which took place early in the production process, before armies of

visual effects artists, engineers, and others crafted the character and performance that eventually

appeared on screen—Rearden seeks a portion of the finished Motion Pictures' profits.

Mindful that this remedy incentivizes plaintiffs to "shoot the moon," courts impose strict

gating requirements for indirect profits claims.  It is "particularly important for the plaintiff in [an]

indirect profit action to demonstrate the alleged causal link between the infringement and the

profits sought."  *Polar Bear Prods.*, 384 F.3d at 711 n.7.  Ninth Circuit law is clear that:

> [T]o survive summary judgment on a demand for indirect profits pursuant to
> § 504(b), a copyright holder must proffer sufficient non-speculative evidence to
> support a causal relationship between the infringement and the profits generated
> indirectly from such an infringement.

*Mackie*, 296 F.3d at 915–16.

That burden is significant.  The plaintiff must show, through concrete evidence, that the

infringement increased the revenue earned by the infringer.  *Id*. at 911 (requiring "a link between

---

[4] *See* Steele Decl. ¶ 5; Costa Decl. ¶¶ 4–5; LaSalle Decl. ¶ 8; Conmy Decl. ¶ 5; *see also* Costa
Decl. ¶ 6 (listing amount for visual effects provided by entity Rearden allegedly controlled for
motion picture produced in 2012); Isroelit Decl. ¶ 4 (same for motion picture produced in 2009).

1  the infringement and the [defendant's] supposedly enhanced revenues"); *Dash v. Mayweather*, 731

2  F.3d 303, 332 & n.18 (4th Cir. 2013) (indirect profits claim could not survive summary judgment

3  because plaintiff had "no evidence that the [infringing] playing of the [copyrighted] song …

4  increased any of [defendant's] revenue streams").

5      A plaintiff's indirect profits theory is amenable to testing on summary judgment.  Because

6  the causation inquiry is rigorous and indirect profits claims are often attenuated, such claims often

7  do not survive judgment.  4 Nimmer on Copyright § 14.03[B][2][b], at p. 14 (such

8  claims "are more frequently unsuccessful"); *see IBM Corp. v. BGC Partners, Inc.*, No. 10 Civ.

9  128 (PAC), 2013 WL 1775437, at *3 (S.D.N.Y. Apr. 25, 2013) ("Because of the at-best highly

10  speculative nature of all indirect profits claims … the decision to send such claims to a jury should

11  be extremely rare.") (quoting 6 William F. Patry, *Patry on Copyright* § 22:131 (2010)) (alteration

12  omitted).  The Ninth Circuit and many other courts have granted summary judgment where the

13  plaintiff is unable to proffer non-speculative evidence that the infringement increased revenues.[5]

14      *Mackie* demonstrates why Rearden's claim for indirect profits cannot survive summary

15  judgment.  The district court there rejected such a claim where the defendant made an infringing

16  copy of plaintiff's artwork and used it on one page of a 24-page promotional brochure mailed to

17  150,000 potential ticket buyers of the Seattle Symphony.  The page with the infringing artwork

18  directly followed a page containing information about an upcoming series called "Pops."  The

19  plaintiff sought a share of the Symphony's profits from the Pops series based on the inclusion of

20  his artwork in the brochure.

21      The Ninth Circuit affirmed summary judgment on the indirect profits claim because there

22

---

23  [5] *See, e.g.*, *Mackie*, 296 F.3d 909 (affirming grant of summary judgment where evidence of causation was speculative); *Dash*, 731 F.3d at 332 & n.18 (affirming grant of summary judgment

24  where plaintiff had "no evidence that the playing of the [infringing] song … increased any of [defendant's] revenue streams"); *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 520

25  (4th Cir. 2003) (affirming grant of summary judgment where plaintiff offered only speculation that use of infringing logo caused increased merchandise sales); *Thale v. Apple, Inc.*, No. C-11-

26  03778-YGR, 2013 WL 3245170, at *7–9 (N.D. Cal. June 26, 2013) (granting summary judgment where plaintiff "proffered no evidence that the use of the [infringing] Photo caused any iPhone

27  3GS sales, nor that the "Concert" commercial did itself"); *New Show Studios, LLC v. Needle*, No. 2:14-cv-01250-CAS (MRWx), 2016 WL 5213903, at *9 (C.D. Cal. Sept. 20, 2016) (granting

28  summary judgment where plaintiff "ha[d] not offered any non-speculative evidence that the [infringing] videos" included in defendant's advertising portfolio "generated profits").

-4-

were "virtually endless" reasons that people might purchase tickets to the Pops series:  "For example, was it because of the Symphony's reputation, or the conductor, or a specific musician, or the dates of the concerts, or the new symphony hall, or the program, or the featured composers, or community boosterism, or simply a love of music, or ... ?"  *Mackie*, 296 F.3d at 916.  The plaintiff's expert asserted that some people likely bought tickets as the result of seeing the infringing artwork.  The Ninth Circuit rejected this argument for the fundamental reason that there are numerous reasons why people would buy Symphony tickets:  "In the absence of concrete evidence, [plaintiff's] theory is no less speculative than our effort … to enumerate even a relatively short list of the myriad factors that could influence an individual's purchasing decisions."  *Id.*

The causal link between infringement and revenues in *Mackie* was closer than that Rearden attempts to establish here.  In *Mackie*, consumers at least saw the infringing copies in the promotional brochure.  Here, consumers who paid to see the Motion Pictures did not see any copied MOVA code, or even any output file (in which Rearden has no copyright).  As in *Mackie*, the number of factors here influencing a moviegoer's decision to purchase a ticket are so varied that any attenuated link to MOVA would be pure speculation.

## II.   PROCEDURAL HISTORY UNDERLYING THIS MOTION

The Court granted Defendants leave to file this motion in December 2018.[6]  Defendants first moved for summary judgment on February 28, 2019.  Rearden's response has been delayed while it has taken an extraordinary amount of discovery on the causal nexus issue.  Having conducted that discovery, Rearden still has no evidence showing a non-speculative nexus between DD3's temporary copying of MOVA code and Motion Picture revenues.

## III.   FACTUAL BACKGROUND

Rearden's complaints vastly overstate MOVA's role, reprinting images from its marketing materials to make it appear that going from the performance capture, to the tracked mesh, to a completed CG character proceeds 1-2-3.[7]  In reality, the special effects process of creating a CG

---

[6] Dkt. 128.
[7] FAC ¶¶ 37–42.

character is far more complex than that.  MOVA software's role in the process of creating just the *facial motion* of a single CG character is preliminary and miniscule.  In terms of creating an entire motion picture, the software's significance is dwarfed by countless creative ingredients.

### A.    The First, And Only, Step Involving The Alleged Infringement:  Temporary Copies Of MOVA Software Code Are Created In RAM

The alleged copyright infringement is narrow.  Specifically, Rearden alleges that when third-party visual effects vendor DD3 launched the MOVA system at the start of a motion-capture or data-processing session, pieces of MOVA software code were temporarily copied from the computer's hard drive into the computer's RAM.[8]  Other than the temporary copying of the MOVA software code through a routine computer operation, there is no alleged exercise of the exclusive rights of copyright, 17 U.S.C. § 106, and there is nothing more to the alleged infringement.  Rearden tried to allege that it had a copyright interest in the output files, but the Court dismissed that claim at the outset of the case.[9]

### B.    The Next Step—Producing The Tracked Mesh—Requires Human Involvement

The MOVA processes of recording an actor's facial movements and generating data points can take only a few hours.  The process of taking the resulting information from the face capture and creating a CG character involves the use of *non*-MOVA software tools and substantial human artistry, and takes thousands of hours over a period of months.[10]

1.    During face capture, the MOVA code necessary for the relevant software operation resides in RAM.  The code provides instructions to the physical machinery (cameras and lights) for the strobing of visible and ultraviolet ("UV") lights and recording and synchronizing the data. The actor, wearing phosphorescent makeup (visible only under UV light), sits or stands in the physical MOVA apparatus and provides the performance.  A supervisor directs the actor's facial performance.  Li Decl. ¶¶ 13–17.

---

[8] *Id.* ¶¶ 99, 107, 115, 129.
[9] Dismissal Order at 7–8, Dkt. 60.
[10] *See, e.g.*, Li Decl. ¶ 26; Cirelli Decl. ¶ 10; Rothbart Decl. ¶¶ 9–17; LaSalle Decl. ¶ 8; Steele Decl. ¶ 4; Hendler Decl. *passim.*

-6-

2.      During data processing, the temporary copies of MOVA code again reside in RAM and provide instructions, most notably to assist with generating an output file called the "tracked mesh."  The tracked mesh is a collection of data following the position of various points on the face in three dimensions over time.  *Id.* ¶¶ 18–19.

The tracked mesh is created by processing other facial motion data called the "point cloud."  First, each frame of the actor's performance is translated into a "point cloud."  The point cloud is the actor's face represented by thousands of coordinates along three dimensions (*x*, *y*, and *z* axes) in space.  Visualized on a computer display, the point cloud appears as a collection of dots arranged in a 3D form covering the major regions of the face.  *Id.* ¶ 19.

Second, the tracked mesh is produced by processing the point cloud data.  MOVA software supplies an algorithm that tracks specific points on the face across time to produce the tracked mesh.  The tracked mesh is a collection of data specifying particular 3D coordinates that permit consistent tracking of the motion of the actor's face.  If visualized on a computer display, the tracked mesh shows as a facial mask.  The data of the tracked mesh plots points only on the face (not the top or back of the head, including hair, or the ears), and excludes critical regions of the face, such as the teeth, tongue, eyes, skin around the eyes, and part of the lips.  *Id.* ¶¶ 19–20. Below is a render of tracked mesh output data, shown side-by-side with the corresponding facial performance of Dan Stevens, who played the Beast in *Beauty and the Beast*.  Hendler Decl. ¶ 27.



Human involvement goes into the data processing required to create the tracked mesh.  The MOVA algorithm is complex but not robust enough to accurately track complex facial movement or produce a perfectly accurate tracked mesh.  The tracked mesh output file would be unusable without human intervention to supplement and correct the tracking.  Li Decl. ¶ 20c.

The output files—in which Rearden has no copyright—are the point cloud, the tracked mesh, and the raw video footage of the actor's performance.  The tracked mesh is most relevant to the process of animating a CG character, whereas the video footage and point cloud may be used as reference material.  *Id.* ¶ 21.  No output file is alleged to be an infringing copy.

MOVA was not the only software program that could be used for capturing facial motion performance or in the creation of a tracked mesh.  Industrial Light & Magic, Weta Digital, and Di4D also provided comparable facial motion performance capture software.[11]

**C.     The Next Step—Creating The Facial "Rig"—Does Not Involve Copies Of MOVA Software Code**

The tracked mesh is only a set of data points.  To create a CG character, digital artists must separately create a 3D animation model of the character's face, to which the data can be applied to help create facial motion.  This model, called a "rig," is like a facial puppet that can be manipulated to perform a range of facial expressions.  Li Decl. ¶ 21.  The rig is typically hand-crafted by animators, with assistance from non-MOVA software, and is imbued with stylistic and artistic choices.  *Id.* ¶ 22; *see, e.g.*, Rothbart Decl. ¶ 11; Hendler Decl. ¶ 13.  Below are three images of rigs of the character "Thanos" from *Guardians of the Galaxy* and *Avengers: Age of Ultron*:  (a) at top, the Thanos rig performing a variety of hand-crafted facial expressions; (b) below and on the left, a close-up Thanos rig with a neutral facial expression; and (c) below and on the right, a close-up Thanos rig with a different facial expression.  The appearance of the rig in the images below is the result of non-MOVA artistry and techniques.  Cirelli Decl. ¶ 5.

---

[11] *See* Reed Dippo Decl. Ex. E (Li Dep. Tr. 81:18–25, 82:21–23, 86:17–22); Ex. F (Steele Dep. Tr. 124:8–125:2); Ex. D (Hendler Dep. Tr. 31:8–32:4; 89:20–91:2; 109:2–9); Hendler Decl. ¶¶ 25, 47; Steele Decl. ¶ 3.

1
2
3
4
5



6
7
8
9
10
11
12
13




14
15
16
17
18
19

20        The desired facial performance is then mapped onto the rig in a process that requires

21   additional non-MOVA software, and does not involve copies of MOVA software code.  Li Decl.

22   ¶ 24.  The tracked mesh supplies data points that reflect the facial *motion* from the actor's

23   performance.  But the tracked mesh typically cannot be directly applied to the facial rig because

24   the (frequently inhuman) CG characters are often very differently proportioned from the human

25   actors—Thanos and the Beast being two examples.  A one-to-one port would result in unrealistic

26   facial expressions.  *See, e.g.*, Cirelli Decl. ¶ 7.  Specially designed non-MOVA software is

27   required to translate the coordinates in the tracked mesh to computer parameters that can control

28

1  the rig's facial movements.  Li Decl. ¶ 24.  DD3 uses a proprietary software program, "Direct

2  Drive," for this purpose.[12]

3        Digital artists refine the mapped performance on the facial rig for accuracy and stylistic

4  reasons, such as the director's preference for more exaggeration in the facial expression.  Altering

5  the rig's facial expression modifies or overwrites the expression reflected in the tracked mesh.  Li

6  Decl. ¶ 25; *see also, e.g.*, Steele Decl. ¶ 4.  This further delinks the facial rig from the tracked

7  mesh data that MOVA generates.  For any shots that use data from the tracked mesh, animators

8  must add the movement of the eye and lip regions, which are not included in the tracked mesh, to

9  the mapped performance.  Li Decl. ¶ 25; Cirelli Decl. ¶ 6; LaSalle Decl. ¶ 5.  Moreover, the

10  tracked mesh supplies data only for shots based on the actor's facial performance in the MOVA

11  apparatus.  Other shots do not involve MOVA data, such as shots based on manually created

12  expressions.  *See, e.g.*, Cirelli Decl. ¶ 6; Li Decl. ¶ 25; Hendler Decl. ¶ 17.

13      **D.**    **Innumerable Additional Steps (None Of Which Involve Copies Of The MOVA Software Code) Are Required To Create The CG Character**

14
15        The completed facial rig is not the completed CG character.  Hundreds or even thousands

16  of hours of human labor and artistry are still needed to transform the rig into the face of the on-

17  screen CG character.  These later stages may be broken down into three broad categories, none of

18  which involves MOVA software and each of which can take weeks or months to complete:

19      •   *Modeling*.  The face must be developed with color, texture, shading, hair, and other

20            details.  A photoreal CG face includes pore-level details, skin tone and color,

21            changes in texture (e.g., wrinkles for particular expressions), and changes in skin

22            tone based on emotion (e.g., blood flow to the cheeks to depict anger).  Each detail

23            must be designed through manual artistry or other techniques that do not involve

24            MOVA and then must be layered onto the facial rig.  Li Decl. ¶ 26a; *see, e.g.*,

25            Steele Decl. ¶ 4.  The images below are examples from the processes of modeling

---

[12] LaSalle Decl. ¶ 5; Steele Decl. ¶ 3; *see also* Cirelli Decl. ¶¶ 6–7 (special effects studio for *Guardians of the Galaxy* and *Avengers: Age of Ultron* developed proprietary "Face2Face" software for this purpose); Ledda Decl. ¶¶ 4–5 (facial motion data was too different from target CG character to warrant creating software script to translate MOVA data to rig); Hendler Decl. ¶ 25.

the face of Thanos, specifically (a) layering hand-painted textures onto Thanos's face using non-MOVA modeling software; and (b) modeling facial hair onto Thanos's face.  Cirelli Decl. ¶ 8a.




- *Animation*.  Facial movement must be developed with manual animation for certain kinds of movement that cannot be created from the actor's facial performance.  Examples include movement that results from contact between a face and another object (e.g., the punching of a face), or secondary facial motion caused by the character's movement (e.g., jiggling when jumping or shaking the head).  To reproduce this movement, a technical director or animator will use computer parameters to simulate the particular movement, essentially employing a trial and error process until it "looks right."  Once the computer parameters are satisfactory, the simulation may still require further refinement based on the artistic preference of the production team.  Li Decl. ¶ 26b.  Below is a sample from the process of refining the movement of Thanos's facial skin by hand.  Cirelli Decl. ¶ 8b.



- *Rendering*.  The culmination of all the steps described above is a 3D version of the character's face, visible only on a computer using appropriate 3D-viewer software.  This 3D version must be converted into a 2D image that can be incorporated into a final motion picture through a process called rendering.  Rendering combines all of the facial components:  the shape and motion of the face, the color, the texture, the shading, and other attributes.  This involves months of effort by an entire team of specialized digital artists.  The rendering process is extremely complex, requiring, among many other things, the incorporation of the realistic reflection of light onto the entire scene.  MOVA software is not involved in this process.  Li Decl. ¶ 26c; *see, e.g.*, Rothbart Decl. ¶¶ 14–16.  The images below are (a) on the left, a sample from the process of perfecting the light reflected on Thanos's face; and (b) on the right, four sample images that show a few of the different visualizations of the Thanos face involved in the rendering process.  Cirelli Decl. ¶ 8c.



- The image below shows the final onscreen version of Thanos's face, lacking even a shadow of resemblance to a tracked mesh.  Cirelli Decl. ¶ 9.[13]



### E.    Countless Additional Steps Are Required To Complete A CG Character—And An Entire Motion Picture

The undertakings described above are required just to produce the CG character's *face*. The character's body does not rely on the facial performance:  technicians conduct a separate full-body capture session, which may require performances by one or more actors or stunt doubles; body skeletons may need to be built for models; and the actor's movement must be retargeted to the skeleton of the CG character.  The development of the character's voice may also require hours of additional work, including a separate voice performance.  Li Decl. ¶ 28; *see also* Rothbart Decl. ¶¶ 4–10.

The work of creating a single CG character is just one small part in completing the overall motion picture.  That character must be integrated into the full-length footage, which includes the performances of many actors.  For several of the Motion Pictures in suit, the CG character in issue appeared on screen for mere seconds:  In *Avengers: Age of Ultron*, "Thanos" appears only *in the closing credits* and for just over four seconds of the Motion Picture's 141 minutes.  Costa Decl. ¶ 2.  In *Guardians of the Galaxy*, Thanos appears on screen for 39 seconds of the Motion

---

[13] *See also* Hendler Decl. *passim* (illustrating the many steps in developing the Beast that had nothing to do with MOVA, and the vast difference between the tracked mesh output data and final rendering of the Beast).

Picture's two hours. *Id.* And in *Night at the Museum: Secret of the Tomb*, the talking bust of Augustus Caesar appears on screen for approximately 11 seconds of the Motion Picture's 98 minutes. Nash Decl. ¶ 4. Even in Motion Pictures where the character had longer screen time, many other characters were critical to the story and consumer interest. In *Beauty and the Beast*, for example, other popular characters include Belle, Gaston, Mrs. Potts, Chip, Lumiere, and Cogsworth.

The characters alone do not constitute a completed motion picture, which requires a script for all the action and dialogue, as well as a director and hundreds of other creative and technical personnel. Motion pictures also include elaborate sets (e.g., creating the French village, and Paris itself, in *Beauty and the Beast*); costumes (such as wardrobes evocative of 18th-century France); music ("Be Our Guest"); and visual effects (everything from talking teapots and other household objects to CG wolves). Innumerable elements go into creating a motion picture.[14]

The amounts paid for the facial motion capture process underscore the limited role of the MOVA software in the production process. DD3's invoices for its facial capture services (which encompassed more than just the use of the MOVA software) constituted a tiny fraction of DD3's overall special effects work, and an even smaller fraction of the overall special effects budgets for the Motion Pictures.[15]

## ARGUMENT

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). "A dispute is genuine only if there is sufficient evidence for a reasonable trier of fact to resolve the issue in the nonmovant's favor, and a fact is material only if it might affect the outcome of the case." *LivePerson, Inc. v.*

---

[14] Defendants have lodged DVD copies of the completed Motion Pictures. *See* Reed Dippo Decls. ¶¶ 2–4, Exs. A–C (manual filing of Motion Pictures in each respective docket). Defendants are also submitting videos, Excel spreadsheets, and files with images illustrating the many steps involved in the process of creating shots of the Beast. *See* Hendler Decl. Exs. 1–52.

[15] *See* Costa Decl. ¶¶ 4–5; Conmy Decl. ¶ 5; LaSalle Decl. ¶ 8; Steele Decl. ¶ 5. The DD3 invoices include the cost of transportation, lodging, and other costs incidental to the use of the software and face-capture services.

-14-

*[24]7.ai, Inc.*, No. 17-cv-01268-JST, 2018 WL 5849025, at *3 (N.D. Cal. Nov. 7, 2018).  Where, as here, the summary judgment motion pertains to "an issue as to which the nonmoving party will have the burden of proof," "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

**I.    REARDEN CANNOT SATISFY ITS BURDEN TO SHOW A CAUSAL NEXUS BETWEEN THE INFRINGEMENT AND MOTION PICTURE REVENUES**

The Ninth Circuit holds plaintiffs to a substantial burden of presenting concrete, non-speculative evidence that the alleged infringement drove consumers' purchasing decisions.  For multiple reasons, this requirement is fatal to Rearden's indirect profits claim based on DD3's temporary copying of MOVA software into computer RAM.

**A.    Rearden Cannot Show A Causal Nexus Because Consumers Decide To See A Particular Motion Picture For Innumerable Reasons**

There are myriad reasons why consumers choose to see a particular motion picture.  No reasonable jury could conclude that there is a causal link between DD3's temporary RAM copying of MOVA software and Motion Picture revenues.

*Mackie* is squarely on point.  The Ninth Circuit held that plaintiff failed to establish a causal link between the infringing artwork and Symphony revenues because of the innumerable other reasons why consumers might buy Symphony tickets.  Rejecting a claim similar to Rearden's here, the court found that the plaintiff's expert's opinion could not bridge the gap since the expert's analysis could not "determine how many of those individuals subscribed *because of*" the infringed artwork specifically.  *Mackie*, 296 F.3d at 916.  Because "the artwork was but one page in a multi-page brochure that advertised a series of concerts," the causal "thread" was too "attenuated" to connect purchasing decisions to the infringement; any such effort would be "[r]ank speculation."  *Id*.

Similarly, the Fourth Circuit in *Dash* rejected the plaintiff's attempt to establish a causal nexus between music played during Floyd Mayweather's entrance into the ring at two wrestling events and profits from videos of those events.  *Dash*, 731 F.3d 303.  Even though the infringing content was used in the video and was audible to consumers, the court found the infringing use

-15-

1   "form[ed] only a small, incidental portion" of the videos, and that it "defies credulity that a

2   consumer would purchase" the videos because of the infringing song.  *Id.* at 332 (internal

3   quotation marks omitted).

4       *Mackie* and *Dash* undermine Rearden's indirect profits claim.  The list of elements that

5   could have contributed to consumer interest in the Motion Pictures is limitless:  Each had stars,

6   scripts, other special effects, music, and costumes, to name just a few elements that consumers

7   could perceive with their eyes and ears in the finished Motion Pictures.  A multitude of other

8   factors likewise could have caused people to see the Motion Pictures, including the genre (e.g.,

9   superhero or romance); that they were part of a series with a huge fan following (e.g., Marvel

10  Cinematic Universe); or, in the case of *Beauty and the Beast*, that the Motion Picture was a live-

11  action remake of an incredibly popular animated classic.  Rearden can offer nothing but

12  speculation to show that people paid to see any of the Motion Pictures "because of" DD3's

13  copying of MOVA into RAM.  *See Mackie*, 296 F.3d at 916.

14      **B.    Rearden's Causal Nexus Claim Is Even More Speculative Than The Claims**
        **Rejected In *Mackie* And *Dash*, Because No Consumer Ever Saw (Or Could**
15      **See) The Ephemeral Copies Of MOVA Software Residing In RAM**

16      The nexus between infringement and revenues in *Mackie* and *Dash* was hopelessly

17  speculative, but still was closer than the nexus Rearden alleges in this case.  In those cases, the

18  infringing copy was or could have been seen (or heard) by prospective consumers.  Rearden's

19  theory is even more attenuated, because no consumer saw (or could have seen) the infringing copy

20  of MOVA software residing in computer RAM.  Those copies simply could not have caused any

21  consumer to pay money to see any Motion Picture.

22      *Polar Bear Productions* is on point.  In that case, Timex launched a promotional campaign

23  for watches that used infringing footage from the plaintiff's video.  *Polar Bear Prods.*, 384 F.3d at

24  714.  The plaintiff claimed that Timex's display of the infringing materials at trade shows and in

25  promotional materials generated excitement about Timex watches and "enhanced brand prestige"

26  that "translated into consumers purchasing Timex's products" at other locations.  *Id.* at 713–14.

27  The jury delivered a verdict for the plaintiff.  The Ninth Circuit, however, even under a highly

28  deferential standard of appellate review, held that the plaintiff could not establish a causal link

between the trade show promotion and retail revenues.  The court said there was no "evidence establish[ing] that the infringement may have actually influenced the purchasing decisions of those that bought [the infringer's] watches at retail stores or other outlets."  *Id*. at 714–15.  As in this case, "[a]ctual retail purchasers were never exposed to the infringing images."  *Id*. at 715.

Here, MOVA is merely a software tool used as part of an elaborate creative process.  Rearden's only infringement claim is for the copying of MOVA code into RAM, *but no consumer sees (or could ever see) that copied code*.  Even the tracked mesh—which is merely an output of multiple processes, in which Rearden has no copyright—is not a part of any Motion Picture or seen by any consumer.

If Rearden's causal nexus theory were correct, the owner of software used to record and process images of the *Mackie* artwork (or to lay out the brochure) would have an indirect profits claim if the use of that software were unlicensed.  Rearden's theory stretches the concept of causal nexus beyond the breaking point.

### C.   Rearden Cannot Show Causation Because The Use Of The MOVA Software Was A Preliminary Step In An Elaborate Process Of Creating A Motion Picture

Rearden's causal nexus theory fails for yet another reason:  The temporary copies of the MOVA software code were an irrelevant byproduct of the software's use (which is not protected by copyright, *see* Section II.B, *infra*), and even the actual use of the software made only a minute contribution to the completed Motion Pictures.  That contribution was dwarfed by innumerable other creative efforts, rendering Rearden's indirect profits claim unduly speculative.

*Lowry's Reports, Inc. v. Legg Mason, Inc*., 271 F. Supp. 2d 737 (D. Md. 2003), is instructive.  The defendant, a financial services company, distributed infringing copies of daily stock market reports to its analysts.  The analysts used the copied reports in formulating financial advice for clients and in making daily investment decisions.  *Id*. at 751.  The court explained that the infringing copies were "never distributed" to customers and were synthesized with "a variety of other information" used to produce the firm's profitable investment analyses.  *Id.* at 751–52 (alteration omitted).  The court rejected the plaintiff's claim for revenues derived from the defendant's financial advice (which it earned by advising investors, buying and selling securities,

1   and managing customer assets), because "[t]he complex, variable, independent thought processes

2   of hundreds of individual brokers intervene between the copying and any subsequent gain." *Id.* at

3   752; *see also Orgel v. Clark Boardman Co.*, No. 92-2, 1960 WL 8025, at *1 (S.D.N.Y. Nov. 29,

4   1960) (rejecting causation where plaintiff argued that defendant's copying of law treatise enabled

5   him to increase the profits from his law practice; "[t]he subject is too remote and speculative to be

6   susceptible of computation by a court").

7        Here, Rearden has asserted that "the CG character as it appears in the film is the product of

8   two processes: one to capture a live actor's facial performance in a lifelike manner, and the other

9   to create a CG model," and that because both processes make "important contributions," the

10  involvement of pieces of MOVA software code in the former satisfies the causal nexus

11  requirement.[16]   Rearden's "contribution" theory overstates the significance of the temporary

12  copies of MOVA software code and understates the innumerable processes (far more than two)

13  that go into making the completed CG character (not to mention the full Motion Picture).

14       The creation of the temporary RAM copies was a byproduct of using the MOVA software.

15  The copies did not represent the output of the program or the recorded facial performance.  The

16  software program itself only provided mathematical instructions for processing the captured

17  performance into output files representing facial motion through data points.  And even the output

18  files consisted only of preliminary data, not anything that appeared in the completed Motion

19  Pictures.  The other elements and contributions to the CG character were numerous and complex.

20       Moreover, MOVA was not uniquely required even for the process of capturing facial data

21  points and creating tracked meshes.  Other facial motion capture technologies could have been

22  used to do the same work.[17]   For this reason, it is entirely unsurprising that the amounts paid to

23  DD3 for its facial motion capture services (which involved many non-MOVA elements) were a

24  minuscule percentage of the overall special effects budget.[18]

25

26

27  [16] Letter Br. Re Filing of Causal Nexus Mot. (Dec. 21, 2018), Dkt. 127, at 6 ("Letter Br.").
    [17] *See* Reed Dippo Decl. Ex. E (Li Dep. Tr. 81:18–25, 82:21–23, 86:19–22); Ex. F (Steele Dep. Tr.
28  124:8–125:2); Steele Decl. ¶ 3; Hendler Decl. ¶¶ 25, 47.
    [18] *See* Costa Decl. ¶¶ 4–5; Conmy Decl. ¶ 5; LaSalle Decl. ¶ 8; Steele Decl. ¶ 5.

1    Those facts, too, undermine Rearden's causal nexus theory.  Courts have stressed that

2 "mere connection or usage alone" is "insufficient" to establish a causal nexus—even where the use

3 was "critical" to the infringer's business.  *See Complex Sys., Inc. v. ABN Ambro Bank N.V.*, No. 08

4 Civ. 7497 (KBF), 2013 WL 5970065, at *5 (S.D.N.Y. Nov. 8, 2013) (collecting cases); *see also*

5 *Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, No. 11 CV 726 (CBA) (RLM),

6 2012 WL 3306575, at *3–4 (E.D.N.Y. Aug. 13, 2012) (rejecting claim for indirect profits under

7 Digital Millennium Copyright Act where defendant accessed plaintiffs' software and used it for

8 processing orders, invoices, financials, and inventories; notwithstanding that plaintiff's "software

9 was an important tool," connection between the underlying act and defendant's sales was "too

10 speculative and attenuated" to permit award of indirect profits).

11    Any claimed connection between copying and indirect revenues is even more remote

12 where, as here, other software programs could have provided the same functionality as MOVA.

13 *Complex Sys., Inc.*, 2013 WL 5970065, at *11 (rejecting software owner's indirect profits claim

14 predicated on unlicensed use of software where, inter alia, other "processing software

15 companies … operate in the market" and "provide a certain basic set of functionality") (quotations

16 omitted); *Dash*, 731 F.3d at 332 n.18 ("Dash was required to show not merely that Appellees

17 generated more revenue from playing 'Yep' than from playing no song, but that they generated

18 more revenue from playing 'Yep' than from playing a non-infringing song.").

19    Ultimately, DD3's use of the MOVA software was only a small and non-essential part of

20 DD3's work, and pales in comparison to all the other work required to create the facial appearance

21 and motion of the particular CG character—to say nothing of the completed Motion Picture.

22 **II.    REARDEN'S CAUSAL NEXUS THEORIES ARE BASED ON SPECULATION**
   **AND A MISUNDERSTANDING OF NINTH CIRCUIT LAW**

23    In its prior filings and summary judgment discovery, Rearden previewed how it will seek

24 to establish a causal nexus.  None of its arguments satisfy its burden.

25

26

27

28

-19-

**A.    References To "MOVA" In Interviews, Articles, And Depositions Describing Particular Shots Do Not Establish A Causal Nexus**

Rearden has argued that public statements in articles and YouTube videos about the Motion Pictures establish that the alleged infringement was a "driver[] of film attendance."[19]  The sources Rearden cites either discuss the facial motion capture process generally (which includes a host of hardware and software processes other than the RAM copying of MOVA software), discuss numerous other elements of the Motion Pictures, or do not refer to "MOVA" at all.  None of the sources Rearden cites refer to the copying of MOVA software at all.  These facts simply confirm the futility of trying to show that DD3's copying of MOVA software drove consumer purchasing decisions.

Rearden's showpiece example—a YouTube video of a "Paris Press Conference" featuring the director and stars of *Beauty and the Beast*—proves these points.  From this video, Rearden pulled quotations of actors Dan Stevens and Emma Watson and of director Bill Condon as lead examples in its complaint against Disney.[20]  In the video, a reporter asks about motion capture technology generally, and Dan Stevens mentions "MOVA" one time in his response.  But the three-minute discussion that ensues focuses on a range of topics having nothing to do with MOVA, including the actors' skill in performing and in dealing with the challenging aspects of incorporating special effects; the body capture; the fact that Mr. Stevens did both facial performances and on-set walkthroughs of his action; and the fact that the producers built a separate "Beast" character to which Emma Watson read some of her lines.  Mr. Stevens's reference to "MOVA" was a shorthand reference to the entire face capture process, and neither he nor any other panelist said anything about MOVA software being responsible for the financial success of the Motion Picture.  And the full video of this single press conference addressed numerous other topics, including the actor Luke Evans's stage experience; the challenge of

---

[19] Letter Br. at 6.
[20] FAC ¶ 2.  The video is available at https://www.youtube.com/watch?v=R9mKV_gklgw&feature=youtu.be&t=12m14s.

"bring[ing] a new breath of fresh air to this classic and yet remain[ing] respectful to the original"[21]; and the music and dancing in the Motion Picture.

Rearden's written discovery requests suggest it will rely on the fact that, for some shots of the Beast included in a *Beauty and the Beast* trailer, a corresponding capture of Mr. Stevens's facial performance had been conducted in the MOVA rig.  Reed Dippo Decl. Ex. G (Defendant The Walt Disney Company's Amended Objections and Responses to Plaintiffs' First Requests for Admission).  Even if a tracked mesh from one of those sessions was used in the process of creating a shot that appeared in the trailer, *none of those shots (or anything else any potential customer saw) were infringing*.  Rearden has a copyright only in the software—not in the tracked mesh, not in any completed shot, and not in any image in any trailer or any completed Motion Picture.[22]  Rearden cannot rely on the trailer (or anything else) to argue that prospective consumers saw the allegedly infringing work or that the infringement drove their purchasing decisions.

In short, none of the articles, videos, or trailers Rearden relies on imply, much less establish, any non-speculative connection between the narrow infringement that Rearden alleges and the revenues it is trying to reach.

**B.      Rearden Cannot Base Its Claim On DD3's "Use" Of MOVA**

Rearden asserts that it can establish a causal nexus based on the fact that DD3 "*used*" MOVA software "to capture an actor's performance, and then to process the captured performance."[23]  The theory fails, not only for the reasons discussed above, but also because Rearden is conflating the "use" of the entire MOVA system with the specific act alleged to infringe *copyright* (DD3's making temporary copies of pieces of the MOVA software code in RAM).  Rearden has no copyright interest in the *use* of the MOVA system or even the use of the MOVA software code.

The Copyright Act is clear:  "In no case does copyright protection . . . extend to any idea, procedure, process, system, [or] method of operation."  17 U.S.C. § 102(b).  In the context of

---

[21] Paris Press Conference, *Beauty and the Beast*, YouTube (Feb. 20, 2017) https://www.youtube.com/watch?v=R9mKV_gklgw&feature=youtu.be&t=21m12s.
[22] Dismissal Order at 7–8, Dkt. 60.
[23] Letter Br. at 6 (emphasis added).

-21-

1    computer software, Section 102(b) "make[s] clear" that the particular form of "expression adopted

2    by the programmer is the copyrightable element in a computer program," but "the actual processes

3    or methods embodied in the program are not within the scope of copyright law."  *Computer*

4    *Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 703 (2d Cir. 1992) (quoting H.R. Rep. No. 1476,

5    94th Cong., 2d Sess. 54, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5670); *cf. Apple Computer, Inc. v.*

6    *Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994) ("Apple cannot" use copyright law to "get

7    patent-like protection for the *idea* of a graphical user interface") (emphasis added).

8            The process embodied in software is the proper subject of patent rather than copyright

9    protection.  35 U.S.C. § 101 (a patent may be obtained for "any new and useful process").  But

10   patent law would likely limit Rearden's damages to the value of a "reasonable royalty"; and no

11   case law would support Rearden's patent-based claim to a portion of the ultimate profits of the

12   Motion Pictures.  35 U.S.C. § 284; *see LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d

13   51, 67 (Fed. Cir. 2012) (the "general rule" is that "royalties be based … on the smallest salable

14   patent-practicing unit") (quotation omitted).  Here, the available patent royalty would likely have

15   been capped at the amounts that the Studios paid DD3 for its special effects services.  That is

16   presumably why Rearden chose to abandon its patent claims in this suit.[24]

17           Rearden is relying on the use of the process embodied in the MOVA software code to

18   make sweeping claims to Motion Picture profits.  But only Rearden's copyright claims remain

19   live, and those claims involve only the temporary copies of MOVA software code in computer

20   RAM.  If Rearden can show copyright infringement, it may be entitled to the recovery of lost

21   revenue (measurable based on what Rearden charged customers for MOVA services, or vendors

22   for a license), or to statutory damages under 17 U.S.C. § 504(c).  But Rearden is not entitled to a

23   portion of Motion Picture profits based on DD3's use of MOVA.  *See* Goldstein on Copyright

24   § 14.1.1.1 at 14:8, 14:12 (identifying "lost sales," "a reasonable royalty," or "market value" as the

25   appropriate measures of damages).

26

27

28
_____
[24] Dkt. 93.

## C.   Rearden Cannot Skip To The Apportionment Stage

Rearden's prior filings also argued that all of the elements besides the temporary RAM copies of the software code are irrelevant to the causal nexus question, and instead are matters for Defendants to prove in apportioning profits that are not attributable to the infringement.[25]

Rearden has the burdens backward.  Section 504(b) "creates a two-step framework for recovery of indirect profits:  [first,] the copyright claimant must first show a causal nexus between the infringement and the gross revenue; and [second,] once the causal nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement." *Polar Bear Prods.*, 384 F.3d at 711.  Rearden must establish a causal nexus "*before* the parties can wrangle about apportionment," *Mackie*, 296 F.3d at 915 (emphasis added), and must do so based on concrete, non-speculative evidence, *id.* at 915–16; 4 Nimmer on Copyright § 14.03[B][2][a]. Rearden cannot establish the required causal nexus and therefore never gets to the apportionment stage.

## III.   IN ADDITION TO BEING BASED ON SPECULATION, REARDEN'S INDIRECT PROFIT CLAIMS FOR TRACK 1 MOTION PICTURES FAIL DUE TO THE DE MINIMIS (OR NONEXISTENT) APPEARANCE OF CG CHARACTERS WHOSE DEVELOPMENT INVOLVED ANY USE OF MOVA

These cases concern six Motion Pictures, each alleged to contain one CG character for which there is alleged to have been some use of MOVA software.  Summary judgment for lack of causal nexus is warranted for all six Motion Pictures for the reasons stated above.

Rearden also cannot establish a causal nexus for the four Motion Pictures in the "Track 1" tier of discovery due to the de minimis or nonexistent use of MOVA.[26]  They are (with one exception) in Track 1 because of the very small amount of time the characters in issue appear on screen.  *See* Costa Decl. ¶ 2 (Thanos on screen for four seconds—in closing credits—of 141 minutes of *Avengers: Age of Ultron*; and for 39 seconds of two-hour *Guardians of the Galaxy*); Nash Decl. ¶ 4 (Caesar bust on screen for 11 seconds of 98-minute *Night at the Museum: Secret of*

---

[25] *See* Joint Am. Case Mgmt. Stmt. at 8–9 (July 18, 2018), Dkt. 97.
[26] "Track 1" is intended to provide for narrow discovery and early mediation.  Order Adopting Discovery Plan at 1–2, Dkt. 113.

-23-

*the Tomb*).  In the other Track 1 Motion Picture—*Fantastic Four*— the facial motion of the CG "Thing" character was not based on MOVA tracked mesh data.  Ledda Decl. ¶ 4.[27]

In the Track 1 Motion Pictures, not only are the temporary copies of MOVA software code and tracked mesh many creative steps removed from the ultimate character that appears on screen, but that character itself appears on screen only fleetingly (if at all).  When "the infringing content forms only a small, incidental portion of the products that generated the claimed revenue streams," it "defies credulity that a consumer would" base purchasing decisions on that content.  *Dash*, 731 F.3d at 332 (internal quotation marks omitted).  The same can be said for *all* of the Motion Pictures.  Notably, Rearden did not take a single deposition related to any of the Track 1 Motion Pictures.  Rearden's claims based on the Track 1 Motion Pictures simply demonstrates the extent of Rearden's overreaching to seek a remedy that has no application to the facts of this case.

## CONCLUSION

Rearden cannot proffer concrete, non-speculative evidence of a causal nexus between the temporary copies of MOVA software—which was not and could not be seen by consumers—and Motion Picture revenues.  Even the *use* of the MOVA software (which is not protected by Rearden's copyright) was a preliminary process that was superseded by numerous artistic and technical efforts and innumerable hours of additional work even to create a single CG character.  For these and the other reasons set forth above, Defendants respectfully request that the Court grant partial summary judgment on Rearden's indirect profits claim.

DATED:  October 14, 2020          MUNGER, TOLLES & OLSON LLP

By:   *   /s/ Ginger D. Anders   *
          GINGER D. ANDERS
          *Attorneys for Defendants*

---

[27] Rearden apparently filed a copyright claim based on *Fantastic Four* because the MOVA logo appears in the DVD/Blu-ray featurette.  The Fox group responsible for the featurette had no involvement in the motion picture process.  It appears the featurette included the MOVA logo because DD3 provided a third-party vendor that produced the featurette with images of Jamie Bell that were not in fact used in connection with the CG character that appeared in the Motion Picture.  Mulvihill Decl. ¶¶ 2–7; Ledda Decl. ¶¶ 3–5.