# EXHIBIT D

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN FRANCISCO DIVISION
    _____
 4  REARDEN LLC, REARDEN MOVA    )
    LLC, California limited      )
 5  liability companies,         )
                                 )
 6            Plaintiffs,        )
                                 )
 7  v.                           )  Case No. 4:17-CV-04006-JST
                                 )            4:17-CV-04191-JST
 8  THE WALT DISNEY COMPANY,     )
    a Delaware corporation,      )
 9  WALT DISNEY MOTION           )
    PICTURES GROUP, INC., a      )
10  California corporation,      )
    BUENA VISTA HOME             )
11  ENTERTAINMENT, INC. a        )
    California corporation,      )
12  MARVEL STUDIOS, LLC, a       )
    Delaware limited             )
13  liability company,           )
    MANDEVILLE FILMS, INC., a    )
14  California corporation,      )
                                 )
15            Defendants.        )
    _____)
16

17                      CONFIDENTIAL

18           Deposition of DARREN HENDLER

19              via videoconference

20             Friday, June 12, 2020

21

22

23

24      Michael P. Hensley, RDR, CSR No. 14114

25
```

```
 1                  UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN FRANCISCO DIVISION
    _____
 4  REARDEN LLC, REARDEN MOVA     )
    LLC, California limited       )
 5  liability companies,          )
                                  )
 6               Plaintiffs,      )
                                  )
 7  v.                            ) Case No. 4:17-CV-04006-JST
                                  )          4:17-CV-04191-JST
 8  THE WALT DISNEY COMPANY,      )
    a Delaware corporation,       )
 9  WALT DISNEY MOTION            )
    PICTURES GROUP, INC., a       )
10  California corporation,       )
    BUENA VISTA HOME              )
11  ENTERTAINMENT, INC. a         )
    California corporation,       )
12  MARVEL STUDIOS, LLC, a        )
    Delaware limited              )
13  liability company,            )
    MANDEVILLE FILMS, INC., a     )
14  California corporation,       )
                                  )
15               Defendants.      )
    _____)
16

17

18

19       Deposition of DARREN HENDLER, commencing at the

20   hour of 9:24 A.M. and concluding at the hour of

21   1:20 P.M. on Friday, June 12, 2020, via videoconference,

22   before Michael Hensley, Registered Diplomate Reporter,

23   Certified Shorthand Reporter No. 14114, in and for the

24   State of California.

25
```

1　very impressive, but the delivery of data from the ILM

2　team was not up to par.

3　　　　　The ILM team -- I don't know exactly when the

4　ILM team started delivering data from the Medusa -- the

5　service.  It was much later on than Beast.  And I think

6　it was around the time that we were doing

7　Avengers:  Infinity War.

8　Q.　　Okay.  So let me see if I understand.  During

9　your work on -- well, let me take a step back, sir.

10　　　　Medusa is a facial performance capture

11　technology; is that correct?

12　A.　　Yes.

13　Q.　　And Medusa was developed by a company called

14　Disney Zurich; is that correct?

15　A.　　No.  Disney Zurich is a team of Disney

16　researchers in Zurich.  We just call them Disney Zurich.

17　But it's a team of researchers working for Disney that

18　have developed that technology.  It's a Disney-owned

19　technology.

20　Q.　　Okay.  And both Disney Zurich and ILM offer

21　facial performance capture using Medusa; is that

22　correct?

23　A.　　Disney Zurich is a development team.  They were

24　working on shows.  The ILM team -- the ILM team also

25　delivered data with the Medusa system.

1   Q.      Okay.  And in your -- in Digital Domain's work
2   on the film Maleficent, the facial performance capture
3   data was provided by Disney Zurich; is that correct?
4   A.      Yes, it was.  And it was pretty amazing.
5   Q.      Yes.  You had a positive experience with Disney
6   Zurich.
7   A.      Yes.
8   Q.      And but then in Avengers:  Infinity War, you
9   used Medusa for facial performance capture provided by
10  the ILM team; is that correct?
11  A.      That is correct, yes.
12  Q.      And you had some problems with the data that you
13  received from ILM; is that correct?
14  A.      That is correct.  I mean, there were -- now, we
15  definitely would use the data.  The data worked for us
16  very successfully.  We were just always pushing to show
17  that we were going to get the best quality.
18          And so Dave was very tied and connected to that
19  process, and so we were just making sure -- we were just
20  informing him to ensure that we could make this process
21  as smooth and easy as possible because usually, we
22  wanted the data deliveries to be as clean and as good as
23  they could be.
24  Q.      And ILM was not meeting your expectations; is
25  that correct?

1  A.     I -- I don't know what Digital Domain told
2  Disney.
3  Q.     It would be pretty surprising if Digital Domain
4  had said that to Disney, wouldn't it?
5  A.     I don't know.  Different conversations are held
6  at different levels, and I don't know who may have said
7  what.
8  Q.     Okay.  You weren't party to those discussions;
9  correct?
10 A.     I don't believe so.
11        MR. CARLSON:  That's all I have at this time.
12        MR. KLEINMAN:  Okay.  I will -- I have a couple
13 of questions or basically, just one line of questioning.
14                    EXAMINATION
15 BY MR. KLEINMAN:
16 Q.     All right.  Mr. Hendler, you're okay to proceed
17 now?
18 A.     Yes.
19 Q.     Okay.
20        You stated earlier, I believe, that the VFX team
21 at Digital Domain received data from the MOVA team and
22 then proceeded to do some processing of that data.
23        Is that a fair generalization?
24 A.     Yes.
25 Q.     Did the -- could the VFX team also receive input

1  from outside vendors who use systems like Dimensional
2  Imaging or Medusa?
3  A.      Absolutely.
4  Q.      Are there differences in the quality of the data
5  produced to the VFX team by the MOVA system as opposed
6  to, say, the Medusa system?
7          MR. CARLSON: Ben, I'm sorry. I just --
8          THE WITNESS: Yes.
9          MR. CARLSON: Can I ask for clarification. Are
10 we talking about Beauty and the Beast, or are we talking
11 about something else?
12         MR. KLEINMAN: Thanks. Fair point.
13 BY MR. KLEINMAN:
14 Q.      Generally speaking, the nature of the data
15 produced, the overall character of the data produced by
16 the MOVA system to Digital Domain's VFX system, does
17 that differ in type from the way the data is produced to
18 the VFX team by Medusa's system?
19 A.      No. The types of data coming in from the MOVA
20 system to the -- versus the Medusa systems would be the
21 visual effects pipeline are very much the same types of
22 data. The Medusa system does give us additional data
23 that the MOVA system didn't give us.
24         Quality-wise, the Medusa system gives us
25 additional areas -- regions around the eyes, better

1  coverage of the lips, much higher fidelity of structure
2  and detail in the face -- than the MOVA system.
3  Q.      Is there -- when the VFX team at Digital Domain
4  receives data from the MOVA team, what's the first step
5  in the process that the VFX team does with that data?
6  A.      Okay.  So the VFX team receives data from the
7  MOVA team, and also the MOVA team is segmented onto
8  separate systems and things from the other team.  So the
9  data from the MOVA team has to be uploaded to a special
10 holding area before it could actually moved over to the
11 VFX teams.  And so the data would be sent off to its
12 holding area.  From that holding area, we would do an
13 inventory on it almost like they were a completely
14 separate vendor delivering data to us.
15         From there, we have the -- from there, we have
16 the MOVA data.  That MOVA data then goes through a
17 internal publishing process where the data is actually
18 published up to our drives.  And we generate a series of
19 QCs of that data so we can actually take a look at what
20 that data looks like.  And so we can see how it's
21 moving, working.
22         If it needs to be kicked back at that stage,
23 then they're going to kick the data back.  Data often
24 that is not correctly stabilized, has noise, has other
25 issues, jitter, things like that, then it would have to

 1  A.      I do, yes.

 2  Q.      And Dimensional Imaging is another facial motion

 3  capture technology?

 4  A.      Yes, they are.

 5  Q.      Functionally, does it differ very much from what

 6  MOVA does?

 7  A.      Yes.  They give a higher quality output than --

 8  functionally, it's exactly the same thing, although it's

 9  a higher quality output than MOVA.

10  Q.      And in your experience with digital imaging, did

11  it take between two weeks to get a partial delivery and

12  three to four weeks to get a full delivery?

13  A.      Yes.

14          MS. YOUNG:  Okay.  That's all that I have.

15          Thank you.

16          MR. CARLSON:  I just have a couple.

17                        EXAMINATION

18  BY MR. CARLSON:

19  Q.      Mr. Hendler, you were asked a series of

20  questions by Mr. Kleinman about all of the work that you

21  had to do on the VFX team with the facial performance

22  capture data in order to render the -- to animate the

23  rig.

24          Do you recall that testimony?

25  A.      Yes.

1      CERTIFICATE OF SHORTHAND REPORTER

2

3       I, Michael P. Hensley, Registered Diplomate

4  Reporter for the State of California, CSR No. 14114, the

5  officer before whom the foregoing deposition was taken,

6  do hereby certify that the foregoing transcript is a

7  true and correct record of the testimony given; that

8  said testimony was taken by me stenographically and

9  thereafter reduced to typewriting under my direction;

10 that reading and signing was not requested; and that I

11 am neither counsel for, related to, nor employed by any

12 of the parties to this case and have no interest,

13 financial or otherwise, in its outcome.

14

15

16

17

18       Michael P. Hensley, CSR, RDR

19

20

21

22

23

24

25