STEVE BERMAN (*pro hac vice*)
MARK CARLSON (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
markc@hbsslaw.com

PHILIP GRAVES (CBA No. 153441)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
philipg@hbsslaw.com

RIO PEARCE, CBA No. 298297
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
riop@hbsslaw.com

*Attorneys for Plaintiffs*
Rearden LLC and Rearden Mova LLC

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| REARDEN LLC, et al.,<br><br>       Plaintiffs,<br><br> v.<br><br>THE WALT DISNEY COMPANY, *et al.*,<br><br>       Defendants.<br><hr>REARDEN LLC, *et al.,*<br><br>       Plaintiffs,<br><br> v.<br><br>TWENTIETH CENTURY FOX FILM CORPORATION, *et al.*,<br><br>       Defendants. | No. 4:17–CV 04006-JST-SK<br>No. 4:17–CV-04191-JST-SK<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED R. 79-5(D)(1)(d)**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON CAUSAL NEXUS ISSUE**<br><br>Judge: Hon. Jon S. Tigar<br>Date:  To be set<br>Time:  To be set<br><br>Ctrm.: 6, 2nd Floor |

1

**TABLE OF CONTENTS**

<u>Page</u>

INTRODUCTION ....................................................................................................1

BACKGROUND FACTS .........................................................................................3

ARGUMENT ...........................................................................................................4

I.     REARDEN'S BURDEN ON SUMMARY JUDGMENT .............................4

     A.     The Summary Judgment Standard................................................4

     B.     The Gross Revenue at Issue. .........................................................4

     C.     The Causal Nexus Between Gross Revenue and Infringement...................................5

II.     DEFENDANTS' UNAUTHORIZED COPYING OF THE CONTOUR PROGRAM AT LEAST PARTIALLY CAUSED REVENUE AND AVOIDANCE OF EXPENSE. .........................................................6

     A.     Defendants promoted their use of "MOVA" in the films at issue to act as a draw to filmgoers for the films at issue. ...........................6

          1.     Print, press conferences, interviews, and social media "MOVA" promotions...................................7

          2.     "MOVA" promotion for *Guardians of the Galaxy* as a draw to filmgoers...................................11

          3.     The *Beauty and the Beast* and *Deadpool* Featurettes touted "MOVA." ...................................12

     B.     The Beast Reveal Trailer relied on Contour-based clips as a draw to filmgoers. ...................................13

     C.     The Contour system was critical to humanize the CG Beast so that audiences could empathize with him and believe that Belle could love him. ...................................14

     D.     Use of the Contour system avoided significant cost of hand animation by VFX artists to approximate the level of subtle nuance that "came for free" with Contour. ...................................19

III.     DEFENDANTS' SUMMARY JUDGMENT ARGUMENTS ARE NOT PERSUASIVE...................................20

     A.     That defendants can hypothesize "innumerable" or "myriad" reasons why a moviegoer might see a film does not make the causal nexus to revenue speculative. ...................................20

B.    Defendants' argument that infringer profits are not available in software cases because users do not see the copied code, itself, is contrary to precedent. ...................................................................21

C.    Defendants' argument that MOVA is only "a preliminary step" of creating a motion picture is an *apportionment* argument, not relevant to *causal nexus*....................................................................23

D.    Rearden's theories do not rely on speculation or misunderstand copyright.............................................................................24

    1.    Defendants assert only credibility issues with respect to their use of "MOVA" in the films at issue to act as a draw to audiences. ............................................................................24

    2.    *Use* of software is not a defense to unlawful *copying* of software. ..............................................................................25

CONCLUSION .............................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

C<small>ASES</small>

4

*Anderson v. Liberty Lobby, Inc.*,
5
477 U.S. 242 (1986) ....................................................................................................4

6

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ....................................................................................................4

7

*Charter Sch. Capital, Inc. v. Charter Asset Mgmt. Fund, L.P.*,
8
2016 WL 5921062 (C.D. Cal. 2016) .....................................................................6, 19

9

*Complex Sys., Inc. v. ABN Ambro Bank N.V.*,
2013 WL5970065 (S.D.N.Y. 2013) ....................................................................23, 24
10

11

*Dash v. Mayweather*,
731 F.3d 303 (4th Cir. 2013) ........................................................................20, 21, 23, 24

12

*Ellison v. Robertson*,
13
357 F.3d 1072 (9th Cir. 2004) .....................................................................................6

14

*Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*,
886 F.2d 1545 (9th Cir. 1989) (*Frank Music II*) .......................................................23
15

16

*Garcia v. Coleman*,
2009 WL 799393 (N.D. Cal. 2009) .........................................................................6, 20

17

*Griffo v. Oculus VR, Inc.*,
18
2018 WL 6265067 (C.D. Cal. 2018) ........................................................................6, 20

19

*Hendricks v. Physicians Skin & Weight Centers*,
2014 WL 12561621 (C.D. Cal. 2014) .........................................................................6
20

21

*Lowrys Reports, Inc. v. Legg Mason, Inc.*,
271 F.Supp. 2d 737 (D. Md. 2003)...........................................................................23

22

*Mackie v. Rieser*,
23
296 F.3d 909 (9th Cir. 2002) ............................................................................. *passim*

24

*MAI Sys. Corp. v. Peak Computer, Inc.*,
991 F.2d 511 (9th Cir. 1993)..................................................................................21, 25
25

26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 US 574 (1986) ......................................................................................................4

27

28

*Oracle America, Inc. v. Google, Inc.*,
   2016 WL 234365 (N.D. Cal. 2016) ................................................................21, 22

*Perfect 10, Inc. v. Giganews, Inc.*,
   847 F.3d 657 (9th Cir. 2017) ......................................................................................6

*Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*,
   2012 WL 3306575 (E.D.N.Y. 2012) ........................................................................24

*Polar Bear Prod., Inc. v. Timex Corp.*,
   384 F.3d 700 (9th Cir. 2004) ..........................................................................4, 5, 6, 22

*Rearden LLC v. Crystal Dynamics, Inc.*,
   2019 WL 8275254 (N.D. Cal. 2019) ......................................................................1, 7

*SHST v. Rearden*,
   3:15-cv-00797 ECF No. 208-1 ..................................................................................24

*Wall Data Inc. v. Los Angeles County Sheriff's Dept.*,
   447 F.3d 769 (9th Cir. 1984) ....................................................................................21

### STATUTES

17 U.S.C. § 101 ...............................................................................................................21

17 U.S.C. § 504(b) ................................................................................................... *passim*

### OTHER AUTHORITIES

Fed. R. Civ. P. 56(a) ..........................................................................................................4

H.R. Rep. No. 94-1476, § 504 (1976) ................................................................................4

1

**<u>INTRODUCTION</u>**

2      Rearden LLC and Rearden Mova LLC (collectively, "Rearden") filed this vicarious and

3  contributory copyright infringement case against defendants for copying Rearden's Contour Reality

4  Capture software ("Contour program"), a program that implements the Contour facial performance

5  capture technology ("Contour system").  In addition to its lost profits, Rearden seeks the portion of

6  defendants' film profits that is attributable to their infringements of the Contour program copyright

7  as authorized by 17 U.S.C. § 504(b) of the Copyright Act.  Defendants have moved for partial

8  summary judgment on a narrow damages issue.  They argue that Rearden's claim for a portion of

9  their film profits requires proof that the profits were caused at least in part by their infringements,

10  and that here the causal relationship is so attenuated that there can be no "nexus" as a matter of law.

11      But in the pages that follow, Rearden proves that defendants chose to expressly tout their use

12  of "MOVA" when they marketed the films at issue to filmgoers.[1]  It follows that a jury could

13  reasonably conclude that their marketing efforts had the desired effect:  they influenced at least in

14  part filmgoer purchasing decisions.  *See, Rearden LLC v. Crystal Dynamics, Inc.*, 2019 WL

15  8275254, *9 (N.D. Cal. 2019) (touting use of MOVA in video game promotion supports a jury

16  inference that the infringer obtained direct financial benefit from Contour copyright infringement).

17      For example, Disney's *Beauty and the Beast* press kits touted its use of "MOVA" to make the

18  computer graphics ("CG") Beast character, and MOVA's first ever use to make a CG romantic hero.

19  The film's director Bill Condon and producer David Hoberman both repeatedly emphasized to the

20  press Disney's use of MOVA to make the CG Beast.  And actor Dan Stevens, who played the Beast,

21  repeatedly described in interviews and press conferences how Disney used MOVA to capture his

22  performance.  In Disney's trailer for the film, the CG Beast—revealed to audiences for the first

23  time—appeared almost exclusively in MOVA-based CG.  Similarly, Marvel's president Kevin Feige

24  described the use of MOVA to capture Josh Brolin's performance as Thanos in *Guardians of the*

25  *Galaxy* to the press.  Marvel issued a joint press release with Luma Pictures, the visual effects

26

27  ───────────────
       [1] Defendants refer to the Contour system as "MOVA," the name of the Rearden entity that offers
28  Contour.  Here, the two terms will be used interchangeably as context dictates.

("VFX") studio that made the CG Thanos character, describing their use of MOVA.  And the "making of" featurettes for *Beauty and the Beast* and *Deadpool* both featured their use of "MOVA."

These were not isolated incidents, but rather the product of defendants' firm pre-litigation belief that the "magic" of MOVA would interest filmgoers.  Of all the technology and artistry that defendants' brief and declarations detail in describing the end-to-end animation pipeline of a CG character, defendants chose MOVA to tout to potential audiences.  Defendants used MOVA to create a sense of *excitement and anticipation* in potential audiences, to give them the impression that they would see something *new and revolutionary* in the films at issue, *to act as a draw to audiences*.

Professor Angela Tinwell, testifying by declaration, confirms that use of Contour in *Beauty and the Beast* was necessary to make a CG romantic hero with whom audiences could empathize. She is an expert on human response to CG characters in films and games, based on extensive experiments with human subjects.  Condon and Hoberman confirmed that audience empathy for the CG Beast was essential to the film's success.  Dr. Tinwell testifies that defendants' use of Contour allowed the capture of facial expression subtleties and nuances that, if not captured, would have prevented the audience from empathizing with the Beast.  She concludes that, in her opinion, *Beauty and the Beast* revenue can be attributed at least in part to Disney's use of Contour.  And former Fox International film executive Philip Fier's declaration confirms that Disney's use of Contour to make the Beast in its *Beauty and the Beast* trailer likely influenced filmgoers' decisions to see the film.

Defendants' argument that no one could possibly have been influenced to see the films at issue even in part because they used "MOVA," use that requires making *countless* infringing copies of the Contour program, cannot be reconciled with their choice to expressly feature "MOVA" to market and promote the films to potential audiences.  And their contentions that MOVA is only the beginning of a CG character's long animation pipeline, that the cost of MOVA was only a small part of their VFX budgets, and that use of MOVA is only one of the many possible reasons a filmgoer might choose to see a film, are not relevant.  Of all the steps in the CG character animation pipeline that defendants detail here, they believed that MOVA had the most potential to draw audiences to see the films at issue.  How important MOVA was, relative to the other steps that they never mentioned,

1   is a matter of apportionment.  Apportionment is Defendants' burden to prove under Section 504(b) of

2   the Copyright Act, and it has *no relevance* to the issue of causal nexus raised by Defendants motion.

3        Accordingly, the Court should deny defendants' partial summary judgment motion.

4   ### BACKGROUND FACTS

5        Rearden invented the Contour facial performance capture system, which was publically

6   unveiled on July 31, 2006.  The Contour program that controls the system is copyright-protected.

7        Contour is an arc-shaped rig and computers running the Contour program to control 27

8   cameras and panels of natural and ultraviolet lights.  The actor wears phosphor-based makeup, which

9   provides thousands of glowing points of reference in a random pattern.  During the performance, the

10  Contour program alternately flashes the natural and ultraviolet lights more rapidly than the eye can

11  detect, and alternately opens and closes the camera apertures to capture the performance under the

12  natural lights.  The captured video is fed into the Contour program, which processes it into "raw

13  scans."  Then the raw scans are fed back into Contour to re-process them into a "tracked mesh,"

14  which replicates the surface of the performer's face in three dimensions from frame-to-frame at a

15  sub-millimeter level of precision never before achievable with conventional hand animation or

16  marker-based technologies.  VFX artists can retarget the tracked mesh to the face of a CG character,

17  such that the character's face displays every subtle nuance of the actor's captured facial performance.

18       Contour's unveiling created a sensation.  Within days, production began on the first released

19  film using the Contour system, *The Curious Case of Benjamin Button.* The photorealistic reverse-

20  aging of Brad Pitt's face was widely lauded as a VFX milestone, winning an Oscar for Best Visual

21  Effects.  Thereafter, film studios lined up to hire Rearden to use the Contour system in fifteen films,

22  including Disney's *TRON: Legacy, Pirates of the Caribbean: On Stranger Tides*, *John Carter*, and

23  *The Avengers*, and Fox's *Percy Jackson and the Olympians: The Lightning Thief*.

24       Digital Domain 3.0 ("DD3") wrongfully appropriated the Contour system.  Defendants,

25  acting through a spider's web of gossamer subsidiaries, contracted with DD3 to perform facial

26  performance capture on *Beauty and the Beast, Avengers: Age of Ultron, Guardians of the Galaxy,*

27  *Deadpool, Night at the Museum: Secret of the Tomb,* and *Fantastic Four* (the "films at issue").

28

Each time defendants used the Contour system, whether for facial performance capture, processing captured video into raw scans, or re-processing raw scans into tracked mesh, each computer made a copy of the Contour program in random access memory ("RAM").  Each copy infringed the Contour program copyright, *likely thousands of infringements for the films at issue.*

## ARGUMENT

### I.     REARDEN'S BURDEN ON SUMMARY JUDGMENT

#### A.     The Summary Judgment Standard.

Under Fed. R. Civ. P. 56(a), a court may not grant a summary judgment motion unless there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court cannot engage in credibility determinations or weighing of the evidence. *Id.*, at 255.  Rather, the non-moving party's evidence must be believed. *Id.*  And the court must draw all reasonable inferences in favor of the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 US 574, 587 (1986).

#### B.     The Gross Revenue at Issue.

The Copyright Act provides for recovery of "any profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b).  A copyright owner is entitled to an award of the infringer's profits "[t]o take away incentives for would-be infringers" and "to prevent the infringer from unfairly benefitting from a wrongful act." *Polar Bear Prod., Inc. v. Timex Corp.,* 384 F.3d 700, 708 (9th Cir. 2004); H.R. Rep. No. 94-1476, § 504, at 161 (1976).  Both direct profits (from sales of infringing products), and indirect profits (from sales of products marketed or promoted by infringement), are recoverable. *Polar Bear*, 384 F.3d at 708, 710.  The statute also divides the evidentiary burden for proving infringer profits between the parties:  "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's <u>gross revenue</u>, and the infringer is required to prove his or her <u>deductible expenses and the elements of profit attributable to factors other than the copyrighted work</u>." *Id.*, at 707; 17 USC § 504(b).

Although the plaintiff must prove only "gross revenue," "the ['attributable to the infringement'] causation element of the statute serves as a logical parameter to the range of gross profits a copyright plaintiff may seek." *Polar Bear,* 384 F.3d at 711.  Consequently, "a copyright owner is required to do more *initially* than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement." *Id.,* at 711.  "[T]he plaintiff in a copyright action against a multidivision, multi-product company such as General Mills" may not simply "offer an overall gross revenue number—like $11.5 billion—and sit back." *Id.,* at 711.  "[C]laiming profits beyond what *might be* attributable to the infringement" is the "good deal of mischief" that the *Polar Bear* court said the causation element obviates.  *Id.*

Here, the "gross revenue" at issue is not defendants' overall gross revenue from all their divisions, films, and other sources of revenue, but only the revenue from the specific films that defendants made and promoted by infringing the Contour program.  Thus, for example, although The Walt Disney Company reported over $55 billion in revenue from all sources for the fiscal year ended September 30, 2017 (*Beauty and the Beast* was released in March, 2017),[2] the "gross revenue" at issue for that film here is only the revenue that Disney derived from *Beauty and the Beast* in 2017 and thereafter (less any deductible expenses and apportionment that defendants may later prove at the apportionment stage).  Accordingly, Rearden's "gross revenue" claims meet the *initial* "logical parameter" and "legally significant relationship" requirements of *Polar Bear*.[3]

**C.     The Causal Nexus Between Gross Revenue and Infringement.**

Section 504(b) "creates a two-step framework for recovery of indirect profits:  1) the copyright claimant must first show a causal nexus between the infringement and the gross revenue; and 2) once the causal nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement." *Id.*, at 711.  In other words, causal nexus is a procedural fact issue in a copyright damages case, to shift the statutory burden from plaintiff (to prove gross revenue), to defendant (to prove expenses and profit attributable to non-infringing factors).

---

[2] https://thewaltdisneycompany.com/walt-disney-reports-fourth-quarter-full-year-earnins-fiscal-2017/

[3] Revenue and profit estimates for the films at issue are provided in Declaration of Phil Fier, ¶18.

On "summary judgment, a copyright infringement plaintiff seeking to recover indirect profits damages under 17 U.S.C. § 504(b) must proffer some evidence to create a triable issue regarding *whether the infringement at least partially caused the profits that the infringer generated as the result of the infringement*." *Mackie v. Rieser,* 296 F.3d 909, 911 (9th Cir. 2002); *Polar Bear*, 384 F.3d at 711.  The causal nexus element of a copyright *damages* case parallels the "direct financial benefit" element of a vicarious *infringement* case.  "*Financial benefit exists where the availability of infringing material acts as a draw for customers*." *Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004). "[T]he size of the 'draw' relative to a defendant's overall business is immaterial." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017). Rather, "[t]he essential aspect of the direct financial benefit inquiry is *whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps*, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Id.*, quoting *Ellison*, 357 F.3d at 1079.

To prove a causal nexus, Rearden is not required to submit declarations from filmgoers that their purchasing decisions were because of defendants' unauthorized copying.  *Polar Bear*, 384 F.3d at 715; *Griffo v. Oculus VR, Inc.*, 2018 WL 6265067 at n. 13 (C.D. Cal. 2018); *Charter Sch. Capital, Inc. v. Charter Asset Mgmt. Fund, L.P.*, 2016 WL 5921062 at n. 3 (C.D. Cal. 2016).  Nor is Rearden required to show that defendants' copying of Contour was the *only* or even the *main* reason for film revenue.  *Griffo*, 2018 WL 6265067 at *12; *Garcia v. Coleman*, 2009 WL 799393 at *4 (N.D. Cal. 2009); *see also*, *Mackie,* 296 F.3d at 911 (plaintiff must proffer evidence that the infringement "*at least partially* caused the profits that the infringer generated as the result of the infringement.").  And causal nexus may be proved by circumstantial evidence.  *Polar Bear*, 384 F.3d at 712; *Hendricks v. Physicians Skin & Weight Centers*, 2014 WL 12561621, *3 (C.D. Cal. 2014).

## II.   DEFENDANTS' UNAUTHORIZED COPYING OF THE CONTOUR PROGRAM AT LEAST PARTIALLY CAUSED REVENUE AND AVOIDANCE OF EXPENSE.

### A.   Defendants promoted their use of "MOVA" in the films at issue to act as a draw to filmgoers for the films at issue.

Before this case was filed, defendants firmly believed that "MOVA" would serve as a draw to filmgoers, because they advertised their use of MOVA when promoting the films at issue.  Based on

this evidence, a jury could reasonably infer that defendants were correct in viewing MOVA as a draw to filmgoers.  *See, Crystal Dynamics,* 2019 WL 8275254 at *9 (advertising use of MOVA to promote a video game supports jury inference that infringer benefitted directly from infringement).

       **1.**      **Print, press conferences, interviews, and social media "MOVA" promotions.**

As early as March 4, 2015, two years before *Beauty and the Beast's* release, a film publicity firm hired by Disney identified the transformation of Dan Stevens into the Beast as a subject in which audiences would be interested.  Rachel Kennedy, of Rachel Kennedy PR, wrote an email to director Bill Condon and producer David Hoberman with the subject "B&B: Beast development (Behind the scenes)," in which she said that cameramen would document Stevens's transformation:

Ex. 1.[4]  Hoberman testified that Disney hired Ms. Kennedy to interest people in *Beauty and the Beast* to get them to see the film:

Ex. 2 (Hoberman 37:1-25).

Disney agreed that audiences would have ▮▮▮▮▮ for ▮▮▮▮▮▮▮ Before the film's release, Disney prepared production notes and a press kit to provide information about the

---

[4] Unless specified otherwise, "Ex." refers to exhibits to the Declaration of Mark Carlson.

film that Disney believed would interest filmgoers.  Ex. 3 (press kit); Ex. 4 (production notes); Ex. 2

(Hoberman 65:9-67:15); Ex. 5 (Condon 32:18-34:9; 45:2-21).  The press kit repeatedly touts

Disney's use of "MOVA" in the film.  For example, under the heading █████████████

███████  the press kit described how MOVA was a █████  to the film's success:

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

Ex. 3, at DIS-REARDEN-07968; Ex. 4, at MAND-REARDEN-01027.  Disney's press kit also

described how the key MOVA facial capture technology worked:

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

Ex. 3, at DIS-REARDEN-07969; Ex. 4, at MAND-REARDEN-01028.

One month before the film's release, on February 20, 2017, the director and cast of *Beauty

and the Beast* appeared at a press conference in Paris, published worldwide on YouTube, where Dan

Stevens, the actor who portrayed the Beast, introduced "MOVA" to the press:

> the facial capture was done separately using a technology called
> **MOVA**.  So every ten days, two weeks, we would go into—I would go
> into a booth—spray my face with UV paint and 27 little cameras
> would capture the facial expressions of all the scenes that we had done
> on previous days.  [Co-star] Emma [Watson] would be sitting outside
> of the cage, and we would play the scenes again, just capturing the
> face.  They would take that information, morph it into the Beast, his
> face, and map it onto the body that I'd puppeteered on the set.

Ex. 6, at 12:10-13:18; Ex. 5 (Condon 104:14-25; 106:25-107:8); Ex. 7 at 0:55-2:32.[5]  Emma Watson,

who played Belle opposite Stevens's Beast, picked up on the press kits' "new technology" theme,

and emphasized that "when you see Beast on screen, there is something so human about him, and so

---

[5] Mr. Stevens was an authorized representative and spokesperson for Disney.  Ex. 8.

kind of, *it really captures the subtlety of Dan's facial expressions and the performance that he gives, which is, I don't think the world has seen anything like it before, because its really unique to our film.*" Ex. 6 at 13:56-14:19[6]; Ex. 5 (Condon 107:10-21); Ex. 7 at 2:43-3:34. Director Bill Condon underscored MOVA's importance to the film, continued the "new technology" theme, and credited MOVA with allowing Stevens's performance to come through to the CG Beast in the film:

> And yes, to your point about, this was, this was one of the scariest challenges jumping into this movie that we had somebody who was at the emotional center of the movie, who was the romantic hero of the movie, who was going to be a CG character, you know, and it was this new process which, you know usually its dots like this and then, and then animators fill in the dots. *But this actually captured every pore of Dan's skin, and that's why so much of him comes, this great performance comes through.*

Ex. 6 at 14:34-15:01[7]; Ex. 5 (Condon, 107:22-109:9); Ex. 7 at 3:44-5:13. And he told a story about the MOVA facial performance capture for the film's iconic waltz scene that poignantly emphasizes the impact that Disney believed audiences could expect from its use of MOVA in the film:

> I tell this story about a visual effects supervisor from LA, and her daughter came to visit while he was doing the oddest thing, which was, we were playing Beauty and the Beast, and Dan was just doing the facial expressions imagining that he is dancing with Emma, we finished the take, the girl hadn't seen it shot live, but she was crying, just from what he was expressing on his face.

Ex. 6 at 15:02-15:42; Ex. 5 (Condon, 108:22-109:9); Ex. 7 at 5:13-6:19. Disney captured that performance using MOVA. Ex. 5 (Condon 19:14-20:6).

Similarly, before the IMAX advance screening, broadcast on Facebook worldwide on March 6, 2017 just over a week before the film's release, Mr. Stevens re-introduced "MOVA" to the audience, and continued the theme of how Disney had used it in a new way for a romantic lead:

> And, uh, I would go, after a day's filming, … and my face would be sprayed with UV dots, about ten thousand dots, and I'd sit in this, what I liked to call the TRON cage, which is sort of a UV, UV lights and 27 little cameras, and we'd play all of our scenes again. And Emma would be sitting outside the cage, and I would be inside just, you know, doing anything that I'd been doing the previous two weeks, uh week, with my face, whether it was eating or sleeping or roaring or waltzing, I would sit there and just do it all. And they'd take that information, take it away, morph it into the Beast, and map it onto the body that I had puppeteered on the set. *So it's an amazing fusion of*

---

[6] Ms. Watson, too, was an authorized representative and spokesperson for Disney. Ex. 9.

[7] Mr. Condon was also an authorized representative and spokesperson for Disney. Ex. 10.

1   *these technologies and it's never really been used this extensively*
    *before, certainly not for a romantic lead.*

2

3   Ex. 11 at 11:33-12:31; Ex. 5 (Condon, 20:18-22:8, 27:11-15; 109:12-110:9); Ex. 12.  Stevens made

4   virtually identical comments promoting Disney's use of MOVA in interviews with Fox 5 Online on

5   March 4, 2017 (Ex. 15 at 2:37-4:10), People Magazine Online on March 16, 2017 (Ex. 13 at 0:59-

6   1:40), and People.com on March 17, 2017 (Ex. 14), the day of the film's theatrical release.

7       Condon produced a set of talking points for an interview to promote the DVD release of

8   *Beauty and the Beast*, which touted Disney's use of "MOVA" for the first CG romantic hero:

9   

10

11

12

13

14

15

16

17

18

19

20

21   Ex. 16; Ex. 5 (Condon, 28:8-31:23).  And Condon admitted that it was "MOVA" that allowed the

22   capture of :

23

24

25

26

27

28

1

2

[redacted]

Ex. 5 (Condon 31:10-23).  Similarly, Hoberman produced a set of interview talking points describing

Disney's use of "MOVA" in the film for the press:

[redacted]

Ex. 17; Ex. 2 (Hoberman 73:9-16; 74:14-25; 77:4-16).

Disney's use of "MOVA" in *Beauty and the Beast* was picked up by journalists.  In the

March 8, 2017 *New York Times* review, titled [redacted]

[redacted] the critic described the MOVA technology Disney had used to make the CG Beast:

[redacted]

Ex. 18, at DIS-REARDEN-011288.

2.   **"MOVA" promotion for *Guardians of the Galaxy* as a draw to filmgoers.**

Defendants promoted the use of "MOVA" in other films at issue, as well.  For example, on

July 26, 2014, Kevin Feige, the CEO of Marvel Studios, described the importance of using MOVA

to capture Josh Brolin's performance as Thanos in *Guardians of the Galaxy*:

> Well, yeah. Utilizing technology is what all these movies are about. I would
> say that the technology – it's not just, certainly with Thanos, it's not just a
> vocal performance. It's a facial performance. […] You want a great
> performance and the reason we were comfortable moving forward with
> seeing as much Thanos as we do in Guardians is because we had a great actor
> *who was willing to put the dots on his face and do the performance.*

Ex. 19.  And Marvel issued a joint press release with Luma Pictures (the VFX studio for the CG

Thanos character) touting *Guardians's* use of MOVA:



Ex. 20, at DIS-REARDEN-0942.

### 3.     The *Beauty and the Beast* and *Deadpool* Featurettes touted "MOVA."

Disney continued advertising its use of "MOVA" *after* the film's theatrical release, for sales

of DVDs, Blu-rays, and streaming.  The *Beauty of a Tale* featurette featured interviews of Condon

and Stevens about Disney's use of MOVA, intercut throughout with clips of Stevens's MOVA facial

performance capture.  Ex. 21, at 24:28-25:53.  Condon credited MOVA's capture of Stevens's

performance for making a Beast that audiences could believe in, and for making the film work:

> **Condon:**  And then when it came to his face, we used a technology which
> allowed us not to have to put a big rig of cameras around him as always
> happens in a CG performance.  He was just himself so Emma could play off
> of him.  But then at night, he would have to go into this rig and he would sit
> there and recreate his performance.  *Id.*

> **Stevens:**  It's a separate facial capture, which is a whole other challenge, so
> you have to kind of think yourself back into the scenes that you shot many,
> one or two weeks ago, and without moving your body, you know, just
> moving your face do, do the scenes whether they have lines in or not. *Id.*

> **Condon:**  So he gets his face sprayed, which means every single
> muscle is captured, every pore, and that's why I think so much of Dan's
> performance comes through, because every twitch is captured.  *Id.*

> **Condon:**  There have been a lot of great CG performances.  But this was
> a romantic hero, someone who was at the emotional center of the movie.
> *I always said we could get everything else in this movie right, but if we
> didn't get a Beast that people believed in, then it wouldn't work.  Id.*

And Condon confirmed in his deposition that he was speaking of "MOVA" in that interview:



Ex. 5 (Condon 58:9-59:18).

Fox similarly touted its use of "MOVA" in a promotional featurette for *Deadpool*.  Visual Effects Supervisor Pauline Duvall described Fox's use of MOVA in the Blu-ray/DVD/streaming promotional featurette called *From Comics to Screen...to Screen:  MAGIC!*:

> Digital Domain has a great system called '**MOVA**', which is a facial capture system.  You paint on the face and it creates thousands and thousands of little tracking markers.  At that point, you get a piece of geometry that captures movement and acting of the actor.

Ex. 22.

## B.    The Beast Reveal Trailer relied on Contour-based clips as a draw to filmgoers.

On November 14, 2016, Disney unveiled a *Beauty and the Beast* trailer, revealing the CG Beast to audiences.  Ex. 23.  The Beast appeared almost entirely in MOVA-based film clips.  The trailer featured eleven clips of the Beast, and Mr. Condon confirmed that at least *nine* were based on "MOVA."  Ex. 5 (Condon 110:14-114:13); Ex. 23 at 0:54-57; 0:59-1:03; 1:24-:26; 1:33-:36; 1:36-:40; 1:41-:43, 1:53-:54; 1:55-56; 1:56-:58; Ex. 24.  Shortly after the trailer's release on YouTube, Disney reported it had set a new record with *over 127 million views in the first 24 hours*, and was

among the top-trending videos on YouTube.  Ex. 25 (RFA 2-3).  Within the first half hour of the

trailer's launch, #BeautyAndTheBeast was the leading trend worldwide on Twitter.  *Id.,* (RFA 4).

And the trailer's success was reported in the media.  Ex. 26; Ex. 5 (Condon, 56:8-57:1).

A 2018 National Research Group ("NRG") report prepared for Fox entitled ██████████

████████  concluded that █████████████████████████████████████████████████

(Ex. 27 (FOX-REARDEN-01375 )), trailers were ██████████████████████████████

███████  (*Id.*), ████████████████████████████████████████████████████████

██████████  (*Id.*, at 01377), and for moviegoers between 18 and 45 years old, ████████████

█████████████████████  (*Id.*, at 01378).  Most pertinently, the NRG report found that ████████

███████████████████████████████████.  *Id.*, at 01379.  Hoberman confirmed this finding:

████████████████████████████████████████████████

██████████

████████████████████████████████

██████████

██████████████████████████████████████████████████████████

██████████████████

Ex. 2 (Hoberman 55:6-17).

Philip Fier, former Vice President and Chief Financial Officer of 20th Century Fox

International and current owner of Focus Advisory Services LLC, agrees that trailers drive film

attendance.  Fier Dec. ¶¶19-28.  And he confirmed the NRG conclusion independently.  *Id.,* at ¶¶20-

21.  He testifies by declaration that the *Beauty and the Beast* trailer released on November 14, 2016

was exceptionally successful, that the Beast was an important factor in its appeal, and that at least

some moviegoers likely saw the film at least partially because of the trailer.  Fier Decl. ¶¶19-29.

**C.      The Contour system was critical to humanize the CG Beast so that audiences could empathize with him and believe that Belle could love him.**

In making *Beauty and the Beast*, it was important to show the human within the Beast, so that

audiences could empathize with him.  The Disney press kit stressed this point:

1

2

3

4

Ex. 3, at DIS-REARDEN-07968.  Condon agreed.  He said of the Paris press conference:

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22  Ex. 5 (Condon 13:1-14:17); Ex. 6 (14:34-15:02).  Hoberman agreed that showing the Beast's human

23  side was important so filmgoers could empathize with him and believe Belle could love him:

24

25

26

27

28

Ex. 2 (Hoberman 10:17-11:3).  He believed that to get a Beast the audience could empathize with, it was important to capture as much of Stevens's performance as possible and transfer it to the Beast:

Ex. 2 (Hoberman 51:2-20).

Condon agreed.  Ex. 5 (Condon 40:11-15).  Speaking of the Facebook IMAX advance-screening press conference, Condon confirmed that it was MOVA that made it possible to preserve the human nuances of Mr. Stevens's performance:

*Id.* (Condon 26:25-27:10); Ex. 11 (11:33-12:31).  Stevens confirmed Condon and Hoberman in his People.com interview.  After describing how MOVA was used to capture his facial performance in *Beauty and the Beast*, he stated:

> The British actor adds that he and director Bill Condon, along with the effects team, *went that extra mile with facial capture in order for audiences to be able to see Beast's human qualities*.

Ex. 14.

1   Professor Angela Tinwell agrees.  Dr. Tinwell is uniquely qualified to shed light on the

2   central issue here—whether the copying of the Contour program inherent in defendants' use of the

3   system likely influenced filmgoers—because she studies human reactions to CG characters.  Tinwell

4   Decl. ¶¶ 1-5, Tinwell Ex. A.  By declaration, she explains that human beings are intensely sensitive

5   to subtle nuances in the facial expressions of others, and her research confirms that this sensitivity

6   extends to CG characters.  *Id.*, ¶¶ 10, 25-35.  If these expressions are not faithfully captured in CG

7   characters, viewers are likely to respond adversely.  *Id.*  Adverse reactions may extend from

8   uneasiness to dread, but most pertinently, her research demonstrates that when CG characters' facial

9   expressions lack expected subtle nuances, viewers *are unable to empathize with the CG characters*.

10  *Id.*, at ¶¶36-38.  Her research shows that children exhibit this same adverse response to CG

11  characters lacking natural facial expression, *and it is particularly acute in young girls*.  *Id.*, ¶¶39-41.

12   Dr. Tinwell correlated this adverse response to CG characters lacking expected nuance in

13  their facial expressions with examples of films that featured them and did poorly at the box office.

14  *Id.*, ¶¶42-66.  All of the poor-performing films used conventional key framing or low-density

15  marker-based facial capture.  *Id.*  The subtlety and nuance of natural human facial expression was

16  beyond these technologies to reproduce within the constraints of film budgets and production

17  schedules.  *Id.* at ¶71.  Dr. Tinwell contrasted these films with the advent of high-density facial

18  performance capture, the first being the Contour system, capable of capturing all of the subtlety and

19  nuance of an actor's facial expression.  *Id.*, ¶¶67-71.  As an example, she cites *The Curious Case of

20  Benjamin Button*, one of the first released films that used Contour.  *Id.*, ¶¶72-78.

21   Disney used the Contour system extensively in *Beauty and the Beast* in hundreds of shots:

22  Condon testified that *he needed a "MOVA reference" of Stevens whenever a shot included the Beast*.

23  Ex. 5 (Condon 42:15-43:8).  Rather than comment on all, Dr. Tinwell closely examined several

24  popular scenes from *Beauty and the Beast*, and demonstrated how the Contour system captured the

25  subtle nuances required for the CG Beast to express genuine human emotion to audiences.

26   **The Library Scene.**  The Beast introduces Belle to his library.  Belle, amazed, gasps "Have

27  you read all of them?"  And the Beast replies humorously, "Well, not all of them, some of them are

28

in Greek."  Delighted, Belle asks "Is that a joke?  Are you making jokes now?"  Tinwell Decl. Ex. 5.

Hoberman reported to Condon that Alan Horn, Chairman of Walt Disney Studios, asked to fine-tune

the Beast's facial expression in this scene because he regarded it as most important to show another

side of the Beast.  Ex. 29.  This scene was based on "MOVA."  Ex. 5 (Condon 50:4-51:8; 112:13-

22); Ex. 30.  And a portion appears in the trailer.  Ex. 23 at 1:36-40; Ex 24 at 2:54-3:14.

Dr. Tinwell viewed both this scene from the film and a clip produced by DD3 showing how

the Beast's facial expressions were created using the Contour system.  Tinwell Decl. ¶80; Exs. 4, 5.

She notes how non-verbal communication captured in Stevens's performance and transferred to the

CG Beast's face provided essential context for the audience to appreciate the new humorous side of

the Beast's character.  Tinwell Decl. ¶¶ 80-88.

**The Waltz Scene.**  The Beast and Belle dance a waltz in the castle's ballroom.  Tinwell Decl.

Ex. 6.  Not a word is spoken.  As early as August 14, 2014, in a first meeting with the director,

Condon identified the importance of this scene, as the point where ███████████████████████

████████████████████████████████████████  Ex. 31.  Mr. Condon confirmed that the waltz

scene was based on "MOVA" facial performance capture.  Ex. 5 (Condon 19:14-20:6; 114:7-13).

And portions appear in the trailer.  Ex. 23 at 1:41-43; 1:56-58; Ex 24 at 4:41-4:57.

In this scene, Dr. Tinwell identified subtle non-verbal communication in the flare of the

Beast's nostrils, the corners of his lips, his cheeks and brows that "would not have been possible

without capturing the full range of facial expressions that Dan Stevens performed in his MOVA

facial performance capture that were retargeted onto the animated Beast."  Tinwell Decl. ¶¶ 89-95.

**The Snowball Scene.**  The Beast and Belle are outside in the snow, and he is startled when

she throws a snowball at him.  He throws one at her in return.  Tinwell Decl. Ex. 7.  Condon

confirmed that this scene was based on "MOVA."  Ex. 5 (Condon 149:17-150:4).

In 2011, Dr. Tinwell performed human experiments involving subjects viewing CG

characters purporting to show a startled expression, and found that a lack of upper facial movement

in CG characters invoked an uneasy response compared to the control group.  Tinwell Decl. ¶95.  In

the Snowball Scene, she identifies brow lifts and other non-verbal communication that the audience

1  expects from a startled human-like character.  *Id.*  She also identifies non-verbal communication in

2  the Beast's inner brow and cheek that allows the CG Beast to convincingly express concentration

3  (for throwing) and delight (in hitting his target).  *Id.*, at ¶96-97.

4         Stevens's facial performance captured using Contour gave audiences a human-like Beast they

5  could believe in, empathize with, and believe that Belle could romantically love.  Tinwell Decl. ¶10.

6  "[F]ewer film-goers would have seen *Beauty and the Beast* originally, whether in theaters, on DVD

7  or Blu-ray, or by streaming, and fewer would have seen the film more than once, if MOVA Contour

8  facial performance capture had not been used in the Beast's animation pipeline."  *Id.*  Consequently,

9  "at least some of the film's revenue can be directly attributed to the use of MOVA Contour facial

10 motion capture for Dan Stevens's facial performance as the Beast."  *Id.*

### D. Use of the Contour system avoided significant cost of hand animation by VFX artists to approximate the level of subtle nuance that "came for free" with Contour.

12        Revenue and expense are two sides of the same coin; in other words, all else being equal, an

13 increase in revenue or reduction of expense equals increased profit.  In the causal nexus inquiry, it is

14 appropriate to consider whether infringement caused avoidance of increased costs.  *Charter Sch.*

15 *Capital, Inc. v. Charter Asset Mgmt. Fund, LP*, 2016 WL 5921062, *3 (C.D. Cal. 2016).

16        In his PhD thesis, defendants' expert Hao Li wrote that ████████████████████

17 ████████████████████████████████████████████████████████

18 ████████████████████████████████ Ex. 32 (Li 66:7-13).  He

19 agreed that high-resolution facial performance capture reduces time and labor:



25 *Id.* (Li 67:16-68:5).  And Dr. Tinwell agrees.  Tinwell Decl. ¶¶71, 104, 107.  Defendants'

26 unauthorized copying of the Contour program allowed the Contour system to achieve natural, subtle,

1   nuanced, human facial expression that otherwise would have required substantial additional animator

2   person-hours—and consequently substantial additional expense—to even approximate.  *Id.*

3   **III.    DEFENDANTS' SUMMARY JUDGMENT ARGUMENTS ARE NOT PERSUASIVE**

4       **A.    That defendants can hypothesize "innumerable" or "myriad" reasons why a**
        **moviegoer might see a film does not make the causal nexus to revenue speculative.**

5       Defendants hypothesize numerous reasons why a purchaser might have seen a film, but this

6   does not make the infringement's causal nexus to revenue speculative *per se*.  Their argument runs

7   counter to longstanding Ninth Circuit precedent that a copyright owner is not required to prove

8   causal nexus by showing that the infringement was the *only* reason *or even the main reason* for the

9   infringer's revenue.  *Griffo*, 2018 WL 6265067 at *12; *Garcia*, 2009 WL 799393 at *4; *see also*,

10  *Mackie,* 296 F.3d at 911 (plaintiff seeking indirect profits must offer evidence that the infringement

11  "*at least partially* caused the profits that the infringer generated as the result of the infringement.").

12      Defendants rely on cases that simply do not apply.  In *Mackie*, 296 F.3d 909 (9th Cir. 2002),

13  the infringement was a picture of Mackie's art, called The Tango—the dance steps of the tango cast

14  in bronze and set into a concrete sidewalk.  It was inserted in a brochure for the Seattle Symphony's

15  concert season.  But the brochure "*advertised a series of concerts that were unrelated to the artwork*

16  *itself.*"  *Mackie*, 296 F.3d at 916.  The Symphony did not use The Tango to *make* the concert

17  performances.  And the Symphony did not tell potential audiences about The Tango, how it works,

18  how the Symphony had used it in concert performances, or that The Tango was new and used by the

19  Symphony in a new way in concert performances.  It did not use The Tango as a draw to audiences.

20      Similarly, in *Dash v. Mayweather*, 731 F.3d 303 (4th Cir. 2013) the infringement was a song

21  played for boxer Floyd Mayweather's entrance to Wrestlemania events that copied Dash's song

22  "Yep."  But World Wrestling Entertainment did not use Yep to promote the events to potential

23  audiences, it did not tell potential audiences that Yep was a new song that would be used in the

24  events in a way never before heard.  It did not use Yep as a draw to audiences.

25      And in both cases, the ruling that a causal nexus had not been proved by the copyright holder

26  rested on the copyright holder's *failure to produce proof.*  The Court's ruling in *Mackie* was based on

27  Mackie's expert's admission "*that he could not 'understand' how it would be possible to establish a*

28

1   *causal link between the Symphony's infringing use of 'The Tango' and any Pops series revenues*

2   *generated through the inclusion of the collage in the direct-mail literature.*"  *Mackie*, 296 F.3d at

3   916.  And Dash argued that *he was not required to submit any evidence linking the WWE revenue*

4   *streams to the infringement.  Dash*, 731 F.3d at 332.  In that context—with no evidence linking

5   revenue to infringement—the courts could not find a causal link where other plausible audience

6   draws were possible. But here, Rearden has submitted on-point expert testimony from Dr. Tinwell

7   and Mr. Fier supporting a causal nexus between Defendants' infringements of Contour and their

8   revenue from the films at issue, as well as substantial other evidence that defendants used MOVA in

9   their promotion of the films at issue to act as a draw to audiences, and as a means to reduce cost.

10   **B.     Defendants' argument that infringer profits are not available in software cases
         because users do not see the copied code, itself, is contrary to precedent.**

11   The Copyright Act defines a "computer program" as "a set of statements or instructions to be

12   used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101.

13   The Ninth Circuit has "long held that a computer program is copyrightable as a 'tangible medium of

14   expression.'"  *Wall Data Inc. v. Los Angeles County Sheriff's Dept.,* 447 F.3d 769, 776-77 (9th Cir.

15   1984).  The unauthorized copying of copyrighted software into RAM made when using the software

16   is a copyright infringement. *MAI Sys. Corp. v. Peak Computer, Inc*., 991 F.2d 511, 518 (9th Cir.

17   1993).  And the copyright owner is entitled to recover for this infringement its actual damages and

18   the portion of the infringer's profits attributable to the infringement.  17 U.S.C. § 504(b).

19   Defendants argue that a software copyright owner cannot recover infringer profits if "no

20   consumer saw (or could have seen) the infringing copy of … software residing in computer RAM."

21   EDF No. 249 at 16.  But that argument is contrary to *Oracle America, Inc. v. Google, Inc.*, 2016 WL

22   234365 (N.D. Cal. 2016).  Oracle sued Google for infringement of its copyright in the Java software,

23   alleging Google copied the declaring code and structure, sequence, and organization of 37 Java API

24   packages in its Android operating system.  *Id.,* at *1.  Oracle sought indirect profits from Google's

25   infringements, including advertising and search revenue from Android devices.  *Id.*  Obviously, no

26   Android user who performed searches on Android devices ever saw the copyrighted Java source

27   code on their screens. Yet when Google moved to exclude Oracle's expert's testimony regarding

28

1   gross advertising and search revenues on the ground that the causal nexus between infringement and

2   revenue was too attenuated, the Court held that the expert's rebuttal report contained a "platform

3   contribution factor" theory that could satisfy the causal link requirement.  *Id.*, at *5.  There was no

4   requirement that Oracle must prove that any Android user ever saw the copied Java code itself.

5       Nor does *Polar Bear* support defendants' argument.  Polar Bear won at trial on its claim that

6   Timex infringed its copyright in an "extreme kayaking" video that Timex used to promote its

7   "Expedition" brand watches.  The verdict awarded Timex's profits from three sources:  (1) direct

8   sales at trade shows where the video played; (2) a promotion for a soft drink that used a video still;

9   and (3) *overall enhancement of brand prestige that allowed Timex to raise prices on all Expedition*

10  *watches based on their association with the video*.  *Polar Bear*, 384 F.3d at 712.  *Affirming* the

11  verdict for Polar Bear on (1) and (2), the Court rejected the "brand prestige enhancement" theory.

12      Defendants misrepresent *Polar Bear's* rejection of the "brand prestige enhancement" theory

13  as resting on the fact that "[a]ctual retail purchasers were never exposed to the infringing images

14  from the trade shows" (ECF No. 249 17:1-4).  But that sentence continued "*nor did the evidence link*

15  *retail consumers to the trade show promotion*," "*[n]or was there evidence that vendors at the trade*

16  *shows somehow transmitted enthusiasm to retail customers*."  *Polar Bear*, 384 F.3d at 715.  The

17  Court concluded Polar Bear's evidence was insufficient to link infringement to "brand prestige"

18  profits "because they do not explain how the infringement influenced the purchasing decisions that

19  lead to increased prices and ultimately to increased profits."  *Id.*  *Polar Bear* did not lay down a new

20  rule that no copyright holder can recover infringer profits unless customers saw the infringing copy.

21  Rather, the Court held that with no evidence that customers were exposed to the infringement *and no*

22  *other evidence linking the infringement to profits*, the "brand prestige enhancement" theory failed.

23  But here, the very link that was missing in *Polar Bear* is supplied by defendants, themselves,

24  because they introduced the "MOVA" technology to potential audiences when promoting the films at

25  issue, and used "MOVA" to act as a draw to filmgoers to see the films.

26

27

28

1

2

**C.      Defendants' argument that MOVA is only "a preliminary step" of creating a motion picture is an _apportionment_ argument, not relevant to _causal nexus_.**

Defendants argue that "the actual use of the software made only a minute contribution to the completed Motion Pictures," and "[t]hat contribution was dwarfed by innumerable other creative efforts …." _Id._ at 17.  Their "Factual Background" details each step in the CG character animation pipeline after defendants' infringing copying of Contour: the "hundreds or even thousands of hours of human labor and artistry" required, "the performances of many actors," the script, sets, costumes, music, and "the work of hundreds of other creative and technical personnel." _Id.,_ at 10, 13, 14.

But the Ninth Circuit treats "the creativity of producers, performers and others involved in staging," costumes, and sets as matters that "will largely be taken into account when deducting the defendants' costs." _Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.,_ 886 F.2d 1545, 1549 (9th Cir. 1989) (_Frank Music II_).  In other words, they are part of the apportionment stage, where the burden shifts to defendants to prove expenses and elements not attributable to the infringement.  The parties agree that we cannot "skip to the apportionment stage" in this motion.  ECF No. 249 at 23.

Defendants' reliance on _Lowrys Reports, Inc. v. Legg Mason, Inc._, 271 F.Supp. 2d 737 (D. Md. 2003) is misplaced.  Lowrys owned the copyrights in stock market analyses that Legg Mason infringed, and sought an apportionment of all $4.63 billion of Legg Mason's gross revenue.  But Lowrys's expert _admitted he could not say whether the infringements were causally related to Legg Mason's profits.  Id._  So _Lowrys_ is like _Mackie_, where the plaintiff's expert admitted he could not say revenue was causally related to the infringement, or _Dash_ where the plaintiff proffered no causal evidence.  _And in the absence of evidence of causation_, the court found the correlation speculative. There was no evidence that Legg Mason advertised its use of Lowrys Reports as a draw to investors, as defendants did here when they used MOVA to act as a draw to potential audiences.  And Rearden has presented on-point expert testimony of a causal link between infringement and profit.

Similarly, in _Complex Sys., Inc. v. ABN Ambro Bank N.V.,_ 2013 WL5970065 (S.D.N.Y. 2013), CSI's expert Smith, like _Mackie_, testified that he knew of no impact the infringement had on Ambro's revenue.  _Id._, at *9-11.  And unlike here, the bank's Chief Administrative Officer testified that it "_does not promote its use of BankTrade [(the infringing software)] to its custo_mers."  _Id._, at

1   *12.  The Court concluded "[i]n this ruling, the Court does not suggest that there is no scenario in

2   which a copyright holder—and even CSI on a different record—could demonstrate a sufficient

3   causal nexus, *even when multiple factors are contributing to a company's profits.*"  *Id.*, at 14.

4         And in *Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.,* 2012 WL 3306575

5   (E.D.N.Y. 2012), the plaintiff sought indirect profits from a medical supply business because of its

6   use of infringing backroom software for processing orders, invoices, financials, and inventories.

7   Like *Mackie,* the medical supplies sold were "unrelated to" the back room infringement.  Nor did

8   Tri-State promote its use of Point 4's software as new, never before seen, as a draw to customers.

9         Finally, defendants argue that the availability of Disney's own Industrial Light & Magic

10  software (Medusa) and two other products that "could have provided the same functionality as

11  MOVA" makes causal nexus "even more remote" here.  But when this Court enjoined DD3's further

12  use of the Contour system on June 17, 2016 (*SHST v. Rearden*, 3:15-cv-00797 ECF No. 208-1),

13  while DD3 was still working on *Beauty and the Beast*, DD3's President O.D. Welch filed

14  declarations stating that the work *could not be completed without access to Contour*.  SHST ECF No.

15  208-1 ¶13, ECF No. 222-2 ¶3.  And the Special Master has found in that case that DD3 continued

16  using Contour in violation of the injunction for over a month.  SHST ECF No. 577 at 2-3.  If it were

17  true, as defendants argue, that other non-infringing software provided the same functionality as

18  Contour, then DD3 would have opted for that software rather than continue using Contour in

19  violation of this Court's injunction.  Defendants cite *Complex Sys.*, 2013 WL 5970065 * 11, but there

20  the court only recited deposition testimony in the opinion's fact section that is not relied upon in the

21  court's analysis.  And they cite to a footnote in the Fourth Circuit's *Dash*, 731 F.3d at 332 n. 18, but

22  that footnote plays no role in the court's analysis.  At best, defendants rely on *dictum.*

23      **D.    Rearden's theories do not rely on speculation or misunderstand copyright.**

24          **1.    Defendants assert only credibility issues with respect to their use of "MOVA"
             in the films at issue to act as a draw to audiences.**

25

26  Defendants argue that in the studio, director, producer, and cast comments and studio

27  documents touting use of "MOVA," "[t]he references to MOVA … are general references to the

28  entire facial motion capture process, which comprised of a host of non-MOVA hardware and

software tools and non-copyrightable processes." ECF No. 246 at 20. But the record belies this argument. *See* evidence cited at pages 7-14, above. In fact, Condon testified he did not even know about the other animation processes that defendants refer to here. Ex. 5 (Condon 185:11-186:24; 187:23-189:10). Defendants argue that their witnesses meant, and their documents were intended, to say something different from what they actually said. And they are free to do so *at trial*. But this argument presents only credibility issues that cannot be resolved here on summary judgment.

2.     *Use* of software is not a defense to unlawful *copying* of software.

Defendants try to confuse matters by arguing that Rearden's claim for copying the Contour program is a claim for *use* of the program, and use is not protected by copyright. ECF No. 246 at 21-22. Their argument is pure sophistry. Their own expert, Hao Li, conceded that every time a computer uses the Contour program, it makes a copy of the program into RAM. Ex. 32 (Li 108:19-109:4); ECF No. 249-15 at ¶16. And the Ninth Circuit has held that, if unauthorized, this copy into RAM is a copyright infringement. *MAI*, 991 F.2d at 518. The Copyright Act does not make use of software an exception to the copyright owner's exclusive right to make and authorize reproduction of a protected work, nor does it make use of software a defense to copyright infringement. And *MAI* refutes Defendants' argument, because if copying software into RAM is an impermissible copyright claim for *use* of the software, then there could have been no infringement in *MAI*.

## CONCLUSION

Defendants chose to use the "magic" of MOVA in repeated descriptions of its software-implemented technology to *promote* the films at issue to potential audiences, to create a sense of *excitement and anticipation* in potential audiences, to give them the impression that they would see something *new and revolutionary* in the films at issue, *to act as a draw to audiences*. And that choice paid off in some measure of film profit to be determined at the apportionment stage of the damages trial in this case. But the consequence of that choice is a trail of documentary, video, and testimonial evidence of the causal nexus between defendants' infringements of the Contour program and revenue of the films at issue. Accordingly, the Court should deny defendants' Motions for Partial Summary Judgment on Causal Nexus Issue.

1    DATED:  November 18, 2020            HAGENS BERMAN SOBOL SHAPIRO LLP

2

3                                        By: /s/ Mark Carlson
                                             Mark Carlson
4

5                                        STEVE BERMAN (*pro hac vice*)
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
6                                        1301 Second Avenue, Suite 2000
                                         Seattle, WA 98101
7                                        Telephone: (206) 623-7292
                                         Facsimile:  (206) 623-0594
8                                        steve@hbsslaw.com
                                         markc@hbsslaw.com
9
                                         PHILIP GRAVES (CBA No. 153441)
10                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                         301 North Lake Avenue, Suite 920
11                                       Pasadena, CA 91101
                                         Telephone: (213) 330-7150
12                                       Facsimile:  (213) 330-7152
                                         philipg@hbsslaw.com
13
                                         RIO PEARCE, CBA No. 298297
14                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                         715 Hearst Avenue, Suite 202
15                                       Berkeley, CA 94710
                                         Telephone: (510) 725-3000
16                                       Facsimile:  (510) 725-3001
                                         riop@hbsslaw.com
17
                                         *Attorneys for Plaintiffs*
18                                       Rearden LLC and Rearden Mova LLC

19

20

21

22

23

24

25

26

27

28