KELLY M. KLAUS (SBN 161091)
kelly.klaus@mto.com
BLANCA F. YOUNG (SBN 217533)
blanca.young@mto.com
TERESA A. REED DIPPO (SBN 315960)
teresa.reeddippo@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

GINGER D. ANDERS (*pro hac vice*)
ginger.anders@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500 East
Washington, DC 20001-5369
Telephone:     (202) 220-1100
Facsimile:     (202) 220-2300

GLENN D. POMERANTZ (SBN 112503)
glenn.pomerantz@mto.com
ERIN J. COX (SBN 267954)
erin.cox@mto.com
JOHN L. SCHWAB (SBN 301386)
john.schwab@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| REARDEN LLC et al., <br><br> Plaintiffs, <br><br> vs. <br><br> THE WALT DISNEY COMPANY et al., <br><br> Defendants, | Case Nos.    4:17-cv-04006-JST <br> 4:17-cv-04191-JST <br><br> **DEFENDANTS' REPLY IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT ON CAUSAL NEXUS ISSUE** |
| REARDEN LLC et al., <br><br> Plaintiffs, <br><br> vs. <br><br> TWENTIETH CENTURY FOX FILM CORPORATION et al., <br><br> Defendants. | Judge:    Hon. Jon S. Tigar <br> Date:     To be set <br> Time:     To be set <br> Ctrm.:    6 (2nd Floor) |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   *MACKIE* REQUIRES DISMISSAL OF REARDEN'S INDIRECT PROFITS
      CLAIM AT THE CAUSAL NEXUS STAGE ..................................................... 3

III.  REARDEN'S CULLING OF MARKETING MATERIALS FOR REFERENCES
      TO MOVA DOES NOT SAVE REARDEN'S SPECULATIVE CLAIM ............ 6

IV.   REARDEN'S CLAIM THAT COPYING MOVA SOFTWARE LED TO A
      "HUMANIZED" BEAST DOES NOT SHOW A CAUSAL NEXUS AND IS
      UNSUPPORTED ................................................................................................. 9

      A.    The Facts Concerning MOVA's Minor Role In The Beast's Appearance
            Are Undisputed ....................................................................................... 9

      B.    Dr. Tinwell's Opinion That The Beast's Appearance Drove *BATB* Revenue
            Is Inadmissible And Speculative .......................................................... 11

      C.    Rearden's Argument Confirms It Is Conflating Copyright And Patent
            Liability And Damages ......................................................................... 13

V.    AVOIDING EXPENSE DOES NOT ESTABLISH A CAUSAL NEXUS TO
      REVENUES, AND REARDEN HAS NOT SHOWN MOVA SAVED COSTS ... 14

VI.   REARDEN HAS ABANDONED ITS INDIRECT PROFITS CLAIM FOR ALL
      MOTION PICTURES OTHER THAN *BATB* ................................................. 15

VII.  CONCLUSION ................................................................................................. 15

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**FEDERAL CASES**

4

*Bank Meilli Iran v. Pahlavi*,
    58 F. 3d 1406 (9th Cir. 1995)..................................................................................11

5

6

*Barber v. United Airlines Inc.*,
    17 F. App'x 433 (7th Cir. 2001)..............................................................................12

7

*Bauer & Cie v. O'Donnell*,
    229 U.S. 1 (1913) ....................................................................................................13

8

9

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
    772 F.2d 505 (9th Cir. 1985)......................................................................................6

10

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
    886 F.2d 1545 (9th Cir. 1989)....................................................................................6

11

12

*Garcia v. Coleman*,
    2009 WL 799393 (N.D. Cal. Mar. 24, 2009) ............................................................4

13

*Griffo v. Oculus VR, Inc.*,
    2018 WL 6265067 (C.D. Cal. Sept. 18, 2018) ..........................................................4

14

15

*Hendricks v. Physicians Skin & Weight Centers, Inc.*,
    2014 WL 12561621 (C.D. Cal. Feb. 24, 2014) ..........................................................4

16

17

*Leonard v. Stemtech International Inc.*,
    834 F.3d 376 (3d Cir. 2016) ..................................................................................5, 6

18

*Mackie v. Reiser*,
    296 F.3d 909 (9th Cir. 2002)............................................................................ *passim*

19

20

*Oracle America, Inc. v. Google Inc.*,
    2016 WL 2342365 (N.D. Cal. May 3, 2016) ...........................................................14

21

22

*Oracle America, Inc. v. Google LLC*,
    750 F.3d 1339 (Fed. Cir. 2014) ...............................................................................14

23

*Paddack v. Dave Christensen, Inc.*,
    745 F.2d 1254 (9th Cir. 1984) .................................................................................10

24

25

*Polar Bear Productions, Inc. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004)................................................................................5, 15

26

27

*Rambus Inc. v. Hynix Semiconductor Inc.*,
    254 F.R.D. 597 (N.D. Cal. 2008) .............................................................................12

28

-ii-

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Rearden LLC v. Crystal Dynamics, Inc.*,
    2019 WL 8275254 (N.D. Cal. July 12, 2019) .................................................................................5

*Ryoo Dental, Inc. v. Thomas D. Han DMD*,
    2016 WL 6138413 (C.D. Cal. Apr. 25, 2016) ...........................................................................12

**FEDERAL STATUTES**

17 U.S.C. § 504 ....................................................................................................................5, 14, 15

**FEDERAL RULES**

Fed. R. Evid. 702 .............................................................................................................................12

1  I.    **<u>INTRODUCTION</u>**

2      Rearden's first amended complaint repeatedly touted MOVA software's importance in

3  creating "the life-like motion of faces of CG characters that appear in a finished movie."  Dkt. 63

4  ¶ 43.  To support this boast, Rearden presented page after page of glossy images purporting to

5  show that copying MOVA software into RAM magically transforms an actor's facial performance

6  into a CG character.  *Id*. ¶¶ 37-42, 54-55, 98-99, 119-121.  Rearden claimed the software was so

7  critical to the success of major motion pictures that it could seek an indirect profits award here that

8  potentially would be in the hundreds of millions of dollars.  Dkt. 102 at 3-4, 40-41.

9      After 18 months of discovery, it is now clear that Rearden misrepresented what MOVA

10  actually does and grossly exaggerated its contribution to a completed motion picture.  Defendants

11  filed declarations from multiple witnesses that consistently showed the miniscule role of MOVA

12  software, which was only used in the preliminary stage of capturing and processing facial motion

13  data and only for a subset of shots.[1]  Those declarations are uncontroverted.  Rearden's Opposition

14  is conspicuously bereft of any images showing what MOVA software does, and Rearden *does not*

15  *dispute any of Defendants' evidence* on that topic.  And, Rearden's own purported expert (on the

16  supposedly critical role MOVA played in "humanizing" the Beast) confirmed MOVA's

17  insignificance when she admitted she could not tell whether specific shots of the Beast were made

18  with or without MOVA output data.  MOVA data were not even used for half the shots of the

19  Beast in the completed *Beauty and the Beast* (*BATB*).  The fact that Rearden's expert could not

20  find any inconsistency between shots that involved the use of MOVA data and those that did not

21  confirms what Defendants' uncontroverted declarations establish: the Beast's on-screen

22  appearance was the result of DD3's CG artists spending thousands of hours to animate and

23  humanize the Beast's face, not the result of the temporary RAM copying of MOVA.

24      Rearden has failed to meet its burden under *Mackie v. Reiser*, 296 F.3d 909, 916 (9th Cir.

25  2002), to show with non-speculative evidence that DD3's temporary copying of MOVA software

26  caused consumers to pay to see any of the motion pictures in suit, including *BATB*, which is nearly

27

28  ───────────────
[1] *See* Cirelli, Hendler, LaSalle, Ledda, Li, Nash, Rothbart, Steele Decls.

the sole focus of Rearden's Opposition.[2]  Like the decision to buy symphony tickets in *Mackie*, there are countless reasons why consumers would buy tickets to a multi-faceted motion picture like *BATB*.  Nothing but speculation supports the claim that one aspect (motion capture) of one feature (the face) of one character (in some but not all shots) in an enormously complex motion picture was responsible for purchasing decisions.

Rearden now claims it has filled the causal nexus gap because isolated excerpts from marketing materials for *BATB* refer to "MOVA," but the marketing materials actually highlight precisely why Rearden cannot satisfy its burden under *Mackie*.  The fact that MOVA was mentioned in three sentences in a 44-page press kit or in one question-and-answer exchange during a 30-minute press conference—both of which discussed in detail myriad elements that were part of the making of *BATB*—does not provide non-speculative evidence of a causal nexus.  On the contrary, the materials Rearden cites confirm there are endless motivations to movie-goers' purchasing decisions, and the copying of a software tool into computer RAM cannot be shown to have caused consumers to pay to watch *BATB*.

Rearden also argues that two expert declarations establish a causal nexus.  They do not. Mr. Fier opines that motion picture trailers generate audience interest.  That fact does nothing to help Rearden, because the *BATB* trailer says not a word about MOVA.  The trailer does, however, include numerous elements of *BATB* (actors, music, costumes, sets, etc.) and thus provides further proof that Rearden cannot distinguish its case from *Mackie*.

Rearden also relies on Dr. Tinwell's opinion that because four motion pictures she cherry-picked from the past 20 years purportedly lost money and did not use MOVA in the facial motion capture process, MOVA must have been responsible for increasing *BATB*'s revenues.[3]  Dr. Tinwell's opinion is nonsensical.  This is analogous to an expert in *Mackie* saying that four other symphonies in the past two decades whose brochures did not use the plaintiff's photograph lost

---

[2] Rearden's Opposition ignores three of the motion pictures in suit altogether and barely discusses two others.  Rearden's experts say nothing about MOVA's role for any of these five movies.

[3] Dr. Tinwell testified that she based her opinions on clips ranging from 5-15 minutes for each of those four movies.  Young Decl. in Supp. of Mot. to Exclude Ex. 2 at 164:1-165:21.

money, so the copying of plaintiff's photograph must have increased the Seattle Symphony's revenues.  Rearden's speculative claim does not become non-speculative just because it has packaged that claim in an expert declaration, especially one that is grossly deficient on its face.

It is hard to imagine a case where a copyright claim based on the temporary copying of software into RAM could ever establish a causal nexus to motion picture profits.  This is definitely not that case.  Rearden has not met its burden under *Mackie*, and this motion should be granted.

## II.  *MACKIE* REQUIRES DISMISSAL OF REARDEN'S INDIRECT PROFITS CLAIM AT THE CAUSAL NEXUS STAGE

Rearden's arguments all rest on the assumption a jury could find that DD3's copying of MOVA software into RAM caused consumers to pay to watch *BATB*.  That foundational premise cannot be squared with *Mackie*.  The Ninth Circuit emphasized there were "virtually endless permutations to account for an individual's decision to subscribe to the Pops series, reasons that have nothing to do with the artwork in question." 296 F.3d at 916.  The "myriad factors that could influence" the decision to buy symphony tickets (*e.g.*, "reputation," "conductor," "specific musician," *id.*) pale in comparison to the factors that could motivate people to buy tickets to see a major motion picture like *BATB*.  Such a list would include the actors, the music, nostalgia for the original animated version, attachment to the story, the costumes, the sets, the enchanted household objects, a love of movies generally, or of fantasy or Disney movies in particular.  The list goes on and on.  It is speculation in the extreme to say that the copying of software into computer RAM (which no consumer saw) to produce a collection of dots (which no one saw either) that then may or may not have been used by a CG artist to save time early in the development of one aspect of one character drove consumer purchasing decisions.  That is the crux of Rearden's claim, and it fails under *Mackie*.

Recognizing that *Mackie* dooms its claim, Rearden advances multiple legal arguments for distinguishing it or deferring its application to the apportionment stage.  None has merit.

*First*, Rearden repeatedly states that a plaintiff need only show the infringement "at least partially caused" revenues to increase.  Opp. 6, 14, 20 (quoting *Mackie*, 296 F.3d at 911).  Rearden, however, has not shown that DD3's RAM copying of MOVA caused revenues to

-3-

increase *at all*, much less partially.  In the "partial cause" cases Rearden cites, the infringing

copies *themselves* were visible to consumers and were "a prominent part of [the defendant's]

advertising campaign."  *Griffo v. Oculus VR, Inc.*, 2018 WL 6265067, at *11 (C.D. Cal. Sept. 18,

2018) (clips of plaintiff's work "were the only images in the Kickstarter video demonstrating

how" defendant's product worked); *Hendricks v. Physicians Skin & Weight Ctrs.*, 2014 WL

12561621, at *3 (C.D. Cal. Feb. 24, 2014) (infringing photos on billboard were "a vital part" of

defendant's primary advertising strategy); *Garcia v. Coleman*, 2009 WL 799393, at *4 (N.D. Cal.

Mar. 24, 2009) (plaintiff's photograph "featured prominently" on defendant's wine label).

    Here, the infringing copies of the software are not in *BATB*, the *BATB* trailer, or any ad for

*BATB*.  They existed only temporarily in RAM.  Li Decl. ¶¶ 15-20.  Those copies could not have

been responsible, even in part, for consumers' purchasing decisions.  Rearden has consistently

tried to divert attention from the temporary copy of software in RAM by focusing on the final

motion picture (while ignoring the thousands of hours of CG artists' time).  But even when

reviewing scenes from the released version of *BATB*, Rearden's expert on CG character facial

expressions could not discern when MOVA data were actually used.  This is particularly relevant

because nearly half the shots of the Beast were created without the use of MOVA data.  Hendler

Decl. ¶ 17.[4]  Had MOVA been responsible for the Beast's on-screen appearance, Dr. Tinwell

should have been able to distinguish whether a shot of the Beast was or was not created with the

use of MOVA data.  Dr. Tinwell, however, could only speculate whether MOVA data were used

for a shot.  She guessed—incorrectly—that a shot developed without the MOVA tracked mesh

must have been made with it because she could "see Dan Stevens there," "his idiosyncrasies, his

characteristics."  Young Ex. 2 at 108:5-109:1; Ex. 3; Hendler Supp. Decl. in Supp. of Mot. To

Exclude ¶ 6.  Dr. Tinwell also assumed—again, incorrectly—that other shots had not used MOVA

data because "I can't really see Dan Stevens in the Beast," when in fact MOVA data had been

used for those shots.  Young Ex. 2 at 109:12; Hendler Supp. Decl. ¶ 7.  If Rearden's own expert on

---

[4] Mr. Hendler is the only declarant who knows which shots used MOVA data in the production
pipeline and which did not, because that information is stored in DD3's DMX review system.
Hendler Decl. ¶ 49.  Tellingly, Rearden has moved to strike the Hendler Declaration.

1  CG facial expressions, after repeatedly watching a scene, could not identify when MOVA was

2  used, there is no basis to find that MOVA was even partly responsible for any layperson's

3  purchasing decision.

4  *Second*, Rearden argues the Ninth Circuit dismissed Mackie's claim because the

5  defendants' symphony subscription was "'unrelated to'" Mackie's artwork, whereas MOVA

6  copying had some relationship to the motion of some shots of the Beast's face.  Opp. 20 (quoting

7  296 F.3d at 916).  Rearden ignores that the Ninth Circuit's "unrelated to" statement was made as

8  part of an *additional* basis for rejecting Mackie's alternative theory for indirect profits.  296 F.3d

9  at 916.  The court's primary basis for rejecting both of Mackie's theories was the impossibility of

10  showing, from a virtually limitless of factors that may influence purchasing decisions, that

11  consumers "subscribed *because of [plaintiff's] work*."  *Id*.  That is Rearden's problem in spades.

12  *Third*, Rearden argues that this Court's decision in *Rearden LLC v. Crystal Dynamics, Inc.*,

13  2019 WL 8275254 (N.D. Cal. July 12, 2019), implies that references to MOVA in marketing

14  materials show a causal nexus.  *Crystal Dynamics* considered the test for the vicarious liability

15  tort's financial benefit prong.  That is not the test for causal nexus.  For vicarious liability, the

16  question is whether the defendant's financial interest flowing from a third party's infringement is

17  such that the defendant must exercise a right to stop that infringement.  *Id.* at *7.  The Court

18  recognized the attenuation between the unauthorized copying and "the results of" such copying—

19  but said this attenuation should not "insulate [Crystal] from vicarious liability" altogether.  *Id.* at

20  *8.  Unlike *Crystal Dynamics*, this motion does not resolve Rearden's liability claims.  If it proves

21  vicarious liability, Rearden can pursue actual (i.e., lost revenue) or statutory damages.  17 U.S.C.

22  § 504(b), (c).  Rearden cannot recover indirect profits because it cannot show a causal nexus.

23  For the causal nexus test, unlike vicarious liability, attenuation does make a difference.  To

24  establish a causal nexus, the plaintiff must show with non-speculative evidence that people paid

25  money "*because of [plaintiff's infringed] work*."  *Mackie*, 296 F.3d at 916.  Where, as here, "there

26  is a gap between the infringement and actual sales revenues," the plaintiff cannot recover indirect

27  profits.  *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 715 (9th Cir. 2004).

28  *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376 (3d Cir. 2016), illustrates why proving

vicarious liability does not establish causal nexus.  The court affirmed a vicarious liability verdict where copies of plaintiff's photographs shown to consumers (not the case here) "could have drawn customers to buy" defendant's products.  *Id*. at 389.  The court, however, held the same evidence did not show a causal nexus to defendant's revenues, because plaintiff did not "show[] how or why [plaintiff's] images, as opposed to other aspects of [defendant's] marketing materials, influenced profits," leaving "mere speculation regarding the causal connection."  *Id.* at 395-96.

  *Fourth*, Rearden argues that the myriad reasons why people paid to watch *BATB* are irrelevant at the causal nexus stage and should be considered only at the apportionment stage.  Opp. 23.  This argument misstates the law and ignores *Mackie*'s requirement that Rearden establish a causal nexus "before the parties can wrangle about apportionment."  296 F.3d at 915.  Rearden incorrectly states that under *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 886 F.2d 1545, 1549 (9th Cir. 1989) ("*Frank II*"), "the creativity of producers [and] performers" and "[expensive] costumes, and sets" are only to be considered at the apportionment, not the causal nexus, stage.  Opp. 23.  *Frank II* announced no such rule.  The court said these elements were relevant to apportionment *in that case* because *Frank II* was solely about the apportionment stage.  The Ninth Circuit's earlier decision held the plaintiff met its causal nexus burden where defendants incorporated music, characters, and dialogue from plaintiff's copyrighted work into a show at their hotel.  *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 514-17 (9th Cir. 1985) ("*Frank I*").

  Neither *Frank I* nor *Frank II* holds or implies that costumes, sets, and other elements that consumers see and hear are irrelevant to whether a plaintiff can show a causal nexus.  *Mackie*'s discussion of analogous elements makes clear those elements *are* relevant at the causal nexus stage.  296 F.3d at 916.  Here, as in *Mackie*, the myriad other elements that may contribute to purchasing decisions are fatal to Rearden's claim.

## III. REARDEN'S CULLING OF MARKETING MATERIALS FOR REFERENCES TO MOVA DOES NOT SAVE REARDEN'S SPECULATIVE CLAIM

  Rearden argues that marketing documents referencing "MOVA" provide the non-speculative link between RAM copying and *BATB* revenue.  The marketing materials in *Mackie*

-6-

1    not only referred to the plaintiff's work, they copied it.  But even that was not enough to show

2    causal nexus.  Here, the marketing materials Rearden claims provide the non-speculative link

3    between RAM copying and *BATB* revenue are far more attenuated and provide even less support

4    than the promotional brochure in *Mackie*.

5        The MOVA references that Rearden magnifies are in reality small, isolated excerpts of

6    much larger documents (themselves part of a larger advertising campaign) that extensively discuss

7    myriad other aspects of *BATB*.  When the MOVA references are read in context and the

8    documents are considered as a whole, it is clear that Rearden faces the same insurmountable

9    obstacle that barred the plaintiff's claim in *Mackie*:  Rearden cannot show that, out of "virtually

10   endless permutations," DD3's copying MOVA into RAM "account[ed] for an individual's

11   decision to" to pay to watch *BATB*.  296 F.3d at 916.

12       For example, Rearden emphasizes three sentences referring to MOVA in the *BATB* press

13   kit.  Carlson Ex. 3 at 8.  The press kit actually shows that Rearden's claim rests on speculation.

14   The document is *44 pages long*.  It features hundreds of elements of *BATB*.  It devotes more space

15   to describing the process of making Belle's yellow satin ball gown than it does to discussing facial

16   motion capture.  *Id.* at 12-13.  The press kit includes detailed discussions of (among many other

17   topics) the sets, which required "[o]ver 1,000 crew members work[ing] around the clock to build

18   and decorate," *id.* at 9, 11; "the beloved characters," *id.* at 4-9; the music, *id.* at 17-19; and the all-

19   star cast, director, screenwriters, and other creative personnel.  *Id.* at 20-44.

20       While Rearden claims this document and others show MOVA was singled out for having

21   "the most potential to draw audiences," Opp. 2, the press kit in fact discusses numerous

22   technologies that were "behind the magic on screen."  These include (among others) the process

23   for making "the household objects … magically come to life," the computer design for Mrs. Potts,

24   and the creation and "special effects elements" for Garderobe, the talking wardrobe.  Carlson Ex. 3

25   at 14-17.  And even when discussing the Beast's face, the document quotes Mr. Condon as saying,

26   "Dan [Stevens] brings such warmth and nuance to the character [of the Beast] and was able to

27   evoke all of the pain and the humanity that was still there and give a powerful performance, *which*

28   *is told predominantly through his eyes and voice*," elements that have nothing to do with MOVA

-7-

1  software, which captures neither.  *Id.* at 14-15.  The press kit confirms *Mackie*'s point that there

2  are "virtually endless permutations" for consumers' entertainment purchasing decisions.

3       The same dynamic is at play when Rearden culls out less than 90 seconds from a nearly

4  30-minute DVD featurette (released months after *BATB*'s theatrical release), which discusses

5  (among many other things), audience nostalgia for the 1991 animated *BATB*, the music, the sets,

6  the cast, and the development of Belle into a strong female lead.  *Id.* Ex. 21.  Rearden also

7  misleadingly truncates the Paris press conference, focusing only on a single question-and-answer

8  that discusses the process of Mr. Stevens having his face covered with makeup and performing in

9  the rig.  *Id.* Ex. 6.  The complete video of the conference runs for 37 minutes, and the cast and

10  crew talk about a wide range of topics, including their nostalgic connections to *BATB*'s music and

11  story, *id.* 1:15-4:00, and Mr. Stevens's challenges with waltzing while wearing a prosthetic muscle

12  suit and steel stilts.  *Id.* 7:20-9:54.[5]

13       Rearden also relies heavily on the November 2016 *BATB* trailer, Carlson Ex. 23, and Mr.

14  Fier's opinion that trailers drive box office revenue.  Opp. 13-14.  Far from supporting Rearden's

15  causal nexus claim, the trailer undermines it.  No one questions that movie trailers are intended to

16  draw consumers to a motion picture.  Reviewing this trailer makes it obvious why *Mackie* controls

17  the outcome here:  the trailer highlights the story, music, characters, nostalgia, and other factors

18  that drew consumers to the theater, not the copying of a software tool at the inception of the facial

19  motion capture process.  No output from the use of that tool appears on screen, and the trailer

20  makes no mention of MOVA or the many other software tools used in making *BATB*.

21       Rearden argues the trailer supports its claim because *BATB*'s director (Mr. Condon)

22  testified MOVA was used in connection with several shots in the trailer.  Opp. 13-14.  That

23  testimony does nothing for Rearden.  Mr. Condon did not testify that a copy of the MOVA

24

25  ───────────────
   [5] Rearden's discussion of other marketing materials likewise exaggerates the references to MOVA
26  and minimizes the many other elements of *BATB* featured in those materials.  *See*, *e.g.*, Carlson
   Ex. 11 (IMAX screening) (actors discussing, among other things, their connection to the animated
27  original, *id.* 2:00-7:40, and Stevens mastering the waltz while wearing a "big muscle suit covered
   in grey Lycra on stilts," *id.* 11:21, 18:30-19:30); *id*. Ex. 14 (*People* article: "A 40-Lb. Muscle Suit,
28  Waltzing on Stilts: How Dan Stevens Transformed into Beauty's Beast").

software was in the trailer; as a matter of undisputed fact, the software was not in any shot.  *See* Li Decl. ¶¶ 15-20, 21-28; Hendler Decl. ¶¶ 15-17, 21, 25-32.  Mr. Condon's testimony shows nothing more than that for some (but not all) shots of the Beast in the trailer, Mr. Stevens performed his scene in the physical MOVA rig, and this was followed by a "process by which Dan's performance is … turned into the Beast's image."  Carlson Ex. 5 at 185:22-186:3.  The MOVA output data was dots, not the Beast.  Rearden has no evidence connecting the use of MOVA to generate those dots to the trailer's or the movie's popularity.

Notably, Defendants produced thousands of pages of marketing analyses in discovery, including an analysis of the *BATB* trailer.  Klaus Decl. ¶ 4.  Mr. Fier asserts such analyses are important to gauge what does and does not work for attracting audiences.  Fier Decl. ¶ 22.  If any marketing analysis for *BATB* discussed the Beast's face, facial motion capture generally, or MOVA specifically, Rearden obviously would have submitted it.  The absence of any internal marketing analysis from Rearden's submission is telling.

## IV.   REARDEN'S CLAIM THAT COPYING MOVA SOFTWARE LED TO A "HUMANIZED" BEAST DOES NOT SHOW A CAUSAL NEXUS AND IS UNSUPPORTED

Rearden argues that MOVA was "critical" to creating a "humanize[d]" CG Beast, with which "audiences could empathize," Opp. 14, and that this empathy in turn drove up revenues.  Even if MOVA had the overstated role in creating aspects of the Beast that Rearden claims, that would not satisfy *Mackie*.  Rearden cannot establish the causal nexus between one aspect, of one character (even an important one), in the retelling of a star-driven motion picture, filled with many well-known and nostalgic characters, and the motion picture's revenues.  Moreover, Rearden has no support for its characterization of MOVA's role.

### A.   The Facts Concerning MOVA's Minor Role In The Beast's Appearance Are Undisputed

The first link in Rearden's causal chain is that the use of MOVA "gave audiences a human-like Beast."  Opp. 19.  The undisputed facts directly contradict this claim.  The facts regarding what MOVA does, and the preliminary and miniscule role it plays in only one early stage of developing part of a CG face are established in the declarations Defendants submitted.  *See* n.1,

*supra*.  These declarations—which Rearden does not challenge or contradict—establish that the Beast that appeared on screen was the result of thousands of hours of painstaking work by CG animators and the use of non-MOVA technology.  Mot. 6-13 (citing declarations).

These undisputed declarations further establish MOVA's preliminary and very limited role helping to track facial motion.  The software "control[s] the operation of the hardware's video recording operations," "synchronize[s] the data captured by multiple camera angles," "tracks points on the face across frames of captured motion data," and "supplies an algorithm" for use in processing a tracked mesh.  Li ¶¶ 17-18, 20.b.  The tracked mesh data that the MOVA software processes—output in which Rearden has no copyright interest, Dkt. 60 at 7-8—were not "critical" to creating the Beast's appearance; the MOVA data were not used at all for nearly half the shots of the Beast that DD3 prepared.  Hendler ¶ 17.  "[T]he initial step of facial capture"—where MOVA software was used—"was interchangeable among various vendors."  Steele ¶ 3.

Rearden claims that Dr. Tinwell's testimony establishes that MOVA was critical to having a humanized Beast.  It does not.  As discussed above, Dr. Tinwell could not distinguish between shots for which MOVA was and was not used.  Additionally, as discussed in Defendants' *Daubert* motion, Dr. Tinwell has no expertise or foundation for her opinion that MOVA software produced the Beast's human-like expressions.  Young Ex. 2 at 18:11-22.  She had never even heard of MOVA before Rearden retained her, and she admitted she is not an expert in MOVA or any other facial motion capture technology.  *Id.* at 18:23-19:8; 71:19-72:2.  Dr. Tinwell admitted she did not even bother to review the testimony of the witnesses who were involved in the creation of the Beast's face, so she has no basis for saying how MOVA was (or was not) used to develop the Beast.  *Id.* at 65:8-66:21.[6]

Rearden also tries to show that MOVA played a greater role than it did by patching

---

[6] Dr. Tinwell's statements about MOVA's supposed technological advances in the field, Tinwell Decl. ¶¶ 67-78, just repeat inadmissible hearsay statements by Steve Perlman and others.  An expert may rely on hearsay, but the hearsay is inadmissible to create a disputed fact issue.  *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1262 (9th Cir. 1984) (Rule 703 "does not allow the admission" of hearsay upon which an expert relies "to establish the truth of what they assert").  These statements are not only hearsay, they also are immaterial.  None of them controverts any of the evidence about what MOVA does or the role it played in *BATB*.

1    together quotes about "MOVA" from Mr. Condon, David Hoberman (a producer), and Mr.

2    Stevens.  Opp. 15-16.  As with Dr. Tinwell's testimony, none of these statements changes the

3    undisputed facts about what MOVA does and does not do.  Those facts are established through the

4    uncontroverted declarations of witnesses with firsthand technical knowledge of MOVA and how it

5    was used in the motion pictures in suit.  The issue here is not witness credibility, as Rearden

6    claims, Opp. 25, but personal knowledge.  Messrs. Condon, Hoberman, and Stevens were

7    involved with the creative, not the technical side, of making *BATB*.  Rearden does not show that

8    any of them has personal knowledge of what the MOVA software does or does not do.  *Bank*

9    *Meilli Iran v. Pahlavi*, 58 F.3d 1406, 1412 (9th Cir. 1995) (statements by witnesses without

10   personal knowledge have "no weight" on summary judgment).  The evidence is undisputed they

11   did not have such knowledge regarding MOVA software.

12           For example, Mr. Condon testified that, to him, "MOVA" means "*the process by which*

13   Dan [Stevens]'s performance is… turned into the Beast's image," and that he "do[esn't] really

14   know the specifics of [that process]."  Klaus Ex. A at 185:22-186:17, 189:12-190:10 (emphasis

15   added).  "[T]here's a big gap," Mr. Condon explained, between when "I work with Dan in the rig

16   and then I give comments on the shot when it's ready to be seen.  How—what happens [in]

17   between … is not my area of expertise."  *Id*. at 186:4-17.  Mr. Hoberman likewise explained that

18   "I hire people to do all the technical aspects of the film that I can't, won't, and will never

19   understand."  *Id*. Ex. D at 78:14-79:5.  Rearden cites a *People* magazine article quoting Mr.

20   Stevens as saying the *BATB* team "went that extra mile with facial capture."  Opp. at 16; Carlson

21   Ex. 14.  Neither this nor any other statement by Mr. Stevens, or any other witness, contradicts the

22   undisputed facts about how MOVA works and its limited role in tracking facial motion at the most

23   preliminary stage of developing one aspect of a CG character.

24           **B.      Dr. Tinwell's Opinion That The Beast's Appearance Drove *BATB* Revenue Is
                       Inadmissible And Speculative**

25           Rearden's argument that the "humanized" Beast is causally linked to *BATB* revenues rests

26   entirely on Dr. Tinwell's declaration.  Dr. Tinwell distills her causation opinion from four

27   purportedly money-losing motion pictures (one, in fact, made money) as to which some critics

28

-11-

complained about the lack of realism in the faces of CG characters.  Obviously many other movies were made during this 20-year period with facial motion capture technology, but Dr. Tinwell ignored them.  Young Ex. 2 at 193:2-193:19, 221:24-222:4, 210:23-211:12, 296:11-23, 301:22-302:11.  Dr. Tinwell instead relied on a deficient and biased sample to opine, without further analysis or explanation, that there is a causal relationship between the selection of "the initial facial motion-capture *technology*" and a motion picture's financial success, and that *BATB* would have made less money without the "*use*" of "MOVA contour technology."  Tinwell Decl. ¶¶ 10, 58-66 (emphasis added).[7]

As explained in the *Daubert* motion, Dr. Tinwell's causation opinion is not based on reliable principles and methods and should be excluded under Fed. R. Evid. 702.  Dr. Tinwell's only discernable methodology was to select examples that fit the conclusion she wanted to reach and to ignore examples that undermined it.  "[S]uch a selective use of facts fails to satisfy the scientific method and *Daubert*."  *Barber v. United Airlines Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001).  Moreover, Dr. Tinwell's opinion amounts to the claim that "[Defendants'] products incorporate [the Plaintiffs'] claimed inventions; those products have been successful; *ergo* [Plaintiffs'] inventions caused the products' success"—which does not suffice for Rule 702. *Rambus Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 605 (N.D. Cal. 2008).  Nor does such syllogistic reasoning establish a causal nexus.  *Ryoo Dental, Inc. v. Thomas D. Han DMD*, 2016 WL 6138413, at *7 (C.D. Cal. Apr. 25, 2016) (expert's observation that timing of drops in website traffic and search rankings correlated to time frame of defendant's alleged infringement insufficient to show causal nexus between infringement, web traffic, and revenues).

If anything, Dr. Tinwell's testimony confirms that the myriad factors that influence purchasing decisions for movies preclude any finding of causal nexus here.  Dr. Tinwell did not control for factors other than the selection of facial motion capture technology that could have accounted for the financial results of the motion pictures she selected, even though she testified that a wide array of factors, including "story line," "[w]hether [the motion picture is] based on a

---

[7] Dr. Tinwell's repeated references to the "*use*" of "*technology*" show she was opining on matters relevant, if at all, to patent not copyright infringement.  Part C, *infra*.

1    best selling book," "[m]arketing of the film beforehand," "[t]he cast of actors," or the "target

2    audience" may influence a motion picture's financial success.  Young Ex. 2 at 192:1-16.  The

3    importance of such factors—independent of the use of a particular facial motion capture

4    technology—was underscored when Dr. Tinwell was confronted with the example of *The Polar*

5    *Express*.  Dr. Tinwell's prior writings cited that motion picture as evoking the "uncanny" response

6    in viewers who sensed the characters' non-human expressions. But, contrary to the hypothesis Dr.

7    Tinwell offers here, *The Polar Express* was a hit—and Dr. Tinwell conspicuously omitted any

8    mention of it in her declaration.  During her deposition, Dr. Tinwell tried to explain away this

9    inconsistency by citing the popularity of the star (Tom Hanks), the fact the motion picture "was

10   based on a best selling children's novel," and that it was a Christmas movie.  *Id*. at 202:21-204:5.

11   Not only does this testimony expose that Dr. Tinwell selected examples to fit a predetermined

12   conclusion, it confirms Rearden's inability to satisfy *Mackie* because of the myriad factors that

13   influence movie-goers' purchasing decisions.

14   **C.    Rearden's Argument Confirms It Is Conflating Copyright And Patent**
         **Liability And Damages**

15       Rearden's argument about MOVA software, the Beast's facial appearance, and BATB

16   revenues—like other arguments throughout the Opposition—assumes Rearden is entitled to

17   damages based on the MOVA "*system*," and how that "system" was "*used*."  Opp. 2, 8, 9, 11, 12,

18   25.  The right to "use" software or a "system," however, is protected, if at all, by patent law.

19   Copyright protects the right to copy the underlying work, not the right to use it.  *See Bauer & Cie*

20   *v. O'Donnell*, 229 U.S. 1, 13-14 (1913) ("It is apparent that the principal difference in the

21   [copyright and patent] enactments lies in the presence of the word 'use' in the patent statute and its

22   absence in the copyright law.").  By focusing on the *use* of the MOVA *system*, Rearden confirms

23   it is trying to use a copyright claim to seek damages that would be recoverable, if at all, only for

24   patent infringement (and that would be limited to a reasonable royalty).  *See* Mot. 21-22.

25       Rearden's only response is that if RAM copying can infringe copyright, Rearden must be

26   able to seek damages for such copying.  Opp. 25.  This is a red herring:  even if Rearden is not

27   entitled to indirect profits, it nonetheless can seek actual or statutory damages.  17 U.S.C.

28

-13-

1   § 504(b), (c).  Rearden cannot obtain an indirect profits remedy based on the claimed use of data

2   output from the use of software, since that is not a remedy for a right protected by copyright.

3           Notably, Rearden does not cite *any* case allowing an indirect profits claim based on RAM

4   copying.  Rearden insists that Judge Alsup's decision allowing Oracle's expert to testify about

5   Google's profits shows that RAM copying may support such a claim.  Opp. 21-22 (citing *Oracle*

6   *Am., Inc. v. Google Inc.*, 2016 WL 2342365 (N.D. Cal. May 3, 2016)).  That is wrong.  In *Oracle*,

7   "Google copied the declaring source code from the 37 Java API packages verbatim, inserting that

8   code into parts of its Android software."  *Oracle Am., Inc. v. Google LLC*, 750 F.3d 1339, 1350-51

9   (Fed. Cir. 2014).  The copied source code thus was in products that Google distributed.  In

10  contrast, MOVA software, as a matter of undisputed fact, is not "in" *BATB* at all.

11          In addition to being factually inapposite, *Oracle* also confirms Rearden's inability to meet

12  the *Mackie* standard.  Oracle's original damages report sought a portion of "the full $29 billion of

13  Google's revenue from search and advertisement on Android devices," on the theory the copied

14  source code enabled Google to have numerous apps on the Android system and thereby obtain

15  search and ad revenue.  *Oracle*, 2016 WL 2342365, at *5.  The court held this theory was too

16  broad, because "there were 'virtually endless permutations to account for an individual's decision'

17  to conduct a Google search or to visit a site that uses one of Google's advertising services."  *Id.*

18  (quoting *Mackie*, 296 F.3d at 916).  The court allowed Oracle's expert to testify, but only to a

19  more limited share of Google's revenues, specifically, money Google retained by not having to

20  share search and advertising revenue with operators of non-Android platforms.  *Id.*  Rearden seeks

21  a share of the entirety of *BATB* revenues, which (like the broader pool of revenues found to have

22  been sought impermissibly in *Oracle*) were the result of "virtually endless permutations" for

23  purchasing decisions.

## V.   AVOIDING EXPENSE DOES NOT ESTABLISH A CAUSAL NEXUS TO REVENUES, AND REARDEN HAS NOT SHOWN MOVA SAVED COSTS

        Rearden argues that MOVA reduced the expenses associated with *BATB* and that this

supports a finding of causal nexus.  Opp. 19-20.  This is wrong as a matter of law and fact.  The

issue at this stage is the nexus between infringement and revenue: "the copyright claimant must

-14-

first show a causal nexus between the infringement and the *gross revenue*." *Polar Bear*, 384 F.3d at 711 (emphasis added). Deductions for apportionment and cost are relevant only after plaintiff establishes a causal nexus. 17 U.S.C. § 504(b). And while MOVA software in theory can be a time-saving tool, Rearden provides no evidence that it saved time on *BATB*, or that any time-saving lowered any costs. The evidence actually shows it did neither. It is undisputed that on *BATB*, "the time-saving benefit from using Mova was minimal or non-existent." Hendler Decl. ¶ 47; Klaus Ex. B at111:16-112:4 (same).

## VI.   REARDEN HAS ABANDONED ITS INDIRECT PROFITS CLAIM FOR ALL MOTION PICTURES OTHER THAN *BATB*

Rearden offers no argument or evidence whatsoever for three motion pictures in suit: *Avengers: Age of Ultron*, *Night at the Museum: Secret of the Tomb*, and *Fantastic Four*. Rearden devotes just three paragraphs to the two other non-*BATB* motion pictures. Opp. 11-13. Specifically, Rearden points to a *draft* press release about Josh Brolin being cast as Thanos, a character that appeared on screen for 39 seconds in *Guardians of the Galaxy*. The document states "[m]uch of the heavy lifting" for capturing Brolin's performance "was in the retargeting." Carlson Ex. 20. MOVA software does not retarget tracked mesh data, Li Decl. ¶ 24, and the draft press release makes clear that Luma (the visual effects vendor) "created a new system" for the retargeting. Carlson Ex. 20. Rearden also cites an interview that does not discuss any facial motion capture software, much less MOVA. *Id*. Ex. 19. Rearden's only evidence regarding *Deadpool* is a 19-second snippet from an 80-minute featurette that makes a single reference to MOVA. Carlson Ex. 22. None of this evidence comes close to establishing a causal nexus.

## VII.   CONCLUSION

Rearden took an extraordinary amount of discovery and filed a pile of paper in opposition, but still cannot show that the temporary copying of software into RAM at the most preliminary stage of developing facial motion for one character caused consumers to pay to see a major motion picture with myriad elements of audience appeal. Defendants respectfully request the Court grant this motion.

-15-

1    DATED:  December 22, 2020              MUNGER, TOLLES & OLSON LLP

2

3
                                           By:    _____/s/ Kelly M. Klaus_____
4                                                    KELLY M. KLAUS

5                                          *Attorneys for Defendants*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY ISO SUMMARY JUDGMENT MOTIONS
NOS. 17-CV-04006, 17-CV-04191