UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REARDEN LLC, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>THE WALT DISNEY COMPANY, et al.,<br><br>    Defendants. | Case No. 17-cv-04006-JST<br><br>Re: ECF No. 249 |
| REARDEN LLC, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>TWENTIETH CENTURY FOX FILM CORPORATION, et al.,<br><br>    Defendants. | Case No. 17-cv-04191-JST<br><br>Re: ECF No. 212<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT ON CAUSAL NEXUS ISSUE** |

In this case, Plaintiffs Rearden LLC and Rearden Mova LLC ("Rearden") bring copyright, trademark, and patent infringement claims based on the alleged use of Rearden's MOVA Contour Reality Capture Program ("MOVA Contour" or "MOVA") in the production of major motion picture films including *Beauty and the Beast*, *Deadpool*, and *Guardians of the Galaxy*. Now before the Court is Defendants' motion for summary judgment. ECF No. 249.[1]

Defendants move for summary judgment on the ground that Rearden cannot show the required causal nexus between Defendants' alleged infringement and the profits from their films under 17 U.S.C. § 504(b). The Court will grant the motion in part and deny it in part.

---

[1] In this order, the Court uses the docket numbers from *Rearden v. The Walt Disney Co.*, Case No. 17-cv-04006. Identical copies of the declarations, briefs, and other related materials have been filed on the docket in *Rearden v. Twentieth Century Fox Film Corp.*, Case No. 17-cv-04191.

## I. BACKGROUND

The factual and procedural background of this case is summarized in the Court's prior orders addressing Defendants' motions to dismiss. ECF Nos. 60, 85.[2] "MOVA Contour," as the name suggests, is a program for capturing the motion of the human face to create images used in motion pictures. ECF No. 60 at 2. Plaintiff alleges that, unlike previous motion capture technologies, the MOVA Contour Program "precisely captures and tracks the 3D shape and motion of a human face to sub-millimeter precision, producing photorealistic results." ECF No. 63 ¶ 22. The operative first amended complaint ("FAC" or "Disney FAC"), *id.*, brings claims against Defendants for vicarious and contributory copyright infringement based on work performed by their special effects vendor, Digital Domain 3.0 Inc. ("DD3"). Rearden alleges that DD3 directly infringed the copyright in the MOVA program, and that Defendants contracted with DD3 "to provide facial performance capture services and output works made with the patented Contour systems and methods and the copyrighted Contour program." *Id.* ¶ 97. Specifically, Rearden alleges that the MOVA program was used in the production of the films *Beauty and the Beast*, *Deadpool*, *Terminator: Genisys*, *Avengers: Age of Ultron*, *Night at the Museum: Secret of the Tomb*, and *Fantastic Four* ("Motion Pictures"). *Id.* ¶¶ 96-124; Fox FAC, No. 17-cv-04191, ECF No. 41 ¶¶ 95-120. Rearden seeks to recover Defendants' profits from the six Motion Pictures pursuant to 17 U.S.C. § 504(b). Disney FAC ¶¶ 155, 185; Fox FAC, No. 17-cv-04191, ECF No. 41 ¶ 149.

Defendants originally moved for summary judgment on causal nexus grounds on February 28, 2019. ECF No. 139. On March 8, 2019, the parties stipulated to adjust the briefing schedule to allow Rearden to identify and propose discovery it would need to oppose the motion. ECF No. 140. Once discovery began in earnest, the Court terminated Defendants' motion with instruction to refile it when causal nexus discovery concluded. ECF No. 187.

Defendants filed the present motion for summary judgment on October 14, 2020. ECF No.

---

[2] In addition, the Statement of Decision in a related action, *Shenzhenshi Haitiecheng Science and Technology Company v. Rearden LLC*, includes a summary of the facts underlying the dispute as to the ownership of the MOVA assets. *See* No. 15-cv-00797 JST, ECF No. 427 (N.D. Cal. Aug. 11, 2017). The Court found that Rearden owns the MOVA assets. *Id.* at 18.

1   249.  Rearden filed an opposition, ECF No. 264, and Defendants replied, ECF No. 280.

2   Defendants again base their motion on Plaintiffs' alleged lack of causal nexus evidence.

3   　　　　Concurrently with their reply, Defendants filed a motion to strike portions of the report

4   from Rearden's expert witness, Dr. Angela Tinwell, for failure to satisfy the requirements of

5   Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

6   (1993).  ECF No. 281.  On July 12, 2021, the Court granted in part and denied in part the motion

7   to strike, permitting Tinwell to testify that a computer-generated ("CG") character's nuanced

8   expression can affect viewers' feelings towards a film and that MOVA is a significant factor in

9   producing the Motion Picture CG characters' nuanced expressions, but striking her opinions that a

10  causal connection exists between a film's use of MOVA and the film's profitability.  ECF No.

11  295.  Having determined what evidence is properly before the Court on this motion, the Court now

12  turns to the motion itself.

13  **II.     JURISDICTION**

14  　　　　This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

15  **III.    LEGAL STANDARD**

16  　　　　Summary judgment is proper when a "movant shows that there is no genuine dispute as to

17  any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

18  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by"

19  citing to depositions, documents, affidavits, or other materials.  Fed. R. Civ. P. 56(c)(1)(a).  A

20  party also may show that such materials "do not establish the absence or presence of a genuine

21  dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R.

22  Civ. P. 56(c)(1)(B).  A dispute is genuine only if there is sufficient evidence for a reasonable trier

23  of fact to resolve the issue in the nonmovant's favor, and a fact is material only if it might affect

24  the outcome of the case.  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125

25  (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "In

26  considering a motion for summary judgment, the court may not weigh the evidence or make

27  credibility determinations, and is required to draw all inferences in a light most favorable to the

28  non-moving party."  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).  "The standards for

1    partial summary judgment are identical to the standards for summary judgment." *St. Paul*
2    *Mercury Ins. Co. v. Am. Safety Indem. Co.*, No. 12-cv-05952, 2014 WL 2120347, at *6 (N.D. Cal.
3    May 21, 2014).
4        Where the party moving for summary judgment would bear the burden of proof at trial,
5    that party bears the initial burden of producing evidence that would entitle it to a directed verdict if
6    uncontroverted at trial. *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474,
7    480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of
8    proof at trial, that party bears the initial burden of either producing evidence that negates an
9    essential element of the non-moving party's claim, or showing that the non-moving party does not
10   have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.
11   *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).
12       If the moving party satisfies its initial burden of production, then the non-moving party
13   must produce admissible evidence to show that a genuine issue of material fact exists. *See id.* at
14   1102-03. The non-moving party must "identify with reasonable particularity the evidence that
15   precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). It is not the
16   duty of the district court "to scour the record in search of a genuine issue of triable fact." *Id.* "A
17   mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary
18   judgment; rather, the non-moving party must introduce some significant probative evidence
19   tending to support the complaint." *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th
20   Cir. 1997) (internal quotation marks and citation omitted). If the non-moving party fails to make
21   this showing, the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477
22   U.S. 317, 323 (1986).
23   **IV.    DISCUSSION**
24       Defendants argue that they are entitled to partial summary judgment as to Rearden's claim
25   for indirect profits because Rearden cannot show a causal nexus between the Motion Pictures'
26   profits and the alleged infringement. Defendants make two main arguments. First, Defendants
27   say that Rearden has failed to present sufficient non-speculative evidence of causal nexus, i.e., the
28   relationship between the alleged infringement and Defendants' profits, to create a dispute of

material fact. "[A] copyright infringement plaintiff seeking to recover indirect profits damages under 17 U.S.C. § 504(b) must proffer some evidence to create a triable issue regarding whether the infringement at least partially caused the profits that the infringer generated as the result of the infringement." *Mackie v. Rieser*, 296 F.3d 909, 911 (9th Cir. 2002). Second, Defendants argue that Rearden's theory of a causal nexus, even if supported by sufficient evidence, fails as a matter of law because profits deriving from Defendants' alleged "use" of Plaintiffs' copyright is not actionable.

### A. Indirect Damages Under the Copyright Act

Under the Copyright Act, a copyright owner "is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). Section 504(b) "does not differentiate between 'direct profits' – those that are generated by selling an infringing product – and 'indirect profits' – revenue that has a more attenuated nexus to the infringement." *Mackie*, 296 F.3d at 914. However, "there must be a causal nexus regardless of which kind of profits is being sought." *Garcia v. Coleman*, No. C-07-2279 EMC, 2009 WL 799393, at *2 (N.D. Cal. Mar. 24, 2009) (citing *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796 (8th Cir. 2003)). "[T]he causation element of the statute serves as a logical parameter to the range of gross profits a copyright plaintiff may seek." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004).

Where, as here, a plaintiff seeks indirect profits, the Ninth Circuit directs courts to apply a "two-step framework." *Id.* First, "the copyright claimant must first show a causal nexus between the infringement and the gross revenue," and second, "once the causal nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement." *Id.* It is "the duty of the copyright plaintiff to establish a causal connection between the infringement and the gross revenue reasonably associated with the infringement." *Id.* at 715 (citing *On Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001)).

"[T]o survive summary judgment on a demand for indirect profits pursuant to [Section] 504(b), a copyright holder must proffer sufficient non-speculative evidence to support a causal

5

1  relationship between the infringement and the profits generated indirectly from such an

2  infringement." *Mackie*, 296 F.3d at 915-16.  "[A] copyright owner is required to do more initially

3  than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally

4  significant relationship to the infringement." *Polar Bear Prods*, 384 F.3d at 711.  "When an

5  infringer's profits are only remotely and speculatively attributable to infringement, courts will

6  deny recovery to the copyright owner." *Id.* (quoting 4 Nimmer on Copyright § 14.03, 14-34).

7  Importantly, "[t]he plaintiff is not required at this step to show that the infringement was the

8  primary cause of the defendant's revenues, and a fair degree of inference is allowed." *Dash v.*

9  *Mayweather*, 731 F.3d 303, 330 (4th Cir. 2013).  Nonetheless, the asserted nexus "must be

10 reasonable in light of the evidence" such that the jury could reasonably conclude that the

11 infringement was "one of the causes of the claimed revenues." *Id.* at 330-31.

## B. Sufficiency of Evidence that Defendants' Infringement Caused Profits

To recover indirect profits, Rearden has the burden to demonstrate that the alleged copyright infringement is "causally linked" to Defendants' film profits.  Rearden makes four arguments in support of its causal nexus theory, supporting each with evidence, including witness testimony, expert reports, and Defendants' internal and external communications.  Applying the standards set forth above, the Court concludes that Rearden has met its evidentiary burden at the summary judgment stage and therefore "the trier of fact will ultimately decide if the causal nexus . . . has been met." *See Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 WL 2342365, at *5 (N.D. Cal. May 3, 2016).

First, Rearden argues that Defendants promoted MOVA as part of their advertising strategies for the Motion Pictures.  Reardon contends that Defendants did so because they believed that MOVA would be a draw for moviegoers, and suggests that Defendants would not have advertised the use of MOVA if they did not think it would drive sales.  ECF No. 263-4 at 11-18.  As support for this argument, Rearden introduces two categories of evidence.  The first category is made up of Defendants' internal emails, talking points, and draft press releases, which Rearden argues demonstrate Defendant's desire to tout MOVA as a feature of the films.  For example, an email sent to *Beauty and the Beast* Producer David Hoberman by his assistant, *see* ECF No. 263-6

at 10, contains talking points which stated: "used MOVA . . . [T]he reason it's so effective is because they mark thousands of spots on his face in phosphorescent makeup so that the many individual points could be derived from that makeup, like 5000 points . . . Those points allow to get all the nuance of expression." ECF No. 263-15 at 2. In a *Guardians of the Galaxy* draft press release, Marvel proposed to highlight the "relatively new, hi-fidelity facial capture system called Mova," noting that "[u]nlike traditional gridded methods, the Mova system makes use of UV reactive particulate in a make up [sic] base to give us thousands of trackable points on the surface." ECF No. 263-17 at 2. And in an email to Hoberman and *Beauty and the Beast* Director Bill Condon, Disney's publicist recommends "capturing various stages of the development process" including "the first stage of [actor Dan Stevens] becoming the beast" because "[t]here does seem to be an appetite for this." ECF No. 263-5 at 2.

        The second category of evidence supporting this argument includes Defendants' external communications about MOVA's use in the Motion Pictures. Highlighted by Rearden are interviews with Condon and *Beauty and the Beast* actors Dan Stevens and Emma Watson, in which MOVA is referenced by name and the process described in detail to the press. ECF No. 263-10 at 01:40-01:44 (Stevens stating that "the facial capture was done separately using a technology called MOVA."); *id.* at 4:44-4:58 (Condon stating that "it was this new process which, you know usually its [sic] dots like this and then, and then animators fill in the dots . . . but this actually captured every pore of Dan's skin, and that's why so much of him comes, this great performance comes, through."); *see also* ECF No. 263-14 at 6-7 (transcription of interview with Condon about facial capture process); ECF No. 263-9 at 7-8 (Condon's testimony of same). Rearden also cites to the *Beauty and the Beast* press kit, in which Disney devotes a section to "Behind the Magic on Screen," emphasizing that "[t]o create a realistic looking Beast in a real-world environment while maintaining Dan Stevens' performance, a combination of physical performance capture and MOVA facial capture technology was used." ECF No. 263-7 at 32. The press kit goes on to describe the "MOVA facial capture sessions" and the way in which "[t]he MOVA customized hardware and software then converted the performance into data." *Id.* at 33; *see also* ECF No. 263-8 (*Beauty and the Beast* draft production notes containing same). Likewise,

7

in a promotional featurette for *Deadpool*, Fox describes DD3's use of "a great system called 'MOVA,' which is a facial capture system. You paint on the face and it creates thousands and thousands of little tracking markers. At that point, you get a piece of geometry that captures movement and acting of the actor." ECF No. 264-2, Ex. 22.

Second, Rearden argues that the use of MOVA-based clips in the *Beauty and the Beast* trailer helped the trailer achieve a record-breaking number of views on YouTube, which in turn resulted in larger box office profits. ECF No. 263-4 at 18-19. To support this argument, Rearden introduces Condon's testimony confirming that the *Beauty and the Beast* trailer included eleven clips of the Beast, nine of which were MOVA-made. ECF No. 263-9 at 18-19. Next, Rearden cites to a National Research Group study prepared for Fox, which identifies the number of trailer views as a driver of film attendance. ECF No. 263-18 at 54-55 ("Trailer exposure correlates with theatrical attendance."; "[O]nline trailer exposure outpaces theatrical exposure among all groups except 45-74 year olds."). Rearden also points to Hoberman's deposition testimony confirming that "the purpose of the trailer is to induce audiences to come see the film," to "spark interest," and that "a successful, . . . widely seen trailer would motivate at least some people to come see a movie." ECF No. 263-6 at 6. Finally, Rearden introduces the declaration of former Fox executive Philip Fier and his discussion of the correlation between trailer views and box office gross.[3] ECF No. 264-10. Fier posits that "[t]here is a positive correlation between the number of trailer viewings on youtube.com and worldwide box office gross for the film that is the subject of the trailer." *Id.* ¶ 10; *see also id.* ¶ 21 (explaining Fier's independent analysis of big-budget films, comparing the number of views of YouTube trailer releases and box office performances). Fier observes that "[t]he November 14, 2016 *Beauty and the Beast* trailer, which was touted as the first one showing the Beast with full visual effects, broke all previous 24 hour viewing records for a trailer on youtube.com." *Id.* ¶ 11. He concludes that the trailer "was exceptionally successful in creating audience awareness of the film" and "was almost certainly one of the most important factors in creating audience interest to see the film, and thus almost certainly contributed to its

---

[3] Defendants have not challenged Fier's expert declaration.

very strong box office performance." *Id.* ¶ 28.

Third, Rearden argues that MOVA was necessary for Disney to create a CG character of the Beast that would invoke audience empathy. This, Rearden contends, was important not only for Defendants' promotion of a "believable" character, but also because, as Rearden's expert has opined, the failure to faithfully capture subtle nuances in a CG character's facial expressions may lead viewers to respond adversely. ECF No. 263-4 at 19-24. In support of this argument, Rearden cites the *Beauty and the Beast* press kit statement that "[o]ne of the keys to a successful live-action adaptation of [the film] lay with the Beast" because he must "look somewhat believable and be someone with whom the audience will care for," but "the technology needed to pull off such a feat did not exist until recently." ECF No. 263-7 at 32 (proceeding to discuss the "combination of physical performance capture and MOVA facial capture technology [that] was used"); *see also* ECF No. 263-6 at 3, 5 (Hoberman testifying as to same); ECF No. 264-3 at 3 (People.com interview with Stevens stating that "[t]he British actor adds that he and director Bill Condon, along with the effects team, went that extra mile with facial capture in order for audiences to be able to see Beast's human qualities"). Further, Dr. Tinwell states that "MOVA Contour technology enabled the presentation of a human-like CG Beast character that viewers could believe in, empathize with, and believe that Belle could plausibly romantically love." ECF No. 264-16 at 4. She explained that, based on her research, "[f]ailure to capture the nuances of genuine human facial expression in human-like CG characters intended to be viewed by the audience as protagonists or empathetic has resulted in well-documented adverse audience responses to films." *Id.* at 12.

Fourth and finally, Rearden argues that the use of MOVA allowed Defendants to avoid the costs of hand animation. ECF No. 263-4 at 24. Rearden cites the testimony of Defendants' expert, Dr. Hao Li, who stated that "if you want to do realistic and complex surface dynamics . . . for facial performance using physical simulation or keyframing, it takes a lot of time and animators to do that work, it's labor intensive, whereas all of the . . . nuances, the realistic and complex nuances of a person's facial expression, those . . . come along for free, essentially, if you have a high-resolution capture data." ECF No. 263-21 at 3; *see also* ECF No. 264-16 at 18, 28

9

1   (Tinwell confirming same).

2   This non-speculative evidence supports Rearden's theory of a causal nexus between the
3   infringement and profits from *Beauty and the Beast*, *Guardians of the Galaxy*, and *Deadpool*.[4]  As
4   to these films, it would be reasonable for the jury to infer from Rearden's evidence that
5   Defendants advertised their use of MOVA and used MOVA-based clips in the film trailer in order
6   to drive interest in the films and thereby increase film profits.  *See Garcia v. Coleman*, No. C-07-
7   2279 EMC, 2009 WL 799393, at *5 (N.D. Cal. Mar. 24, 2009) (denying motion for judgment as a
8   matter of law on causal nexus between use of infringing photograph on wine label and wine sales,
9   in part based on defendant's testimony as to "the significant effect label design can have on a
10  wine's image and marketability; designing wine labels was, after all, a substantial part of
11  [defendant's] business").  Moreover, Rearden has presented evidence to create a dispute of fact as
12  to whether the promotion of MOVA and use of MOVA-based clips in the trailer did result in
13  higher profits.  *See* ECF No. 264-10 ¶¶ 9-12, 21, 27; *see also Griffo v. Oculus VR, Inc.*, No. SA
14  CV 15-1228-DOC, 2018 WL 6265067, at *13 (C.D. Cal. Sept. 18, 2018) (finding evidence of "the
15  influx of capital following the start of the Kickstarter campaign" and defendants' admissions that
16  "the Kickstarter video 'was helpful' in raising capital" sufficient to create a triable issue that the
17  alleged infringing material used in the Kickstarter video at least partially caused venture capital
18  profits).  In addition, although Rearden's evidence that the use of MOVA allowed Defendants to
19  create a more human-like character with whom viewers could empathize is not, standing alone,
20  sufficient to show the causation of profits, the jury can consider whether this fact was emphasized
21  in Defendants' advertising to boost interest or whether it drove trailer views that may have
22  ultimately led to greater profits.  *Cf. Complex Sys., Inc. v. ABN Ambro Bank N.V.*, No. 08 CIV.
23  7497 KBF, 2013 WL 5970065, at *11 (S.D.N.Y. Nov. 8, 2013) (noting, among other
24  considerations, that plaintiff's witness stated that "he was not aware of [the infringed product]
25  having any impact" on the number of credit letters from which indirect profits were sought).

---

[4] Rearden introduced no evidence to show a causal nexus between the infringement and profits of the Motion Picture films *Terminator: Genisys*, *Avengers: Age of Ultron*, *Night at the Museum: Secret of the Tomb*, and *Fantastic Four*.

1    Finally, Rearden presents some evidence that Defendants increased their profits by eliminating the
2    expense of realizing the same CG character presentation that they would have had to create
3    manually. *See Charter Sch. Cap., Inc. v. Charter Asset Mgmt. Fund, L.P.*, No. CV 14-3385-
4    GW(PLAX), 2016 WL 5921062, at *3 (C.D. Cal. Apr. 1, 2016) ("A trier of fact could reasonably
5    conclude that Defendants avoided increased costs – and therefore enjoyed increased profits, at
6    least initially – because they were able to simply adopt the copyrighted language Plaintiff and its
7    attorneys had prepared. To the extent Defendants are able to compete with Plaintiff on price, this
8    initial cost-avoidance may have had an impact there as well.").

9    Defendants argue that Rearden's evidence does not establish a causal nexus because the
10   cited internal and external communications also discussed other elements of the Motion Pictures,
11   did not say "anything about MOVA software being responsible for the financial success of the
12   Motion Picture," and did not "refer to the copying of MOVA software at all." ECF 249 at 27-28.
13   Defendants further argue that the trailer's use of MOVA-based clips does not establish a nexus
14   because there is nothing that ties the success of the trailer to the infringement – i.e. the software
15   itself. *Id.* at 28. In large part, Defendants' arguments rest on the view that "Rearden cannot show
16   a causal nexus because consumers decide to see a particular motion picture for innumerable
17   reasons." *Id.* at 22. These arguments are not persuasive.

18   To show a causal nexus to indirect profits, there must be evidence that the infringing
19   product is a causal factor, but it "need not be the sole causal factor." *Complex Sys., Inc.*, 2013 WL
20   5970065, at *13. Defendants rely on *Mackie v. Rieser* for the proposition that "the number of
21   factors here influencing a moviegoer's decision to purchase a ticket are so varied that any
22   attenuated link to MOVA would be pure speculation." ECF No. 249 at 12. *Mackie* does not aid
23   Defendants. There, the plaintiff sought to recover profits from the Seattle Symphony's 1996-1997
24   season, based on the use of plaintiff's collage in a twenty-four page brochure advertising the "Pops
25   series" as part of the season. *Mackie*, 296 F.3d at 912-13. The court affirmed that "Mackie did
26   not articulate a non-speculative correlation between the Symphony's infringement and subsequent
27   Pops revenues." *Id.* at 916. The court emphasized the "virtually endless permutations to account
28   for an individual's decision to subscribe to the Pops series, reasons that have nothing to do with

11

the artwork in question," but did so "[i]n the absence of concrete evidence" from the plaintiff. *Id.* Mackie's only evidence in support of his causal nexus theory was a contradictory expert declaration which supposed that "the Symphony's *goal* of generating a 1.5% response rate to its direct-mail brochure was somehow directly correlated with revenue generated by individuals who subscribed because of [the infringing] art" – a supposition that the court called "a virtual non-sequitur." *Id.* (emphasis added). Even Mackie's own expert, however, "stated that he could not 'understand' how it would be possible to establish a causal link between the Symphony's infringing use of [Mackie's collage] and any Pops series revenues generated through the inclusion of the collage in the direct-mail literature." *Id.* Read in context, *Mackie*'s reference to "myriad factors" was meant merely to underline that plaintiff's total lack of causation evidence, and not to suggest that infringement must be the sole cause of a defendant's profits. *Id.* ("In the absence of concrete evidence, Mackie's theory is no less speculative than our effort in this paragraph to enumerate even a relatively short list of the myriad factors that could influence an individual's purchasing decisions.").

      This case is not *Mackie*. Rearden has introduced evidence that Defendants not only included MOVA-based clips in the record-setting *Beauty and the Beast* trailer, with the knowledge that film trailers are one of the biggest drivers of film attendance, but also prepared and made external statements touting the use of the MOVA software as part of their promotions of the Motion Pictures. This is not the case, in other words, where there is an absence of "nonspeculative evidence . . . sufficient to create a triable issue of fact." *Id.* Other courts have distinguished *Mackie* on similar bases. *See, e.g.*, *Griffo*, 2018 WL 6265067, at *12 (explaining that "the facts in [*Mackie*] bear little resemblance" to the case because, although it was true that "contributors to the Kickstarter campaign might have been motivated by a number of factors other than the display of the Oculus Rift's functionality in the Kickstarter video," plaintiff met her burden by showing that the infringing material "may have actually influenced the purchasing decisions" of contributors (citation omitted)). Moreover, key in *Mackie* was the fact that plaintiff's own expert stated that "he could not 'understand' how it would be possible to establish a causal link between the Symphony's infringing use of 'The Tango' and any Pops series revenues

generated through the inclusion of the collage in the direct-mail literature." *Mackie*, 296 F.3d at 916; *see also Lowry's Reps., Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 752 (D. Md. 2003) ("Remarkably, however, Lowry's own expert admitted that he could not say whether a causal link connected the infringement to Legg Mason's profits."). Plaintiffs here make no such concession.

The Court concludes that Rearden has identified sufficient, non-speculative evidence to satisfy its burden at the summary judgment stage and is entitled to present its causal nexus theories and evidence to the jury as to the three films for which it offered evidence.

### C. Availability of Indirect Profits for Use of MOVA Software

Defendants' final argument challenges Rearden's causal nexus theory as a whole, arguing that even if there were a material dispute of fact, the asserted causal nexus is not recognized by law. Defendants take the position that because the audience does not see the copyrighted software itself, Rearden cannot make the necessary causation showing between the infringement and the profits as a matter of law. Taking the argument one step further, Defendants assert that Rearden's claim to indirect profits relies on the "use" of the copyrighted software, but that Rearden "has no copyright interest in the *use* of the MOVA system." ECF No. 249 at 28. Rearden responds that these arguments are "pure sophistry." ECF No. 263-4 at 30.

Although neither party presents authority directly addressing this dispute, *Oracle America, Inc. v. Google Inc.* suggests that Defendants' argument is not correct. In *Oracle*, Judge Alsup considered Google's motion to exclude testimony of Oracle's damages expert, which was based in part on the argument that Oracle failed to proffer sufficient evidence of a causal connection between Google's infringement and the claimed advertising and search profits. 2016 WL 2342365, at *3. Oracle was seeking to recover these indirect profits from Google's "use of the declaring code and structure, sequence, and organization of 37 API packages from Oracle's copyrighted works." *Id.* at *1. Oracle's expert based his gross profits assessment on the assumption that "Google's use of the declaring code and SSO of 37 Java API packages enabled faster development of applications for the Android platform, gave Google access to the community of Java developers, increased Google's speed to market, and the lack of available alternatives." *Id.* at *5.

13

The court went on to evaluate whether Oracle had evidentiary support for *all* of Google's revenue from search and advertisements on Android deceives. But more important here is that the infringement based on the *use* of Oracle's software in Google's Android platform – use that was not visible to consumers or ad purchasers – presented no barrier to a causal nexus finding. *See id.* at *6 (holding "Oracle has proffered sufficient evidence of a causal nexus to present its case (subject to [the court's given] limitations)"). Just as the second-order business effects of Google merely using Oracle's software were sufficient in that case to allow the causal nexus dispute to reach the jury, the same is true here.

## CONCLUSION

Defendants' motion for summary judgment on the issue of causal nexus to indirect profits is granted as to the films *Terminator: Genisys*, *Avengers: Age of Ultron*, *Night at the Museum: Secret of the Tomb*, and *Fantastic Four*, and denied as to films *Beauty and the Beast*, *Guardians of the Galaxy*, and *Deadpool*.

**IT IS SO ORDERED.**

Dated: August 16, 2021



JON S. TIGAR
United States District Judge

14