Steve W. Berman (*pro hac vice*)
Mark S. Carlson (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 2nd Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
markc@hbsslaw.com

Rio S. Pierce, CBA No. 298297
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile5073: (510) 725-3001
riop@hbsslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| REARDEN LLC, REARDEN MOVA LLC, California limited liability companies,<br><br>                           Plaintiffs,<br><br>    v.<br><br>DISNEY ENTERPRISES, INC., a Delaware corporation, DISNEY STUDIO PRODUCTION SERVICES CO., LLC f/k/a WALT DISNEY PICTURES PRODUCTION, LLC, a California limited liability company, WALT DISNEY PICTURES, a California corporation, MARVEL STUDIOS, LLC, a Delaware limited liability company, MVL PRODUCTIONS LLC, a Delaware limited liability company, CHIP PICTURES, INC., a California corporation, INFINITY PRODUCTIONS LLC, a Delaware limited liability company, ASSEMBLED PRODUCTIONS II LLC, a Delaware limited liability company.<br><br>                           Defendants. | No. 4:17-cv-04006-JST<br><br>**SECOND AMENDED COMPLAINT FOR COPYRIGHT AND TRADEMARK INFRINGEMENT**<br><br><br><br><u>**DEMAND FOR JURY TRIAL**</u>, |

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION .................................................................................................1

II.     THE PARTIES ......................................................................................................4

III.    JURISDICTION AND VENUE ............................................................................5

IV.     FACTUAL ALLEGATIONS ................................................................................6

        A.    The Contour program, systems, and methods ..........................................6

        B.    The Contour intellectual property ..........................................................36

        C.    Rearden's use of the Contour program, system, and methods in fifteen major motion pictures, and industry acclaim ...............................39

        D.    Transfer of the Contour Assets to OnLive, Inc., OL2, Inc., and Rearden Mova......41

        E.    Shenzhenshi's transparently false ownership claims ..............................42

        F.    Defendants' unauthorized use of the Contour Assets..............................43

              1.    *Guardians of the Galaxy* ............................................................47

              2.    *Avengers: Age of Ultron* .............................................................52

              3.    *Beauty and the Beast* ..................................................................56

FIRST CAUSE OF ACTION: VICARIOUS AND CONTRIBUTORY COPYRIGHT INFRINGEMENT  (DEFENDANTS MARVEL, MVLP, ASSEMBLED PRODUCTIONS AND INFINITY PRODUCTIONS)..............................................................................61

SECOND CAUSE OF ACTION: VICARIOUS AND CONTRIBUTORY COPYRIGHT INFRINGEMENT  (DEFENDANTS DISNEY ENTERPRISES, DISNEY PICTURES PRODUCTION, DISNEY PICTURES, AND CHIP PICTURES)......................................67

THIRD CAUSE OF ACTION: TRADEMARK INFRINGEMENT, FALSE ADVERTISING AND DILUTION (DEFENDANTS DISNEY ENTERPRISES, CHIP PICTURES, DISNEY PICTURES PRODUCTION, DISNEY PICTURES, MVLP, INFINITY PRODUCTIONS, AND MARVEL) ......................................................................................................72

PRAYER FOR RELIEF ................................................................................................75

DEMAND FOR JURY TRIAL .....................................................................................76

Plaintiffs Rearden LLC and Rearden Mova LLC (collectively "Plaintiffs"), through their attorneys and for their claims against defendants Disney Enterprises, Inc., Disney Production Services Co., LLC f/k/a Walt Disney Pictures Production, LLC, Walt Disney Pictures, Chip Pictures, Inc., Marvel Studios, LLC, MVL Film Finance LLC, Infinity Productions LLC, and Assembled Productions II LLC (collectively "Defendants"), allege as follows.

## I.    INTRODUCTION

> "There have been a lot of great CG [computer graphics] performances, but [the Beast] was a romantic hero, someone who was at the emotional center of the movie. I always said that we could get everything else in this movie right, but if we didn't get a Beast that people believed in then [the movie] wouldn't work."[1]
>
> – Bill Condon, Director, *Beauty and the Beast*

1.     Disney's *Beauty and the Beast* opened on March 17, 2017, to an astonishing $170 million in North America and $350 million globally, establishing numerous box-office records. It became the top film opening of all time for a PG-rated film, both domestically *and* internationally. It was the seventh largest opening for a film of any rating in North America. And it is now the highest grossing PG-rated film of all time, earning over $500 million domestically and $1.25 billion worldwide. *Beauty and the Beast* is the tenth highest grossing movie of any rating of all time. [2]

2.     The film's romantic hero, the Beast, was a CG (computer graphics) character played by actor Dan Stevens, with every human subtlety of his facial performance carried through to the animal-like CG face of the Beast by an innovative Oscar-winning visual effects ("VFX") technology called Contour Reality Capture, but generally referred-to by defendants as "MOVA." Stevens described how Contour was used:

> The facial capture [for the Beast] was done separately using a technology called "MOVA." So, every ten days, two weeks, I'd go into a booth and spray my face with UV paint and 27 little cameras would capture the facial expressions of all the scenes we had done on previous days…they would take that information and morph it onto the Beast, his face…

---

[1] Truitt, Brian, "Watch the crazy way 'Beauty and the Beast' turned Dan Stevens into a monster," USA Today, May 29, 2017. https://www.usatoday.com/story/life/entertainthis/2017/05/29/exclusive-video-how-dan-stevens-was-transformed-in-beauty-and-the-beast/102281138/.

[2] http://www.boxofficemojo.com/movies/?id=beautyandthebeast2017.htm.

And co-star Emma Watson (Belle) lauded Contour, saying:

> I'm so pleased that we did it the way we did it because when you see Beast on screen there is something so human about him… [Contour] really captures the subtlety of Dan's facial expression and the performance that he gives…I don't think the world has seen anything like it before. I think it's really unique to our film. [3]

Director Bill Condon went further, expressly crediting the success of the CG Beast to the unique capabilities of Contour and attributing the film's success in its entirety to it:

> "[The Beast] was at the emotional center of the movie, who was the romantic hero of the movie, who was going to be a CG character…and it was this new process [Contour] which—you know usually its dots like this [Condon points to his face] and then animators fill in the dots—but actually captured every pore of Dan [Stevens]'s skin and that's why so much of him, this great performance, comes through…" [4]

This view was affirmed by *Beauty and the Beast's* editor, Virginia Katz:

> "…the main concern, for me and I think for all [working on the movie], was how that the Beast was going to be visualized. I mean, if the Beast didn't work, then the film wouldn't work." [5]

3.      But in all of the film industry and media accolades about the record-breaking success of *Beauty and the Beast*, and the acclaimed cutting-edge digital Contour technology that made the film's success possible, nowhere is it mentioned that the patented and copyright-protected Contour technology was stolen from its inventor and developer, Rearden LLC, and its owner Rearden Mova LLC. Nowhere is it mentioned that although Disney had previously contracted with Rearden LLC and its controlled entities on *four previous major motion pictures* to use Contour, had entered negotiation on multiple occasions with the thieves for "licensing or acquiring" the "MOVA" Contour assets including "patents" and "software," and knew of a Rearden Demand Letter[6] to one of the thieves warning that he was unlawfully in possession of Rearden's facial performance capture intellectual property (which it knew included "patents" and "software"), Disney nonetheless

---

[3] Paris Press Conference, Feb 17, 2017. https://www.youtube.com/watch?v=R9mKV_gklgw&feature=youtu.be&t=12m14s.

[4] *Id.*

[5] Romanello, Linda, Post Magazine, March 1, 2017. http://www.postmagazine.com/Publications/Post-Magazine/2017/March-1-2017/Cover-Story-Disneys-i-Beauty-and-the-Beast-I-.aspx.

[6] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No. 15-797, Dkt: 383, at 169.

contracted with the thieves to use the stolen Contour system.  Nowhere is it mentioned that Disney received numerous Contour capture videos bearing Rearden's copyright notice but continued using the copyrighted Contour software and *removed* Rearden's copyright notice when it used the capture videos in promotional materials. And nowhere is it mentioned that *after* Rearden and Rearden Mova were in widely reported litigation against the thieves over the Contour copyrighted software, patents and MOVA and CONTOUR trademarks, Disney secretly used Contour in *Beauty and the Beast* throughout the litigation, and then prior to the film's release, flaunted its unauthorized use of Contour as a promotional vehicle for the film. Throughout this entire time, Disney never bothered to contact its longtime Contour service provider Rearden LLC to ask any questions or to verify Disney's authorization to use the Contour program, system, methods, trade secrets, or trademarks that Disney knew Rearden owned.

4.     And this was not the first time. Disney contracted with the same thieves previously (after receiving the Rearden Demand Letter) to use Contour in another film, *Guardians of the Galaxy*, which was also highly successful. Disney falsely designated the thieves as the owners of Rearden Mova's Contour facial capture technologies in the film's credits, resulting in widespread industry confusion to the point where Disney's unauthorized use of Contour in *Guardians of the Galaxy* was the *only* movie cited by the Academy of Motion Picture Arts and Sciences when awarding "MOVA Facial Performance Capture system"—confusing the name of the company (Rearden Mova) with the name of the technology (Contour)—a Sci-Tech Oscar:

> "MOVA uses phosphorescent makeup applied with a sponge, strobing fluorescent lights, and an array of 32 cameras. Instead of capturing around a hundred points on the face [using conventional marker-based facial capture] MOVA creates an animated mesh with thousands of points. This offers digital recreations with all the subtle and dynamic motions performed by the actor. **You would have seen this most recently by Josh Brolin playing Thanos in the blockbuster *Guardians of the Galaxy*.**"[7]

---

[7] https://youtu.be/F90iv9I-Sr4 and https://www.oscars.org/sci-tech/ceremonies/2015 (emphasis added).

And Disney contracted with the same thieves again to use the Contour technology for the same Thanos character in a sequence following the closing credits of *Avengers: Age of Ultron* used by defendants Disney MPG and Marvel to promote the next *Avengers* film.

5.      Disney used the stolen Contour systems and methods, induced, caused, and materially contributed to copying of the stolen Contour software, and caused confusion in its use of the MOVA mark in at least *Guardians of the Galaxy*, *Avengers: Age of Ultron*, and *Beauty and the Beast*, in knowing or willfully blind violation of Rearden's intellectual property rights. This case seeks all just and equitable copyright and Lanham Act remedies on behalf of the authors and owners of the Contour program, the intellectual property and copyright vested therein, and the MOVA trademark and goodwill: plaintiffs Rearden and Rearden Mova.

## II.      THE PARTIES

6.      Plaintiff Rearden LLC ("Rearden") is a California limited liability company having its principal place of business at 355 Bryant Street, Suite 110, San Francisco, California 94107.

7.      Plaintiff Rearden Mova LLC ("Rearden Mova") is a California limited liability company having its principal place of business at 355 Bryant Street, Suite 110, San Francisco, California 94107. Rearden Mova is wholly owned by Rearden.

8.      Defendant Disney Enterprises, Inc. ("Disney Enterprises") is a Delaware corporation having its principal place of business at 500 S. Buena Vista Street, Burbank, California 91521. Disney Enterprises is the sole shareholder and owner of Chip Pictures, Inc. and Walt Disney Pictures.

9.      Defendant Walt Disney Pictures ("Disney Pictures") is a California corporation having its principal place of business at 500 S. Buena Vista Street, Burbank, California 91521.  Walt Disney Pictures is wholly owned by Disney Enterprises, and it is the owner and sole member of Walt Disney Pictures Production, LLC.

10.      Defendant Disney Studio Production Services Co., LLC. f/k/a Walt Disney Pictures Production, LLC ("Disney Pictures Production") is a California corporation having its principal

place of business at 500 S. Buena Vista Street, Burbank, California 91521. Walt Disney Pictures is the sole owner and member of Disney Pictures Production.

11.    Defendant Chip Pictures, Inc., ("Chip Pictures") is a California corporation having its principal place of business at 500 S. Buena Vista Street, Burbank, California 91521. Disney Enterprises is the sole owner and shareholder of Chip Pictures, and Chip Pictures is the alter ego of Disney Enterprises. Chip Pictures is an agent of Walt Disney Pictures Production.

12.    Defendant Marvel Studios, LLC ("Marvel") is a Delaware limited liability company having a principal place of business at 500 S. Buena Vista Street, Burbank, California, 91521. On December 31, 2009, The Walt Disney Company purchased Marvel, and Marvel is indirectly wholly-owned by Disney Enterprises.

13.    Defendant MVL Productions LLC ("MVLP") is a Delaware limited liability company having a principal place of business at 500 S. Buena Vista Street, Burbank, California, 91521. Marvel is the sole owner and member of MVLP.

14.    Defendant Infinity Productions, LLC ("Infinity Productions") is a Delaware limited liability company having a principal place of business at 500 S. Buena Vista Street, Burbank, California, 91521. MVLP is the sole owner and member of Infinity Productions, and Infinity Productions is the alter ego of MVLP. Infinity Productions is the agent of Marvel Studios, LLC.

15.    Defendant Assembled Productions II LLC ("Assembled Productions") is a Delaware limited liability company having a principal place of business at 500 S. Buena Vista Street, Burbank, California, 91521. MVLP is the sole owner and member of Assembled Productions, and Assembled Productions is the alter ego of MVLP. Assembled Productions is the agent of Marvel Studios, LLC.

### III.    JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), and § 1338 (copyright and trademark jurisdiction).

17.    This Court has personal jurisdiction over all defendants. It has general personal jurisdiction over defendants because they are corporations or limited liability companies organized and existing under the laws of the State of California and/or because they are authorized to do

SECOND AMENDED COMPLAINT          - 5 -
Case No.: 4:17-cv-04006-JST
005073-12/1962241 V1

1    business and are doing business in the State of California, and they have the capacity to sue or be

2    sued in the State of California. And this Court has specific personal jurisdiction over all defendants

3    because they have committed acts in the State of California that give rise to all acts of infringement

4    asserted herein.

5        18.    Venue is proper for plaintiffs' copyright infringement claims and Lanham Act claims

6    under 28 U.S.C. § 1400(a) and § 1391 (b), (c) and (d). Defendants are residents of the State of

7    California and subject to personal jurisdiction in this judicial district, and they have committed acts

8    in the State of California that give rise to all acts of infringement asserted herein.

9

10               **IV.    FACTUAL ALLEGATIONS**

11   **A.    The Contour program, systems, and methods**

12       19.    The technology at the core of this case includes Contour Reality Capture ("Contour")

13   technology that was conceived, developed, and authored by plaintiff Rearden and is currently owned

14   by plaintiff Rearden Mova.

15       20.    Contour (http://www.rearden.com/mova.html) is one of many technologies incubated

16   and offered by Rearden (www.rearden.com), a San Francisco Bay Area company founded in 1999 by

17   Steve Perlman as an incubator for fundamental technology, creative works, and their interplay.

18       21.    Contour is the fourth performance motion capture technology that Rearden has used

19   in film and videogame production since its founding 19 years ago. Facial performance motion

20   capture, as both a technology and a tool for motion picture and videogame production, falls squarely

21   within the focus of Rearden's business. Rearden practices all of its technologies and inventions,

22   either directly or indirectly by spinning off Rearden entities to use its technologies and inventions.

23   Despite holding a global portfolio of hundreds of its own patents, Rearden has never been in the

24   business of licensing third parties to practice its technologies and inventions, and it has never

25   licensed nor sought to license any of its technologies, inventions, patents, copyrights, or trademarks.

26   Rearden's intellectual property portfolio exists only to protect Rearden's product and services

27

28

offerings, and neither Rearden nor any of its controlled entities has ever previously sued any other

person or entity for patent or copyright infringement.

22.    Mr. Perlman previously worked as Principal Scientist at Apple where he developed,

among many other technologies, the multimedia underpinnings of the color Macintosh as well as

QuickTime. He left Apple for two startups that later went public, and designed and co-founded

WebTV, which was later acquired by Microsoft. Microsoft named Perlman President of a new

Silicon Valley division focused on television products, which ultimately developed Microsoft's

cable, satellite, IPTV and Xbox 360 systems. Perlman left Microsoft in 1999 and self-funded a

technology incubator and visual effects production studio in San Francisco called Rearden, Inc. (now

Rearden LLC). Rearden focused largely on developing fundamental media-related technologies

whose development times (e.g., 5 to 15 years) are beyond the horizon of venture capital and

corporate research and development. Perlman has operated Rearden continuously through to this day.

He is a prolific inventor. Perlman is a named inventor on over five hundred patents worldwide, and

among his many innovations are the following:

- The underlying technology for QuickTime (the video streaming technology for iPhone, iPad, iPod, and Mac and much of the multimedia technology for Apple);

- The underlying technology for many of Microsoft's video products;

- OnLive cloud gaming technology;

- Contour facial capture technology;

- Artemis pCell wireless technology; and

- A wide range of other technologies in other fields, including medical and national defense life-saving technologies, often in cooperation with the U.S. government and U.S. agencies, sometimes not publicly disclosed.

23.    A major technology focus of Rearden from its 1999 founding to this day is

"performance motion capture," a production technology typically used to create a 3D animated

character in a movie or a videogame that moves exactly like a human performer. In 2000, Rearden

began offering motion capture services for movies and videogames (through wholly-owned

SECOND AMENDED COMPLAINT        - 7 -
Case No.: 4:17-cv-04006-JST
005073-12/1962241 V1

subsidiaries Rearden Studios and then MOVA LLC) using existing commercial "marker-based" motion capture systems that could capture and track body ("skeletal") motion, but there was no known technology at that time that could capture and track the subtleties of human facial motion in a realistic, life-like manner, despite an urgent need:

> "The state of the art [before Contour] was … marker-based motion capture…we looked at a number of other films at the time that were using facial marker tracking…as you can see, it gives you a pretty crappy performance… What we realized was that what we needed was the information that was going on between the markers. We needed the subtleties of the skin. We needed to see skin moving over muscle moving over bone. We needed creases and dimples and wrinkles…" [8]

Rearden set out to invent and perfect a photorealistic facial motion capture and tracking system.

24.     Over the next five years, Rearden's technical team—including brilliant, talented, and highly creative engineers, programmers, and visual effects artists—tried dozens of different approaches to solve the problem. Years of experimenting, testing, trials, failures, sweat of the brow, expenditure of millions of dollars, and finally stunning breakthroughs, ultimately led to the conception and perfection of a solution to the long-felt need—a technology that precisely captures and tracks the 3D shape and motion of a human face to sub-millimeter precision, producing photorealistic results. Rearden branded the technology Contour Reality Capture and offered it to the videogame and motion picture industries. The solution was comprised of a complex apparatus and methods for capturing facial performances, and wholly original software that operated the apparatus and subsequently processed the performance captures into works that could be used by effects studios to animate CG characters. This innovative technology was recognized in the motion picture industry as revolutionary:

> "Contour's promise is enormous," [Director David] Fincher said, "The notion that the human face in all its subtleties could be mapped in real time and such density of surface information opens up so many possibilities for both two- and three-dimensional image makers and story-tellers."

> "I live in this environment, and I see stuff every day, so I get a little jaded," said [then Digital Domain Senior VP and Executive Producer Ed] Ulbrich… "Other developments have been gradual, more

---

[8] Ulbrich, Ed (former Digital Domain CEO), "How Benjamin Button Got His Face" TED Talk, Feb 2009. https://www.ted.com/talks/ed_ulbrich_shows_how_benjamin_button_got_his_face.

evolutionary than revolutionary. Contour separates the performance from the photography. It's a substantial turning point in the business, and I think it will change how picture are made."[9]

25.    Contour's technical breakthrough was introduced at the Special Interest Group on Computer Graphics and Interactive Techniques ("SIGGRAPH") Conference on July 31, 2006 to wide acclaim, including photographs of Contour's systems and methods on the front page of the *New York Times*[10], page B1 of the *Wall Street Journal*[11], and *The Hollywood Reporter*, among other publications. Mr. Perlman was invited to present MOVA Contour technologies and their practical applications in movie production to the Directors Guild of America[12]. And he was invited on many occasions to give public presentations on MOVA Contour and the development process that led to its invention, for example in a speech at Columbia University[13].

26.    The following photograph[14] from an article in *The Hollywood Reporter* on the day Contour was unveiled—July 31, 2006—was directed to movie and videogame industry professionals and illustrates several Contour program output works, which are described in further detail later in subsequent allegations:

---

[9] Marlowe, Chris, "Contour mapping intricate detail: Mova revolutionizing motion-capture process with new system," The Hollywood Reporter, July 31, 2006, http://www.mova.com/pdf/Contour-HollywoodReporter-060731-2.pdf.

[10] Markoff, John, "Camera System Creates Sophisticated 3-D Effects", New York Times, July 31, 2006. https://www.nytimes.com/2006/07/31/technology/31motion.html.

[11] Wingfield, Nick, "Digital Replicas May Change Face of Films," July 31, 2006. http://on.wsj.com/2teIRbO.

[12] "'Facial Performance Capture for Photoreal Digital Characters' Presented by Steve Perlman, Founder & President, Mova," Digital Day 2007: The Future of the Future, Directors Guild of America, July 28, 2007. http://ishindler.com/articles/DGA_Digital_Day_flyer07.pdf.

[13] https://youtu.be/1QxrQnJCXKo.

[14] Marlowe, *op. cit*.

SECOND AMENDED COMPLAINT             - 9 -
Case No.: 4:17-cv-04006-JST
005073-12/1962241 V1



27.    Also on July 31, 2006, the following photographs appeared in a *New York Times* article directed to a general readership audience, which illustrate an application of the phosphor-based makeup used in Contour facial motion capture methods:



Actors must cover themselves with makeup containing phosphorescent powder for Contour, a system that can create 3-D effects. Austin Hice

and three Contour program output works (this photograph appeared on the front page):[15]



An actress goes from live performance, left, to phosphorescence, to a Contour-generated image, right. Mova.com

28.    Also on July 31, 2006, the following photograph appeared in a *Wall Street Journal* article directed to a general readership audience, which illustrates the same three Contour program output works with "non-technical reader" annotations for each image (the web version of the article included a video that showed the three output works in motion):[16]



[15] Markoff, *op. cit*.

[16] Wingfield, *op. cit*.

29.     In one embodiment, Contour uses an array of cameras whose shutters are synchronized to strobing white lights and ultraviolet lights in conjunction with phosphor-based makeup applied to the performer in random patterns, with the entire system controlled by the highly-advanced, original, and proprietary Contour program that operates the Contour system in real time to capture an actor's performance frame-by-frame, and then processes the capture into original Contour program output works based on the captures.

30.     The Contour system is controlled, and the captured camera images are processed, by several computers running the Contour program. Part of the program operates prior to a facial performance capture session to prepare and calibrate the Contour system. Part operates in real-time during a live facial performance capture. And part operates after the facial capture to process the captures into works that can be used to animate CG characters. The Contour program produces several types of output works, some of which are used by the Contour program itself for further processing, and some are used for animating a CG face in a movie or videogame.

31.     One embodiment of the operation of the Contour program, system, and methods is described in the following page from a Contour brochure below, distributed at computer graphics and entertainment industry conferences:

SECOND AMENDED COMPLAINT          - 12 -
Case No.: 4:17-cv-04006-JST
005073-12/1962241 V1

32.    **Preparation:** Phosphor-based makeup (various types of phosphors are supported) is applied in a random pattern on the performer's face, neck, etc.—whatever body surfaces are intended to be captured—typically using an airbrush, sponge or cotton swab.

33.     **Lights:** The performer sits or stands in the arc-shaped Contour apparatus in a light-sealed stage. One part of the Contour program causes white lights and ultraviolet lights to be flashed so rapidly that the flashing is beyond human perception, and it appears to the performer and observers that the white and ultraviolet lights are on steadily.

34.     **Cameras:** One part of the Contour program causes the shutters on two pluralities of cameras, distributed around the apparatus, to open and close synchronously with the flashing of the lights such that:

       (a)    a first plurality of cameras open their shutters when the white lights are on, illuminating the natural skin color of the performer; and

       (b)    a second plurality of cameras open their shutters when the white lights are off and the phosphor-based makeup is emitting random patterns of light.

35.     **Action:** The performer provides her or his facial performance while one part of the Contour program causes the output of each of the plurality of cameras to be recorded onto storage devices. The output works of the two pluralities of cameras are illustrated in each half of the face in the "Capture Process" section of the brochure reproduced above.

       (a)    the output of the first plurality of cameras is called the "**Skin Texture**" and it looks like normal skin and facial features of the performer from multiple angles, largely without visible makeup, and

       (b)    the output of the second plurality of cameras is called the "**Makeup Pattern**" and it looks like a random pattern of green or blue largely without showing the skin or other facial features (e.g., eyes or mouth) of the performer.

36.     Part of the Contour program processes the Makeup Pattern output work to create a high-resolution 3D surface that moves in the shape of the skin of the performer with sub-millimeter precision. This output work is called the "**Captured Surface**" and rendered on a display, it looks like a 3D bust of the performer's skin in motion. A still frame of a Captured Surface work is shown in the "Captured Surface" section of the brochure reproduced above.

37    The same part of the Contour program processes the Makeup Pattern output work to create a high-resolution 3D mesh that tracks points on the skin of the performer in 3D as the skin moves from frame-to-frame. This output work is called the "**Tracking Mesh**" and rendered on a display, it looks like a 3D mesh that exactly follows the movement, stretching and wrinkling, etc., of the skin as the performer moves her or his face. A still frame of a Tracking Mesh work is shown in the "Tracked Surface" section of the brochure reproduced above. The Tracking Mesh work tracks the subtleties of the performer's facial motion with sub-millimeter precision. For example, if the performer's expression causes the cheeks to bulge out from a smile, the points on the 3D mesh tracking the cheek will bulge out in exactly the same 3D shape. If the forehead furrows into wrinkles, then the points on the 3D mesh tracking the forehead will furrow into wrinkles in exactly the same 3D shape. The Tracking Mesh work can be configured to be at any resolution, whether thousands or even millions of points, depending on the level of tracking detail required by the project. An example of a Tracking Mesh work tracking skin deformation from an extreme expression is shown here:



38.     The Contour program's output works specified above can be used for many different applications. Often they are used for "retargeting" the performer's face onto another 3D model of a face, either a real face (e.g. when Rupert Grint (Ron Weasley)) transforms into the face of Daniel Radcliffe (Harry Potter) in *Harry Potter and the Deathly Hallows, Part I*), or a fictional face (e.g. Mark Ruffalo's face transforms into the Hulk's face in *The Avengers*, Brad Pitt's 44-year-old face retargeted to an 87 year-old version of his face in *The Curious Case of Benjamin Button*), or Jeff Bridge's face retargeted in *TRON: Legacy* (2010) to his 28 year-younger face as it appeared in *TRON* (1982).

39.     When the retargeting is from a first performer's real face to the real face of a second performer, then each performer's face is captured by the Contour system, with output works created by the Contour program for each performer. The Captured Surface, Tracking Mesh, Makeup Pattern, and Skin Texture output works can be used in the construction of a 3D model of the face of the second performer, and then the Tracking Mesh work of the first performer is used to animate the 3D model of the second performer's face. The result is a 3D model of the face of the second performer that is animated by the motion of the first performer's face. For example, the photograph below shows a man (the "second performer") captured by the Contour program, system, and methods. The 3D model of a CG head (center) was generated from the Contour program output works, including the Makeup Pattern (left) and Tracking Mesh (right) works:



40.     The photograph below shows the performance of the woman (the "first performer") in the brochure reproduced above (showing her Skin Texture (left) and Tracking Mesh (right) Contour output) works retargeted to the man's CG head in the above photo by retargeting the points on her Tracking Mesh work to the 3D model of the man's CG head. As you can see in her Live Performance (showing the Skin Texture output work, below left), her facial expression causes the man's CG head to track her facial expression. Contour's Tracking Mesh work is so precise that a high degree of realism is maintained, even though the man's CG face and head have a very different shape and size than hers, and he is male and she is female. In fact, Contour output works capture the woman's performance with such fidelity that observers of the animation have commented that despite the fact that the man's CG face clearly has a male *shape*, the *motion* appears to be that of a female face. The video of this and other Contour examples is available on Rearden's home page (www.rearden.com, click on the MOVA logo and click on the video), or directly (www.rearden.com/mova.php or https://vimeo.com/86130623):



41.     A similar retargeting process can be performed with a fictional head. For example, the two photographs below are of a performer whose face was captured in the Contour system showing the Skin Texture output work on the left and how she appeared to the naked eye (or a conventional camera), showing the Makeup Pattern work combined with the Skin Texture work on the right:



42.     The photograph below shows several views of a CG model of the head of a videogame character that was created by an artist:



Although the head looks almost photoreal (it was only a test, not a polished CG model) when it is in a neutral pose and immobile, if the face were animated—whether through hand-drawn animation or prior art motion capture techniques—any photorealism would be lost because the human eye and brain are precisely attuned to notice any unnatural imperfection in facial motion. But, by using the Contour program, every subtle motion of the human face is captured with sub-millimeter precision, producing output works that retain that precision and can be retargeted to any fictional CG head, bringing it to life.

43.     The photographs below show the above videogame character's head in two expressions retargeted from the Tracking Mesh work generated by the Contour program from the

Contour facial capture of the above actress. Although the photorealism of the motion cannot be seen in static photographs, the motion is realistic and life-like, despite the fact that the performer's face is a very different shape than that of the CG head. Even in a static image, however, one can see how the expressionless CG model tracked the good-natured expression of the actress:





44.      A 3D "wireframe" (a mesh of 3D points) of the retargeted CG character's head is shown below, separately and overlaid upon the rendered image, and then the final rendered image:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







45.    In summary, the Contour program transforms the facial performance of a live performer, capturing the most subtle of facial motions with sub-millimeter precision to animate with realism the life-like motion of faces of CG characters that appear in a finished movie, videogame, or other production. The process begins by airbrushing or otherwise applying a random pattern of phosphor-based makeup on a performer, having the performer sit or stand in the arc-shaped Contour apparatus surrounded by an array of white lights and ultraviolet lights and two pluralities of cameras, with the lights flashed rapidly and synchronized with the camera shutters as Skin Texture and Makeup Pattern works are created by the Contour program. The Contour program then processes the Makeup Pattern work to create thousands or even millions of points in 3D as the performer's face moves, producing precise Captured Surface and Tracking Mesh works. Thus, the Contour program produces output works that include the following:

- **Skin Texture**, showing the normal skin and facial features of the performer from multiple angles, largely without visible makeup, in color

- **Makeup Pattern**, showing the random pattern of makeup on the performer from multiple angles, largely without visible skin or facial features, in grayscale

- **Captured Surface**, a high-resolution moving 3D surface in the shape of the performer's skin as the performer's face moves

- **Tracking Mesh**, a high-resolution 3D mesh that exactly tracks the movement, stretching, wrinkling, etc. as the performer moves their face.

The Tracking Mesh work can then be retargeted to a CG face, animating it with photorealistic and natural motion, thereby precisely preserving every subtlety of human expression by the performer in the final movie, videogame, or other production.

46.    The Contour program includes a security mechanism that automatically affixes notice of Rearden's Contour program copyright to Skin Texture and Makeup Pattern output works, an example of which is shown in the three images below from a *Beauty and the Beast* Contour capture of performer Dan Stevens. The first and second groups of images below show the first and second frames, respectively, of the three color Skin Texture and twenty-two grayscale Makeup Pattern

1   works. The first frame contains the copyright notice, year, date, and time of the capture and technical

2   Contour capture information; the second frame (and all subsequent frames) shows the performer's

3   frame-by-frame capture by the Contour program from the angle of each camera in the Contour

4   apparatus. The third image below is an enlargement of the first frame of one Skin Texture output

5   work, showing the copyright notice which reads, "Copyright 2016 - Rearden LLC", and also

6   includes the date and time of the Contour capture session: "Tue, Jun 14, 2016 - 09:41:16". The date

7   and time stamping notifies any Contour program end-user that the copyright of the Contour program

8   is controlled by Rearden LLC as of the date and time of the Contour capture. Since the end-user

9   would not have access to the copyright notices embedded into the Contour program's source code,

10  the current-year copyright notice serves as *express notification that Rearden LLC is asserting its*

11  *copyright in the Contour program.* This copyright protection feature affixed copyright notice on

12  every Contour program Skin Texture and Makeup Pattern work from the date of the Contour

13  program theft in early 2013 until this Court's Preliminary Injunction Order[17] went into effect on June

14  17, 2016, finally halting use of the stolen Contour program. The below Contour capture was time-

15  stamped on June 14, 2016, evidencing that the stolen Contour program was still in use by defendants

16  Disney Pictures Production, Disney Pictures, and Chip Pictures three days before the Injunction

17  Order in *Shenzhenshi, et al. v. Rearden, et al.* From its theft in 2013 through the June 17, 2016

18  Injunction Order, many thousands of Contour program works were created for Disney movies using

19  the stolen Contour program, each affixed with "Copyright [current date] - Rearden LLC" and the

20  date and time of the capture.

21

22

23

24

25

26

27

28
---
[17] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No. 15-797, Dkt. 188

SECOND AMENDED COMPLAINT          - 22 -
Case No.: 4:17-cv-04006-JST
005073-12/1962241 V1



47.     Within days after the Contour program and system were unveiled at SIGGRAPH in 2006, tests and production began on one of the first movies utilizing Contour, *The Curious Case of Benjamin Button.* The movie was released in 2008. The photorealistic reverse-aging of Brad Pitt's face from an 87-year-old man backwards to his then-age of 44, and then further backwards to a younger age, was widely lauded as a visual effects ("VFX") milestone, the first ever photorealistic CG face, winning an Academy Award for Best Visual Effects for the team at the VFX production company, Digital Domain, which had hired Rearden to operate the Contour system to capture Brad Pitt's face and generate Contour program output works for the film.

48.     In a widely-viewed TED (Technology, Entertainment, Design) Talk entitled, "How Benjamin Button Got His Face," Ed Ulbrich, then Digital Domain's Senior VP and Executive Producer (subsequently the CEO of successor Digital Domain 3.0, Inc.), confirmed that *The Curious Case of Benjamin Button* would have been "impossible" to make but for unprecedented facial capture precision and subtlety of the Contour program's output works. Ulbrich stated in the talk:

> "We first got involved in *The* [*Curious Case of Benjamin Button*] project in the early 90s.... We took a lot of meetings and we seriously considered it. But at the time, we had to throw in the towel. **It was deemed impossible**. **It was beyond the technology of the day to depict a man aging backward**... The project came back to us a decade later.... **we came across a remarkable technology called Contour**... creating a surface capture as opposed to a marker capture...**This was when we had our 'Aha!' This was the breakthrough**...we could put Brad [Pitt] in this [Contour] device, and use this Contour process, and we could stipple on this phosphorescent makeup and put him under the black lights, and we could, in fact, scan him in real time... effectively, we ended up with a [Contour program output file] 3D database of everything Brad Pitt's face is capable of doing...we could transpose the [Contour program output file] data of Brad at [then-aged] 44 onto [a 3D model of] Brad at 87. So now, we had a 3D database of everything Brad Pitt's face can do at age 87, in his 70s and in his 60s."[18]

49.     In the TED Talk, Ulbrich showed details of the Contour program and output works, and how the CG face of Benjamin Button in the final movie was derived from the Contour program

---

[18] Ulbrich, *op. cit*. (emphasis added).

output works. The following paragraphs describe still frames from the TED talk (labeled by "Minutes: Seconds" from the start of the video).

50.     **9:43:** The branded Contour apparatus, a semicircle of two pluralities of cameras with synchronized white and ultraviolet lights surrounding a performer, with Rearden's Mova LLC staff operating the Contour system:



51.     **10:11:** On the left, Contour program **Skin Texture** output work, showing the performer's natural skin color and facial features. On the right, a performer with conventional motion capture markers on her face:



52.    **10:17:** On the left, Contour program **Tracking Mesh** output work, showing hundreds of thousands of points in 3D, the Tracking Mesh work's resolution is so high that the points can only be seen by zooming in. In contrast, conventional marker-based resolution is shown on the right:



53.    **10:20:** On the left the Contour program **Captured Surface** work, showing high-resolution surface geometry. In contrast, marker-based facial capture surface geometry on the right:



54.     **10:39:** Contour program **Makeup Pattern** work, showing random patterns from glowing phosphor-based makeup. Each of the four Contour facial captures of Mr. Pitt was a separate motion facial performance used for a different facial expression of Benjamin Button. The Contour program created high-resolution **Captured Surface** and **Tracking Mesh** works from each of these:

1    55.    **10:49:** Contour program **Makeup Pattern** works, showing how many Contour output

2    works were used. Each of the Contour facial captures was a separate motion facial performance of

3    Mr. Pitt used for a different facial expression of Benjamin Button. The Contour program created

4    high-resolution **Captured Surface** and **Tracking Mesh** output works from each of these, creating a

5    database of Capture Surface and Tracking Mesh output works:



6    56.    **12:33:** Contour program **Makeup Pattern** work (left), **Captured Surface** work

7    (middle), retargeted **Captured Surface** and **Tracking Mesh** works to a fictional aged head (right),

8    are shown below. The 3D points of the Contour **Tracking Mesh** work of Mr. Pitt's actual face were

9    retargeted to corresponding points on the 3D fictional "maquette" (i.e., hand-made 3D bust) of Mr.

10    Pitt at age 87. As a simple example, the point on the right corner of Mr. Pitt's actual mouth could

11    correspond to the point on the right corner of the 3D maquette's mouth. As Mr. Pitt's smile widens

12    during the Contour capture session, moving the tracked point on the corner of his mouth outward, the

13    retargeted point on the 3D maquette's mouth would move proportionately outward causing the 87-

14    year-old smile to widen. As described by Mr. Ulbrich: "[Left:] This is Brad doing one of the

15    [character expression] poses. [Middle:] And here's the resulting [**Captured Surface** work] data that

16    comes from that, the model that comes from that. [Right:] Retargeting is the process of transposing

that [**Captured Surface** and **Tracking Mesh** work] data onto another model. And because the life cast, or the bust—the maquette—of Benjamin was made from Brad, we could transpose the [**Captured Surface** and **Tracking Mesh** work] data of Brad at 44 [years] onto Brad at 87 [years]. Effectively, we ended up with a [**Captured Surface** and **Tracking Mesh** work] 3D database of everything Brad Pitt's face is capable of doing…we could transpose the [**Captured Surface** and **Tracking Mesh** work] data of Brad at [then-aged] 44 onto [a 3D maquette of] Brad at 87. So now, we had a 3D database of everything Brad Pitt's face can do at age 87, in his 70s and in his 60s":



57.     **17:18:** On the left is 87-year-old fictional head maquette Tracking Mesh work retargeted from a Contour program **Tracking Mesh** work, with a pair of glasses added in as a prop. The final CG face is shown on the right after various steps such as texturing and lighting that is applied to the maquette. The resulting CG face is integrated into the live-action footage of the final scene:

1



12    58.    The photorealistic reverse-aging derived from the Contour system, methods and

13  output works received wide acclaim when *The Curious Case of Benjamin Button* was released in

14  December of 2008. But even before the movie's release, word of the unprecedented CG face realism

15  achieved by the Contour system was spreading through the VFX industry. In July of 2008, defendant

16  Disney hired Mova LLC for another reverse-aging movie, *TRON: Legacy,* the sequel to Disney's

17  *TRON* released in 1982. Contour was used in a similar manner as in *Benjamin Button* to reverse-age

18  the face of Jeff Bridges, the star of *TRON* and *TRON: Legacy*, to look as he did in 1982. Mr. Bridges

19  published his experience of using Contour through wide-angle black-and-white photography and

20  hand-written notations, below:

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



and Ready



to be digitized

1

2

3

4

5

6

7

8



9      *Mova Technology came up with this rig  .     .     .*

10

11

12

13

14

15

16

17



18      *that captures every expression you can think of .    .*

19

20

21

22

23

24

25



26

27      *.    .    .    .    .    from every angle*

28

59.    In addition to transforming an actor's age, the same process can be used for many other VFX purposes, such as transforming an actor's face into a creature (e.g. the Hulk in defendant Disney's *The Avengers*), or mapping one character's face onto another's (e.g. Rupert Grint (Ron Weasley) was transformed into Daniel Radcliffe (Harry Potter) in *Harry Potter and the Deathly Hallows, Part I*).

60.    The following four photographs show the arc-shaped Contour apparatus, two pluralities of synchronized cameras, white light and ultraviolet light sources, computers running the Contour program, and actors wearing the phosphor-based makeup of the Contour systems and methods, used lawfully by defendants and operated by Rearden and its controlled entities in *TRON: Legacy* (2010)*, Pirates of the Caribbean: On Stranger Tides* (2011), *John Carter* (2012), and *The Avengers* (2012) (Mr. Perlman appears at the right in the last photograph):







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18      61.     And the following photograph released by Digital Domain shows the stolen Contour

19  apparatus that was operated by the thieves and used unlawfully by defendants in at least *Guardians*

20  *of the Galaxy, Avengers: Age of Ultron,* and *Beauty and the Beast*. Close inspection of the photo

21  shown in the left inset, shows the thieves neglected to remove a Rearden asset tag on one of the

22  stolen cameras. Rearden Asset #10393 is a Basler 102f Camera, Serial # 20606024, purchased on

23  October 1, 2006, and stolen in 2013 along with the Contour program. Also, numerous tell-tale details

24  specific to Contour's operation are visible in the stolen Contour apparatus photograph (e.g. the right

25  inset shows black tape is wrapped around the end of a fluorescent lamp tube to prevent light spillage

26  from the glowing electrode, a Contour-specific technique taught in Rearden's US Patent 7,567,293 at

27  19:66-20:15), confirming that the thieves used the identical Contour program, system and methods:

28

SECOND AMENDED COMPLAINT          - 35 -
Case No.: 4:17-cv-04006-JST
005073-12/1962241 V1



62.    The Contour system has no "operating manual." It is a hand-built system, the operation of which is known only by Rearden's MOVA team who invented it and Rearden's MOVA employees and contractors who have been trained to use it under strict confidentiality obligations. It was not intended to be an end-user system and must be used carefully with knowledge of its operation for it to function correctly and safely. Defendants were able to use the Contour system only because they had contracted with DD3, which had hired the rogue former Rearden employees who orchestrated the theft to operate Rearden's Contour system without authorization.

**B.    The Contour intellectual property**

63.    The Contour computer program is the subject of United States Copyright Registration No. TXu001977151, a copy of which is attached hereto as Exhibit 1. A copyright vested in the

Contour program at least as early as 2009, when it was completed. Plaintiff Rearden Mova is the owner of the Contour program intellectual property and copyright, and the Copyright Registration No. TXu001977151. The Contour program runs on computers that are part of the Contour apparatus.

64.    The Contour methods and systems are the subject of issued United States Patent Nos. 7,605,861 (the "'861 Patent"), 8,659,668 (the "'668 Patent"), 7,548,272 (the "'272 Patent"), 7,567,293 (the "'293 Patent"), and 8,207,963 (the "'963 Patent"), as well as numerous United States pending patent applications, and international patents and patent applications.  Plaintiff Rearden Mova is the exclusive owner of the '861, '668, '272, '293, and '963 patents, as well as all other domestic patent applications and all international patents and patent applications drawn to the Contour systems and methods. The Contour apparatus and methods are embodiments of the claims of the '861, '668, '272, '293 and '963 patents.

65.    MOVA® and Contour® are the subject of United States Trademark Registration Nos. U.S. Registration No. 3,843,152 and U.S. Registration No. 3,628,974, respectively. Copies of these registrations are attached hereto as Exhibits 2 and 3.

66.    The Contour systems and methods include know-how: confidential information that derives independent economic value, both actual and potential, from not being generally known to the public or other persons who can obtain economic value from its disclosure and use. The Contour confidential information includes, without limitation:

- the source code and object code used in operating the Contour physical assets;
- many specific functionally-designed mechanisms, such as determining when part of the face is obstructed from the view of certain cameras and seamlessly filling in those parts of the face with views from other cameras;
- certain of the processes used along with the Contour physical assets, such as the timing configurations for the Contour system;
- sequencing the steps of calibration, aperture adjustment and focus adjustment of the Mova cameras;
- specific phosphor-based makeup formulations;

SECOND AMENDED COMPLAINT          - 37 -
Case No.: 4:17-cv-04006-JST
005073-12/1962241 V1

- techniques for applying makeup to performers being captured;

- specific electrical set up safety measures of the Contour apparatus;

- specific electrical modification of fluorescent light ballasts to operate safely;

- specific performer medical considerations, such as, in the case of performers receiving Botox treatments for facial wrinkles, scheduling shoots in specific intervals relative to their treatments to maintain natural skin motion;

- specific instructions to performers on how to perform in such a way to keep their faces within the capture volume;

- specific instructions to performers for specialized moves, such as singing, or bending the head downward and upward, with the face going out of and then back into view of the cameras; and

- information regarding Rearden's and Rearden's controlled entities' prior customer relationships and business terms.

67.    Rearden and Rearden Mova have protected this confidential information by, *inter alia*, maintaining email, documents, source and object code, and other software in secure locations; controlling access to these locations; and by including confidentiality provisions in its agreements with all of its employees and contractors who have ever had access to any source code, object code, other software, electrical set up, proprietary electrical circuit designs, timing systems, interconnects, makeup formulations, phosphor research, results of proprietary tests, etc. The following confidentiality provisions of a Rearden employment agreement (Rearden referenced as "the Company"), are representative of those in all other Rearden employment and contractor agreements:

- "At all times, both during my employment by the Company and after its termination, I will keep in confidence and trust and will not use or disclose any Proprietary Information or anything relating to it without the prior written consent of an officer of the Company..."

- "I agree that during my employment by the Company I will not remove any Company Documents and Materials from the business premises of the Company or deliver any Company Documents and Materials to any person or entity outside the Company, except as I

SECOND AMENDED COMPLAINT         - 38 -
Case No.: 4:17-cv-04006-JST
005073-12/1962241 V1

am required to do in connection with performing the duties of my employment. I further agree that, immediately upon the termination of my employment by me or by the Company for any reason ... I will return all Company Documents and Materials, apparatus, equipment and other physical property, or any reproduction of such property ..."

68.     The Contour confidential information constitutes trade secrets as that term is defined in the California Uniform Trade Secrets Act ("CUTSA") at sections 3426 to 3426.11 of the California Civil Code, and the Defense of Trade Secrets Act at 18 U.S.C. § 1832(b), *et seq.*

69.     The "Contour Assets" at issue herein include the Contour technology, and related hardware and software, source code, domestic and international patents and patent applications, domestic and international trademarks, copyrights, trade secrets, domain names, business records, and various related physical goods (the "Contour Assets").

**C.     Rearden's use of the Contour program, system, and methods in fifteen major motion pictures, and industry acclaim**

70.     Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by defendant Paramount Pictures for "*The Curious Case of Benjamin Button*" (2008) and *Transformers: Dark of the Moon* (2011).

71.     Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by Universal Studios in *The Incredible Hulk* (2008) and *Snow White and the Huntsman* (2012).

72.     Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by defendant 20th Century Fox in *Percy Jackson and the Olympians: The Lightning Thief* (2010).

73.     Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by Sony Pictures in *The Amazing Spider-Man* (2012).

74.     Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by Warner Brothers Studios in *Harry Potter and the Deathly Hallows*, Part 1 (2010) and Part 2 (2011), *Green Lantern* (2011), *Jack the Giant Slayer* (2013), and *Gravity* (2013).

75.     And Rearden and/or its controlled affiliates operated the Contour system for, and authorized use of its system, methods and Contour program output works by defendants Disney Pictures Production and/or Disney Pictures in *TRON: Legacy* (2010)*, Pirates of the Caribbean: On Stranger Tides* (2011), *John Carter* (2012), and *The Avengers* (2012) (including defendant Marvel).

76.     In each of the above fifteen films, the motion picture studios performed a routine intellectual property due diligence prior to contracting with Rearden for use of the Contour systems and methods, in part to verify that Rearden and/or Rearden-controlled affiliates owned the Contour Assets and technology and had the right to use them for the benefit of the studios.

77.     Rearden and/or Rearden-controlled affiliates have built considerable good will in the Contour Assets and technology. Rearden and/or Rearden-controlled affiliates used the Contour systems and methods in the fifteen major motion pictures identified above, which collectively grossed roughly $9.5 billion in global box office. Five of these movies are in the top-25 highest-grossing movies since 2008 (when the first Contour movie was released), including the number one highest grossing movie in each of 2011 and 2012[19]. The Contour system and methods and the Contour program have been the subject of numerous motion picture industry press articles in which movie industry luminaries like director David Fincher have lauded the Contour technology:

> "Contour's promise is enormous," Fincher said. "The notion that the human face in all its subtleties could be mapped in real time and with such density of surface information opens up so many possibilities for both two- and three-dimensional image makers and storytellers."[20]

---

[19] www.boxofficemojo.com.

[20] Marlowe, July 31, 2006, *op. cit*.

SECOND AMENDED COMPLAINT                - 40 -
Case No.: 4:17-cv-04006-JST
005073-12/1962241 V1

The Contour system and methods and the Contour program have been the subject of an invited presentation by Steve Perlman to the Director's Guild of America[21], and they were identified as a "breakthrough" in the TED talk. [22] Contour's improvements over prior facial performance capture technologies have been acclaimed by major motion picture actors, producers, directors, and top VFX professionals, including Ed Ulbrich in his TED Talk description of Contour and how it was essential in the creation of *The Curious Case of Benjamin Button*.[23] And on February 9, 2015, the Academy of Motion Picture Arts and Sciences awarded the Scientific and Technical Award to the MOVA [Contour] facial performance capture system.[24]

**D.    Transfer of the Contour Assets to OnLive, Inc., OL2, Inc., and Rearden Mova**

78.    Rearden's Contour assets, intellectual property, and apparatus (the "Contour Assets") as well as Rearden's other motion capture assets, along with videogame streaming technology, was spun out of Rearden on or about July 2, 2007 into OnLive, Inc., a corporation controlled by Rearden. OnLive, Inc. owned all of the Contour Assets at that time.

79.    On or about August 17, 2012, OnLive, Inc. assigned all of its assets, including the Contour Assets, to OL2, Inc. as part of an assignment for the benefit of creditors ("ABC").

80.    On or about October of 2012, Rearden learned that OL2, Inc. was interested in selling the Contour Assets and apparatus, and Rearden decided to reacquire them. Rearden formed a wholly owned subsidiary, MO2, LLC, as a vehicle to acquire the Contour Assets from OL2, Inc.

81.    On or about February 11, 2013, OL2, Inc. transferred the Contour Assets to MO2 LLC through a Membership Interest and Asset Purchase and Sale Agreement. MO2 LLC is wholly owned by Rearden.

82.    On or about April 19, 2013, MO2 LLC transferred the Contour Assets to another wholly owned Rearden company, plaintiff Rearden Mova LLC.

---

[21] Directors Guild of America, July 28, 2007, *op. cit.*http://ishindler.com/articles/DGA_Digital_Day_flyer07.pdf

[22] *Op. cit.*

[23] Ulbrich, *Op. cit.*

[24] https://www.oscars.org/sci-tech/ceremonies/2015

83.     On or about September 18, 2014, Rearden recorded patent assignments for the Contour Asset patents, reflecting the assignment from OL2, Inc. to MO2 LLC made in the Membership Interest and Asset Purchase and Sale Agreement.

84.     Rearden also recorded patent assignments for the Contour Asset patents, reflecting the assignment from MO2 LLC to Rearden Mova on or about April 19, 2013. However, the execution dates of the online forms were incorrectly filled in with the recordation dates of September18, 2014 (and in one case, September 8, 2014). As soon as it became aware of the errors, Rearden corrected the erroneous execution dates to the correct date: April 19, 2013.

**E.     Shenzhenshi's transparently false ownership claims**

85.     Unknown to Rearden, starting in October 2012, rogue Rearden employee LaSalle was in negotiation with a company called Digital Domain 3.0, Inc. ("DD3"), then a People's Republic of China and India-owned Delaware Corporation doing business in Venice Beach, California under "DD3" or "Digital Domain" business names. DD3 is a successor company to prior Digital Domain companies that Rearden, OnLive, Inc., and LaSalle (on behalf of Rearden and OnLive, Inc.) had worked with previously in movie productions making authorized use of the Contour technology identified above. DD3 is currently wholly owned by Digital Domain Holdings Ltd. ("DDHL"), a Hong Kong exchange-listed Bermuda corporation with its principal place of business in Hong Kong.

86.     On February 20, 2015, Shenzhenshi Haitiecheng Science and Technology Co., Ltd. ("Shenzhenshi"), allegedly another People's Republic of China corporation with its purported principal place of business in Shenzhen, China, filed a declaratory judgment action against Rearden and various other Rearden entities in this judicial district, Case No. 3:15-cv-00797-JST, alleging that it had acquired the Contour Assets by assignment from MO2 LLC on May 8, 2013.  Shenzhenshi further alleged that it had granted an exclusive license to the Contour Assets to DD3.

87.     But as set forth above, MO2 LLC did not own the Contour Assets on May 8, 2013, so it could not have assigned them to Shenzhenshi on that date. Rather, MO2 LLC had previously assigned the Contour Assets to Rearden Mova LLC on April 19, 2013. Further, on May 8, 2013, LaSalle was not a Rearden employee, and as an employee or not, LaSalle never had authority to sell

the MO2 LLC Assets to anyone. Nor could Shenzhenshi have granted a license of the Contour Assets to Digital Domain because it never owned the Contour Assets. Shenzhenshi, DD3 and LaSalle knew that the MO2-Shenzhenshi transaction was a ruse. LaSalle wrote to his attorneys, "[DD3] are going to actually acquire the Contour Assets through one of their Chinese companies [Shenzhenshi]. I believe this is so it would be nearly impossible for Steve [Perlman] to go after them…. They will indemnify me against any claims brought by Rearden and Steve Perlman." [25]

88.     The day after the Court granted Rearden permission to file counterclaims, a company called Virtue Global Holdings, Ltd., a British Virgin Islands corporation, suddenly appeared in the Shenzhenshi case represented by Shenzhenshi's counsel. Shenzhenshi absconded from the litigation. Months later Virtue Global Holdings alleged that Shenzhenshi had assigned the Contour Assets to Virtue Global Holdings on December 17, 2015. But again, as set forth above, Shenzhenshi never owned the Contour Assets and therefore could not have assigned them to Virtue Global Holdings.

89.     Rearden asserted counterclaims for declaratory relief against Shenzhenshi and Virtue Global Holdings affirming Rearden's ownership of the Contour Assets, and for patent, trademark, and copyright infringement, misappropriation of trade secrets, fraudulent transfer, and other causes of action, against Shenzhenshi and Virtue Global Holdings.

90.     The Contour Asset ownership and fraudulent transfer claims were bifurcated and tried in December 2016. On August 11, 2017, the Court entered a statement of decision in Rearden's favor. It found that Rearden had at all material times been the owner of the Contour Assets, apparatus, and program.

## F.     Defendants' unauthorized use of the Contour Assets

91.     Once LaSalle was hired by DD3 in or about May 2013, DD3 took possession of the Contour Assets as licensee of Shenzhenshi. On information and belief, LaSalle had access to the secure storage facility where the Contour Assets were kept, and assisted DD3 in taking unauthorized possession of the patented Contour apparatus and copies of the copyrighted Contour program.

---

[25] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No. 15-797, HEYL001594.

92.      Thereafter, DD3 began secretly offering Contour facial performance capture services and Contour program output works to motion picture studios and production companies, including defendants.

93.      But even before Shenzhenshi allegedly acquired the Contour Assets, and before DD3 began offering Contour facial performance capture services and output works, The Walt Disney Company and DD3 were in negotiation to acquire the Contour Assets. LaSalle testified that from "September of 2012… [u]ntil sometime in April of 2013" he spoke to "The CTO of the Walt Disney Company," "[s]omebody at Industrial Light and Magic[26], and the president of Digital Domain" about "potential partnerships or acquisitions of [the] Mova [Assets]"[27]. Ken Pearce, LaSalle's accomplice and another rogue Rearden former employee, testified that "after October 2nd [, 2012] – [he] talked with ILM and Disney about the Mova assets"[28]. LaSalle testified that his "discussions with Digital Domain, Industrial Light and Magic and Walt Disney" were exclusively "about licensing or acquiring [the Mova asset]."[29] Former DD3 Chairman Seah Ang testified that in "early 2013", then DD3 CEO Ed Ulbrich told him that "Mova is for sale and … if we don't take this asset, this asset will soon go to our competitor … Industrial Light & Magic, and also Disney."[30] On February 1, 2013, Pearce emailed Disney's Chief Technical Officer, Andy Hendrickson, to set up a conference to discuss The Walt Disney Company acquiring "all the MOVA assets (patents, software, etc.)." Hendrickson had been talking internally at The Walt Disney Company "about MOVA," and agreed to confer with LaSalle on February 14[31]:

---

[26] Industrial Light & Magic, AKA ILM, was acquired by the Walt Disney Company in late 2012.

[27] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No. 15-797, Dkt. 385 at 148-149.

[28] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No. 15-797, Dkt. 385 at 69.

[29] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No. 15-797, Dkt. 383 at 168:169.

[30] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No. 15-797, Dkt. 385 at 88.

[31] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No. 15-797, SHST0007127. Red highlighting boxes added.

94.    On March 27, 2013, Rearden wrote LaSalle a demand letter (the "Rearden Demand Letter") asserting that LaSalle was contractually obligated to return to Rearden "performance motion capture intellectual property," which LaSalle was then in negotiations to sell to Disney and which The Walt Disney Company knew included at least "patents" and "software:"[32]

---

[32] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No. 15-797, HEYL000306-HEYL000307 (Red highlighting boxes added).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

MORRISON | FOERSTER

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA 94105-2482

TELEPHONE:415.268.7000
FACSIMILE:415.268.7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SACRAMENTO, SAN DIEGO,
DENVER, NORTHERN VIRGINIA,
WASHINGTON, D.C.

TOKYO, LONDON, BRUSSELS,
BEIJING, SHANGHAI, HONG KONG

March 27, 2013

Writer's Direct Contact
415.268.6915
ETate@mofo.com

Via Overnight Mail and Electronic Mail
g2@mova.com

Greg Lasalle
228 Del Rosa Way
San Mateo, CA 94403

Re:     Performance Motion Capture Intellectual Property

Dear Mr. Lasalle:

This law firm has been retained to represent Rearden LLC ("the Company") regarding the performance motion capture intellectual property and production assets you acquired while employed by the Company (collectively, "Acquired IP"). Any further communications regarding the Acquired IP should be directed to me.

We understand that the Company has repeatedly attempted to dialogue with you regarding this matter. Most recently, on March 20, 2013 Steve Perlman contacted you via email in a further attempt to address the Acquired IP and other outstanding issues. In that email, Mr. Perlman requested that you contact him by the end of the week. You failed to do so. Accordingly, the Company had no choice but to refer this matter to its legal counsel.

As you know, when you began your employment with the Company, you signed a Proprietary Information and Inventions Agreement ("PIIA"). The PIIA states that the Proprietary Information related to the Company's Business includes "performance motion capture." You are obligated under the PIIA to assign the rights to any Proprietary Information you acquired while an employee to the Company. The Acquired IP consists of performance motion capture intellectual property, which is Propriety Information subject to the PIIA. Accordingly, your failure to turn over to the Company the Acquired IP is a clear violation of your obligations under the PIIA, for which the Company has instructed us to seek any and all available legal remedies if we are unable to resolve this issue immediately.

The Company would prefer to get this matter resolved and resume offering production services as soon as possible without further delay. Please contact me by Monday, April 1, 2013, to discuss a resolution to this issue, including your potential involvement in the

sf-3267407

19

20

21

22

23

24

25

26

27

28

95.     LaSalle notified The Walt Disney Company that he had received the Rearden Demand Letter and as a result, The Walt Disney Company "dropped out" of the running to acquire the Contour Assets.[33] Only DD3 remained, but after receiving the Rearden Demand Letter, it also declined to acquire the Contour Assets itself, and instead had its shadowy foreign affiliate Shenzhenshi acquire the Contour Assets and license them back to DD3 "…so it would be nearly impossible for Steve [Perlman] to go after them."[34]

---

[33] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No.15-797, Dkt: 383, p. 169, *op. cit.*

[34] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No.15-79717, HEYL001594, *op. cit.*

96.     On or about February 6, 2015, The Hollywood Reporter published an article entitled "Oscars SciTech Awards Hit by Visual Effects Credit Dispute (Exclusive)."  The article reported on the contents of a letter that Steve Perlman, Rearden's CEO, had sent to the Academy of Motion Picture Arts and Sciences Science and Technology Council, arguing that the "core members" of the R&D team responsible for the development of the Contour system and software were not being recognized. The article also reported:

> Compounding the situation is a bitter disagreement over licensing of the technology, as Perlman makes a related claim that LaSalle and Digital Domain used MOVA technology for Marvel's megahit film Guardians of the Galaxy, but "I never granted Digital Domain a license."

On information and belief, employees and executives of Disney Enterprises, Disney Pictures Production, Disney Pictures, Marvel, and MVLP, read or were made aware of this article, including the fact that Rearden claimed ownership of the Contour Assets and the related intellectual property, and had never granted DD3 a license to use them.

97.     Despite the fact that The Walt Disney Company was sufficiently concerned about the Rearden Demand Letter to drop out of acquiring the Contour Assets that it knew included at least patents and software, despite the fact that it knew that Rearden had owned and claimed to still own the Contour Assets that included patents and other intellectual property, and it knew that Rearden had asserted in the demand letter that LaSalle was unlawfully in possession of the Contour Assets, Defendants nonetheless contracted with DD3, either directly or through entities subject to their direction and control, for use of the Contour Assets on at least three major motion pictures *without ever contacting Rearden*.

## 1.     *Guardians of the Galaxy*

98.     *Guardians of the Galaxy* is a motion picture produced by defendant Marvel.

99.     As of March 31, 2015, defendant Infinity Productions contracted with DD3 to provide facial performance capture services and output works made with the patented Contour systems and methods and the copyrighted Contour program, including at least the performance of actor Josh Brolin as the character Thanos in *Guardians of the Galaxy*.

1    100.    Infinity Productions was formed and wholly owned by defendant MVLP, as its sole

2    member. At all material times, Infinity Productions was dominated and controlled by, and served as a

3    mere instrumentality, agent, conduit, and alter ego of, defendant MVLP. Infinity Productions has no

4    business other than the production of the *Guardians of the Galaxy* film. On information and belief,

5    Infinity Productions has no source of revenue or profit, and serves as a mere conduit for passing

6    *Guardians of the Galaxy* production expenses on to or through MVLP for reimbursement.

7    Furthermore, on information and belief, MVLP authorized Infinity Productions to use Marvel assets

8    including Marvel characters as its own without compensation to Marvel, and MVLP authorized

9    Marvel to market, distribute, and profit from Infinity Productions's only asset—the product of its

10    work on the *Guardians of the Galaxy* film—as Marvel's own without license from or compensation

11    to Infinity Productions. MVLP authorized Infinity Productions to use Marvel employees and officers

12    as its own pursuant to a Lending Services Agreement without compensation from Infinity

13    Productions. MVLP authorized the transfer of Infinity Productions's only asset—the product of its

14    work on the *Guardians of the Galaxy* film—to Marvel without adequate compensation.  None of the

15    revenue earned from the *Guardians of the Galaxy* film was booked by Infinity Productions, and

16    Infinity Productions had no other source of revenue, such that at all material times Infinity

17    Productions was MVLP's severely undercapitalized pass-through shell entity. Infinity Productions

18    shares the same principal place of business with MVLP.   MVLP dominated the finances, policies,

19    and practices of Infinity Productions such that Infinity Productions had no separate existence, and

20    served as a mere business conduit of MVLP.  It would be inequitable to respect the separate

21    corporate identity of Infinity Productions in view of at least its severely inadequate capitalization, the

22    transfer of its assets without adequate compensation, and commingling of assets with or through

23    MVLP.

24    101.    Defendants Marvel, MVLP, and Infinity Productions, through their officers,

25    employees, and agents, reviewed color and grayscale Contour output works capturing Brolin's

26    performance and bearing Rearden's copyright notice on the first frame. The below images show still

27    frames from Contour output works capturing one of Brolin's performances:

28

SECOND AMENDED COMPLAINT          - 48 -
Case No.: 4:17-cv-04006-JST
005073-12/1962241 V1

1
2
3
4
5
6
7
8
9



10  They are, left to right, one of three Skin Texture output works, one of twenty-two Makeup Pattern

11  output works, one Captured Surface output work, and one Tracking Mesh output work. *Each* of the

12  *twenty-five* Skin Texture and Makeup Pattern Contour output works of *each capture* of Brolin's

13  performance bears Rearden's Contour copyright notice on its first frame. And there were many

14  captures of Brolin's performance. Thus, any review of Brolin's captures would have resulted in

15  defendants Marvel, MVLP, and Infinity Productions, through their officers, employees and agents,

16  seeing a vast number of Rearden copyright notices, each bearing the year, date, and time of the

17  capture, constantly reminded that Rearden LLC was asserting its copyright in the Contour program

18  and the Contour program works from the Brolin capture sessions.

19      102.    At all material times, DD3 provided Contour facial performance capture services

20  subject to the terms of its contract with, and subject to the supervision and control of, defendants

21  Marvel, MVLP, and Infinity Productions. Each time that DD3 operated the Contour system, whether

22  to capture performances or to process the captured performances into 3D output works, the

23  computers made a copy of the Contour program in their central processing unit's ("CPU") random

24  access memory ("RAM") without authorization from Rearden. Defendants Marvel, MVLP, and

25  Infinity Productions incorporated the output works of the patented Contour systems and methods and

26  copyrighted Contour program to animate CG characters that were reproduced, distributed, displayed,

27  and performed in *Guardians of the Galaxy.* The following photograph was used by defendants

28

1  Marvel, MVLP, and Infinity Productions to promote the use of the Contour facial motion capture

2  technology in the film, followed by a close-up of the Thanos character's face:



22       103.    Defendants Marvel, MVLP, and Infinity Productions knew or should have known that

23  the patented Contour systems and methods and copyrighted Contour program were owned by

24  Rearden and/or other Rearden-controlled entities because:

25     ▪  In October 2008, Steve Perlman met with ten senior Walt Disney Company executives,

26       including CEO Bob Iger, on two occasions to discuss purchase of or investment in Rearden-

controlled OnLive. At both meetings, Perlman presented a PowerPoint presentation that touted OnLive's MOVA Contour technology and its potential for Walt Disney Company's film and videogame businesses.

- Walt Disney Company had been notified that the Contour Assets included at least "patents" and "software."

- Marvel, MVLP, and Infinity Productions, through their officers, employees, and agents, reviewed color and grayscale Contour output works that were consistently and extensively marked with Rearden's Contour copyright notice.

- Walt Disney Company was notified of the Rearden Demand Letter, which confirmed that Rearden employee LaSalle was unlawfully in possession of the Contour Assets. Upon conducting due diligence, Disney Company dropped out of the running to acquire the Contour Assets. [35]

- Walt Disney Company, Disney Pictures Production, Disney Pictures, and/or Marvel had previously contracted with Rearden and/or its controlled entities to provide authorized facial performance capture services and Contour program output works for use in *TRON: Legacy* (2010)*, Pirates of the Caribbean: On Stranger Tides* (2011), *John Carter* (2012), and *The Avengers* (2012), and performed intellectual property due diligence.

- On information and belief, Marvel, MVLP, and/or Infinity Productions performed intellectual property due diligence when they contracted with DD3 to provide Contour facial performance capture and output works. Based upon their due diligence, Disney Company, Marvel, MVLP, and Infinity Productions knew or should have known that DD3 did not have the right to offer or provide facial performance capture services and output works made using the patented Contour system and copyrighted Contour program.

104.    Neither Rearden nor Rearden Mova authorized use of the patented Contour systems and methods and copying of the copyrighted Contour program by DD3, defendants Marvel, MVLP, and Infinity Productions, or any other entity associated with *Guardians of the Galaxy*.

---

[35] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No. 15-797, Dkt: 383, p. 169, *op. cit.*

1

105.    Defendant Disney Enterprises, through a subsidiary subject to its direction and

2  control, distributed *Guardians of the Galaxy* in domestic theaters on July 21, 2014. To date, the film

3  has grossed over $333 million at the box office in the United States and $773 million globally.[36] It

4  was the third highest-grossing film released in 2014, both domestically and worldwide.[37]

5

106.    Defendant Disney Enterprises, through a subsidiary subject to its direction and

6  control, distributed *Guardians of the Galaxy* on DVD and Blu-ray, and via digital distribution such

7  as download and streaming services in the United States on or about December 9, 2014. DVD and

8  Blu-ray sales in the United States exceeded $131 million. Defendant Disney Enterprises, through a

9  subsidiary subject to its direction and control, also distributed *Guardians of the Galaxy* across a wide

10  range of other distribution means, such as on airplanes, in hotels, through cable and satellite

11  television services, *etc.*

12  **2.    *Avengers: Age of Ultron***

13

107.    *Avengers: Age of Ultron* is a motion picture produced by defendant Marvel.

14

108.    As of January 15, 2015, defendant Assembled Productions contracted with DD3 to

15  provide facial performance capture services and output works made with the patented Contour

16  systems and methods and the copyrighted Contour program, including at least Josh Brolin's reprisal

17  of the Thanos character.

18

109.    Assembled Productions was formed and wholly owned by defendant MVLP, as its

19  sole member. At all material times, Assembled Productions was dominated and controlled by, and

20  served as a mere instrumentality, agent, conduit, and alter ego of, defendant MVLP. Assembled

21  Productions has no business other than the production of the *Avengers: Age of Ultron* film. On

22  information and belief, Assembled Productions has no source of revenue or profit, and serves as a

23  mere conduit for passing *Avengers: Age of Ultron* production expenses on to or through MVLP for

24  reimbursement. Furthermore, on information and belief, MVLP authorized Infinity Productions to

25  use Marvel assets including Marvel characters as its own without compensation to Marvel, and

26

27

[36] http://www.boxofficemojo.com/movies/?id=marvel2014a.htm.

[37] http://www.boxofficemojo.com/yearly/chart/?yr=2014,

28  http://www.boxofficemojo.com/alltime/world/.

MVLP authorized Marvel to market, distribute, and profit from Assembled Productions's only asset—the product of its work on the *Avengers: Age of Ultron* film—as Marvel's own without license from or compensation to Assembled Productions. MVLP authorized Assembled Productions to use Marvel employees and officers as its own pursuant to a Lending Services Agreement without compensation from Infinity Productions. MVLP authorized the transfer of Assembled Productions's only asset—the product of its work on the *Avengers: Age of Ultron* film—to Marvel without adequate compensation.  None of the revenue earned from the *Avengers: Age of Ultron* film was booked by Assembled Productions, and Assembled Productions had no other source of revenue, such that at all material times Assembled Productions was MVLP's severely undercapitalized pass-through shell entity. Assembled Productions shares the same principal place of business with MVLP. MVLP dominated the finances, policies, and practices of Assembled Productions such that Assembled Productions had no separate existence and served as a mere business conduit of MVLP. It would be inequitable to respect the separate corporate identity of Assembled Productions in view of at least its severely inadequate capitalization, the transfer of its assets without adequate compensation, and commingling of assets with or through MVLP.

110.    Defendants Marvel, MVLP, and Assembled Productions, through their officers, employees, and agents, reviewed color and grayscale Contour output works capturing Brolin's performance and bearing Rearden's copyright notice.

111.    At all material times, DD3 provided Contour facial performance capture services subject to the terms of its contract with, and subject to the supervision and control of, defendants Marvel, MVLP, and Assembled Productions. Each time that DD3 operated the Contour system, whether to capture performances or to process the captured performances into 3D output works, the computers made a copy of the Contour program in their CPU's RAM without authorization from Rearden. Defendants Marvel, MVLP, and Assembled Productions incorporated the output works of the patented Contour systems and methods and copyrighted Contour program to animate CG characters that were reproduced, distributed, displayed, and performed including at least the same

1

2

Thanos CG character from *Guardians of the Galaxy,* appearing in the closing credits of *Avengers: Age of Ultron*:



112.    Defendants Marvel, MVLP, and Assembled Productions knew or should have known that the patented Contour systems and methods and copyrighted Contour program were owned by Rearden and/or other Rearden-controlled entities at least because:

- In October 2008, Steve Perlman met with ten senior Disney Company executives, including CEO Bob Iger, on two occasions to discuss purchase of or investment in Rearden-controlled OnLive. At both meetings, Perlman presented a PowerPoint presentation that touted OnLive's MOVA Contour technology and its potential for Disney Company's film and videogame businesses.

- Disney Company had been notified that the Contour Assets included at least "patents" and "software."

- Defendants, Marvel, MVLP, and Assembled Productions, through their officers, employees, and agents, reviewed color and grayscale Contour output works that were consistently and extensively marked with Rearden's Contour copyright notice.

- Disney Company was notified of the Rearden Demand Letter, which confirmed that Rearden employee LaSalle was unlawfully in possession of the Contour Assets that Disney Company

knew included at least "patents" and "software." Upon conducting due diligence, Disney Company had dropped out of the running to acquire the Contour Assets. [38]

▪ Disney Pictures Production, Disney Pictures, and/or Marvel had previously contracted with Rearden and/or its controlled entities to provide authorized facial performance capture services and Contour program output works for use in *TRON: Legacy* (2010)*, Pirates of the Caribbean: On Stranger Tides* (2011), *John Carter* (2012), and *The Avengers* (2012) (including defendant Marvel), and had performed intellectual property due diligence.

▪ On information and belief, defendants Marvel, MVLP, and/or Assembled Productions performed intellectual property due diligence when they contracted with DD3 to provide Contour facial performance capture and output works. Based upon its due diligence, defendants Marvel, MVLP, and Assembled Productions knew or should have known that DD3 did not have the right to offer or provide facial performance capture services and output works made using the patented Contour system and copyrighted Contour program.

113.   Neither Rearden nor Rearden Mova authorized use of the patented Contour systems and methods and copying of the copyrighted Contour program by DD3, defendants Marvel, MVLP, or Assembled Productions, or any other entity associated with *Avengers: Age of Ultron*.

114.   Defendant Disney Enterprises, through a subsidiary subject to its direction and control, distributed *Avengers: Age of Ultron* in domestic theaters on or about April 13, 2015. The film has grossed over $459 million at the box office in the United States, and over $1.4 billion worldwide.

115.   Defendant Disney Enterprises, through a subsidiary subject to its direction and control, distributed *Avengers: Age of Ultron* on DVD and Blu-ray, and by digital distribution such as download and streaming services on or about October 2, 2015. DVD and Blu-ray sales in the United States exceed $79 million. Defendant Disney Enterprises, through a subsidiary subject to its direction and control also distributed *Avengers: Age of Ultron* across a wide range of other distribution means, such as on airplanes, in hotels, through cable and satellite television services, etc.

---

[38] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No. 15-797, Dkt: 383, p. 169, *op. cit.*

SECOND AMENDED COMPLAINT          - 55 -
Case No.: 4:17-cv-04006-JST
005073-12/1962241 V1

1

### 3.    *Beauty and the Beast*

2

116.    *Beauty and the Beast* is a motion picture produced by defendant Disney Pictures

3

Production and/or Disney Pictures.

4

117.    As of March 31, 2015, defendant Chip Pictures contracted with DD3 to provide facial

5

performance capture services using copies of the copyrighted Contour program, including at least the

6

performance of actor Dan Stevens as the Beast character.

7

118.    Defendant Chip Pictures was formed and wholly owned by defendant Disney

8

Enterprises, as sole shareholder of Chip Pictures. At all material times, Chip Pictures was dominated

9

and controlled by, and served as a mere instrumentality, agent, conduit, and alter ego of, defendant

10

Disney Enterprises. Chip Pictures has no business other than production of the *Beauty and the Beast*

11

film.  On information and belief, Chip Pictures has no source of revenue or profit, and serves as a

12

mere conduit for passing *Beauty and the Beast* production expenses on to or through Disney

13

Enterprises and/or other entities wholly owned by Disney Enterprises for reimbursement.

14

Furthermore, on information and belief, Disney Enterprises authorized Chip Pictures to use Disney

15

assets including the animated *Beauty and the Beast* (1991) characters, script, songs, and/or music, as

16

its own without adequate compensation, and Disney Enterprises authorized other entities that were

17

wholly-owned by Disney Enterprises to market, distribute, and profit from Chip Pictures's only

18

asset—the product of its work on *Beauty and the Beast*—without adequate compensation.  Disney

19

Enterprises authorized Chip Pictures to use officers and employees of other entities that were wholly

20

owned by Disney Enterprises as Chip Pictures's own officers and agents without compensation from

21

Chip Pictures.  Disney Enterprises authorized the transfer of Chip Pictures's only asset—the product

22

of its work on *Beauty and the Beast*—without adequate compensation.  None of the revenue earned

23

from *Beauty and the Beast* was booked by Chip Pictures, and Chip Pictures had no other source of

24

revenue, such that at all material times Chip Pictures was Disney Enterprises's severely

25

undercapitalized pass-through shell entity.  Chip Pictures shares the same principal place of business

26

with Disney Enterprises.  Disney Enterprises dominated the finances, policies, and practices of Chip

27

Pictures such that defendant Chip Pictures had no separate existence, and served as a mere business

28

conduit for Disney Enterprises.  It would be inequitable to respect the separate corporate identity of Chip Pictures in view of at least its severely inadequate capitalization, the transfer of its assets without adequate compensation, and commingling of assets with or through Disney Enterprises and/or other entities wholly owned by Disney Enterprises.

119.    Defendants Disney Pictures Production, Disney Pictures, and/or Chip Pictures, through their officers, employees, and agents, reviewed color and grayscale Contour output works capturing Stevens's performance and bearing Rearden's copyright notice.

120.    DD3 provided Contour facial performance capture services subject to the terms of its contract with, and subject to the supervision and control of, defendants Disney Pictures Production, Disney Pictures, and/or Chip Pictures. Each time that DD3 operated the Contour system, whether to capture performances or to process the captured performances into 3D output works, the computers made a copy of the Contour program in their CPU's RAM without authorization from Rearden. Defendants Disney Pictures Production, Disney Pictures, and/or Chip Pictures incorporated the output works of the patented Contour systems and methods and copyrighted Contour program to animate CG characters that were reproduced, distributed, displayed, and performed in *Beauty and the Beast*.

121.    Defendants Disney Pictures Production, Disney Pictures, and/or Chip Pictures knew or should have known that the patented Contour systems and methods and copyrighted Contour program were owned by Rearden and/or other Rearden-controlled entities because:

- In October 2008, Steve Perlman met with ten senior Walt Disney Company executives, including CEO Bob Iger, on two occasions to discuss purchase of or investment in Rearden-controlled OnLive. At both meetings, Perlman presented a PowerPoint presentation that touted OnLive's MOVA Contour technology and its potential for Walt Disney Company's film and videogame businesses.

- Walt Disney Company was notified that the Contour Assets included at least "patents" and "software."

- ▪ Disney Pictures Production, Disney Pictures, and/or Chip Pictures, through their officers, employees, and agents, reviewed color and grayscale Contour output works that were consistently and extensively marked with Rearden's Contour copyright notice. For example, the below images show the Rearden copyright notice of the first frame of twenty-five Contour output works, with one frame enlarged. This is followed by still images from the second frame of the twenty-five Contour output works, showing the color and grayscale images of the Skin Texture and Makeup Pattern output works.

- Walt Disney Company was notified of the Rearden Demand Letter, which confirmed that Rearden employee LaSalle was unlawfully in possession of the Contour Assets. Upon conducting due diligence, Disney Company had dropped out of the running to acquire the Contour Assets.[39]

- Walt Disney Company, Disney Pictures Production, and/or Disney Pictures had previously contracted with Rearden and/or its controlled entities to provide authorized facial performance capture services and Contour program output works for use in *TRON: Legacy* (2010)*, Pirates of the Caribbean: On Stranger Tides* (2011), *John Carter* (2012), and *The Avengers* (2012), and had performed intellectual property due diligence.

- On information and belief, Disney Pictures Production, Disney Pictures, and/or Chip Pictures performed intellectual property due diligence when they contracted with DD3 to provide Contour facial performance capture and output works. Based upon its due diligence, Disney Pictures Production, Disney Pictures, and/or Chip Pictures knew or should have known that

---

[39] *Shenzhenshi, et al. v. Rearden, et al.,* NDCA Case No. 15-797, Dkt: 383, p. 169, *op. cit.*

SECOND AMENDED COMPLAINT                - 59 -
Case No.: 4:17-cv-04006-JST
005073-12/1962241 V1

1    DD3 did not have the right to offer or provide facial performance capture services and output

2    works made using the patented Contour system and copyrighted Contour program.

3    122.    Neither Rearden nor Rearden Mova authorized copying of the copyrighted MOVA

4    Contour program by DD3, Disney Enterprises, Disney Pictures Production, Disney Pictures, and/or

5    Chip Pictures, or any other entity associated with *Beauty and the Beast*.

6    123.    Defendants Disney Enterprises, Disney Pictures Production, and/or Disney Pictures

7    distributed *Beauty and the Beast*, through entities wholly owned by Disney Enterprises, in domestic

8    theaters on or about March 17, 2017. The film has grossed over $500 million at the box office in the

9    United States, and over $1.25 billion globally.[40]

10    124.    Defendants Disney Enterprises, Disney Pictures Production, and/or Disney Pictures

11    distributed *Beauty and the Beast*, through entities wholly owned by Disney Enterprises, on DVD and

12    Blu-ray, and via digital distribution such as download and streaming services on or about June 6,

13    2017. Many of the DVD, Blu-ray and digitally distributed versions of *Beauty and the Beast* included

14    the Bonus Featurette entitled "*A Beauty of a Tale*" that showed how the Contour system was used in

15    the creation of the Beast, including Contour program output works. Defendants Disney Enterprises,

16    Disney Pictures Production, and/or Disney Pictures also distributed "*Beauty of a Tale,*" through

17    entities wholly owned by Disney Enterprises, showing how Contour was used, including Contour

18    program output works as a promotion for the DVD, Blu-ray, and digital distribution release on USA

19    Today's website, where it is publicly available for streaming over the Internet.[41]    Defendants Disney

20    Enterprises, Disney Pictures Production, and/or Disney Pictures have earned many millions of

21    dollars from DVD, Blu-ray, and digital distribution as of the date of this complaint. Defendants

22    Disney Enterprises, Disney Pictures Production, and/or Disney Pictures also distributed *Beauty and*

23    *the Beast*, through entities wholly owned by Disney Enterprises, across a wide range of other

24    distribution means, such as on airplanes, in hotels, through cable and satellite television services. The

25    profits were ultimately booked by Disney Pictures.

26

27    [40] http://www.boxofficemojo.com/movies/?id=beautyandthebeast2017.htm.

28    [41] Truitt, *op. cit*.

**FIRST CAUSE OF ACTION:**
**VICARIOUS AND CONTRIBUTORY COPYRIGHT INFRINGEMENT**
**(DEFENDANTS MARVEL, MVLP, ASSEMBLED PRODUCTIONS AND INFINITY**
**PRODUCTIONS)**

125.    Plaintiffs reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if they were fully set forth here.

### *Rearden's Copyright in the Contour Program.*

126.    The Contour program is an original literary work of authorship by Rearden-employed programmers.

127.    The Contour program was fixed in a tangible medium of expression when it was completed and stored in non-volatile computer memory and/or media such as computer hard drives, CD, CD-R, DVD, or Blu-ray disks from which it may be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. Accordingly, the Contour program is a valid subject of copyright protection.

128.    Rearden's programmers duly assigned their copyrights in the Contour program to Rearden. At the times of all acts of infringement alleged herein, Plaintiff Rearden Mova was and is the owner of intellectual property and copyright vested in the Contour program, and United States Copyright Registration No. TXu001977151.

### *DD3's Direct Infringement of Rearden's Copyright.*

129.    Each time that DD3 operated the Contour apparatus, whether for facial performance capture or for processing captures into output works, the computers made an unauthorized copy of the Contour program in their central processing unit's ("CPU") random access memory ("RAM"). Each such copy is a violation of Rearden's exclusive right to authorize copies of its Contour program under 17 U.S.C. § 106 (1), and therefore each copy is an act of direct copyright infringement by DD3.

*Defendants' Vicarious Liability for DD3's Infringement*[42]

130.    Defendants Assembled Productions, and Infinity Productions, through employees and agents of defendant Marvel and/or MVLP, contracted with DD3 for facial performance capture services and output works using copies of the Contour program for *Guardians of the Galaxy* and *Avengers: Age of Ultron*. At all material times during DD3's performance of the facial performance capture contracts, Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions had the right and ability to supervise and control DD3's performance.

131.    Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions, initiated and scheduled each facial performance capture session with DD3 using copies of the Contour program.

132.    For each session, Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions supplied performers to provide facial performances for capture by DD3 using copies of the Contour program.

133.    For each session, Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions supplied a director to control and direct the actions of DD3 in providing facial performance capture using copies of the Contour program. Acting as the supervising agent of Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions, the director supervised and controlled DD3's use of copies of the Contour program by starting and terminating each session, starting and stopping each take, ordering DD3 to provide additional takes, and choosing "Selects" (the Contour capture takes which were deemed "good takes" by the director) for further Contour program processing to create Captured Surface and Tracking Mesh output works, all using copies of the Contour program.

134.    For each session, Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions, provided various film crew to support and facilitate DD3's facial performance capture using copies of the Contour program. Defendants Marvel, MVLP, Assembled Productions, and

---

[42] *See, e.g., Oracle America, Inc. v. Hewlett Packard Enterprise Co.*, 2017 WL 2672113, *2-3 (N.D. Cal. Jan. 19, 2017).

1   Infinity Productions relied on the presence of a clapperboard operated by defendants' film crew in

2   images in the original complaint to show that the facial performance sessions were supervised and

3   controlled by representatives of Defendants Marvel, MVLP, Assembled Productions, and Infinity

4   Productions.[43]

5        135.    Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions

6   received from DD3 and reviewed numerous Contour program output works bearing the Rearden

7   Contour copyright notice.

8        136.    After reviewing the Contour program output works from Contour capture takes,

9   Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions chose specific Contour

10  program output works and designated them as "Selects," and caused DD3 to use copies of the

11  Contour program to further process the Selects to create new output works that were used to animate

12  CG characters in *Guardians of the Galaxy* and *Avengers: Age of Ultron*, including at least the

13  Thanos character.

14       137.    The contracts between DD3 and defendants Assembled Productions and Infinity

15  Productions, signed by employees and agents of defendants Marvel and/or MVLP, granted them the

16  unrestricted right to terminate the contract with DD3 for breach of its representation and warranty

17  that its services did not infringe any copyright. Accordingly, Defendants Marvel, MVLP, Assembled

18  Productions, and Infinity Productions had the right and ability to supervise and control DD3's

19  infringing acts.

20       138.    Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions had an

21  obvious and direct financial interest in exploitation of Rearden's copyright in the Contour program to

22  use the Contour output works to animate CG characters in *Guardians of the Galaxy* and *Avengers:*

23  *Age of Ultron*, including at least the Thanos character. Defendants Marvel, MVLP, Assembled

24  Productions, and Infinity Productions believed that Contour facial performance motion capture

25  would make the Thanos CG character more believable and compelling, which would in turn draw a

26

27  _____

28       [43] *Id.* at 8:4-15.

SECOND AMENDED COMPLAINT        - 63 -
Case No.: 4:17-cv-04006-JST
005073-12/1962241 V1

wider audience to the films. And Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions shared the risk, costs, and profits from the films.

139.    Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions did not exercise their right and ability to supervise or control DD3's infringements.

140.    Defendants Marvel, Assembled Productions, and Infinity Productions are liable to plaintiffs for their acts of vicarious copyright infringement.  Defendant MVLP is liable to plaintiffs for the acts of vicarious copyright infringement of defendants Assembled Productions and Infinity Productions because they are alter egos of MVLP.

141.    Accordingly, Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions, and each of them, are jointly and severally vicariously liable to Rearden for each of DD3's direct infringements.

### Defendants' Contributory Copyright Infringement[44]

142.    Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions knew or should have known of DD3's specific acts of infringement, and induced, caused, and materially contributed to DD3's infringement.

143.    Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions knew or should have known of DD3's acts of infringement for at least the reasons alleged in paragraphs 103, 112, and 121, above, and for those that follow.

144.    Defendants Assembled Productions and Infinity Productions, through employees and agents of Marvel and/or MVLP, contracted with DD3 for facial performance capture services and output works using copies of the Contour program for Disney MPG's films *Guardians of the Galaxy* and *Avengers: Age of Ultron*.

145.    Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions initiated and scheduled each facial performance capture session with DD3 using copies of the Contour program.

---

[44] *See, e.g., Oracle America, Inc. v. Hewlett Packard Enterprise Co.*, 2016 WL 3951653, *5-6 (N.D. Cal. July 22, 2016)

146.    Each of the requests for facial performance captures caused DD3 to use the Contour program, which created an infringing copy of the program for non-transitory duration in the RAM of Contour system computers.

147.    For each session, Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions supplied performers to provide facial performances for capture by DD3 using copies of the Contour program.

148.    For each session, Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions supplied a director to control and direct the actions of DD3 in providing facial performance capture using copies of the Contour program. Acting as supervising agent of Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions, the director supervised and controlled DD3's use of copies of the Contour program by starting and terminating each session, starting and stopping each take, ordering DD3 to provide additional takes, and choosing "Selects" (the Contour capture takes which were deemed "good takes" by the director) for further Contour program processing to create Captured Surface and Tracking Mesh output works, all using copies of the Contour program.

149.    For each session, Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions provided various film crew to support and facilitate DD3's facial performance capture using copies of the Contour program. Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions relied on the presence of a clapperboard operated by defendants' film crew in images in the original complaint to show that the facial performance sessions were supervised and controlled by representatives of Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions.

150.    Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions received from DD3 and reviewed numerous Contour program output works bearing the Rearden Contour copyright notice.

151.    After reviewing the Contour program output works from the Contour capture takes, Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions chose specific Contour

works and designated them as "Selects," and caused DD3 to use the Contour program to further process the Selects to create new output works that were used to animate CG characters in *Guardians of the Galaxy* and *Avengers: Age of Ultron*, including at least the Thanos character.

152.    Each of Defendants Marvel, MVLP, Assembled Productions, and Infinity Productions' requests for further processing of defendants' selected Contour output works caused DD3 to use the Contour program, which created an infringing copy of the program for non-transitory duration in the RAM of Contour system computers.

153.    Accordingly, defendants Marvel, MVLP, Assembled Productions, and Infinity Productions, knew or should have known of DD3's direct infringements and intentionally materially contributed to DD3's direct infringements. They and each of them are contributory infringers of Rearden's copyright in the Contour program, and they are jointly and severally liable to Rearden for each of DD3's direct infringements.

154.    The acts of vicarious and/or contributory copyright infringement by defendants Marvel, MVLP, Assembled Productions, and Infinity Productions were, and are, willful, intentional, purposeful, and knowing, in that defendants at all material times knew or should have known that the copyright in the Contour program has been, and is, owned by Rearden, or were in reckless disregard of or willfully blind to Rearden's copyright, and defendants have acted in knowing disregard of and indifference to Rearden's rights.

155.    Defendants Marvel, Assembled Productions, and Infinity Productions are liable to plaintiffs for their acts of contributory copyright infringement.  Defendant MVLP is liable to plaintiffs for the acts of contributory copyright infringement of defendants Assembled Productions and Infinity Productions because they are alter egos of MVLP.

155.    Rearden has been harmed as the direct and proximate result of the foregoing acts of copyright infringement. Plaintiffs are entitled to actual damages, profits of the infringers, and all such other remedies as may be available under the Copyright Act.

**SECOND CAUSE OF ACTION:**
**VICARIOUS AND CONTRIBUTORY COPYRIGHT INFRINGEMENT**
**(DEFENDANTS DISNEY ENTERPRISES, DISNEY PICTURES PRODUCTION, DISNEY**
**PICTURES, AND CHIP PICTURES)**

156.    Plaintiffs reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if they were fully set forth here.

### Rearden's Copyright in the Contour Program

157.    The Contour program is an original literary work of authorship by Rearden-employed programmers.

158.    The Contour program was fixed in a tangible medium of expression when it was completed and stored in non-volatile computer memory and/or media such as computer hard drives, CD, CD-R, DVD, or Blu-ray disks from which it may be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. Accordingly, the Contour program is a valid subject of copyright protection.

159.    Rearden's programmers duly assigned their copyrights in the Contour program to Rearden. At the times of all acts of infringement alleged herein, Plaintiff Rearden Mova was and is the owner of the intellectual property and copyright vested in the Contour program, and the United States Copyright Registration No. TXu001977151 for the Contour program.

### DD3's Direct Infringement of Rearden's Copyright

160.    Each time that DD3 operated the Contour apparatus, the computers made an unauthorized copy of the Contour program in their central processing unit's ("CPU") random access memory ("RAM"). Each such copy is a violation of Rearden's exclusive right to authorize copies of its Contour program under 17 U.S.C. § 106 (1), and therefore each copy is an act of direct copyright infringement by DD3.

### Defendants' Vicarious Liability for DD3's Copyright Infringement[45]

161.    Defendant Chip Pictures, through employees and agents of Disney Pictures Production and/or Disney Pictures, contracted with DD3 to provide facial performance capture

---

[45] *See, e.g., Oracle America, Inc. v. Hewlett Packard Enterprise Co.,* 2017 WL 2672113, *2-3 (N.D. Cal. Jan. 19, 2017).

1    services and output works using copies of the Contour program for Disney MPG's film *Beauty and*

2    *the Beast*. At all material times during DD3's performance of the facial performance capture

3    contract, Disney Pictures Production, Disney Pictures, and Chip Pictures had the right and ability to

4    supervise and control DD3's performance.

5          162.    Disney Pictures Production, Disney Pictures, and Chip Pictures initiated and

6    scheduled each facial performance capture session with DD3 using copies of the Contour program.

7          163.    For each session, Disney Pictures Production, Disney Pictures, and Chip Pictures

8    supplied performers to provide facial performances for capture by DD3 using copies of the Contour

9    program.

10         164.    For each session, Disney Pictures Production, Disney Pictures, and Chip Pictures

11   supplied a director to control and direct the actions of DD3 in providing facial performance capture

12   using copies of the Contour program. Acting as the supervising agent of defendants Disney Pictures

13   Production, Disney Pictures, and Chip Pictures, the director supervised and controlled DD3's use of

14   copies of the Contour program by starting and terminating each session, starting and stopping each

15   take, ordering DD3 to provide additional takes, and choosing "Selects" (the Contour capture takes

16   which were deemed "good takes" by the director) for further Contour program processing to create

17   Captured Surface and Tracking Mesh output works, all using copies of the Contour program.

18         165.    For each session, Disney Pictures Production, Disney Pictures, and Chip Pictures

19   provided various film crew to support and facilitate DD3's facial performance capture using copies

20   of the Contour program. Defendants Disney Pictures Production, Disney Pictures, and Chip Pictures

21   relied on the presence of a clapperboard operated by defendants' film crew in images in the original

22   complaint to show that the facial performance sessions were supervised and controlled by persons

23   provided by defendants Disney Pictures Production, Disney Pictures, and Chip Pictures.[46]

24         166.    Disney Pictures Production, Disney Pictures, and Chip Pictures received from DD3

25   and reviewed numerous Contour program output works bearing the Rearden Contour copyright

26   notice.

27   _____

28   [46] *Id.* at 8:4-15.

SECOND AMENDED COMPLAINT          - 68 -
Case No.: 4:17-cv-04006-JST

167.    After reviewing the Contour program output works from Contour capture takes, Disney Pictures Production, Disney Pictures, and Chip Pictures chose specific Contour works and designated them as Selects, and caused DD3 to use copies of the Contour program to further process the Selects to create new output works that were used to animate CG characters in *Beauty and the Beast*, including at least the Beast character.

168.    The contract between DD3 and Disney Pictures Production, Disney Pictures, and Chip Pictures granted them the unrestricted right to terminate the contract with DD3 for breach of its representation and warranty that its services did not infringe any copyright. Accordingly, Disney Pictures Production, Disney Pictures, and Chip Pictures had the right and ability to supervise or control DD3's infringing acts.

169.    Defendants Disney Pictures Production, Disney Pictures, and Chip Pictures had an obvious and direct financial interest in exploitation of Rearden's copyright in the Contour program to use the Contour output works to animate CG characters in *Beauty and the Beast*, including at least the romantic lead character Beast. Disney MPG and Mandeville regarded the Contour program's faithful tracking of Dan Stevens's performance as critical to the believability of the CG Beast character to filmgoers, and thus would draw a wider audience to the film. Defendant Disney Pictures booked the profits from the films.

170.    Defendants Chip Pictures, Disney Pictures Production, and Disney Pictures are liable to plaintiffs for their acts of vicarious copyright infringement.  Defendant Disney Enterprises is liable to plaintiffs for the acts of vicarious copyright infringement of defendant Chip Pictures because it is the alter ego of Disney Enterprises.

171.    Accordingly, defendants Disney Enterprises, Disney Pictures Production, Disney Pictures, and Chip Pictures, and each of them, are jointly and severally vicariously liable to Rearden for each of DD3's direct infringements.

*Defendants' Contributory Copyright Infringement*[47]

172.    Defendants Disney Enterprises, Disney Pictures Production, Disney Pictures, and Chip Pictures knew or should have known of DD3's specific acts of infringement, and induced, caused, and materially contributed to DD3's infringement.

173.    Defendants Disney Enterprises, Disney Pictures Production, Disney Pictures, and Chip Pictures knew or should have known of DD3's acts of infringement for at least the reasons alleged in paragraphs 103, 112, and 121, above, and those that follow.

174.    Defendants Disney Pictures Production, Disney Pictures, and Chip Pictures contracted with DD3 for facial performance capture services and output works using copies of the Contour program for Disney MPG's film *Beauty and the Beast*.

175.    Defendants Disney Pictures Production, Disney Pictures, and Chip Pictures initiated and scheduled each facial performance capture session with DD3 using copies of the Contour program.

176.    Each of the requests for facial performance captures caused DD3 to use the Contour program, which created an infringing copy of the program for non-transitory duration in the RAM of Contour system computers.

177.    For each session, Disney Pictures Production, Disney Pictures, and Chip Pictures supplied performers to provide facial performances for capture by DD3 using copies of the Contour program.

178.    For each session, Disney Pictures Production, Disney Pictures, and Chip Pictures supplied a director to supervise and direct the actions of DD3 in providing facial performance capture using copies of the Contour program. Acting as supervising agent of Disney Pictures Production, Disney Pictures, and Chip Pictures, the director supervised and controlled DD3's use of copies of the Contour program by starting and terminating each session, starting and stopping each take, ordering DD3 to provide additional takes, and choosing "Selects" (the Contour capture takes

---

[47] *See, e.g., Oracle America, Inc. v. Hewlett Packard Enterprise Co.*, 2016 WL 3951653, *5-6 (N.D. Cal. July 22, 2016)

which were deemed "good takes" by the director) for further Contour program processing to create Captured Surface and Tracking Mesh output works, all using copies of the Contour program to capture the performer's facial performance.

179.    For each session, Disney Pictures Production, Disney Pictures, and Chip Pictures provided various film crew to support and facilitate DD3's facial performance capture. Disney Pictures Production, Disney Pictures, and Chip Pictures relied on the presence of a clapperboard operated by defendants' film crew in images in the original complaint to show that the facial performance sessions were superintended and directed by persons provided by Disney Pictures Production, Disney Pictures, and Chip Pictures.

180.    Disney Pictures Production, Disney Pictures, and Chip Pictures received from DD3 and reviewed numerous Contour program output works bearing the Rearden Contour copyright notice.

181.    After reviewing the Contour program output works from Contour capture takes, Disney Pictures Production, Disney Pictures, and Chip Pictures chose specific Contour works and designated them as "Selects," and caused DD3 to use the Contour program to further process the Selects to create new output works that were used to animate CG characters in *Beauty and the Beast*, including at least the Beast character.

182.    Each of defendants Disney Pictures Production, Disney Pictures, and Chip Pictures' requests for further processing of defendants' selected Contour output works caused DD3 to use the Contour program, which created an infringing copy of the program for non-transitory duration in the RAM of Contour system computers.

183.    Defendants Chip Pictures, Disney Pictures Production, and Disney Pictures are liable to plaintiffs for their acts of contributory copyright infringement.  Defendant Disney Enterprises is liable to plaintiffs for the acts of contributory copyright infringement of Chip Pictures because Chip Pictures is the alter ego of Disney Enterprises.

184.    Accordingly, defendants Disney Enterprises, Disney Pictures Production, Disney Pictures, and Chip Pictures, knew or should have known of DD3's direct infringements and

intentionally materially contributed to DD3's direct infringements. They and each of them are contributory infringers of Rearden's copyright in the Contour program, and they are jointly and severally liable to Rearden for each of DD3's direct infringements.

185.    The acts of vicarious and/or contributory copyright infringement by Defendants were, and are, willful, intentional, purposeful and knowing, in that defendants at all material times knew or should have known that the copyright in the Contour program has been, and is, owned by Rearden, or were in reckless disregard of or willfully blind to Rearden copyrights, and defendants have acted in knowing disregard of and indifference to the Rearden's rights.

186.    Rearden has been harmed as the direct and proximate result of the foregoing acts of copyright infringement. Plaintiffs are entitled to actual damages, profits of the infringers, and all such other remedies as may be available under the Copyright Act.

**THIRD CAUSE OF ACTION: TRADEMARK INFRINGEMENT, FALSE ADVERTISING AND DILUTION**
**(DEFENDANTS DISNEY ENTERPRISES, CHIP PICTURES, DISNEY PICTURES PRODUCTION, DISNEY PICTURES, MVLP, INFINITY PRODUCTIONS, AND MARVEL)**

187.    Plaintiffs reallege and incorporate each and every allegation contained in the paragraphs above with the same force and effect as if said allegations were fully set forth herein.

188.    At all material times, plaintiff Rearden Mova was the owner of U.S. Registration No. 3,843,152 for the MOVA mark.

189.    MOVA is an arbitrary or fanciful mark that is inherently distinctive.

190.    Since at least 2006, Rearden Mova and its predecessors in interest have used the MOVA mark in commerce in connection with the marketing, promotion, and sales of facial performance capture services and output files to the motion picture and video game industry, including major motion picture studios and VFX studios.

191.    Through the marketing, promotion, and sales efforts of Rearden Mova and its predecessors in interest from 2005 through the present, and through the widespread publicity of and industry acclaim for the MOVA Contour facial performance capture technology and services offered by Rearden Mova and its predecessors in interest, Rearden Mova's MOVA mark has acquired

secondary meaning indicating that Rearden is the exclusive origin of the MOVA Contour facial performance capture technology and services.

192.    Without authorization, defendants MVLP, Infinity Productions, and/or Marvel used Rearden Mova's MOVA mark in commerce in the credits on their *Guardians of the Galaxy* film, stating that "Facial motion capture services were provided by Mova, a division of Digital Domain," as shown below:

193.    The above statement includes a reproduction of the registered MOVA mark in connection with the distribution of goods that is likely to cause confusion, or to cause mistake, or to



deceive the consuming public in violation of 15 U.S.C. § 1114(1).

194.    The above statement is a literally false designation of origin and/or a literally false or misleading description of fact or misleading representation of fact that is likely to cause confusion, mistake or to deceive as to affiliation, connection, association or sponsorship of defendants' goods with Rearden Mova and its predecessors in interest, that has misled, confused, or deceived the consuming public in violation of 15 U.S.C. § 1125(a).

195.    Plaintiff and their predecessors in interest have been damaged by the above unauthorized use of their MOVA mark and defendants' false or misleading representations.

196.    Without authorization, Disney Enterprises, Chip Pictures, Disney Pictures Production, Disney Pictures, MVLP, Infinity Productions, and/or Marvel, acting either directly or through

entities subject to their supervision and control, used Rearden's MOVA mark in commerce in connection with commercial advertising and promotion of its *Guardians of the Galaxy* and *Beauty and the Beast* films, including press kits, press releases, press conferences, and other advertising and promotional activities.

197.   The above-referenced unauthorized uses of Rearden's MOVA mark included reproductions of the registered MOVA mark in connection with the distribution of goods that are likely to cause confusion, or to cause mistake, or to deceive the consuming public in violation of 15 U.S.C. § 1114(1).

198.   The above-referenced unauthorized uses of Rearden's MOVA mark constitute literally false designations of origin and/or literally false or misleading descriptions of fact or misleading representations of fact that are likely to cause confusion, mistake or to deceive as to affiliation, connection, association or sponsorship of defendants' goods with Rearden Mova and its predecessors in interest, that have misled, confused, or deceived the consuming public in violation of 15 U.S.C. § 1125(a).

199.   The above-referenced unauthorized use of Rearden Mova's MOVA mark constitute dilution by blurring in violation of 15 U.S.C. § 1125(c).

200.   At the time that defendants used Rearden's MOVA mark in connection with *Beauty and the Beast*, at least defendants Disney Pictures Production and Chip Pictures had received and reviewed the SHST preliminary injunction that prohibited DD3 and its customers including defendants from using the MOVA mark. Therefore, defendants' unauthorized use of Rearden Mova's MOVA mark in commerce in connection with promotion and distribution of at least *Beauty and the Beast* was with actual knowledge or willful disregard of Rearden Mova's rights, with intent to cause confusion, mistake, or deception.

201.   Plaintiffs and their predecessors in interest have been damaged by the above use of their MOVA mark and defendants' false or misleading representation.

SECOND AMENDED COMPLAINT          - 74 -
Case No.: 4:17-cv-04006-JST
005073-12/1962241 V1

202.     Plaintiffs are entitled to an award of their actual damages, disgorgement of defendants' profits, costs, and attorney's fees. Furthermore, plaintiffs are entitled to enhanced damages based on defendants' willful, intentional, and bad faith conduct.

203.     Furthermore, Plaintiffs have suffered irreparable harm that is not compensable by monetary damages and are therefore entitled to injunctive and other equitable relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request the following relief:

A.     Award financial damages compensation as follows:

    1.     Pursuant to 17 U.S.C. § 504, award Plaintiffs (a) actual damages; and (b) any additional profits of defendants that are attributable to the copyright infringements alleged herein and are not taken into account in computing the actual damages.

    2.     Pursuant to 15 U.S.C. §§ 1117 and 1125, award disgorgement of defendants' profits, damages sustained by plaintiffs, costs, and attorney's fees, and enhanced damages for defendants' trademark infringement, false advertising, and dilution.

B.     Pursuant to 15 U.S.C. §§ 1116 and 1125, enter an injunction prohibiting defendants from using any of Plaintiffs' trademarks, and prohibiting distribution of the *Guardians of the Galaxy* and *Beauty and the Beast* motion pictures in any medium bearing any of Plaintiffs' trademarks without authorization of Plaintiffs.

C.     Pursuant to 15 U.S.C. § 1118, order the impoundment and destruction of all copies of *Guardians of the Galaxy* and *Beauty and the Beast* motion pictures in any medium.

D.     Pursuant to 17 U.S.C. § 505, award full costs and a reasonable attorney's fee to Plaintiffs.

E.     Grant such other and further relief as the Court deems just and equitable.

SECOND AMENDED COMPLAINT     - 75 -
Case No.: 4:17-cv-04006-JST
005073-12/1962241 V1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands trial by jury of all issues so triable under the law.

DATED:  July 6, 2022

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Steve Berman*
        Steve Berman

Steve W. Berman (*pro hac vice* pending)
Mark S. Carlson (*pro hac vice* pending)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
markc@hbsslaw.com

Rio S. Pierce, CBA No. 298297
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
riop@hbsslaw.com

*Attorneys for Plaintiffs*
Rearden LLC and Rearden Mova LLC