## DD3'S PORTION

### Rearden's Motion to Compel is Untimely and Should be Summarily Denied

Rearden seeks to compel further fact discovery[1] from non-party DD3. In this Court, "no motions related to fact discovery may be filed more than 7 days after the fact discovery cut-off" Civil L.R. 37-3. As the Court's commentary explains, this rule "encompasses all motions relating to discovery, including motions to compel … [and] motions to quash or enforce subpoenas." *See also Digit. Reg of Tex., LLC v. Adobe Sys. Inc.*, No. CV 12-01971-CW (KAW), 2013 WL 5442269, at *1 n.1 (N.D. Cal. Sept. 30, 2013) ("While this Court does not entertain motions to compel, the Court follows Civil Local Rule 37–3 to determine the last day to file a joint letter pursuant to the Court's Standing Order."). This rule is enforced.[2] *See*, *e.g.*, *United Specialty Ins. Co. v. Super. Risk Mgmt., Inc.*, No. 21-cv-05662-TLT, 2023 WL 3149255, at *2 (N.D. Cal. Mar. 13, 2023); *Impinj, Inc. v. NXP USA, Inc.*, No. 19-cv-03161-YGR (AGT), 2022 WL 16586886, at *3 (N.D. Cal. Nov. 1, 2022); *Illumina, Inc. v. BGI Genomics Co.*, No. 19-cv-03770-WHO (TSH), 2021 WL 4305975, at *1-3 (N.D. Cal. Sept. 22, 2021).

Fact discovery closed March 2, 2023. ECF No. 313. Rearden's motion is untimely.

### DD3 Has Discharged Its Obligations and The Requests Are Improperly Burdensome

Rearden has already taken at least seven depositions of non-party DD3 and its current and former employees and received thousands of documents on subpoenaed topics. Rearden now asserts that its untimely document requests of May 10, 2023 (more than two months after fact discovery closed relate back to its first document subpoena to DD3, served on June 21, 2018.

---

[1] In correspondence to the Court and to DD3 leading to this briefing, Rearden stated its motion is based on document requests served via subpoena in June 2018 and January 2023. Rearden may argue that because it retained an expert to inspect documents during the chain of events giving rise to its motion, this is expert discovery. Not so. "Inspecting your opponent's materials or obtaining or accessing data or information is fact discovery." *Finjan, LLC v. Qualys Inc.*, No. 18-cv-07229-YGR (TSH), 2020 WL 6581836, at *1 (N.D. Cal. Nov. 10, 2020). "The plain language of Rule 26 makes clear that expert discovery means discovery of the expert, not by the expert." *Id.*

[2] Unlike the portion of the rule that pertains to new discovery, the portion applying to discovery motions does not contain a good cause exception. Nor, during the meet and confer, did Rearden assert an exception applied.

That subpoena listed 14 topics. Ex. D. Topic 9 purported to reach all documents "related to" DD3's use of Mova for, *inter alia*, BATB. On August 24, 2018, DD3 served responses and objections. Ex. E. During a meet and confer, Rearden explained that Topic 9 was directed to documents showing that Defendants knew about or controlled the use of Mova for BATB. DD3 explained that it would search for responsive correspondence.

<u>Four and a half years later</u>, on January 5, 2023, Rearden served a self-styled "supplemental" subpoena with 27 new topics. Ex. B. Rearden has refused to specify, but DD3 believes the relevant topics are 3, 7, and 14-18. Each refers to specific paragraphs of Dkt. 249-4, a declaration of then-DD3-employee Hendler submitted in support of Defendants' motion for summary judgment. That declaration describes DD3's animation and visual effects processes and the minimal role that Mova played in DD3's work on BATB.

On January 19, 2023, DD3 served objections and responses to the January 5 requests. Ex. F. Then, via meet and confer, DD3 explained that to the extent certain requested files existed, they would have to be located on tape and restored to systems with sufficient storage. DD3 offered to do this if Rearden contributed to the cost, consistent with FRCP 45. <u>DD3 also invited Rearden to inspect the material Hendler had used in preparing his declaration</u>.

On January 31, DD3 served supplemental objections and responses.[3] Ex. G. At Rearden's request, the supplemental objections quantified the burden: DD3 stated that subject to previous objections, "DD3 will make available for inspection documents kept in the production data, conditioned upon agreement regarding DD3's objections as to the cost and burden of restoring that production data and making it available for inspection, which DD3 currently estimates at $27,534.31." On February 17, Rearden rejected this solution.

On February 22, after Rearden finally responded to an earlier offer, DD3 provided

---

[3] The numbering is terribly broken, but by tracking the language a proper correspondence to the topics can be made.

Rearden with a courtesy copy of documents that DD3 had produced to Disney—the full set of documents on which Hendler's declaration relied. DD3 also reiterated a previous offer to allow Rearden to inspect the systems that Hendler had used and to review the full universe of files that were available to him, relied upon or not. DD3 did so at significant expense: DD3 restored eight terabytes of files, provisioned computers, and tasked employees to support the inspection and create solutions to issues related to the age of the files. Rearden did not bother to inspect those files and systems until April 18, a month and a half after the close of fact discovery. After the inspection, DD3 produced several gigabytes of inspected video files requested by Rearden.

This brings us to the May 10, 2023, request. Three weeks after the inspection, Rearden emailed a request for Maya files related to 58 different shots on BATB. For each shot, it requested "all versions to build a timeline of when things were introduced" and stated that "the Maya files have links to other assets, like textures and another type of links called 'references'. We request those as well." DD3 responded on May 15. Ex. H. As explained in that response (and set forth here), the new requests were both untimely and improperly burdensome.

The May 10 request is not for files that had been reviewed during the inspection. The May 10 request targets files that—if they were ever archived to tape—have not been restored during this litigation and were not relied on by Hendler in his declaration or deposition.[4]

Tellingly, Rearden fails to distinguish between (1) specific files Hendler relied upon and (2) general material described during his discussion about DD3's production pipeline. The distinction can be seen by tracing the topics in the January 2023 "supplemental" subpoena back to the contents of Hendler's declaration. Each topic includes a reference to a deposition paragraph. *See* Ex. B. In those paragraphs, Hendler refers to—but does not state that he reviewed

---

[4] They are therefore outside the scope of Rearden's subpoena because on April 27, counsel for Rearden acknowledged that "[o]ur subpoena was for the records that were available to Hendler." This makes the May 10 request an untimely and unauthorized new discovery request.

or relied upon—tracked mesh output of Mova[5] (ECF No. 249-4 ¶¶ 17 and 19, topics 3 and 14), reference footage[6] (¶¶ 19 and 33, topics 7 and 18), DD3's proprietary Direct Drive process (¶ 25, topic 16), and "ingestion" of tracked mesh output into DD3's animation/fx pipeline (¶ 26, topic 17). In contrast, Hendler relied on renders[7] (or screenshots of renders). *See* ¶ 20 (et seq.), topic 15. Again, DD3 has produced the specific files that Hendler relied upon and even allowed Rearden to use the systems that Hendler used and to review the universe of files that were available to him. But the new May 10 request does not go to this material.

Moreover, the May request is more burdensome than the January supplemental topics. Because of how DD3's archives work, the January topics would have required DD3 to restore everything it had archived related to its work on BATB. Based on, *inter alia*, its work with the special master in the asset return process, DD3 reasonably estimated the cost of making that information available for inspection at over $27,000. That estimate did not include the cost of isolating responsive files, but merely making all archived files (responsive or not) available for inspection. The new requests require restoring those archives, manually looking for unnamed files that match certain parameters, manually examining any such files for dependencies, and then manually examining any dependencies for further dependencies, *ad infinitum*. The May 10 request thus requires the originally objected-to burden, plus an order of magnitude more.

**Conclusion**

The motion should be denied as untimely. The underlying requests should be denied as untimely and unauthorized, as well as unduly burdensome under FRCP 45.

---

[5] A tracked mesh is geometry data, from Mova or other tools, representing movements of portions of an actor's face.
[6] Reference footage is standard video from standard cameras recording the actor's facial motion capture session.
[7] A render or "daily" is a standard video or image file created from, e.g., a Maya file. The relationship is somewhat analogous to how a printed chart may render the content of a spreadsheet but shows none of the numeric data or formulae. In his declaration and deposition testimony, Hendler relied on renders, a subset of which were systemically archived contemporaneous with the production of BATB and which are amenable to visual inspection. Those renders were also produced to Rearden. As discussed above, Hendler did not review or rely upon the underlying Maya files that Rearden now requests.