JAMES M. WAGSTAFFE (95535)
wagstaffe@wvbrlaw.com
FRANK BUSCH (258288)
busch@wvbrlaw.com
**WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK LLP**
100 Pine Street, Suite 725
San Francisco, CA 94111
Telephone: (415) 357-8900
Fax: (415) 357-8910

*Limited Appearance Attorneys for Plaintiffs*
REARDEN LLC and REARDEN MOVA LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| REARDEN LLC, REARDEN MOVA LLC, *Plaintiffs,* v. WALT DISNEY PICTURES, a California corporation, MARVEL STUDIOS, LLC a Delaware limited liability company, MVL PRODUCTIONS LLC, a Delaware limited liability company, CHIP PICTURES, INC., a California corporation, INFINITY PRODUCTIONS LLC, a Delaware limited liability company, ASSEMBLED PRODUCTIONS II LLC, a Delaware limited liability company, *Defendants.* | Case No. 4:17-cv-04006-JST **DECLARATION OF FRANK BUSCH IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO PRECLUDE REARDEN'S RELIANCE ON UNTIMELY "MAYA SCRIPTS INFRINGEMENT" THEORY** Date: June 29, 2023 Time: 2:00 p.m. Judge: Hon. Jon S. Tigar Ctrm.: 6 (2nd Floor) |

I, Frank Busch, declare as follows:

1. I am an attorney at law duly licensed to practice before all state and federal courts in California. I am a partner at Wagstaffe, von Loewenfeldt, Busch & Radwick LLP ("WVBR"), and counsel in a limited role for Plaintiffs in this action.

2. I also represent Defendants Rearden, LLC, Rearden Mova, LLC, MO2, LLC, and Mova, LLC (collectively, "Rearden") as lead counsel in *Shenzhenshi Haitiecheng Science and Technology Co., Ltd. ("SHST"), and Virtue Global Holdings Limited ("VGH"), Intervenor, v. Rearden, LLC, et al.* assigned Case No. 4:15-cv-00797-JST (the "SHST Matter").

3. In the SHST Matter, Rearden obtained a preliminary injunction based upon a finding that Rearden was likely to prevail on its claims because it presented both a "substantial evidence of VGH and SHST's actual intent to defraud" and "a likelihood of dissipation of the claimed assets and that it will suffer from irreparable harm as a result." ECF No. 188[1] at 12:13-14, 13:20-21. For these reasons, the Court granted Reardens motion and ordered that SHST, VGH, and Digital Domain 3.0, Inc. ("DD3") were "restrained and enjoined, pending trial, from selling, using, moving, concealing, transferring or otherwise disposing of any MOVA Asset in its possession, custody or control" with the term "MOVA Assets" used as defined in Rearden's Amended Counterclaims. *Id*. at 15:27-16:1. The preliminary injunction took effect on June 20, 2016, when Rearden posted the required bond, as DD3 had already received the order. *See* ECF No. 253 at ¶ 2.

4. After a bench trial, on August 11, 2017, the Court weighed the evidence and made extensive factual findings. DD3's bad faith was confirmed as follows: "SHST, DD3, and VGH knew that LaSalle did not own the Mova Assets, and did not have actual or apparent authority to sell the Mova Assets. Neither SHST nor DD3 nor VGH took the Mova Assets in good faith." ECF No. 427 at 15:7-9. The Court found the MOVA Assets belonged to Rearden, and had belonged to Rearden at all relevant times. *Id*. at 15:15-17. The Court found that DD3's explanations for its bad-faith acquisition tactics were "false." *Id*. at 13:13. The Court concluded

---

[1] Unless otherwise indicated, all ECF docket references are to the SHST Matter.

- 1 -
DECLARATION OF FRANK BUSCH I/S/O PLTFS' OPP. TO MOT. TO PRECLUDE REARDEN'S RELIANCE ON UNTIMELY "MAYA SCRIPTS INFRINGEMENT" THEORY

- 2 -

1  by holding that "[t]he Court's prior injunction is dissolved. Rearden may take possession of the
2  Mova Assets forthwith." *Id*. at 18:11-12.

3      5.    In further proceedings regarding the final judgment, on October 2, 2017, the
4  Court issued an Asset Return Order in which it ordered SHST, VGH, and/or any party acting in
5  concert with them (expressly including DD3) to "return forthwith the following assets" to
6  Rearden. ECF No. 449 at 1:2-5. The relevant category of assets is: "MOVA Software, Source
7  code, and Output files – All software, source, and object code related to the MOVA Assets,
8  including the Contour program and all related MOVA Contour output files created by MOVA
9  that were taken by Mr. LaSalle and/or others (e.g., SHST, VGH, DD3, or others acting in concert
10 with these entities) from Rearden, OnLive, Inc. ("OnLive"), or OL2 LLC ("OL2")." *Id*. at 1:10-
11 14.

12     6.    After the Court issued the Asset Return Order, the parties engaged in additional
13 litigation while awaiting entry of judgment. *See, e.g.,* ECF Nos. 476 (denying VGH's motion to
14 stay enforcement pending appeal). Judgment was entered in Rearden's favor on August 28,
15 2018. ECF No. 493.

16     7.    Rearden soon became concerned that VGH and DD3 were not complying with the
17 Court's unambiguous order that all MOVA Assets be immediately returned to Rearden. For that
18 reason, Rearden filed a motion for enforcement of judgment on December 21, 2018. ECF No.
19 499. The motion was granted on April 10, 2019, and the Court found that "VGH, DD3, LaSalle,
20 and Pearce have, at various points, assured Rearden that they have located and returned all
21 MOVA Assets. Those assurances have repeatedly been proven incorrect." ECF No. 521 at 12:3-
22 5. As such, it found "exceptional circumstances warranting the appointment of a special master"
23 and directed the parties to nominate candidates. *Id.* at 12-13.

24     8.    Initially, the Court appointed a special master who served from June 17, 2019,
25 through his resignation on March 26, 2020. *See* ECF Nos. 525, 546.

26     9.    On April 4, 2020, the Court appointed a second Special Master with an order that
27 authorizes him to "adjudicate all post-trial disputes related to the enforcement of the Court's
28 judgment and orders regarding the return of the MOVA Assets to Rearden, see ECF Nos. 427,

449, 493, including the identification, preservation, and return to Rearden of any and all MOVA Assets in the possession of VGH and/or any parties acting in concert with VGH, including without limitation DD3, Greg LaSalle, and Kenneth Pearce. The Special Master shall also oversee any forensic analysis of DD3's computer systems and services, including computers in the possession of Greg LaSalle and Kenneth Pearce, that is necessary to accomplish the foregoing." ECF No 549 at 1:25-2:4.[2]

10. A forensic expert—DisputeSoft—was also appointed to perform the forensic analysis function referenced in the Special Master's appointment order. Among its charges was to "identify Recoverable Mova Assets at the Premises, on the Computer Systems, and/or in the possession of Personnel, and determine how the same can be accessed and recovered, both from locations in the United States and, if necessary, in other countries." ECF No. 534 at 5:21-24. Furthermore, "any Recoverable Mova Assets identified by DisputeSoft shall be returned to Rearden and removed (if a physical asset) or irrecoverably deleted (if a digital asset) from DD3's (or the relevant party's) possession, to the full extent this has not already occurred." *Id.* at 6:18-21 "Recoverable Mova Assets" were defined to include "[a]ll software, source, and object code related to the MOVA Assets, even if subsequently modified, and all MOVA Contour output files, transferred to Original M02 in February 2013 or taken by Mr. LaSalle and/or others (e.g., SHST, VGH, DD3, or others acting in concert with these entities) from Rearden, OnLive, Inc. ("OnLive"), or OL2 LLC ("OL2") prior to February 2013." *Id.* at 2:23-28.

11. On May 26, 2020, Rearden and DD3 agreed upon joint instructions to govern DisputeSoft's collection of Mova Assets, and submitted those joint instructions to DisputeSoft and the Special Master. A true and correct copy of these documents is attached as **Exhibit A**. The joint instructions specify that DisputeSoft is to search for Mova Software Assets via "programmatic analysis of all VGH/DD3 computer systems." Joint Instructions at 5. Mova Software Assets are defined as "files created prior to April 21, 2013" or newer files that are "copies of recoverable Mova software assets created prior to April 21, 2013," "created from

---

[2] The Court previously appointed a different special master,

- 3 -
DECLARATION OF FRANK BUSCH I/S/O PLTFS' OPP. TO MOT. TO PRECLUDE REARDEN'S RELIANCE ON UNTIMELY "MAYA SCRIPTS INFRINGEMENT" THEORY

recoverable Mova source code created prior to April 21, 2013," or "consist of files that are identical or nearly identical to pre-April 21, 2013 Mova files." *Id*.

12. Disputes regarding the scope of the Special Master and DisputeSoft's work, and the definition of Mova Assets, continued in parallel to DisputeSoft's work in implementing the joint instructions. DisputeSoft engaged in site visits to DD3's offices, and analysis of its electronic systems. That process proved complex, for reasons including because access limitations led to problems accessing DD3's systems and because DD3 staff deleted Mova Assets during the inspection process. True and correct copies of emails reporting these matters are attached as **Exhibits B** and **C**.

13. In addition, DisputeSoft informed Rearden on or about September 11, 2020, that it had found .ma files that incorporated Mova .mel scripts during its collections.

14. DisputeSoft's efforts to identify the full scope of potential Mova Assets took many months to complete, though it was clear that there were significant withheld Mova Assets before the Special Master issued Order Number 6 ("Order 6", ECF No. 577) on October 13, 2020. At that time, the Special Master found that the scope of the asset return would be large, as "in the days and weeks following the injunction VGH/DD3 violated it by using Mova software intensively and aggressively." Order 6 at 2:22-23. This would result in a significant amount of return work, as DD3 also "willfully disobeyed" the Court's orders, requiring the Special Master's appointment. Order 6 at 3:27-4:2.

15. Indeed, the volume of returnable MOVA Assets proved so large that further involvement from the Special Master was required in the form of Order Number 10 ("Order 10", ECF No. 583), which issued on March 17, 2021. In that order, the Special Master found that the size of the return was extraordinarily large, including because of "DD3's failure to limit the use and spread of Mova Assets, and its apparent failure to direct its staff to refrain from using Mova Assets or the Mova name." Order 10 at 3:17-18. In addition, the Special Master addressed a concern "that some post-injunction output files may contain material in which DD3 or its clients have copyright protection" by ruling "that some post-injunction output files may contain material in which DD3 or its clients have copyright protection." Order 10 at 7:11-14.

16. Also on March 17, 2021, DisputeSoft was finally able to begin providing Rearden with spreadsheets itemizing the Mova Assets it had located on DD3's systems. A true and correct copy of one such transmission, identifying by path and file name 863,369 potential Mova Software files, is attached as **Exhibit D**.

17. During the remainder of 2021, DisputeSoft had identified and returned approximately 120,000 files, all of which were Mova Assets created ***prior to*** the theft at issue in the SHST Action, but were still located on DD3's servers. It also conducted site visits and continued to assemble spreadsheets of additional Mova Assets that were not created prior to the theft.

18. Also in 2021, the parties agreed to a protocol where DisputeSoft would identify potential Mova Assets, DD3 would indicate whether they could be returned to Rearden or required alternate treatment, and the parties would thereafter address any disputes regarding non-return designations. The protocol, sent in draft form but never revised, did not include a provision to allow DD3 to withhold production based upon potential studio intellectual property. A true and correct copy of this protocol is attached as **Exhibit E**.

19. In the first half of 2022, DisputeSoft prepared consolidated spreadsheets of what it considered to be potential Mova Assets and requested that DD3 indicate whether it had an objection to returning the files to Rearden. As of July 30, 2022, DisputeSoft reported that it had identified approximately 1.8 million files, DD3 had agreed to the return of approximately 1.6 million files, and that approximately 55,000 of those files were being withheld on the basis of DD3's claim that a studio may have an interest in the context, indicated by the designation of "STUDIO." A true and correct copy of an email from DisputeSoft presenting this information, is attached as **Exhibit F**.

20. Promptly upon the use of a "STUDIO" designation, Rearden attempted to meet and confer with DD3 regarding its objection to that concept. Between April 27, 2022, and May 2, 2022, Rearden and DD3 met and conferred regarding the validity of the STUDIO designation. Rearden expressed its position that any such objections must be brought by third-parties, not addressed in the abstract by DD3.

21. On May 6, 2022, Disney sent me a letter requesting that "any files containing images of Dan Stevens in connection with *Beauty and the Beast*. . . not be transferred from DD3 or DisputeSoft to Rearden, but rather that any such files will be transferred to [Disney]." A true and correct copy of this letter is attached as **Exhibit G**.

22. After receiving Disney's letter, I promptly engaged in significant meet-and-confer efforts with Disney. Those efforts included electronic mail, telephone calls, and zoom meetings, both with Mr. Klaus and Mr. Schwab of Munger, Tolles & Olson LLP. In those meet and confer efforts, the parties exchanged draft orders on at least June 9, 2022, June 23, 2022, October 13, 2022, October 31, 2022, November 14, 2022, and December 1, 2022.

23. When it became clear that the parties had reached impasse, Rearden requested that the Special Master consider the issue at a hearing scheduled to discuss other matters. Specifically, on January 5, 2023, Rearden wrote that "Rearden and Disney were unable to resolve their differences regarding return of files related to Disney projects, and therefore there is a separate time-sensitive issue—Shall DisputeSoft return files tagged "STUDIO" in relation to Disney projects. In the related studios litigation, Rearden's failure to obtain files identified by DisputeSoft as returnable in spreadsheets in 2021, but still withheld due to DD3's designation as STUDIO, provided an argument in Disney's Motion to Dismiss. (*See Rearden et al. v. Disney et al.* (4:22-cv-02464-JST)*, Dkt. 42 13:8-13). Further, in *Rearden et al. v. Disney et al.* (4:22-cv-02464-JST) Fact discovery cutoff is March 2, 2023 (4:17-cv-04006-JST), and there are highly material documents that are being withheld by the Studio designation. Preventing Rearden's access to the STUDIO documents is prejudicial to Rearden." A true and correct copy of this email is attached as **Exhibit H**.

24. The hearing occurred on February 1, 2023. The Special Master did not resolve the dispute, but instead directed the parties to further meet-and-confer based upon guidance he provided. Rearden and Disney promptly resumed negotiations, and narrowed the scope of their dispute, but were unable to reach agreement.

25. At the same time, DD3 refused even to identify which files it had designated as STUDIO were withheld from return in relation to work performed for Disney (as opposed to

other studios). Specifically, it indicated that it could only assist with that work "[o]nce the various depositions and document production requested of DD3 in the Disney litigation is complete." A true and correct copy of this email is attached as **Exhibit I**.

26. As of February 15, 2023, the parties had again reached impasse despite the guidance offered by the Special Master. Rearden informed the Special Master of this fact, again emphasizing that "Rearden is very concerned that delay, either in finalizing a protocol or in segregating Disney Files, will cause those files not to be returned in advance of the discovery deadline in *Rearden I*, which is March 10, 2023. Rearden therefore requests an expedited path to resolve this dispute with a clear timeline for the return/production of files." A true and correct copy of this email is attached as **Exhibit J**.

27. Unfortunately, the Special Master was unable to resolve the matter for reasons known to the Court and outside of Rearden's control. As such, the Court addressed the matter itself, holding hearings on February 21, 2023, and March 2, 2023. ECF Nos. 600, 603. Those hearings resulted in an order on March 15, 2023, directing the production of most STUDIO files. ECF No. 605. Pursuant to that order, all STUDIO files related to DD3's work with Disney would be produced by DD3 concurrently to Rearden and Disney.

28. DisputeSoft prepared the productions of files encompassed by the Court's March 15, 2023, order, and it and DD3 produced the relevant materials concurrently to Rearden and Disney in batches on March 24, 2023, April 7, 2023, and April 20, 2023. Until these dates, the produced files were not available to Rearden because DD3 unilaterally designated them as "STUDIO" files and Disney objected to their return to Rearden.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 20th day of June, 2023 at San Francisco, California.

             /s/ *Frank Busch*
             FRANK BUSCH