Steve W. Berman (*pro hac vice*)
Mark S. Carlson (*pro hac vice*)
Jerrod C. Patterson (*pro hac vice*)
Garth Wojtanowicz, CBA No. 246510
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
markc@hbsslaw.com
jerrodp@hbsslaw.com
garthw@hbsslaw.com

Rio S. Pierce, CBA No. 298297
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
riophbsslaw.com
gaynek@hbsslaw.com

*Attorneys for Plaintiffs*

KELLY M. KLAUS (SBN 161091)
kelly.klaus@mto.com
BLANCA F. YOUNG (SBN 217533)
blanca.young@mto.com
STEPHANIE G. HERRERA (SBN 313887)
stephanie.herrera@mto.com
SHANNON AMINIRAD (SBN 324780)
shannon.aminirad@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

JOHN W. SPIEGEL (SBN 78935)
john.spiegel@mto.com
JOHN L. SCHWAB (SBN 301386)
john.schwab@mto.com
ANNE K. CONLEY (SBN 307952)
anne.conley@mto.com
ROWLEY J. RICE (SBN 313737)
rowley.rice@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| REARDEN LLC and REARDEN MOVA LLC, California limited liability companies,<br><br>Plaintiffs,<br><br>vs.<br><br>WALT DISNEY PICTURES, a California corporation,<br><br>Defendant. | Case Nos.    4:17-cv-04006-JST<br><br>**JOINT PRETRIAL CONFERENCE STATEMENT**<br><br>Judge:   Hon. Jon S. Tigar<br>Date:    October 27, 2023<br>Time:    2:00 p.m.<br>Ctrm.:   6 (2nd Floor) |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.      SUBSTANCE OF THE ACTION

*A brief description of the parties, the substance of claims and defenses that remain to be decided, and the operative pleadings.*

Plaintiffs Rearden LLC and Rearden Mova LLC ("Plaintiffs" or collectively "Rearden") bring claims for copyright and trademark infringement against Defendant Walt Disney Pictures ("Defendant" or "Disney").

Plaintiffs claim that they own the copyright in the MOVA Contour software program and that non-party Digital Domain 3.0, Inc. ("DD3") directly infringed Plaintiffs' copyright by making unauthorized copies of code from the MOVA Contour software into the random access memory of computers DD3 operated while working on Defendant's 2017 live-action movie *Beauty and the Beast*. Plaintiffs claim that Defendant is liable for DD3's alleged infringement under theories of both vicarious and contributory infringement.

Plaintiffs also claim that they own the trademark in the mark "MOVA" and that Defendant infringed that trademark by using the mark "MOVA" in promoting *Beauty and the Beast*.

Defendant claims that Plaintiffs did not own the copyright in the MOVA Contour software at the time DD3 was working on *Beauty and the Beast*, and that DD3 therefore did not infringe any copyright belonging to Rearden when it made copies of the MOVA Contour software into the random access memory of computers that DD3 operated. Defendant further claims that even if DD3 itself committed copyright infringement, Defendant is not vicariously or contributorily liable for that infringement.

Defendant also claims that Plaintiffs did not own the trademark in the "MOVA" mark at the time Defendant promoted *Beauty and the Beast*. Defendant further denies infringing the trademark in the "MOVA" mark and contends that its use of the "MOVA" mark was nominative fair use.

## II.    RELIEF REQUESTED

*A detailed statement of all requested relief, including an itemization of all elements of damages claimed.*

Rearden seeks an award of monetary damages.

Rearden seeks to recover its actual damages as a result of Defendant's vicarious and contributory copyright infringement in the amount of the profits it lost on DD3's use of the MOVA Contour program under contract with Disney for *Beauty and the Beast* (2017).  Rearden seeks actual damages in the amount of $590,000.

In addition, Rearden seeks to recover Defendant's profits from *Beauty and the Beast* (2017) that are attributable to Defendant's alleged vicarious and contributory copyright infringement.

Rearden also seeks to recover Defendant's profits from *Beauty and the Beast* (2017) that are attributable to Disney's alleged trademark infringement.  The parties agree that this is an equitable remedy for the Court to determine only if there is a finding of trademark infringement by the jury.

## III.    UNDISPUTED FACTS

*A plain and concise statement of all relevant facts to which the parties will stipulate for incorporation into the trial record without supporting testimony or exhibits. The parties shall exercise good faith in stipulating to facts that are not reasonably disputable.*

The following facts are undisputed, and the Parties hereby stipulate that these facts may be incorporated into the trial record without supporting testimony or exhibits:

1.    Plaintiff Rearden, LLC developed the MOVA Contour software, which is part of a facial performance capture system called Contour Reality Capture.  Prior to August 17, 2012, Rearden offered facial performance capture services using the Contour Reality Capture system through Rearden's wholly owned subsidiaries, and Rearden used the trademark "MOVA" in commerce.

2.       On August 17, 2012, ownership of all of the MOVA Contour assets, including the MOVA Contour software, the copyright in that software, and the trademark "MOVA," transferred to a company called OL2, Inc.  Plaintiffs Rearden LLC and Rearden Mova LLC have never had an ownership interest in OL2, Inc.

3.       On February 11, 2013, OL2, Inc. transferred all of the MOVA Contour assets to a company called MO2, LLC. As the result of that transfer, the copyright in the MOVA Contour software and the trademark "MOVA" became the property of MO2, LLC.

4.       Digital Domain 3.0, Inc. ("DD3") is a visual-effects company and is not a party to this case.  DD3 made copies of the MOVA Contour software into the random access memory of computers DD3 operated while working on Defendant's 2017 live-action movie *Beauty and the Beast*.

5.       Defendant's live-action movie *Beauty and the Beast* was released to theaters on March 17, 2017.

## IV.    DISPUTED FACTUAL ISSUES

*A plain and concise list of issues of fact that are contested and remain to be litigated at trial.* The following issues of fact are contested and remain to be litigated at trial:

### A.    Plaintiffs' Position

**1.**     Whether Rearden owns the MOVA Contour software's copyright.

**2.**     Whether DD3's copying of the MOVA Contour software into the random-access memory of computers running the MOVA Contour software was without authorization from Rearden.

**3.**     Whether Disney is contributorily liable for any direct copyright infringement by DD3.

**4.**     Whether Disney is vicariously liable for any direct copyright infringement by DD3.

**5.**      Whether Rearden is entitled to an award of its actual damages caused by the copyright infringement.

**6.**      Whether Rearden has shown a causal nexus between the copyright infringement and Disney's profits from *Beauty and the Beast* (2017).

**7.**      Whether Rearden has met its burden to prove Disney's gross revenue from *Beauty and the Beast* (2017).

**8.**      Whether Disney has met its burden to prove its deductible costs and expenses from *Beauty and the Beast* (2017).

**9.**      Whether Disney has met its burden to prove the portion of Disney's profit that is not attributable to the infringement of the MOVA Contour software's copyright.

**10.**      If Disney has met its burden to prove apportionment, the portion of its profit from *Beauty and the Beast* (2017) that is attributable to the infringement of the Contour program's copyright.

**11.**      If Disney has not met its burden to prove apportionment, the sum of Disney's profit from Beauty and the Beast (2017).

**12.**      Whether Rearden owns the MOVA trademark.

**13.**      Whether Disney's use of the MOVA trademark to refer to the MOVA Contour software is a nominative fair use.

**14.**      Whether Rearden is entitled to an award of a portion of Disney's profits from *Beauty and the Beast* (2017) that is attributable to Disney's infringement of Rearden's MOVA trademark.

**B.      Defendant's Position**

- Whether Plaintiffs owned the copyright in the MOVA Contour software program at the time DD3 was working on *Beauty and the Beast*.

-4-

1    • Whether Plaintiffs owned the "MOVA" trademark at the time Defendant promoted
2       *Beauty and the Beast*.

     • Whether Defendant is contributorily liable for DD3's alleged infringement of the
3       copyright in the MOVA Contour software program, including (1) whether Defendant
4       knew of the alleged infringement; and (2) whether Defendant induced or materially
5       contributed to the alleged infringing activity.
6

     • Whether Defendant is vicariously liable for DD3's alleged infringement of the
7       copyright in the MOVA Contour software program, including (1) whether Defendant
8       had the legal right and practical ability to control the alleged infringement; and
9       (2) whether Defendant directly benefitted financially from the alleged infringement.
10

11   • Whether Plaintiffs are entitled to actual damages for Defendant's alleged vicarious
12      liability and or/contributory infringement, and, if so, the amount of such damages.

13   • The total amount of Defendant's profits from *Beauty and the Beast*.

14   • Whether a causal nexus exists between DD3's alleged infringement of the copyright
15      in the MOVA Contour software program and Defendant's profits from *Beauty and the*
16      *Beast*.

17   • If a causal nexus exists between DD3's alleged infringement of the copyright in the
18      MOVA Contour software program and any of Defendant's profits, what percentage, if
19      any, of those profits are attributable to DD3's alleged infringement of the copyright in
20      the MOVA Contour software program and what amount of indirect profits damages,
21      if any, Plaintiffs are entitled to recover as a result.

22   • Whether Defendant's use of the "MOVA" trademark constituted nominative fair use.

23   • Whether Defendant infringed the "MOVA" trademark, including whether
24      Defendant's use of the "MOVA" trademark was likely to cause confusion as to the
25      source of goods or services.

26   • Whether Plaintiffs are entitled to recover damages for infringement of the "MOVA"
27      trademark and, if so, the amount of such damages.

28

-5-

1

2   **V.    AGREED STATEMENT**

3       *A statement assessing whether all or part of the action may be presented upon an agreed*

4   *statement of facts.*

5       **A.    Plaintiffs' Position**

6           Disney's "Agreed Statement" is an unauthorized reply in support of its Motion in

7   Limine No. 1, which seeks to exclude the Statement of Decision and Ninth Circuit affirmance of the

8   ruling in the *SHST* case that Rearden, not SHST or VGH, owns the MOVA Assets including the

9   Contour program copyright at issue here.  As an offer of compromise, Rearden attempted to

10  negotiate an agreed statement to the jury that would have informed them of the relevant facts

11  regarding the *SHST* litigation.  But the parties were unable to agree upon the relevant facts regarding

12  the *SHST* litigation, and therefore this issue may not be presented upon an agreed set of facts.  The

13  Court should not adopt Disney's proposed agreed statement, which Rearden rejected in its effort to

14  negotiate a compromise on this issue.  Rearden is now compelled to respond to Disney's

15  unauthorized reply, as follows.

16

17      Disney tries to distinguish the controlling case, *United States v. Boulware*, 384 F.3d 794 (9th

18  Cir. 2004), on the ground that here Disney was not a party in, and is not bound by, the ruling in the

19  prior *SHST* trial.  But the court found in *Boulware* that the United Stateslike Disney, was not a party

20  to and was not bound by the earlier trial.  In *Boulware*, Boulware had litigated the issue of whether

21  he or his company HIE owned a sum of money in a state court trial.  In that prior trial, the court ruled

22  that HIE, *not Boulware,* owned the disputed sum of money.  The IRS later sued Boulware for tax

23  evasion, alleging that the *same sum of money was owned by Boulware, not HIE,* and should therefore

24  have been reported on his personal federal tax return.  Boulware sought to offer the state court

25  judgment into evidence to prove that he did not own the disputed sum of money and argued that the

26  United States was bound by it.  But the Ninth Circuit agreed with the United States and held that it

27

28

-6-

was *not bound* by state court's ruling that Boulware did not own the disputed sum of money.  *Id.*, at 803-805.  Yet despite the fact that the United States was not *bound* by the earlier trial, the court still admitted the evidence of the earlier judgment.  The fact that Disney is not bound by the *SHST* judgment does not distinguish *Boulware*.

Disney also attempts to distinguish *Boulware* by arguing that here, this Court's SHST ruling and the Ninth Circuit's affirmance "have no probative value in this action and create a substantial risk the jury 'would import [the decision] from the prior proceeding' on an element on which Plaintiffs bear the burden."  But the Ninth Circuit ruled in *Boulware* that the prior state court judgment *was probative* on the issue of whether Boulware or his company HIE owned the disputed sum of money:

> Whether Boulware transferred the HIE funds to [his girlfriend] Lee for
> personal purposes or for her to hold in trust for HIE was a key issue in the
> case. That he pursued a successful litigation against Lee to force her to
> return the monies to HIE has some tendency to make it more likely that he
> gave the monies to her to hold in trust.

*Boulware,* 384 F.3d at 805.

Here, as in *Boulware*, the prior litigation resolved only one narrow issue:  whether the party who offered the prior ruling owned particular personal property.  As in *Boulware*, the personal property in the prior and present case is *identical*, and the ownership issue decided in the prior and present case is *identical*.  Here, as in *Boulware,* the prior ruling is offered in the present case as evidence of who owns the disputed property.  As in *Boulware*, the prior ruling in *SHST* "has some tendency to make it more likely" that Rearden—not SHST/VGH—owns the MOVA Contour assets, because like Boulware Rearden pursued a successful litigation to prove that Rearden owned the MOVA Contour assets and to force SHST/VGH to return them.  *Id.*  Similarly, in Disney's primary

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

case, *Engquist v. Oregon Dept. of Agriculture,* 478 F.3d 985 (2007) the Ninth Circuit held that the prior state court judgment at issue "is relevant evidence" to the common issue in the later case in which the judgment was offered.  *Id.*, at 1009.  Disney's relevance argument does not distinguish *Boulware.*

Furthermore, *Engquist* distinguished *Boulware* on the ground that there the prior case decided a single issue "that only related to one component of *Boulware's* [later] criminal prosecution."  *Id.* at 1010.  In that circumstance, the prior ruling "presents a much smaller risk of prejudice or confusion of the issues."  *Id.*  And so it is here, the *SHST* case decided only one issue—that Rearden, not SHST/VGH, owned the MOVA Contour assets—and ownership of the MOVA Contour copyright is only one of many issues in the present case that were *not* decided by the *SHST* ruling.  *Engquist* is distinguished here because in that case, the prior and later cases had different plaintiffs asserting *similar* discrimination claims against the *same* defendant.  In that circumstance, "there was a substantial risk that the jury would import the whole verdict of liability from the prior proceeding."  *Id.*  There is no even remotely comparable risk here because the *SHST* ruling narrowly decided only the MOVA Contour asset ownership issue, but none of the many other issues in this case such as infringement, causal nexus, damages, and many others.  Here, there is no "risk that the jury would import the whole verdict of liability from the prior proceeding" as there was in *Engquist. Id.*

Finally, Disney argues that under the common circumstances presented here, *Boulware* ruled that "the trial judge could have easily controlled any danger that the jury would give undue weight to the state court judgment and also controlled any waste of time or confusion."  It provides no evidence or argument that the Court could not do the same here.

Accordingly, Disney's alleged "due process right" has been determined by the Ninth Circuit to be *not* prejudiced by admission of the *SHST* ruling and the Ninth Circuit's affirmance under the

circumstances presented here.  Disney fails to distinguish the controlling *Boulware* case, and

*Engquist* does not apply.

### B.     Defendant's Position

One of the most critical issues to be resolved before trial is how the jury is to be informed of

relevant facts regarding the *SHST* litigation.  As discussed in Defendant's Motion *In Limine* No. 1

("MIL No. 1"), and as Plaintiffs agree, Defendant was not a party to the *SHST* litigation and is not

bound by any of the Court's rulings or findings in that prior litigation.  To be clear, Defendant does

not dispute that the existence of the *SHST* litigation, the allegations in that litigation, or the issuance

of a preliminary injunction in that litigation are relevant to certain issues in this case.  But this

Court's rulings and findings in the *SHST* litigation are a different matter and must be carefully

managed so as not to improperly tip the scales in Plaintiffs' favor and deprive Defendant of its due

process right to defend this litigation.

To ensure the jury is informed of relevant facts about the *SHST* litigation without violating

Defendant's due process rights, Defendant proposed to Plaintiffs having the Court read the following

neutral and balanced statement to the jury and otherwise precluding evidence or mention of judicial

decisions or findings on the very issues the jury will be asked to decide in this case:

> On February 20, 2015, a company called Shenzhenshi Haitiecheng Science and
> Technology Co., Ltd., which I will refer to as "SHST" for short, filed a lawsuit
> against Rearden asking for a ruling that it, and not Rearden, owned the Mova Contour
> Reality Capture facial performance capture system and intellectual property, including
> the same software, copyright, and trademark that are at issue in this case.
> SHST alleged that it bought Mova Contour from a company called MO2, LLC. SHST
> alleged that the MO2 company was owned by an individual named Greg LaSalle, and
> that the MO2 company had acquired the Mova Contour assets from a company called
> OL2, Inc., which is not affiliated with Rearden. SHST further alleged that, after
> acquiring the Mova Contour assets, it licensed a company called Digital Domain 3.0
> to use Mova Contour in its movie visual effects business. I will refer to Digital
> Domain 3.0 as "DD3."

Rearden filed counterclaims against SHST in the same case, asking for a ruling that Rearden, not SHST, owned Mova Contour. Rearden later filed more counterclaims for damages and an injunction based on claims for alleged patent, copyright and trademark infringement.

Rearden alleged that it, and not Greg LaSalle, owned the MO2 company, and that OL2 transferred the Mova Contour assets to the MO2 company for Rearden's benefit. Rearden alleged that Mr. LaSalle was not authorized to sell Mova Contour, that Rearden owned Mova Contour, and that DD3 was not authorized to use Mova Contour.

The judge permitted a new company called Virtue Global Holdings Limited, B.V. to substitute for SHST in the case. I will refer to that company as "VGH."

On June 17, 2016, the judge granted an injunction that prohibited any further use or transfers of Mova Contour by SHST, VGH, or DD3 until at least after trial, and ordered VGH to give a copy of the injunction order to DD3 and to the movie studios that DD3 was working with using Mova Contour. The court's injunction order did not address whether Rearden owned the Mova Contour assets.

The Walt Disney Company learned of the injunction order on June 22, 2016.

*Beauty and the Beast,* the movie at issue in this case, was released in March 2017. Sometime later, the litigation that had involved SHST, VGH and Rearden resolved.

[Defendant Walt Disney Pictures] was not a party to the SHST and VGH lawsuit against Rearden. In this case, you, the jury, must make up your own minds on the issue of whether Rearden owns the copyright in Mova Contour.

Plaintiffs indicated they were willing to agree to a statement of some kind regarding the *SHST* litigation, but only on the condition the jury would be told that "the judge ruled that Mova Contour had always belonged to Rearden, and that Shenzhenshi, VGH, and DD3 had never owned or had any right to use MOVA Contour," and that on appeal "the appellate judges agreed with the trial judge's ruling."  Klaus Decl. ISO Motions *In Limine* Ex. W (Dkt. 495-23).  Defendant could not agree to that condition:  The *SHST* ownership decision and the Ninth Circuit's affirmance are not relevant to any issue in this case (those decisions postdate the release of *Beauty and the Beast* by months and years, respectively, and thus could not have been known to Defendant at any relevant

time); and this total lack of relevance is obviously outweighed by the extreme prejudice to Defendant of telling the jury that *multiple judges* have decided one of the issues to be tried in Plaintiffs' favor.

This is one of the many reasons this case is readily distinguishable from *United States v. Boulware*, 384 F.3d 794, 808 n.5 (9th Cir. 2004), the centerpiece of Plaintiffs' opposition to MIL No. 1.  As the Ninth Circuit explained in the more recent decision Defendant relies on, *Engquist v. Oregon Dept. of Agriculture*, 478 F.3d 985 (9th Cir. 2007), the prior judgment in *Boulware* was "highly probative" of a criminal defendant's liability (i.e., highly probative exculpatory evidence); "under the circumstances of [*Boulware*], the trial judge could have easily controlled any danger that the jury would give undue weight to the state court judgment." *Id.* at 1010.  By contrast, the prior decisions Defendant seeks to exclude here—the *SHST* ownership decision and the Ninth Circuit's affirmance and the findings therein—have *no* probative value in this action and create a substantial risk the jury "would import [the decision] from the prior proceeding" on an element on which Plaintiffs bear the burden.  *Id.*

Because this issue implicates Defendant's due process right to litigate each issue in the case, Defendant respectfully requests oral argument on its MIL No. 1 at the Final Pretrial Conference.

## VI.   STIPULATIONS

*A statement of proposed stipulations or agreements that will expedite the presentation of evidence.*

**Scope of Trial:**  The Parties have agreed that the trial in this matter shall address only the dispute regarding *Beauty and the Beast* (2017) and have agreed to stay the other disputes in suit. This agreement is set forth in the joint stipulation ordered by the Court at Dkt. No. 313.

**Parties**:  The Parties have agreed that Walt Disney Pictures will be the only named defendant in this matter insofar as it relates to *Beauty and the Beast*.  This and related agreements are set forth in the joint stipulation ordered by the Court at Dkt. No. 324.

-11-

***Stipulated Facts:***  The Parties have agreed to stipulate to the facts set forth in Section III.

***Exhibits:***  The Parties have agreed to stipulate to the admissibility of the trial exhibits that are so identified in **Exhibits A (Plaintiffs' Exhibit List)** and **B (Defendant's Exhibit List).**  The Parties have also reached the following agreements regarding certain categories of trial exhibits:

- ***Copies of Public Records:***  The Parties will not challenge the authenticity of copies of public records based on a lack of certification under Fed. R. Evid. 902(4);

- ***Pre-Authenticated Business Records:***  To avoid wasting time and to streamline the presentation of evidence to the jury, the Parties have agreed that an expert witness may be the sponsoring witness for a trial exhibit that satisfies the requirements of Fed. R. Evid. 803(6), as shown by the testimony of the custodian or another qualified witness, or by a declaration that complies with Fed. R. Evid. 902(11).  The Parties are actively meeting and conferring about the trial exhibits that fall within the scope of this agreement and are in the process of obtaining additional Fed. R. Evid. 902(11) declarations.  The Parties will provide the Court with a final list of the trial exhibits that are subject to this agreement, along with the excerpts of testimony and/or declarations that establish the requirements of Fed. R. Evid. 803(6) as to each exhibit, no later than November 17, 2023.  The Parties will identify any remaining disputes that require the Court's resolution at that time.

- ***Third-Party Publications:***  The Parties have agreed to waive authenticity objections to TX0001, TX0007, TX0010-TX0012, TX0047-TX0048, TX0206, TX1006, TX1035, TX1268, and TX1301-TX1308.

***Demonstratives:***  The Parties have agreed that "demonstrative" means "any slides, compilations, summaries, graphics, timelines, charts and other material designed to illustrate testimony or argument that is not offered or admitted into evidence.  A demonstrative includes any exhibit or transcript that includes call-outs, emphasis, characterization, argument, or additional color or highlighting."  For numbering purposes, the Parties have agreed to use the prefixes "PDX" for Plaintiffs' demonstratives, and "DDX" for Defendant's demonstratives.

1       ***Infinity War:***  Plaintiffs have agreed not to offer evidence or argument regarding DD3's

2   services contract for *Avengers: Infinity War* (2018) or the fact of, or the allegations in, the separate

3   lawsuit regarding that movie and *Avengers: Endgame* (2019).  Plaintiffs have reserved the right to

4   argue that Defendant continues to use facial performance capture in its films, including *Infinity War*

5   and others, without referencing MOVA Contour.  Defendant did not file a motion *in limine* in

6   reliance on this agreement.

7       ***TWDC's Gross Revenues:***  Plaintiffs agreed not to offer evidence or argument about The

8   Walt Disney Company's gross revenues, including without limitation the $55 billion gross revenue

9   figure referenced in Plaintiffs' summary judgment opposition and Plaintiffs' damages expert's

10  report.  Defendant did not file a motion *in limine* in reliance on this agreement.

11      ***Disclosure of Witnesses During Trial:***  The Parties have agreed that, by 7:00 a.m. the day

12  preceding each trial day, each Party will disclose the witnesses that Party anticipates calling the next

13  calendar day and the order in which that Party intends to call them.  Each Party shall identify who the

14  last witness will be in its case-in-chief when that witness is disclosed.

15      ***Disclosure of Exhibits and Demonstratives During Trial:***  The Parties have agreed that

16  exhibits and demonstratives that will be offered during the testimony of the witness with whom the

17  exhibits or demonstratives will be used (other than for impeachment) will be disclosed, along with

18  identification of witness to whom the exhibits and/or demonstrative relate, by 4:30 p.m. the day

19  before the trial day the witness will be called; the receiving Party will notify the disclosing Party of

20  any objections by 8 pm the same day; any exhibit not objected to by the 8 pm deadline will be

21  deemed received in evidence upon its identification in connection with the examination of the

22  disclosed witness; the Parties will meet each morning before trial resumes to confirm the exhibits to

23  come into evidence and advise the Court of any issues.

24      ***Identification of Exhibits Each Party Anticipates Using During Opening Statements:***  The

25  Parties have agreed that, by 11:00 a.m. one calendar day before the jury trial begins, the Parties will

26  identify exhibits they each anticipate using during opening statements.  The Parties will work in good

27

28

1    faith to stipulate to the admission of such exhibits so they may be published during opening

2    statements and if the Parties cannot stipulate, they will raise with the Court prior to openings.

3         ***Exchange of Demonstratives Each Party Anticipates Using During Opening Statements:***

4    The Parties have agreed that, by 6:00 p.m. one calendar day before the jury trial begins, the Parties

5    will exchange the demonstratives they each anticipate using during opening statements.  The Parties

6    will work in good faith to resolve any objections to the use of such demonstratives so they may be

7    published during opening statements and if the Parties cannot resolve objections, they will raise with

8    the Court prior to openings.

9         ***Exchange of Demonstratives For Use During Closing Arguments:***  The Parties have agreed

10   that, by 12:01 a.m. on the day closing arguments are to be delivered, the Parties will exchange the

11   demonstratives they each anticipate using during closing statements.  The Parties will work in good

12   faith to resolve any objections to the use of such demonstratives so they may be published during

13   closing statements and if the Parties cannot resolve objections, they will raise with the Court before

14   Court resumes for the day.

15        ***Sealing:***  In light of the higher standard for sealing at trial, the Parties have agreed to revisit

16   confidentiality designations for materials that have been identified as trial exhibits.  If a Party desires

17   to maintain its confidentiality designation for any trial exhibit, that Party will notify the other Party

18   no later than November 17, 2023.

19   **VII.    WITNESSES TO BE CALLED**

20        *A list of all witnesses likely to be called at trial other than solely for impeachment or*

21   *rebuttal, and a brief statement following each name describing the substance of the testimony to be*

22   *given. No party shall be permitted to call any witness in its case-in-chief who is not disclosed in its*

23   *pretrial conference statement without leave of court.*

24        **A.    Plaintiffs' Anticipated Witnesses**

25        Rearden identifies below the witnesses it currently anticipates calling, or may call, at trial,

26   other than solely for impeachment or rebuttal.  Rearden also reserves the right to call in its case-in-

27

28

-14-

chief, whether live, by deposition, or by designation of prior trial testimony, any witnesses called in Disney's case-in-chief or included on Disney's witness list.

Rearden anticipates narrowing its witness list as it becomes clearer what issues will be tried and what witnesses Disney actually intends to present.  Rearden addresses Disney's specific concerns regarding Rearden's witness list and designations in Section XV.

Rearden reserves its right to object to any witnesses not properly disclosed.

| Witness Name | Calling Live or By Deposition? | Brief Statement of Substance of Testimony |
|---|---|---|
| Steve Perlman | Live | Mr. Perlman will testify regarding his background, the formation of Rearden and its businesses, the development of MOVA Contour Reality Capture and its software, the terms of employment of Contour's developers, Contour intellectual property including copyrights and trademarks, what Contour is and how it is used, the unveiling of Contour and media response, the assignment to OnLive, Contour's use in motion pictures and games, studio enquiries regarding Rearden's ownership of Contour, meetings with Disney regarding investment in OnLive's business, OnLive's assignment for benefit of creditors, all matters relating to Rearden's formation of MO2 and its re-acquisition of Contour from OL2, his interactions with Greg LaSalle, his discovery that DD3 was using Contour, the SHST litigation and its ultimate conclusion, media publications regarding the SHST litigation and preliminary injunction, the commencement of this litigation, and trademark infringement injury. |
| Tim Cotter | Live | Mr. Cotter will testify regarding his background, his employment at Rearden including his employment agreement and proprietary inventions assignment agreement, his role in the development of Contour, how Contour works and how it is used, and his acceptance of the AMPAS technical achievement award on behalf of MOVA Contour. |
| Roger van der Laan | Live | Mr. van der Laan will testify regarding his background, his employment at Rearden including his employment agreement and proprietary inventions assignment |

-15-

| Witness Name | Calling Live or By Deposition? | Brief Statement of Substance of Testimony |
|---|---|---|
| | | agreement, his role in the development of Contour, how Contour works and how it is used, and his acceptance of the AMPAS technical achievement award on behalf of MOVA Contour. |
| Cindy Ievers | Live | Ms. Ievers will testify regarding her background, her employment history at Rearden, the development of MOVA Contour, the business of MOVA Contour, Contour intellectual property, Rearden's formation of MO2 and its reacquisition of Contour from OL2, her related interactions with Greg LaSalle.  Ms. Ievers will further testify regarding her opinion on the profit Rearden would have earned if it had performed the work performed by DD3 on Beauty and the Beast, in accordance with the opening and rebuttal declarations served on defendants. |
| Alberto Menache | Live | Mr. Menache will testify regarding his background and qualifications, MOVA Contour, facial performance capture, DD3's infringement of the MOVA Contour copyright, matters related to causal nexus between infringement and profits, and other matters within the scope of his opening, rebuttal, and surrebuttal expert witness reports. |
| Phillip Fier | Live | Mr. Fier will testify regarding his background and qualifications, Disney's gross revenue for *Beauty and the Beast*, Disney's allowable costs for *Beauty and the Beast*, and Disney's profits, matters related to causal nexus between infringement and profits, and other matters within the scope of his opening, rebuttal, and surrebuttal expert witness reports consistent with the Court's orders. |
| John Chow | Live | Mr. Chow is expected to testify to matters relating to Disney's first knowledge of the SHST litigation and the SHST preliminary injunction, the preparation of Disney's FRCP 30(b)(6) designee to testify with respect to such matters, his efforts to find an email regarding same, the reasons for his failure to tell the BatB production staff about the injunction, and Disney's designee's testimony, including matters described in Rearden's opposition to Disney's Motion in Limine No. 2. |

-16-

| Witness Name | Calling Live or By Deposition? | Brief Statement of Substance of Testimony |
|---|---|---|
| Bill Condon | Deposition | Mr. Condon is expected to testify as designated in Rearden's deposition designations and counter-designations. |
| Sarah Eggebrecht | Deposition | Ms. Eggebrecht is expected to testify as designated in Rearden's deposition designations and counter-designations. |
| David Feinsilber | Deposition | Mr. Feinsilber is expected to testify as designated in Rearden's deposition designations and counter-designations. |
| Steve Gaub | Deposition | Mr. Gaub is expected to testify as designated in Rearden's deposition designations and counter-designations. |
| Darren Hendler | Deposition | Mr. Hendler is expected to testify as designated in Rearden's deposition designations and counter-designations. |
| William Hendley | Deposition | Mr. Hendley is expected to testify as designated in Rearden's deposition designations and counter-designations. |
| David Hoberman | Deposition | Mr. Hoberman is expected to testify as designated in Rearden's deposition designations and counter-designations. |
| Greg LaSalle | Deposition | Mr. LaSalle is expected to testify as designated in Rearden's deposition and SHST trial transcript designations and counter-designations. |
| Hao Li | Deposition | Dr. Li is expected to testify as designated in Rearden's deposition designations and counter-designations. |
| Kevin Mayer | Deposition | Mr. Mayer is expected to testify as designated in Rearden's deposition designations and counter-designations. |
| Gayle Munro | Deposition | Ms. Munro is expected to testify as designated in Rearden's deposition designations and counter-designations. |

-17-

| Witness Name | Calling Live or By Deposition? | Brief Statement of Substance of Testimony |
|---|---|---|
| Ken Pearce | Deposition | Mr. Pearce is expected to testify as designated in Rearden's deposition and SHST trial transcript designations and counter-designations. |
| Kelly Port | Deposition | Mr. Port is expected to testify as designated in Rearden's deposition designations and counter-designations. |
| Mimi Steele | Deposition | Ms. Steele is expected to testify as designated in Rearden's deposition designations and counter-designations. |
| Dan Stevens | Live/Deposition | Mr. Stevens is expected to testify as designated in Rearden's deposition designations and counter-designations. |
| David Taritero | Live/Deposition | Mr. Taritero is expected to testify as designated in Rearden's deposition designations and counter-designations. |
| Emma Watson | Deposition | Ms. Watson is expected to testify as designated in Rearden's deposition designations and counter-designations. |
| O.D. Welch | Deposition | Mr. Welch is expected to testify as designated in Rearden's deposition designations and counter-designations. |
| Mark Heyl | Live/SHST Transcript | Mr. Heyle is expected to testify as designated in Rearden's SHST trial transcript designations. |
| Joseph Gabriel | SHST Transcript | Mr. Gabriel is expected to testify as designated in Rearden's SHST trial transcript designations. |

**B.    Defendant's Anticipated Witnesses**

Defendant identifies below the witnesses it currently anticipates calling, or may call, at trial, other than solely for impeachment or rebuttal.  Defendant also reserves the right to call in its case-in-chief, whether live, by deposition, or by designation of prior trial testimony, any witnesses called in Plaintiffs' case-in-chief or included on Plaintiffs' witness list.

-18-

Defendant has identified both "likely" and "may call" witnesses because its ultimate witness list will necessarily depend upon the witnesses and evidence Plaintiffs present in their case-in chief and upon the Court's resolution of Defendant's pending motion for summary judgment, *Daubert* motions, and motions *in limine*, as well as the parties' ongoing meet-and-confer regarding exhibits and designations.  Defendant anticipates narrowing its witness list as it becomes clearer what issues will be tried and what witnesses Plaintiffs actually intend to present.  Defendant addresses specific concerns regarding Plaintiffs' witness list and designations in Section XV.

Defendant reserves its right to object to any witnesses not properly disclosed.

## 1.    Witnesses Defendant Likely Will Call

| Witness Name | Calling Live or By Deposition or Trial Testimony? | Brief Statement of Substance of Testimony[1] |
|---|---|---|
| Hendler, Darren | Live and/or Deposition | Visual effects services provided by DD3 for *BATB;* Defendant's lack of knowledge of DD3's alleged infringement |
| Kershaw, Kristie | Live | Apportionment and causal nexus (analysis of *BATB* marketing and MOVA Contour's contribution to audience interest) |
| Lane, Stephen | Live | Apportionment and causal nexus (technical analysis of MOVA Contour and its use in and contribution to *BATB*) |
| Lauder, Gary | Live and/or Deposition and/or Trial Designations | Ownership of MOVA Contour copyright |
| Perlman, Steve | Live and/or Deposition and/or Trial Designations | Ownership of MOVA Contour copyright; damages; Defendant's lack of knowledge of DD3's alleged infringement |
| Russell, Robin | Live | Industry custom and practice relating to retention and use of vendors and vendor-supplied IP |

---

[1] Defendant has provided a brief description of the testimony to be given pursuant to the Court's Standing Order for Civil Jury trials, but reserves the right to offer any designated deposition and/or trial testimony that has been disclosed to Plaintiffs.

| Witness Name | Calling Live or By Deposition or Trial Testimony? | Brief Statement of Substance of Testimony[1] |
|---|---|---|
| Steele, Mimi | Live and/or Deposition | Making of *BATB* and MOVA Contour's contributions; retention of DD3; visual effects services provided by DD3 for *BATB*, to the extent Defendant has knowledge of such services; Defendant's inability to control or detect DD3's alleged infringement; Defendant's lack of knowledge of DD3's alleged infringement |
| Stevens, Dan | Live and/or Deposition | Making of *BATB* and MOVA Contour's contributions; promotion of *BATB* |
| Taritero, David | Live | Making of *BATB* and MOVA Contour's contributions; retention of DD3; visual effects services provided by DD3 for *BATB*, to the extent Defendant has knowledge of such services; Defendant's inability to control or detect DD3's alleged infringement; Defendant's lack of knowledge of DD3's alleged infringement |
| Tinwell, Angela | Deposition | Inability to distinguish shots for which MOVA Contour was used in *BATB* |
| Wunderlich, Robert | Live | Damages; apportionment |

2.      **Witnesses Defendant May Call**

| Witness Name | Calling Live or By Deposition or Trial Testimony? | Brief Statement of Substance of Testimony |
|---|---|---|
| Condon, Bill | Deposition | Making of *BATB* and MOVA Contour's contributions; promotion of *BATB* |
| Cotter, Tim | Deposition | Ownership of MOVA Contour copyright; Mova Contour's functionality; Defendant's inability to control or detect DD3's alleged infringement |
| Eggebrecht, Sarah | Live | Authentication of Defendant's business records; *BATB* revenues, costs, and profits |
| Feinsilber, David | Deposition | Making of *BATB*; visual effects services provided by DD3 for *BATB*, to the extent Defendant has knowledge of such services |

| Witness Name | Calling Live or By Deposition or Trial Testimony? | Brief Statement of Substance of Testimony |
|---|---|---|
| Fontaine, Robin | Deposition | Defendant's inability to control or detect DD3's alleged infringement; Defendant's lack of knowledge of DD3's alleged infringement; damages |
| Gaub, Steve | Deposition | Making of *BATB*; visual effects services provided by DD3 for *BATB*, to the extent Defendant has knowledge of such services; Defendant's inability to control or detect DD3's alleged infringement; Defendant's lack of knowledge of DD3's alleged infringement |
| Hendrickson, Andy | Deposition | Ownership of MOVA Contour copyright; Defendant's lack of knowledge of DD3's alleged infringement |
| Hoberman, David | Deposition | Making of *BATB*; visual effects services provided by DD3 for *BATB*, to the extent Defendant has knowledge of such services |
| Ievers, Cindy | Live and/or Deposition | Ownership of MOVA Contour copyright; damages |
| LaSalle, Greg | Live and/or Deposition | Ownership of MOVA Contour copyright; visual effects services provided by DD3 for *BATB;* Defendant's lack of knowledge of DD3's alleged infringement |
| Mayer, Kevin | Deposition | Ownership of MOVA Contour copyright; Defendant's lack of knowledge of DD3's alleged infringement |
| Menache, Alberto | Live and/or Deposition | Technical analysis of MOVA Contour's contribution to *BATB* |
| Munro, Gayle | Deposition | Authentication of DD3 business records; Visual effects services provided by DD3 for *BATB*; Defendant's inability to control or detect DD3's alleged infringement; Defendant's lack of knowledge of DD3's alleged infringement; damages |
| Pearce, Ken | Deposition | Mova Contour's functionality |
| Port, Kelly | Deposition | Visual effects services provided by DD3 for *BATB*; Defendant's inability to control or detect DD3's alleged infringement; Defendant's lack of knowledge of DD3's alleged infringement |

| Witness Name | Calling Live or By Deposition or Trial Testimony? | Brief Statement of Substance of Testimony |
|---|---|---|
| Stankevich, Ryan | Live | Authentication of Defendant's business records; marketing of *BATB* |
| Van der Laan, Roger | Deposition | Ownership of MOVA Contour copyright; Mova Contour's functionality; Defendant's inability to control or detect DD3's alleged infringement |
| Watson, Emma | Deposition | Making of *BATB* and MOVA Contour's contributions; promotion of *BATB* |
| Welch, O.D. | Deposition | Defendant's inability to control or detect DD3's alleged infringement; Defendant's lack of knowledge of DD3's alleged infringement |

## VIII.   EXHIBITS, SCHEDULES, AND SUMMARIES

*A list of all documents or other items to be offered as exhibits at trial, other than solely for impeachment or rebuttal, and a brief statement following each that describes: (1) its substance or purpose; (2) the identity of the sponsoring witness; and (3) whether the parties have stipulated to its admissibility and, if they have not, the objection to its admission, the grounds for the objection, and the position of the offering party.*

Attached as **Exhibit A** is Plaintiffs' exhibit list, not including impeachment or rebuttal exhibits or demonstratives, including a brief statement of each document's substance or purpose, the likely sponsoring witness, the ground for any objection and Plaintiffs' response.

Attached as **Exhibit B** is Defendant's exhibit list, not including impeachment or rebuttal exhibits or demonstratives, including a brief statement of each document's substance or purpose, the likely sponsoring witness, the ground for any objection and Defendant's response.

For numbering purposes, Plaintiffs have reserved the use of Exhibit Nos. 1 through 999. Defendant have reserved the use of Exhibit No. 1000 and on.

The parties have met and conferred, but are continuing to meet and confer about objections and ways to streamline the presentation of evidence at trial.

## IX.   DISPUTED LEGAL ISSUES

*Without extended legal argument, a concise statement of each disputed point of law concerning liability or relief, citing supporting statutes and decisions.*

The following legal issues, which may need to be decided by the Court before the matter is submitted to the jury or after the jury returns its verdict, are in dispute or potentially in dispute.

### A.   Plaintiffs' Position

**1.**   Whether to award prejudgment interest.

**2.**   Whether to award the prevailing party attorney's fees and costs pursuant to 17 U.S.C. § 505 and the amount of any attorney's fees and costs for infringement after 2/11/16.

**3.**   Whether the Court should increase any damages award as authorized 15 USC § 117(a).

### B.   Defendant's Position

Defendant believes the following legal issues are in dispute or potentially in dispute:

- The proper jury instructions to present to the jury; these are addressed in the parties' joint proposed jury instruction submission;

- The proper verdict form to present to the jury; this is addressed in the parties' joint proposed verdict form submission;

- The legal standards under which Defendant's potential liability for contributory and vicarious liability are to be tested at trial; these are addressed in the parties' summary judgment briefing;

- If Defendant is the prevailing party, whether Defendant is entitled to recover reasonable attorneys' fees and/or costs, and, if so, the amount thereof.  15 U.S.C. § 117(a), 17 U.S.C. § 505.

- Whether disgorgement of profits under 15 U.S.C. § 1117(a) is an equitable remedy that may not be submitted to the jury.

Defendants' position is that Plaintiffs may not recover attorney's fees and/or costs under 17 U.S.C. § 505.  This remedy is not available to Plaintiffs because the alleged infringement commenced before the effective date of registration of the copyrighted work.  17 U.S.C. § 412.

X.      **PENDING MOTIONS OR MATTERS**

*A statement of any motions or other matters that must be resolved prior to trial.*

The following motions and matters must be resolved prior to trial.  The Parties will be prepared to address all of the motions *in limine* at the pretrial conference should the Court wish to hear argument on any of them.  Recognizing that the Court may not have time to address all of the pending motions *in limine* during the pretrial conference, Defendant respectfully requests the opportunity to argue at least its Motions *in Limine* Nos. 1, 2, and 5.

A.      **Plaintiffs' Motions**

Plaintiffs' Motion In Limine Excluding Darren Hendler Opinions Under FRE 702 (ECF No. 497).

B.      **Defendant's Motions**

- Motion for Summary Judgment (Dkt. 421)
- Motion to Exclude Portions of Alberto Menache's Testimony (Dkt. 422)
- Motion to Exclude Testimony of Cindy Ievers (Dkt. 424)
- Motion *In Limine* No. 1: To Preclude Evidence or Argument regarding Judicial Decisions or Findings from *SHST* Litigation (Dkt. 488)
- Motion *In Limine* No. 2:  To Exclude Testimony of or Reference to Defendant's Litigation Counsel, Jon Chow (Dkt. 489)
- Motion *In Limine* No. 3:  To Preclude Lay Testimony By Rearden Witnesses Regarding DD3's Use of MOVA (Dkt. 490)
- Motion *In Limine* No. 4:  To Preclude Evidence or Argument Regarding Formation of Rearden Corporate Affiliates (Dkt. 491)

-24-

- Motion *In Limine* No. 5:  To Exclude Evidence or Argument Regarding DD3's Contractual Indemnification Agreement (Dkt. 492)
- Motion *In Limine* No. 6:  To Preclude Hearsay Evidence Regarding Purported Due Diligence Calls (Dkt. 493)
- Motion *In Limine* No. 7:  To Preclude Evidence or Argument Regarding Purported Copyright Notice in MOVA Output Files (Dkt. 494)

Disputes with respect to proposed voir dire questions, jury instructions, and forms of verdict are being concurrently filed in accordance with the Court's Case Management Order (Dkt. 313).

## XI.    BIFURCATION OR SEPARATE TRIAL OF ISSUES

*A statement of whether either party requests bifurcation or a separate trial of specific issues and why.*

Neither Party requests bifurcation or separate trial of any specific issues.

## XII.    USE OF DISCOVERY RESPONSES

*Citations to all evidence that a party might introduce at trial, other than that to be used solely for impeachment or rebuttal, that was obtained from deposition testimony, interrogatory responses, or responses to requests for admission. Counsel shall state any objections to the use of these materials and shall certify that they have conferred regarding such objections. Counsel shall separately file a document containing each disputed discovery response or deposition testimony excerpt, and as to each shall state the objection to its admission, the grounds for the objection, and the position of the offering party.*

This case involves several witnesses who are located outside the subpoena power of the Court who may be presented at trial through deposition or prior trial testimony.    The volume of testimony designated for possible use at trial is large and remains the subject of discussion between the parties. In light of the volume of designated material and the short time period between the exchange of counter-designations and objections (October 13) and submission of this joint pretrial conference

-25-

statement (October 20) under the Court's Case Management Order (Dkt. 313), the Parties filed a joint stipulation requesting additional time to meet and confer and to submit the information required by the Court's Standing Order Section 12.B (Dkt. 536), which was ordered by the Court on October 17, 2023 (Dkt. 537).  The Parties agree that significant narrowing will need to take place before trial to ensure a focused and efficient presentation for the jury and are continuing to meet and confer with that aim.

The Parties dispute whether Plaintiffs are permitted to affirmatively designate testimony from the *SHST* trial.  That issue is addressed in Section XV(C).

## XIII.   ESTIMATE OF TRIAL TIME

*An estimate of the number of hours or days needed for the trial.*

### A.   Plaintiffs' Position

Given the number of witnesses disclosed, and the volumes of deposition and *SHST* trial testimony and hundreds of trial exhibits designated by _both_ parties, Plaintiffs do not believe that eight trial days (as proposed by Disney) is even remotely realistic.  Disney has disclosed 9 *will call* witnesses, 19 *may call* witnesses, and have designated 493 trial exhibits.  To put the issue in perspective, Disney intends to retry the *SHST* ownership case, *and then* try the copyright and trademark claims that Rearden asserts here.  But the *SHST* case *alone* took 7 trial days.  SHST ECF Nos. 383-387, 393-394.  If Disney truly believes it can present its case in only four trial days—2 "will call" witnesses for direct and cross-examination, as many as 5 "may call" witnesses, and 125 exhibits _per day_—then they have grossly over-designated their pretrial disclosure.

Rearden respectfully requests that the Court allow a modest increase of 10 trial days. Rearden agrees with Disney that the parties should have equal time, and the Court should allow an additional 50 minutes each for opening statements, and 60 minutes each for closing argument.  Even under Rearden's proposal, both parties will have to drastically streamline their cases and make their evidentiary presentations to the jury efficient to finish in the allotted time.

1

**B.      Defendant's Position**

2          Defendant respectfully requests that the Court impose a time limit of 18 hours total per side,

3    plus 50 minutes each for opening statements, and 60 minutes each for closing argument.  Based on

4    the Court's trial schedule, under this proposal the trial would run seven to eight trial days from

5    December 4 to December 12 or 13.  Defendant believes this proposal provides adequate time for

6    each side to make a non-duplicative, streamlined evidentiary presentation to the jury.

7          Imposing reasonable and specific time limits on each side is critical to ensure that the parties'

8    trial presentations are efficient and focused.  A vague expectation framed in terms of a number of

9    trial days, as Rearden proposes, does not accomplish this objective.  The Court should impose a

10   specific hours limit and hold both sides to it.  This is necessary because Plaintiffs had not shown any

11   discipline in the amount of prior testimony they designated for trial, or how long they expect each

12   live witness to be on the stand.  Plaintiffs have affirmatively designated deposition testimony from

13   <u>19 witnesses</u>, totaling an estimated <u>22 hours of deposition testimony</u>, some of which is not

14   videotaped and will need to be read into the record.  In addition, Plaintiffs have said they will call

15   seven witnesses live, one of whom (Steve Perlman) Plaintiffs expect to put on for two days of direct

16   examination.  These estimates do not include <u>more than 200 pages of *SHST* trial testimony</u> Plaintiffs

17   have designated and which are not admissible against Defendant as a non-party to that litigation.  *See*

18   *infra* Section XV(C).  Plaintiffs have also insisted on pursuing lines of argument that are irrelevant or

19   at best peripheral to the issues in the case, requiring Defendant to defensively designate testimony

20   from witnesses Defendant might not otherwise need to call, such as Andy Hendrickson, David

21   Feinsilber, Sarah Eggebrecht, Kevin Mayer, Gayle Munro, Ken Pearce, and Kelly Port.  And,

22   Plaintiffs refuse to agree that witnesses should be called only once, which will result in unnecessary

23   duplication, inconvenience witnesses, and confuse the jury and generally waste the jury's time.  *See*

24   *infra* Section XV(A).  An order from the Court now imposing a strict time limit on each side and

25

26

27

28

-27-

ordering that witnesses will be called once will force the parties to start streamlining their cases and ensure an efficient presentation to the jury.

Defendant is confident the parties can try all of the issues in the case within the proposed 18-hour limit.  Trying the ownership issues will not take the same amount of time in this case as it did in *SHST*, because (as discussed below) Rearden should not be able to present to the jury trial testimony from that case and it has vastly over-designated such testimony in any event.  There are also a number of witnesses who testified in the *SHST* trial who do not appear on either party's witness list, including Ang (Daniel) Sheah, Amit Chopra, and Fan Lei.  Additionally, the parties have stipulated to key undisputed facts, including undisputed facts that discharge Rearden's burden to prove copying by DD3.

## XIV.   SETTLEMENT DISCUSSIONS

*A brief summary of settlement negotiations, without indicating specific dollar amounts, and an indication of whether further negotiations are likely to be productive and what, if anything, would facilitate settlement.*

This case has been pending for more than six years.  The Parties have invested substantial resources in discovery, motion practice, and trial preparation.  The Parties have twice engaged in substantial private mediations that did not result in a settlement.  The Parties mediated with the Hon. Louis M. Meisinger in January 2020 and again with Tony Piazza in January 2022.  The Parties also recently discussed settlement as part of the pretrial meet-and-confer process, as required by the Court's Standing Order.  The Parties do not believe further discussions will be productive, particularly while various motions remain pending.

## XV.   MISCELLANEOUS

*Any other matters that will facilitate the just, speedy, and efficient resolution of the action.*

The Parties respectfully submit that rulings on the following miscellaneous matters would facilitate the just, speedy, and efficient resolution of the action.

### A.       Calling Witnesses Once

#### 1.       Plaintiffs' Position

Plaintiffs oppose a rigid rule that a witness may only be called once.  The only live witnesses who appear on both parties' lists are Steve Perlman (will call on Disney's) and Cindy Ievers (may call on Disney's).  Both will attend trial every day and Rearden has no objection if they are called twice.  None of Disney's live witnesses appear on Rearden's list.  And there is no realistic inconvenience or duplication in presenting a deposition transcript of the same witness twice because there is unlikely to be any overlap between Rearden's and Disney's deposition designations. Disney's proposal also does not account for rebuttal.  Plaintiffs reserve the right to re-call their experts and other witnesses to rebut Disney's case-in-chief.

Disney's proposal to allow free range cross-examination outside the scope of direct will not avoid any inconvenience to witnesses—they have identified none.  And rather than streamline presentation of evidence, it will present a muddle of unconnected testimony that will confuse the jury.  There is good reason for the rule limiting cross-examination to the scope of direct, and Disney has identified no countervailing benefit to abandoning that rule.

#### 2.       Defendant's Position

Defendant respectfully requests that the Court order that witnesses be called only once, such that a witness who appears on both parties' lists need not be re-called in the other side's case. For example, if a witness called in Plaintiffs' case-in-chief is also listed on Defendant's witness list, Defendants should be permitted to examine the witness or present deposition testimony beyond the scope of the direct examination on cross-examination.  This will avoid inconvenience to witnesses

1   and allow a more streamlined presentation of the evidence to the jury and is critical given the number

2   of witnesses and huge volume of deposition testimony that Plaintiffs plan to present at trial.

3

4       **B.      Witnesses Not Properly Disclosed Under Rule 26(a)** [2]

5           **1.      Plaintiffs' Position**

6       ***Mark Heyl.***  Mr. Heyl was Greg LaSalle's attorney to paper the MOVA Contour asset

7   transaction between MO2 and DD3.  PX269 is the email LaSalle sent to Heyl informing him that

8   DD3 planned to substitute a Chinese company for DD3 as buyer, and that he (LaSalle) believed that

9   the reason was so that Mr. Perlman would be unable to obtain the return of his MOVA Contour

10  assets.  Rearden produced this email to Disney on November 23, 2022, nearly a year ago.  It was

11  authenticated by Mr. Heyl in the *SHST* trial in the publicly available *SHST* trial transcript, where he

12  testified to circumstances that made it admissible in evidence at that trial.  It was referenced in this

13  Court's Statement of Decision.  And Rearden placed it on its trial exhibit list.

14  After Disney asserted a litany of objections to PX269, Rearden designated Mr. Heyl's *SHST*

15  trial testimony and listed him as a witness to be called live or to testify by *SHST* trial transcript to

16  overcome those objections.  Rearden had not included Mr. Heyl as a person with knowledge in its

17  Rule 26(a) initial disclosures, but this was not part of some clever plot to "sandbag" Disney over one

18  document.  It was a simple oversight with respect to one document among thousands.  Whether Mr.

19  Heyl testifies live or by transcript, it will be for a matter of minutes out of Rearden's trial time only

20  to overcome Disney's objections and get the previously admitted document into evidence in this

21  case.  Neither Rearden nor Disney has ever deposed Mr. Heyl, so we are at an equal disadvantage.

22

23

24

25

26

27  _____

28  [2] The parties continued to exchange positions on these issues through the date for filing.  Each side reserves the right to respond further at the Final Pretrial Conference.

JOINT CASE MANAGEMENT STATEMENT
NO. 17-CV-04006

And to alleviate any prejudice, Rearden consents to a deposition of Mr. Heyl so that Disney may examine him.  Although not ideal, such depositions are not unknown even in the midst of trial.

Disney asserts that Rearden designated more of Mr. Heyl's trial testimony than Disney regards as strictly necessary to overcome its objections to PX269 and that the testimony encompasses other documents.  But some context is needed to establish hearsay exceptions, so some leeway was necessary when Rearden made its testimonial designations.  And to the extent that its designations may exceed the cope of testimony necessary to overcome Disney's objections to PX269 or encompass other documents, Rearden waives them.

PX269 is on its face a law firm business record produced from Mr. Heyl's files in the *SHST* case, and it will be offered here to show Mr. LaSalle's state of mind in orchestrating the MO2/DD3/SHST transaction.  Rearden will address Disney's hearsay objection in more detail below.

**Joseph Gabriel.**  Provided that Rearden may offer PX269 through the live or transcript testimony of Mr. Heyl, Rearden waives its designations of Mr. Gabriel's trial testimony.

### 2. Defendant's Position

Plaintiffs have included two witnesses on its list who were not properly disclosed under Rule 26(a):  Mark Heyl, an attorney who represented Greg LaSalle in dealing with DD3 and SHST, and Joseph Gabriel, DD3's vice president and general counsel.  Plaintiffs should not be permitted to call either witness at trial.

**Mark Heyl.**  Plaintiffs never disclosed Mark Heyl under Rule 26.  Plaintiffs disclosed Mr. Heyl as a potential witness for the first time on their witness list served October 9, 2023.  The Court should preclude Plaintiffs from calling this undisclosed witness under Fed. R. Civ. Proc. 37(c)(1).

-31-

1     Plaintiffs say they would call Mr. Heyl live, or through his *SHST* trial testimony, for the

2   limited purpose of authenticating TX269.[3]  TX269 is an email authored by Greg LaSalle.  Plaintiffs

3   deposed Mr. LaSalle *twice* in this litigation and included him on their "likely to be called by

4   deposition" list.  Plaintiffs nevertheless want to call Mr. Heyl because Plaintiffs failed to examine

5   Mr. LaSalle, the author of TX269, about that email at either of his depositions.  Plaintiffs cannot

6   claim that they failed to examine Mr. LaSalle about TX269 because they did not know Defendant

7   planned to try ownership.  Defendant specifically addressed its intent to litigate copyright ownership

8   in a September 27, 2022 letter—more than four months before Mr. LaSalle's second deposition—

9   and in multiple meet and confers thereafter, and served numerous discovery requests on this topic.

10  Plaintiffs knew Defendant intended to try ownership, and should have known in any event that they

11  needed to develop evidence to support all the elements of their claims.  Plaintiffs simply failed to

12  adduce deposition testimony about a document they have now decided they want to use at trial.

13  Plaintiffs' omission is not a justification for sandbagging Defendant with a never-disclosed witness

14  weeks before trial.[4]

15

16

17    Contrary to Rearden's arguments, a belated deposition of Mr. Heyl will not cure the prejudice

18  to Defendant.  Plaintiffs "proposal that a party can cure any prejudice from disclosing a witness on

19  the eve of trial simply by offering that witness up for a late deposition would transform Rule

20  37(c)(1)'s 'self-executing,' 'automatic' sanction' into a nullity" *Plexxikon Inc. v. Novartis Pharms.*

21  *Corp.*, No. 17CV04405HSGEDL, 2019 WL 12038882, at *3 (N.D. Cal. Sept. 9, 2019) (quoting *Yeti*

22  *by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)).  Had Plaintiffs

23

24

25    [3] Plaintiffs' claim does not square with their actual designations, which span 18 pages and include testimony on documents other than TX269, including five documents not on Plaintiffs' exhibit list.

26    [4] Nor is it relevant that Rearden has now decided that TX269 is important to its case.  *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("Courts have upheld the use of the [Rule 37(c)(1)] sanction even when a litigant's entire cause of action or defense has been precluded.").

27

28

-32-

disclosed Mr. Heyl as a witness in discovery, as they were required to do under Rule 26, Defendant would have had the opportunity to depose Mr. Heyl in a timely fashion and "pursue further discovery that may have arisen from [Mr. Heyl's documents or testimony]." Further, Plaintiffs' untimely disclosure would not require Defendant to "divert resources" at a critical time in the case. "Disruption to the schedule of the court and other parties ... is not harmless." *Id.*

The Court should preclude Plaintiffs from presenting Mr. Heyl's *SHST* trial testimony for the additional reason that such testimony is hearsay not subject to any exception. It appears that Mr. Heyl resides within the subpoena power of the Court, so he is not unavailable; but even if he was, his prior trial testimony would not be admissible under Fed. R. Evid. 804(b)(1), as explained in Section XV(C), *infra.*

**_Joseph Gabriel._** Plaintiffs listed Joseph Gabriel on their initial disclosures (served August 28, 2018), but *removed* him from their Supplemental Initial Disclosures (served January 17, 2023). When the Parties supplemented their initial disclosures, the Parties agreed to remove witnesses not likely to be called at trial and further agreed that if a Party later determined a removed witness would likely be called at trial, that Party would provide sufficient notice to enable the other Party to take a deposition of the witness. Plaintiffs did not provide such notice and also did not list Mr. Gabriel on their Second Amended Initial Disclosures (served March 28, 2023), thereby demonstrating once again that Plaintiffs did not intend to call Mr. Gabriel as a witness at trial. Accordingly, Plaintiffs should be barred from presenting Mr. Gabriel's testimony at trial under Rule 37(c)(1). *See* Fed. R. Civ. Proc. 37(c)(1).

The Court should preclude Plaintiffs from presenting Mr. Gabriel's *SHST* trial testimony for the additional reason that it is hearsay not subject to any exception, *see* Fed. R. Evid. 804(b)(1)(B); Section CV(C), *infra.*

-33-

### C.      Plaintiffs' Designation of *SHST* Trial Testimony[5]

#### 1.      Plaintiffs' Position

Rule 804(b)(1) provides a hearsay exception for former testimony of an unavailable witness given at a prior trial where it is offered against a party or a "predecessor in interest" of a party who had an opportunity and similar motive to develop it by direct, cross, or redirect examination.  FRE 804(b)(1).  Disney meets the definition of "predecessor in interest" as defined in the Ninth Circuit.

"The decision whether to admit a deposition from a prior lawsuit is vested in the district court's sound discretion."  *Hub v. Sun Valley Co.*, 682 F.2d 776, 777 (9th Cir. 1982). The modern test for "predecessor in interest" under FRE 804(b)(1) does not require identity or privity between the current party and the party who participated in the prior proceeding.  *Hynix Semiconductor Inc. v. Rambus Inc.*, 250 FR.D. 452, 458 (N.D. Cal. 2008).  "Under the modern view of the former testimony exception ... parties who are found to have an 'opportunity and similar motive' like that of the current party are deemed to be predecessors in interest."  *Trulove v. D'Amco*, 2018 WL 1248095, *2 (N.D. Cal. 2018), citing *Lisker v. City of Los Angeles*, No. CV09-09374 AHM AJWX, 2012 WL 3610134, at *1 (C.D. Cal. Aug. 20, 2012).  "[I]f it appears that in the former suit a party having a like motive to cross-examine about the same matters as the present party would have, was accorded an adequate opportunity for such examination, the testimony may be received against the present party."  *Culver v. Asbestos Defendants (BP)*, 2010 WL 5094698, *4 (N.D. Cal. 2010).

Thus, a previous party is a predecessor in interest to the present party if it had like motive to develop the testimony about the same material facts. *Brighton Collectibles, Inc. v. Coldwater Creek, Inc.*, 2008 WL 11337288, *2 (S.D. Cal. 2008), citing *Horne v. Owens-Corning Fiberglass Corp.*, 4 F.3d 276, 283 (4th Cir. 1993); *Murphy v. Owens-Illinois, Inc.*, 779 F.2d 340, 343 (6th Cir. 1985);

---

[5] The parties continued to exchange positions on these issues through the date for filing.  Each side reserves the right to respond further at the Final Pretrial Conference.

1  *Lloyd v. Am. Export Lines*, 580 F.2d 1179, (3rd Cir. 1978); Rutter Group, *Fed. Civil Trials &*

2  *Evidence*, ¶ 8:3061 (2004). Under these circumstances, the previous party having like motive to

3  develop the testimony about the same material facts is, in the final analysis, a predecessor in interest

4  to the present party.  *Culver*, 2010 WL 5094698, *4, citing *Clay v. Johns–Manville Sales Corp.*, 722

5  F.2d 1289, 1295 (6th Cir.1983) (quoting *Lloyd v. Am. Export Lines, Inc.*, 580 F.2d 1179, 1187 (3d

6  Cir.1978)).

7

8       Here, the SHST witnesses Rearden designated (with the exception of Mark Heyl) are

9  "unavailable" because they reside more than 100 miles from the Northern District of California.  And

10  Disney meets the standard for "predecessor in interest" under FRE 804(b)(1).

11       Counsel objecting to the admissibility of former testimony bears the burden of "explain[ing]

12  precisely why [the] motive and opportunity of defendants in the first case were not adequate to

13  develop cross-examination that the instant defendant would have presented to the witness." Rutter

14  Group, *Fed. Civil Trials & Evidence*, 8:3062 (citing *Horne*, 4 F.3d at 283; *O'Banion v. Owens-*

15  *Corning Fiberglass Corp.*, 968 F.2d 1011, 104 (10th Cir. 1992)).  Disney cannot meet its burden.

16  SHST and VGH were predecessors in interest of Disney because they had the opportunity and a

17  similar motive to examine Rearden's SHST witness designees.  At the SHST trial, the only issue was

18  whether SHST/VGH owned the MOVA Contour assets, or Rearden owned them.  Here, Rearden

19  must prove it owns the copyright in the MOVA Contour program and MOVA trademark as an

20  element of its case.  Disney disputes Rearden's ownership by reasserting the SHST/VGH ownership

21  claims tried in the SHST trial.  Furthermore, in the *SHST* case Rearden asserted a counterclaim for

22  infringement of the MOVA Contour software's copyright, which would have been tried following

23  the Court's determination that Rearden owned the MOVA Contour software's copyright in the *SHST*

24  ownership trial.

25

26

27

28

-35-

1

2

In sum, VGH had the opportunity to examine Rearden's designated *SHST* trial witnesses at

the *SHST* trial.  And VGH's motive to cross examine them was *identical* to Disney's here:  to prove

that Rearden did not own the MOVA Contour software's copyright and thereby avoid a claim for

monetary damages for infringement of Rearden's copyright.  In fact, VGH had a greater motive than

Disney to examine *SHST* trial witnesses because had it prevailed, VGH would have been the owner

of the MOVA Contour assets.  Disney has no comparable motivation here.

Furthermore, Disney cherry-picked the *SHST* testimony of Greg LaSalle and Gary Lauder to

offer in the present case.  At minimum, Rearden should be free to designate the portions of their

testimony that is favorable to Rearden.  But more broadly, Disney cherry-picked LaSalle and Lauder

from among the numerous *SHST* trial witnesses whose testimony was unfavorable to the position

Disney advances here.  The *SHST* trial transcript is a writing, and FRE 106 grants Rearden the right

to "require the introduction, at that time, of any other part—or any other writing or recorded

statement—that in fairness ought to be considered at the same time."  Disney has opened the door to

admissibility of the *SHST* trial testimony by designating choice tidbits from the *SHST* trial transcript.

Finally, Rearden's *SHST* trial designees reside (with the exception of Mr. Heyl) more than

100 miles from the Northern District of California so they are "unavailable witnesses."  FRCP

32(a)(2)(B) allows use of their *SHST* testimony for any purpose.

Consequently, Rearden's designated SHST trial testimony is admissible in evidence against

Disney under FRE 804(b)(1) and 106, and FRCP 32(a)(2)(B).

### 2.    Defendant's Position

Plaintiffs have made voluminous affirmative designations of witness testimony from the

*SHST* trial.  This testimony is inadmissible hearsay against Defendant because Defendant was not a

party and therefore did not have an opportunity to develop testimony in that proceeding.  *See* Fed. R.

-36-

Evid. 804(b)(1) (for prior testimony to be admissible (i) the witness must be unavailable; (ii) the witness's testimony must have been given at, inter alia, a trial; and (iii) the testimony must "now [be] offered against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination.").

Plaintiffs designated testimony from the *SHST* trial on September 29, 2023. [6]  Defendant thereafter asked Plaintiffs repeatedly how they could designate this testimony consistent with Rule 804(b)(1).  On October 17, three days before the Joint Pretrial Conference Statement was due, Plaintiffs for the first time claimed that VGH (the plaintiff in the *SHST* trial) was the predecessor-in-interest of Defendant here for purposes of Rule 804(b)(1) because VGH had the opportunity and a similar motive as Defendant to question witnesses on the issue of Rearden's claim of copyright ownership.

If Plaintiffs had proffered their predecessor-in-interest theory before in limines were due, or before this week, Defendant would have filed a motion in limine or separate motion regarding this issue.  Because Plaintiffs have made this claim on the eve of the filing of the joint pretrial conference statement, Defendant believes it must state its position here to avoid further prejudice.  If the Court would prefer separate briefing on this issue before trial, Defendant will convert the following to a motion and work out a briefing schedule with Plaintiffs.

Rearden's predecessor-in-interest claim is meritless for several reasons.

First, Rearden's theory cannot be squared with the text of Rule 804(b)(1), which on its face indicates that legal privity is required.  *See Marshall v. Northrop Grunman Corp.*, No.

---

[6] Plaintiffs' *SHST* trial designations were also untimely.  Pursuant to the Case Management Order (Dkt. 313) and the Parties' agreement, the Parties exchanged designations at 5:00 pm on September 29, 2023.  At 7:47 pm—after Plaintiffs had reviewed Defendant's designations from the *SHST* trial— Plaintiffs purported to designate more than 200 pages of testimony from the *SHST* trial, enough to fill 1.25 trial days.

CV16CV06794ABJCX, 2019 WL 6358249, at *3 (C.D. Cal. Oct. 16, 2019) ("[T]he rule equating "predecessor in interest" to the concept of "privity" in the law of property and contracts is more consistent with the text of Rule 804(b)(1)(B). Accordingly, Plaintiffs must show that the individual Defendants in this action 'so identified in interest with a party to former litigation that [they] represent[ ] precisely the same right in respect to the subject matter involved.'" (quoting *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1052–53 (9th Cir. 2005)); *Edwards v. Techtronic Indus. N. Am., Inc.*, No. 3:13-CV-01362-SI, 2015 WL 3616558, at *10 (D. Or. June 9, 2015) (same).[7] Plaintiffs' reliance on *Hynix Semiconductor Inc. v. Rambus Inc.*, 250 F.R.D. 452, 459 (N.D. Cal. 2008) (Whyte, J.), is unavailing as that case involved a stipulation permitting the use of deposition testimony from other cases. *See Realtek Semiconductor Corp. v. LSI Corp.*, No. C-12-03451-RMW, 2014 WL 46997, at *8 (N.D. Cal. Jan. 6, 2014) (Whyte, J.) (distinguishing *Hynix* on that basis).

Second, even under Rearden's interpretation of Rule 804(b)(1), VGH did not have the same motivation as Defendant about how to question these witnesses. The *SHST* trial did not address any issues about Defendant's alleged secondary liability for DD3's purported infringement. As a result, there was no reason for VGH's attorneys to ask questions about Defendant's knowledge or right and ability to control any of DD3's allegedly infringing activities. To the contrary, having provided representations and warranties to Defendant that DD3 had the right to use MOVA and all other material used to provide DD3's services, VGH had every incentive to *avoid* asking its own witnesses questions that might show DD3 concealed relevant information from Defendant. Far from being aligned, VGH's motive to pursue such questions was *directly opposite* to that of Defendant. Even on

---

[7] The Ninth Circuit has not expressly addressed this issue. *See Hub v. Sun Valley Co.*, 682 F.2d 776, 778 (9th Cir. 1982) ("we reserve for another day deciding whether the presence of an adversary with the same motive to cross-examine is sufficient" but noting the "troubling" possibility that a deposition could "be admitted against a party who did not participate in the cross-examination").

-38-

the question of Rearden's purported ownership of the MOVA technology, VGH's motives were not aligned with Defendant's and were, in many ways, adverse.  Much of Rearden's ownership case turned on what it described as hidden transactions between various entities associated with DD3, and between Greg LaSalle and DD3.  VGH had no motive to explore the extent to which these transactions occurred in secret, but that issue is critically important to Defendant and its argument that it did not have—and indeed could not have had—knowledge of or the practical ability to supervise DD3's alleged infringement.

Third, beyond these overarching differences of interest and motive, Defendant would have taken a different approach in cross-examining the specific witnesses at issue:

**Mark Heyl.**  The testimony Plaintiffs seek to introduce from Mr. Heyl focuses on his communications with Mr. LaSalle and Mr. Gabriel regarding the potential transaction between MO2, LLC (the entity formed by Greg LaSalle to acquire MOVA) and SHST.  In particular, Plaintiffs seek to introduce testimony from their cross-examination of Mr. Heyl establishing the terms of MO2's transaction with SHST and DD3's role in the transaction.  *VGH did not conduct any redirect of Mr. Heyl*, possibly because of his status as the attorney of a DD3 employee.  *See United States v. Baker*, 923 F.3d 390, 402 (5th Cir. 2019) (SEC and DOJ did not have similar motive to develop testimony where SEC failed to conduct cross-examination or follow-up questioning).

By contrast, if Defendant had been present at the *SHST* trial, Defendant would have extensively questioned Mr. Heyl regarding the confidential nature of his discussions with SHST, including establishing that he never communicated with Defendant about the transaction and that he never informed Defendant that there was any relationship between SHST and DD3.  Defendant would also have established that Mr. LaSalle's transaction with SHST occurred months *after* Defendant had informed Mr. LaSalle that Defendant had no interest in acquiring MOVA.  This evidence would be critical to establishing that Defendant did not know or have reason to know of

-39-

DD3's allegedly infringing activity, did not intentionally induce or materially contribute to that activity, and did not have the ability to control that activity.

VGH had no motive to, and did not, explore any of these issues because infringement was not tried during the *SHST* trial.  And even if it had been, VGH would not have had any motive to develop testimony relevant to Defendant's liability for contributory and vicarious infringement.  Plaintiffs' claim for copyright infringement in the *SHST* litigation was limited to alleging infringement by VGH's affiliates, as discussed above, and VGH did not have the same motive as Defendant to develop testimony relevant to the theories of secondary liability *against Defendant* that Plaintiffs assert here.

**Joseph Gabriel.**  Plaintiffs seek to introduce testimony from Mr. Gabriel's cross-examination that Mr. LaSalle initially negotiated with DD3 to purchase MOVA before agreeing to sell to SHST instead, that SHST licensed MOVA to DD3, that Mr. Gabriel represented both DD3 and SHST in the transactions, and that the agreement was oral.  VGH's redirect was limited to a handful of unrelated questions, reflecting the fact that VGH's motive to develop testimony on these subjects was *necessarily limited by Mr. Gabriel's role as DD3's general counsel*.  Defendant would not have faced the same limitation at trial.  Further, Defendant would have been motivated to question Mr. Gabriel on related topics relevant to Defendant's alleged vicarious and contributory infringement. Defendant would have been motivated to establish at least the following additional issues:

- Mr. Gabriel never communicated with Defendant about any transaction between MO2, DD3, and SHST.

- Mr. Gabriel's discussions with Mr. LaSalle and SHST occurred after Defendant had had informed Mr. LaSalle Defendant had no interest in acquiring MOVA.

- The documents relating to DD3's transactions with SHST and Mr. LaSalle were kept confidential and never shared with Defendant.

-40-

- Mr. Gabriel never informed Defendant that he had communicated with Mr. Perlman about Mr. Perlman's claim to own MOVA.

- Mr. Gabriel never informed any of the DD3 executives who negotiated DD3's contract for *BATB* about Mr. Perlman's claim to own MOVA.

- Mr. Gabriel did not inform Defendant when SHST filed its complaint against Rearden.

- Mr. Gabriel did not inform Defendant when Rearden filed its counterclaims against SHST and VGH.

- DD3 entered into a contract with Defendant representing and warranting that DD3 had the right to use the MOVA technology.

- Between DD3's acquisition of MOVA and the Court's decision in *SHST*, DD3 entered into contracts with multiple other studios to offer MOVA services on feature films.  For each of those films, DD3 represented and warranted it had the right to use the MOVA technology.

VGH had no motivation at trial to question Mr. Gabriel on these and other topics relating to Defendant's knowledge of DD3's alleged infringement or Defendant's ability to control the alleged infringement.  Indeed, VGH was incentivized to *avoid* questioning Mr. Gabriel—DD3's vice president and general counsel—on any topic that would suggest DD3 failed to disclose DD3's alleged infringement to Defendant.  Likewise, VGH, a DD3 affiliate, was incentivized to avoid questioning Mr. Gabriel on the terms of DD3's commercial relationships with its customers, which were not at issue in *SHST*.

***Ken Pearce.***  Plaintiffs seek to introduce testimony from Mr. Pearce's cross-examination concerning Mr. Pearce's employment agreement with Rearden, his potential interest in acquiring MOVA from OL2, Mr. Pearce's assistance in communication with Defendant's affiliates about

-41-

potentially acquiring the MOVA assets, and Mr. Pearce's employment at DD3. *VGH did not conduct any redirect of Mr. Pearce*. Again, VGH may have been limited in its ability to question Mr. Pearce because of his status as a former DD3 employee, a limitation that would not have applied to Defendant.

Defendant would have been motivated to develop Mr. Pearce's testimony on these and other topics as they related to Defendant's alleged vicarious infringement, Defendant's alleged contributory infringement, and Plaintiffs' alleged damages. Defendant would have been motivated to establish at least the following points:

- Mr. Pearce never communicated with Defendant or any member of the *BATB* production team regarding Plaintiffs' claim to own MOVA.

- Mr. Pearce never communicated with any DD3 employee who worked on *BATB* regarding Plaintiffs' claim to own MOVA.

- While employed by DD3, Mr. Pearce worked on several films for major motion picture studios where he used MOVA. On those projects, no other studio questioned DD3's right to offer MOVA services.

- Mr. Pearce had previously been employed by OnLive (a Rearden controlled company) during a time (before August 2012) when it was undisputed that OnLive owned MOVA. During that time, Mr. Pearce was responsible for providing MOVA services for feature films and did so for numerous films, including several films produced by Defendant's affiliates.

- During the time Mr. Pearce worked for OnLive, MOVA was generally unprofitable.

Mr. Pearce's lack of communication with Defendant regarding Plaintiffs' claim to own MOVA would establish that Defendant lacked knowledge of such claim and had no ability to control the alleged infringement. Mr. Pearce's past experience on MOVA would establish that DD3's use of

-42-

MOVA reasonably did not arouse any suspicion on Defendant's part, as it was consistent with OnLive and DD3's past practices on other films.  And Mr. Pearce's testimony regarding MOVA's lack of profitability would support Defendant's argument that MOVA did not contribute to *BATB*'s profits and that Plaintiffs are owed little, if any, actual damages.

For the same reasons as described above with respect to Mr. Gabriel, VGH had no motive to question Mr. Pearce, a DD3 employee, on these topics and was incentivized to avoid any questioning that suggested DD3 failed to disclose its own alleged infringement to Defendant.  VGH would also be incentivized to avoid any questioning suggesting that MOVA, a technology VGH owned, lacked value and was unprofitable.

***Greg LaSalle.***  Plaintiffs seek to introduce testimony from their cross-examination of Mr. LaSalle at the *SHST* trial.  Plaintiffs' designations focus on Mr. LaSalle's employment with DD3, DD3's use of MOVA, Mr. LaSalle's employment at Rearden, Mr. LaSalle's work at OnLive providing MOVA services, Mr. LaSalle's attempt to find a buyer for MOVA, Mr. LaSalle's communications with Defendant's affiliate regarding MOVA, his creation of MO2 to acquire MOVA, MO2's transaction with OL2, and MO2's subsequent transaction with SHST.  On examination of Mr. LaSalle, Defendant would have been motivated to develop his testimony on these topics as they related to Defendant's alleged contributory infringement, Defendant's alleged vicarious infringement, and Plaintiffs' claimed damages.  Defendant would have been motivated to establish at least the following additional issues:

- Mr. LaSalle was employed by OnLive and, during his time at OnLive, provided MOVA services on a number of films, including films produced by Defendant.  Mr. LaSalle was one of the OnLive employees primarily responsible for communicating with MOVA's customers and was the employee responsible for transporting and operating the MOVA rig on set.

- During the time OnLive owned MOVA, MOVA was not profitable.

- During the time OnLive owned MOVA, OnLive was not paid a retainer for days the rig was onset and not used.

- Mr. LaSalle never communicated with Defendant regarding Plaintiffs' claim to own MOVA.

- Mr. LaSalle never provided Defendant with a copy of the letter he received from Steve Perlman relating to Mr. Perlman's claim to own MOVA. Mr. Perlman received this letter after Defendant had indicated it was not interested in purchasing MOVA.

- Mr. LaSalle never provided Defendant with any documents filed in the *SHST* litigation, including SHST's complaint, Plaintiffs' counterclaim, or the Court's preliminary injunction.

- While working with DD3, Mr. LaSalle provided MOVA services on a number of major motion pictures for several different studios. For those motion pictures, he provided services in the same way he had previously done while at OnLive and did on *BATB*, i.e., he worked on set and operated the MOVA rig.

- Mr. LaSalle did not reside in the United Kingdom during the filming of *BATB* and the MOVA rig was not standing by ready to capture at any time.

Mr. LaSalle's testimony about his lack of communication with Defendant regarding Plaintiffs' claim to own MOVA would show that Defendant lacked any knowledge or reason to know of DD3's alleged infringement. Mr. LaSalle's testimony about the process for filming *BATB* would show Defendant lacked the ability to control the infringement. Mr. LaSalle's testimony about MOVA's lack of profitability would support Defendant's arguments on damages and his testimony regarding the use of the MOVA rig on *BATB* would rebut the claims of Plaintiffs' purported actual

-44-

damages expert that Plaintiffs would have been paid a significant sum for the MOVA rig to remain available for capture at any time during *BATB*.[8]

VGH's questioning of Mr. LaSalle reflects just how different its interests and motivations were from those of Defendant. *On direct*, VGH's counsel elicited testimony from Mr. LaSalle that he shared a letter from Mr. Perlman's counsel claiming ownership of the MOVA assets with three companies he was negotiating with, and thereafter two of them—including Disney—dropped out. SHST, Dkt. 383 at 168:6–169:19. Defendant never would have elicited that testimony because it is demonstrably false. As Mr. LaSalle testified at his deposition in *this* case—and as corroborated by contemporaneous documents (including the absence of any copy of the letter in the files of any of Defendant's witness) and the testimony of Mr. LaSalle's contact at Disney—his discussions with Disney had terminated *before* he received the letter. Rearden has relied heavily on Mr. LaSalle's *SHST* testimony to argue that Defendant was on notice that Rearden owned the MOVA assets. VGH was not protecting Defendant's interests during the *SHST* trial, and did not have access to the Defendant's documents and witnesses that would have shown Mr. LaSalle's recollection to be inaccurate. Had VGH truly been acting as a "predecessor interest" to Defendant, it never would elicited this inaccurate testimony from Mr. LaSalle.

***Rule 32 Does Not Apply.*** Contrary to Rearden's claim, Federal Rule of Civil Procedure 32(a)(2)(B) does not permit the use of a witness's trial testimony for any purpose if the witness

---

[8] It is no matter that Defendant had the opportunity to depose Mr. Pearce and Mr. LaSalle during discovery in this case. Rule 804(b)(1) requires that the party against whom the testimony is offered "had an opportunity and similar motive to develop the witness's testimony from the prior [trial] . . . It is irrelevant that discovery would allow for subsequent examination of the witness in a civil action because the rule itself requires that the opportunity have existed with respect to the testimony that the proponent seeks to admit." *Affinity Labs of Texas, LLC v. Apple Inc.*, No. C 09-04436 CW, 2011 WL 232521, at *2 (N.D. Cal. Jan. 24, 2011) (rejecting plaintiff's attempt to introduce deposition testimony from prior lawsuit even where defendant had opportunity depose witnesses in the present action).

-45-

unavailable.  By its terms, Rule 32(a)(2)(B) applies to "*the deposition* of a witness" who is

unavailable.  The relevant rule for admitting *trial* testimony from an unavailable witness is Federal of

Rule Evidence 804(1), which applies to testimony given "*at a trial,* hearing, or lawful deposition,"

and which allows the admission of such testimony only if it is "offered against a party who had—or,

in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by

direct, cross, or redirect examination."

### *Rule 106 Does Not Permit The Wholesale Admission of all SHST Trial Testimony Just Because Defendant Designated Limited Portions of Some SHST Testimony.*

Plaintiffs' argument that, because Defendant has designated testimony from the *SHST* trial,

Plaintiffs may introduce any other part of the trial transcript under Federal Rule of Evidence 106,

fails.  Rule 106 requires the introduction " of any other part--or any other writing or recorded

statement--that in fairness ought to be considered at the same time."  Fed. R. Evid. 106.  Here, with

the exception of Greg LaSalle, the parties have designated testimony from different witnesses at the

SHST trial: Defendant has designated *SHST* trial testimony from Greg LaSalle, Gary Lauder, and

Steve Perlman, but not from Mark Heyl, Joseph Gabriel, or Ken Pearce.   Allowing Plaintiffs to

introduce unrelated testimony from the *SHST* trial (including testimony from different witnesses)

would not only be unfair, it would prejudice Defendant for exercising its right under Rule 804(b)(1)

to offer testimony against Plaintiffs that they had an opportunity to develop at trial in *SHST*.  *See*

*United States v. Ricks*, 882 F.2d 885, 892 (4th Cir. 1989) ("Nor does F.R.E. 106 compel the

introduction of the entire prior cross-examination when King seeks to introduce only a portion of it.

[T]he rule is intended only to ensure that any admitted portion of a previous statement or writing is

placed in its proper context. Accordingly, Rule 106 does not necessitate the introduction of those

portions of Ward's cross-examination testimony which do not explain or clearly pertain to the limited

portions King sought to introduce.").  If Defendant ultimately introduces testimony from *SHST* at

trial under Rule 804(b)(1), the Court can consider at the time whether Plaintiffs have a basis to introduce additional, responsive testimony from the same witness.  But Rule 106 does not give Rearden a basis to designate the entirety of a witness's testimony, let alone testimony from different witnesses.

**Defendant's Ability to Offer SHST Trial Testimony.**  By contrast, Defendant may offer *SHST* trial testimony against Plaintiffs because Plaintiffs were parties and had an opportunity to develop the testimony of witnesses in that proceeding.  Fed. R. Evid. 804(b)(1)(B).

Defendant may also introduce the *SHST* trial testimony of Plaintiffs' own witnesses under Rule 801(d)(2).

### D.      Trademark Damages

#### 1.      Plaintiffs' Position

Disney's position on this issue is an untimely motion for summary judgment or in limine and should not be ruled upon by the Court in the context of the parties Joint Final Pretrial Conference Statement.

If the jury finds that Disney infringed Rearden's trademark, then Rearden will ask the Court (not the jury) to award a disgorgement of Disney's profits attributable to the infringement.  The request will be based on the opinion of Mr. Fier regarding Disney's gross revenue, costs, and profits, and admissions by Disney and its expert witnesses.  It is defendants' burden to prove apportionment, so the Court may not rule that Rearden's disgorgement of profits remedy is barred by the exclusion of *Mr. Fier's* testimony.

#### 2.      Defendant's Position

Plaintiffs' request for trademark damages raises two significant issues.

*First*, Plaintiffs may not ask the jury for disgorgement of trademark profits. Disgorgement of profits under Section 1117(a) is an equitable remedy, not a legal remedy.  *Fifty-Six Hope Road Music*

-47-

*v. A.V.E.L.A.*, 778 F.3d 1059, 1075 (9th Cir. 2015) (collecting cases).  It appears that the parties are now in agreement on this issue, but Defendant is preserving the objection.

*Second,* Plaintiffs may not ask the jury for any form of trademark damages because Plaintiffs have no evidence and can offer no expert opinion on which to base such a request.  Plaintiffs now claim that "[a]ll of the acts that constitute trademark infringement are also included in the copyright claim" but that does not say anything about trademark damages.  Plaintiffs' expert, Philip Fier, did not mention the word "trademark" in his report, much less opine on Rearden's trademark damages; there was thus no way for Defendant to know that Rearden would seek to offer never disclosed trademark damages opinions from Mr. Fier at trial or to support a request for disgorgement of profits and no way for Defendant to know a motion *in limine* to exclude such testimony was needed.  In any event, Mr. Fier's copyright apportionment opinions have now been excluded.  Dkt. 539.  Without any expert opinion, and without any evidence establishing trademark damages, Rearden cannot ask the Court for such an award.

### E.    Disclosure of Final Deposition/Trial Testimony Designations

The Parties were unable to reach agreement on a schedule for the disclosure of final deposition and trial testimony designations before the filing of this statement, so have included their separate proposals and ask the Court to order a schedule at the pretrial conference.

#### 1.    Plaintiffs' Position

**Rearden proposed the following:**  Five calendar days before the trial begins, each party provides to the other a list of final designations that will be played or read and the order in which each designation will be played or read, and will identify which portions (if any) of the final designations were previously designated confidential by either Party.  The receiving Party shall, by 9:00 a.m. the next calendar day, identify any additional, previously-designated testimony to be read or played, and any unresolved objections to testimony or exhibits sought to be used with the witness.

The Parties shall meet and confer by 6:00 p.m. the same day regarding (1) whether either Party is maintaining its previous confidentiality designations and intends to request that the courtroom be sealed for any portion of the final designations; and (2) any previously-stated but unresolved objections.  The Parties will raise with the Court the day before the testimony is to be presented any objections the Parties are unable to resolve and any portions as to which either Party is asserting confidentiality and requesting that the courtroom be sealed.

The purpose of this proposal is to allow each party to have deposition testimony pre-approved to use when a live witness is late or must be rescheduled, or when there otherwise is down time available that might not otherwise be used.

## 2.       Defendant's Position

**Defendant proposes the following**:  For each witness a Party intends to call by deposition, the Party shall, by 9:00 a.m. three calendar days prior to the date on which the Party intends to call such witness, provide to the other side a list of final designations that will be played or read and the order in which each designation will be played or read, and will identify which portions (if any) of the final designations were previously designated confidential by either Party.  The receiving Party shall, by 9:00 a.m. the next calendar day, identify any additional, previously-designated testimony to be read or played, and any unresolved objections to testimony or exhibits sought to be used with the witness.  The Parties shall meet and confer by 6:00 p.m. the same day regarding (1) whether either Party is maintaining its previous confidentiality designations and intends to request that the courtroom be sealed for any portion of the final designations; and (2) any previously-stated but unresolved objections.  The Parties shall raise with the Court the day before the testimony is to be presented any objections the Parties are unable to resolve and any portions as to which either Party is asserting confidentiality and requesting that the courtroom be sealed.

*       *       *

*The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues of fact and law remaining to be litigated, this order will supplement the*

-49-

*pleadings and govern the course of trial of this case, unless modified by the Court to prevent*

*manifest injustice.*

DATED:  October 20, 2023          HAGENS BERMAN SOBOL SHAPIRO LLP

By:   /s/ Mark Carlson
          MARK S. CARLSON
          *Attorneys for Plaintiffs*

DATED:  October 20, 2023          MUNGER, TOLLES & OLSON LLP

By:   /s/ Kelly M. Klaus
          KELLY M. KLAUS[9]
          *Attorneys for Defendant*

---

[9] Signed electronically by Mark S. Carlson with the concurrence of Kelly M. Klaus, pursuant to L.R. 5-1(i)(3).

-50-