UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REARDEN LLC, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>THE WALT DISNEY COMPANY, et al.,<br><br>    Defendants. | Case No. 17-cv-04006-JST<br><br>**ORDER GRANTING MOTION TO EXCLUDE TESTIMONY OF CINDY IEVERS**<br><br>Re: ECF No. 424 |

Before the Court is Defendants' motion to exclude the testimony of Cindy Ievers. ECF No. 424. The Court will grant the motion.

## I.    BACKGROUND

The factual and procedural background of this case are summarized in greater detail in this Court's prior orders. ECF Nos. 60, 85, 297. In short, this case concerns claims for contributory copyright infringement, vicarious copyright infringement, and trademark infringement by Plaintiffs Rearden LLC and MOVA LLC (collectively, "Rearden") against Defendants The Walt Disney Company; Walt Disney Motion Pictures Group, Inc.; Walt Disney Pictures; Buena Vista Home Entertainment, Inc.; Marvel Studios LLC; Mandeville Films, Inc.; Infinity Productions LLC; and Assembled Productions II LLC (collectively, "Disney"). Rearden alleges that Digital Domain 3.0 ("DD3") directly infringed Rearden's copyright to Rearden's MOVA Contour Reality Capture ("MOVA")—a program for capturing the human face to create computer graphics ("CG") characters in motion pictures. Rearden further alleges that Disney "contracted with DD3 to provide facial performance capture services using the copyrighted . . . program" to create the character Beast in its film *Beauty and the Beast* (2017). ECF No. 315 ¶ 117.

Disney has moved for summary judgment on all of Rearden's claims in connection with

1  *Beauty and the Beast*. ECF No. 421. In opposition to Disney's motion, Rearden relies on the

2  expert report and testimony of Cindy Ievers—Rearden LLC's Vice President of Finance. Ms.

3  Ievers' report and testimony pertain to the actual damages suffered by Rearden as a result of

4  Disney's alleged infringement. Disney seeks to exclude Ms. Ievers' testimony.

## II. LEGAL STANDARD

The proponent of expert testimony "has the burden of proving admissibility." *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Under Rule 702 of the Federal Rules of Evidence:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Following *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), trial courts serve a "gatekeeping" role "to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)). The question "is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995). Thus, courts should "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the

1  burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

2  **III.    DISCUSSION**

3      "'Actual damages' are the extent to which the market value of a copyrighted work has been injured or destroyed by an infringement." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1087 (9th Cir. 2014) (quoting *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985)). The "test of market value" is "what a willing buyer would have reasonably been required to pay to a willing seller for plaintiffs' work." *Frank Music Corp.*, 772 F.2d at 512 (quoting *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1174 (9th Cir. 1977), *overruled on other grounds*, *Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin* 952 F.3d 1051 (9th Cir. 2020)). "Excessively speculative claims of damages are to be rejected, and the 'market value approach is an objective, not a speculative, analysis.'" *Jarvis v. K2 Inc.*, 486 F.3d 526, 534 (9th Cir. 2007) (citation omitted) (quoting *Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002).

    Disney argues that the Court should exclude Ms. Ievers' testimony as to actual damages because, *inter alia*, (1) she did not consider what a hypothetical willing buyer would have paid for Rearden's services and (2) she fails to estimate the actual damages attributable to the alleged infringement.

### 1.    Willing Buyer

    Disney argues that the Court should exclude Ms. Ievers's testimony because she did not assume the existence of a hypothetical willing buyer and, by extension, failed to estimate the fair market value of Rearden's services. Rearden argues that Ms. Ievers's model properly estimates lost profits.

    Disney is correct that Ms. Ievers did not purport to consider what a willing buyer would have paid a hypothetical seller for Rearden's services. Instead, Ms. Ievers "quantif[ies] the sum that [Rearden] would have charged [Disney] to perform the facial performance capture services using [MOVA] that [DD3] performed on the *Beauty and the Beast* film." ECF No. 420-19 at 3. Throughout her expert report, Ms. Ievers first estimates the costs that Rearden would have incurred to provide the MOVA services to Disney in the production of the film. ECF No. 420-19

at 4–10. Ms. Ievers then adds a "20% markup" profit margin to the cost based on the fact that MOVA had previously been used in fifteen films at the time that production of *Beauty and the Beast* began, and on the fact that one of those films won an Oscar for Best Visual Effects. *Id.* at 10. On the basis of the cost estimates and 20% markup, Ms. Ievers concludes that $3.49 million is what the total that "Rearden *would have charged* for the MOVA Contour services for [*Beauty and the Beast*]." *Id.* Ms. Ievers's testimony in her deposition is consistent with the contents of the report insofar as she couches her analysis only in terms of what Rearden would have charged Disney for its services. *See* ECF No. 420-18 at 16, 18, 26, 27, 31, 43.

Testimony as to what Rearden would have charged will not assist the trier of fact to determine what a hypothetical willing buyer would have paid for Rearden's services, which is essential to the jury's determination of the fair market value of those services. *See On Davis v. The Gap, Inc.*, 246 F.3d 152, 166 (2d. Cir. 2001) ("The question is not what the owner would have charged, but rather what is the fair market value."). Accordingly, Ms. Ievers's conclusion as to Rearden's actual damages is not relevant to the question actually before the jury, and the Court will exclude her testimony. *See Apple, Inc. v. Samsung Electronics Co.*, No. No. 11–CV–01846–LHK, 2012 WL 2571332, at *6 (N.D. Cal. June 30, 2012) (excluding expert testimony apportioning damages as "unreliable under FRE 702 and *Daubert*" where the calculation of damages with respect to the infringement claims were "contrary to law"); *United Food and Com. Workers Loc. 1776 & Participating Emps. Health and Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1183 (N.D. Cal. 2017) (excluding testimony contrary to the legal standard on the ground that "exclusion of opinions that are irrelevant as a matter of law or contrary to the law is appropriate through the *Daubert* process.").

Rearden protests that considerations as to what a willing buyer would have paid are relevant only to actual damages based on a hypothetical model, but not to damages based lost profits. While Rearden is correct that actual damages "can be awarded in the form of lost profits" or "hypothetical-license damages," both forms of actual damages require an assessment of fair market value. *See Polar Bear Prods, Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004) ("Actual damages are usually determined by the loss in the fair market value of the copyright,

4

measured by the profits lost due to the infringement or by the value of the use of the copyrighted work to the infringer." (quoting *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 566 (7th Cir. 2003))). The cases on which Rearden relies are not to the contrary, but rather stand for the unremarkable proposition that lost profits may be used to determine actual damages. These cases do not change the outcome of the analysis.

### 2. Damages Attributable to the Alleged Infringement

As an alternative ground for exclusion, Disney argues that Ms. Ievers fails to differentiate between the infringing and non-infringing aspects of MOVA's services. Namely, Rearden alleges that Disney is vicariously liable for DD3's direct infringement, and that DD3 infringed Rearden's copyright when its computers operated the MOVA software program. ECF No. 315 ¶ 120. Disney contends that Ms. Ievers's estimates include compensation for a number of non-infringing services unrelated to the operation of the software program, such as costs associated with makeup, travel, and test shoots. Rearden argues that there is "no feasible method to calculate the marginal profits earned from a MOVA Contour software license" because Rearden never would have agreed to sell Disney a license to the MOVA code, but Rearden does not challenge Disney's argument that the opinion fails to differentiate between the infringing and non-infringing aspects of MOVA's services. ECF No. 443 at 15.

In addition to the $3.49 million that Ms. Ievers estimated in lost profits, Ms. Ievers testified in her deposition and wrote in her rebuttal report that because Rearden was unwilling to license its software, Rearden would have insisted that Disney purchase MOVA for its enterprise value, which she estimated to be $10 million. ECF No. 420-18 at 19; *see* ECF No. 420-21 at 4. But the Ninth Circuit has explained that the assessment of fair market value is a "hypothetical approach" that turns on "an objective, not a subjective, analysis" such that Rearden's "personal objections" to the licensing of its software are irrelevant. *Mackie*, 296 F.3d at 917. And the assessment turns on the hypothetical buyer's "willing[ness] to pay" a hypothetical willing seller "for a use of a plaintiff's product work *similar to the defendant's use*." *Frank Music Corp.*, 772 F.2d at 513 (emphasis added). Accordingly, the amount that Rearden would have charged Disney for its services of for the MOVA enterprise would "t[ell] the jury little of what" profits Rearden lost based on DD3's

"specific use of [Rearden's] copyrights." *Oracle Corp.*, 765 F.3d at 1091; *see Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dept.*, 447 F.3d 769, 786 (9th Cir. 2006) (upholding as a proper statement of the law jury instructions defining actual damages as the "amount a willing buyer would have been reasonably required to pay a willing seller at the time of the infringement for the actual use made . . . of the plaintiff's [copyrighted] work"). Because Ms. Ievers's testimony is also contrary to law for this reason, the Court will also exclude her testimony on this independent ground.

## CONCLUSION

For each of the foregoing reasons, Disney's motion is granted.

**IT IS SO ORDERED.**

Dated: October 20, 2023



JON S. TIGAR
United States District Judge