# ATTACHMENT

# [PROPOSED] REDACTED VERSION OF DKT. 539

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REARDEN LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE WALT DISNEY COMPANY, et al., <br><br> Defendants. | Case No. 17-cv-04006-JST <br><br> **ORDER GRANTING DEFENDANTS' MOTION TO EXCLUDE PORTIONS OF PHILIP FIER'S TESTIMONY** <br><br> Re: ECF No. 425 |

Before the Court is Defendants' motion to exclude portions of the testimony of Philip Fier. ECF No. 425. The Court will grant the motion.

## I.  BACKGROUND

The factual and procedural background of this case are summarized in greater detail in this Court's prior orders. ECF Nos. 60, 85, 297. In short, this case concerns claims for contributory copyright infringement, vicarious copyright infringement, and trademark infringement by Plaintiffs Rearden LLC and MOVA LLC (collectively, "Rearden") against Defendants The Walt Disney Company; Walt Disney Motion Pictures Group, Inc.; Walt Disney Pictures; Buena Vista Home Entertainment, Inc.; Marvel Studios LLC; Mandeville Films, Inc.; Infinity Productions LLC; and Assembled Productions II LLC (collectively, "Disney"). Rearden alleges that Digital Domain 3.0 ("DD3") directly infringed Rearden's copyright to Rearden's MOVA Contour Reality Capture ("MOVA")—a program for capturing the human face to create computer graphics ("CG") characters in motion pictures. Rearden further alleges that Disney "contracted with DD3 to provide facial performance capture services using the copyrighted . . . program" to create the character Beast in its film *Beauty and the Beast* (2017). ECF No. 315 ¶ 117.

Disney has moved for summary judgment on all of Rearden's claims in connection with

1  *Beauty and the Beast*. ECF No. 421. In opposition to Disney's motion, Rearden relies on the
2  expert report and testimony of Philip Fier to support its claim for wrongful profits pursuant to
3  Section 504(b) of the Copyright Act. Disney seeks to exclude portions of Mr. Fier's expert report
4  and testimony.

5  **II.  LEGAL STANDARD**

6  The proponent of expert testimony "has the burden of proving admissibility." *Lust ex rel.*
7  *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Under Rule 702 of the
8  Federal Rules of Evidence:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

17  Following *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), trial courts serve
18  a "gatekeeping" role "to ensure the reliability and relevancy of expert testimony." *Kumho Tire*
19  *Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

20  "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection
21  to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the
22  knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget*
23  *Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th
24  Cir. 2010)). The question "is not the correctness of the expert's conclusions but the soundness of
25  his methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995).
26  Thus, courts should "screen the jury from unreliable nonsense opinions, but not exclude opinions
27  merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. "Shaky but
28  admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the

burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

## III. DISCUSSION

Disney seeks to exclude Mr. Fier's expert report and testimony on apportionment, issues of law, and causal nexus.

### 1. Apportionment

In a copyright infringement case, the plaintiff must first establish a "causal nexus" between the infringement and the alleged infringer's gross revenue. *Fahmy v. Jay-Z*, 835 F. Supp. 2d 783, 793 (C.D. Cal. 2011). The burden then shifts to the alleged infringer to apportion the profits. *Id.* "[I]f an infringer's profits are attributable to factors in addition to use of plaintiff's work, an apportionment of profits is proper." *Id.* (quoting *Andreas v. Volkswagen of Am., Inc.,* 336 F.3d 789, 796 (8th Cir.2003)).

Disney argues that the Court should exclude Mr. Fier's conclusions as to the apportionment of motion picture profits attributable to Disney's alleged copyright infringement because those conclusions lack any methodological foundation and because Mr. Fier failed to explain how his experience qualifies him to reach those conclusions. Rearden responds that Mr. Fier's conclusions are well-founded and that Mr. Fier is qualified to render his opinion.

In his rebuttal report, Mr. Fier purports to calculate the percentage of the film's profits attributable to Disney's use of MOVA based on audience exit poll data. *See* ECF No. 420-28 at 59–65. That exit poll data recorded viewers' reasons—or "drivers"—for seeing the film. These drivers included, for example, Emma Watson's performance as Belle; the narrative itself; the film's visual effects; the fact that a viewer was a fan of the original version of *Beauty and the Beast*; the romance between Belle and the Beast; and the positive reviews the movie had received. *E.g.*, ECF No. 420-28 at 59. Mr. Fier then presents different tables that purport to apportion the percentage of profits attributable to each driver (1) based on the exit poll data, (2) based on the poll data and adjusted for the number of shots that contained the Beast, (3) based on a method employed by one of Disney's experts, Kristie Kershaw, and (4) based on Ms. Kershaw's method and adjusted for the number of shots that contained the beast. Each table of features a column titled "% related to MOVA" in which Mr. Fier estimates the percentage of Disney's profits that he

3

believes should be apportioned to Disney's use of MOVA in the film. *E.g.*, *id.* For example, when calculating apportionment based on the exit poll data, Mr. Fier attributes 2.5% of viewers' interest in Emma Watson's performance as Belle to Disney's use of MOVA to animate the Beast's face. Because 6.25% of viewers cited Watson's performance as the reason behind their decision to see the film, he multiplies that 6.25% by his 2.5% attribution figure to arrive at an apportionment of the film's profits based on MOVA of 0.16% for that driver. *Id.* He repeats this calculation for each of the drivers. Based on his results from each of the four tables, Mr. Fier calculates the range of net percentage value of the film's profits attributable to Disney's use of MOVA to be approximately ▮▮▮▮▮▮▮▮▮ *Id.* at 65.

Mr. Fier's attribution analysis is inadmissible for two reasons. First, Mr. Fier did not employ an identifiable methodology in estimating the percentages in the "% related to MOVA" column. Instead, to put it plainly, he watched the movie once and came up with some numbers. In his report, he conceded that "[a]ssigning apportionments is often subjective," *id.* 59, and that he selected percentages ranging from 2.5% to 50% for 16 of the 31 drivers "based upon [his] viewing of the film, [his] review of Ms. Kershaw's data[,] and [his] experience," *id.* at 60. But Mr. Fier did not explain or provide any basis as to why many of the listed drivers bore any relation to MOVA—including the story itself, that a viewer was a fan of the original film, the "[c]ast overall," that the film "looked fun," the comedic aspects of the film, the fact that "[e]veryone [wa]s talking about the film," that a friend recommended the film, or that the film had "[g]ood reviews." *Id.* at 62. Moreover, for 14 of the 16 drivers, Mr. Fier provided no explanation in his report as to how he arrived at the percentages he selected. Nor was his explanation any better during his deposition. Mr. Fier testified, "I felt like those were reasonable numbers. That's all I can say. I can't explain why something is two, two and a half percent, or three. I felt two and a half percent was reasonable." ECF No. 420-31 at 32. There was, in other words, no basis grounded in objective fact for the percentages he assigned.

Mr. Fier did explain why he selected particular percentages for two of the drivers: a viewer's decision to see the movie due to visual effects and Dan Stevens's performance as the Beast. But he arrived at those percentages equally randomly. Mr. Fier determined that a viewer's

4

1   decision to see the movie due to visual effects and Dan Stevens's performance as the Beast were
2   each 50% attributable to MOVA. To justify these figures, Mr. Fier wrote only that "Ms.
3   Kershaw's report mentions that 'half of the positive interest in the visual effects for the movie was
4   driven by the Beast's CGI' so I assigned 50% of [visual effects] in my table [in the '% related to
5   MOVA' column]." *Id.* (quoting ECF No. 419-20 at 19). But Ms. Kershaw's report, in the
6   sentence immediately following that quoted by Mr. Fier, notes that MOVA "was not used to create
7   Beast in his entirety." ECF No. 419-20 at 19. Attributing 50% of a viewer's interest in visual
8   effects or in Dan Stevens's performance to MOVA assumes that MOVA was entirely responsible
9   for animation of the Beast. That assumption is inconsistent with the report on which Mr. Fier
10  relied for that information as well as the remaining body of evidence in the case, including the
11  testimony of Rearden's CEO, Steve Perlman, and Rearden's own experts. ECF No. 420-34 at 3
12  (Perlman confirming that it is not "possible to make a fully formed [computer graphics ("CG")]
13  character of the quality you saw in the Beast . . . using just the MOVA Contour software"); *id.*
14  (Perlman confirming that "MOVA Contour software is just a step in creating a fully formed CG
15  character like the Beast'); ECF No. 420-33 at 3 (Rearden's expert agreeing that "it's not possible
16  to make a fully formed C.G. character of the quality of the Beast . . . with just the actor's
17  performance in the MOVA Contour software," that "MOVA Contour software is not a hundred
18  percent accountable for the Beast's CGI," and that "other software products besides MOVA
19  contour" as well as "the efforts of the animators and their artistry" were also used to create the
20  Beast). In other words, if half of the positive interest in the visual effects for the movie was driven
21  by the Beast's CGI, not all of that interest can be allocated to MOVA, because MOVA was not the
22  sole ingredient in the CGI.

23  Consequently, Mr. Fier fails to ground his apportionment analysis in any coherent
24  methodology. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either
25  *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is
26  connected to existing data only by the ipse dixit of the expert. A court may conclude that there is
27  simply too great an analytical gap between the data and the opinion proffered."); *NetFuel, Inc. v.*
28  *Cisco Sys. Inc.*, No. 5:18-CV-02352-EJD, 2020 WL 1274985, at *2 (N.D. Cal. Mar. 17, 2020)

5

("Experts must follow some discernable methodology, and may not be a black box into which data is fed at one end and from which an answer emerges at the other." (quoting *GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014))); *Philips N. Am. LLC v. Summit Imaging, Inc.*, No. C19-1745-JLR, 2021 WL 2118400, at *1 (W.D. Wash. May 25, 2021) (excluding apportionment analysis grounded in methodology "not sufficiently 'tied to the goal of estimating the profits [the defendant] actually earned due to its use of the allegedly infringing [material]'" (alteration in original) (quoting *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 WL 1743154, at *3 (N.D. Cal. May 2, 2016))); *Zhu v. Li*, No. 19-cv-02534-JSW, 2023 WL 1111507, at *2 (N.D. Cal. Jan. 30, 2023) (excluding expert report and testimony where the expert report was "based on an unreliable foundation and methodology because [the expert] fail[ed] to explain the bases for his conclusions or provide the methodology he used" (collecting cases)).

Second, although Mr. Fier selected his percentages substantially on the basis of his professional experience, he never "explain[s] 'how that experience leads to the conclusion reached, why that experience is a sufficient basis for [his] opinion, and how that experience is reliably applied to the facts." *Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1246–47 (W.D. Wash. 2018) (quoting Fed. R. Evid. 702 advisory committee's notes to 2000 amendments). Mr. Fier has thirty years of experience in the film industry in the areas of finance and distribution, including six-years of experience in overseeing the financial aspects of film distribution at 20th Century Fox and Sony Pictures. *See* ECF No. 420-27 at 4. He never indicates, however, how that qualifies him to conduct his apportionment analysis. Rearden focuses on Mr. Fier's experience but ignores Mr. Fier's failure to ground his ability to calculate specific percentages in that experience.

For each of these reasons, the Court will exclude Mr. Fier's apportionment analysis.

### 2. Legal Issues

Disney asks the Court to exclude Mr. Fier's legal opinions, arguing that although "Mr. Fier is not qualified to opine on legal issues," ECF No. 425 at 15, he "presents a series of legal opinions, complete with block quotes from decisions, in which he asserts that Ninth Circuit precedent supports

6

Case 4:17-cv-04006-JST Document 529 Filed 10/25/23 Page 8 of 11

his analysis, including his specific apportionment percentages, and that Defendants have failed to meet their legal burdens." ECF No. 425 at 10. Rearden argues that Mr. Fier "is not offering legal advice." ECF No. 448-21 at 18.

Contrary to Rearden's characterization, Mr. Fier's rebuttal report contains a number of legal conclusions. Mr. Fier concludes that "Disney has not proven the elements of costs to be deducted from sales in arriving at profit, it has not demonstrated that these overhead costs were of actual assistance in the production of the Film, and it did not show that the various categories of overhead listed in [Disney's expert's] report actually contributed to the revenue generated by [*Beauty and the Beast*]." ECF No. 420-28 at 23. 17 U.S.C. § 504(b), which entitles a copyright owner to any profits of the infringer attributable to the infringement, requires the infringer "to prove his or her deductible expenses." Mr. Fier's conclusion directly relates to the question of whether Disney has satisfied its burden to prove deductible expenses and the Court will therefore exclude it. *See United States v. Diaz*, 876 F.3d 1194, 1196 (9th Cir. 2017) ("'[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law.' This prohibition of an opinion testimony on an ultimate issue of law recognizes that, '[w]hen an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.'" (second alteration in original) (citations omitted) (first quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004); and then quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994))). The Court will exclude these legal conclusions.

Second, in the portion of his rebuttal report in which he performs his attribution analysis, Mr. Fier discusses the Ninth Circuit's decisions in *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.* ("*Frank Music I*"), 772 F.2d 505 (9th Cir. 1985) and *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.* ("*Frank Music II*"), 886 F.2d 1545 (9th Cir. 1989). Mr. Fier purports to describe the facts, holdings, and applicability of those two cases to the facts at hand. For example, Mr. Fier notes that the range of apportionment established by the four tables discussed above "align[s] with the 9% apportionment determined in *Frank Music II* for an infringement of similar magnitude," ECF No. 420-28 at 65, he expressly purports to "apply" the Ninth Circuit's reasoning in *Frank*

7

*Music I* "to the film at hand," *id.* at 58, and he explains that "[a]ssigning apportionments is often subjective" under the Ninth Circuit's reasoning in *Frank Music II*, *id.* at 59. In each of these instances, Mr. Fier seeks to frame his analysis as persuasive on the ground that it is supported by the caselaw, which is exactly the kind of legal argument that Mr. Fier is neither qualified nor permitted to make. *Mannick v. Kaiser Found. Health Plan, Inc.*, No. C 03-5905 PJH, 2006 WL 1626909, at *17 (N.D. Cal. June 9, 2006) ("Testimony 'which articulates and applies the relevant law . . . circumvents the [fact finder's] decision-making function by telling it how to decide the case.'" (alteration in original) (quoting *Specht v Jensen*, 853 F.2d 805 (10th Cir. 1988))); *see also Arista Networks, Inc. v. Cisco Sys. Inc.*, No. 16-CV-00923-BLF, 2018 WL 8949299, at *4–5 (N.D. Cal. June 15, 2018). Rearden's argument to the contrary—that Mr. Fier's invocation of these cases provides the context for his analysis—simply mischaracterizes the contents of this section of the report.

### 3. Causal Nexus

17 U.S.C. § 504(b), the damages provision of the Copyright Act, provides that a copyright owner "is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." The statute does not, "[o]n its face, . . . differentiate between 'direct profits'—those that are generated by selling an infringing product—and 'indirect profits'—revenue that has a more attenuated nexus to the infringement." *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002). However, the Ninth Circuit has held that "a copyright holder must establish the existence of a causal link before indirect profits damages can be recovered." *Id.* This "element of the statute serves as a logical parameter to the range of gross profits a copyright plaintiff may seek." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004).

Disney argues that the Court should exclude Mr. Fier's analysis as to whether there is a causal nexus between DD3's infringing use of MOVA and profits from *Beauty and the Beast* consumer products. Disney asserts that Mr. Fier only addressed the issue for the first time in his surrebuttal report, and that his analysis as to the issue is inadmissible. Rearden responds that Mr.

8

Fier's opening report and surrebuttal report properly analyze the causal nexus issue because each discusses the revenue streams attributable to the film, including that of consumer products.

Regardless of where Mr. Fier first discussed the causal nexus issue, his analysis would not assist the trier of fact in determining whether Rearden has demonstrated "a causal nexus between the *infringement* and the gross revenue." *Polar Bear Prods.*, 384 F.3d at 711 (emphasis added). His opinion that "the film itself . . . was the driving factor behind consumers' decisions to purchase merchandise and the soundtrack" says nothing about whether or the extent to which DD3's *use of MOVA* motivated those purchasing decisions. ECF No. 420-30 at 18; *see Polar Bear Prods.*, 384 F.3d at 711 ("[N]o evidence establishes that *the infringement* may have actually influenced the purchasing decisions . . . that lead to increased sales revenue . . . .") (emphasis added).

Rearden protests that Mr. Fier "adopted the consumer product revenue that Disney self-identified as related to the movie" and that the burden "then shifted to Disney to show which portion of the consumer product revenue were [sic] not attributable to the infringement." ECF No. 448-21 at 22. This argument is consistent with Mr. Fier's surrebuttal report insofar as he concludes that "Ms. Kershaw does not disprove a causal link between MOVA and consumer products and music profits." ECF No. 420-30 at 18. But it is a copyright holder's burden to establish a causal nexus in the first instance, and only then does the burden shift to the infringer to apportion the profits that were not the result of infringement. *See Polar Bear Prods.*, 384 F.3d at 712 ("The standard is straightforward: a copyright plaintiff is bound no more and no less than its statutory obligation to demonstrate a causal nexus between the infringement and the profits sought."); *see also id.* ("[17 U.S.C.] § 504(b) creates a two-step framework for recovery of indirect profits: 1) the copyright claimant must first show a causal nexus between the infringement and the gross revenue; and 2) once the causal nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement."). Put differently, Mr. Fier does not purport to identify the existence of a causal nexus; rather, he erroneously concludes that Disney has failed to meet its nonexistent burden to disprove that one exists. His analysis is thus "contrary to law" and "would confuse the issues and mislead the trier of fact." *Intel Corp. v. Tela*

9

*Innovations, Inc.*, No. 3:18-cv-02848-WHO, 2021 WL 1222622, at *27 (N.D. Cal. Feb. 11, 2021); *see id.* ("To the extent that [the expert]'s opinions rest on this basis, I agree that they squarely contradict [controlling caselaw] and are, accordingly, contrary to law; they would, by the same token, be inadmissible under *Daubert* and FRE 403 as it would confuse the issues and mislead the trier of fact."); *United Food and Com. Workers Loc. 1776 & Participating Emps. Health and Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1183 (N.D. Cal. 2017) (excluding testimony contrary to the legal standard on the ground that "exclusion of opinions that are irrelevant as a matter of law or contrary to the law is appropriate through the *Daubert* process."). The Court will therefore exclude this testimony to the extent Mr. Fier offers it for the purposes of establishing a causal nexus between DD3's use of MOVA and Disney's consumer products profits in connection with the film.

## CONCLUSION

For the reasons stated above, Disney's motion is granted.

**IT IS SO ORDERED.**

Dated: October 18, 2023

JON S. TIGAR
United States District Judge

10