# EXHIBIT 13

# REDACTED PER
# ECF NO. 538

**REARDEN LLC, ET AL. vs TWDC ENTERPRISES 18 CORP., ET AL.**
**Gayle Munro on 03/10/2023**

```
 1                UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                     OAKLAND DIVISION
 4
    REARDEN LLC and REARDEN      )
 5  MOVA LLC,                    )
                                 )
 6            Plaintiffs,        )
                                 )   Civil Action No.
 7         vs.                   )
                                 )   4:17-cv-04006-JST
 8  TWDC ENTERPRISES 18 CORP.    )
    f/k/a/ THE WALT DISNEY       )
 9  COMPANY, et al.,             )
                                 )
10            Defendants.        )
    _____ )
11
12
13
14
15
            VIDEOCONFERENCE DEPOSITION OF GAYLE MUNRO
16
                    MARCH 10, 2023
17
18
19
20
21
22
23
24   Reported By:
25   Dianne Coughlin, RDR, CRR
     Licensed Certified Shorthand Reporter No. 10418
```

```
 1     A.   No.
 2     Q.   All right.  That's what I mean.  Thank you.
 3          Let's pull up tab 1, please.  We'll mark
 4   this as Exhibit 272.
 5          (Plaintiffs' Exhibit 272 marked
 6          for identification.)
 7   BY MR. CARLSON:
 8     Q.   Ms. Munro, do you have that document
 9   available to you?
10     A.   I do.
11     Q.   All right.  And what is it?
12     A.   Declaration of Gayle Munro.
13     Q.   All right.  Did you write this document?
14     A.   I was involved in writing it, yes.
15     Q.   All right.  So the words that are written in
16   the document, those are your words?
17     A.   They are words that I approved and agreed
18   with, and changed when necessary.
19     Q.   All right.  Let me ask you a better
20   question.
21          Can you just describe for me how this
22   document, this declaration, was created?
23     A.   I was sent a draft for feedback, additional
24   information, and to make sure that I was 100 percent
25   comfortable with all of the contents, and signing off
```

 1    that agreement.

 2        Q.   All right.  And from whom did you receive

 3    the draft?

 4        A.   If I recall correctly, it was Sam Hyams.

 5             If it wasn't Sam, it would have been Ben.

 6        Q.   And those are Digital Domain's outside

 7    counsel; is that correct?

 8        A.   Correct.

 9        Q.   When you say "Ben," you mean Mr. Kleinman?

10        A.   Sorry.  Yes.

11        Q.   So either Mr. Hyams or Mr. Kleinman did the

12    first draft of this document; is that your testimony?

13        A.   Yes.

14             MR. HYAMS:  Objection.  Speculation.

15    BY MR. CARLSON:

16        Q.   And then you received it and you reviewed

17    it?

18        A.   Yes.

19        Q.   And did you make any corrections to it?

20        A.   Not necessarily corrections, but I did make

21    changes based on my personal knowledge since it's my

22    declaration.

23        Q.   All right.  Can you turn to the last page of

24    the declaration?

25        A.   Can I confirm that's page 6?

1     Q.   If I had it in --

2          MS. YOUNG:   Yes.

3     BY MR. CARLSON:

4     Q.   Yes, it is.

5     A.   Thank you.

6     Q.   I was just going to ask you, Ms. Munro, is

7     that your signature on page 6?

8     A.   Yes.

9     Q.   And you understood that you were signing

10    this document under penalty of perjury?

11    A.   Correct.

12    Q.   All right.  To your understanding, was this

13    document prepared for your deposition today?

14    A.   To my understanding, yes.

15    Q.   All right.  Let's flip up to paragraph 3,

16    please.

17    A.   Yes.

18    Q.   All right.  And Ms. Munro, in paragraph 3

19    you identify a series of Excel spreadsheets; is that

20    correct?

21    A.   It is.

22    Q.   And I believe, if my math is correct, there

23    is nine of them; is that correct?

24    A.   I would have to count.

25    Q.   You would have to count.  Well, let's both

1  numerous people asking.

2  BY MR. CARLSON:

3      Q.   **Well, who were the people who asked you to**

4  **generate this and the other spreadsheets that we've**

5  **been looking at?**

6          MR. HYAMS:  Objection.  Object to the form.

7          Vague.

8          THE WITNESS:  I know Joseph Gabriel, who is

9  an internal counsel at Digital Domain, had requested

10 some documents.

11         I worked with head of finance, Nicholas Ho

12 on some.

13         And there were a number of documents, so I'm

14 sorry if I'm not clear who exactly requested them.

15         It's been five months.

16 BY MR. CARLSON:

17     Q.   **To your understanding did you generate these**

18 **documents for this litigation?**

19         MR. HYAMS:  Objection.  Privilege.

20         Attorney-client privilege.

21         You can continue.  You can answer.

22         MR. CARLSON:  I'm just looking for a yes or

23 no here, Sam.

24         THE WITNESS:  It wasn't specifically pointed

25 out, but I made my own assumption.

 1   I've seen it.

 2          MS. YOUNG:  Can we please see tab 11 in the

 3   Zoom?  I'm having a lot of technical difficulties

 4   right now, and I can't download it from the chat.

 5          THE VIDEOGRAPHER:  It should be there.

 6          MR. CARLSON:  Let us know when you have it,

 7   Blanca.

 8          MS. YOUNG:  Is it Nonparty Digital Domain's

 9   Response and Objections to Subpoena?

10          MR. CARLSON:  It is.

11          MS. YOUNG:  Okay.  I have it.

12   BY MR. CARLSON:

13      Q.   Let me ask you to turn to page 4, and there

14   is a little paragraph titled "Matter No. 1."

15          Do you see that?

16      A.   Rolling.  Sorry.

17      Q.   That's all right.

18      A.   Ah.  Yup.

19      Q.   Could you read that to yourself, and let me

20   know when you are done?

21      A.   I've read it.

22      Q.   Are you -- do you understand that you are

23   Digital Domain's representative to testify with

24   respect to its knowledge regarding "Communications

25   with Disney and/or any Disney affiliate including but

1   not limited to Chip Pictures relating to facial

2   performance capture, how it would be provided, and

3   the technologies that would be used for visual

4   effects in Beauty and the Beast"?

5       A.   I do, yeah.

6       Q.   When did -- well, let me strike that for a

7   moment.

8            How did you prepare yourself to testify with

9   respect to Digital Domain's knowledge on that

10  subject?

11      A.   Firstly, obviously my own exposure to Chip

12  Pictures.

13           I spoke to one of the people that was

14  involved in the original bidding and pitch to Disney

15  for DD to be considered for the work.

16           I also spoke to my direct report at the time

17  in 2016, who is also executive producer, and just

18  checked to see what their exposure was with regard to

19  this.

20      Q.   Okay.

21           MR. CARLSON:  And Counsel, I am going to

22  invite Mr. Perlman to come back since we're done with

23  the spreadsheets.

24           Any objection?

25           MR. HYAMS:  No objection.

1          THE WITNESS:  I don't know how to answer
2   that because I just don't know.
3   BY MR. CARLSON:
4      Q.   All right.  If you wanted to know the answer
5   to that question, who would you ask?
6      A.   Probably Joseph Gabriel.
7      Q.   I guess you haven't spoken to him in
8   preparation for your deposition today.
9      A.   I have, but not about this particular
10  article specifically.
11     Q.   Okay.  So let's pull up tab 13, please.
12          Actually, let's go back to the 30(b)(6)
13  notice if we could.  I want to ask about Matter No.
14  2.
15     A.   It's tab 11?
16          THE VIDEOGRAPHER:  Yes.
17          MR. CARLSON:  Okay.  Thank you.  I was going
18  through my notes to find that.
19     Q.   I wanted to ask you about matter No. 2 now.
20  It's on page 5 of the notice, and it's -- the matter
21  for inquiry is "The negotiation and meaning of the
22  terms of Digital Domain's contract with Chip Pictures
23  for visual effects in Beauty and the Beast."
24          Do you understand that you are Digital
25  Domain's designee to testify with respect to its

```
 1    knowledge on this subject?

 2        A.   I do.

 3        Q.   All right.

 4             Now we can go to tab 13.  This is Exhibit 67

 5    to the Mimi Steele deposition, and if you could flip

 6    to page 2, please, I would appreciate it.

 7             There.  No.  No.  Back up.  I meant the

 8    second page.

 9             There we go.  Good.  Thank you.

10             My question, Ms. Munro, is whether you've

11    seen this document before.

12        A.   I've seen the document once it was fully

13    executed.

14        Q.   All right.  And that was -- that was on or

15    about the date it bears, March 31 of 2015?

16        A.   That would be correct.

17        Q.   Okay.  And did you have a purpose in mind

18    when you saw this document?

19             MR. HYAMS:  Objection.  Vague.

20             THE WITNESS:  It contains a lot of

21    information that's very relevant to running a

22    project, including and not limited to things like

23    payment schedules, credits.  Sometimes it will

24    contain -- and I'm scrolling through -- they contain

25    full shot lists, asset lists.
```

1    section 11.a.





22   BY MR. CARLSON:

23        Q.    Okay this is -- I think this is the last one

24   I am going to go over with you, Ms. Munro.

25              Can we go to section 21?  This is a section

```
1      A.   Joseph Gabriel.

2      Q.   Did you talk with -- I gather -- you

3   mentioned that you spoke with Mr. Gabriel.  I am not

4   going to ask you for any specifics, but did you --

5   was he the source of the information that he knew

6   about the SHST case?

7      A.   He was, yes.

8      Q.   Did you talk to anyone else about whether

9   they knew about the SHST case?

10     A.   I talked to Ben Kleinman and Sam about it,

11  yeah.

12     Q.   Did you talk to anyone else at Digital

13  Domain about whether they knew about the SHST case?

14     A.   I did.

15     Q.   Who else did you talk to?

16     A.   I talked to Erika Jennings, who I referenced

17  earlier.  At the time she was DD's executive producer

18  and head of production.

19     Q.   And what did she say about that?

20     A.   She also was unaware of it at the time.

21     Q.   Did you attempt to contact Mr. LaSalle, and

22  ask him about it?

23     A.   Not directly, I did not.

24     Q.   Did you try to contact him indirectly?

25     A.   Not even indirectly.
```

1          How did you prepare for this topic, prepare

2    to testify regarding this topic?

3      A.   I talked to Heather Jennings, who was around

4    at the time of the pitch.

5          I talked to Kelly Port also, who was onsite

6    and the visual effects supervisor involved in all

7    aspects.

8          I checked all records.

9      Q.   Okay.  So you looked for relevant records

10   regarding this topic; is that correct?

11     A.   That's correct.

12          MR. CARLSON:  Objection.  Leading.

13          THE WITNESS:  It is correct.

14   BY MR. HYAMS:

15     Q.   Okay.  Did you speak with Kelly Port

16   regarding this topic?

17          MR. CARLSON:  Objection.

18   BY MR. HYAMS:

19     Q.   You can answer if you know.

20     A.   Sorry.  When I look up like that, it means

21   I'm actually thinking what did I talk to Kelly about.

22          Not specifically the subject, no.

23     Q.   Did you speak with Joanna?

24     A.   I did not.

25     Q.   Okay.  Did you speak with Joe Gabriel

**REARDEN LLC, ET AL. vs TWDC ENTERPRISES 18 CORP., ET AL.**
Gayle Munro on 03/10/2023                                      Page 227

```
 1   regarding this topic?

 2      A.    We did broadly.

 3      Q.    Okay.

 4            Can we go to matter No. 2, please.

 5            How did you prepare for matter No. 2,

 6   Ms. Munro?

 7      A.    Prep sessions with people that were around

 8   and directly involved in that original contract,

 9   which predated my joining the show.

10      Q.    Did you speak with Erika about -- in your

11   preparation for this topic?

12      A.    Yup.  Erika and Heather Jennings.

13      Q.    Okay.  Did you speak with Joe Gabriel

14   regarding this topic?

15      A.    I can't recall whether it came up.  I'm

16   sorry.

17      Q.    Did you review the contract that's mentioned

18   in this topic?

19      A.    Yes, I did.

20      Q.    Thank you.

21            Let me scroll to matter No. 3, please.

22            Do you have it on your screen, Ms. Munro,

23   item No. 3?

24            THE VIDEOGRAPHER:  Sorry.  It froze on me.

25            MR. HYAMS:  That's okay.
```

1    Q.   For matter No. 3, how did you prepare for

2    this matter number?

3    A.   I asked Erika Burton in the course of one of

4    our conversations.

5         I also talked to Joseph Gabriel.

6    Q.   Okay.  Did you research and review the

7    relevant records?

8    A.   There were no records available to me on

9    this case.

10   Q.   Are you aware of any communications between

11   DD3 and Disney or Disney affiliate regarding the SHST

12   case?

13   A.   Yeah.

14   Q.   Let's go to matter No. 4, please.  Okay.

15        How did you prepare for matter No. 4,

16   Ms. Munro?

17   A.   I read through the contract just to refresh

18   myself after all of this time as to what level of

19   detail and methodology included.

20        I cross-referenced that to the bid that I

21   produced as a live bid by some of the initial dates

22   for the show, and nowhere in there was Mova facial

23   performance capture or Mova services.

24   Q.   Did you speak with anyone regarding your

25   preparation for this matter?

1          The only thing provided was animation, some

2    of which used processed Mova data as the basis, but

3    none of that Mova data was passed to animation after

4    June 17th, 2016, again by Storm, DMX, and Shotgun

5    records.

6        Q.    Did you speak with anyone during your

7    preparation to confirm this?

8        A.    Not really.  It's kind of similar to the

9    last one, so I would have nothing more to add.

10       Q.    And let's go to matter No. 21.

11             Ms. Munro, what did you do today to prepare

12    to testify -- I'm sorry.

13             What did you do to -- strike that.

14             What did you do to prepare to testify today

15    regarding matter No. 21?

16       A.    I communicated with Joseph Gabriel at DD,

17    who handled all of our project contracts.

18             MR. HYAMS:  That's all I have.  Thank you.

19               EXAMINATION BY MS. YOUNG

20    BY MS. YOUNG:

21       Q.    Ms. Munro, I have few questions, and they

22    should be short, but I want to clean up a few things.

23             Can we please pull up tab 2, what we marked

24    as Exhibit 273.

25             So Ms. Munro, this is a very detailed

**REARDEN LLC, ET AL. vs TWDC ENTERPRISES 18 CORP., ET AL.**
Gayle Munro on 03/10/2023                                    Page 244

```
 1    UNITED STATES DISTRICT COURT     )
      NORTHERN DISTRICT OF CALIFORNIA )  ss.
 2    OAKLAND DIVISION                 )

 3

 4         The witness, GAYLE MUNRO, in the foregoing
      deposition appeared before me, Dianne Coughlin, a
 5    Certified Shorthand Reporter in and for the State of
      California.
 6
           Said witness was then and there at the time and
 7    place previously stated, by me placed under oath to
      tell the truth, the whole truth, and nothing but the
 8    truth in the testimony given on the date of the
      within deposition.
 9
           The testimony of the witness and all questions
10    and remarks requested by Counsel and reported
      thereafter, under my direction and control, caused to
11    be transcribed into typewritten form by means of
      Computer-Aided Transcription.
12
           I am a Certified Shorthand Reporter licensed by
13    the State of California.  I further certify that I am
      not of counsel or attorney for either or any of the
14    parties to the case named in the within caption, and
      that I am not related to any party thereto.
15
           IN WITNESS WHEREOF, I have hereunto affixed my
16    signature this 11th day of March, 2023.

17

18

19    _____
      Dianne Coughlin, RDR, CRR
20    California Certified Shorthand Reporter No. 10418

21

22

23

24

25
```

```
 1                    CHANGES AND SIGNATURE

 2    WITNESS NAME: Gayle Munro, 03/10/2023

 3    PAGE      LINE      CHANGE                 REASON

 4     8         2        "via fix" to "vfx"        Misheard what I said

 5     71        8        "I coordinate" to "coordinator"   Correction

 6     81        8        "spirit" to "Aspera"      Correction

 7    119        22       "THE WITNESS" to "MR CARLSON"

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20       I, Gayle Munro, have read the foregoing

21    transcript and hereby affix my signature that same is

22    true and correct, except as noted above.

23                          Gayle Munro

24                      _____

25                          Gayle Munro
```