# ATTACHMENT

# [PROPOSED] REDACTED VERSION OF DKT. 555

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REARDEN LLC, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>THE WALT DISNEY COMPANY, et al.,<br><br>          Defendants. | Case No. 17-cv-04006-JST<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF No. 421 |

Before the Court is the motion for summary judgment of Defendants The Walt Disney Company; Walt Disney Motion Pictures Group, Inc.; Walt Disney Pictures; Buena Vista Home Entertainment, Inc.; Marvel Studios LLC; Mandeville Films, Inc.; Infinity Productions LLC; and Assembled Productions II LLC (collectively, "Disney"). ECF No. 421. The Court will grant the motion in part and deny it in part.

**I.     BACKGROUND**

The factual and procedural background of this case are summarized in greater detail in this Court's prior orders. ECF Nos. 60, 85, 297. In short, Plaintiff Rearden LLC developed and owns MOVA Contour Reality Capture ("MOVA")—a program for capturing the human face to create computer graphics ("CG") characters in motion pictures. MOVA has been used in the production of various motion pictures, including *The Curious Case of Benjamin Button* (Paramount Pictures 2008); *Harry Potter and the Deathly Hallows, Part I* (Warner Bros. Pictures 2010)*, and *Pirates of the Caribbean: on Stranger Tides* (Walt Disney Pictures 2011). ECF No. 315 ¶¶ 38, 60.

This Court initially adjudicated a dispute between Rearden LLC and Shenzhenshi Haitiecheng Science and Technology Company ("SHST") concerning the ownership of equipment and intellectual property associated with MOVA ("Ownership Litigation"). SHST is a Chinese

entity associated with Digital Domain 3.0, Inc. ("DD3"), a visual effects company with whom

Disney contracted to perform facial capture services for several of its motion pictures.  ECF No.

315 ¶¶ 98–124; *see Shenzhenshi Haitiecheng Sci. and Tech. Co., LTD. v. Rearden LLC* ("*SHST*"),

No. 15-cv-00797-JST, 2017 WL 3446585 at *2, *7. (N.D. Cal. Aug. 11, 2017).  The facts of that

case pertinent to the dispute at hand are as follows:

> Steve Perlman has founded a series of entities under the Rearden name that act as technology incubators by developing new technologies, assigning them to subsidiaries, and – if the technologies are successful – spinning the subsidiaries off as separate companies.   In 2007, Perlman transferred the MOVA technology to OnLive, Inc., another one of Perlman's incubated companies.  OnLive then began providing MOVA services to customers.
>
> In August 2012, OnLive went through an assignment for the benefit of creditors.  As part of that process, OnLive was shut down and reborn as a new company called OL2.  On February 11, 2013, OL2 transferred ownership of the MOVA Assets to MO2, LLC – an entity owned by Rearden LLC.  At that time, Greg LaSalle, who had been involved with the development of MOVA and had at various times worked for Rearden and OnLive, was in the process of negotiating the sale of MOVA assets to DD3. Ultimately, LaSalle sold the assets to SHST rather than DD3, in an attempt to insulate DD3 from liability. The sale closed on May 8, 2013.  DD3 then licensed the assets from SHST.

*Rearden LLC v. Crystal Dynamics, Inc.*, No. 17-cv-04187-JST, 2019 WL 8275254, at *2 (N.D.

Cal. July 12, 2019) (citations omitted).

The Court issued a preliminary injunction prohibiting the sale, use, movement,

concealment, transfer or disposal of MOVA Assets by SHST or Virtual Global Holdings

Limited—a subsidiary of Digital Domain Holdings Limited.  *See Virtue Glob. Holdings Ltd. v.*

*Rearden LLC*, No. 15-cv-00797-JST, 2016 WL 9045855, at *2, *10 (N.D. Cal. June 17, 2016).

After a bench trial, the Court dissolved the injunction and held that "Rearden, not . . . DD3, owns

and at all relevant times has owned the MOVA Assets."  *SHST*, 2017 WL 3446585, at *9.  The

Court found that LaSalle never owned the MOVA assets or possessed the authority to sell them

such that the transfer of the assets to SHST was invalid.  *Id.*  The Court further ordered the return

of those assets to Rearden, which included "MOVA Software, Source code, and Output files."

Order Regarding the Return of MOVA Assets 1, *SHST*, No. 15-cv-00797-JST (N.D. Cal. Oct. 2,

1   2017), ECF No. 449.  The Court also "retain[ed] jurisdiction to enforce its Orders regarding the

2   return of MOVA Assets to Rearden."  Judgment 2, *SHST*, No. 15-cv-00797-JST (N.D. Cal. Aug.

3   28, 2018), ECF No. 493.  Additionally, the Court appointed a special master to "adjudicate all

4   post-trial disputes related to the enforcement of the Court's judgment and orders regarding the

5   return of MOVA Assets to Rearden, . . . including the identification, preservation, and return to

6   Rearden of any and all MOVA Assets."  Order Appointing Hon. Edward A. Infante (Ret.) as

7   Special Master Pursuant to Federal Rule of Civil Procedure 53, at 1, *SHST*, No. 15-cv-00797-JST

8   (N.D. Cal. June 17, 2019), ECF No. 529.

9        Contemporaneously, Rearden filed a series of lawsuits, including the instant suit against

10  Disney, bringing copyright and trademark infringement claims against several motion picture

11  studios that allegedly used MOVA in producing motion pictures and video games.  *See Rearden*

12  *LLC v. Walt Disney Company*, 293 F. Supp. 3d. 963, 967–68 (N.D. Cal. 2018).  In 2022, Rearden

13  filed an additional lawsuit against Disney, bringing copyright and patent infringement claims for

14  Disney's alleged use of MOVA in the films *Avengers: Infinity War* (2018) and *Avengers:*

15  *Endgame* (2019).  *See Rearden LLC v. TWDC Enters. 18 Corp.*, No. 22-cv-02464-JST, 2023 WL

16  3579324, at *1–2 (N.D. Cal. Feb. 21, 2023).  Proceedings in all of these cases are ongoing.  *See*

17  Case Nos. 17-cv-04006-JST, 17-cv-04187-JST, 17-cv-04191-JST, 17-cv-04192-JST, 22-cv-

18  02464-JST.

19       In this case, Plaintiffs Rearden LLC and MOVA LLC (collectively, "Rearden") bring

20  claims for contributory copyright infringement, vicarious copyright infringement, and trademark

21  infringement against Disney.  Rearden alleges that each time DD3 used MOVA, "the computers

22  made a copy of the . . . program in their CPU's RAM without authorization from Rearden," thus

23  infringing on Rearden's copyright.  ECF No. 315 ¶ 120.  Rearden further alleges that Disney is

24  secondarily liable for this infringing conduct because Disney contracted with DD3 for DD3 to

25  provide facial capture services using MOVA in order to create CG characters in the motion

26  pictures *Guardians of the Galaxy* (2014), *Avengers: Age of Ultron* (2015), and *Beauty and the*

27  *Beast* (2017).   ECF No. 315 ¶¶ 98–124.

28       The Court previously granted summary judgment to Disney as to Rearden's copyright

United States District Court
Northern District of California

infringement claims predicated on *Guardians of the Galaxy* and *Avengers: Age of Ultron* on the ground that Rearden failed to identify evidence showing a causal nexus between Disney's alleged infringement and the gross revenue generated by the films. *See Rearden LLC v. Walt Disney Co.*, Case Nos. 17-cv-04006-JST & 17-cv-04191-JST, 2021 WL 4099622, at *5 n.4 (N.D. Cal. Aug. 17, 2021); *Rearden LLC v. Walt Disney Co.*, Case Nos. 17-cv-04006-JST & 17-cv-04191-JST, 2022 WL 2064976, at *3–4 (N.D. Cal. June 8, 2022).

Prior to filing the instant motion, Disney moved to preclude Rearden from presenting evidence or argument based on the copying of various script lines in Maya files ("Maya Scripts"). ECF No. 395. The Court granted the motion on the ground that Rearden did not timely disclose its reliance on Maya Scripts evidence, and its lack of timely disclosure was neither substantially justified nor harmless. ECF No. 482.

Disney now moves for summary judgment as to all of Rearden's claims predicated on *Beauty and the Beast*, for which DD3 used MOVA to create the CG face of the Beast, performed by actor Dan Stevens. ECF No. 315 ¶¶ 2, 117–24. The parties concurrently moved to exclude portions of the expert reports and/or testimonies of Alberto Menache, Cindy Ievers, Phillip Fier, Dr. Stephen Lane, and Robert Wunderlich. ECF Nos. 422, 424, 425, 429, 431. The Court excluded the testimony of Cindy Ievers, 553; excluded the testimony of Philip Fier on the issues of apportionment, issues of law, and causal nexus, ECF No. 539; denied the motion to exclude portions of the testimony of Dr. Stephen Lane, ECF No. 541; and denied the motion to exclude portions of the testimony of Robert Wunderlich, ECF No. 526.[1] Having determined what evidence is properly before the Court on this motion, the Court now turns to the motion itself.

## II.     JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331.

## III.     LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[1] The motion to exclude the testimony of Alberto Menache is still under submission.

United States District Court
Northern District of California

56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court must consider all evidence in the light most favorable to the non-moving party. *Isbell v. City of San Diego*, 258 F.3d 1108, 1112 (9th Cir. 2001).

Where the party moving for summary judgment would not bear the burden of proof at trial, that party "bears both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). In order to carry its initial burden of production, the moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* In order to carry its ultimate burden of persuasion, "the moving party must persuade the court that there is no genuine issue of material fact." *Id.*

If the moving party satisfies its initial burden of production, the nonmoving party "must produce evidence to support its claim or defense." *Id.* at 1103. The nonmoving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). It is not the duty of the court "to scour the record in search of a genuine issue of triable fact." *Id.* (quoting *Richards*, 55 F.3d at 251). "[A] mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 249 (1986)). If the nonmoving party fails to make this showing, the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

# IV.    DISCUSSION

## A.    Copyright Claims

### 1.    Contributory Copyright Infringement

"To establish secondary [copyright] infringement," Rearden "must first demonstrate direct infringement." *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 937 (9th Cir. 2010).  Disney does not dispute that DD3 copied MOVA software code into RAM without authorization from Rearden, ECF No. 421, and that "the loading of software into RAM creates a copy under the Copyright Act," *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 519 (9th Cir. 1993).  Accordingly, DD3's conduct violated Rearden's "exclusive reproduction right." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 857 (9th Cir. 2017).

"Contributory liability requires that a party '(1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement.'" *VHT, Inc. v. Zillow Grp.*, 918 F.3d 723, 745 (9th Cir. 2019) (quoting *Perfect 10, Inc. v. Visa Int'l Serv., Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007)).  The first element is satisfied where "the secondary infringer know[s] or has reason to know of direct infringement,"[2] *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 943 (9th Cir. 2011) (quoting *A&M Records, Inc. v. Napster, Inc.*, 239

---

[2] The parties dispute whether actual knowledge of direct infringement is required.  *Compare* ECF No. 421 at 14 *with* ECF No. 451 at 9.  Earlier Ninth Circuit cases, such as *Louis Vuitton Malletier*, articulated the standard as one in which actual or constructive knowledge is sufficient.  658 F.3d at 943; *see also Ellison v Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).  In a later case, *Luvdarts, LLC v. AT & T Mobility, LLC*, the Ninth Circuit wrote that "'actual knowledge of specific acts of infringement' is required for contributory infringement liability." 710 F.3d 1068, 1072 (9th Cir. 2013) (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1021 (9th Cir. 2001)).  This Court previously found it "dubious . . . that the three judge-panel in *Luvdarts sub silentio* overruled an entire line of Ninth Circuit cases." *Rearden LLC v. Crystal Dynamics, Inc.*, No. 17-cv-04187-JST, 2019 WL 8275254, at *9 n.9 (N.D. Cal. July 12, 2019).  Further, the Ninth Circuit more recently acknowledged that contributory trademark infringement occurs where a party "'continues to supply its product to one whom it knows *or has reason to know* is engaging in trademark infringement,'" and wrote that the standard for contributory trademark infringement is "at least as demanding as" as the standard for contributory copyright infringement. *Y.Y.G.M. SA v. Redbubble, Inc.*, Nos. 21-56150 & 21-56236, 2023 WL 4697350, at *4 (9th Cir. July 24, 2023) (quoting *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 854, (1982) (emphasis added)).  If the standard for contributory trademark infringement is at least as demanding as the standard for contributory copyright infringement, and the former permits a showing of either actual or constructive knowledge, then the latter must as well.  However, the Ninth Circuit has not expressly resolved this tension in the caselaw, *see Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 832 (9th Cir. 2019), and the Court need not because the outcome here is the same under either formulation of the standard.

United States District Court
Northern District of California

F.3d 1004, 1020 (9th Cir. 2001)), but "requires more than a generalized knowledge . . . of the possibility of infringement," *Luvdarts, LLC v. AT & T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013).

Disney argues that Rearden cannot satisfy the "knowledge" element of contributory infringement because Disney could not have known that DD3's conduct was infringing until this Court held in *SHST* that Rearden owns the MOVA assets, which occurred after *Beauty and the Beast* was released in theaters. Rearden argues that this argument is "a red herring," and identifies evidence that it argues demonstrates actual or constructive knowledge. ECF No. 451 at 14.

The evidence Rearden identifies includes meetings in 2008 between Steve Perlman and Disney executives in which Perlman presented PowerPoint slides that described MOVA as one of the "[s]ister [c]ompanies in [the] Rearden incubator," ECF No. 448-8 at 6; *see* ECF No. 448-5 at 4–20; Disney's, Marvel's, and 20th Century Fox's work with Rearden on six films between 2008 and 2012, three of which included MOVA in their screen credits, ECF No. 451-3 at 2; ECF No. 451-29 at 2; ECF No. 451-30 at 2; a 2012 e-mail chain in which Disney executives discussed an e-mail from the CEO of OnLive inquiring as to whether Disney would be interested in purchasing MOVA, ECF No. 448-9; Greg LaSalle's testimony in the *SHST* litigation that he gave Disney a copy of a 2013 letter from Rearden's attorneys informing him that he did not own MOVA, which caused Disney to back out of discussions with LaSalle about acquiring MOVA from Rearden, ECF No. 451-11 at 2–5; and a February 6, 2015 article in the *Hollywood Reporter* that quotes Perlman as saying he "never granted Digital Domain a license," ECF No. 451-14 at 3. Rearden also argues that Disney should have performed intellectual property due diligence investigations consistent with the Motion Picture Association of America's best practices guidelines, which would have apprised Disney of Rearden's claim to ownership of the MOVA assets. *See* ECF No. 451-4 at 2–3; 451-7 at 2–6.

All of the foregoing interactions involving Disney pre-date LaSalle's May 8, 2013 sale of the MOVA assets to SHST and are thus "not probative as to whether [Disney] knew in [2015] that DD3, which had licensed the MOVA assets from SHST, was not authorized to use MOVA technology." *Crystal Dynamics,* 2019 WL 8275254, at *10. More to the point, Disney entered

into its contract with DD3 on March 31, 2015. ECF No. 448-11 at 2. *Beauty and the Beast* opened on March 17, 2017, and this Court did not hold that Rearden owned MOVA until August 11, 2017, nearly five months after the film opened. ECF No. 315 ¶ 1; ECF No. 419-10 at 48. As this Court previously observed, the resolution of the ownership dispute turned on "intensely factual issues," that centered around the question of whether LaSalle had the actual or apparent authority to transfer the MOVA assets to SHST. *Crystal Dynamics*, 2019 WL 8275254, at *10; *see generally SHST*, 2017 WL 3446585, at *8–10. As revealed at trial, those factual issues spanned a short but intricate history as to which no party's testimony was entirely credible, *SHST*, 2017 WL 3446585, at *1 n.3, and included the terms of agreements LaSalle signed at the onset of his employment; the character of the conduct of Perlman, LaSalle, and others throughout the relevant time period; and the circumstances surrounding the transfer of MOVA to SHST. Thus, even if Disney learned of the *SHST* litigation on February 23, 2016, *see* ECF No. 448-10 at 11, saw the *Hollywood Reporter* article, or conducted a due diligence investigation and learned of the contested ownership of the MOVA assets, Rearden's claim that it owned the MOVA assets was "anything but readily verifiable" because the underlying ownership issue "turn[ed] on complex analysis of" circumstances that "require[d] resolution by a trier of fact." *Faulkner v. Nat'l Geographic Soc'y*, 211 F. Supp. 2d 450, 474–75 (S.D.N.Y. 2002). Disney, as a nonparty to the *SHST* litigation, was not adequately positioned to ascertain the veracity of Rearden's ownership claim. *Cf. Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1374 (N.D. Cal. 1995). Moreover, the instant infringement claim is a step removed from the ownership claim that Rearden asserted in the *SHST* litigation. Accordingly, Disney's knowledge of Rearden's ownership claim equates to, at best, an insufficient "generalized knowledge . . . of the possibility of infringement" by DD3. *Luvdarts*, 710 F.3d at 1072. Disney is therefore entitled to summary judgment as to Rearden's contributory infringement claim.

### 2. Vicarious Copyright Infringement

To establish various copyright infringement, "[Rearden] must prove [Disney] has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *VHT*, 918 F.3d 723 (quoting *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657,

8

673 (9th Cir. 2017)). "A vicarious infringer 'exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so.'" *Williams v. Gaye*, 895 F.3d 1106, 1132 (9th Cir. 2010) (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007)).

The Court finds that there is a genuine issue of material fact as to whether Disney had the practical ability to stop or limit the infringing conduct for two reasons. First, the contract between DD3 and Disney secures for Disney considerable control over DD3's services such that it is possible that Disney could have, as a practical matter, taken affirmative steps to stop or limit DD3's use of MOVA. The contract entitled Disney "██████████████████████████████ ████████████████████," ECF No. 448-11 at 2; ███████████████████████████ ███████████████████████████████████████ *id.* at 3; ███████████████████████ ████████████████████████████████████████████████ ECF No. 448-11 at 4; entitled Disney ████████████████████████████ *id.* at 5; retained for Disney "█████████████████████████████████████████████████████████████," *id.* at 6; warranted that █████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████ ███████████████████████ " *id.* at 11; and reserved for Disney ████████████████ ████████████████████, *id.* at 9.

A reasonable trier of fact could conclude that Disney's ability to ███████████ ███████████████████████████████ ███████████████████████████████████████, afforded Disney the practical ability to supervise, limit, or stop DD3's use of MOVA. *See Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996) (holding that a company's ability "to police its vendors under [the company's] . . . broad contract with its

1  vendors[ ]was sufficient to satisfy the control requirement"); *Napster*, 239 F.3d at 1023–24

2  (holding that Napster had the ability to police infringing conduct because it had "the ability to

3  locate infringing material listed on its search indices, and the right to terminate users' access to the

4  system").

5        Disney protests that, under the Ninth Circuit's holding in *Perfect 10, Inc. v. Amazon.com*, a

6  contractual relationship goes to the question of the legal right to control, not the practical ability to

7  do so. *See* ECF No. 462 at 9. Disney misstates the holding of that case. The Ninth Circuit held

8  that Google's right to terminate advertising partnerships with third-party websites did not give

9  Google the legal right to stop infringement because terminating the partnerships would not inhibit

10  the websites from "reproduc[ing], display[ing], and distribut[ing]" the content at issue.

11  *Amazon.com*, 508 F.3d at 1174. The Ninth Circuit further held that Google lacked the practical

12  ability to police this conduct because "Google's supervisory power [wa]s limited" because it

13  lacked "image-recognition technology" that would have allowed it to identify the conduct at issue.

14  Nothing in the Ninth Circuit's opinion suggest that a party's practical ability to police the

15  infringing conduct of another party cannot arise from a contractual relationship between the two.

16  And unlike Google's contract with third-party websites on the internet, Disney's contract with

17  DD3 affords Disney considerable supervisory power over DD3's conduct in connection with

18  *Beauty and the Beast*.

19        Second, evidence in the record creates a genuine dispute of material fact as to whether

20  Disney could have limited or stopped DD3's use of MOVA during the production process. One of

21  Disney's representatives on the set of *Beauty and the Beast*, Steve Gaub, participated in the

22  decision to use facial motion capture in the film, ECF No. 448-15 at 7, oversaw the visual effects

23  vendors and supervised the visual effects supervisors on the project, *id.* at 3, and attended the

24  MOVA facial capture sessions, *id.* at 7. Additionally, Disney hired Bill Condon to direct the film

25  pursuant to a contract that requires Condon to furnish his services "██████████████████

26  ECF No. 448-14 at 5. Condon also attended the MOVA facial performance capture sessions, ECF

27  No. 448-15 at 9, and he participated in selecting shots for further processing using the MOVA

28  software, *id.* at 12; *see* ECF No. 448-16 at 2. The MOVA software was copied into RAM when

United States District Court
Northern District of California

MOVA was used on a computer.  ECF No. 448-2 at 8–9, *see id.* at 11–12.  And according to Disney's own expert, the MOVA software was used to "control[] the hardware's video recording operations" during a facial performance capture session and thereafter "process[] the captured data into output files . . . in the form of a 'tracked mesh'" by "track[ing] points on the face across multiple frames of captured motion data."  ECF No. 420-8 at 18.

If running the software makes a copy in a computer's RAM, and the software was used both during and after the capture sessions, then a reasonable trier of fact could conclude that Gaub's and Condon's involvement in the production process afforded Disney the practical ability to limit or stop DD3's use of MOVA in connection with the film.  In view of the contract between Disney and DD3, Disney, through these individuals, could simply have declined to proceed with the MOVA facial motion capture sessions altogether, instructed DD3 to use an alternative, or instructed DD3 not to process the captured data into output files.

For each of these two reasons, the Court concludes that there is a genuine issue of material fact as to whether Disney had the practical ability to control DD3's conduct.

Disney sets forth three arguments to the contrary.  First, Disney argues that it lacked a practical ability because it could not "directly observe" DD3's "copying of MOVA into RAM." ECF No. 421 at 19.  This argument ignores the evidence that Disney, through its representatives, did, in fact, directly observe DD3's conduct when the MOVA software was used during facial capture sessions.  Further, this argument seeks to impose a requirement of direct observation that is absent from the caselaw.  While Disney discusses a number of cases in which courts have found a practical ability where the vicarious infringer could directly observe the conduct, none of those cases imposed direct observation as a requirement.  Rather, the vicarious infringer must have the practical ability to "supervise" the infringer.  *VHT*, 918 F.3d 723 (quoting *Giganews, Inc.*, 847 F.3d at 673).  As a matter of common sense, a party can supervise another party without directly observing that party at all times.  Disney's receipt of weekly progress reports from DD3, discussed above, is one such example.

Second, Disney argues that it did not have the ability to recognize that DD3 was infringing. As the Supreme Court has observed, however, "vicarious liability . . . allows imposition of

11

liability . . . even if the defendant initially lacks knowledge of the infringement."  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 n.9 (2005); *see Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 308 (2d Cir. 1963) ("The imposition of [vicarious] liability . . . , even in the absence of an intention to infringe or knowledge of infringement, is not unusual."); *Crystal Dynamics*, 2019 WL 8275254, at *7 ("Because 'vicarious infringement's roots lie in the agency principles of *respondeat superior*,' it does not matter 'whether or not the person [with supervisory authority] knew of the infringement.'" (alteration in original) (citations omitted) (first quoting *Visa Int'l Serv. Ass'n*, 494 F.3d at 802; and then quoting *In re Barboza*, 545 F.3d 702, 709 (9th Cir. 2008))).

Third, Disney argues that it was impractical to supervise DD3's use of MOVA because DD3 was "one of four visual effects companies and over a hundred vendors that [Disney] contracted with on [*Beauty and the Beast*]" and "used over 20 different software tools other than MOVA just for its work on the Beast's face."  ECF No. 419-3 at 20.  Whether this task would, in fact, be impractical for a company of Disney's size and wherewithal is something a jury must decide.

In the alternative, Disney argues that it did not have a direct financial interest in DD3's use of MOVA after this Court's issuance of the preliminary injunction in the *SHST* litigation because Disney did not use in the film any shots prepared by DD3 using MOVA after that point.  *See* ECF No. 421-14 at 3, 4–5; ECF No. 420-8 at 64–65.  Rearden does not offer any argument in opposition, nor does it identify any evidence to the contrary.  Therefore, the Court concludes that Rearden has failed to carry its burden to create a dispute of material fact as Disney's financial benefit in connection with DD3's post-injunction use of MOVA.  *See Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 829 (9th Cir. 2019) ("The essential aspect of the direct financial benefit inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps . . . ." (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004))).  Accordingly, Disney is not entitled to summary judgment as to Rearden's vicarious infringement claim for DD3's pre-injunction use of MOVA, but Disney is entitled to summary judgment as to Rearden's claim for DD3's post-injunction use of MOVA.

### 3. Actual Damages

Disney argues that it is entitled to summary adjudication on Rearden's claim for actual damages. Concurrently with its motion for summary judgment, Rearden moved to exclude the expert testimony of Cindy Ievers—Rearden LLC's Vice President of Finance—as to Rearden's actual damages. *See* ECF No. 424. Disney argues that, without Ms. Ievers's opinions, Rearden fails to create a genuine dispute of material fact as to actual damages. Rearden concedes that its claim for actual damages is dependent on the outcome of that separate motion. ECF No. 451 at 27 ("If Disney's motion to exclude Ms. Ievers's testimony is denied, then its motion for summary judgment on Rearden's actual damages fails."). The Court granted Disney's motion on the ground that Ms. Ievers's testimony was irrelevant to the question of the fair market value of the MOVA software. Namely, Ms. Ievers failed to consider the amount that a hypothetical willing buyer would pay to use the MOVA software in a manner akin to that of DD3. *See Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985). The Court has excluded Ms. Ievers's testimony, and Rearden has otherwise failed to identify any evidence as to what a willing buyer would pay. Accordingly, Disney is entitled to summary adjudication as to Rearden's claim for actual damages.

### 4. Maya Scripts

The parties dispute whether evidence that DD3 copied Maya Scripts constitutes evidence of copyright infringement. Because the Court previously issued an order excluding evidence of Maya Scripts infringement on the ground that Rearden did not timely disclose its reliance on Maya Scripts evidence, ECF No. 482, Disney is entitled to summary adjudication as to Rearden's vicarious infringement claim to the extent that it is predicated on this theory.

### 5. Indirect Profits and Causal Nexus

Rearden seeks Disney's allegedly wrongful profits from Disney's sale of *Beauty and the Beast* merchandise and music. "[T]o survive summary judgment on a demand for indirect profits pursuant to [17 U.S.C.] § 504(b), a copyright holder must proffer sufficient non-speculative evidence to support a causal relationship between the infringement and the profits generated indirectly from such an infringement." *Mackie v. Rieser*, 296 F.3d 909, 915–16 (9th Cir. 2002).

United States District Court
Northern District of California

1    "[A] copyright owner is required to do more initially than toss up an undifferentiated gross

2    revenue number; the revenue stream must bear a legally significant relationship to the

3    infringement." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004).  This

4    principle requires that "a plaintiff seeking to recover indirect profits must 'formulate the initial

5    evidence of gross revenue duly apportioned to relate to the infringement.'" *Id.* (quoting 4 Nimmer

6    on Copyright § 14.03, 14–34).  Accordingly, "[w]hen an infringer's profits are only remotely and

7    speculatively attributable to infringement, courts will deny recovery to the copyright owner." *Id.*

8    (quoting 4 Nimmer on Copyright § 14.03, 14–34).

9          Disney argues that Rearden lacks evidence showing a causal nexus between DD3's

10   infringement of the MOVA copyright and revenues from merchandise and music related to *Beauty*

11   *and the Beast*.  Rearden argues that it has offered evidence "in the form of [Philip] Fier's [expert]

12   opinion and Disney's internal accounting practice of allocating consumer product and music

13   revenue to *Beauty and the Beast*."  ECF No. 447-3 at 27.

14         The Court has excluded Mr. Fier's opinion as to the portion of Disney's motion picture

15   profits attributable to DD3's infringing use of MOVA because Mr. Fier failed to ground his

16   analysis in any coherent methodology.  Evidence as to Disney's internal allocations of

17   merchandise and music revenue to *Beauty and the Beast* is not "initial evidence of gross revenue

18   *duly apportioned to relate to the infringement*." *Polar Bear Prods.*, 384 F.3d at 711 (emphasis

19   added) (quoting 4 Nimmer on Copyright § 14.03, 14–34).  The evidence in the record establishes

20   that MOVA was not entirely responsible for the creation of the Beast's face and that MOVA was

21   not used in all of the shots in which the Beast appeared.  *See, e.g.*, ECF No. 420-8 at 28–47, 48–

22   50; ECF No. 420-34 at 3; ECF No. 420-33 at 3.  Rearden's invocation of Disney's internal

23   allocations, without more, does not translate the percentage of the process of creating the Beast's

24   face attributable to MOVA in the shots where MOVA was used into any particular portion of

25   those allocations.  Put differently, even if the merchandise and music revenue are attributable to

26   the film in some way, the Court can "surmise virtually endless permutations to account for an

27   individual's decision" to make those purchases on the basis of the film.  *Mackie*, 916 F.3d at 916.

28   Disney's internal allocations are thus too speculative to establish a causal link, and Rearden cites

                                                    14

no case to the contrary.  *Cf. Polar Bear Prods.*, 384 F.3d at 711 (holding that evidence of a causal link was "woefully insufficient" where there were "too many question marks remain[ing] between the" infringing conduct and the increase in sales).  Rearden has thus failed to create a dispute of material fact as to the existence of a causal nexus, and Disney is therefore entitled to summary adjudication as to indirect profits from Disney's merchandise and music sales.

### B.   Trademark Claims

#### 1.   Trademark Infringement

Disney argues that it engaged in a nominative fair use of the MOVA trademark under the inquiry articulated by the Ninth Circuit in *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302 (9th Cir. 1992).  Rearden argues that the defense is inapplicable and, that the applicable test is set forth by the Ninth Circuit in *AMF Inc v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), and that there is a likelihood of confusion under that test.

Nominative fair use "protects a defendant 'where the use of the trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one.'"  *Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071, 1081 (9th Cir. 2015) (quoting *New Kids*, 971 F.2d at 308).  "This principle recognizes the proposition that '[t]rademark law generally does not reach the sale of genuine goods bearing a true mark even though such sale is without the owner's consent.'"  *Id.* (alteration) (quoting *Am. Circuit Breaker Corp. v. Oregon Breakers Inc.*, 406 F.3d 577, 585 (9th Cir. 2005)).  The nominative fair use inquiry "replaces the usual *Sleekcraft* test as the proper measure of consumer confusion when a defendant uses the mark to refer to the trademarked good itself."  *Id.*

The parties' disagreement as to the applicability of the nominative fair use inquiry stems from their competing characterizations of the complaint.  Disney characterizes the complaint as bringing a trademark claim based on Disney's use of the MOVA mark, whereas Rearden contends that the complaint "makes clear that Rearden used the CONTOUR trademark," not the MOVA trademark, "to identify the *technology*" itself.  ECF No. 451 at 28 (emphasis in original).

Contrary to Rearden's characterization, Rearden's trademark claim is predicated on Rearden's allegation that "[w]ithout authorization, Disney . . . used Rearden's *MOVA mark* in

commerce in connection with commercial advertising and promotion of its . . . *Beauty and the Beast* film[], including press kits, press releases, press conferences, and other advertising and promotional activities." ECF No. 315 ¶ 76 (emphasis added). In connection with its trademark claim, Rearden refers explicitly and exclusively to the MOVA mark, *id.* ¶¶ 188–201, and alleges that the "MOVA mark has acquired secondary meaning indicating that Rearden is the exclusive origin of the MOVA Contour performance capture *technology* and services," *id.* ¶ 191 (emphasis added). Thus, per Rearden's own allegations, the MOVA mark identifies the technology, and Rearden identifies no probative evidence to the contrary. *See Hakopian v. Mukasey*, 551 F.3d 843, 846 (9th Cir. 2008) ("Allegations in a complaint are considered judicial admissions."). Because Disney featured the MOVA mark in connection with a film featuring shots created in part using the facial capture technology, it follows that Disney "use[d] the [MOVA] mark to refer to the trademarked good itself" such that "the *Sleekcraft* analysis does not apply." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175 (9th Cir. 2010); *see id.* ("The Tabaris are using the term Lexus to describe their business of brokering Lexus automobiles; when they say Lexus, they mean Lexus."); *Adobe Sys.*, 809 F.3d at 1078 2 ("The bottom line is that Christenson's nominal use of the marks was to identify the products themselves. . . .").

To determine whether Disney's nominative use of the MOVA mark was fair, the Court asks "whether (1) the product was 'readily identifiable' without use of the mark; (2) defendant used more of the mark than necessary; or (3) defendant falsely suggested [it] was sponsored or endorsed by the trademark holder." *Toyota Motor Sales*, 610 F.3d at 1175–76 (quoting *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 801 (9th Cir. 2002)). The inquiry focuses on the "reasonably prudent consumer in the marketplace." *Id.* at 1176 (quoting *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1988)).

Here, the parties agree that the relevant marketplace is the "movie, game, and visual effects studios in the market for facial motion capture services." ECF No. 421 at 30; ECF No. 451 at 31 (quoting ECF No. 421 at 30). Disney argues that it satisfies this inquiry because Rearden has no evidence that MOVA was readily identifiable without the mark, that Disney used more of the MOVA mark than necessary, or that Disney falsely suggested it was sponsored by Rearden.

1   Rearden argues that Disney cannot satisfy the first prong because MOVA "was already known to

2   the VFX industry as CONTOUR," and that Disney cannot satisfy the third prong because

3   "Disney's use of the MOVA mark . . . inherently implies sponsorship or endorsement by

4   Rearden." ECF No. 451 at 29. Rearden does not challenge Disney's argument as to the second

5   prong. Accordingly, the second prong is satisfied. *See Toyota Motor Sales*, 610 F.3d at 1182–83;

6   *Nissan Fire*, 210 F.3d at 1102–03.

7          As to the first prong, Rearden's argument is repetitive of its argument as to why the

8   nominative fair use defense is inapplicable. Rearden neither argues nor identifies evidence

9   showing that the trademarked facial capture technology was readily identifiable without the use of

10  the MOVA mark. Nor does Rearden identify any evidence in support of its assertion that MOVA

11  was already known to the industry as CONTOUR. Instead, Rearden points to an allegation in the

12  operative complaint, *see* ECF No. 451 at 29 (citing ECF No. 315 ¶ 48), but "[a]ssertions in

13  pleadings are not facts," *United States ex rel. Reagan v. Carolina Liquid Chemistries Corp.*, No.

14  13-cv-01497-JST, 2022 WL 19975389, at *3 n.1 (N.D. Cal. Dec. 20, 2022) (quoting *Dozier v.*

15  *Maispace*, No. C-05-1761 PVT, 2007 WL 518622, at *2 (N.D. Cal. Feb. 13, 2007)). In the

16  absence of any evidence to the contrary, the Court concludes that the first prong is satisfied.

17         As to the third prong, Rearden's argument is simply without merit. Rearden does not

18  elaborate as to why the use of the MOVA mark would inherently imply Rearden's sponsorship or

19  endorsement. It cannot be that the mere use of a mark, without more, inherently implies a holder's

20  sponsorship or endorsement. Such a principle would, in every case, "require that the defendant

21  make an affirmative statement that their product is not sponsored [or endorsed] by the plaintiff,"

22  but the Ninth Circuit has expressly rejected that notion. *Mattel, Inc. v. Walking Mountain Prods.*,

23  353 F.3d 792, 811 (9th Cir. 2003).

24         The user of a mark may suggest sponsorship or endorsement where the user takes

25  particular action "in conjunction with the mark," *New Kids*, 971 F.2d at 308, where the user "uses

26  an unnecessary trademark," *Toyota*, 610 F.3d at 1176, or where use of the mark entails a "claim"

27  to that effect, *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1155 (9th Cir. 2002). Rearden

28  identifies no evidence in support of its argument, let alone the requisite evidence suggesting that

United States District Court
Northern District of California

17

any aspect of Disney's use of MOVA in its press materials and at its press conferences suggested Rearden's sponsorship or endorsement. The uncontested evidence Disney identifies in its motion includes a brief five-paragraph discussion of "MOVA facial capture technology" in a 44-page press kit, ECF No. 421–1 at 32–33, and mentions of the technology by the cast in press conferences, *see* ECF No. 419-10 at 36–42. This evidence establishes that Disney's "nominal use of the [MOVA] mark[] was to identify the [facial motion capture technology itself] and not to 'inspire a mistaken belief on the part of the consumer that [Disney] is sponsored or endorsed by [Rearden].'" *Adobe Sys.*, 809 F.3d at 1081 (quoting *Toyota Motor Sales*, 610 F.3d at 1176). The Court concludes that the third prong is satisfied. Disney is therefore entitled to summary judgment as to Rearden's trademark infringement claim.

### 2. Dilution by Blurring

To establish dilution, "a plaintiff must show that (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008). Dilution by blurring "occurs when a mark previously associated with one product also becomes associated with a second." *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1169 (9th Cir. 2011) (quoting *Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1090 (9th Cir. 2010)). 15 U.S.C. § 1125(c)(2)(B) sets forth six factors for courts to consider in determining whether a mark is likely to cause dilution by blurring: (1) "[t]he degree of similarity between the mark or trade name and the famous mark," (2) [t]he degree of inherent or acquired distinctiveness of the famous mark," (3) "[t]he extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark," (4) "[t]he degree of recognition of the famous mark," (5) "[w]hether the user of the mark . . . intended to create an association with the famous mark," and (6) "[a]ny actual association between the mark . . . and the famous mark."

Disney argues that Rearden cannot show that the MOVA mark is famous to the general public. Rearden argues that the mark "was made famous" in its "business-to-business" market "when the Academy for Motion Picture Arts and Sciences awarded MOVA's Contour a Technical

18

1    Achievement award on February 7, 2015."  ECF No. 451 at 32.

2           As a preliminary matter, Rearden's argument focuses on the wrong market.  The statute

3    provides that "a mark is famous if it is widely recognized *by the general consuming public of the*

4    *United States* as a designation of source of the goods or services of the mark's owner."  15 U.S.C.

5    § 1125(c)(2)(A) (emphasis added).  Accordingly, "the requisite level of fame [i]s that of 'a

6    household name.'"  *Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 693 F.3d 859, 870 (9th Cir.

7    2020) (quoting *Thane Int'l., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911 (9th Cir. 2020),

8    *superseded by statute*, Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312, 120 Stat.

9    1730 (codified at 15 U.S.C. § 1125)).

10          The Technical Achievement award cited by Rearden appeared in the February 6, 2015

11   *Hollywood Reporter* article discussed above, but Rearden provides no evidence as to the "extent[]

12   and geographic reach" of this publicity, 15 U.S.C. § 1125(c)(2)(A)(i).  And Rearden does not

13   identify any other evidence as to "[t]he duration, extent, and geographic reach of advertising and

14   publicity of the mark," or "[t]he extent of the actual recognition of the mark."  *Id.*

15   § 1125(c)(2)(A)(i), (iii).  Without more, no reasonable trier of fact could conclude that a single

16   article in the *Hollywood Reporter* resulted in the mark's wide recognition by the general

17   consuming public.  *See Blumenthal Distrib.*, 963 F.3d at 871 (holding that Herman Miller's

18   EAMES trade dresses are not famous although Herman Miller "spent, on average, $550,000 per

19   year on advertising the Eames chairs from 2004 through 2015 . . . ; the Eames chairs appeared in

20   obscure publications . . . ; at the time of trial in 2016, [Herman Miller] had, at the very most,

21   around 875,000 unique followers on Facebook Twitter, and Instagram combined; most of the

22   Eames chairs are sold through a distribution channel consisting of only around 45 independently

23   owned dealers with 130 locations across the country; and the Eames chairs were 'very heavily'

24   featured in the TV show *Mad Men*, have appeared in other TV shows and movies, and have been

25   exhibited at several American museums, including the Museum of Modern Art and the Henry

26   Ford Museum"); *cf. Jada Toys*, 518 F.3d at 635 (holding that the HOT WHEELS mark is famous

27   because "it has been in use for over thirty-seven years; 350 million dollars have been expended in

28   advertising its mark; three billion HOT WHEELS units have been sold since the inception of the

United States District Court
Northern District of California

mark; and HOT WHEELS are sold in all fifty states and throughout the world"). Rearden has thus failed to create a dispute of material fact as to whether the MOVA mark is famous, and Disney is entitled to summary judgment as to Rearden's dilution-by-blurring claim.

## CONCLUSION

For the above reasons, Disney's motion is granted in part and denied in part. The motion is granted as to Rearden's claims for contributory infringement, Rearden's claim for vicarious infringement to the extent Rearden's claim is predicated on DD3's post-injunction use of MOVA and on the Maya Scripts theory, actual damages, indirect profits from *Beauty and the Beast* merchandise and music, and trademark infringement. The motion is otherwise denied as to Rearden's claim for vicarious infringement.

**IT IS SO ORDERED.**

Dated: October 23, 2023



_____
JON S. TIGAR
United States District Judge