**Pages 1 - 85**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

| | |
|---|---|
| REARDEN LLC, ET AL., )<br>)<br>        Plaintiffs, )<br>)<br>  VS. )<br>)<br>THE WALT DISNEY COMPANY, ET )<br>AL., )<br>)<br>        Defendants. )<br>_____ ) | **NO. CV 17-04006-JST** |

Oakland, California
Thursday, November 30, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

> HAGENS BERMAN SOBOL SHAPIRO LLP
> 1301 Second Avenue, Suite 2000
> Seattle, WA 98101
> **BY:  MARK CARLSON, ESQUIRE**
> **JERROD PATTERSON, ESQUIRE**

> HAGENS BERMAN SOBOL SHAPIRO LLP
> 1918 8th Avenue, Suite 3300
> Seattle, WA 98101
> **BY:  GARTH D. WOJTANOWICZ, ESQUIRE**

For Defendants:

> MUNGER TOLLES & OLSON LLP
> 560 Mission Street, 27th Floor
> San Francisco, CA 94105
> **BY:  KELLY KLAUS, ESQUIRE**
> **BLANCA YOUNG, ESQUIRE**
> **STEPHANIE HERRERA, ESQUIRE**

Reported by:        Pamela Batalo Hebel, CSR No. 3593, FCRR, RMR
                    Official Reporter

**APPEARANCES CONTINUED:**


                        MUNGER TOLLES & OLSON LLP
                        350 S. Grand Avenue, 50th Floor
                        Los Angeles, CA 90071
                BY:  **JOHN SPIEGEL, ESQUIRE**
                     **JOHN SCHWAB, ESQUIRE**
                     **ANNE CONLEY, ESQUIRE**
                     **SHANNON AMINIRAD, ESQUIRE**

| | |
|---|---|
| **Thursday - November 30, 2023** | **9:00 a.m.** |

**P R O C E E D I N G S**

**---oOo---**

1        **THE CLERK:**  Your Honor, now calling CV 17-4006-JST,

Rearden, LLC, et al. vs. The Walt Disney Company, et al.

If counsel could please state their appearances for the
record, starting with counsel for plaintiffs.

**MR. CARLSON:**  Good morning, Your Honor.  It's
Mark Carlson for Rearden.  With me today are my colleagues
Jerrod Patterson and Garth Wojitanowicz, who will also be
participating.

**THE COURT:**  Good morning.

**MR. KLAUS:**  Good morning, Your Honor.  Kelly Klaus
from Munger Tolles & Olson for the defendant.  I'm joined by my
colleagues John Spiegel, Blanca Young, and Stephanie Herrera,
who also may be participating.

**THE COURT:**  Good morning.  I don't know if anyone
announced Mr. Schwab's appearance, but I see him on my screen.

**MR. KLAUS:**  I apologize, Your Honor.  That was my
fault.  John Schwab is also here.

**THE COURT:**  Very good.

**MR. CARLSON:**  Also, Your Honor, I think Mr. Perlman
will join us if he's not with us already.

**THE COURT:**  All right.  Let me look in the attendees
column.

1          **THE CLERK:**  I just promoted him, Your Honor.  Or he

2   just declined to be promoted, actually.  So I think he might

3   just watch from the attendees.

4          **THE COURT:**  All right.  Very good.

5      Well, the purpose of this morning's conference is to learn

6   from you whether you believe, having seen the questionnaires,

7   that there are jurors that we should excuse now.  Usually

8   that's for hardship reasons, but you may have other reasons.

9   It's not a time to make arguments to me about why you feel

10  jurors should be excused if your opponent does not agree.

11  We'll do that when we select our jury.

12     And then the other purpose is for you to ask whatever

13  last-minute questions you might have about the trial that we're

14  scheduled to start next week.

15     I didn't print them out, but I have on my computer screen

16  open tabs for my own notes and the set of questionnaires, so I

17  can jump back and forth as I need to.

18     Mr. Carlson, have the parties reached any agreements about

19  jurors that should be excused today?

20          **MR. CARLSON:**  They have, Your Honor.  We believe the

21  parties have agreed that jurors 1, 3, 5, and 7 should be

22  excused -- excuse me.  1, 3, and 57.  1, 3, and 57 should be

23  excused for hardship.

24          **THE COURT:**  Give me just a moment, please.

25     Yeah.  Juror No. 1 will be excused for cause.  He states

1   that he does not speak English sufficiently to serve as a juror

2   in the case.

3        Juror No. 3 will be excused on hardship grounds.  That

4   juror also reports that her English is very limited.  But in

5   addition to that, she has medical issues that makes service for

6   her impractical.

7        Juror No. 57 appears to be working a full-time job and

8   also going to school and reports that it would be a hardship

9   for her, and so she also will be excused on hardship grounds.

10        If you will give me a moment, I just want to go through my

11   notes and asking -- either asking you about jurors or just

12   signaling to you what I think might happen.  I may err on the

13   side of saying nothing, though.

14        Juror No. 35 is a custodian at San Francisco International

15   Airport.  That person's name is Weiyan Wu, W-E-I-Y-A-N, W-U.

16   And they report that they cannot speak or understand English.

17   So I expect that to play itself out next week.

18        This is the rare case where I might suggest to you that I

19   would like to excuse a juror on my own volition.  Juror No. 43,

20   Gretchen Sue Patterson, is 73 years old.  She lives in

21   Santa Rosa.  She has some concerns about Oakland, which I don't

22   think are a reason to excuse her, having to do with crime and

23   that sort of thing, but also reports that the drive for her

24   would be very, very difficult.  And I will tell you that if she

25   had actually asked to be excused in her response to the jury

1    office, which she did not do, but if she had done that, based

2    on her age, they would have automatically excused her.  And so

3    I think it's just -- if she knew -- believe me, if she knew

4    what her rights were, she would have already exercised them.

5    So unless the parties object, I would like to excuse

6    Ms. Patterson this morning.

7            **MR. KLAUS:**  No objection, Your Honor.

8            **MR. CARLSON:**  No objection, Your Honor.

9            **THE COURT:**  Okay.  Very good.  So we'll excuse her.

10       Well, I think that's all I have on my own motion.  I think

11   there are a couple people here who are going to present fairly

12   compelling hardship requests, but you never know.  Sometimes

13   people hear the Court's remarks, and they learn more about the

14   case.  And they decide it's interesting, and they decide not to

15   make a hardship request.

16       You have one juror who has very, very strong feelings

17   about the United States court system, capitalism, media, your

18   clients, and I think probably many other topics, but we'll

19   learn more about that next week.

20       Does anyone have any questions or concerns that we should

21   talk about while we're all together?

22       Mr. Carlson?

23            **MR. CARLSON:**  About the jurors, Your Honor?

24            **THE COURT:**  About anything.

25            **MR. CARLSON:**  Oh, well, we do have a couple, then.

1  How many jurors will be selected?

2          **THE COURT:**  Nine.

3          **MR. CARLSON:**  Okay.  And then --

4          **THE COURT:**  Can I ask you a question?  Let me ask the

5  group and tell you what my experience has been.  I don't know

6  if I've had more trials than anyone since we resumed after

7  COVID, but I would be surprised if there are a lot of my

8  colleagues who have had more than I have.  So I have been in

9  trial a lot.  And I have experienced a much greater number of

10 failures to appear, which is fine.  We've -- we've ordered up

11 enough jurors in advance.  I think we've dealt with that.

12      But in addition to that, jurors are a little bit less

13 likely to stick it out.  And so I -- I've -- I just had a

14 criminal case where I had, I don't remember, six alternates.  I

15 mean, it was a seven-week case, but we were down to one

16 alternate by the end.  And so I said nine because I just sort

17 of have a rule of thumb.  Given the length of this trial,

18 that's what I would normally do.  But I'm interested in what

19 the parties think.

20      Mr. Carlson, do you have a view?

21          **MR. CARLSON:**  We don't have an objection to nine, Your

22 Honor.

23          **MR. KLAUS:**  No objection, Your Honor.

24          **THE COURT:**  Okay.  If you all think nine is enough, I

25 think nine's enough.  That's what we will do.

1          Mr. Carlson, what other questions do you have?

2          **MR. CARLSON:** Yeah.  So these are going to pop around

3     a little bit, Your Honor.

4          So in the transcripts, right, the video transcripts, there

5     are a number of instances where the opposite party's counter

6     designation is at a different point in the transcript from the

7     designation that it's supposed to correspond to.

8          **THE COURT:** Oh, yeah.  And I owe you some rulings.  I

9     need to start doing that work also.  Right?

10         **MR. CARLSON:** Right.  The question is simply whether

11    we may run the selections, counters and directs, just

12    sequentially in the transcript so that the counter-designation

13    comes up wherever it comes up in the transcript, not

14    necessarily spliced in next to the designation.

15         **THE COURT:** I don't know.

16         What does your opponent think?

17         **MR. CARLSON:** Well, it sounds like we need to raise

18    that with -- we haven't brought that up yet.

19         **THE COURT:** I mean, this is -- these are --

20         **MS. YOUNG:** This is Blanca Young --

21         **THE COURT:** Hold on, Ms. Young, just one second.

22         Every single time from now on that you ask the Court for

23    anything, the first thing I'm going to ask you is, "What does

24    the other side think?"  And I mean anything:  Take a witness

25    out of order; I need an early bathroom break; can I put my

1    boxes here.  Anything.  Because most of the time, the other

2    side is going to agree, and then I don't have to get involved.

3    And it will just make for a smoother trial for everybody.  So I

4    don't know.

5          MR. CARLSON:  Okay.

6          MS. YOUNG:  Your Honor, this is Blanca Young.  May I

7    be heard on that issue because I do think the parties have

8    discussed this and agreed on it, actually?

9          THE COURT:  Okay.

10          MS. YOUNG:  We have a stipulation regarding deposition

11    designations, and that's part of the pretrial conference order

12    that's before the Court right now.  And I believe what we

13    agreed in there was that whatever is designated will just be

14    played sequentially as it appears in the transcript, but I'm

15    happy to confirm that offline with Mr. Carlson.

16          THE COURT:  I think the order to which you referred a

17    moment ago, Ms. Young, is that the order that memorializes

18    certain rulings on motions in limine as to which there was no

19    argument and that sort of thing?

20          MS. YOUNG:  No.  It's the joint pretrial conference

21    statement that we submitted most recently to the Court.  Let me

22    get the docket number for Your Honor.  It is docket No. 593,

23    and there's a section in there for stipulations.  I believe it

24    addresses this issue.

25          MR. KLAUS:  It does.

1          **MR. CARLSON:**  And we could -- we could deal with this

2     offline.  What Ms. Young has suggested is what we had in mind

3     as well.  So it sounds like the parties are in agreement.

4          **THE COURT:**  What -- Docket No. 593 says at page -- at

5     ECF page 11, which is page 10 of the document, all designations

6     will be presented in the order in which the testimony was given

7     originally.  So --

8          **MR. CARLSON:**  I'm sorry.  I overlooked that, and I

9     apologize.

10          **THE COURT:**  That's all right.  It's great to have an

11     answer so quickly.

12          **MR. CARLSON:**  Yes.

13     Your Honor, we have discussed this point, and we're not

14     able to resolve it ourselves.

15     How does the Court like to see depositions read into the

16     record when unfortunately we have to do that?  I've done it a

17     number of ways.  Sometimes we put one of our colleagues in the

18     witness box, and we read the transcript back and forth.  That's

19     somewhat more engaging than just having one attorney stand and

20     read the whole thing.  I just wanted to know if the Court had a

21     preference.

22          **THE COURT:**  Well, let me find out what the parties --

23     as you know, there is no rule about this.  It's just a matter

24     of judicial administration, so let me find out what the

25     parties' competing proposals are.

1    **MR. KLAUS:**  Our preference, Your Honor, would be to

2    have the attorney read the transcript.  That reduces the

3    possibility of the person in the box adding their own

4    intonation and acting.  We understand there is -- there is an

5    instruction that can -- can be given on that, but that would be

6    our preference to have the lawyer just read the transcript.

7    **THE COURT:**  Yeah.  Mr. Carlson, what's your

8    preference?

9    **MR. CARLSON:**  Our preference would be the former,

10   would be that we put someone in the box and have the

11   interchange just because I think it's more engaging for the

12   jury.  And neither party should be play acting.

13   **THE COURT:**  Well, we're going to do it the way --

14   we're going to do it the way plaintiffs have requested.  I see

15   zero possibility of prejudice.  Jurors are so smart, and

16   they're not -- and when someone gets on the stand -- and they

17   have been told by the Court that the person reading it -- you

18   know, there's no way to tell what the intonation was at the

19   deposition and that sort of thing.  And if the -- the lawyer or

20   the paralegal or what have you gets on the stand and starts

21   hamming it up, the jurors are going to hold it against them.

22   So I -- I -- I have never had a problem with this.

23   What's next?

24   **MR. CARLSON:**  Does the Court anticipate jury selection

25   taking a whole day?

1          **THE COURT:**  Yes.  Unfortunately, yes.

2          **MR. CARLSON:**  Okay.

3          **THE COURT:**  It may not.

4          **MR. CARLSON:**  Yeah.

5          **THE COURT:**  But I -- but I would be -- I would be

6     surprised if it didn't.

7          **MR. CARLSON:**  Okay.  I have other questions.  I think

8     it would be more efficient if we discussed them with opposing

9     counsel first.

10         **THE COURT:**  Well, it's only 9:15.

11         **MR. CARLSON:**  Okay.

12         **THE COURT:**  I mean, I -- because here's what happened

13    before.  You had a question, and then Ms. Young said, Oh, we

14    agreed on that.  So it could be that you'll raise something as

15    a possibility.  And even though there hasn't been prior

16    consultation, opposing counsel might say, oh, that's fine.  And

17    then that's -- that can be something that can come off the

18    list.

19         **MR. CARLSON:**  Okay.  Both parties' exhibit lists, I

20    think as is common, are substantially longer than the number of

21    exhibits that can possibly get in -- be gotten into evidence at

22    trial.  We've stipulated to the admissibility of many of these

23    exhibits, hundreds of them.

24        How does the Court want those stipulated exhibits

25    introduced into evidence?

1          **THE COURT:**  By a witness.

2          **MR. CARLSON:**  Okay.

3          **THE COURT:**  Who has some idea what the exhibit is, you

4     know, has some basis of knowledge.

5          **MR. CARLSON:**  Okay.  So --

6          **THE COURT:**  What we're not going to do for the most

7     part -- I occasionally make exceptions to this rule -- is just

8     say, oh, this is coming into evidence.  There hasn't been a

9     witness which has explained it, but we're just going to put it

10    in evidence.  And then later in closing argument, we'll find

11    out what the story is.  That's not going to happen.

12         **MR. CARLSON:**  Okay.  That's -- that's very helpful.

13       I think -- I think that's all the questions that we have

14    at this time.

15         **THE COURT:**  Very good.

16       Mr. Klaus?

17         **MR. KLAUS:**  Thank you, Your Honor.  Following up on

18    one of the questions that Mr. Carlson asked, if the -- we're

19    planning for jury selection to take all or most of the day on

20    the 5th, are we -- should we prepare for openings to be on the

21    6th?

22         **THE COURT:**  Yes.  Openings will occur on the 6th.  I

23    mean, unfortunately, I had to make myself unavailable on

24    Monday, and so our time is quite tight.  And so I need to use

25    every minute I can.  If I thought there was a realistic

1    possibility of there being time for an entire opening statement

2    on that Tuesday, I would -- I would plan for it, but I think

3    Ms. Lee -- Ms. Lee's and my experience has been, taking folks

4    in groups, as we have started to do post COVID, it just takes

5    the whole day.

6        Let me go over that.  Let's talk about the mechanics of

7    that.  I don't know if I -- did I do that already?  How that

8    works?

9            **MR. KLAUS:**  I think we had -- we had some -- a few

10    questions regarding the process of *voir dire*, just the numbers

11    of folks coming in at a time, Your Honor, so we'd be happy to

12    hear it again.

13            **THE COURT:**  Yeah.  We -- with some trial and error,

14    Ms. Lee and I have established more or less a routine.

15        So we have 60 -- nominally, we have 65 jurors.  There will

16    be failures to appear.  We can safely say that's three groups

17    of 20 because at least five people will not show up.

18        So the jury office will send us three groups, and with

19    respect to each group, the pattern will be the same.  I will

20    give somewhat lengthy opening remarks.  I won't say much about

21    the trial.  I will not ask a lot of questions of our jurors

22    unless there is something you want me to ask because you feel

23    that if a lawyer were to ask the question, the prospective

24    juror might hold it against the lawyer and so you want the

25    Court to ask it.  Otherwise, I know -- I have basic information

1    from our jurors in -- from these questionnaires.

2         So I would turn the questioning over to you, first the

3    plaintiff and then the defendant.

4         Normally, I would allocate 20 minutes to each of you with

5    your having the ability at the end of that time to say to me

6    that you think there is good cause for more time.  We have

7    three groups.  It doesn't sound like a lot of time.  As you'll

8    see, it actually is.  It turns out to be.  It's pretty much

9    time.  But in any event, we have to get the process finished in

10   one day.

11        Probably we will need to take a lunch break, so we jam

12   that in usually between groups two and three.  We don't take

13   very long because we've got a group of jurors waiting at that

14   point.

15        After the questioning of each group is usually when I do

16   hardships.  It's not on its face the most time efficient way of

17   doing it because, of course, you will have spent time -- we all

18   will have spent time getting to know jurors who ultimately are

19   going to leave.  But I found that by doing it that way, it

20   reduced the number of hardship requests because people are

21   reminded about their civic duty in a way that, frankly, is

22   usually effective for at least some jurors.

23        And they've gotten to know you, and they've heard --

24   through your questions, they've learned a little bit about the

25   facts and some of them say, you know what?  I'll postpone the

dentist appointment or whatever.  So that's why I do it at the end.  So we do the hardships.  They're gone.

You make your cause challenges when they're gone.  We don't do peremptories.  And sometimes I -- I will have heard the hardship request, but often I will not have ruled on that yet because I want to know how -- in the aggregate, can I just grant them all?  Or based on the numbers, do I need to deny some just to make sure we have enough possible jurors?

My philosophy about hardship requests is there is no percentage in being tougher than I need to be because if I do that, what I wind up with is a juror who is upset at being there.  And they are going to be a less engaged juror, and they're going to be more concerned about their own personal circumstances and less concerned with the evidence that you're presenting and the claims that you're making.

So I wave the flag pretty hard during jury selection, and then once it actually gets down to it, I mostly grant hardships.

But as I said, it may be that I'll defer deciding all those hardships until the end of the process.

So we finish the first group.  We've heard their hardship requests.  You have made and I have ruled on any challenges for cause.  We bring in the next group.  We repeat the process.  We bring in the third group.  We repeat the process.  Now, it's the end of the day.

1        Everybody's been qualified for cause.  At that point, I

2    deal with hardships.  Now we have a group of jurors in

3    numerical order.  You have all the information that I have

4    about the jurors, which will always be true, by the way.  I'll

5    never know anything you don't know.  And I will say, here are

6    the first nine jurors in order that are left.  That's your

7    jury.

8        And then we'll go back and forth, and you'll exercise your

9    peremptories.  And after each peremptory, I will again say,

10   here are your nine jurors so that everyone has five or six

11   opportunities to correct the Court if the Court has made a

12   mistake about who's ultimately going to be in the box.  That's

13   how it works.

14       Mr. Klaus, other questions?

15       **MR. KLAUS:**  I will ask Mr. Spiegel if he has any

16   questions on the *voir dire* process.

17       **MR. SPIEGEL:**  I think not, Your Honor.  John Spiegel

18   for defendant.  That's a very helpful explanation.

19       **THE COURT:**  Does anyone anticipate using demonstrative

20   exhibits during their *voir dire*?

21       **MR. CARLSON:**  No, not for plaintiffs, Your Honor.

22       **THE COURT:**  Mr. Spiegel?

23       **MR. SPIEGEL:**  No, Your Honor.

24       **THE COURT:**  Okay.  Very good.  One less -- one less

25   potential bone of contention.

1       Mr. Klaus, other questions?

2           **MR. KLAUS:**  Your Honor, will you give the jury

3   preliminary instructions before or after the opening

4   statements?

5           **THE COURT:**  Good question.  I don't have a fixed

6   practice.  I do with closing instructions.  I always do those

7   before closing arguments.  I want them to hear from you last.

8       I'm trying to remember what I did in that criminal trial

9   we just finished.

10       Ms. Lee, do you remember?

11           **THE CLERK:**  Your Honor, I was out for family --

12           **THE COURT:**  Oh, that's right.

13           **THE CLERK:**  -- for the beginning.  Sorry.

14           **THE COURT:**  I think probably before.  Again, I want --

15   you know, it's recency and primacy, right?  I feel like if

16   you've done your opening statements, now we're off to the

17   races.  Now it's interesting.  And for the Court to say let me

18   talk to you about don't go on TikTok while you're a juror, you

19   know, it just -- it interrupts the flow of the narrative.  So

20   unless anyone feels that I should do otherwise, I think I would

21   just instruct and then turn the trial over to you essentially.

22           **MR. KLAUS:**  That's fine with us, Your Honor.

23           **MR. CARLSON:**  Yep.  Plaintiffs are fine with that,

24   Your Honor.

25       I have one more question about *voir dire*.  I'm sorry.

1          It's 20 minutes per side or 20 minutes total?

2               **THE COURT:**  Per side.

3          **MR. CARLSON:**  Okay.

4               **THE COURT:**  It's a lot of people, you know.

5          **MR. KLAUS:**  Your Honor, we had -- we would raise and

6     apologize for the length of the document, but in the final

7     pretrial conference, there are a number of issues that, with

8     notwithstanding the prior orders and our meet and confer

9     efforts, the parties were unable to agree on.

10         We are happy to -- with respect to the majority of these,

11    we can raise them today or wait.  There were a few that would

12    be relevant, particularly for opening statements in the

13    beginning of the trial that we definitely would like to raise

14    this morning.

15              **THE COURT:**  Yes.

16         **MR. KLAUS:**  And the first of these, which Ms. Young --

17              **THE COURT:**  Oh, I see this now.  I think I'm

18    inadequately prepared for this morning's conference, frankly.

19    I know it's not -- it's not generally done in my profession for

20    judges to admit that, but I will just tell you, I sheepishly

21    acknowledge to you that there are parts -- I assume you are

22    referring to Docket 593.

23              **MR. KLAUS:**  It's Docket 593, and there were a number

24    of issues that were raised principally at Roman 15, which

25    starts at page 22 -- it's numbered 22, but it's 23 of 56 of the

1    ECF docket.

2            **THE COURT:**  Yes.  I'm there.

3        **MR. KLAUS:**  We had three issues -- three of those

4    issues we were hoping to raise.  Although, we -- if Your Honor

5    is not prepared to address them, then we can --

6            **THE COURT:**  I think what we ought to do is this,

7    frankly.  I mean, I have a summary judgment hearing a little

8    bit later today in the afternoon, but not until the afternoon.

9    I think we should take a break right now.  I should read that

10   portion of the statement.  I would then be ready to proceed.

11   And we could get back together again in an hour, 45 minutes,

12   something like that.  I can't imagine it will take that long.

13       **MR. KLAUS:**  We don't -- we don't have anything else --

14   on our side, we don't have anything else to do today, Your

15   Honor, so that's --

16           **THE COURT:**  Let's do that.  I would rather do this in

17   a prepared way than to do, you know -- than do it sort of by

18   pop quiz.  You went to the trouble to lay these issues out for

19   me and explain your positions.  I think I should learn them.

20       **MR. CARLSON:**  Your Honor, it would be helpful to know

21   whether Mr. Klaus plans to raise some or all of the issues that

22   are in section 15.

23           **THE COURT:**  Okay.  So bear with me just a moment.  I'm

24   going to turn my microphone off.  I'm going to print that

25   portion of the statement, and then when Mr. Klaus says which

1    ones it is that he wants to address, I can actually mark those

2    on a paper.  Otherwise, I'll have to rely on my memory, which I

3    think is not a good approach.  So as I said, I'll turn my mic

4    off.  I will turn it back on when I've got this thing printed

5    or the part that I need printed.

6                          (Pause in proceedings.)

7         **THE COURT:**  You can still hear the hum of the printer

8    in the background, but hopefully that will cease.  I have

9    printed out from ECF page 23 through the end of the document

10   without the attachments.

11        So why don't we go through these, and let me find out -- I

12   mean, let me find out whether there are any of these that are

13   not -- that don't require discussions I think is probably the

14   more sensible question to ask.

15        The first is evidence of post injunction -- excuse me --

16   injunction or post injunction conduct.

17        **MR. KLAUS:**  We would like to address that, Your Honor.

18        **THE COURT:**  The next is the parties' proposals

19   regarding the SHST decisions.

20        **MR. KLAUS:**  We would like to address that one, too.

21        **THE COURT:**  Can I just say there is so much

22   unnecessary argument in this portion of the document and

23   rehashing of things that we've already talked about and sort of

24   posturing, a word I rarely use, but I would just beg the

25   parties to be a little more cognizant of the opportunity cost

1    of time.

2        Anyway, I don't begrudge you raising these issues for

3    decision.  That's not my point, and I apologize for not being

4    more prepared.  Anyway, okay.

5        This next thing is the vicarious liability instruction.

6            **MR. KLAUS:**  We would like to -- we would ask Your

7    Honor to hear that one.

8            **THE COURT:**  Pre-authenticated business records.

9            **MR. KLAUS:**  That would be helpful for -- to address

10    today, Your Honor.  That would expedite --

11            **THE COURT:**  Shouldn't I just start reading?  We're

12    four for four, I think.

13            **MR. KLAUS:**  I only have one more after that, Your

14    Honor.

15            **THE COURT:**  Is it plaintiff's evidence and testimony

16    related to excluded topics?

17            **MR. KLAUS:**  It is not.

18            **THE COURT:**  Mr. Carlson, would you like the Court to

19    address that issue?

20            **MR. CARLSON:**  I don't think it's -- it's necessary to

21    address that at this juncture.

22            **THE COURT:**  All right.  I will -- we will address that

23    at some future time perhaps.

24        Section F, scope of -- is it Menache?  I have never known

25    how to pronounce it.

1          **THE COURT:**  Scope of Mr. Menache's testimony.

2          **MR. KLAUS:**  That was the last one that we had, Your

3     Honor.

4          **THE COURT:**  Mr. Carlson, would you like to address

5     topic G, evidence of MOVA's ownership prior to August 2012?

6          **MR. CARLSON:**  That is -- whether we would like you to

7     decide that now?

8          **THE COURT:**  Yeah.  Later today.  Don't be bashful.

9     Mr. Klaus put a lot of things in the shopping cart.

10          **MR. CARLSON:**  He did.  Your Honor, these are -- these

11    are issues for the most part raised by defendants, so --

12          **THE COURT:**  I see.

13          **MR. CARLSON:**  It's our position that this evidence

14    should come in and --

15          **THE COURT:**  No.  No.  No.  Stop.  Don't tell me what

16    your position is.  I'm just asking do you want me to decide it

17    later today or not?

18          **MR. CARLSON:**  Yes.

19          **THE COURT:**  Okay.  And then H, which is -- okay.  H is

20    plaintiff's untimely exhibits and designations.  I feel

21    confident that was not your header.  Do you want me to address

22    that?

23          **MR. CARLSON:**  Your Honor, I believe this is still a

24    moving target.  I mean, the defendants informed us today that

25    they're supplementing their exhibit list.

1          **THE COURT:**  I'll take that as a no.  How about

2     plaintiffs other improper designations?

3          **MR. CARLSON:**  Yeah.  That wasn't my heading either,

4     Your Honor.

5          **THE COURT:**  I inferred that.

6          **MR. CARLSON:**  Yeah.  I -- I don't think it's necessary

7     to address it today.

8          **THE COURT:**  All right.  We won't.  Very good.  We're

9     going to go in recess until 10:30, and then we'll reconvene.

10    Thank you.

11                    (Recess taken at 9:17 a.m.)

12                (Proceedings resumed at 10:30 a.m.)

13         **THE CLERK:**  Your Honor, now recalling CV 17-4006-JST,

14    Rearden, LLC, et al. vs. The Walt Disney Company, et al.

15         If counsel could please just restate their appearances for

16    the record, beginning with counsel for plaintiffs.

17         **MR. CARLSON:**  Yes.  This is Mark Carlson for the

18    plaintiffs, and with me are my colleagues Garth Wojitanowicz

19    and Jerrod Patterson.  Also on the line is our client,

20    Steve Perlman.

21         **MR. KLAUS:**  Thank you, Your Honor.  Kelly Klaus from

22    Munger Tolles & Olson, and I am joined on the line by my

23    colleagues, John Spiegel, Blanca Young, John Schwab,

24    Stephanie Herrera, Shannon Aminirad, and Anne Conley.

25         **THE COURT:**  Very good.

1      Well, I'm much better prepared than I was before, and I

2   thank the parties for their indulgence.

3      I'm going to say something that you already know, but I'm

4   going to say it anyway.  The deafening noise in the back of the

5   mind of every judge at all times is, Whom can I trust?  Whom

6   can I trust?

7      You know your case.  Now, imagine if you had 300 cases.

8   Think about the average amount of paper that is filed in every

9   case, the number of citations to the factual record, the number

10  of citations to prior cases, legal cases, and ask yourself how

11  much weight it would need to put on what the lawyers are

12  telling you.

13      How great it would be the first few times you went to

14  check on what somebody had said about a case or what somebody

15  had said about some evidence and find out each time that it was

16  exactly right.  Your shoulders would come down.

17      Now ask yourself what would happen if you went to look,

18  and that's not exactly what the case said.  Or you read a

19  declaration that had been cited to you, and you found that the

20  declaration was quoted accurately but that the quotation

21  omitted other language which changed the meaning of the

22  declaration.  And what your reaction would be the next time

23  that lawyer said something to you and you wanted so badly to be

24  able to take it on faith.

25      Why do I say that?  Well, we've had lots of experience

1    together.  And the needle is wherever it is.  But that needle

2    is always capable of moving one direction or the other, and

3    we're about to start moving at very high speed.

4         And the moment I feel that I cannot trust

5    one hundred percent what somebody is telling me, my train of

6    thought as to whatever you're saying will stop.  It will need

7    to stop because if I can find the time, I'm going to have to go

8    off and verify whatever it is you're telling me.  And the good

9    news is that if you do say -- for example, if I say, you know,

10   does the case exactly say that?  You say, well, not exactly.

11   And you qualify it, and you make it a hundred percent accurate,

12   even though that may not feel good in the moment, your

13   credibility with the Court is going up more than I can tell

14   you.

15        So, anyway, you all know this already.  I'm not trying to

16   be schoolmarmish, but if you would bear this in mind while we

17   go through this process, we'll all be better off.

18        Okay.  Let's turn to the topics in this pretrial

19   conference statement.  We'll just take them in order.

20        The first is capital letter A on page -- ECF page 23,

21   evidence of the injunction, post injunction conduct.  This is

22   really in the nature of a motion in limine by defendant.  So,

23   Mr. Klaus or Mr. Spiegel or someone on your team, I'll let you

24   go first.

25             **MR. KLAUS:**  Your Honor, thank you.  Ms. Herrera of our

1    team of be arguing this.

2             THE COURT:  Very good.  Ms. Herrera?

3             MS. HERRERA:  Good morning, Your Honor.  I'm happy to

4    address whichever portions of the arguments in the papers Your

5    Honor is most interested in.  I think since we filed the

6    papers, Your Honor has issued a few rulings that let us know

7    what the Court's view is on the relevance of the injunction.

8    So I'd like to focus just briefly on the post injunction

9    conduct, which we think raises different issues.

10        In the summary judgment order, Your Honor ruled that

11   Rearden has no claim for vicarious liability for post

12   injunction conduct.  Plaintiffs appear to misunderstand that as

13   a ruling about damages, but our understanding of the ruling is

14   that the claim is out for post injunction conduct.  Defendant

15   cannot be liable for post injunction conduct.

16        And so for that reason, we think evidence of DD3's post

17   injunction conduct is not relevant.  But at a minimum, it

18   raises serious issues under Rule 403 because it would be

19   incredibly confusing and misleading for the jury to hear

20   extensive evidence and testimony about conduct for which

21   defendant cannot be liable.  And so at a minimum under

22   Rule 403, we would ask Your Honor to exclude evidence and

23   testimony on that topic.

24             THE COURT:  All right.  Thank you.

25        Mr. Carlson?

1          **MR. CARLSON:**  Yes, Your Honor.

2          The motion is really directed towards a handful of emails

3      and then some testimony that relates to those emails.  And what

4      the emails reveal is that on June 28 of 2016, 11 days after the

5      Court had issued the injunction, Darren Hendler at

6      Digital Domain broadcast to a large number of people at

7      Digital Domain his, quote, Beast MOVA plan, close quote.

8          And in that, he told them all that Mr. LaSalle was busily

9      working with MOVA to create scans.  That's the first stage of

10     MOVA processing.  It's a clear violation of the Court's

11     injunction.

12         The reason why this is relevant is twofold.  The first is

13     this has to do with -- with Mr. Chow's testimony.  The Court

14     has already ruled that Mr. Chow's post injunction conduct is

15     relevant and admissible, and that is in document 604 at page 2.

16         And the reason why these are related is because while

17     Mr. Chow was sitting on the news of the injunction and not

18     passing that information on to the people in production at --

19     on *Beauty and the Beast* at the same time, that is when

20     Digital Domain's -- was busily violating the injunction by

21     making copies.  So what this does is it puts the necessary

22     context on Mr. Chow's failure to alert the company that the

23     injunction had been issued.

24         But the second point -- second reason why this is relevant

25     has to do with Disney's claim that MOVA had no effect, had no

1    effect one way or the other on the animation of the Beast

2    because hand animation and MOVA animation are fungible.

3    They're completely undiscernible, and so no -- it has no effect

4    on the audience, on the appeal of the movie, and to be

5    disregarded.

6         Well, Digital Domain's MOVA Beast plan that Mr. Hendler

7    proposed was, how do we do this?  How do we complete these

8    scenes without the MOVA tracked mesh?  So they were trying to

9    do that, but at the same time, they had Mr. LaSalle making the

10   scans using MOVA.  And the reason why they did that, we

11   believe, is because they did not trust hand animation.  And

12   they were afraid that if they had completed these scenes and

13   presented the results to Disney using hand animation, that

14   Disney would not be happy with them, and Digital Domain would

15   be up against a deadline.  It would miss its deadline to

16   process these.

17        So they had the scans done as a backup because they did

18   not trust hand animation, and that means that hand animation

19   and MOVA animation were not fungible in their eyes.

20        **MS. HERRERA:**  Your Honor, may I respond just very

21   briefly to those specific points?

22        **THE COURT:**  Yes.

23        **MS. HERRERA:**  I have just three points which I think

24   go to both of Mr. Carlson's argument.

25        So the first is that the emails he describes are all

1    internal DD3 documents.  No one at Disney is copied on them.

2    Mr. Chow is not copied on them.  Every Disney witness who was

3    asked about them in deposition testified that they had never

4    seen them and had no awareness of what DD3 was doing.  So this

5    is all hearsay, which is sort of a separate issue that Rearden

6    is not going to be able to get into evidence.

7         But with respect to what defendant knew or was thinking or

8    the actions it took, the undisputed record evidence is that

9    Disney had no idea what DD3 was doing.

10        And then the second point is that, as Your Honor ruled in

11   the summary judgment order on page 12, there is zero evidence

12   that any of the shots that were processed after the injunction

13   by DD3 made it into the movie.  So with respect to this

14   argument about the superiority of MOVA overhand animation and

15   motivations for continuing to process files after the

16   injunction, none of those files made it into the movie --

17        **THE COURT:**  Why is -- let me ask you this question.

18   Why does that matter as a matter of logic?  Let's say, for

19   example -- I'm going to have to choose an artist who is no

20   longer alive, unfortunately, for my hypothetical.  I'm going to

21   pick Picasso.  Let's say that I -- so the Court puts me in

22   charge of painting the side of the courthouse building.  And

23   one possibility is I could have Picasso do it, and, you know,

24   it would be beautiful.  It would be all kinds of

25   representations and things.

1        And the other would be that I would have Frank do it, and

2   Frank just has a spray gun.  And he would just spray the side

3   of the building with one color of paint.  And later in

4   litigation, there turns out to be -- never mind.  That

5   hypothetical is going to consume our whole morning.

6        I'll just use the facts as Mr. Carlson described them.  If

7   his point is Disney is going to make the argument that MOVA was

8   not special, that -- that -- that at least to some extent, MOVA

9   was interchangeable with hand animation and therefore not

10  valuable, isn't it -- regardless of the timing and the

11  chronology, why isn't it relevant on that point that DD3

12  expresses the concern, oh, my goodness, we can't use MOVA

13  anymore?  And why is that irrelevant?  I don't understand.

14        **MS. HERRERA:**  So I think, Your Honor, I would have two

15  responses to that.

16        One is I don't think there is an email that says that.  I

17  think we can look at the emails and present them to Your Honor,

18  but I think the description that there is some discussion in

19  there about oh, my goodness, we must use MOVA, we can't hand

20  animate is not what the evidence says.  But I'm happy to pull

21  up the documents, and we can discuss it.

22        And then the second point is that Disney did not ask DD3

23  to do that, and so this question about what Disney believed --

24        **THE COURT:**  No.  No.  No.  That's -- but that's why

25  I -- that's why I wanted to have this conversation with you.

1    That's a separate question.  Disney's knowledge is a separate

2    question.  $10 is worth more than $5.  Okay?  Whether Disney

3    knows it or not.  And if there issue -- a dispute about which

4    one is more valuable, the knowledge of Disney is a separate

5    question.  That's where I'm going with all of this.

6             MS. HERRERA:  I understand, Your Honor.  I think we

7    believe that Disney's knowledge is still relevant to that point

8    because Disney's testimony is that it could have used hand

9    animation to finish the couple of shots that were outstanding.

10   But I understand Your Honor's --

11            THE COURT:  Then why isn't it impeaching that its own

12   contractor felt otherwise if that's what the evidence shows?

13            MS. HERRERA:  So, again, Your Honor, we don't think

14   that's what the evidence shows.  But even if Your Honor thinks

15   there is relevance, which I understand you to be saying, we

16   still have serious concerns about the prejudice to Disney of

17   having all of this evidence about post injunction conduct be

18   front and center at the trial when Your Honor has ruled that

19   Disney cannot be held liable for that conduct.  It will be

20   confusing to the jurors.  It will consume a lot of our time

21   explaining to them that Disney did not know about any of that

22   conduct, and it is inflammatory.

23       It creates a risk that the jury will want to punish

24   someone for DD3's violating the injunction, and there is no

25   evidence that Disney had anything to do with that or any

1   awareness of that.  So that would be our pitch to Your Honor,

2   that even if there is relevance, it should be excluded under

3   Rule 403.

4          **THE COURT:**  Mr. Carlson, last words on this.

5          **MR. CARLSON:**  Just this.  It really isn't necessary to

6   our point that the -- that the email says, "Oh, my gosh, we

7   can't animate without MOVA."  I think the email speaks for

8   itself.  Mr. Hendler announced to a wide number of highly

9   placed people in Digital Domain that Mr. LaSalle was using

10  MOVA, and this was 11 days after the injunction.  And they

11  wouldn't have done that if they didn't think they needed to.

12         **THE COURT:**  They say it very quickly, but they do say

13  "hearsay" in their portion of the case management statement.

14  Do you want to address that?

15         **MR. CARLSON:**  Yeah.  That's not -- well, okay.  It --

16  it's not -- it's not hearsay.  It's written by Mr. Hendler, and

17  Mr. Hendler gets it into evidence.  It's -- it's his own

18  writing.  It's his own email.

19         **THE COURT:**  I have a feeling the fact that he said it

20  is going to turn out to be legally relevant also as opposed to

21  the facts contained in the email itself.  But anyway, I don't

22  have the email in front of me.

23         All right.  I need to take a look at my summary judgment

24  ruling at Docket 555 at page 12.  That seems to me fundamental

25  to Ms. Herrera's argument, so I'll do that.

1     So let me just take that under submission.

2     Let's turn to capital letter B, which is the parties'

3  respective proposals regarding SHST decisions.  I'm sure I'm

4  going to wind up taking this under submission because it has to

5  do with the wording of a jury instruction.

6     One question that I had was that defendants propose a

7  separate instruction regarding the preliminary injunction

8  order.  I didn't see in here -- and perhaps I missed it -- that

9  the plaintiffs propose an instruction on that topic.  Do they?

10     **MR. CARLSON:**  Your Honor, I -- I have it in my -- in

11  my papers here.  Let me just -- it's in 606-1, and it's page 2

12  of 2.

13     **THE COURT:**  Okay.

14     **MR. CARLSON:**  It's actually a single page.  So this

15  was, I guess, attached to something else.  But it's 606-1.

16     **MS. YOUNG:**  Your Honor, this is Blanca Young on behalf

17  of defendant.

18     There was an inadvertent error where that got omitted by

19  mistake from the filing.  And instead of having that at -- the

20  instruction about the SHST decision was put in, so there was an

21  errata on it.

22     **THE COURT:**  Right.  I'll just print that out.

23     Okay.  Mr. Carlson, argument -- oh, darn it.  Now this

24  printer is going to make noise for a second.  I'll just use

25  these headphones.

1    There.  Now I don't have to worry about it.

2    Mr. Carlson, argument regarding these instructions.

3    **MR. CARLSON:**  Yeah.  Your Honor, I don't know what to

4    say in terms of argument.  I think this is a matter of the

5    Court reviewing the two submissions by the parties and

6    determining which is -- is fair and balanced.

7    To me, having reread these just a half hour ago, it just

8    seems very obvious.  I think our instructions very closely

9    follow what the Court's ruling was, and they take into account

10   the *Boulware* case, which says that the ruling in the fire --

11   prior proceeding is relevant and admissible.  And so that --

12   the information that we are providing the jury regarding the

13   SHST result and the appeal is information that should -- the

14   jury should consider in addition to what they hear at trial.

15   And our instruction makes all that clear.  They should

16   make up their own minds.  Disney is not bound.  They should

17   listen to the evidence presented at trial, but that evidence

18   does include the instruction to the jury.  That's why we're

19   providing it.  And so that's -- that's evidence that they

20   should consider as well.

21   The differences between ours and their proposal is they

22   barely touch on the SHST decision, I think a sentence, maybe

23   two, and barely touch on the appeal.  And then all the rest of

24   it is this huge cautionary instruction about don't listen to

25   that.  And I think it's just clearly contrary to *Boulware*,

1    right?  What they're trying do is argue to the jury in a

2    statement read by the Court that they should not consider the

3    result of the SHST case and the appeal.  And that is -- it's

4    wrong as a matter of law, and it's just very clearly

5    argumentive.

6        The differences between the parties' proposed instructions

7    on the preliminary injunction order are narrower, but I think

8    they're of the same -- substantially the same nature.  And what

9    they are trying to do is spend -- is devote most of the

10   instruction to -- to telling the jury why the order doesn't

11   mean anything and should be disregarded.

12       I think that's just weighing the evidence for the jury

13   coming from the Court, which would be very improper.  They

14   should simply be told the facts of what was decided and -- and

15   that there is -- there's no liability for post injunction

16   infringement but that they may consider that evidence for any

17   other relevant purpose.

18           **THE COURT:**  Thank you, Mr. Klaus.

19       Who will be arguing this point for Disney?

20           **MR. KLAUS:**  I'm -- that's Mr. Spiegel.

21           **THE COURT:**  Mr. Spiegel.  Mr. Spiegel, your microphone

22   is muted.

23           **MR. SPIEGEL:**  Are we turning to topic C, Your Honor,

24   vicarious --

25           **THE COURT:**  No.  I haven't heard from your side yet

1    about B, I don't think.

2            **MR. KLAUS:**  I'm sorry.  I thought we -- B is still

3    Ms. Young who had spoken the first time, Your Honor.

4            **THE COURT:**  Oh, I take it back.  Yeah.

5        Ms. Young?

6            **MS. YOUNG:**  Thank you, Your Honor.

7        So let me start from a point of agreement.  During the

8    break, the parties met and conferred about when these

9    instructions about the SHST decision should be given to the

10    jury.  We feel it's important before the jury hears openings

11    that they be informed about what they will likely hear in

12    opening regarding the Court's decisions in the SHST case.  And

13    the parties have agreed that whatever instruction the Court

14    decides to give about both the SHST decision and the

15    preliminary injunction order should be part of both the

16    preliminary instructions the jury is given as well as the

17    concluding instructions at the end.

18        And then I'd like to just briefly respond to the

19    substantive issues that Mr. Carlson raised, and we've laid all

20    of this out in our papers.  But there are some important issues

21    with respect to the proposals that the plaintiff -- the

22    plaintiffs have made on both of these instructions.

23        So on the SHST instruction, we understood the purpose of

24    that to be an attempt by the Court to strike a balance between

25    advising the jury about the outcome of the SHST proceeding and

1   trying to mitigate some of the prejudice that would inherently

2   come in by the jury being informed that a Court has already

3   decided one of the issues the jury will be asked to decide in

4   the case.

5        And, therefore, we think the way to strike that balance is

6   to have as concise a statement as possible about what the Court

7   decided without bringing in unnecessary detail about what

8   happened in the litigation or the facts of that litigation.

9        So, for example, in the plaintiff's proposal, there is a

10  lot of verbiage about the contentions that were being made by

11  the parties on the SHST side of the case.  It's repeated again

12  when it talks about VGH substituting in for SHST, and then it

13  concludes by saying, essentially, the Court disagreed with that

14  and concluded the opposite of what those parties were

15  advocating.

16       We think that's unnecessary, and we think it raises with

17  it both implications about what the Court found as a factual

18  matter rather than a concise statement of the outcome and also

19  suggests that the Court did not find that evidence credible.

20       Another issue related to that is there is --

21            **THE COURT:**  Can I ask you a question?

22            **MS. YOUNG:**  Yes.

23            **THE COURT:**  If you knew that I was dispositionally a

24  baseball arbitration decider, is there any part of Disney's

25  proposed instruction you would -- would you still stand behind

1    every phrase in Disney's proposed instruction?

2         MS. YOUNG:  No, not necessarily.  I think there are

3    parts of that --

4         THE COURT:  Let me ask you a question.  Can you think

5    of any other jury instruction that you have ever seen actually

6    given in a trial that tells the jury they should not defer to

7    some particular evidence in the case?

8         MS. YOUNG:  Well, I --

9         THE COURT:  You should not -- you should not defer to

10   any decision in that case.  If the decision in the case is

11   evidence, I'm telling the jury not to defer to a particular

12   piece of evidence, am I not?  My point is simply this.  We

13   don't have to agree or disagree about the comment I just made.

14   This instruction is very argumentive, I think.

15        MS. YOUNG:  Understood, Your Honor.  I do think it's

16   important for the jury to understand that the decision

17   ultimately is up to them, and the language about not deferring

18   to another decision comes from the *Engquist* case where the

19   Court specifically noted the risk that that could happen if a

20   jury is informed of a prior decision.  So that is what we were

21   trying to avoid with this instruction.

22        THE COURT:  Understood.

23        MS. YOUNG:  So just on a couple of other points that I

24   think are unnecessary in the proposal from the plaintiffs,

25   there is a long procedural history in that instruction about

1    SHST disappearing from the lawsuit.

2         **THE COURT:**  Yes.  I'm not going to use the word

3    "disappear" either.

4         **MS. YOUNG:**  And there is also a quote from the Court's

5    decision that we think is misleading and incorrect in the

6    context of this case.  It quotes the Court's decision that

7    Rearden, not DD3, owns and at all relevant times has owned the

8    MOVA assets.  There are relevant time periods in this case when

9    Rearden did not own the MOVA assets.  And so we believe it

10   would be misleading to suggest to the jury that here Rearden

11   owned the assets at all relevant times.

12        **THE COURT:**  Mr. Carlson, I saw that point in the case

13   management statement.

14        **MR. CARLSON:**  Yes.

15        **THE COURT:**  Do you want to rise in defense of the

16   phrase "at all relevant times," or can we just take that out?

17        **MR. CARLSON:**  We can take that out, yeah.

18        **THE COURT:**  There we go.  Okay.

19       Ms. Young.

20        **MS. YOUNG:**  Thank you, Your Honor.  Those are the --

21   those are the main points I wanted to make on that instruction.

22       On the preliminary injunction order instruction, I think

23   the parties agree -- again, I'll start from points of agreement

24   that we have.  I think we agree that the jury should be told

25   the preliminary injunction order directed DD3 to stop using

1    MOVA.  We agree that the jury should be told the preliminary

2    injunction order did not decide who owns the MOVA assets.  And

3    we agree that the jury should be told that it has been decided

4    earlier in this proceeding that Disney is not liable for any

5    infringement that may have occurred after the injunction.

6        And that goes to the point Ms. Herrera was just arguing,

7    which is that, in fact, the Court has found there is no

8    liability after the injunction.  So we think it's quite

9    important for the jury to understand that Disney cannot be

10   found liable or have damages assessed against it for any

11   conduct occurring after the injunction.

12       There is -- again, there are some statements in the

13   proposal from the plaintiffs that I just wanted to flag

14   because, again, I think it -- it brings in irrelevant issues

15   into the case.  And in particular, there is a statement in

16   their proposal that in the preliminary injunction order, the

17   Court ruled that the transfer from SHST to VGH was fraudulent.

18   It's not clear why that question is relevant to anything the

19   jury will be asked to decide --

20       **THE COURT:**  Let me stop you.  Let me stop you.

21       Mr. Carlson, why do I need that?

22       **MR. CARLSON:**  Well, the parties were setting forth in

23   their respective proposals what the Court decided about

24   ownership, and it's -- everybody agrees you didn't decide the

25   fundamental ownership issue that was decided at trial.

1      **THE COURT:**  Right.  It's not that second sentence I'm

2  focused on.  It's the first one.

3      **MR. CARLSON:**  I understand.

4      **THE COURT:**  The word "fraud" tends to light people up

5  and be a magnet for people's attention.

6      **MR. CARLSON:**  I understand that.

7      **THE COURT:**  And your opponent's point is it's not at

8  issue in the case.  Then why is that wrong?

9      **MR. CARLSON:**  It's -- it's -- well, it is at issue,

10 whether VGH owns the MOVA assets.

11     **THE COURT:**  No.  No.  It's fraudulent.  It's the

12 fraudulent transfer part.  That's what I'm talking about.

13     **MR. CARLSON:**  I was sensitive to that, Your Honor,

14 when I was drafting this, but that is, in fact, what the issue

15 was.  It was a ruling on the fraudulent transfer --

16     **THE COURT:**  Yes, I understand that.  But applying

17 *Boulware*, why is it an issue in this trial?  I know it was an

18 issue in that order.  That's why it's in there.

19     **MR. CARLSON:**  The reason why it's -- it's relevant and

20 at issue is because the question is whether SHST's transfer to

21 VGH was effective.  And this was a ruling where the Court said

22 that we were likely to succeed --

23     **THE COURT:**  Yeah.  Let me -- well, okay.  I keep

24 interrupting you, so I apologize for that.  You can finish your

25 argument, and then I'll tell you what my concern is when you're

1  done.

2         **MR. CARLSON:**  Your Honor, I -- I'm done.

3         **THE COURT:**  My concern is this.  *Boulware* says when a

4  court has finally decided something, that's relevant.  This

5  sentence says two things that are problematic to me.

6         One is that it introduces the question -- it introduces

7  the concept that the transfer itself might have been

8  fraudulent.  That's not an issue in our trial.  It's just

9  calling somebody a word that is associated with bad actors for

10  no reason that I've heard you say or that I saw in the

11  statement.

12         The second is that it says the injunction order ruled that

13  Rearden was likely to succeed, which is a poor fit with

14  *Boulware*.  I'm not aware of any authority that makes it

15  relevant that a court ruling that somebody is likely to succeed

16  on something gets to be evidence in a second trial.

17         So those are my concerns.  If you want to respond, you

18  can.  If your preliminary injunction -- if the version I wind

19  up marking up is yours and not the defendant's, that sentence,

20  the whole sentence is likely to go out.

21         **MR. CARLSON:**  Yep.  Yep.  Your Honor, I think as I

22  indicated, I was sensitive to the load that those words carried

23  when I drafted this.

24         This sentence is drafted this way because I was trying to

25  have as much fidelity to the Court's decision as I possibly

1    could, but we're not wedded to the fraudulent transfer.

2        I think if you're going to -- if you're going to state

3    that the injunction did not resolve the -- who owned MOVA, I

4    think it should state what the -- what the injunction did say

5    on that point.  And that's that -- in words to the effect that

6    Rearden was -- was, you know, had shown or whatever that the

7    transfer to -- from SHST to VGH was not effective.  It just

8    balances the statement that it didn't decide the fundamental

9    ownership issue.  And, you know, frankly, we're not wedded to

10   any of that language.

11       **THE COURT:**  All right.  Ms. Young, I think I

12   interrupted you to ask Mr. Carlson a question.

13       **MS. YOUNG:**  No.  And I would just respond to what he

14   just said by saying the efficacy of that transfer also is not

15   at issue in the case.  The question is whether Rearden is the

16   owner of the MOVA assets.

17       There is another statement in the proposal from the

18   plaintiffs on the preliminary injunction order that I also

19   wanted to address, which is this statement that VGH was ordered

20   to serve a copy of the injunction order on defendant.  That may

21   be relevant if defendants' conduct after the injunction were at

22   issue.  It is not.  The Court has ruled that we're not liable

23   for any of that conduct, and so I think it's quite confusing to

24   provide that instruction to the jury.

25       **THE COURT:**  All right.  Submitted?

1          **MR. CARLSON:**  I was just going to say, I think we

2     already discussed that with respect to the previous issue.  The

3     post-injunction conduct is relevant.  It is -- you know, we do

4     not get damages for that.  But it is relevant to other issues.

5     And the fact that Digital Domain was ordered to serve it on

6     Disney, and then Mr. Chow received it and then chose not to

7     disseminate it to the production team on *Beauty and the Beast*,

8     all of that ties together.  And I think it's relevant and

9     admissible and should be in the instruction.

10              **THE COURT:**  Thank you, Mr. Carlson.  Submitted?

11              **MR. CARLSON:**  Yes.

12              **MS. YOUNG:**  Yes, Your Honor.

13              **THE COURT:**  All right.  Let's turn to the next one.

14          **MR. PERLMAN:**  May I say one small thing?

15              **THE COURT:**  No.  You may not.  You can text your

16     lawyer and see if he wants to say it.

17          **MR. PERLMAN:**  I will do that.

18          **THE COURT:**  He's representing you in this proceeding,

19     Mr. Perlman.

20          **MR. PERLMAN:**  Thank you.

21          **THE COURT:**  Mr. Spiegel, I think at long last, we have

22     arrived at capital letter C.

23          **MR. SPIEGEL:**  Thank you, Your Honor.  We are

24     requested, Your Honor, that the Court add two words to the

25     model instruction on the element of vicarious infringement that

1    says that the plaintiff must prove that the defendant had the

2    right and ability to control or supervise the infringing

3    conduct.

4        We think in conformity with Ninth Circuit law and Your

5    Honor's motion for summary judgment ruling, we should use the

6    formulation of the Ninth Circuit, which is the defendant had

7    the legal right and practical ability.  And the word that

8    really matters there, Your Honor, is "practical ability."

9    "Legal right," if Rearden objects to that, we're okay just

10   leaving it as "right," although "legal right" is what the

11   Ninth Circuit standard is.

12       "Practical ability" is a very important instruction to

13   give to the jury, and I think Your Honor's summary judgment

14   ruling reflects that at pages 11 and 12.  Your Honor says the

15   issue --

16       **THE COURT:**  I do have some concerns with a jury

17   determining a legal right.

18       **MR. SPIEGEL:**  Then let's --

19       **THE COURT:**  And I would ask whether any of those

20   present think it's a good idea to have jurors decide what the

21   law is.  I don't sort of doubt it.

22       **MR. SPIEGEL:**  I'll withdraw it, Your Honor.  It was

23   from the Ninth Circuit formulation.  So as I say, the real

24   issue here is practical, practical ability.  Your Honor defined

25   the issue we're trying in this case is whether Disney had the

1   practical ability to limit or control DD3's use of MOVA.

2   Pages 11 and 12 make that clear.  Your Honor says again on

3   page 12 --

4           **THE COURT:**  Yeah, I'm actually going to stop you

5   because I think you might have the wind at your back on this a

6   little bit.

7       Mr. Carlson, what's the prejudice to you of having to

8   prove that they had the practical ability to control the

9   conduct?  Why is that -- first of all, I'm not -- I do -- I

10  wonder whether Mr. Spiegel's wrong, and I should -- I wonder

11  whether he's wrong.  And why is that unfair to you?

12          **MR. CARLSON:**  Yeah, Your Honor, I think it's -- to get

13  to the point of why it's unfair, I think that "practical

14  ability" is something that any lawyer would recognize is a

15  gloss on the word "ability."  And it's one that we would send

16  lawyers and judges scurrying off to the cases to study and find

17  out what the boundaries of a practical ability are.

18      And -- and I don't think the jury is equipped to determine

19  what ability is practical and what is not.  Is it a matter

20  of -- if its -- if it requires walking across the street, is

21  that practical?  Is it -- is it practical if you're in the

22  middle of your lunch when that's going on?  What are the

23  boundaries on the word "practical"?

24      I think as lawyers and as a judge, we all recognize that

25  that word requires some context, and I think the jury is

1    ill-equipped to determine what is practical and what is not.

2         I think if we then look at the cases, right, to try and

3    find out, what we find is that in the Ninth Circuit, the

4    standard formulation is exactly what is in the pattern jury

5    instruction, the right and ability to control.  And, in fact,

6    that comes from the Supreme Court, so that language, that

7    formulation is -- is the standard.  However, there have been

8    cases where the -- the issue of the practicality of the ability

9    to control was at issue.  And the comments that are the

10   source --

11        **THE COURT:**  And do you -- and do you make that

12   distinction because you contend that the practical ability of

13   Disney is not at issue in this case?

14        **MR. CARLSON:**  I -- I -- yes.  I -- I think whether it

15   was practical for Disney to pick up the telephone and call

16   Mr. -- Mr. Perlman or use the email address that they had --

17   they had the telephone number.  They had his email address --

18   to just call and say, We saw this in the *Hollywood Reporter*.

19   You say that DD3 doesn't have a license.  Should we be

20   concerned about that?  That -- it's literally that level of

21   effort.

22        When you look at the cases that the comments cite that say

23   in certain cases it may be appropriate to instruct the jury on

24   practical ability, those are cases where it has to do with the

25   technical ability to -- to -- to detect and to prevent

1    infringement.  And that's --

2            THE COURT:  Do you have a copy of the case management

3    statement handy?

4            MR. CARLSON:  I do -- oh, the case management

5    statement?

6            THE COURT:  Yeah.  This is the one that lays out all

7    the issues we've been discussing.  Do you have that?

8            MR. CARLSON:  Yes.  Yes.  Yes.  I've got it right in

9    front of me.

10           THE COURT:  So the bottom of page 39, which is

11   ECF page 40, there is a Footnote 9.  Do you see that?

12           MR. CARLSON:  Yes.

13           THE COURT:  And it contains -- oh, I don't know --

14   roughly a dozen cases -- I haven't counted them -- all of which

15   defendants say stand for the proposition that lots of cases

16   that don't use online infringement use the "legal right" and

17   "practical ability" language.

18       And my question for you is -- because everyone on both

19   sides is saying to me, Oh, you just have to do what the

20   Ninth Circuit always does, but then -- but you don't agree on

21   what they always do.

22       If I ask somebody to read all those cases or I take the

23   time myself to do it, will they have -- will it turn out that

24   they've been miscited to me?

25           MR. CARLSON:  Does the Court want me to address that

1    point, Your Honor?

2            **THE COURT:**  I do.

3        **MR. CARLSON:**  Okay.  In the time that we've had

4    available, I have not been able to read this entire -- all of

5    the cases that are in this string cite.  We have, in previous

6    briefs to the Court, submitted string cites of the standard

7    formulation of right and ability.

8        What I was able to do was pull the Marvin Gaye case which

9    they cite in the body of their brief and review that.  And they

10   are correct that the Marvin Gaye case cites the *Perfect 10*

11   language when it's citing the formulation of the rule.

12           **THE COURT:**  Yes.  This is in Footnote 8 on page 38.

13   Yeah.

14       **MR. CARLSON:**  Yeah.  It's -- yes.  Well, it's on

15   page -- it's cited in the body of the brief.  It starts --

16   yeah.  I'm sorry.  You're right, Your Honor.  It's in

17   Footnote 8.

18       And in the Marvin Gaye case, it does state the -- the

19   right and ability language that comes from *Perfect 10*, but the

20   practical ability to control is not at issue anywhere in that

21   case.  It cites that formulation, and then it moves on to -- to

22   other issues, and there is no analysis of -- of what the --

23   what an ability needs to be in order to be practical.

24       The cases that provide that context are the ones that are

25   cited in the comments of the -- of the jury instruction, and

1    those are *Perfect 10* and -- but -- oh, it's the *Visa* case.  And

2    those two cases are ones in which it had to do with the

3    technical ability of the defendant to -- to control.  And

4    that's just simply not at issue in this case.

5         THE COURT:  All right.  Mr. Spiegel, what's your

6    favorite case in Footnote 9, if you have one?

7         MR. SPIEGEL:  Well, Your Honor, we would say the cases

8    that we've cited in our lead briefing --

9         THE COURT:  That's not the question.

10        MR. SPIEGEL:  Okay.

11        THE COURT:  You can say "I don't know."

12        MR. SPIEGEL:  I understand --

13        THE COURT:  The question I asked is -- excuse me, sir.

14   The question I asked is what is your favorite case in

15   Footnote 9.  It's a softball.  If you have one?

16        MR. SPIEGEL:  *Range Road*, Your Honor, the first one

17   cited.

18        THE COURT:  Thank you, sir.

19        MR. SPIEGEL:  May I further respond, Your Honor, to

20   Mr. Carlson?

21        THE COURT:  Please.

22        MR. SPIEGEL:  Practical ability is exactly an issue

23   that the jury is well qualified to decide, Your Honor.  So it

24   is exactly the issue that Your Honor has identified for trial

25   here.  The jury is to decide what's practical.

1           And in terms of legal citations, Rearden's own briefing in

2   opposing our summary judgment motion on vicarious infringement

3   used the practical ability standard.

4               **THE COURT:**  Yes, I saw that.

5           **MR. SPIEGEL:**  Your Honor used it in your ruling and,

6   of course, we used it.  That's the law.  Practical ability.

7           And even the cases that -- that Rearden cites in the

8   pretrial conference statement, the *Zillow* case, for example,

9   they use -- that case uses practical ability as well.

10          And the reason why it's important in this case -- I'm sure

11  Your Honor realizes -- is for Rearden to be left to argue,

12  well, you know, Disney is a giant company.  They have the

13  ability to do a million different things, hire tons of law

14  firms to go audit the vendor's software licenses and so forth.

15  That's not the law in the Ninth Circuit or anyplace else.

16          So we think practical ability is the core issue for trial

17  in this case, and I think Your Honor has said that in the

18  summary judgment motion.

19              **THE COURT:**  Gentlemen, I think we have placed as much

20  weight on this one word in one jury instruction in this large

21  case as it could possibly bear, and we're going to move on to

22  capital letter D.

23              **MR. CARLSON:**  Your Honor, Mr. Patterson is going to

24  address this point.

25              **MR. KLAUS:**  And Ms. Herrera will present for us, Your

1    Honor.

2              **THE COURT:**  Very good.

3         Good morning, Mr. Patterson.

4              **MR. PATTERSON:**  Good morning, Your Honor.

5              **THE COURT:**  So my questions for you are two.

6         First, why is *Lomeli* wrong?  And in your papers, you say,

7    well, in that case, you know, the third parties did -- they did

8    have third-party declarants.  But my question would be isn't

9    Disney's declarant here, whose last name I forgot to write

10   down, in the same position as the declarant called Mulcahy,

11   M-U-L-C-A-H-Y in *Lomeli*.  But I think the more important

12   question is doesn't the case *Lomeli* cites, which is *MRT*,

13   basically make this argument for Disney in a way that's

14   convincing?  Those are my questions for you.

15             **MR. CARLSON:**  Well, Your Honor, the difference between

16   *Lomeli* and this case is that in *Lomeli*, the declarants had the

17   actual information and knowledge to submit the declaration.

18   And the declaration from Ms. Stankevich, she simply doesn't

19   have the foundation, or at least she didn't establish the

20   foundation in her declaration that she had information about

21   how these third parties collected information and if they were

22   done by persons with knowledge of their contents.  It is simply

23   not there.

24             **THE COURT:**  Okay.  Have you, by any chance, read the

25   *MRT* case which, out of fairness to you, I will say I don't

1    think any party cites, but the *Lomeli* court cites?

2         **MR. PATTERSON:**  No.  I think both parties discuss *MRT*,

3    Your Honor.

4         **THE COURT:**  Oh, you do, actually.  There it is,

5    quoting *MRT*.  I take it back.

6         **MR. PATTERSON:**  Yes.  Well, I would submit that first

7    of all, the Ninth Circuit's analysis in MRT is very succinct.

8    It doesn't really explain its reasoning.  And I think it's

9    unique facts because there, it was about whether the client

10   could rely on the accuracy and reliability of law firm bills

11   that the client itself had to pay.  And so --

12        **THE COURT:**  Right.

13        **MR. PATTERSON:**  And so I think that those are unique

14   circumstances because, of course, the client has to rely on the

15   accuracy of law firm bills that the client actually pays.

16        **THE COURT:**  Well, anticipating an argument I would

17   expect Ms. Herrera to make, what happened in *MRT* is that, as

18   you say, the client engaged a law firm, they got bills from the

19   law firm, and they had to rely on the information that was put

20   together by somebody else.  And they didn't know how it was put

21   together, but they had to rely on it.

22        As I understand the information here, it consists of

23   something like marketing documents that were prepared by a

24   third party that Disney engaged.  And I would assume that when

25   somebody hires a marketing consultant, it's very similar to

1    hiring a law firm.  They're going to get this information from

2    them.  They're going to rely on it.  That's what they paid them

3    for.  So I need more help from you in understanding what the

4    meaningful distinction is between what happened in *MRT* and what

5    we have here.

6        And on the point that *MRT* court could have said more about

7    why they did what they did, I'm just a trial judge.  So when

8    the Ninth Circuit says, do it this way, I just do it that way.

9        **MR. PATTERSON:**  Well, I don't think the Ninth Circuit

10   provided enough guidance to the district court to -- to Your

11   Honor in making this decision because I don't think the Court

12   identified what are the specific unique factors that would

13   allow one business to get in another business' records.  And so

14   I think that's the issue.  And I think it's certainly a

15   case-by-case decision.

16       **THE COURT:**  Well, here's -- it's a little more

17   complicated than the sentence you just said.  What you just

18   said is that would allow one business to get in another

19   business' records.  But I think to make that sentence complete,

20   the question is, what is the rule about when a business is

21   itself in possession of records created by a third party that

22   it asked for or paid for -- what's the rule in that situation.

23   And I don't know.

24       I have *Lomeli*.  I have *MRT*.  Is there a case that says --

25   I don't think there is authority in the plaintiff's section of

1    this part of the case management statement.

2         MR. PATTERSON:  Right, Your Honor.  This was written

3    in the course of about an hour pending the deadline for

4    submission of this.  I would be happy to research this further

5    for the Court.

6         I also think it's a document-by-document decision in the

7    sense that some of these marketing surveys contain hearsay

8    within hearsay.  In other words, there's surveys of individuals

9    who have seen the movie.  A 12-year-old girl in Kansas says, "I

10   went to the movie because I like Belle, and Belle is the reason

11   I went to the movie."  And so I anticipate Disney trying to

12   offer this, perhaps even in its opening statement, for the

13   truth of the matter, that that's why people went to see the

14   movie.

15        So even if the Court is skeptical of our argument

16   regarding Disney's ability to establish foundation on hearsay,

17   I still believe that it's a document-by-document decision.

18        THE COURT:  Ms. Herrera, I did some of your work for

19   you already.

20        MS. HERRERA:  Yes, you did, Your Honor.  I think Your

21   Honor has hit on the key points.  As far as what the test is

22   for a circumstance like this where a party has asked a third

23   party to prepare records for it that it relies on in the

24   ordinary course of its business, the test is MRT.  And this is

25   quoted in full in *Lomeli* which we cited first because I think

1   the facts are quite analogous.

2        But the rule is, in this circuit, records a business

3   receives from others are admissible under Federal Rule of

4   Evidence 8036 when those records are kept in the regular course

5   of that business, relied upon by that business, and where that

6   business has a substantial interest in the accuracy of the

7   records.

8        **THE COURT:**  In the interest of time, I'm going to jump

9   over that point because I think you're going to win that.  What

10  about the hearsay within hearsay?

11       **MS. HERRERA:**  So that's the first time we've heard

12  that argument, Your Honor.  I don't believe there is hearsay

13  within hearsay within these documents.  I would have to look on

14  a document-by-document basis.

15       I believe the exhibits that plaintiffs are holding out on

16  here are sort of marketing research strategy reports, like

17  higher level strategy, but I would have to look at it.  There

18  may be hearsay within hearsay.  And I think for those, we're

19  not offering them for the truth of the matter.  We would have

20  to do that on a document-by-document basis.

21       But the question here is whether these are business

22  records that we have authenticated through a declaration that

23  satisfies the requirements of Rule 90211.  Ms. Stankevich is a

24  senior vice-president of marketing at the Walt Disney Company.

25  She knows and has established that these are the types of

1    records that Disney relies upon in producing and distributing

2    its movies.  And the practical import of this issue, Your

3    Honor, is that if these -- if these exhibits don't come in as

4    stipulated business records, we will have to call

5    Ms. Stankevich as a witness for the sole purpose of repeating

6    what she says in her declaration, which is not a good use of

7    the jury's time or our time --

8         THE COURT:  Well, I don't think we need to get into

9    that, but I will just tell you, I don't know why you would do

10   that.  If Court ruled that her declaration testimony was

11   insufficient to establish these as business records, having her

12   say the same thing live I don't know would make a difference,

13   would it?

14        MS. HERRERA:  I -- I take Your Honor's point.  I think

15   we would also update the declaration to address whatever

16   deficiencies Your Honor found, but that -- that's the concern

17   here with these records.

18        THE COURT:  Okay.  Whoops.  It says Mr. Carlson still,

19   so I apologize, counsel, but I need your name again.

20        MR. PATTERSON:  Certainly.  It's Jerrod Patterson.

21   We're all in the same room here.

22        THE COURT:  That's fine.  Mr. Patterson, last words on

23   this topic.

24        MR. PATTERSON:  Well, there's a second set of

25   documents that are at issue, Your Honor.

1          **THE COURT:**  I don't know.  I'm on this -- I'm on this

2     same business records capital letter D part of the case

3     management statement.  And my question for you, having --

4     you're already having made an initial argument is whether you

5     have any further argument now that you've heard from

6     Ms. Herrera.

7          **MR. PATTERSON:**  Yes, Your Honor.  There is a second

8     group of documents under capital letter D, and that's a series

9     of TV ads that Disney seeks to introduce.  And when we were

10    conferring with Disney, we said that we would stipulate to

11    their authenticity, not admissibility, but authenticity if they

12    submitted a declaration that the ads were actually aired.  And

13    the -- the declaration actually just said that they were used

14    to promote the movie and not -- not aired.

15         But the more important point here is that we still object

16    on relevance grounds.  What -- what we have is at least 50

17    different ads that there's no context for, when were they --

18    they were aired, to what demographics they were aired.  So I

19    anticipate Disney is going to try to move into evidence 50 ads

20    and then use the ads that favor their side and say, you know,

21    that this was the cornerstone of the Disney's promotional

22    campaign.  But without any kind of context through the use of

23    the ads and running the ads, there is simply no way to

24    establish their relevance.

25         **THE COURT:**  Ms. Herrera, how many ads are there

1   currently in dispute between the parties?

2           **MS. HERRERA:**  There are about 50, Your Honor.  But

3   this is a -- sort of a separate issue.  It's not a business

4   record issue.

5       We're not asking plaintiff to stipulate to their

6   relevance.  The only issue from our perspective is that

7   plaintiff asked us to provide a declaration establishing that

8   the ads were actually run.  They now are using the word

9   "aired."  We provided that declaration.  Their sole issue is

10  that they don't like that Ms. Stankevich said, "used to promote

11  *Beauty and the Beast* to the public," which could only have one

12  meaning if it was actually used to promote to the public.

13          **THE COURT:**  Let me stop you.  Let me stop you.  This

14  is really head-of-a-pin stuff, but that's where we're going to

15  go because apparently that's where the fight is.

16      Did they use -- this is a yes-or-no question.  Did they

17  use a specific word that they wanted your declarant to use

18  before they would agree to authenticity?

19          **MS. HERRERA:**  So I did not understand that to be the

20  substance of the objection, but the specific word they used on

21  the exhibit list was "ran."

22          **THE COURT:**  They said --

23          **MS. HERRERA:**  It was not "aired."

24          **THE COURT:**  Okay.  They said we want a declaration

25  from someone that said that they ran, the ads ran?

1          **MS. HERRERA:**  That's correct.  Although we didn't

2     discuss that it needed to be that word.

3          **THE COURT:**  Okay.  No.  I understand.  But this is the

4     fight we apparently are having.

5          **MS. HERRERA:**  It is.

6          **THE COURT:**  Does your declaration use in any

7     conjugation the verb "run"?

8          **MS. HERRERA:**  No, Your Honor, that's not an industry

9     term, so our declarant used language that --

10         **THE COURT:**  That's also a yes-or-no question.  I'm not

11    asking for argument about whether it was the right or not-right

12    thing to use that word or do they have the right to insist on

13    it or whatever.  This is lawyers fighting about whether

14    something can come into evidence or be authenticated.  They

15    made a request.  It sounds to me like the request was not

16    satisfied.

17         So the parties' prior course of dealing about whether

18    there is an agreement is irrelevant.  Now we just have this

19    exhibit.  And the question is, is it authentic; right?  Because

20    you yourself have said you don't understand there to be any

21    stipulation to admissibility.  The question is, is it

22    authentic.  And I'm gathering that -- and authentication, as

23    you all know, is a fairly low bar.  And this Ms. Stankevich who

24    does high-level marketing decision-making for Disney says, "We

25    made these ads, and we showed them to some focus groups";

1    correct?  Or something like that.

2            **MS. HERRERA:**  She actually said they were used to

3    promote the movie to the public.  She doesn't say, "We made

4    them and they were shown to focus groups."

5            **THE COURT:**  I see.  Okay.  But she says Disney made

6    these.

7            **MS. HERRERA:**  That's correct.

8            **THE COURT:**  And then we used them as you just said.

9        So then, Mr. Patterson, my question is, A, are we really

10   fighting now about authenticity only?  Is that what we're

11   fighting about?

12           **MR. PATTERSON:**  Yes, Your Honor.  But authenticity

13   with respect to whether they are what they purport to be, which

14   is ads that were actually aired.

15           **THE COURT:**  Well, you're going to have a -- okay.

16   Ms. Herrera is a witness going to be on the stand and say

17   here -- you know, we made these ads, and here's who we showed

18   them to?

19           **MS. HERRERA:**  So, Your Honor -- others should correct

20   me if this is not -- others on my team should let me know if

21   this is not correct.  But I don't believe that is the intent.

22   I believe that these exhibits were relied upon by our marketing

23   expert, and she is going to testify about them so the purpose

24   of the declaration was for someone with knowledge from Disney

25   to authenticate them in advance of trial because plaintiffs

1   were maintaining authenticity objections.

2          THE COURT:  And is it -- and can I infer from what

3   you've just said that these videos will not be shown to the

4   jury?

5          MS. HERRERA:  I believe that is correct, but if --

6   Mr. Klaus can address that if that's not right.

7          THE COURT:  Mr. Klaus, is that correct, they will not

8   be shown to the jury?

9          MR. KLAUS:  It is a commercial, Your Honor.  We think

10  that they -- we would reserve the right to show --

11         THE COURT:  That is not my question.  It is the

12  Thursday before jury selection.  I need to decide this.  Are

13  you going to show them to the jury?  You can say yes --

14         MR. KLAUS:  Yes.

15         THE COURT:  -- and then not actually show them.

16  That's fine.

17         MR. KLAUS:  Yes.

18         THE COURT:  Okay.  Great.  I'm sorry if I'm becoming

19  more stern as time goes by.

20     Mr. Patterson -- well, first of all, who -- what witness

21  is going to be testifying while those videos are being shown,

22  Mr. Klaus?

23         MR. KLAUS:  That would be Ms. Kershaw, who is our

24  marketing expert, Your Honor.

25         THE COURT:  And will she say to what use the videos

1    were put when they were originally made?

2        **MR. KLAUS:**  Yes.  Yes.  That they were commercials

3    that were shown to the public.

4        **THE COURT:**  Interesting.  This is getting harder, not

5    easier.

6        Mr. Patterson, as you know, experts are permitted to rely

7    on anything that an expert in their field would typically rely

8    upon, even when it's hearsay or whatever.  But now I think we

9    have a different issue in front of us because the question

10    of -- they can rely on it, but that doesn't mean necessarily

11    that it gets presented to the jury.

12        This feels a little undeveloped.  I feel like all of

13    sudden, I'm going to want to start asking questions that are

14    not addressed in this case management statement.  Perhaps I

15    should just let the parties finish making their arguments.

16        Mr. Patterson.

17        **MR. PATTERSON:**  I don't have much else to say, Your

18    Honor, other than I certainly agree with Your Honor, that an

19    expert can rely on otherwise inadmissible material.  The issue

20    with authenticity is that when Ms. Kershaw takes the stand and

21    says these 30 -- you know, these 50 ads were aired in the

22    promotion of the movie, then that's a disconnect between what

23    Ms. Stankevich said and what Ms. Kershaw is expected to say.

24        **THE COURT:**  Ms. Herrera, on what syllable of her last

25    name does Ms. Stankevich place the greatest emphasis?

1          **MS. HERRERA:**  I believe it's the first one,

2    Your Honor --

3          **THE COURT:**  Stankevich.

4          **MS. HERRERA:**  Or maybe it's the third.  Stankevich.

5    Yeah.  That's correct.

6          **THE COURT:**  Well, she is your expert.  I'm going to go

7    with your pronunciation.

8       What does she say in the declaration about when these

9    videos -- when and to whom these videos were shown?

10         **MS. HERRERA:**  So all Ms. Stankevich says in the

11   declaration is that they were used to promote the movie to the

12   public.  We understood that to be what plaintiffs' authenticity

13   question was.  We think questions about when, how many times,

14   in what markets, that is discovery.  Plaintiffs could have

15   taken discovery on those facts.  Ms. Stankevich was disclosed

16   as a witness.  They did not depose her.

17      So we didn't think that an authenticity declaration needed

18   to sort of develop all of those facts.  We understood the issue

19   to be whether they actually ran, which we thought was a fair

20   question.  And Ms. Stankevich went and personally checked that

21   each one actually was used to the public.  I represented that

22   to Mr. Patterson in our meet and confer.  And that is what the

23   declaration says.

24         **THE COURT:**  I think I've been saying Ms. Stankevich.

25   The case management statement says that the person's name is

1    Ryan Stankevich.

2              **MS. HERRERA:**  That's correct.  She is a woman.  She

3    uses she/her pronouns.

4              **THE COURT:**  Thank you.  So there are other objections

5    to these marketing reports, but there is just an authenticity

6    objection to the TV ads; is that correct, Mr. Patterson?

7              **MR. PATTERSON:**  No.  There is a relevance objection as

8    well.

9              **THE COURT:**  All right.  I'm going to take that under

10   submission.

11        The parties have asked me not to address capital letter E

12   today, which brings me to capital letter F, which is the scope

13   of Alberto Menache's expert testimony.

14             **MR. KLAUS:**  Yes, Your Honor.  That's me.

15             **THE COURT:**  All right.  Go ahead.

16             **MR. KLAUS:**  Yes, Your Honor.

17        The -- the issue here is that Mr. -- Rearden intends to

18   have Mr. Menache offer the opinion that DD3 used blendshapes,

19   and in the -- in the -- in the course of creating the -- the

20   MOVA Rig, and that -- not the MOVA Rig, I'm sorry, the Beast

21   Rig.  And that this is, we believe, an attempt to bring into

22   evidence evidence that was excluded through the Maya Scripts

23   order, which is Docket 480.  The entire point of the

24   Maya Scripts order, as stated on page 1 and 2, was that we

25   moved for an order precluding Rearden from introducing evidence

1  at trial related to the theory that DD3 infringed Rearden's

2  copyright --

3          THE COURT:  Mr. Klaus --

4          MR. KLAUS:  Yes?

5          THE COURT:  Is your argument that Mr. Menache wants to

6  testify that these characters were created using blendshapes,

7  and the only way to make blendshapes is through the use of Maya

8  Scripts?  And the Court already precluded evidence regarding

9  the use of Maya Scripts?  Is it more complicated than that?

10         MR. KLAUS:  It -- that is, in essence, the argument,

11 Your Honor, but I would like -- can I make one -- can I say one

12 thing in addition to that?

13         THE COURT:  Yes.

14         MR. KLAUS:  Is that what Rearden now says is that

15 Mr. Menache should be able to testify about blendshapes without

16 mentioning the word "Maya Scripts."  And the problem with that

17 is Mr. Menache said in his surrebuttal report, he said in his

18 deposition testimony, that Rearden has designated and submitted

19 that the way that these blendshapes were created was with Maya

20 Scripts files, meaning the use of MOVA, according to Rearden,

21 after the point in time when the tracked mesh was created.

22     And at -- what the order said on page -- at Docket 480 at

23 page 10 is that there was prejudice to us because fact

24 discovery was closed, and we had had no opportunity to take

25 discovery of whether scripts were used after the tracked mesh

was delivered to DD3's visual effects team.

          **THE COURT:**  Mr. Carlson, who will argue this for Rearden?

          **MR. CARLSON:**  Your Honor, I will respond.

    This is -- is or should be a non-issue.  It arises out of a great deal of confusion that defendants have created.  I'd like to take a moment to clear up the confusion.

    The first is what is blendshapes?  When you capture an actor's performance and you intend to -- to do a continuous capture, that is, that the actor stands there and delivers all the lines from the scene that you want to do and then MOVA is used to stitch, frame by frame, all of those together so you have a moving mesh.  And then that is used to animate the face.  That is one way of animating a face.

    Another way is to do what's called FACS, F-A-C-S, poses, and in that instance, the actor stands in the MOVA Rig and makes faces, essentially.  They get a passive face, a big smile face, a little smile face, eyes, surprised face, scared face.  They make a whole bunch of these, and it's just a single frame for each one.

    And then all of those are put together in a library, and it becomes like a pallet that the -- that the animator can use.  So the animator wants the Beast to smile.  So he takes a passive face and then puts that in.  And then several fames down, he puts the smiley face in.  And then blendshapes is a

1  software function that blends the two together so that you can

2  see the smile gradually emerging from the passive face.

3      That's what blendshapes is.

4      Now, the second source, I think, of confusion that

5  defendants have created here is when they talk about

6  Maya Scripts, and we've all -- we used that term before, but we

7  were using it before specifically with reference to MOVA's

8  Maya Scripts.  That is, Rearden wrote scripts in Maya's

9  proprietary language just for use with Rearden's MOVA output.

10  Right?  So it provided those -- and one of those scripts was a

11  script that allowed the creation of blendshapes.

12      Maya comes from Adobe.  And Maya has built-in scripts, and

13  one of those built-in scripts also creates blendshapes.  And

14  what Mr. Menache is going to testify to is that DD3 created or

15  captured FACS poses, a set of FACS poses and that he believed

16  that when DD3 animates -- animated the Beast face, it did it

17  using blendshapes.  They used that technique.

18      I think a final source of confusion here is that the

19  citations to Mr. Menache's deposition transcript don't say what

20  the defendants say they say.  And I'll take an example here.

21      **THE COURT:**  Well, let me -- I want to hear that

22  argument, but let me ask you a couple of questions to make sure

23  I'm following your argument.

24      **MR. CARLSON:**  Yes.

25      **THE COURT:**  Is it possible to create a blendshape

1    without copying a Maya Script file?

2         **MR. CARLSON:**  Yes.  Yes.  Blendshapes is a standard

3    hand animation technique.  It is the preferred technique in the

4    industry because it's faster than having to make each of the

5    changes of expression by hand.  And it doesn't matter whether

6    MOVA was used to originally capture the FACS pose or Medusa,

7    Disney's proprietary facial animation or facial capture system,

8    or any other facial capture system that's available.

9       You take the -- you take the tracked mesh for the facial

10   pose --

11        **THE COURT:**  Yes.  On page -- I'm just going to stop

12   referring to both sets of pages and just use the one that --

13   number that's at the bottom of the actual printed page.  On

14   page 49, Disney says that Mr. Menache opined that DD3 used MEL

15   Scripts for its work on *Beauty and the Beast* and that what

16   Disney says is that by that reference, Mr. Menache meant Maya

17   Script files.

18        **MR. CARLSON:**  No.

19        **THE COURT:**  Is that correct, or do you disagree?

20        **MR. CARLSON:**  It is not correct.

21      So MEL is the name of Maya's proprietary language,

22   programming language for writing scripts.  It is the language

23   that Rearden used when it wrote MOVA Maya Scripts.  It wrote it

24   in the MEL programming language.  It's also the same language

25   that Adobe used when it programmed the same functionality --

1          **THE COURT:**  Yeah.  Let me interrupt you because I

2    really am concerned about time at this point.

3          Mr. Klaus, I don't know -- I don't feel that in this

4    hearing, I'm going to be able to resolve what sounds to me like

5    a fairly technical dispute about whether or not the software in

6    question used Maya Scripts and if so, to what extent.  I mean,

7    it just feels very much not like something that I should be

8    dealing with on the fly.

9          **MR. KLAUS:**  Your Honor, I would say the following,

10   which is we'd be happy to take this up at another point when

11   we're working before Mr. Menache gets on the stand.  However, I

12   do need to say that in response to what Mr. Carlson said about

13   the -- that Mr. Menache is going to testify that the

14   blendshapes were created using Adobe's off-the-shelf Maya

15   Scripts, what Mr. Menache actually said in his surrebuttal

16   report, which is the first time that the -- which is the first

17   time that we had an explication of his theory that the

18   blendshapes were used.  And this is -- I'll give you a docket

19   number.  It's 411-3.

20         And what he says, "In the same group of post discovery

21   files, I, Mr. Menache, found a few files used to generate FACS

22   blendshapes.  The image below shows a file that was open."

23         He then says it is very clear that the scripts, meaning

24   the Maya Scripts, that he's just described, are loaded into RAM

25   when any of these Maya files is opened.  It can also be shown

1  MOVA was used to create blendshapes using the FACS expressions

2  captured by MOVA Contour.

3       And he says on the following page when describing the

4  scripts -- he says that the scripts that he found were used to

5  create blendshapes.  He says, "We have seen this has already

6  been done."

7       And the last thing I would say, Your Honor, is that in the

8  portion of Mr. Menache's deposition that Mr. Carlson designated

9  at page 338:  "Question:  Where is the MOVA Contour software

10 program used in the process of creating a blendshape?"

11      Mr. Menache's answer is, "It's used in the capture.  It's

12 used in the processing, then the tracked meshed mesh, and then

13 the creation of actual blendshapes."

14      The only opinion that has ever been disclosed to us at any

15 point in time -- and this was well after the close of fact

16 discovery -- was that it was the Maya Script files that -- that

17 Rearden alleged contained their source code, not Adobe -- not

18 Adobe.  And that's -- that's really -- that's our concern with

19 this.

20           **THE COURT:**  Does anyone object to my displaying a few

21 pages from Mr. Menache's report at ECF411 on the screen?

22           **MR. CARLSON:**  No objection, Your Honor.

23           **THE COURT:**  It's under seal, so I need the parties'

24 permission before I do that.

25      Mr. Klaus, do you have any objection?

1          **MR. KLAUS:**  I believe this was all Rearden

2     confidential information.  They were the ones who wanted

3     this --

4               **THE COURT:**  Do you have an objection, Mr. Klaus?

5          **MR. KLAUS:**  No.

6               **THE COURT:**  Thank you.

7          Okay.  There's page 5.  I think that's the page Mr. Klaus

8     was just reading from.

9          Okay.  Now I'm on page 4.  And you can see it says, "And

10    opens another Maya window."

11         Mr. Carlson, is it your contention that that -- "another

12    Maya window" refers to something other than the Maya Scripts,

13    which were the subject of the Court's prior order?

14         **MR. CARLSON:**  Your Honor, I don't have enough context,

15    and I don't want to mischaracterize the report.

16         So here, he is -- it appears that he is talking about

17    functionality built into Maya as opposed to a -- a

18    Rearden-authored tool.

19         Maya contains a window called Hypergraph.  That's a --

20    that's a built-in Maya function, and the image below shows it

21    with the script notes.  And then it says the user can select

22    and open another Maya window.

23         So I guess that's how I would interpret this.

24              **THE COURT:**  Well, these -- I gather the graphic

25    representation from this page that's now on everyone's screen

that shows, quote, script nodes.  Those are Maya Script nodes

of the kind that I -- in the way that I used Maya Script in my

prior order; correct?

       **MR. CARLSON:**  Well, Maya -- Maya Scripts are

MEL Scripts, and Rearden wrote MEL Scripts and Adobe wrote MEL

Scripts.  Adobe has built-in MEL Scripts that perform

blendshapes.

    Your Honor, may I point out that at the time the report

was submitted, we were focused on MEL Scripts because that was

an infringement issue.  And so we didn't -- we didn't discuss

all the other ways that blendshapes can be created.

    But the -- the -- the argument that FACS poses that were

captured using MOVA and therefore infringed were used to hand

animate the Beast is still viable in the case.

    And, Your Honor, may I -- may I just read from -- briefly

from the script that defendants cited in support of this

proposition?

       **THE COURT:**  You may, but I have to tell you, our

discussion of this topic is rapidly coming to a close.  I'm

being asked to process too much information in too short a

period of time without adequate context.  And I have the

feeling, now that I've taken a look at this report, that if I

can really get my arms around it, I'm going to wind up being

deeply disappointed by at least one of the positions that was

taken today.  But I don't know as I sit here right now which

1    one that is.

2         Go ahead.

3         **MR. CARLSON:**  Your Honor, this is at pages 44 to 45 of

4    the Menache deposition, and it makes the distinction I just

5    articulated clear.  And this is cited by Disney.

6         Here is the question.  "You said Maya is a computer

7    software; correct?

8         "Yes.

9         "And it has a programming in it that is separate and

10   distinct from the MOVA Contour software program; correct?

11        "Yes.

12        "And that those programs within Maya can do things that

13   the MOVA Contour software program cannot do; is that right?

14        "Yes.

15        "And what kind of things can the Maya software program do

16   that the MOVA Contour software program cannot do?"

17        The witness gives some examples.

18        "Question:  Anything else that would have been used top

19   animate the Beast that is a functionality in the Maya program

20   that you can't do with MOVA Contour software?

21        "Answer:  Yeah.  Animating the face using blendshapes."

22        This is a direct quote from a portion of his deposition

23   that Disney cites.

24        **THE COURT:**  Sounds helpful.

25        I'd like the parties to just talk with each other and

1   figure out how you can brief this a little more thoroughly as a

2   standalone motion.  I want to discourage the parties from

3   unnecessary length, but having said that, this is a complicated

4   issue.  And by, I don't know, 3:00 today, just file a

5   stipulation telling me what the schedule is so that I can

6   anticipate when these papers might come in.

7        Okay.  Let's turn to capital letter G, which I think is

8   the last issue the parties want to discuss today.  And that is

9   captioned as evidence of MOVA's ownership prior to August 2012

10  but appears to relate to or relate primarily to a meeting or

11  meetings that Mr. Perlman had in 2008.

12           **MR. KLAUS:**  That's Ms. Herrera for us, Your Honor.

13           **THE COURT:**  I want to hear from the plaintiffs first.

14  Mr. Carlson, who will be arguing this for Rearden?

15           **MR. CARLSON:**  It would be me, Your Honor.

16           **THE COURT:**  Do you think Disney mischaracterizes the

17  Court's prior rulings?

18           **MR. CARLSON:**  I -- I did not go back and compare the

19  Court's prior rulings to what they said about them.  So I -- I

20  wouldn't be comfortable jumping in and answering that.

21           **THE COURT:**  Okay.

22       Further argument?

23           **MR. CARLSON:**  Yes.  From us, first of all, there's a

24  disjunct between the heading and what they talked about in the

25  body.  It sounds like from the heading, they want to exclude

1    everything that happened before August 2012.  And in the body,

2    we're talking about two meetings that happened in

3    October of 2008.

4        I think it's -- it's preposterous to try and exclude

5    everything that happened before August 2012.  That's, you know,

6    six years of invention by a dozen people to develop this

7    software that costs Rearden $12 million.  And in a copyright

8    case, we can't get that to the jury?  So I think that's just --

9    that's just absurd.

10       So assuming that what defendants actually are concerned

11   about are two meetings with Disney senior executives, including

12   Bob Iger that occurred in October of 2008, I do think that this

13   is relevant to Disney's ability to supervise or control.  These

14   are the meetings that gave Disney the email address for

15   Mr. Perlman.  It gave them his phone number, which they used in

16   the course of doing this.  And it provided notice to Disney

17   that Rearden's OnLive company owned the MOVA copyright.

18       And they are free to attack on cross-examination the

19   passage of time between 2008 and 2015, even though most or if

20   not all -- well, I know not all, but most of the executives

21   were still with the company.

22       But they're free to try and attack the weight that should

23   go into this.  But I think it's clearly relevant that

24   Mr. Perlman met with senior executives, not once, but twice,

25   including the chairman of -- of the Walt Disney Company and

1    told them about MOVA and discussed MOVA and what it could do

2    for Walt Disney.  And so we think that -- that should come in.

3        I guess it should come in on the right and ability to

4    supervise or control.

5            **THE COURT:**  Well, and actually you made the point a

6    second ago that it's relevant on the issue of whether -- of

7    notice to Disney that Rearden owned the MOVA copyright.  And I

8    think the parties dispute whether that is at issue in the

9    trial.  But I agree with you, if that is at issue in the trial,

10   then it's potentially relevant.  So, all right.

11       Mr. Klaus, who will argue this point for Disney?

12           **MR. KLAUS:**  Ms. Herrera, Your Honor.

13           **THE COURT:**  Oh, that's right.  You said that.

14       Ms. Herrera.

15           **MS. HERRERA:**  So just jumping off from Your Honor's

16   last point, it is undisputed that Rearden owned MOVA prior to

17   the August 17th, 2012 assignment for the benefit of creditors,

18   and it is also undisputed that as of August 18th, 2012, Rearden

19   did not own MOVA.  That is part of the undisputed facts before

20   the Court in the pretrial conference statement on page 2.

21       There is no dispute.  Everyone --

22           **THE COURT:**  Isn't that a different issue, though?

23   That's a different issue.  The issue is, is Disney's knowledge

24   of Rearden's ownership relevant.

25           **MS. HERRERA:**  I understand Your Honor's point.  Let me

 1   make my point a different way.

 2        Disney is not denying and isn't going to contest that

 3   Rearden owned MOVA prior to August 12th, 2017 or that Disney

 4   was aware of it.  That's not a live issue in the case.

 5   Everyone agrees that Disney had knowledge or awareness that

 6   MOVA was owned by Rearden prior to that date.  And everyone

 7   agrees that after that date, MOVA was not owned by Rearden.

 8        And so in Your Honor's summary judgment order on page 7,

 9   Your Honor talked about these exact meetings in 2008.  It was

10   in the context of the contributory infringement claim because

11   that was the purpose for which this evidence was initially

12   offered.

13        And Your Honor describes the evidence and then says on the

14   bottom paragraph of that page, "All of the foregoing

15   interactions involving Disney predate LaSalle's 2013 sale of

16   the MOVA assets to SHST and are thus not probative of whether

17   Disney knew in 2015 that DD3 was not authorized to use the MOVA

18   technology."

19        And there Your Honor is quoting *Crystal Dynamics*.  And

20   so --

21             **THE COURT:**  Right.  And that's still true.  So is this

22   sort of a 403 argument, which is, hey, this issue is not really

23   in dispute, and if Mr. Perlman gets to testify that he met with

24   Bob Iger, then they -- you know, then Rearden gets all of this

25   free kind of glamour and credibility when the fact is not

1    really disputed?

2        **MS. HERRERA:**  I think it is a 403 issue but not

3    exactly the way Your Honor put it.  I think the issue is that

4    Rearden has designated testimony from a witness solely for this

5    purpose, and there's 14 exhibits that go solely to this issue.

6    And so defendant will have to waste some of its limited trial

7    time countering that witness' testimony on this issue to

8    contextualize it to the jury, which we can certainly do.  But I

9    think our position that the prejudice is having to use our

10   trial time to counter an issue that isn't in dispute.  That's

11   the main 403 issue from our perspective.  And that's --

12   Kevin Mayer is the witness whose testimony is solely being

13   offered on this issue.  And the exhibits at issue are listed in

14   the pretrial conference statement.

15       **THE COURT:**  Mr. Carlson.

16       **MR. CARLSON:**  Yes, Your Honor.  It is true that the

17   liability claim that Rearden is asserting does not have a

18   knowledge element in it.  And so we are no longer required to

19   prove knowledge in order to prevail in our liability claim.

20   But I think it is also true that Disney is -- their defense has

21   been to, in our view, to try and backdoor a knowledge element

22   back into the -- to the case.  And it has to do with their

23   practical ability to supervise and control.

24       And what they want to say is that we weren't in the room

25   when the infringement happened, and we didn't know infringement

1    was going on.  And there was this big lawsuit that was

2    intensely factual, and no one could know who owned MOVA.  They

3    want to put all that evidence in.  And -- and we don't get to

4    respond that, well, you sat down with Bob Iger and 10 other

5    senior executives just a few years before and told them -- you

6    had a private meeting with them and told them that you owned

7    MOVA.

8            **THE COURT:**  I get the point.  That's a good point, you

9    know, a question of motive.

10           You know, I think without ruling or suggesting a ruling,

11   jury instruction 17.20 does, I think, bring into play how

12   motivated should someone be to do the investigating and

13   controlling that 17.20 talks about.  I think that's sort of

14   your point, Mr. Carlson.

15           **MR. CARLSON:**  Yes.

16           **THE COURT:**  Which is if somebody has a Mouse Meet

17   technology that's subject to intellectual property protection,

18   the incentives to do the work that 17.20 talks about are much

19   reduced.

20           Ms. Herrera, you can go last, if you like.

21           **MS. HERRERA:**  Thank you, Your Honor.  Just briefly,

22   the issue is that after those meetings, it is undisputed that

23   Rearden no longer owned MOVA, and everyone knew it.  Mr. Lauder

24   also contacted Disney when he owned MOVA.

25           And so I completely take Mr. Carlson's point and Your

1    Honor's point.  And I think at later periods when Disney's

2    knowledge, you know, is relevant or could potentially be

3    relevant to ability to control or -- you know, you put it as

4    motive to investigate, the issue is that the 2008 meetings

5    don't go to any of that, are not probative to any of that

6    because everyone knew that as of August 12th, 2017, MOVA was

7    not owned by Rearden anymore.

8         We can tell that story, and we will tell that story if

9    Your Honor lets this evidence in.  It's just an issue of time

10   usage, to explain that everyone agrees that Rearden no longer

11   owned MOVA as of that date and therefore it's not probative of

12   what Disney knew in 2015 when it retained DD3.

13        **THE COURT:**  Mr. Carlson, is there any dispute that

14   everybody knew that Rearden didn't own MOVA as of

15   August 12th, 2017?

16        **MR. CARLSON:**  I don't know that there -- that I would

17   necessarily agree.  I don't know who everybody is.  And I don't

18   think Disney --

19        **THE COURT:**  Think -- think carefully.  We're going to

20   try this again.

21        Are you aware of evidence tending to show that Rearden

22   owned MOVA on August 13th, 2017?

23        **MR. CARLSON:**  Rearden did not own MOVA when it was

24   assigned to -- from OnLive to OL2 until it was assigned back to

25   Rearden from MO2.  It -- it owned it after OL2 assigned to MO2.

1          **THE COURT:**  What was the injunction date again?  I'm

2     sure you all have that memorized.

3          **MR. CARLSON:**  June 17 --

4          **MS. HERRERA:**  2016.

5          **MR. CARLSON:**  2016.

6          **MS. HERRERA:**  The relevant date, Your Honor -- I don't

7     know if this was just a slip of the tongue, but it's

8     August 17th, 2012.  I think Your Honor said August 2017.

9          **THE COURT:**  I see.  Okay.  Thank you.  I'm sure I

10    transposed the numbers in my notes, and I was reading from my

11    notes.

12         Okay.  Well, I think I have everyone's arguments.  Thank

13    you for those.

14         **MR. PERLMAN:**  I apologize, Your Honor.  I've been

15    unable to reach my counsel.  May I have one minute to do that?

16         **THE COURT:**  Yes.

17         **MR. PERLMAN:**  Thank you.

18         **THE COURT:**  Mr. Perlman, how are you going to reach

19    them?

20         **MR. PERLMAN:**  I tried texting them, and they've been

21    very busy and I'm sure engaged with you.  I could call them.

22         **THE COURT:**  What's going to happen -- Mr. Perlman, I

23    would say -- I just want to say for the record, we were

24    together for an hour.  And then we took a break, and then

25    between 10:30 and 12:05 p.m., we have been conducting this

1    hearing.  And you -- you -- the Court will grant you a minute,

2    and we'll see what happens, but this isn't going to take very

3    long.  Go ahead.

4         **MR. PERLMAN:**  Understood.  This was a technical

5    matter --

6         **THE COURT:**  Mr. Perlman, if I were you, I would stop

7    talking to me, and I'd get on the phone with your lawyers.

8         **MR. PERLMAN:**  Understood.  Thank you very much, Your

9    Honor.

10                    (Pause in proceedings.)

11        **THE COURT:**  All right.  Let's go back on the record.

12      Mr. Carlson.

13        **MR. CARLSON:**  I apologize to the Court and to counsel.

14   In a conference with Mr. Perlman, he corrected me on a

15   technical issue, and I -- I feel that it's just not appropriate

16   to bring up at this point in time.

17        **THE COURT:**  I see.  If there's something that you want

18   to -- if there's any statement that you or Mr. Patterson made

19   earlier that you would like to correct, you should feel free to

20   do so.  That's fine.

21        **MR. CARLSON:**  Yeah.  If either of us had said anything

22   incorrect to the Court, we would have -- I would tell you now,

23   but --

24        **THE COURT:**  I see.  Okay.

25        **MR. CARLSON:**  It's a tangential thing to what we were

1   talking about.

2           THE COURT:  Very good.  All right.  Thank you all.  I

3   look forward to seeing you all on Tuesday morning.  I'm sure we

4   will have further communication before then.  Thank you.

5           (Proceedings adjourned at 12:08 p.m.)

1

2

3                    CERTIFICATE OF REPORTER

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Thursday, November 30, 2023

8

9    *Pamela Batalo Hebel*

10   _____
     Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25