KELLY M. KLAUS (SBN 161091)
kelly.klaus@mto.com
BLANCA F. YOUNG (SBN 217533)
blanca.young@mto.com
STEPHANIE G. HERRERA (SBN 313887)
stephanie.herrera@mto.com
SHANNON AMINIRAD (SBN 324780)
shannon.aminirad@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

JOHN W. SPIEGEL (SBN 78935)
john.spiegel@mto.com
JOHN L. SCHWAB (SBN 301386)
john.schwab@mto.com
ANNE K. CONLEY (SBN 307952)
anne.conley@mto.com
ROWLEY J. RICE (SBN 313737)
rowley.rice@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| REARDEN LLC and REARDEN MOVA LLC,<br><br>            Plaintiffs,<br><br>      vs.<br><br>WALT DISNEY PICTURES, a California corporation,<br><br>            Defendant. | Case No. 4:17-cv-04006-JST-SK<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>Judge:   Hon. Jon S. Tigar<br>Ctrm.:   6 (2nd Floor)<br><br>[Filed concurrently: (Proposed) Order] |

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW ................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

I. INTRODUCTION ........................................................................................................... 1

II. ARGUMENT .................................................................................................................. 2

    A. Rearden Failed To Prove Ownership Of The MOVA Contour Copyright ................ 3

    B. Rearden Failed To Prove Vicarious Copyright Infringement ................................... 5

        1. Rearden Failed To Prove Defendant Had The Practical Ability To Control DD3's Infringement ........................................................................... 5

            (a) To Prove "Practical Ability to Control," Rearden Was Required To Show That Defendant Could Directly Observe DD3's Conduct And Recognize It As Infringing ............................... 5

            (b) Rearden Failed To Prove Defendant Could Have Directly Observed DD3's Copying Of MOVA Contour Software Into RAM ..................................................................................................... 6

            (c) Rearden Failed to Prove Defendant Had A Practical Ability To Recognize That DD3 Was Infringing ......................................... 7

        2. Rearden Failed to Prove Defendant Derived A Direct Financial Benefit ........................................................................................................... 9

    C. Rearden's Damages Theories Are Barred As A Matter Of Law ............................. 11

        1. Rearden Failed To Present Evidence Of A Causal Nexus Between Temporary RAM Copying Of MOVA Source Code And Consumers' Purchasing Decisions ............................................................ 11

        2. Rearden Failed To Present Sufficient, Non-Speculative Evidence of Actual Damages From The Alleged Infringement ...................................... 13

CONCLUSION ............................................................................................................................. 15

**TABLE OF AUTHORITIES**

**Page**

**FEDERAL CASES**

*A&M Recs., Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) ........................................................................................ 5

*Adobe Systems Inc. v. Canus Productions, Inc.*,
    173 F. Supp. 2d 1044 (C.D. Cal. 2001) ........................................................................ 6

*Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*,
    51 F.3d 1229 (4th Cir. 1995) ........................................................................................ 2

*Complex Sys., Inc. v. ABN Ambro Bank N.V.*,
    No. 08 Civ. 7497(KBF), 2013 WL 5970065 (S.D.N.Y. Nov. 8, 2013) ..................... 12

*Dash v. Mayweather*,
    731 F.3d 303 (4th Cir. 2013) ................................................................................. 12, 14

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2004) .................................................................................... 10

*Erickson Prods., Inc. v. Kast*,
    921 F.3d 822 (9th Cir. 2019) .................................................................................. 9, 10

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) ...................................................................................................... 3

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996) .......................................................................................... 5

*Hammond v. T.J. Litle & Co.*,
    82 F.3d 1166 (1st Cir. 1996) ........................................................................................ 2

*Jarvis v. K2 Inc.*,
    486 F.3d 526 (9th Cir. 2007) ...................................................................................... 13

*Lowry's Reports, Inc. v. Legg Mason, Inc.*,
    271 F. Supp. 2d 737 (D. Md. 2003) ........................................................................... 12

*Mackie v. Rieser*,
    296 F.3d 909 (9th Cir. 2002) ...................................................................................... 11

*Oracle Am., Inc. v. Google Inc.*,
    No. C 10-03561 WHA, 2012 WL 850705 (N.D. Cal. Mar. 13, 2012) ....................... 14

*Oracle Corp. v. SAP AG*,
    765 F.3d 1081 (9th Cir. 2014) ................................................................................... 13, 14

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ................................................................................... 5, 6, 9

*Polar Bear Prods., Inc. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004) ..................................................................................... 11, 13

*Shenzhenshi Haitiecheng Sci. & Tech. Co. v. Rearden LLC*,
    No. 15-cv-00797-JST (N.D. Cal. Aug. 11, 2017), Dkt. 427 ........................................ 4

*Stoliarov v. Marshmello Creative, LLC*,
    No. CV-19-3934 PSG, 2021 WL 2514167 (C.D. Cal. Apr. 8, 2021) ......................... 12

*Thale v. Apple Inc.*,
    No. C-11-03778-YGR, 2013 WL 3245170 (N.D. Cal. June 26, 2013) ...................... 12

*VHT, Inc. v. Zillow Grp., Inc.*,
    918 F.3d 723 (9th Cir. 2019) ....................................................................................... 6

**STATE CASES**

*Brown v. USA Taekwondo*,
    40 Cal. App. 5th 1077 (2019) ..................................................................................... 4

**RULES - OTHER**

Fed. R. Civ. P. 50(a) .................................................................................................... 1, 3

Fed. R. Civ. P. 50(a)(1) ................................................................................................ 2

**NOTICE OF MOTION AND MOTION FOR JUDGMENT AS A MATTER OF LAW**

PLEASE TAKE NOTICE that Defendant Walt Disney Pictures ("Defendant") will and hereby does move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) because Rearden has not presented a legally sufficient evidentiary basis for the jury to find that:

1. Rearden owned the MOVA Contour copyright at any point between August 17, 2012, and June 17, 2016;

2. Defendant had the practical ability to control DD3's alleged infringement;

3. Defendant directly financially benefited from DD3's alleged infringement;

4. There is a causal nexus between DD3's alleged infringement and Defendant's revenue from the movie *Beauty and the Beast* (2017) ("*BATB*"); or

5. Rearden suffered actual damages.

Rearden has been fully heard and has not presented sufficient evidence for the jury to find in its favor on any of these issues. Fed. R. Civ. P. 50(a). This Motion is based on this Notice of Motion and Motion; the Memorandum below; all pleadings on file in this matter; all testimony and evidence admitted at trial; and such argument as the Court may consider.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant seeks judgment as a matter of law on five issues:

*First*, Rearden has not presented sufficient evidence *at this trial* to establish ownership of the MOVA Contour copyright during the period of DD3's alleged infringement. This Court found Rearden owned the MOVA Contour copyright in the *SHST* case based on a different record and a different ownership theory: that the MOVA assets transferred to Greg LaSalle and, through his employment agreement and Proprietary Information and Inventions Agreement ("PIIA"), passed to his employer Rearden. Rearden's new theory is that the assets transferred to a company called MO2, LLC ("MO2") that was, *ab initio*, a wholly-owned subsidiary of Rearden and, therefore, that the MOVA assets never transferred to LaSalle. Rearden has not presented sufficient evidence for the jury to find in its favor on this new ownership theory.

*Second*, Rearden failed to prove that Defendant had the practical ability to control DD3's infringement. Rearden introduced no evidence that Defendant could observe the infringing conduct: the copying of MOVA Contour software into RAM. Rearden also failed to show that Defendant could have recognized that this copying constituted copyright infringement. Rearden claims that Defendant should have conducted some type of due diligence inquiry, but Rearden failed to present evidence that such an inquiry would be practical or would have actually identified copyright infringement.

*Third*, Rearden failed to prove Defendant derived a direct financial benefit from DD3's infringing acts. Rearden presented no evidence of why audiences saw the film, let alone that audiences were drawn to the film because of the copying of MOVA Contour software into RAM.

*Fourth*, Rearden failed to present evidence of a causal nexus between the temporary copying of MOVA source code and consumers' purchasing decisions. Rearden presented no evidence about why consumers paid to see the movie, and it failed to support its claim that the copying of software into computer RAM motivated people to pay to see *BATB*, as opposed to the countless other reasons for which audiences chose to watch the movie.

*Fifth*, Rearden has not presented sufficient non-speculative evidence from which a jury could conclude that Rearden suffered actual damages.

## II.   ARGUMENT

Judgment as a matter of law may be granted "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). Defendant seeks judgment as a matter of law on each of the following issues: (A) ownership of the MOVA Contour copyright; (B) practical ability to control the alleged infringing activity; (C) direct financial benefit from the alleged infringing activity; (D) causal nexus between the alleged infringing activity and Defendant's revenue from *BATB*; and (E) Rearden's actual damages.[1]

---

[1] Defendant may seek judgment as a matter of law on these "discrete legal issues." *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1236 (4th Cir. 1995); *see also, e.g.*, *Hammond v. T.J. Litle & Co.*, 82 F.3d 1166, 1172 (1st Cir. 1996) ("A party may move for

### A.    Rearden Failed To Prove Ownership Of The MOVA Contour Copyright

To prevail on its copyright infringement claim, Rearden must first prove that it owned the MOVA Contour copyright at the time of the alleged infringement. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Here, it is undisputed that Rearden lost ownership of the MOVA Contour copyright on August 17, 2012. On that date, ownership of the MOVA Contour copyright transferred from a Rearden subsidiary to Gary Lauder's company, OL2, Inc. ("OL2"). Tr. 1176:11-14; *see also* Tr. 511:18-512:12, 640:23-641:11. Plaintiffs Rearden, LLC and Rearden MOVA, LLC have never had an ownership interest in OL2. *Id.* 1176:14-16. It is undisputed that, on February 11, 2013, OL2 transferred the MOVA Contour copyright to MO2. Tr. 1176:17-18; Tr. Ex. 1238; *see also* Tr. 571:20-572:9. The question is thus whether a reasonable jury could find that Rearden reacquired the MOVA Contour copyright between February 11, 2013, and June 17, 2016, after which date Defendant cannot be vicariously liable for any conduct of DD3. Dkt. 555 at 12.

This Court held that Rearden owned the MOVA Contour copyright in the *SHST* litigation, but Rearden failed to present sufficient evidence of ownership *in this trial*. Notably, Rearden expressly disclaimed the ownership theory on which the Court's *SHST* decision was based: that *Greg LaSalle acquired the MOVA assets* for Rearden's benefit, and that ownership of the MOVA assets passed to Rearden under the terms of Mr. LaSalle's employment agreement and PIIA.[2] Rearden now contends that MO2 was formed as a Rearden subsidiary and that Rearden has owned the MOVA Contour copyright through its subsidiary since February 11, 2013. Tr. 781:10-14 ("Q: Sir, are you contending in this Court that the MOVA assets came to Greg LaSalle and then passed to Rearden through the PIIA? A: No. The MOVA assets came to MO2, LLC because – and it

---

judgment as a matter of law on an issue by issue basis."); Fed. R. Civ. P. 50(a), Advisory Committee Note to 1993 Amendment.

[2] The PIIA applies on its face only to information that "has commercial value" to Rearden's business. Tr. Ex. 390. The evidence is undisputed that at the time the MOVA assets were transferred to MO2, the MOVA assets did not have commercial value to Rearden. Steve Perlman described the system as "old and unusable" and admitted MOVA was a "slightly less than break-even business (about $100K loss/year)." Tr. Ex. 1135. As a result, Mr. Perlman advocated that Gary Lauder sell "ALL of MOVA . . . for $1," Tr. Ex. 1136, which is exactly what Mr. Lauder did, Tr. Ex. 1238.

was a Rearden subsidiary at the time."); *cf. Shenzhenshi Haitiecheng Sci. & Tech. Co. v. Rearden LLC*, No. 15-cv-00797-JST (N.D. Cal. Aug. 11, 2017), Dkt. 427 at 14-16 (concluding MOVA assets belonged to Rearden because they fell within the scope of LaSalle's PIIA).

Rearden has presented no evidence in this trial from which a reasonable jury could conclude that MO2 was formed as a Rearden subsidiary. MO2's articles of organization contain no reference to Rearden. Tr. 708:16-20; Tr. Ex. 1239. Rearden's Vice President of Finance, Cindy Ievers, testified that one of her responsibilities is to maintain the company's corporate records and, as part of that, she maintains a file of official records that are created when a Rearden subsidiary is formed. Tr. 801:9-23. Ms. Ievers testified that she has never seen a document from the California Secretary of State or any government body identifying MO2 as a Rearden subsidiary. Tr. 801:24-802:2. Ms. Ievers also testified that she is unaware of any document that named Rearden as an owner, member, or parent of MO2 before the execution of a "nunc pro tunc" assignment to Rearden on March 14, 2019 (long after this litigation was filed). Tr. 802:3-19; Tr. Ex. 42.

Rearden also failed to present evidence from which a reasonable jury could conclude that Mr. LaSalle "agree[d] to act," and was in fact acting, as Rearden's agent in setting up and acquiring the MOVA assets for MO2. *See Brown v. USA Taekwondo*, 40 Cal. App. 5th 1077, 1105 (2019) ("Agency is the relationship which results" when the principal "indicate[s] that the agent is to act for him" and the agent "agree[s] to act on his behalf and subject to his control." (quotation marks and citations omitted)). Rearden presented no testimony from Mr. LaSalle in its case in chief and offered no documents from which the jury could infer that Mr. LaSalle agreed to act as Rearden's agent in forming MO2 and acquiring the MOVA assets. To the contrary, the contemporaneous documentary evidence establishes clearly that everyone involved—Mr. LaSalle, Mr. Lauder, and Mr. Perlman—understood that "Greg was to get all the assets for free. End of story." Tr. Ex. 1129; Tr. 696:5-697:18.

No jury could find on this record that MO2 was formed *ab initio* as a Rearden subsidiary and that ownership of the MOVA Contour assets transferred to Rearden on February 11, 2013.

### B. Rearden Failed To Prove Vicarious Copyright Infringement

Rearden was required to present evidence showing Defendant (1) exercised "the requisite control over" DD3, meaning "*both* [a] a legal right to stop or limit the directly infringing conduct, as well as [b] *the practical ability to do so*," and (2) "derive[d] a direct financial benefit from the direct infringement." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007) (emphases added). Rearden did not present sufficient evidence for the jury to find either element satisfied.

#### 1. Rearden Failed To Prove Defendant Had The Practical Ability To Control DD3's Infringement

(a) *To Prove "Practical Ability to Control," Rearden Was Required To Show That Defendant Could Directly Observe DD3's Conduct And Recognize It As Infringing*

A contractual right to terminate in the event of copyright infringement is not enough to satisfy the "requisite control" element of vicarious liability. Rearden also had to show that Defendant had the "practical ability to control" the alleged infringement by proving that Defendant could reasonably have both (1) observed the infringing activity and (2) recognized the activity as infringement. For example, in *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996), the Ninth Circuit held that a swap meet operator had the practical "ability to control" the swap meet vendors' sale of counterfeit recordings because the operator (1) "controlled and patrolled" the vendors' booths and (2) indisputably was "aware that vendors in their swap meet were selling counterfeit recordings." *Id.* at 261–62. Likewise, the Ninth Circuit found the prong satisfied as to Napster with respect to file name indices, (1) which were "within the 'premises' that Napster ha[d] the ability to police," and (2) as to which Napster "ha[d] the ability to locate infringing material," because Napster's search indices identified the names of popular copyrighted music that Napster knew was not licensed. *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1024 (9th Cir. 2001). Napster did not have the ability to police the *contents* of files because "the Napster system does not 'read' the content of indexed files." *Id.*.

By contrast, courts have found no "practical ability to control" where a defendant did not have a reasonable ability to directly observe the infringing conduct and to recognize that conduct

as infringing. For example, in *Adobe Systems Inc. v. Canus Productions, Inc.*, 173 F. Supp. 2d 1044, 1054–55 (C.D. Cal. 2001), Adobe sued a trade show operator whose exhibitors were selling unlicensed copies of Adobe software. The fact that the operator had security guards patrolling the premises made it in part like the *Fonovisa* defendant. *Id.* But that was not enough, because "it was not possible [for the defendant's security guards] to identify what software infringed [plaintiff] Adobe's copyright without training and information that . . . (only Adobe possessed)." *Id.* at 1055. "There can be no practical ability to control the infringing behavior if [the defendant] does not know what constitutes an unauthorized Adobe product." *Id.*; *see also Perfect 10*, 508 F.3d at 1174 (Google lacked practical ability to control third-party websites' use of infringing images where Google could not reasonably "determine whether a certain image on the web infringes someone's copyright." (quotation marks and citation omitted)); *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 746 (9th Cir. 2019) (Zillow could not police users' uploading of infringing photographs because Zillow was unable to "screen out or identify infringing [plaintiff] VHT photos among the many photos that users saved or uploaded daily.").

Rearden failed to show that Defendant could either observe DD3's copying of MOVA software into RAM or recognize that copying infringed copyright. Rearden has therefore failed to establish that Defendant had the practical ability to control DD3's infringement.

    (b)  *Rearden Failed To Prove Defendant Could Have Directly Observed DD3's Copying Of MOVA Contour Software Into RAM*

Defendant *never* interacted with DD3 regarding the copying of MOVA Contour into RAM, which is located inside a computer on a circuit board. Tr. 933:22-934:24. Defendant and the people it hired had no involvement with the infringing software or any ability to determine it was infringing. *See Adobe*, 173 F. Supp. 2d at 1055.

Rearden introduced no evidence that Defendant could observe the infringing conduct. Rearden relies on the fact that Defendant supplied a director and actors to be on set while DD3 was operating the MOVA system, including the rig, computers, and software. But there is no evidence that these individuals, or anyone affiliated with Defendant, observed MOVA code being copied into RAM inside a computer. Tr. Ex. 393 (Stevens Dep.) 21:04-21:24; Tr. 1289:14-23.

And it is undisputed that Defendant was not present when DD3 operated the system to process MOVA data and did not view the tracked mesh that resulted from MOVA processing; Defendant viewed only more finished shots that incorporated DD3's retargeting and animation work.  Tr. 1082:8-1084:1, 1293:19-1295:20.

        (c)    *Rearden Failed to Prove Defendant Had A Practical Ability To Recognize That DD3 Was Infringing*

Rearden has failed to show, as it must, that Defendant could have recognized that DD3's copying of MOVA software into RAM constituted copyright infringement.

Rearden contends that Defendant could have done so by conducting due diligence regarding the MOVA Contour software.  In support of its claim that such measures would be a practical way to determine infringement, Rearden presented testimony regarding alleged "due diligence" inquiries that Rearden received from studios and a 2011 document describing anti-piracy best practices from the Motion Picture Association ("MPA") that has since been withdrawn.  Tr. 488:9-490:21, 1167:10-1168:24.  This evidence fails to establish Defendant's practical ability to detect a vendor's copyright infringement.  Rearden's testimony regarding purported due diligence inquiries suggested only that those phone calls asked for patent and trademark registrations, not copyright registrations.  Tr. 488:9-490:21.  Similarly, the MPA document concerns antipiracy considerations, not efforts to make sure vendors have proper licenses for purposes of preventing copyright infringement.  Tr. 1172:11-21.  Plaintiffs' own expert admitted he had never heard of this document being used to investigate intellectual property ownership rather than anti-piracy/security practices.  Tr. 1172:11-1173:21.

Rearden also failed to show that it would have been practical for Defendant to conduct the type of due diligence inquiry that Rearden says Defendant should have conducted.  *BATB* involved nearly a thousand people, hundreds of vendors, and dozens of technologies.  Tr. 1186:12-14, 1205:16-18, 1234:9-11.  DD3 was one of four visual effects companies Defendant contracted with on *BATB*.  Tr. 1203:3-5, 1205:16-18.  Vendors use numerous types of specialized software and hardware, as well as the basic programs businesses use for email, word processing, etc.  It is not important to Defendant to know which software programs that visual effects artists use to create

1  any given shot.  Tr. 1200:15-20.  DD3 alone used dozens of different software tools *other than*
2  *MOVA* just for its work on the Beast.  Tr. 1234:9-17.  Defendant does not have the practical ability
3  to determine if each of those uses is authorized, and it is not customary in the industry to do so.
4  Tr. 1207:21-24, 1325:15-1326:10.

5  Rearden also failed to prove that, if Defendant had undertaken Rearden's hypothesized
6  "diligence," such "diligence" would have actually identified DD3's copyright infringement.  In
7  contrast to the patent or trademark registration numbers that Mr. Perlman provided in the past to
8  unnamed studio employees, *see* Tr. 488:9-490:21, a copyright registration number here would
9  have been no use.  The copyright for MOVA Contour software was not registered until February
10 2016, nearly a year after Defendant had hired DD3 for the movie.  Tr. Exs. 13, 335; Tr. 724:6-12.
11 And if Defendant had asked DD3 for other documentation confirming that its affiliate owned the
12 MOVA Contour copyright, DD3 could have provided the agreement transferring the MOVA
13 assets from OL2 to MO2 and from MO2 to DD3's affiliate.  *See* Tr. Ex. 1238; Tr. 618:21-619:13.
14 Rearden itself lacked any document purporting to evidence a transfer until 2019.  Tr. 622:16-
15 623:9; Tr. Ex. 42.  It was not until August 11, 2017, well after *BATB*'s release, that a court
16 ultimately determined who owned the MOVA assets as between Rearden and VGH.  Tr. 270:12-
17 15.  In other words, even if Defendant had done exactly what Rearden argues it should have done,
18 Rearden has failed to adduce any evidence that Defendant would have been able to recognize that
19 an infringement had occurred.

20 Nor is there any evidence that Defendant had reason for suspicion or cause to investigate
21 further.  From Defendant's viewpoint, DD3 did not appear to be doing anything out of the
22 ordinary in providing MOVA services.  DD3 had previously hired OnLive (MOVA's prior owner
23 and a Rearden affiliate), along with OnLive's then-employee Greg LaSalle, to conduct facial
24 motion capture on a Disney film.  Tr. 1210:10-19; Tr. Ex. 1497 (LaSalle Dep.) 120:15-122:06.
25 Defendant knew the assets had come under new ownership in 2012 and that the new owner had
26 tried to sell them.  *See* Tr. Ex. 1498 (Lauder Dep.) 105:21-23, 108:09-18.  DD3 possessed the
27 physical rig (a large, unique piece of hardware) and MOVA software; and DD3 employed Greg
28 LaSalle—who had consistently traveled with the rig and operated it on-set for years—to haul the

physical equipment to England for *BATB* motion-capture sessions.  Tr. Ex. 1497 (LaSalle Dep.) 120:15-121:01, 121:02-13, 121:24-122:06.  In short, the *same* people were using the *same* specialized equipment as had always been the case.  There were no red flags indicating this was infringing activity.

Like the defendants in *Zillow* and *Adobe*, Defendant had no practical ability to detect the claimed infringement while DD3 was providing MOVA-related services that yielded data for use in the movie.  Defendant thus did not have the practical ability to control the claimed infringement.

## 2. Rearden Failed to Prove Defendant Derived A Direct Financial Benefit

An independently sufficient ground for judgment as a matter of law on vicarious liability is Rearden's failure to present any evidence that Defendant derived a "direct financial benefit" from DD3's infringing acts.  *Perfect 10*, 508 F.3d at 1173.  "The essential aspect of 'the direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps"; in other words, "the availability of the infringing material [must] act[] as a draw for customers," not "just an added benefit."  *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 829 (9th Cir. 2019) (quotation marks and citations omitted).

Here, the alleged financial benefit is Defendant's profits from *BATB*.  Rearden has presented no evidence from which a jury could conclude that audiences were "draw[n]" to *BATB* because of the alleged infringing activity of DD3:  the copying of MOVA Contour software into the random access memory of computers that DD3 operated while working on *BATB*.  Tr. 1176:21-25.  It is undisputed that no consumer ever saw (or could see) the ephemeral copies of MOVA software residing in RAM.  The creation of the RAM copies was merely a byproduct of using the MOVA software.  Tr. 978:23-979:5.  The copies did not represent the output of the program or the recorded facial performance.  Tr. 991:1-993:13.  The software program itself only provided mathematical instructions for processing the captured performance into output files representing facial motion through data points.  Tr. 882:3-884:8.  And even the output files consisted only of preliminary data, not anything that appeared in *BATB*.  Tr. 990:17-991:11.

Numerous other technologies and processes and hundreds of thousands of hours of labor went into creating the on-screen Beast. Tr. 994:17-24, 1000:13-1001:9, 1486:1-1501:13, 1516:2-1518:3.

Rearden presented no evidence of why audiences saw the film—let alone that audiences paid to see the movie because of these ephemeral RAM copies of MOVA software code. To the contrary, Rearden's technical expert Alberto Menache admitted that he is not a marketing expert and that he does not professionally offer any opinions regarding what motion picture studios should emphasize to get people to come see a film. Tr. 1003:3-1004:13. And Rearden's damages expert Philip Fier testified about only about the sum of Defendant's movie profits and the MPA site security questionnaire. Tr. 1150:14-1169:5. No other Rearden witness purported to opine on why consumers saw *BATB* or on a supposed causal link between ephemeral RAM copying and Disney's financial gains from the movie.

The only benefit of MOVA Contour that Rearden has identified is that it contributed to the creation of a "compelling" or "real"-looking Beast. *See* Tr. 983:11-24. That kind of "added benefit" is not sufficient to establish the requisite "*direct* financial benefit" under the case law. *Erickson*, 921 F.3d at 829-30 (emphasis added) (no direct financial benefit where infringing photographs enhanced general attractiveness of website, but there was no evidence that defendant's customers purchased his services because they saw the photographs); *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (no direct financial benefit where "[t]he record lacks evidence that AOL attracted or retained subscriptions because of the infringement or lost subscriptions because of AOL's eventual obstruction of the infringement").

Because Rearden failed to connect the alleged infringement (DD3's copying of MOVA Contour software code into RAM) to any direct financial benefit to Defendant, the Court should grant judgment as a matter of law. *See Erickson*, 921 F.3d at 829 (vacating verdict on vicarious liability where plaintiff presented no evidence that could constitute a direct financial benefit as a matter of law).

C.   **Rearden's Damages Theories Are Barred As A Matter Of Law**

1.   **Rearden Failed To Present Evidence Of A Causal Nexus Between Temporary RAM Copying Of MOVA Source Code And Consumers' Purchasing Decisions**

Rearden seeks indirect profits from *BATB*. To reach such revenues, Rearden must present evidence "establish[ing] [a] *causal* connection" "between the infringement and the monetary remedy sought." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004); *see id.* at 710. Rearden failed to present evidence that even a single consumer paid to see *BATB* because of DD3's temporary RAM copying of MOVA software.

To meet its causal nexus burden, Rearden was required to present "concrete evidence" connecting consumers' purchasing decisions *to the alleged infringement*. *See Mackie v. Rieser*, 296 F.3d 909, 916 (9th Cir. 2002). In *Mackie*, the Ninth Circuit emphasized there were "virtually endless permutations to account for an individual's decision to subscribe to the Pops series, reasons that have nothing to do with the artwork in question." *Id.* The "myriad factors that could influence" the decision to buy symphony tickets (*e.g.*, "reputation," "conductor," "specific musician," *id.*) pale in comparison to the factors that motivated people to pay to see *BATB*, including the actors, the music, nostalgia for the animated movie, and so much more. Tr. 1384:6-13, 1420:3-1422:13. Rearden claims that there is a causal connection between consumer purchasing decisions and the copying of software into computer RAM (which no consumer saw) to produce a collection of dots and an eyeless, mouthless mask (which no one saw either) that may or may not have been used by an artist to develop the Beast's facial expressions at an early stage of development. This speculation is unsupported by evidence. Rearden has presented no evidence about why consumers paid to see the movie and it offered no marketing expert to opine on any significance of the passing mentions of MOVA in a few pieces of marketing. Rearden did not present at trial even Mr. Fier's opinion that movie trailers are important drivers of audience interest.

Because Rearden presented no "concrete evidence" tying movie sales to DD3's ephemeral RAM copying, Rearden failed to establish causal nexus as a matter of law. *See Mackie*, 296 F.3d at 916 (no causal nexus where there was no concrete evidence establishing link between infringing

use of artwork in symphony mailer and symphony's revenues); *Stoliarov v. Marshmello Creative, LLC*, No. CV-19-3934 PSG (JPRx), 2021 WL 2514167, at *3 (C.D. Cal. Apr. 8, 2021) ("As in *Mackie*, the Court can surmise virtually endless permutations to account for an individual's decision to attend one of Defendants' shows, or for a concert promoter to obtain Defendants' services, many of which have nothing to do with 'Happier.'" (quotation marks and citation omitted)); *Thale v. Apple Inc.*, No. C-11-03778-YGR, 2013 WL 3245170, at *7–9 (N.D. Cal. June 26, 2013) (same, where plaintiff "proffered no evidence that the use of the [infringing work] caused any iPhone 3GS sales, nor that the 'Concert' commercial did itself"); *see also Dash v. Mayweather*, 731 F.3d 303, 332 (4th Cir. 2013) ("[W]hen, as here, the infringing content forms only a small, incidental portion of the products that generated the claimed revenue streams, further evidence is necessary to link the claimed revenues to the infringement."); *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 752 (D. Md. 2003) (rejecting causation between infringing use of financial reports and financial services company's profits, where there was "no more than a speculative correlation" and "[t]he complex, variable, independent thought processes of hundreds of individual brokers intervene[d] between the copying and any subsequent gain").

      Rearden's failure to present such evidence is glaring in light of the undisputed evidence that other software programs could have provided the same functionality as MOVA. Tr. 1480:14-22. Because Rearden has presented no evidence that Defendant profited more from using MOVA than it would have from using other available facial motion capture technologies, Rearden has failed to establish causal nexus. *See Complex Sys., Inc. v. ABN Ambro Bank N.V.*, No. 08 Civ. 7497(KBF), 2013 WL 5970065, at *11 (S.D.N.Y. Nov. 8, 2013) (rejecting software owner's indirect profits claim predicated on unlicensed use of software where, inter alia, other "processing software companies . . . operate in the market" and "provide a certain basic set of functionality" (quotation marks and citation omitted)); *Dash*, 731 F.3d at 332 n.18 ("Dash was required to show not merely that Appellees generated more revenue from playing 'Yep' than from playing no song, but that they generated more revenue from playing 'Yep' than from playing a non-infringing song.").

### 2. Rearden Failed To Present Sufficient, Non-Speculative Evidence of Actual Damages From The Alleged Infringement

The Court should grant judgment as a matter of law on actual damages for two reasons.

*First*, Rearden failed to provide "sufficient objective evidence" of the fair market value of its copyright. *See Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1091, 1093 (9th Cir. 2014) (affirming grant of judgment as a matter of law for failure to present "sufficient non-speculative evidence" of actual damages). It is black letter law that "the profits lost due to the infringement may not be "based on undue speculation." *Polar Bear Prods.*, 384 F.3d at 708-09 (quotation marks and citations omitted). The question, therefore, is "not . . . what the owner would like to have charged if unconstrained by reality, but what a willing owner actually would have charged *after negotiation with the buyer*." *Oracle*, 765 F.3d at 1088 (emphasis added); *id.* at 1089 (describing fair market value as the product of a "voluntary licensing transaction between arms-length parties"). Assuming such a hypothetical negotiation ensures the fair market value analysis is "objective, not . . . subjective" even where, as here, Plaintiff claims to be calculating lost profits. *Id.* at 1088 (quoting *Jarvis v. K2 Inc.*, 486 F.3d 526, 534 (9th Cir. 2007)).

Ms. Ievers made no attempt to evaluate objectively what profit Rearden might have received "after negotiation." *Oracle*, 765 F.3d at 1088. She testified that Rearden would have charged more than $3.5 million to provide MOVA services on *BATB*. Tr. 1126:9-11. The uncontroverted evidence is that Rearden never charged any studio more than six figures total for MOVA services on any movie. *Id.* at 1114:3-6; Tr. Ex. 1284. When pressed to explain her opinion that Rearden would have charged ten times more for MOVA services on *BATB* than it charged Warner Brothers for the two-part *Harry Potter* finale, Ms. Ievers admitted the prices actually charged to Warner Brothers reflected negotiation, whereas her hypothesized charges to Defendant did not. Tr. 1124:4-11 ("Q: More than 10 times what Rearden charged Warner Bros. for the Harry Potter movie? A: Yeah. Warner Bros. negotiated."); Tr. 1123:2-6 ("Q: And when that happened, Rearden didn't charge Warner Bros. $7,500 a day did it? A: I don't know. What we finally charged them was much smaller, but I think we quoted them a much higher rate originally . . . ."). Because Ms. Ievers admits she did not consider what Defendant would have

paid *after negotiation*, and because Rearden's historical charges for similar services *are a full order of magnitude smaller* than her hypothesized charges, Ms. Ievers's proffered actual damages numbers are fatally speculative as a matter of law. *See Oracle*, 765 F.3d at 1093. Nor can Ms. Ievers save that flawed opinion by claiming it measures only "lost profits." The *only* record evidence is that Rearden's subsidiary OnLive *never* charged more than $386,746, Tr. Ex. 1284, Tr. 1113:17-22, and *never* made a profit, Tr. 1125:20-22 ("Q: The OnLive business that operated MOVA and offered it to customers was never profitable, was it?  A: No."). To the extent Ms. Ievers purported to offer a lost profits analysis that did not resort to a hypothetical negotiation, her opinion is unsupported by any evidence.

*Second*, Ms. Ievers failed to differentiate between the infringed copyright—the MOVA source code alleged copied into RAM—and other, non-infringing aspects of MOVA services in hypothesizing the profit Rearden would have earned from providing MOVA services on *BATB*. Specifically, she included in her hypothesized charges a number of non-infringing services, such as costs associated with makeup and travel. *See, e.g.*, Tr. 1118:1-1119:17. A jury may not award actual damages where a plaintiff has failed to present evidence that is limited to the infringing services. For instance, in *Oracle*, the Ninth Circuit found the jury's verdict was unduly speculative because the plaintiff did not provide evidence of "what a hypothetical license for *a specific use* of their [plaintiff's] copyrights for a brief period would have cost Oracle" and instead presented only evidence of the value of a much larger, overall business that was not infringed. *Oracle*, 765 F.3d at 1091 (emphasis added); *see also Dash*, 731 F.3d at 322 (expert opinion could not establish actual damages where expert analyzed fees paid for complete song, but did not address fact that infringed work was only one element of song); *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2012 WL 850705, at *7 (N.D. Cal. Mar. 13, 2012) (expert required to discount actual damages opinion to account for unasserted copyrights). For the same reason, a verdict based on Ms. Ievers's actual damages would be unduly speculative here.

To the extent the Court concluded otherwise in its Order Granting Reconsideration (Dkt. 609), Rearden presented no evidence at trial that Ms. Ievers's hypothesized prices are "derived . . .

from evidence of the MOVA services that DD3 performed on *Beauty and the Beast*,"[3] or that "these services would only have been offered as a package," Dkt. 609 at 5. Defendant has identified no authority obviating the copyright holder's burden to prove that the claimed actual damages resulted from the alleged infringement in such circumstances.

## CONCLUSION

Defendant respectfully requests that the Court grant its motion either in its entirety or as to one or more of the issues discussed above.

DATED:  December 19, 2023         MUNGER, TOLLES & OLSON LLP


                                  By:    /s/ Kelly M. Klaus
                                         KELLY M. KLAUS

                                  *Attorneys for Defendant*

---

[3] Ms. Ievers testified that she relied on a "general rate card" produced by DD3, i.e., not a rate card for a particular movie, and a DD3 "bid sheet in progress" for a one-day shoot for the movie *Full-Tilt: Guardians of the Galaxy*—not evidence of the services DD3 actually provided, or the rates it actually charged, for *BATB*. Tr. 1092:16-1093:11.