United States District Court
Northern District of California

**DEFENDANT'S EXHIBIT 1479**

Case No. 4:17-cv-04006-JST
Date Entered _____
By _____
Deputy Clerk

SPECIAL VISUAL EFFECTS AGREEMENT
FOR
"MARVEL'S THE AVENGERS"

This agreement (this **"Agreement"**) is entered into as of October 25, 2011, by and between MARVEL EASTERN PRODUCTIONS LLC and  MVL FILM FINANCE LLC **(together, "Producer")**, and DIGITAL DOMAIN PRODUCTIONS, INC. ("DDPI") and DIGITAL DOMAIN PRODUCTIONS (VANCOUVER) LTD. ("DDPV") (collectively, **"Digital Domain"**) to set forth the terms by which Digital Domain shall provide special visual effects for the motion picture currently entitled "MARVEL'S THE AVENGERS" (the **"Picture"**).

In consideration of the mutual promises contained herein, the parties hereby agree as follows:

1.  **The Work**

    (a)     **General Definitions:** For all purposes hereunder, the term "Work" shall mean all of the work performed by Digital Domain in the design, in consultation with Producer, of special visual effects shots, the rendering of any necessary plate photography, and the production of special visual effects shots intended to be included in the final print for the Picture. The term "Shot" shall mean a completed special visual effects shot as finally rendered by Digital Domain and accepted by Producer. Digital Domain can complete the Work and will complete and deliver the Shots for the fees provided herein, and has the facilities and has (or will arrange to have) the personnel necessary in order to deliver the Shots in accordance with the delivery schedule provided herein, subject to Producer's timely performance of its obligations hereunder.

    (b)     **Specific Deliverables:** A detailed description of the shots (currently 29 Shots)(the **"Shot List"**) to be delivered under this Agreement is included and attached hereto and the Asset Build and Look Development Summary is included and attached hereto, the Turnover/Delivery Date Summary is included and attached hereto.  The Bid Letter dated October 19, 2011 (received via e-mail on October 25, 2011)(unless otherwise specified herein), the Shot List, the Asset Build and Look Development Summary and the Turnover/Delivery Date Summary are all collectively referred to and included herein as Schedule A. Schedule A is hereby incorporated as part of this Agreement by this reference and if there is any conflict between Schedule A and the terms of this cover Agreement, the cover Agreement shall control. The final Shots will commence delivery by January 13, 2012 and complete final delivery of all the Shots shall occur by February 24, 2012 (such date, the "Delivery Date") unless such date is revised by Producer. The Shots may be amended from time to time through the Change Order process detailed in Section 7. In the event that the delivery of cut sequences and/or frame counts are delayed through no fault of Digital Domain (or any agent thereof), Producer agrees that the Delivery Date for the Shots may need to be extended under the Change Order process and that, in such an event, additional holding charges may apply, provided such holding charges are also subject to the Change Order process.

    (c)     **The Shots:**

    The Deliverables shall be delivered in the form of digital files on Signiant or DTF tapes and/or fire-wire drives, as instructed by Producer, and, in addition the Shots will be rendered and delivered in the same format as Producer's turnover materials (2104 x 1184 pixels, with an aspect ratio of 1:77, with Z Depth mattes for conversion when applicable, and mattes for the DI as necessary) and at 2K resolution of all composited elements, and will:

        (i)     be designed by Digital Domain pursuant to Producer's requirements, as set forth in Schedule A and Schedule B;

MARVEL'S THE AVENGERS-Digital Domain-10-24-2011  v1

HIGHLY CONFIDENTIAL – ATTORNEYS'
EYES ONLY

(ii)    be of highest technical quality consistent with industry standards and suitable for use in the Picture, subject to the quality of the plates and other materials delivered to Digital Domain by Producer; and

(iii)   be completed and delivered (if delivered digitally will be delivered to by Digital Domain to Producer in mutually agreed upon digital format (e.g., firewire drives as approved by Producer) to Producer by the Delivery Date, subject to any revisions to the Producer's Delivery Schedule made pursuant to the Change Order provisions of Section 7 below and subject to the terms for delivery set forth in Section 8 below.

It is expressly acknowledged that the Contract Price for the Work, as set forth in Section 9 below, is based upon the agreement that (i) the Shots will have 8-frame handles at the head and end tails, and (ii) the parties will work together in good faith to minimize the number of takes required to deliver Shots reasonably satisfactory to Producer on the Delivery Date, it being agreed that minor adjustments to any shot shall not be considered a "take". In planning the production of the Work, the parties may initially anticipate that a certain methodology will be used for producing certain Shots, i.e., either digital or practical, or a mixture thereof; nonetheless, the parties agree that the choice of methodologies ultimately used by Digital Domain to create any particular Shot is Digital Domain's responsibility, and Digital Domain shall, after obtaining Producer's approval, use whatever methodology it, in good faith, deems appropriate at the time that any particular Shot is produced. The deliverables under this Agreement shall be the Shots as finally rendered on film (including but not limited to 2D and 3D animation, digital color correction, digital rotoscoping and digital compositing), all files required for digital finish, any physical props, models, or sets created as part of the Work for the Picture (which are to be delivered to Producer in accordance with Paragraph 8.d below), and such digital data files as are necessary in order to coordinate the Work being created by Digital Domain with the work being provided by other visual effects vendors providing services on the Picture, if any; provided, however, nothing herein shall require Digital Domain to deliver to any other vendor any proprietary mechanical devices, processes, application or operating software, digital tools, plug-ins or image libraries relating to such digital data files. In addition to the Deliverables set forth in Schedule "A", upon Producer's request, Digital Doman shall deliver to Producer all digital models (preferably as Maya files), and all digimatte environments, uncomposited footage, digital files and paper files prepared in connection with the Shots, the Work and/or the Picture.

(d)    Digital Domain has not granted, assigned, mortgaged, pledged, hypothecated or otherwise encumbered or disposed of, and will not grant assign, mortgage, pledge, hypothecate or otherwise encumber or dispose of any right, title or interest of any kind whatsoever in or in connection with any Shot to any third party. Digital Domain represents and warrants that, to the best of its knowledge, in the exercise of reasonable prudence, except with respect to work or materials supplied to Digital Domain by Producer in connection with the Agreement, the Work will be free and clear of any third party claims, liens or encumbrances created by Digital Domain (or any approved subcontractor thereof) which would interfere with the performance of Digital Domain's obligations hereunder or adversely affect the rights of Producer hereunder.  Notwithstanding the foregoing, Producer acknowledges that the Contract Price (described below) does not include Digital Domain performing any trademark searches hereunder, and that Digital Domain shall not be responsible for any third party claims regarding trademarks (excluding any such claims relating to the DD Materials). Upon creation of any materials hereunder, ownership shall immediately vest with Producer, and Digital Domain shall hold such materials as bailee for the account of Producer, and Producer shall have the right to possession on demand. However, it is understood and agreed that Producer shall still be responsible for its payment obligations under Paragraph 9,

(e)    With the exception of any required on-set or production laboratory work, the Work shall be produced by Digital Domain personnel at Digital Domain's facility, the Work will not be subcontracted without the express written consent of Producer and Digital Domain shall not supply any Shot to any person, firm, vendor or other subcontractor unless authorized to do so by Producer hereunder or otherwise. If such prior written consent is obtained, then Digital Domain shall remain responsible for ensuring that all subcontracted work conforms to all applicable terms of this Agreement. If any portion

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

DIS-REARDEN-0028354

of the Work is subcontracted by Digital Domain, then Digital Domain is expressly prohibited from assigning or licensing, in any manner whatsoever, any rights granted hereunder. Producer shall remain the sole owner and bailor of all materials produced in connection with the Work (whether produced by Digital Domain or authorized subcontractor), and Digital Domain agrees that Producer shall have the right to (i) receive all such materials from Digital Domain upon request by Producer, or (ii) receive satisfactory evidence of destruction of such materials, or (iii) enter the premises where such materials are stored or produced to take inventory of, witness the destruction of or take possession of and remove any such materials.

Digital Domain shall extend all such obligations to its agreements with any subcontractors.

2    **Ownership**:

(a)     The Work and each Shot created hereunder shall be considered a work-made-for-hire for Producer. Producer shall solely and exclusively own throughout the universe, in perpetuity, all rights, title and interest of every kind and nature, including the copyright and all rights of copyright, and any and all renewals and/or extensions thereof, in and to the Work and the Shots, and Producer shall have the right, in perpetuity, to distribute and exhibit the Work and the Shots in connection with the distribution, advertising, and exploitation of the Picture and any other motion picture that Producer shall elect, without limit as to the number of times or places, throughout the universe, in any media or fields, by any means now in existence or hereafter discovered or conceived, including, but not limited to: (i) any radio or television means, whether pay, free, community antenna or other kind; (ii) in theaters, regardless of whether an admission is charged; (iii) in and in connection with audiovisual discs, tapes, cassettes and cartridges, whether for home use or otherwise; (iv) in connection with commercial records; (v) in any promotional film or other audiovisual promotional materials; and (iv) in and in connection with merchandising, including, without limitation, video and computer games using any technology now or hereafter known if analogous to video or computer games, commercial tie-ups and theme parks, including, but not limited to, theme park attractions, without additional compensation; provided, however, that in the event Producer uses more than one print of any given Shot in the Picture, any additional work required of Digital Domain in connection therewith shall be subject to a Change Order to cover Digital Domain's charges therefor.

(b)     Notwithstanding the foregoing, Digital Domain shall retain exclusive ownership of all rights, title and interest in and to, and possession of, and shall not be required to deliver to Producer (other than as described in Paragraph 1.c above), any proprietary software, firmware, hardware, digital effects, mechanical devices, inventions, ideas, concepts, templates, platforms, processes, and/or technology of any kind or nature only to the extent that it is owned by Digital Domain or licensed by Digital Domain from a third party (collectively, "DD Materials"). Furthermore, Digital Domain shall be entitled to use any of the DD Materials in any manner (e.g., in other productions) so long as the DD Materials are generic in nature, and are not used to produce a shot that is (i) substantially similar to, and generally recognizable as, a Shot created for, and contained in, the Picture, and (ii) which, if created independently by a third party without Producer's authorization, would constitute an infringement of Producer's copyright or violate other laws protecting Producer's rights in its intellectual property.

(c)     This Section 2 shall survive any termination of this Agreement.

3.    **Producer's and Digital Domain's Representatives**:

(a)     Producer has designated the individual listed on Schedule B (each, a "Producer's Representative") to serve as its representative for the Picture and to represent Producer in all matters arising under this Agreement. Producer's Representative shall have the authority to give any approval required or permitted to be given by Producer. Digital Domain shall be entitled to rely and act upon any action taken and on any instruction given by Producer's Representative.

(b)     Digital Domain has designated the individual listed on Schedule B (each, a "Digital Domain Representative") to serve as the Digital Domain Representative for the Picture and to represent

MARVEL'S THE AVENGERS-Digital Domain-10-25-2011 v1          -3-

HIGHLY CONFIDENTIAL – ATTORNEYS'
EYES ONLY

DIS-REARDEN-0028355

Digital Domain in all matters with respect to the Picture arising under this Agreement; provided, however, it is expressly agreed that no modification to this Agreement, including, without limitation, a modification to the scope of the Work or to the Delivery Date shall be effective or binding upon Digital Domain unless and until Producer identifies such modification in a writing and the writing is then counter-signed by Digital Domain's head of production. Producer understands, acknowledges and agrees that Digital Domain's creative staff, including without limitation Digital Artists, Digital Effects Supervisors and/or Special Visual Effects Supervisors ("DD Creatives"), have no authority whatsoever to bind Digital Domain in any way. Producer further understands, acknowledges, and agrees that when any such DD Creative offers an opinion as to what can and cannot be done regarding potential changes to the Work, the DD Creative is offering a technical and/or creative opinion only and is not offering to modify the scope of the Work. Modifications to the scope of the Work may only be effected through the Change Order process described in Section 7 below.

4.    **Plate and Blue Screen Shots:** This Section shall apply to any Work that includes plate and/or blue screen stage plate shots.

(a)    Producer will provide, at its expense, the following for both First and Second Unit plate and blue screen stage plate shots: (i) video assist with monitor; (ii) film stock; (iii) processing and printing for all film which is shot; (iv) blue screen material rental and blue screen rigging on stage; (v) grip and electrical packages; and (vi) any other set support.

(b)    For all said plate and blue screen shoots at Digital Domain, Digital Domain will provide the services of a Visual Effects Supervisor and, when Digital Domain, in consultation with Producer, deems it appropriate, a Visual Effects Producer.

(c)    With the exception of the equipment and personnel to be provided by Producer in accordance with Paragraph 4.a above, Digital Domain will have available all equipment and personnel needed to render the plate and blue screen photography as and when required by Producer based on the Delivery Date.

(d)    If a call is changed within the space of a particular day, Digital Domain will in good faith make a reasonable effort to accommodate Producer.

(e)    In the event Producer fails to cancel a call for any given day in accordance with the above requirements, Producer will be charged for the crew and equipment that were to be used on such day, as well as any other expenses incurred (subject to written substantiation and reasonable good faith efforts to mitigate), in accordance with the rates set forth in Digital Domain's then current shoot rate card, a copy of which shall be provided to Producer.

5.    **Travel:** In the event Digital Domain's Visual Effects Supervisor, Digital Domain's Visual Effects Producer or any other employee or agent of Digital Domain is required by Producer to travel to a location shoot, such travel shall be subject to the internal production schedules of Digital Domain and the written approval of Digital Domain's head of production and the Producer's Representative. Digital Domain reserves the right to determine which of its employees or agents it will send to any particular location shoot, provided that Digital Domain shall send its primary Visual Effects Supervisor and/or Visual Effects Producer to any such location shoots whenever it is practical, in Digital Domain's sole discretion, after consulting with Producer, in good faith, and after considering Digital Domain's internal production schedules for the Work. In the event that a Digital Domain employee or agent is required to travel to a location shoot, Digital Domain shall be reimbursed for the reasonable costs and expenses of said travel subject to written substantiation (which, in the case of international travel, shall mean at least business class airfare), any associated travel, and a crew rate per diem.

6.    **Approval of/Refinements to Work in Progress:** Digital Domain will submit elements, work in progress and/or Shots for the Picture (collectively, "Work in Progress") to Producer for approval on a schedule to be agreed between the parties. Appropriate refinements and adjustments to the Work in Progress will be made as reasonably requested by Producer in order to give Producer the desired look (and such refinements

HIGHLY CONFIDENTIAL – ATTORNEYS'
EYES ONLY

DIS-REARDEN-0028356

shall not be considered a "take" for purposes of Paragraph 1(c)). Digital Domain will notify Producer by way of Digital Domain approval sheets or such other method that the parties may adopt when Work in Progress is being submitted. Upon delivery of the Work in Progress, Producer's Representative shall immediately review the Work in Progress and either approve or reject it, as soon as possible, but in no event later than two (2) business days following the delivery thereof (such time period to be measured from the time Producer receives such Work to the same time of day on the second succeeding business day thereafter).  Such 2 business days may be extended to 3 business days if the director or other key Marvel executive is not readily reachable due to travel and other time zone considerations. In the event any such Work in Progress is not approved or rejected in two (2)[or 3 business day, if applicable] such business days, then either: (i) the Schedule for such Deliverable may be extended by a reasonable amount of time, to be determined and mutually agreed upon by the parties, that reflects the impact of Producer's late response on Digital Domain's production schedule, it being agreed that Digital Domain shall give Producer timely notice in writing of such late response by Producer and disclose to Producer the effect that such late response will have, to the extent that the effect can be determined at the time that Digital Domain gives notice of the late response; or (ii) Digital Domain shall advise Producer in writing of any additional costs that may be required in order to meet the Schedule notwithstanding Producer's late response to delivery of such Work in Progress; and, if Producer wishes to pay such additional cost to meet Producer's Delivery Schedule, then Digital Domain shall issue a Change Order in accordance with Paragraph 7. below.

7.   **Change Orders:**

(a)   **General**: Changes to the Work, if any, for the Picture must be handled through the standard Digital Domain Change Order process, as described in this Section 7. The Shots for the Picture may be amended from time to time through the Change Order process. Also, in the event that frame counts and/or cut sequences are delayed through no fault of Digital Domain, the Delivery Date for the Shots may need to be extended through the Change Order process. Furthermore, Producer may, at its discretion, request proposed changes to the Work, including, but not limited to, an increase or decrease in the scope of the Work, an extension of the Producer's Delivery Schedule and/or the Delivery Date. In the event that Producer elects to increase or decrease the scope of the Work, the Contract Price shall be adjusted accordingly (taking into account that Digital Domain may have incurred direct and/or out-of-pocket expenses in connection with the Work that is the subject of a decrease) to correspond to such increase or decrease pursuant to the procedure described in this Section 7. Any additional work requested by Producer will be subject to the availability of Digital Domain's equipment and personnel, and Digital Domain will use its best efforts to make such equipment and personnel available to Producer, subject to then existing commitments.

(b)   **Process**: In the event a change to the Shots, the Work, the Producer's Delivery Schedule and/or the Delivery Date is requested and/or required by Producer, Digital Domain will submit a written Change Order to Producer that specifies the effect such change will have on the Contract Price and on the Delivery Date. If Producer agrees, Producer shall indicate acceptance of any particular Change Order by signing the Change Order and delivering it to Digital Domain. Such Change Order shall become effective upon counter-signature by Digital Domain's head of production. No change is considered an approved Change Order unless approved by both parties in writing as to any increase in the Contract Price and basis of work, and no changes in the Work will increase the fixed Contract Price set forth below and/or change the Delivery Date, without the Producer's prior written approval. With respect to a change that results in a decrease in the Contract Price, if Producer (in its sole discretion) elects not to require any portion or all of the Deliverables set forth in Schedule "A" attached hereto and incorporated herein by reference, then Producer shall give notice to Digital Domain. The Contract Price shall be automatically reduced for any Deliverables not required by Producer (collectively, the "Cancelled Deliverables") by the corresponding amount(s) set forth on Schedule "A" (or if not set forth on Schedule "A", by a reasonable and allocable portion of the Contract Price), and Digital Domain shall promptly refund to Producer any and all amounts previously paid by Producer in excess of the reduced Contract Price; provided, however, that if and to the extent that Digital Domain has already commenced work (with Producer's knowledge and consent) on any such Cancelled Deliverables, and further provided that Digital Domain has performed all services and obligations hereunder that are required

MARVEL'S THE AVENGERS-Digital Domain-10-25-2011 v1                -5-

DIS-REARDEN-0028357

with respect to the Cancelled Deliverables and is not in material breach or material default hereunder, then (in lieu of the corresponding amount[s] set forth on Schedule "A" for the Cancelled Deliverables) Producer shall instead reimburse Digital Domain in full for all reasonable substantiated and authorized costs and expenses (if any) directly paid or payable by Digital Domain (as a result of such work on the Cancelled Deliverables) prior to the date of Producer's election not to require such Cancelled Deliverables, as and only to the extent directly related to such authorized work on the Cancelled Deliverables for the Picture performed prior to the date of such election (collectively, "Reimbursable Costs"); provided further, however, that: (a) Digital Domain shall use reasonable good faith efforts to mitigate such Reimbursable Costs (if any); (b) any and all corresponding amounts for the Cancelled Deliverables (as set forth in Schedule "A") previously paid by Producer shall be fully applicable against and deducted from said Reimbursable Costs (if any), and Digital Domain shall promptly refund to Producer any and all such corresponding amounts previously paid by Producer in excess of the Reimbursable Costs (if any); and (c) in no event shall the Reimbursable Costs (if any) exceed the corresponding amounts for the Cancelled Deliverables set forth in Schedule "A" (as may be reduced pursuant to this Paragraph 7). Producer acknowledges that there are certain fixed costs that are not variable in the amount of work created by Digital Domain. Thus, a reduction in the Work or Shots may not result in a reduction of all costs associated therewith, and may require certain costs to be allocated to the portion of the Work or Shots not cancelled. Prices and delivery dates quoted in suggested Change Orders shall remain valid for the period of time indicated on the face of the relevant Change Order. In the event a Change Order is not accepted by Producer's Representative within the time period identified on the face of such Change Order, the Work will proceed unmodified by such proposed change (except in the event that Producer-supplied elements are not delivered in accordance with the Producer's Delivery Schedule, in which case the provisions set forth in Paragraph 8.a shall apply).

8      **Delivery of Completed Shots/Materials:**

(a)      The Delivery Schedule for the Work is contingent upon Producer meeting all of its delivery obligations including, but not limited to, the timely delivery of all required plates, cut sequences and all other elements required to be delivered by Producer in accordance with the Producer's Delivery Schedule, including, without limitation, all elements necessary for digital composites and matte painting shots. In the event any such elements are not delivered to Digital Domain by Producer in accordance with the Producer's Delivery Schedule, then either: (i) the Schedule for such Deliverable may be extended by a reasonable amount of time, to be determined and mutually agreed upon by the parties, that reflects the impact of Producer's late delivery on Digital Domain's production schedule, it being agreed that Digital Domain shall give Producer timely notice in writing of such late delivery by Producer and disclose to Producer the impact that such late delivery will have, to the extent that the impact can be determined at the time that Digital Domain gives notice of the late delivery; or (ii) Digital Domain shall advise Producer in writing of any additional costs that may be required in order to meet the Schedule notwithstanding Producer's late delivery of such materials; and, if Producer wishes to pay such additional cost to meet Producer's Delivery Schedule, then Digital Domain shall issue a Change Order in accordance with Paragraph 7. above. Any additional work requested by Producer, or any extension of the Delivery Date requested or caused by Producer, will be subject to the Change Order Process set forth in Section 7.

(b)      Each completed Shot shall be delivered by Digital Domain to Producer's Representative at the Digital Domain studio located at 300 Rose Avenue, Venice, California (the "Studio"). In the event Producer designates a place other than the Studio for delivery of the Shots, Producer shall pay all costs and expenses of shipping the Shots (including insurance). Any Work which is damaged or lost after it has left the Studio shall be the responsibility of Producer (unless such delivery is done by or under the control of Digital Domain), and shall not reduce or otherwise affect the compensation to be paid to Digital Domain with respect to the Work. Producer may reorder any damaged or lost Shots as part of the Change Order process at a cost and on a schedule to be mutually agreed to in good faith by the parties.

(c)      Completed Shots will be submitted to Producer for approval in the manner provided for in Section 6 above. Upon receipt of each completed Shot, Producer's Representative shall immediately review

HIGHLY CONFIDENTIAL – ATTORNEYS'
EYES ONLY

DIS-REARDEN-0028358

the Shot and either approve or reject it, as soon as possible, but in no event later than three (3) business days following the delivery thereof (such time period to be measured from the time Producer receives such Shot to the same time of day on the third business day thereafter). Producer shall not unreasonably withhold or delay its approval of a completed Shot. In the event any Shot is not approved or rejected in three (3) business days, Digital Domain shall be relieved of its obligation to deliver such Shot until such time as the Contract Price and the Delivery Date have been amended in connection with the Change Order Process set forth in Section 7 to reflect such changes as are necessitated by Producer's failure to timely approve or reject such Shot.

(d)     In the event Producer does not retrieve such materials in a timely manner, Digital Domain shall hold all Producer-supplied physical materials and any physical props, models, and sets relating to the Work for the Picture or any portion thereof, including but not limited to negative and positive prints of scenes photographed or used in the process of preparing the Work (collectively, the "Physical Materials"), until ninety (90) days after the delivery of all of the Shots called for hereunder. Upon the written request of Producer, if such request is delivered within such ninety (90) day period, Digital Domain shall deliver all such Physical Materials to Producer by shipping them to a location designated by Producer, at Producer's expense. The requested Physical Materials shall be delivered to Producer in an "as is" condition, and nothing herein shall require Digital Domain to restore the Producer-supplied Physical Materials to the condition in which they were delivered to Digital Domain. However, Digital Domain will use its best efforts to keep the Producer supplied Physical Materials in good condition while they are in the care, custody and control of Digital Domain. If Producer does not make such a request for Physical Materials within such ninety (90) day period, then such Physical Materials will be deemed released to Digital Domain and Digital Domain shall have the right to dispose of them without any further obligation to Producer. In no event shall Digital Domain use the Physical Materials for any other purpose without the written consent of Producer.

9.     **Consideration:**

(a)     **Contract Price:** As consideration for the Work, the Shots to be delivered hereunder, the rights granted to Producer hereunder, and provided Digital Domain has met all required performance standards as established herein, and satisfactorily delivers each stage of the Work in accordance with the applicable approval stages, Producer shall pay Digital Domain the Contract Price set forth below, in accordance with the payment schedule set forth below. The price for the Work as currently described in Schedule A is $700,000 (the **"Contract Price"**). Based upon the current Contract Price, installment payments shall be due and payable on the dates and in the amounts indicated:

1st payment: $140,000 upon contract signing;

2nd payment: $$140,000 the week of 11/30/2011;

3rd payment: $$140,000 the week of 12/31/2011;

4th payment: $$140,000 the week of 1/31/2012; and

5th payment: $140,000 upon the complete final delivery of all of Contractor's services hereunder and complete and timely delivery to Producer of all shots and signature by Contractor of the final payment letter in substantially the form attached hereto as Exhibit "F". Unless other payment terms are negotiated for a specific Change Order, each Change Order shall generally be paid as follows: (a) one-half (1/2) of the Change Order shall be due and payable upon the execution of the Change Order; and (b) the balance of the Change Order shall become due and payable upon delivery of the final approved Shots.

If there is a Change Order in connection with a decrease in the scope of Work, Digital Domain shall credit Producer equally over any remaining payments still due and/or reimburse Producer for any

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

DIS-REARDEN-0028359

overpayment at the time of such Change Order.

If the Delivery Date is extended for any reason, then one-half (1/2) of the scheduled delivery payment shall be made on the Delivery Date, and the balance of the delivery payment shall be paid upon actual delivery. Any such extension(s) shall necessitate a Change Order and any additional compensation to hold personnel and facilities beyond the originally budgeted Delivery Date shall be negotiated, in good faith, subject to such Change Order.

(b)   **No Sales Tax:** Producer and Digital Domain believe that the performance by Digital Domain of its Work hereunder and the delivery to Producer of the Shots pursuant to this Agreement do not constitute the sale of tangible personal property within the meaning of the California Sales and Use Tax Law. Accordingly, no California sales or use tax will be charged to Producer with respect to any amounts paid by Producer to Digital Domain hereunder. Notwithstanding the foregoing, Producer and Digital Domain agree that in the event any California sales and/or use tax is assessed against Digital Domain with respect to amounts paid by Producer to Digital Domain hereunder, Producer shall promptly pay to Digital Domain, upon its demand and written substantiation from the applicable tax authority, an amount equal to any such assessment, plus any assessed interest charges or penalties thereon; provided, however, that Producer shall have the absolute right, with full cooperation from Digital Domain, to contest any such sales or use tax assessment, and in the event Producer is successful in any such contest, Producer shall be entitled to any refund or credit granted to the extent that such refund or credit arises from assessment amounts (and/or interest or penalty amounts) previously paid by Producer to Digital Domain.

(c)   <u>Canadian Tax Credits</u>: The parties agree that DDPV or a wholly-owned DDPV subsidiary (in either case, hereafter "Applicant") will apply for (on behalf of Producer) refundable tax credits under the Production Services Tax Credit and Digital Animation or Visual Effects Tax Credit to the extent that they are available through the Ministry of Small Business and Revenue and Canada Revenue Agency with respect to the portion of the Work that is performed by Applicant in Vancouver ("Tax Credits"). In the event that Applicant receives a refund for the Tax Credits, Applicant agrees that it shall remit payment of such refund to Producer subject to the terms of this section.

(1)   In connection with the Tax Credits, Applicant shall:
(A)   File such applications, forms, requests for certification, or other documents that are reasonably necessary to claim the Tax Credits in connection with the portion of the Work performed in Vancouver, subject to Producer's prior performance of its obligations under section 9(c)(2).

(B)   Remit to Producer an amount equal to any refund for the Tax Credit that the Producer actually receives, less substantiated outside reasonable legal, accounting and administrative costs (capped at $5,000, excluding government filing application fees and subject to adjustment as mutually agreed upon by the parties in the event that the Work materially increases or decreases) and filing fees that Applicant reasonably incurs in connection with the application for the Tax Credits, within ten (10) business days of DDPV's or Applicant's receipt of the Tax Credit refund. Producer reserves the right to apply for the Tax Credits on its own behalf by giving Digital Domain ten (10) business days advance written notice and reimbursing Applicant's costs up to the date of the notice as set forth in the foregoing sentence within thirty (30) days of Producer's receipt of an invoice from DDPV. In any event, Digital Domain and Applicant will consult and cooperate with Producer so as to maximize the potential Tax Credits and minimize any costs associated in applying for and obtaining such Tax Credits. Producer acknowledges that Digital Domain makes no representation or guarantee that the refund for the Tax Credits will be paid.

(2)   In connection with the Tax Credits, Producer shall:

HIGHLY CONFIDENTIAL – ATTORNEYS'
EYES ONLY

DIS-REARDEN-0028360

(A)      Deliver to Applicant original Affidavits appointing the Applicant as Producer's Official Designee with respect to the Tax Credits, sworn by an authorized representative on behalf of Producer, substantially in the form attached as Exhibit C, which the Applicant will be authorized to file in connection with the application for the Tax Credits, and such other documents that are reasonably required of Producer to support the application for the Tax Credits.

(B)      Deliver to Applicant an original written opinion of qualified legal counsel describing the chain-of-title for the Picture and opining, subject to reasonable assumptions, that Producer has the requisite ownership interest in the copyright in the Picture which the Applicant will be authorized to file in connection with the application for Tax Credits.

(C)      In the event that a wholly-owned subsidiary of DDPV produces the Work that is the subject of the Tax Credit, Producer agrees to amend this agreement to include such wholly-owned subsidiary of DDPV as a party.  In the event that Producer is not the owner of at least 51% of the copyright in the Picture, Producer agrees to amend this agreement (unless Producer decides for any reason not to pursue the Tax Credits) to add the owner(s) of at least 51% of the copyright in the Picture ("Majority Copyright Owner") as a party and to cause the Majority Copyright Owner to enter into such amendment, upon request of DDPV.

10.      **Payment**:  All payments under this Agreement are to be made by check payable to DDPI, DDPV, or Applicant as set forth on invoices that shall be sent to Producer prior to the date on which an installment payment becomes due and payable.  Such payment checks shall be delivered to DDPI, DDPV or Applicant, as the case may be, at the addresses identified in Paragraph 21 or on the invoices for installment payments.  Any late payment that is more than thirty (30) days past due shall be subject to a late charge equal to the lesser of 1.5% per month (or portion thereof) or the highest rate permitted by applicable law, unless such late payment is the subject of dispute or discrepancy, in which case no late fee shall apply.

11.      **Termination**:

(a)      Digital Domain shall only terminate this Agreement if Producer breaches a material obligation hereunder; provided, however, that Producer shall have a cure period of (i) five (5) business days for any breach of payment obligations, and (ii) ten (10) business days, or such other greater number of days as may be reasonable under the circumstances, for all other breaches. Other than termination, Digital Domain's only legal remedy for an uncured breach by Producer shall be money damages, and in no event may Digital Domain obtain injunctive or other equitable relief to prevent or inhibit exploitation of the Picture.

(b)      Prior to final delivery of the Shots, Producer may terminate this Agreement for any reason. In the event of termination of this Agreement by Producer for any reason, the parties shall negotiate, in good faith, a mutually agreed to Change Order, which such Change Order shall compensate Digital Domain for services rendered up through the effective date of the termination and for Digital Domain's lost opportunity costs by paying Digital Domain all costs (including without limitation, costs of labor (including fringes) and materials, charges for usage of internal assets at Digital Domain's customary billing rates therefor (a copy of which must be provided to Producer in advance), third party charges and allocated overhead) arising out of this Agreement through the effective date of said termination, subject to written substantiation therefor.

12.      **Publicity**:  Digital Domain shall not issue or authorize the publication of any news stories or publicity of any kind relating to or naming the Picture, Producer, Marvel Studios, Inc. ("Marvel Studios"), or either of their successors, assigns, or any parent, subsidiary or affiliated entities (collectively, the "Marvel Entities"), or Digital Domain's involvement with the Picture, nor may Digital Domain use any images from the Picture or

MARVEL'S THE AVENGERS-Digital Domain-10-25-2011  v1          -9-

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

DIS-REARDEN-0028361

any fanciful characters or designs of Producer or the Marvel Entities, or any of their subsidiary companies, for any purpose whatsoever, without the prior written consent of Producer and Marvel Studios. After the initial general theatrical release of the Picture, Digital Domain may use a portion of the Work approved by Producer for the particular corporate use in Digital Domain's corporate reel for non-commercial use only, subject to the terms of Producer's then-current use restriction letter. Digital Domain may, however, (a) disseminate publicity concerning Digital Domain which incidentally mentions the Picture among a list of Digital Domain's current or past projects, and (b) list the name of the Picture among Digital Domain's current or past projects on Digital Domain's website; provided no details concerning the services or the Picture are disclosed; and provided further that such publicity is not an advertisement for the Picture and is not derogatory to Producer or its affiliates, the Picture or any party rendering services in connection therewith.

(a) **Video**: Digital Domain shall be entitled to a Dl video master of the Shots, which shall be used by Digital Domain as part of a demonstration reel for marketing purposes (i.e., for internal marketing uses and/or to be sent to existing and potential clients to demonstrate Digital Domain's abilities); provided, however, that such use for marketing purposes may occur only after the initial United States general theatrical release of the Picture, unless specifically agreed upon in writing by Producer. Digital Domain shall mark any Shots used in the foregoing manner with an appropriate copyright notice identifying Producer's copyright and shall include with any demonstration reel incorporating such Shots a notification to the recipient thereof to the effect that such Shots are solely for the recipient's use in evaluating Digital Domain's abilities in connection with the consideration of hiring Digital Domain to provide shots for such recipient (or a client or agent thereof).

(b)     **Agreement Confidential**: To the extent reasonably practicable and/or enforceable, the terms of this Agreement will not be disclosed by either party (or its employees) without the prior written consent of the other party, unless such disclosure: (i) is compelled by an order of a court of competent jurisdiction, provided that appropriate protective orders or confidential treatment will be sought to prevent or limit dissemination of the information; (ii) has already been made by the other party; (iii) is made to a party's confidential legal and/or financial advisor, provided that such advisor acknowledges and agrees to be bound by the confidentiality provisions hereof; (iv) is made by a party in connection with asserting or defending its rights under this Agreement; or (v) is otherwise required by law, provided that appropriate protective orders or confidential treatment will be sought to prevent or limit dissemination of the information. Digital Domain may, during the course of its engagement hereunder, have access to, and acquire knowledge about Producer and/or its affiliates, the Picture and/or any element thereof, material, data, systems, and other sources which are not available to the general public ("Confidential Information"). Digital Domain shall keep confidential (and shall cause all of its employees and agents to keep confidential) all such Confidential Information, including without limitation matters relating to the Picture (including, without limitation, the script, the plot, or any elements thereof, any set design, props or effects, or activities of the cast and crew) and Producer's business or production activities, and shall not furnish or authorize any dissemination of such Confidential Information. Any Confidential Information acquired by Digital Domain from such material, data, systems, or otherwise through its engagement hereunder shall not be used, published, or divulged by Digital Domain to any other person, firm, or corporation in any manner whatsoever without first having obtained the written permission of Producer, which permission Producer may withhold in its sole discretion. This clause shall survive the expiration of the Term of this Agreement.

13.     __Credits:__

(a)     Provided Digital Domain is not in material breach, has completed all services in a timely manner, and a substantial portion of the Work is utilized in the Picture, then, subject to all applicable guild and union rules and determinations, Producer agrees to accord Digital Domain up to 3 lines of credit on positive prints of the domestic and foreign theatrical versions of the Picture. Except as expressly provided herein, all aspects of Digital Domain's credit, including but not limited to size and placement, shall be determined by Producer in its sole discretion. The casual or inadvertent failure by Producer or any failure by a third party to comply with the provisions set forth in this Paragraph

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                                      DIS-REARDEN-0028362

shall not be deemed to be a breach by Producer.

(b)     If Digital Domain requests that any additional lines of credit be accorded, Producer shall give good faith consideration to providing such additional lines of credit, but Producer shall have no obligation to provide such additional lines of credit.

14.  **Insurance:**

(a)     During the term of this Agreement, Digital Domain shall secure and maintain the following insurance coverages:

(i)     Statutory Workers' Compensation and Employer's Liability Insurance with a limit of liability on the latter of not less than $1,000,000;

(ii)     Comprehensive General Liability Insurance providing coverage for bodily injury, personal injury or property damage, and blanket contractual coverage for the mutual benefit of both Producer and Digital Domain. Digital Domain shall maintain primary limits of liability and/or Excess Umbrella Liability coverage of not less than $5,000,000 combined single limit. Digital Domain herewith waives on its behalf, and that of any insurance company providing coverage under any policy covering Digital Domain, any right of subrogation or claim against Producer as long as such waiver of subrogation is not prohibited and does not violate any items of any such policy. All insurance maintained by Digital Domain shall provide for primary and non-contributing coverage. Producer shall be an additional insured party on all general liability insurance required of Digital Domain hereunder, and Digital Domain shall deliver to Producer appropriate certificates evidencing such coverage and providing that such coverage will not be canceled without ten (10) days prior written notice to Producer.  Notwithstanding the foregoing, Digital Domain's insurance shall not cover any claim that arises from the gross negligence and/or willful misconduct of Producer.

(b)     During the production of the Picture, Producer shall, at all times, maintain general liability insurance and, with respect to such production, adequate production insurance, including, without limitation, coverage for negatives, faulty stock, props, sets and miscellaneous equipment, third party damage, errors and omissions and other customary coverages, to cover any and all costs, expenses and losses and liabilities relating to the Work to be performed for the Picture, including, without limitation, all faulty stock, all items set forth in the Schedules hereto, and any and all negatives created in connection with such Work, whether in final form or in any stage of development and whether or not accepted by Producer. Producer herewith waives on its behalf, and that of any insurance company providing coverage under any policy covering Producer, any right of subrogation or claim against Digital Domain as long as such waiver of subrogation is not prohibited by and does not violate any terms of any such policy. Digital Domain and its directors, officers, employees, agents, assigns, licensees and approved sub-contractors shall be named as additional insureds on all insurance required of Producer hereunder, and Producer shall deliver to Digital Domain appropriate certificates evidencing such coverage and providing that such coverage will not be canceled without thirty (30) days prior written notice to Digital Domain. Notwithstanding the foregoing, Producer's insurance shall not cover any claim that arises from the gross negligence and/or willful misconduct of Digital Domain.

(c)     Producer acknowledges that Digital Domain recommends that Producer, in its sole discretion, consider making inter-positives of all negatives supplied to Digital Domain, and that the Contract Price does not include any inter-positives being made by or for Digital Domain, To the extent that Producer chooses to supply negatives to Digital Domain without first making inter- positives, Producer acknowledges that it does so at its sole risk, except to the extent that a loss is due to the gross negligence or willful misconduct of Digital Domain.

(d)     Nothing in this Section 14 shall be interpreted to require either party to obtain general liability insurance coverage that extends to types of losses outside of the scope of losses customarily covered

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    DIS-REARDEN-0028363

by such party's existing general liability insurance policy, nor shall anything in this Section 14 be interpreted to require Producer to obtain production insurance coverage that extends to types of losses outside of the scope of losses customarily covered by production insurance policies,

15.   **Remedies**: Notwithstanding any other provisions in this Agreement, Digital Domain's sole legal remedy for breach of payment obligations by Producer shall be an action at law for damages, and in no event shall Digital Domain seek or be entitled to injunctive or other equitable relief to prevent or inhibit exploitation of the Picture in connection with any breach of this Agreement. Notwithstanding anything contained in this Agreement to the contrary, under no circumstance whatsoever shall either Producer or Digital Domain be liable for any indirect, incidental, direct or consequential damages which may arise out of this Agreement, including lost profits, even if the damaging party is notified of the possibility of such damages.

16.   **Warranties**:

(a)      Digital Domain represents and warrants that, to the best of its knowledge, in the exercise of reasonable prudence, except with respect to work or materials supplied to Digital Domain by Producer in connection with this Agreement: (i) Digital Domain has or will have all rights necessary to perform the Work hereunder and to grant to Producer the rights granted hereunder; (ii) the Work will not knowingly violate or infringe the copyright, or any literacy, dramatic, artistic, personal or property right or right of privacy or any other right of any person, firm or corporation; and (iii) the Work will be free and clear of any encumbrances created by Digital Domain (or any approved subcontractor thereof) which would interfere with the performance of Digital Domain's obligations hereunder or adversely affect the rights of Producer hereunder. Notwithstanding the above, Producer acknowledges that the Contract Price does not include Digital Domain performing any trademark searches hereunder, and that Digital Domain shall not be responsible for any third party claims regarding trademarks, excluding any such claims relating to the DD Materials.

(b)      Producer represents and warrants that, to the best of its knowledge, in the exercise of reasonable prudence, except with respect to work or materials supplied by Digital Domain to Producer in connection with this Agreement: (i) Producer has or will have all rights necessary to produce, release, exhibit, exploit and distribute the Picture; (ii) Producer will not knowingly violate or infringe the copyright, or any literary, dramatic, artistic, personal or property right or right of privacy or any other right of any person, firm or corporation; and (iii) the Picture will be free and clear of any encumbrances created by Producer which would interfere with the performance of Producer's obligations hereunder or adversely affect the rights of Digital Domain hereunder.

17.   **Indemnity**:

(a)      Except to the extent that a claim relates to the gross negligence or willful misconduct of Producer, Digital Domain hereby agrees to indemnify, hold harmless, and defend Producer and its shareholders, directors, officers, employees and agents, from and against any and all third party claims, demands, causes of action, judgments, costs, loss, damage or expense (including court costs and reasonable outside attorneys' fees) arising out of or resulting from the gross negligence and/or willful misconduct of Digital Domain, and any proven material breach by Digital Domain of any of the representations and warranties contained herein, provided that Producer gives Digital Domain prompt written notice of any such claim, and provided further that Digital Domain shall have the right to solely defend and/or settle any such claim. In the event Digital Domain undertakes the defense and/or settlement of any claim against Producer, Digital Domain shall give Producer prompt written notice of such claim, and shall keep Producer informed of, and will consult with Producer in connection with, the progress of such action or settlement, and Digital Domain shall not have the right, without Producer's written consent (which such consent shall not be unreasonably withheld or delayed), to settle any claim, to the extent that the settlement: (i) arises from or is part of any criminal action, lawsuit or proceeding; (ii) contains a stipulation to or admission or acknowledgment of, any liability or wrongdoing (whether in contract, tort or otherwise) on the part of Producer; or (iii) includes a non-monetary provision which affects the rights and/or obligations of Producer.

MARVEL'S THE AVENGERS-Digital Domain-10-25-2011 v1          -12-

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

DIS-REARDEN-0028364

(b)      Except to the extent that a claim relates to the gross negligence or willful misconduct of Digital Domain, Producer hereby agrees to indemnify, hold harmless, and defend Digital Domain and its shareholders, directors, officers, employees and agents, from and against any and all third party claims, demands, causes of action, judgments, costs, loss, damage or expense (including court costs and reasonable outside attorneys' fees), other than those described in Paragraph 17.a above, arising out of or in connection with the production, release, exhibition, exploitation or distribution of the Picture, provided that Digital Domain gives Producer prompt written notice of any such claim, and provided further that Producer shall have the right to solely defend and/or settle any such claim. In the event Producer undertakes the defense and/or settlement of any claim against Digital Domain, Producer shall give Digital Domain prompt written notice of such claim, and shall keep Digital Domain informed of, and will consult with Digital Domain in connection with, the progress of such action or settlement, and Producer shall not have the right, without Digital Domain's written consent (which such consent shall not be unreasonably withheld or delayed), to settle any claim, to the extent that the settlement: (i) arises from or is part of any criminal action, lawsuit or proceeding; (ii) contains a stipulation to or admission or acknowledgment of, any liability or wrongdoing (whether in contract, tort or otherwise) on the part of Digital Domain; or (iii) includes a non-monetary provision which affects the rights and/or obligations of Digital Domain.

(c)      In the event a third party brings against Producer or Digital Domain a claim that arises out of or in connection with Digital Domain's Work hereunder, or in the event Producer or Digital Domain desires to bring against a third party a claim that arises out of or in connection with Digital Domain's Work hereunder, the parties hereto will cooperate with and assist each other in any investigations that may be reasonably necessary in connection with any such claim, including, but not limited to, matters of piracy or theft of either party's materials, fraud or any similar such claim.

18.     **Nondisclosure:** Digital Domain shall inform its employees that no information related to the Picture obtained by employees, agents, approved subcontractors or other persons utilized by Digital Domain in connection with performing the Work or otherwise in connection with this Agreement shall be disclosed to any person except as required to perform the Work contracted for hereunder. It is an essential term of this Agreement that any and all information relating to the Picture and its production and exploitation, including any and all information relating to the screenplay or special effects for the Picture or other creative, business and/or physical production elements relating to the Picture ("Production Information") be maintained in the strictest confidence. Accordingly, Digital Domain hereby agrees that unless and until it is expressly authorized to do so by Producer, Digital Domain and all of its employees and agents shall: (i) keep all Production Information (whether relating to the services performed by them or otherwise learned by them) in strictest confidence; (ii) not disclose any Production Information to any person except employees of Producer or other persons performing services on the Picture ("Authorized Personnel"); (iii) disclose Production Information to Authorized Personnel only if and to the extent necessary in order for them to perform their services in connection with the production of the Picture; and (iv) such disclosure of Production Information to Authorized Personnel shall be limited to the minimum information necessary in order to accomplish the relevant production objective. Digital Domain expressly acknowledges and agrees that failure to adhere completely to the terms of this nondisclosure provision shall constitute a material breach of the Agreement and may, at Producer's option, result in the immediate termination of the Agreement for cause.  Producer shall also have the right to use Digital Domain's name, and the names, voices, likenesses and biographical data of Digital Domain's employees who provided services in connection with the Work or the Shots (which employees Digital Domain shall cause to sign the Likeness Release attached as Exhibit "E") in connection with promotional films and behind the scenes footage pertaining to the Picture.

19.     **Force Majeure:** Digital Domain will not be deemed in breach of this Agreement if Digital Domain is unable to complete any portion of the Work, or if Digital Domain's production of any portion of the Work is delayed by reason of fire, earthquake, labor dispute, lock-out, strike, act of God or public enemy, any local, state, federal, national or international law, government order or regulation or any other event beyond the direct control of Digital Domain (each, an event of "DD Force Majeure"), Likewise, Producer will not be deemed in breach of this Agreement if Producer is unable to discharge its obligations hereunder as a result of an event of DD Force Majeure, the inability to secure sufficient labor, power, essential commodities, necessary equipment, adequate transportation or transmission facilities, the death or disability of key personnel rendering services on the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

DIS-REARDEN-0028365

Picture, and/or a labor dispute which Producer
reasonably believes is likely to result in an actual strike (collectively, "Producer Force Majeure") affecting Producer or the Picture. Upon the occurrence of any event of DD Force Majeure and/or Producer Force Majeure, the party subject to such event will give notice to the other party of its inability to perform or of the delay in performance of the relevant portion of the Work and/or the Picture, and the parties will discuss, in good faith, any revisions required to be made to the Producer's Delivery Schedule and/or the Delivery Date, to the extent practicable. Any revisions required to be made to the Delivery Date as a result of an event of either DD Force Majeure and/or Producer Force Majeure will be governed by the Change Order provisions set forth in Section 7 above, and subject to good faith negotiations.

20.   **Relationship of Parties:** This Agreement does not, and shall not be deemed to, make either party the agent of the other, or create a partnership or joint venture between the parties. Digital Domain shall be responsible for, and shall indemnify Producer from and against, any and all compensation and benefits which may be due to Digital Domain's personnel and entities whose services are engaged by Digital Domain on an employment or independent contracting basis in connection with Digital Domain's fulfillment of its obligations to Producer hereunder. Similarly, Producer shall be responsible for, and shall indemnify Digital Domain from and against, any and all compensation and benefits which may be due to Producer's personnel and entities whose services are engaged by Producer (excluding Digital Domain) on an employment or independent contracting basis in connection with Producer's fulfillment of its obligations to Digital Domain hereunder.

21.   **Notices:** All notices or other communications required or desired to be sent to either party hereto in connection with this Agreement or Digital Domain's services hereunder, shall be in writing and shall be delivered in person or by telecopier. Notices shall be deemed received when delivered, in the case of personal delivery, and when confirmed by electronic confirmation of transmission, when sent by telecopier. The address for all notices shall be as follows (or such other address as a party may advise the other in writing):

TO PRODUCER
BY MAIL OR FACSIMILE:

Marvel Eastern
Productions, 1600
Rosecrans Ave. Building
7, Suite 110, Manhattan
Beach, CA 90266 Attn:
Business Department
Telecopier: 310/536-
9871

TO DDPI: Digital Domain
Productions, Inc.
300 Rose Avenue
Venice, CA 90291
Attn: General Counsel
Telecopier: 310/314-2943

BY PERSONAL DELIVERY:

Marvel Eastern Productions LLC
1600 Rosecrans Ave. Bldg 1A, 2nd Floor
Manhattan Beach, CA 90266
Attn: Business and Legal Affairs Dept.

TO DDPV:
Digital Domain Productions (Vancouver) Ltd.
1618 & 1620 West 8th Avenue
Vancouver, BC V6J 1V4
Attn: Studio Manager
Telecopier: 778/783-6000

22.   **Miscellaneous:**

(a)      **Integration:** This Agreement (including the Schedules and Exhibits hereto) and any Change Orders issued and approved hereunder, will constitute the full and binding agreement of the parties with respect to the subject matter hereof, and supersedes any prior or contemporaneous agreements or understandings, either oral or written, with respect thereto.

(b)      **Schedules and Exhibits:** Only writings attached to this Agreement and identified as "Schedules" or "Exhibits" hereto are Schedules or Exhibits to this Agreement. The Schedules and Exhibits are incorporated

MARVEL'S THE AVENGERS-Digital Domain-10-25-2011  v1             -14-

HIGHLY CONFIDENTIAL – ATTORNEYS'
EYES ONLY

DIS-REARDEN-0028366

herein and are a part of this Agreement as if they were set forth in full herein.

(c)     **Further Assistance:** Each party agrees to promptly execute and deliver such documents and instruments and to promptly do such other acts as are reasonably requested by the other party and are in the reasonable judgment of the other party necessary or appropriate to effectuate the purposes of this Agreement, including without limitation, executing and delivering documents and/or instruments which may be recorded or filed and cooperating in effecting such recordation or filing.

(d)     **Severability:** Any portion or provision of this Agreement which is deemed to be invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective only to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining portions or provisions hereof in such jurisdiction.

(e)     **Section and Paragraph Headings:** The section and paragraph headings included in this Agreement are for the convenience of the parties only and shall not affect the construction or interpretation of this agreement.

(f)     **Successors and Assigns:** This Agreement shall be binding upon and shall inure to the benefit of the permitted successors, licensees, assignees and transferees of the parties hereto whether by license, sale, merger, reverse merger, consolidation, sale of stock or assets, operation of law or otherwise. Neither party shall be authorized during the term of this Agreement to assign or transfer its rights, obligations and/or liabilities hereunder without the prior written consent of the other party. No such assignment or transfer will relieve either party of its obligations and liabilities under this Agreement. However, Producer shall have the right to assign its motion picture rights to any third party at any time.

(g)     **Remedies Cumulative:** The remedies contained in this Agreement are cumulative with one another and with any other remedies which a party may have at law, in equity, under any type of agreement or contract, or otherwise, and the exercise or failure to exercise any remedy shall not preclude the exercise of that remedy at another time or of any other remedy at any time; provided, however, that, as set forth in Section 15, Digital Domain shall not have the right to enjoin the distribution of the Picture.

(h)     **Governing Law/Choice of Venue:** This Agreement will be governed by and construed in accordance with the internal substantive laws of the State of California applicable to agreements entered into and fully performed in such state, excluding conflict of law principles. All claims, controversies or disputes arising out of, in connection with, or relating to this Agreement, the performance or breach thereof or default hereunder, whether based on contract, tort or statute, including without limitation any claim that this Agreement was induced by fraud ("Covered Claims"), shall be resolved by binding arbitration in Los Angeles, California, in accordance with Exhibit "DR" attached hereto and incorporated herein by this reference.

(i)     **Attorneys' Fees:** In the event of any litigation, or any other proceeding, undertaken in connection with or related to this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party its expenses incurred in such litigation or proceeding, including without limitation reasonable outside attorneys' fees and costs and any reasonable expenses of investigation.

(j)     **Authorized Representatives:** Each of the parties hereby represents that: (i) is it a duly organized and validly existing corporation and has the full power and authority to enter into this Agreement; (ii) it can and will perform each of its obligations under this Agreement; and (iii) it will not do any act or thing, and has not made and will not make any agreement or other commitment which would materially interfere with the performance of its obligations hereunder, or would adversely affect the other party's right to receive complete and quiet enjoyment of all rights granted to it under this Agreement.

(k)     **Counterparts:** This Agreement may be executed in several counterparts, each of which shall be an original as against any party who signed it and all of which shall constitute one and the same document.

MARVEL'S THE AVENGERS-Digital Domain-10-25-2011  v1                    -15-

DIS-REARDEN-0028367

IN WITNESSETH WHEREOF, the parties hereto agree to be bound by the terms and conditions set forth herein and have caused this Agreement to be executed by their duly authorized representatives.

MARVEL EASTERN PRODUCTIONS LLC          DIGITAL DOMAIN PRODUCTIONS, INC.

By: _Michael Ross_                       By: _Jody R. Madden_

Name: _MICHAEL ROSS_                     Name: _JODY R. MADDEN_

Title: _SVP, BUSINESS & LEGAL AFFAIRS_   Title: _SVP, GLOBAL STUDIO OPERATIONS_


MVL FILM FINANCE LLC                     DIGITAL DOMAIN PRODUCTIONS (VANCOUVER) LTD.

By: _____                    By: _Jody R. Madden_

Name: _BENJAMEN HUNG_                     Name: _JODY R. MADDEN_

Title: _VP, BUSINESS DEVELOPMENT_        Title: _SVP, GLOBAL STUDIO OPERATIONS_

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    DIS-REARDEN-0028368

<u>**Schedule A**</u>

<u>Bid Letter,</u>

<u>Asset Build and Look Development Summary,</u>

<u>Shot List,</u>

<u>and Turnover/Delivery Dates</u>

[See Attached]

Avengers_bidltr_v01   Avengers_ClientBid_   Avengers_Payment_
.pdf           v01.xlsm        Schedule.xls

MARVEL'S THE AVENGERS-Digital Domain-10-24-2011  v1

HIGHLY CONFIDENTIAL – ATTORNEYS'
EYES ONLY

DIS-REARDEN-0028369

# DIGITAL DOMAIN

October 19, 2011

Susan Pickett
THE AVENGERS
Via Email: susanmpickett@earthlink.net

Re: THE AVENGERS ESTIMATE v01

Dear Susan,

Thank you for considering Digital Domain and for giving us the opportunity to bid The Avengers. The following estimates the total cost to produce twenty-nine (29) shots. This estimate is based on the bid package received October 13, our Cinesync October 17 and some general assumptions about the nature and scope of the work, which we have outlined below.

### COST ESTIMATE SUMMARY:

| | | |
|---|---|---:|
| i. | Digital Asset Build & Look Development | $ 179,983. |
| ii. | Digital Shot Cost | $ 547,635. |
| **TOTAL ESTIMATE:** | | **$ 727,618.** |
| **REDUCTION:** | | **<$ 27,618.>** |
| **REVISED TOTAL ESTIMATE:** | | **$ 700,000.** |

### TENTATIVE OVERALL SCHEDULE:

We have based our estimate on an overall seventeen (17) week schedule starting October 31, 2011 with final delivery February 24, 2012. As discussed, we are expecting plate turnovers beginning October 24, with the goal of all turnovers completed by November 4, 2011.  While we understand that final show delivery is February 24, 2012 we will work with you to begin finaling shots mid January in order to allow for the conversion process.

Our budget and corresponding schedule reflects the delivery of temp shot work on February 10, 2012 for temp screening purposes.

## I.      ASSET BUILD & LOOK DEVELOPMENT:

This category provides for development of an appropriate look, methodology, proceduralization and integration for CG elements. The element characteristics of size, shape, color and texture are to be provided by Production based on approved production designs, conceptual artwork, blueprints, and any other standard descriptive data.

These items are separate from the Digital Shot Cost outlined at the conclusion of this bid letter, as they would be amortized over many shots and sequences throughout the film.

Please refer to the attached Visual Effects Asset Build Breakdown for the per item breakdown.

| | |
|---|---:|
| **ASSET BUILD & LOOK DEVELOPMENT ESTIMATE:** | **$ 179,983.** |

300 Rose Avenue, Venice CA 90291 ☏ 310.314.2800 🖷 310.314.2888 🕸 digitaldomain.com

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

The Avengers
October 19, 2011
Bid Letter v01 - Page 2

We have assumed that the appropriate Production departments will assume responsibility for designing all digital characters, wardrobe, props, sets, locations and the overall look of all the necessary effects.

## II.    DIGITAL SHOT COST:

This category covers 3D & 2D CG animation, digital color correction, digital rotoscoping and digital compositing. For bidding purposes we have used shot lengths based on the cut provided, plus an additional 8-frame handle at each end.

Please refer to the attached Visual Effects Shot Breakdown for the per shot breakdown.

**DIGITAL SHOT COST ESTIMATE:**                                   **$ 547,635.**

CRITICAL ASSUMPTIONS:
   i.  The current delivery schedule is based on a two (2) business day approval window.
   ii. A stereoscopic delivery is not within the scope of work for this estimate and schedule and would require additional costs and review of key dates and delivery schedule.

The following are not included in our estimate and we have assumed will be provided by Production:
   i.  All pre-visualization, LIDAR and Cyberscan Data.
   ii. Digital scanning, recording (filmouts) and dustbusting.

Please note this bid is based upon the use of Digital Domain's standard special visual effects contract for feature films, which addresses such issues as ownership of Digital Domain technology, screen credits, payment schedules and the cut sequences delivery schedule. It is assumed that Production will provide production insurance and special risks coverage for any live action shot by Production, as well as errors and omissions coverage.

Please feel free to call me if you have any questions or comments. My direct line is (310) 314-2805. I look forward to speaking with you soon.

Best regards,

Joanna Capitano

cc:   Cliff Plumer
      Kevin Weston
      Jody Madden
      Bonnie Pritzker
      Dan Brimer

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    DIS-REARDEN-0028371

AVEN
GERS
Shot
Break
down
v01

| Line Number | Shot Count | Sequence Name | VFX Shot Name | Client Shot Number | Interior / Exterior | Location | TOD | Description | VFX Elements | Complexity | Assumptions | Client Notes | Individual Shot Cost | Total Contract |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 29 | | | | | | | | | | | | | $ 647,695 |
| 1 | 1 | Alien World Throne | AWM07 00 | 67Q/4C | Int./Ext. | Secret Lair/Alien World | Night | MS: Track in on Loki as he sits cross-legged in a quiet corner of his secret lair. As the camera orbits around him, the world transitions to an alien landscape. Loki sees himself approach as "The... | • CG/matte painting environment (secret lair) • CG/matte painting set ext./env. (alien world) • BG composite (Loki/Other/partial set) • FX anim/composite (trippy image treatment) • FX anim/composite (transition from real world... | Hard | > Vision Treatment > Vision Transition x2 | • Initial secret lair BG created from re-projected location stills. • Alien World BG created as 3D panoramic environment. • Alien World BG to include FX anim. elements – drifting atmos., etc. • Alien World BG to include enhancing/replacing set ground plane. • Extend rock face to hide char deities above The Other. • Overall image treatment to imply out-of-body experience. • Allow for shots to transition to one another in an interesting manner. • Alien look devtime for image treatment and transition FX. • Scepter jewel to have subtle internal animation/fire. | $ 44,385 | $ 44,385 |
| 2 | 1 | Alien World Throne | AWM07 10 | 67/4C | Ext. | Alien World | Night | MWS: Orbit around The Other as he walks past a rocky outcrop. Loki walks the opposite direction, turning to speak to The Other. | • CG/matte painting set ext./env. (alien world) • BG composite (Loki/Other/partial set) • FX anim/composite (trippy image treatment) • FX anim/composite (transition to next shot) | Med | > Vision Treatment > Vision Transition x2 | • Alien World BG created as 3D panoramic environment. • Alien World BG to include FX anim elements – drifting atmos, etc. • Alien World BG to include enhancing/replacing set ground plane. • Overall image treatment to imply out-of-body experience. • Allow for shots to transition to one another in an interesting manner. • Alien look devtime for image treatment and transition FX. | $ 15,895 | $ 15,895 |
| 3 | 1 | Alien World Throne | AWM_T BD_0713 | ? | Ext. | Alien World | Night | MS: The Other steps back and rests his hand against the rock face. | • BG spill suppression • FX anim/composite (trippy image treatment) • FX anim/composite (transition to next shot) • Rig removal (rod between The Other's thumbs) | Easy/ Med | > Vision Treatment > Vision Transition x2 | • No need for proper alien world environment. • Overall image treatment to imply out-of-body experience. • Allow for shots to transition to one another in an interesting manner. • Alien look devtime for image treatment and transition FX. | $ 10,890 | $ 10,890 |
| 4 | 1 | Alien World Throne | AWM_T BD_0716 | 67M/4C | Ext. | Alien World | Night | MWS: Profile angle. Loki stands, scepter in hand, beyond a rocky outcrop. | • CG/matte painting set ext./env. (alien world) • BG composite (Loki/Other/partial set) • FX anim/composite (trippy image treatment) • FX anim/composite (transition to next shot) | Med | > Vision Treatment > Vision Transition x2 | • Alien World BG created as 3D panoramic environment. • Alien World BG to include FX anim elements – drifting atmos, etc. • Alien World BG to include enhancing/replacing set ground plane. • Overall image treatment to imply out-of-body experience. • Allow for shots to transition to one another in an interesting manner. • Alien look devtime for image treatment and transition FX. | $ 15,895 | $ 15,895 |
| 5 | 1 | Alien World Throne | AWM07 20 | ? | Ext. | Alien World | Night | MS: The Other speaks to Loki, one hand resting on the rock face. | • BG spill suppression • FX anim/composite (trippy image treatment) • FX anim/composite (transition to next shot) | Easy/ Med | > Vision Treatment > Vision Transition x2 | • No need for proper alien world environment. • Overall image treatment to imply out-of-body experience. • Allow for shots to transition to one another in an interesting manner. • Alien look devtime for image treatment and transition FX. | $ 10,890 | $ 10,890 |
| 6 | 1 | Alien World Throne | AWM_T BD_0730 | 67N/2C | Ext. | Alien World | Night | MCU: Profile angle. Loki turns to speak to The Other – "I was a king..." | • CG/matte painting set ext./env. (alien world) • BG composite (Loki/Other/partial set) • FX anim/composite (trippy image treatment) • FX anim/composite (transition to next shot) | Med | > Vision Treatment > Vision Transition x2 | • Alien World BG created as 3D panoramic environment. • Alien World BG to include FX anim elements – drifting atmos, etc. • Alien World BG to include enhancing/replacing set ground plane. • Overall image treatment to imply out-of-body experience. • Allow for shots to transition to one another in an interesting manner. • Alien look devtime for image treatment and transition FX. | $ 15,895 | $ 15,895 |
| 7 | 1 | Alien World Throne | AWM_T BD_0740 | 67B/2C | Ext. | Alien World | Night | CU: The Other turns, and walks away from Loki. | • CG/matte painting set ext./env. (alien world) • BG composite (Loki/Other/partial set) • FX anim/composite (trippy image treatment) • FX anim/composite (transition to next shot) | Med | > Vision Treatment > Vision Transition x2 | • Alien World BG created as 3D panoramic environment. • Alien World BG to include FX anim elements – drifting atmos, etc. • Alien World BG to include enhancing/replacing set ground plane. • Overall image treatment to imply out-of-body experience. • Allow for shots to transition to one another in an interesting manner. • Alien look devtime for image treatment and transition FX. | $ 15,895 | $ 15,895 |
| 8 | 1 | Alien World Throne | AWM07 70 | 67M/4C | Ext. | Alien World | Night | MS: Loki walks forward, speaking to The Other – "...They are a lost people....They validate self-others for spirit..." | • CG/matte painting set ext./env. (alien world) • BG composite (Loki/Other/partial set) • FX anim/composite (trippy image treatment) • FX anim/composite (transition to next shot) • FX anim (scepter jewel enhancement) | Med/ Hard | > Vision Treatment > Vision Transition x2 | • Alien World BG created as 3D panoramic environment. • Alien World BG to include FX anim elements – drifting atmos, etc. • Alien World BG to include enhancing/replacing set ground plane. • Overall image treatment to imply out-of-body experience. • Allow for shots to transition to one another in an interesting manner. • Alien look devtime for image treatment and transition FX. | $ 26,840 | $ 26,840 |

HIGHLY CONFIDENTIAL – ATTORNEYS'
EYES ONLY

| # | Theme | Shot | Int/Ext | Location | Time | Description | Elements | Level | Vision Treatment | Vision Notes | Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9 | Alien World Throne | 67/4C | Ext. | Alien World | Night | VO: The Other stands with his hand on the rock. "How will you rule them..." | • CG/matte painting set ext./env. (alien world)<br>• BS composite (Loki/Other/partial set)<br>• FX axis/composite (trippy image treatment)<br>• FX axis/composite (transition to next shot) | Med/World | > Vision Treatment x2 | • Alien World 3D created as 3D panoramic environment.<br>• Alien World BG to include FX axis elements - drifting atmos, etc.<br>• Alien World BG to include enhancing/replacing set ground plane.<br>• Overall image treatment to imply out-of-body experience.<br>• Allow for shots to transition to one another in an interesting manner. | $26,940 / 26,940 |
| 10 | Alien World Throne | AWML_T BD_0790 | 677/3C | Ext. | Alien World | Night | MCU: Loki replies - "Unmercifully..." | • CG/matte painting set ext./env. (alien world)<br>• BS composite (Loki/Other/partial set)<br>• FX axis/composite (trippy image treatment)<br>• FX axis/composite (transition to next shot) | Med | > Vision Treatment x2 | • Alien World 3D created as 3D panoramic environment.<br>• Alien World BG to include FX axis elements - drifting atmos, etc.<br>• Alien World BG to include enhancing/replacing set ground plane.<br>• Overall image treatment to imply out-of-body experience.<br>• Allow for shots to transition to one another in an interesting manner. | $35,895 |
| 11 | Alien World Throne | AWML_T BD_0800 | 679/3C | Ext. | Alien World | Night | MWS: Track in on The Other as he moves from the rock back to the rock face again. | • CG/matte painting set ext./env. (alien world)<br>• BS composite (Loki/Other/partial set)<br>• FX axis/composite (trippy image treatment)<br>• FX axis (scepter jewel enhancement) | Med | > Vision Treatment<br>> Vision<br>> Vision Transition x2 | • Alien World 3D created as 3D panoramic environment.<br>• Alien World BG to include FX axis elements - drifting atmos, etc.<br>• Alien World BG to include enhancing/replacing set ground plane.<br>• Allow for shots to transition to one another in an interesting manner. | $15,895 |
| 12 | Alien World Throne | AWML_T BD_0810 | 676/3C | Ext. | Alien World | Night | MCU: Loki turns away and moves to check out the staircase. | • CG/matte painting set ext./env. (alien world)<br>• BS composite (Loki/Other/partial set)<br>• FX axis/composite (trippy image treatment)<br>• FX axis/composite (transition to next shot) | Med | > Vision<br>> Vision Treatment<br>> Vision Transition x2 | • Alien World 3D created as 3D panoramic environment.<br>• Alien World BG to include FX axis elements - drifting atmos, etc.<br>• Alien World BG to include enhancing/replacing set ground plane.<br>• Allow for shots to transition to one another in an interesting manner. | $15,895 |
| 13 | Alien World Throne | AWML_T BD_0820 | 672/3C | Ext. | Alien World | Night | MS: Loki's POV of the base of the staircase. | • CG ext./replacement (alien world steps)<br>• FX axis/composite (trippy image treatment)<br>• FX axis/composite (transition to next shot) | Med | > Vision Treatment<br>> Vision<br>> Vision Transition x2 | • Allow for replacing ground plane at base of stairs.<br>• Allow for manipulating the step lighting to add visual interest.<br>• Overall image treatment to imply out-of-body experience.<br>• Allow for shots to transition to one another in an interesting manner. | $15,895 |
| 14 | Alien World Throne | AWML_T BD_0830 | 678/3C | Ext. | Alien World | Night | MCU: The Other speaks to Loki while pressed up against the rock face. | • CG/matte painting set ext./env. (alien world)<br>• BS composite (Loki/Other/partial set)<br>• FX axis/composite (trippy image treatment)<br>• FX axis/composite (transition to next shot) | Med | > Vision<br>> Vision Treatment<br>> Vision Transition x2 | • Alien World 3D created as 3D panoramic environment.<br>• Alien World BG to include FX axis elements - drifting atmos, etc.<br>• Alien World BG to include enhancing/replacing set ground plane.<br>• Overall image treatment to imply out-of-body experience.<br>• Allow for shots to transition to one another in an interesting manner. | $15,895 |
| 15 | Alien World Throne | AWML_T BD_0840 | 674/3C | Ext. | Alien World | Night | MCU: Loki looks up the staircase. | • CG/matte painting set ext./env. (alien world)<br>• BS composite (Loki/Other/partial set)<br>• FX axis/composite (trippy image treatment)<br>• FX axis/composite (transition to next shot) | Med | > Vision Treatment<br>> Vision<br>> Vision Transition x2 | • Alien World 3D created as 3D panoramic environment.<br>• Alien World BG to include FX axis elements - drifting atmos, etc.<br>• Alien World BG to include enhancing/replacing set ground plane.<br>• Overall image treatment to imply out-of-body experience.<br>• Allow for shots to transition to one another in an interesting manner. | $15,895 |
| 16 | Alien World Throne | AWM/N D00 | 672/3C | Ext. | Alien World | Night | MCU: Behind The Other at the rock face. He "glides" over toward Loki. | • CG/matte painting set ext./env. (alien world)<br>• FX axis/composite (trippy image treatment)<br>• FX axis/composite (transition to next shot) | Med | > Vision Treatment<br>> Vision<br>> Vision Transition x2 | • Alien World 3D created as 3D panoramic environment.<br>• Alien World BG to include FX axis elements - drifting atmos, etc.<br>• Alien World BG to include enhancing/replacing set ground plane.<br>• Overall image treatment to imply out-of-body experience.<br>• Allow for shots to transition to one another in an interesting manner. | $15,895 |
| 17 | Alien World Throne | AWM/N D20 | 673/5C | Ext. | Alien World | Night | MS: GTS Loki. The Other "glides" into frame, between Loki and the staircase. | • CG/matte painting set ext./env. (alien world)<br>• BS composite (Loki/Other/partial set)<br>• FX axis/composite (trippy image treatment)<br>• FX axis/composite (transition to next shot) | Med | > Vision Treatment<br>> Vision<br>> Vision Transition x2 | • Alien World 3D created as 3D panoramic environment.<br>• Alien World BG to include FX axis elements - drifting atmos, etc.<br>• Alien World BG to include enhancing/replacing set ground plane.<br>• Replace/enhance steps so that they don't look so flat/set-piece.<br>• Allow for manipulating the step lighting to add visual interest. | $15,895 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| # | Scene | Code | Shot | Int/Ext | World | Time | Action | Technical | Difficulty | Vision Treatment | Cost | Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18 | Alien World Throne | AWA020 3D | 670/1C | Ext. | Alien World | Night | MCU: OTS The Other. He blocks Loki's view, hand raised. | • CG/matte painting set est./env. (alien world)<br>• BG composite (Loki/Other/partial set)<br>• FX axis/composite (transition to next shot)<br>• Rig removal (rod connecting The Other's armature) | Med | > Vision Treatment<br>> Vision Transition x2 | $15,695 | $ 15,695 |
| 1 | Alien World Throne | AWA_T BD_0640 | 670/1C | Ext. | Alien World | Night | MCU: OTS Loki. The Other blocks Loki's view, hand raised. | • CG/matte painting set est./env. (alien world)<br>• BG composite (trippy image treatment)<br>• FX axis/composite (transition to next shot) | Med | > Vision Treatment<br>> Vision Transition x2 | $15,695 | $ 15,695 |
| 19 | Alien World Throne | AWA_J BD_0560 | 670/VC | Ext. | Alien World | Night | MS: OTS Loki. The Other continues to block Loki's view, hand raised. He slowly lowers his hand and moves past Loki to take up position behind him. | • CG/matte painting set est./env. (alien world)<br>• BG composite (Loki/Other/partial set)<br>• FX axis/composite (trippy image treatment)<br>• FX axis/composite (transition to next shot) | Med | > Vision Treatment<br>> Vision Transition x2 | $26,940 | $ 26,940 |
| 1 | Alien World Throne | AWA_J BD_0570 | 670/VC | Ext. | Alien World | Night | CU: OTS Loki. The Other speaks to Loki behind his back. | • CG/matte painting set est./env. (alien world)<br>• FX axis/composite (trippy image treatment)<br>• FX removal (rod connecting The Other's armature) | Med | > Vision Treatment<br>> Vision Transition x2 | $15,695 | $ 15,695 |
| 20 | Alien World Throne | AWA_T BD_0570 | 670/VC | Ext. | Alien World | Night | MCU: OTS Loki. The Other continues to block Loki's view, hand raised. | • CG/matte painting set est./env. (alien world)<br>• BG composite (Loki/Other/partial set)<br>• FX axis/composite (trippy image treatment) | Easy/Hard | > Vision Treatment<br>> Vision Transition x2 | $26,940 | $ 26,940 |
| 1 | Alien World Throne | AWA_T BD_0580 | 670/VC | Ext. | Alien World | Night | MCU: Loki stands in front of The Other. The Other reaches out his hand to Loki's face. Loki reacts in path to his touch. | • BG composite (set)<br>• FX axis/composite (transition to next shot) | Med | > Vision Treatment<br>> Vision Transition x2 | $15,695 | $ 15,695 |
| 21 | Alien World Throne | AWA_T BD_0590 | 670/VC | Ext. | Alien World | Night | MCU: Loki, back in its secret lair in the real world reacts to the pain of the Other's touch. Push in slowly. | • BG composite (Loki)<br>• FX axis/composite (transition from alien world)<br>• FX axis (scepter jewel enhancement) | Med | > Vision Transition x1 | $15,695 | $ 15,695 |
| 22 | Alien World Throne | AWT_TB D_0300 | 670/1C | Ext. | Alien World | Night | MWS: Track us along the last few shards of staircase to reveal The Other on his knees behind a throne. | • CG/matte painting environment (secret lair)<br>• CG set est. (steps)<br>• BG composite (The Other/partial set) | Med/ Hard | > Vision Transition x1 | $26,940 | $ 26,940 |
| 23 | Alien World Throne | AWT032 | 670/1C | Ext. | Alien World | Night | WS: High angle. CrAt around/above The Other on his knees behind the throne. | • CG/matte painting set est./env. (alien world)<br>• BG composite (The Other/partial set) | Hard | > Vision Transition | $44,385 | $ 44,385 |
| 24 | Alien World Throne | AWT_TB D_0350 | 670/1C | Ext. | Alien World | Night | CU: A hand is placed on the arm of throne as its occupant stands. | • CG/matte painting set est./env. (alien world)<br>• BG composite (partial set/armored figure) | Easy/ Med | > Vision Treatment | $10,890 | $ 10,890 |
| 25 | Alien World Throne | AWT_TB D_0340 | 670/1C | Ext. | Alien World | Night | CU: CTS. An armored figure rises into frame. | • CG/matte painting set est./env. (alien world)<br>• BG composite (armored figure) | Easy/ Med | > Vision Treatment | $10,890 | $ 10,890 |
| 26 | Alien World Throne | AWT_TB D_0360 | 670/1C | Ext. | Alien World | Night | CU: Profile angle. The Other bows his head. | • CG/matte painting set est./env. (alien world)<br>• BG composite (The Other/partial set) | Easy/ Med | > Vision Treatment | $10,890 | $ 10,890 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | | Alien World Theme | AWT0270 | Est. | Alien World | Right | The armored figure turns and smiles. | • CG/matte painting set ext./env. (alien world)<br>• CG character (glowing eyes, smile, proportion)<br>• BS composite (armored figure) | Med/ Hard | • Alien World BG created as 3D panoramic environment.<br>• Alien World BG to include FX as/in elements - drifting debris, etc.<br>• Eyes to be replaced with glowing eyes, eyeline shifted screen left.<br>• Smile to be enhanced via re-projection/warp/etc.<br>• Facial anatomy to be tweaked via re-projection/warp/etc. | $26,840 | $ 26,840 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 29 | 1 | | | | | | | | | | | |
| 30 | | | | | | | | | | | $ - | $ - |
| | | | | | | | | | | | | $ 547,695 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
DIS-REARDEN-0028375

Avengers Payment Schedule

DIGITAL DOMAIN CONFIDENTIAL

| PAYMENT # | % | ORIGINAL CONTRACT: | CONTRACT AMT | DISCOUNT AMT | AMOUNT PAID | BALANCE DUE | INVOICE | DATE PAID |
|---|---|---|---|---|---|---|---|---|
| 1 | 20% | Due on or before October 31, 2011 | $ 145,523.60 | $ - | $ - | $ 145,523.60 | | |
| 2 | 20% | Due on or before November 31, 2011 | $ 145,523.60 | $ - | $ - | $ 145,523.60 | | |
| 3 | 20% | Due on or before December 31, 2011 | $ 145,523.60 | $ - | $ - | $ 145,523.60 | | |
| 4 | 20% | Due on or before January 31, 2012 | $ 145,523.60 | $ - | $ - | $ 145,523.60 | | |
| 5 | 20% | Final Delivery February 24, 2012 | $ 145,523.60 | $ - | $ - | $ 117,905.60 | | |
| | 100% | **TOTAL CONTRACT** | $ 727,618.00 | $ 27,618.00 | $ - | $ 700,000.00 | | |
| | | **CHANGE ORDERS:** | | | | | | |
| | | 50% upon signing 50% upon final delivery | $ - | $ - | $ - | $ - | | |
| | | | $ - | $ - | $ - | $ - | | |
| | | | $ - | $ - | $ - | $ - | | |
| | | **TOTAL CHANGE ORDERS** | $ - | $ - | $ - | $ - | | |
| | | **GRAND TOTAL CONTRACT & CHANGE ORDERS** | $ 727,618.00 | $ 27,618.00 | $ - | $ 700,000.00 | | |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

DIS-REARDEN-0028376

## Schedule B

### Designated Representatives

• Digital Domain's Representatives:

Digital Domain designates special visual effects producer Jody Madden and Dan Brimer as its representatives to interface with Producer in connection with the Picture ("**Digital Domain Representative**").

For purposes hereof, each Digital Domain Representative listed above, acting alone, shall have the authority to make all approvals and rejections and to take any other such action required or permitted to be taken by the Digital Domain Representative under the Agreement, and Producer shall be entitled to rely and act upon any action so taken by the Digital Domain Representative.

• Producer's Representatives:

Producer designates both Victoria Alonso and Kevin Feige as "Picture Representative" and both Tim Connors and Louis D'Esposito as "Studio Representative". The Picture Representative plus the Studio Representative shall constitute "Producer's Representative," and Producer's Representative shall have the authority to represent Producer in all matters arising under this Agreement; provided, however, that the Picture Representative shall be deemed the sole Producer's Representative with respect to approving Work in Progress, final composites, and Deliverables, and Digital Domain shall be entitled to rely and act upon any action so taken by a Producer's Representative.

MARVEL'S THE AVENGERS-Digital Domain-10-24-2011  v1

HIGHLY CONFIDENTIAL – ATTORNEYS'
EYES ONLY

**Exhibit C**
## AFFIDAVIT FOR OFFICIAL DESIGNEE

I, _____, of the City of _____, in the
   *(Name)*
Province/State of _____, _____ HEREBY MAKE
                        *(Country)*
OATH AND SAY:

1.  THAT I hereby authorize _____ to be my Official
    Designee                    *(Applicant Production Corporation)*
    for the purpose of applying to the Minister of Tourism, Sport and the Arts (the "Certifying
    Authority") and F.D.B.C. Film Development Society of British Columbia ("British Columbia
    Film") under the Production Services Tax Credit ("PSTC") for an Accreditation Certificate.

2.  THAT I am a copyright owner, or an authorized officer or director of the corporate entity,

    _____, which is a copyright owner of the production/series
         *(Copyright Holder)*

    entitled _____ *(please indicate number of episodes)* (the
    "Production")
                *(Production Title)*
    at the time of the signing of the document.

3.  THAT I own, or the corporate entity named above owns, _____% of the copyright in the
    Production.

4   THAT I hereby agree to provide to my Official Designee all documents required by the Certifying
    Authority and British Columbia Film in order to issue an Accreditation Certificate in respect of the
    Production and any further documentation, books, and records required by the Canada Revenue
    Agency for their audit process in respect of the PSTC.

5.  THAT I hereby agree to notify my Official Designee (and/or the Certifying Authority and British
    Columbia Film) if I should sell or transfer all or part of my copyright ownership, or if the
    corporation should sell or transfer all or part of its copyright ownership, in the Production at any
    time before work on the Production has been completed in British Columbia.


SWORN before me at the City of          )
                                        )        _____
_____, in the       )        Signature
                                        )
                                        )
Province/State of _____,    )        _____
                                        )        Print Name
                                        )
this ___ day of _____, 20___.       )
                                        )        _____
                                        )        Title (if applicable)
                                        )
_____               )        _____
Notary Public or Commissioner of Oaths (affix seal)  )   Date

MARVEL'S THE AVENGERS-Digital Domain-10-24-2011  v1          -19-

HIGHLY CONFIDENTIAL – ATTORNEYS'
EYES ONLY                                          DIS-REARDEN-0028378

**EXHIBIT "E"**

**DIGITAL DOMAIN EMPLOYEES**

**NAME/VOICE/LIKENESS/BIOGRAPHY RELEASE**

_____, 20____

Marvel Eastern Productions LLC
1600 Rosecrans Avenue,
Building 1A, 2nd Floor
Manhattan Beach, CA 90266

Gentlemen and Ladies:

Whereas I have been employed by Digital Domain, Inc. ("DD") in connection with its visual effects services for Marvel Eastern Productions LLC ("Producer") in connection with the motion picture currently entitled "MARVEL'S THE AVENGERS" (the "Picture"), and whereas I understand that Producer may wish to film behind-the-scenes or "making of"-type photography of the services performed by DD in connection with the Picture;

Now, therefore, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, I agree as follows:

I acknowledge and agree that Producer is producing (i) the Picture and/or related motion pictures in which I may appear recognizably, and (ii) certain behind-the-scenes, commentary/interview, and/or other "making of" type audio/visual materials related to the Picture and such other pictures.  For good and valuable consideration, receipt of which is hereby acknowledged, I hereby grant to DD and to Producer, and its agents, affiliates, licensees, successors and assigns, the right, without obligation, to photograph or otherwise reproduce my appearance, record my voice and use my name in connection with any such scenes or sequences.  In addition, I hereby grant to DD and to Producer the further right to utilize my name, voice and/or likeness and to reproduce, display, distribute and exploit the same by any and all means now known or hereafter devised throughout the universe and in perpetuity.

Sincerely,

By: _____
        SIGNATURE


        _____
        NAME (PLEASE PRINT)


        _____
        ADDRESS


        _____
        CITY / STATE / ZIP


        _____
        TELEPHONE NUMBER


MARVEL'S THE AVENGERS-Digital Domain-10-24-2011  v1          -20-

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

<u>EXHIBIT "F" – Final Payment Letter</u>

[DATE], 2012

Digital Domain Productions, Inc.
300 Rose Avenue
Venice, CA 90291
Attn: Joanna Capitano


Dear Joanna:

We are processing the final payment due pursuant to that certain contract dated as of October 25, 2011 between Marvel Eastern Productions LLC and Digital Domain for visual effects services in connection with the motion picture project "MARVEL'S THE AVENGERS".   The remaining amount due pursuant to the contract [and Change Order #_____, if applicable] is $_____.

Please confirm by signing below that this is the full and final payment due pursuant to the contract, Change Orders or otherwise in connection with the project, and that no other amounts are or will become due thereunder.

Best regards,


Victoria Alonso
EVP, Visual Effects
Marvel Eastern Productions LLC

Acknowledged on behalf of DIGITAL DOMAIN

Signature: _____
Print: _____
Title: _____
Date: _____


MARVEL'S THE AVENGERS-Digital Domain-10-24-2011  v1          -21-

HIGHLY CONFIDENTIAL – ATTORNEYS'
EYES ONLY

DIS-REARDEN-0028380

Exhibit "DR"

Other than any claim by Producer for equitable or injunctive relief which will be handled as otherwise provided for in the Agreement, any and all other disputes or controversies of any nature between the parties arising at any time out of this Agreement shall be determined by binding, confidential, non-public arbitration in accordance with the Comprehensive Commercial Arbitration Rules of JAMS (the "Rules") before a single neutral arbitrator (the "Arbitrator"), to be administered and conducted in Los Angeles, California. The Arbitrator shall (i) be selected from the panel of neutrals from the Los Angeles office of JAMS; and (ii) have experience in disputes concerning the licensing or exploitation of intellectual property rights. The Arbitrator shall be selected in accordance with the Rules. JAMS' fees, including fees for the Arbitrator, shall be borne equally by the parties. There shall be a stenographic record of the proceedings at the arbitration hearing and the Arbitrator shall issue a Statement of Award setting forth the factual and legal basis for the Arbitrator's award, within twenty (20) days of completion of the hearing.

The parties hereby agree that a party may appeal any award pursuant to the rules of the JAMS Optional Arbitration Appeal Procedure, modified as follows: If a party wishes to appeal, it shall give written notice of appeal to the other side and to JAMS within ten (10) business days after the issuance of the Statement of Award. If there is no appeal, the Arbitrator's award shall be final and binding and may be enforced by any court of competent jurisdiction. If a party gives written notice of appeal within ten (10) business days after the issuance of the Statement of Award, the award of the Arbitrator shall be appealed to three (3) neutral arbitrators (the "Appellate Arbitrators"), each of whom shall have the same qualifications as the Arbitrator and be selected in accordance with the Rules. Within five (5) business days of service of the notice of appeal, the opposing party may give notice of a cross-appeal. The appellant shall file its appellate brief within thirty (30) days after service of its notice of appeal, regardless of whether the Appellate Arbitrators have been selected; the cross-appellant shall file its cross-appeal brief within the same time period. Opposition briefs shall be filed within thirty (30) days thereafter. Reply briefs may be filed within five (5) business days after service of the opposition briefs. The Appellate Arbitrators shall entertain oral argument by the parties, if a party so requests, as soon as practicable after briefing has been completed. If there is a cross-appeal, all costs and expenses of the appeal, including the fees of the Appellate Arbitrators shall be borne equally by the parties. If only one side appeals and it is the substantially prevailing party it shall be reimbursed for all advanced costs and expenses of the appeal, excluding legal fees. It shall be in the discretion of the Appellate Arbitrators to determine which is the substantially prevailing party. In all events, each party shall be responsible for its own attorneys' fees and no award of attorneys' fees may be awarded in arbitration or court.

All records relating to any arbitration proceedings shall be permanently sealed, except as necessary to obtain court confirmation and enforcement of the arbitration award. If a party refuses to perform any or all of its obligations under the final arbitration award (following appeal, if applicable) within thirty (30) days of such award being rendered, then and only then may the other party enforce the final award in any court of competent jurisdiction.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

DIS-REARDEN-0028381