United States District Court
Northern District of California

**DEFENDANT'S EXHIBIT 1484**

Case No. 4:17-cv-04006-JST
Date Entered _____
By _____
Deputy Clerk

HIGHLY CONFIDENTIAL

DIS-REARDEN-0033043



As of July 2, 2008

Digital Domain Productions, Inc.
300 Rose Avenue
Venice, CA 90291
Attention: Joanna Capitano and Mark Miller

**Re: <u>TRON 2</u>**

Ladies and Gentlemen:

      The following shall set forth the principal terms of the Agreement between Grid Productions, Inc. ("Producer") and Digital Domain Productions, Inc. ("Company") with respect to certain services of Company in connection with the visual effects for the theatrical motion picture tentatively entitled "TRON 2" (the "Picture"). In consideration of the mutual covenants and agreements contained herein, Producer and Company hereby agree as follows:

      1.    <u>Services</u>. Company shall provide those services required by Producer as set forth in that certain letter dated June 20, 2008 (as amended by subsequent change orders) from Company to Art Repola (which letter is attached hereto as Exhibit "A" and incorporated herein by this reference), including without limitation provision of facilities (except as otherwise set forth on Exhibit "A"), production, personnel, equipment and tape or film stock necessary for the completion of the services, (collectively, the "Services"), commencing as of the date hereof in accordance with the schedule to be designated by Producer (the "Schedule"). Time is of the essence with respect to the Services and Schedule specified by Producer. Producer shall be entitled to view portions of the Company's work in progress, and Producer may request changes thereto. Company shall render such Services in accordance with the instructions of Producer. Company will furnish such employees and/or independent contractors necessary to complete the Services in accordance with the Schedule, and Company shall not subcontract any of the Services without prior written approval. Company shall be fully and solely responsible for paying said employees and contractors (including without limitation, salary, overtime, fringes, benefits and taxes) and Producer shall have no responsibility with respect thereto. Company shall furnish the services of Vernon Wilbert and Eric Barba as Visual Effects Supervisors to personally supervise the Services, the parties acknowledge and agree that it is the essence of this Agreement that they render such Services. Producer designates Sean Bailey or Joseph Kosinski as Picture Creative Representative" and Art Repola as "Studio Representative.

      2.    <u>Compensation</u>. Subject to (a) Company's full performance of all Services and material obligations, and (b) Producer's rights of suspension and/or termination as set forth in Paragraph 12 below, promptly following Producer's receipt of a signed original of this Agreement (in form and substance acceptable to Producer), Producer shall pay Company a

VCameron/Films/Tron II/Visual Effects/Digital Domain/Short Form Agreement.Final
Est. 7/10/08; rev. 7/17/08; Fin. 7/21/08

HIGHLY CONFIDENTIAL    DIS-REARDEN-0033044

production fee (the "Production Fee") in accordance with Exhibit "A," provided that Company's total Production Fee for the services set forth in Exhibit "A" shall not exceed $384,374, without Producer's prior written approval. The Production Fee is on an all-inclusive basis; i.e., inclusive of all amounts including without limitation overtime, costs, expenses, overhead, taxes and employee benefits, and Producer shall not be responsible for any additional amounts other than as set forth in Exhibit "A".

3. **Non-interference**. Company may not render any services to third parties which would interfere with the services to Producer hereunder.

4. **Approvals and Controls**. Producer shall retain all approvals and controls with respect to the Picture. The Schedule assumes that if Company submits (accompanied by written notice) any work hereunder for Producer's approval, such as a production painting or still photo composite, work in progress, work submitted as final, or other requests for responses, Producer shall provide a response thereto within two (2) business days of its receipt of such work. All work performed by Company will be of first class technical quality suitable for use in the Picture and will comply with the formats and creative direction required by Producer, and the quality of Company's work will be consistent with the segments of the Picture produced by Producer. Without limiting the generality of the foregoing, Producer shall retain the right to determine whether or not Company has met Producer's technical and artistic standards.

5. **Ownership**.

a.  Except as otherwise set forth in Paragraphs 5.b and 5.c below, Producer shall own all rights, title and interest (including, without limitation, any intellectual property rights related thereto) in the results and proceeds of Company's services hereunder and all ideas of Company in connection with the Picture, including, without limitation, all material composed, submitted, added, created or interpolated by Company in connection with the Picture, from the inception of creation and irrespective of the stage of development or completion (collectively, hereafter the "Work"), which Company acknowledges may have been or may be rendered in collaboration with others engaged by Producer. The Work shall be deemed a "work-made-for-hire" specially ordered or commissioned by Producer, and is the sole property of Producer for any and all purposes whatsoever. Except as otherwise set forth in Paragraphs 5.b and 5.c below, in the event and to the extent that the Work is found not to be a work-made-for-hire, Company hereby irrevocably assigns, transfers, and grants all rights, including all exclusive exploitation rights, of every kind and nature (including any and all applicable intellectual property rights, to the extent such assignment is allowed by law) in and to such Work to Producer, its successors and assigns. All rights to such Work are owned by Producer solely and exclusively, for the duration of the rights in each country and area and space, in all languages, and throughout the universe. Company and Producer are aware and hereby acknowledge that new rights to the Work may come into being and/or be recognized in the future, under the law and/or in equity (hereafter the "New Exploitation Rights"), and Company intends to and does hereby grant and convey to Producer any and all such New Exploitation Rights to the Work granted by Company hereunder. Company and Producer are also aware and do

VCameron/Films/Tron II/Visual Effects/Digital Domain/Short Form Agreement.Final
Est. 7/10/08; rev. 7/17/08; Fin. 7/21/08

2

HIGHLY CONFIDENTIAL                                                      DIS-REARDEN-0033045

hereby acknowledge that new (or changed) (1) technology, (2) uses, (3) media, (4) formats, (5) modes of transmission, and (6) methods of distribution, dissemination, exhibition or performance (hereafter the "New Exploitation Methods") are being and will inevitably continue to be developed in the future, which would offer new opportunities for exploiting the Work. Company intends and does hereby grant and convey to Producer any and all rights to such New Exploitation Methods with respect to the Work. Company hereby agrees to execute any document Producer deems in its interest to confirm the existence of the preceding and to effectuate its purpose to convey such rights to Producer, including without limitation the New Exploitation Rights and any and all rights to the New Exploitation Methods. Company further hereby agrees that it will not seek (1) to challenge, through the courts, administrative governmental bodies, private organizations, or in any other manner the rights of Producer to exploit the Work by any means whatsoever, or (2) to thwart, hinder or subvert the intent of the grants and conveyances to Producer herein and/or the collection by Producer of any proceeds relating to the rights conveyed hereunder.

b.   Notwithstanding anything to the contrary set forth in Paragraph 5.a above, but subject to the provisions of Paragraph 5.c below in connection with "Joint Inventions," Company shall retain ownership of all rights, title and interest (including, without limitation, any patent or trade secret rights) in any (i) proprietary mechanical or electronic devices, (ii) proprietary technologies and processes, (iii) generic or stock elements, and (iv) proprietary software (including, without limitation, computer code, data or files) that are not provided by Producer and are utilized by Company in creating the Work or any element thereof (collectively, the "Company IP"). Producer agrees that to the extent such Company IP is confidential information of Company, it shall be treated as such by Producer in accordance with the provisions of Paragraph 10 below. To the extent any Company IP is incorporated into or is necessary for the use or other exploitation of the Work or any element thereof, Company hereby grants to Producer and its "Affiliates" (as defined below) a perpetual, irrevocable, fully paid-up, royalty-free, worldwide right and license to reproduce, modify, and otherwise use and exploit (including by means of making derivative works of the Company IP as embedded in the Work) all or any portion of such incorporated Company IP in connection with developing, enhancing, marketing, distributing or providing, maintaining, supporting, or otherwise using or exploiting the Work in connection with the Picture.

c.   Producer and Company may, while Company is providing the Services, jointly develop or invent one or more patentable invention(s), where at least one (1) employee of each party has contributed to at least one (1) claim of a patent application covering the patentable invention, as determined by the U.S. Patent and Trademark Office (each, a "Joint Invention"). Each party hereby acknowledges and agrees that neither party is granting or relinquishing any rights such party would otherwise have as a co-creator and/or co-inventor of any Joint Invention, all such rights being hereby reserved by each party.

      i.   Each party shall own an undivided joint interest in and to all patent applications and patents on Joint Inventions made pursuant to this Agreement in

VCameron/Films/Tron II/Visual Effects/Digital Domain/Short Form Agreement.Final
Est. 7/10/08; rev. 7/17/08; Fin. 7/21/08

3

HIGHLY CONFIDENTIAL                                                                 DIS-REARDEN-0033046

all countries, and each party shall have the unrestricted right to use, assign, license and exploit in any manner any such patent applications and patents on Joint Inventions without the consent of, or accounting to, the other party.

   ii. Producer and Company will take all actions necessary to protect a Joint Invention, including, but not limited to, determining in good faith which party shall prepare and file patent applications for the Joint Invention. Both parties shall cooperate in good faith and as necessary in filing appropriate applications. Costs and expenses associated with the preparation and prosecution of Joint Inventions shall be shared equally by the parties. The parties agree to use good faith efforts to determine which countries in which to file and prosecute patent applications for Joint Inventions, and maintain any resulting patent(s) (each, a "Joint Patent"), giving highest priority to the United States and Patent Cooperation Treaty countries (e.g., Europe, Japan, Australia, New Zealand). If a party, however, elects not to pay for or participate in the filing, prosecution or maintenance of any such Joint Patent or patent application, such party (the "Notifying Party") will have the right to notify the other party of such election, whereupon the Notifying Party's obligations to pay or participate will cease and the other party shall have the right to procure patent rights to the Joint Invention at its own cost and expense. The Notifying Party will promptly transfer all of its right, title and interest in such Joint Patent or patent application in the applicable country to the other party, provided that the paying party shall grant the Notifying Party a non-transferable (except to an Affiliate), non-exclusive, royalty free license to any Joint Patent, and the parties will cooperate to execute the necessary documentation in connection with such assignment and license. The Notifying Party will only be deemed to have elected not to pay for or participate in the filing, prosecution or maintenance of that particular Joint Patent or patent application in only the countries indicated in its notice and shall not have relinquished any rights to any Joint Invention, Joint Patent, or patent application in any country not specified in such notice.

   iii. Subject to the limitation and guidelines set forth in this subparagraph, each party shall have the right to enforce in its own name any Joint Patents, provided that an enforcing party shall give the other party notice and opportunity to participate in such action.

     1. If any third party challenges the validity, scope and/or enforceability of a Joint Patent, Producer and Company shall promptly consult with each other on the defense of such Joint Patent. Each party shall bear its own costs incurred in connection with the defense of such Joint Patent.

     2. If either party becomes aware of any infringement of a Joint Patent, then the parties shall promptly consult with each other in the enforcement of the Joint Patent.

VCameron/Films/Tron II/Visual Effects/Digital Domain/Short Form Agreement.Final
Est. 7/10/08; rev. 7/17/08; Fin. 7/21/08

4

HIGHLY CONFIDENTIAL     DIS-REARDEN-0033047

3.  Producer and Company shall each have the right, but not the obligation, to initiate proceedings (at each party's own cost, expense and right) against infringers of a Joint Patent. If both parties agree to join such proceedings, then both parties shall: (i) cooperate in good faith regarding the initiation, prosecution and resolution of such proceedings; (ii) equally share in all costs associated with such proceedings (including all attorney's fees and expenses); and (iii) equally share the proceeds of any such proceedings. If both parties are joined in any such proceedings, each party agrees not to subvert the interests of the other party during such proceedings. If one party elects not to or does not initiate or continue proceedings against such infringer (the "Non-Enforcing Party") then the other party (the "Enforcing Party") shall have the right, but not the obligation, to initiate or continue proceedings against the infringer.

4.  The Non-Enforcing Party shall provide the Enforcing Party (at the Enforcing Party's sole cost and expense) with such assistance in the enforcement proceedings as the Enforcing Party shall reasonably request, including, but not limited to, being named in the action if necessary. Notwithstanding anything to the contrary contained herein, the Non-Enforcing Party may join the proceedings with the Enforcing Party, including in the event that the Non-Enforcing Party is named in any action as a defendant in a counterclaim made by an infringer, and the Non-Enforcing Party shall reimburse the Enforcing Party for one-half (1/2) of the costs incurred prior to such time as the Non-Enforcing Party joins the proceedings.

5.  The Enforcing Party shall not be under any duty to account to the Non-Enforcing Party for any damages or costs awarded to the Enforcing Party arising out of such proceedings. If both parties jointly conduct and pay for proceedings (including in the event that the Non-Enforcing Party joins the proceedings later as set forth in subparagraph 4 above), however, the parties shall share equally in any damages and costs awarded. The Enforcing Party shall have the right to settle any proceedings on such terms in its reasonable discretion, provided that neither party shall settle any proceeding in a manner that has an impact on the scope or validity of the Joint Patent at issue without the advice and written consent of the other party.6.  Nothing in this subparagraph 6(c)(iii) shall preclude a party from using a Joint Patent for defensive purposes in any proceedings brought against it by any third party, provided that in no event shall either party use or apply the Joint Patent in a manner that has an impact on the scope or validity of the Joint Patent at issue without advice and prior written consent of the other party.

VCameron/Films/Tron II/Visual Effects/Digital Domain/Short Form Agreement.Final
Est. 7/10/08; rev. 7/17/08; Fin. 7/21/08

5

HIGHLY CONFIDENTIAL                                                                                      DIS-REARDEN-0033048

d.  As used in this Agreement, an "Affiliate" shall mean a party and any entity which, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with Company or Producer, as applicable. For purposes of this definition, the terms "control," "controls," and "controlled" mean ownership of at least fifty percent (50%) of the equity or beneficial interests of such entity or the right to vote for or appoint a majority of the board of directors or other governing body of such entity, or the power to direct the management and policies of such entity, whether through the ownership of voting securities, by contract or otherwise.

e.  In the event that issues or disagreements involving Joint Inventions or Joint Patents cannot be resolved within a timely manner, but not longer than ninety (90) days, the Patent Escalation Process will be initiated. This process assumes that every reasonable effort will be made to resolve disputed matters by the parties' representatives who have responsibility for the administration of this Agreement. Joint Invention or Joint Patent issues identified for escalation by either party shall be documented and provided to the responsible project managers or producers of each party with a written notice initiating the Patent Escalation Process. The designated representative of each party will, within ten (10) business days of the date of the written notice, meet and attempt to resolve the Joint Patent issues. If the Joint Invention or Joint Patent issues are resolved at this level the resolution will be documented and signed by both parties. If any dispute arising out of or in connection with Joint Inventions or Joint Patents is not resolved after completing the Patent Escalation Process, the parties shall attempt to resolve the dispute through executive level involvement. A senior executive of each party or his or her designated representative shall meet and confer to attempt to resolve the Joint Patent or Joint Invention issue within ten (10) business days of the meeting between the designated representatives. If the parties agree, a neutral third party mediator may be engaged to assist in dispute resolution at the initial resolution attempt or the executive level, or both. If after expending reasonable efforts at executive level resolution of the Joint Patent or Joint Invention dispute, no resolution can be reached, then either party may seek its rights and remedies in a court of competent jurisdiction.

6.  **Representations and Warranties.**

a.  Company represents and warrants as follows:

i.  Company is a duly organized and existing corporation and is at present in good standing under the laws of the state of Company's incorporation. Company has the right and power to enter into this Agreement and to furnish to Producer the services of its staff and crew ("the Staff") under the terms, covenants and conditions hereof, and to grant Producer all of the rights granted or to be granted to Producer hereunder. Further, neither Company nor the Staff is subject to any obligation or disability which will or might prevent or interfere with the performance and observance by Company of all of the covenants, conditions and

VCameron/Films/Tron II/Visual Effects/Digital Domain/Short Form Agreement.Final
Est. 7/10/08; rev. 7/17/08; Fin. 7/21/08

6

HIGHLY CONFIDENTIAL                                                                                           DIS-REARDEN-0033049

agreements to be performed and observed by Company hereunder. Company has not made, nor will it hereafter make any commitment or agreement which will prevent or interfere with the complete rendition of Company's and/or the Staff's services or any grant of rights hereunder;

        ii.     Company shall make or cause to be made, when due, all payments of compensation which may be required to be remitted to the Staff and to make such deductions, withholdings and payments on account of such compensations (including, without limitation, all payments of taxes and other contributions which have arisen or may arise out of the services to be rendered by the Staff) hereunder as are required or permitted to be deducted and withheld from or paid on account of compensation paid to an employee under the provisions of the applicable federal, state and local laws or regulations or any applicable collective bargaining agreement, as supplemented and amended.

        iii.    Company warrants that all materials provided by Company hereunder (except with respect to work or materials supplied to Company by Producer in connection with this Agreement) will be provided to Producer free and clear of any liens, claims, charges or encumbrances which would interfere with the performance of Producer hereunder or derogate from the rights of Producer hereunder. Subject to the provisions in this subparagraph iii regarding Company's representation and warranty with respect to patents, Company warrants that neither the Services, the Work nor any processes used in providing the Services or the Work infringe upon the intellectual property rights of any person or entity, and that the reproduction, exhibition, or any other use by Producer of the Work in the Picture will not in any way, directly or indirectly, infringe upon the rights of any person or entity. Notwithstanding the foregoing, Company warrants that to the best of Company's knowledge (or that which Company should have known in the good faith exercise of reasonable prudence or diligence) neither the Services, the Work, nor any process used in providing the Services or the Work infringes upon any patent rights of any person or entity.

b.    Producer represents and warrants Producer has acquired all rights necessary to furnish to Company all elements to be delivered by Producer and such elements do not violate or infringe upon the copyright of any person or entity, nor to the best of Producer's knowledge (or that which Producer should have known in the exercise of reasonable diligence), do such elements violate or infringe upon the literary or personal right of any person or entity.

7.    **Indemnity.**

a.    Except with respect to (i) matters constituting a breach by Producer of any of the representations and warranties contained herein or (ii) the gross negligence or willful misconduct by Producer, Company hereby saves, indemnifies and holds Producer, its Affiliates, and their respective employees, agents, licensees, successors and assigns,

VCameron/Films/Tron II/Visual Effects/Digital Domain/Short Form Agreement.Final
Est. 7/10/08; rev. 7/17/08; Fin. 7/21/08

7

HIGHLY CONFIDENTIAL           DIS-REARDEN-0033050

harmless from and against any and all liability, loss damage, cost or other expense (including reasonable attorneys' fees) arising out of or related to (i) any breach of any of Company's representations and warranties or (ii) any claim alleging facts which, if true, would constitute such a breach. In connection with any claim relating to patent infringement for which Company does not indemnify and defend Producer as set forth herein, Company shall cooperate with Producer at Producer's sole cost and Company shall provide Producer with all reasonable assistance required by Producer at Producer's sole cost in connection with Producer's defense and/or settlement of such claim, including, but not limited to, providing Producer's in-house counsel and/or Producer's outside counsel with reasonable access to only the applicable know how, technical data and other materials directly relating to the technology and patents at issue and providing reasonable access by Producer or Producer's outside counsel to Company's employees with knowledge of such technology and patents. Such disclosure to Producer or Producer's outside counsel shall be deemed confidential as set forth in Paragraph 10 below and may be subject to a protective order and certain other restrictions to be discussed in good faith in further detail by the parties at a later date.

b.  Except with respect to (i) matters constituting a breach by Company of any of the representations, warranties and/or agreements contained herein, or (ii) gross negligence or willful misconduct by Company, or (iii) a third party claim relating, referring, or arising out of actions by Company that are outside the course and scope of Company's services in connection with the Picture, Producer agrees to indemnify and hold Company, its Affiliates, and their respective employees, agents, licensees, successors and assigns (the "Company Indemnitees") harmless from and against any and all liabilities, losses, damages, costs or other expenses, including but not limited to reasonable attorneys' fees and costs (other than with respect to any settlement entered into without Producer's written consent or claim to which Producer has not been notified) arising out of any third party claim against the Company Indemnitees resulting from Producer's (or agents, employees, assignees, licensees or representatives of Producer) breach of the representations or warranties of Producer contained herein. The foregoing shall not limit Producer's right to include any such damages and expenses in the negative cost of the Picture or as a distribution cost for the Picture. In connection with any claim relating to patent infringement for which Producer does not indemnify and defend Company as set forth herein, Producer shall cooperate with Company at Company's sole cost and Producer shall provide Company with all reasonable assistance required by Company at Company's sole cost in connection with Company's defense and/or settlement of such claim, including, but not limited to, providing Company's in-house counsel and/or Company's outside counsel with reasonable access to only the applicable know how, technical data and other materials directly relating to the technology and patents at issue and providing reasonable access by Company or Company's outside counsel to Producer's employees with knowledge of such technology and patents. Such disclosure to Company or Company's outside counsel shall be deemed confidential as set forth in Paragraph 10 below and may be subject to a protective order and certain other restrictions to be discussed in good faith in further detail by the parties at a later date.

VCameron/Films/Tron II/Visual Effects/Digital Domain/Short Form Agreement.Final
Est. 7/10/08; rev. 7/17/08; Fin. 7/21/08

8

HIGHLY CONFIDENTIAL                                                              DIS-REARDEN-0033051

8. **Assignment**. Producer shall have the right to assign this Agreement or lend Company's services to any Affiliate, or to any corporation with or into which Producer merges or consolidates, or to any person, firm or corporation which produces the Picture for release and distribution by Producer or any of its affiliated companies, or to any licensee or successor of Producer. In the event of an assignment by Producer, and provided the assignee assumes in writing all of Producer's obligations as of the date of such assignment and further provided such assignee is a "major" motion picture company, national network or similarly financially responsible party, Producer shall be relieved from all further obligations to Company hereunder occurring from and after the date of such transfer. Producer may assign and/or license all or any part of its rights hereunder, including without limitation the results and proceeds of Company's services, and /or rights to use Company's name and all of Company's representations and warranties hereunder, to any person, firm or corporation whatsoever, and this Agreement shall inure to the benefit of all such assignees and licensees. This Agreement and Company's rights and obligations hereunder may not be assigned by Company except as otherwise set forth in Paragraph 5.c.i above.

9. **No Obligation to Use**. Producer is not obligated to use the services of Company or to produce, distribute, or exploit the Picture or, if commenced, to continue the production, distribution, or exploitation of such Picture in any territory. Regardless of whether or not Producer elects to produce, distribute and/or exploit the Picture (or to commence same) Producer is not obligated to use the services in whole or in part of Company, and/or any material designed, produced or conceived by Company.

10. **Confidentiality**. Each party may, during the course of its engagement hereunder, have access to, and acquire knowledge from, material, data, systems, and other sources which are not available to the general public. Any knowledge acquired by either party from such material, data, systems, or otherwise through its engagement hereunder shall not be used, published, or divulged to any other person, firm, or corporation in any manner whatsoever without first having obtained the written permission of the disclosing party, which permission such disclosing party may withhold in its sole discretion. The foregoing shall not apply to information which: (a) is now or becomes part of the public domain other than by or through the fault of the disclosee; (b) is already in the disclosee's possession at the time of its disclosure; (c) is rightfully received by the disclosee from a third party who has a right to disclose such information; (d) is approved by the discloser for disclosure without restriction; (e) is disclosed by the discloser to a third party without similar confidential or proprietary restrictions; or (f) is developed independently by the disclosee without use of or reference to discloser's confidential information. The foregoing shall not prohibit either party from disclosing the terms of its engagement hereunder to its professional advisors or as otherwise compelled by law. This clause shall survive the expiration of the Term of this Agreement.

11. **No Publicity**. Company shall not issue or authorize the publication of any news stories or publicity of any kind relating to or naming the Picture, Producer, or the Walt Disney Company, or their successors, assigns, or affiliated entities, or Company's involvement with the Picture, nor may Company use any images from the Picture or any fanciful characters or designs of Producer or The Walt Disney Company, or any of their subsidiary companies, for any purpose

VCameron/Films/Tron II/Visual Effects/Digital Domain/Short Form Agreement.Final
Est. 7/10/08; rev. 7/17/08; Fin. 7/21/08

9

HIGHLY CONFIDENTIAL                                                                                                         DIS-REARDEN-0033052

whatsoever, without the prior written consent of Producer and The Walt Disney Company. The foregoing shall not be construed to prohibit Company from making incidental references to the Services rendered or the Work required under this Agreement after the initial general release of the Picture, provided that any references to or concerning Producer, the Picture, or the Work are not derogatory in nature.

12. **Suspension/Termination**. Producer shall have the right to suspend and/or terminate all or part of Company's engagement and payment of the Production Fee hereunder during all periods: (i) that Company does not render services hereunder due to breach or default of a material term or condition hereunder; or (ii) that production of the Picture is prevented or interrupted because of force majeure events including any labor dispute, fire, war or governmental action, or any disruptive event beyond Producer's or Company's (as the case may be) control.

13. **Insurance**. Company shall maintain at all times while any employees of Company are rendering services hereunder, workers' compensation insurance, unemployment insurance, and state disability insurance as required by California law and any applicable collective bargaining agreement. In connection with workers' compensation insurance, notwithstanding that Company is furnishing its employees' services to Producer, for the purposes of any and all applicable workers' compensation statutes, an employment relationship exists between Company and the employees on one hand and Producer on the other such that Producer is the employees' special employer and Company is their general employer (as terms "special employer" and "general employer" are understood for purposes of workers' compensation statutes). The rights and remedies, if any, of Company and/or any of the employees' heirs, executors, administrators, successors, and assigns, against Producer and/or Producer's employees, successors, assignees, parent, subsidiaries, affiliates, officers, directors, agents or licensees, by reason of injury, illness, disability or death arising out of or occurring in the course of the rendition of services at Company's business location shall be governed by and limited to those provided under such workers' compensation statutes, and neither Producer nor its employees, successors, assigns, parent, subsidiaries, affiliates, officers, directors, agents, or licensees shall have any other obligation or liability by reason of any such injury, illness, disability or death. Company shall also maintain insurance coverage for fire, theft and/or damage to Company's facilities, as well as equipment and work-in-progress located at such facilities, and Company shall cause Producer to be added as an additional insured, as its interest may appear, under such insurance policies and shall provide certificates evidencing such insurance coverage. Company shall be covered as an additional insured on, and Producer shall provide certificates evidencing such insurance coverage with respect to the following policies, each subject to the limitations, restrictions and terms of said policy: (i) Producer's errors and omissions insurance policy in connection with the Picture during customary periods of production and distribution of the Picture;(ii) Producer's general liability insurance policy during such time that Company actually renders services to Producer in connection with the Picture; and (iii) the following portions of Producer's Production Package for the Picture: (1) Negative Film and Faulty Stock; (2) Props, Sets and Wardrobe; (3) Miscellaneous Equipment; and (4) Third Party Property Damage. The provisions of this Paragraph 13 shall not be construed so as to limit or otherwise affect any obligation, representation or agreement of Company hereunder.

VCameron/Films/Tron II/Visual Effects/Digital Domain/Short Form Agreement.Final
Est. 7/10/08; rev. 7/17/08; Fin. 7/21/08

10

HIGHLY CONFIDENTIAL

DIS-REARDEN-0033053

14. **Entire Understanding.** This Agreement expresses the entire understanding between Producer and Company with respect to Company's services in connection with the Picture, as applicable, and Company agrees that no oral understandings have been made with regard thereto. This Agreement may be amended only by written instrument signed by Producer and Company. Company acknowledges that in executing this Agreement, Company has not been induced to do so by any representations or assurances, whether written or oral, by Producer or Producer's representatives relative to the manner in which the rights herein granted may be exercised and Company agrees that Producer is under no obligation to exercise any such rights or to produce any motion picture based upon such rights and agrees Company has not received any promises or inducements other than as herein set forth. The provisions hereof shall be binding upon Company and Company's heirs, executors, administrators, successors and assigns. This Agreement shall be construed in accordance with the laws of the State of California applicable to agreements which are fully signed and performed within the State of California.

15. **Notices.** Any notice pertaining hereto shall be in writing. Any such notice and any payment due hereunder shall be served by delivering said notice or payment personally or by sending it by mail, cable (postage or applicable fee prepaid) or by fax or telecopy (in which case a copy shall be sent by overnight mail and shall be deemed to have been received one hour after the commencement of normal business hours in the place of receipt on the next business day following the date of dispatch) addressed as follows (or as subsequently designated in writing):

> To Company:    DIGITAL DOMAIN PRODUCTIONS, INC.
> 300 Rose Avenue
> Venice, CA 90291
> Attention: Joanna Capitano
>
> To Producer:   GRID PRODUCTIONS, INC.
> 500 S. Buena Vista Street
> Burbank, CA 91521
> Attention: Senior Vice President,
> Business and Legal Affairs

The date of personal delivery, mailing, or delivery to the cable or telex office of such notice or payment shall be deemed the date of service of such notice or payment, unless otherwise specified herein; provided, however, that any notice which commences the running of any period of time for Producer's exercise of any option or Producer's performance of any other act shall be deemed to be served only when actually received by Producer. If the last day on which the parties hereto are empowered to give notice pursuant to any provisions of this Agreement or to perform any other act which parties are required or may desire to perform under or in connection with this Agreement should fall on a Saturday, Sunday or holiday, then the parties hereto shall have until the end of the first full business day following said Saturday, Sunday or holiday within which to give notice or to perform such act.

16. **California Sales and Use Tax.** The parties are of the opinion and belief that the performances by Company of its services pursuant to this Agreement will not constitute the sale

VCameron/Films/Tron II/Visual Effects/Digital Domain/Short Form Agreement.Final
Est. 7/10/08; rev. 7/17/08; Fin. 7/21/08

HIGHLY CONFIDENTIAL

DIS-REARDEN-0033054

of tangible personal property within the meaning of the California Sales and Use Tax Law. Accordingly, no California sales or use tax will be charged to Producer with respect to any amounts paid by Producer to Company under this Agreement. If the foregoing is not the case, or if sales or use tax implications of any other state may apply, provided that Company notifies Producer of an assessment in a timely manner, Producer will be responsible for payment of, and will indemnify Company against liability for, any applicable sales or use tax hereunder and for any interest or penalties that may arise from the tax. The foregoing obligation of Producer shall be subject to Producer's right, with full cooperation from Company at Producer's expense, to control the audit and/or contest any such sales tax assessment.

17. **General**. This Agreement shall be governed by the laws of the State of California applicable to agreements entered into and to be wholly performed therein and shall not be modified except by a written document executed by both parties hereto. This Agreement expresses the entire understanding of the parties hereto and supersedes any and all former agreements or understanding, written or oral, relation to the subject matter hereof. Nothing contained in this Agreement shall constitute a partnership between, or joint venture by, the parties hereto or constitute either party the agent of the other. Neither party shall hold itself out contrary to this provision nor shall either party become liable for the acts or representations

[remainder of page intentionally left blank]

VCameron/Films/Tron II/Visual Effects/Digital Domain/Short Form Agreement.Final
Est. 7/10/08; rev. 7/17/08; Fin. 7/21/08

12

HIGHLY CONFIDENTIAL                                                                                              DIS-REARDEN-0033055

of the other contrary to the provisions hereof. This Agreement is not for the benefit of any third party and shall not be deemed to grant any right or remedy to any third party whether referred to herein or not. Company's sole and exclusive remedy for Producer's breach or termination of the Agreement or any term hereof shall be an action for damages and Company irrevocably waives any right to rescission or equitable or injunctive relief.

Please indicate your agreement to the foregoing by signing in the space provided below.

GRID PRODUCTIONS, INC.

By: _____

Its: PRESIDENT

ACCEPTED AND AGREED TO:

DIGITAL DOMAIN PRODUCTIONS, INC.

By: _____

Its: PRESIDENT/CEO

VCameron/Films/Tron II/Visual Effects/Digital Domain/Short Form Agreement.Final
Est. 7/10/08; rev. 7/17/08; Fin. 7/21/08

13

HIGHLY CONFIDENTIAL                                                                      DIS-REARDEN-0033056

**Exhibit "A"**

VCameron/Films/Tron II/Visual Effects/Digital Domain/Short Form Agreement.Final
Est. 7/10/08; rev. 7/17/08; Fin. 7/21/08

14

HIGHLY CONFIDENTIAL

DIS-REARDEN-0033057

# DIGITALDOMAIN®

June 20, 2008

Art Repola
Tron 2
Via Email: art.repola@disney.com

Re: Revised Tron 2 Initial Award Estimate/ Phase I

Dear Art,

Thank you for your continued interest in Digital Domain. We are thrilled to be part of this wonderful film and hope we may continue on the project to create something spectacular with you.

In an effort to collaborate with Production and begin the visual effects development for Tron 2, we have carved out a scope of work that includes the Contour Facial Capture, Still Shoot and Life Cast. Acquiring these critical assets now will provide Digital Domain with the necessary materials and data to begin work on the digital Clu head, in order to meet Production's schedule requirements.

**COST ESTIMATE SUMMARY:**

| | | |
|---|---|---:|
| i. | Project & Digital Supervision & Estimate: | $ 45,999. |
| ii. | Still Shoot: Texture/Reference Estimate: | $ 12,044. |
| iii. | Contour Facial Capture & Data Delivery Estimate: | $ 144,375. |
| iv. | Stage Cost Estimate: | $ 153,081. |
| v. | Life Cast Estimate: | $ 28,875. |
| | **TOTAL ESTIMATE:** | **$ 384,374.** |

**I. PROJECT & DIGITAL SUPERVISION & SUPPORT:**

The Visual Effects Supervisor, Visual Effects Producer, Digital Effects Supervisor, Rigging Supervisor, Animation Supervisor, Texture Lead and Digital Coordinator are included in this category full and/or part time for a week that consists of prep and the shoot. Various production equipment and workstations are also included.

**PROJECT & DIGITAL SUPERVISION & SUPPORT ESTIMATE:**     $ 45,999.

**II. STILL SHOOT: TEXTURE/REFERENCE:**

We have scheduled two (2) days at Giant Studios, to take high-dynamic range photographs of Jeff Bridges for lighting and skin texture reference. Our estimate also covers age appropriate skin reference photography, as well as maquette stills (to be shot at a later date).

✉ 300 Rose Avenue, Venice CA 90291 ☏ 310.314.2800 🖷 310.314.2888 🌐 digitaldomain.com

TRON 2
6/20/08
Initial Award/Phase I - Page 2

Included in this cost are a grip/gaffer swing position and stage manager, as well as the equipment necessary to capture the digital information required.

**STILL REFERENCE TEXTURE SHOOT ESTIMATE:** $ 12,044.

### III. CONTOUR FACIAL CAPTURE & DATA DELIVERY:

This section defines the cost of using Mova's Contour volumetric facial capture system including Mova's estimate for travel from San Francisco to Giant Studios in Los Angeles, set up and preparation on stage, as well as the capture sessions for Jeff Bridges. This capture session is for the acquisition of the basic Facial Animation Capture shapes. The estimate includes a handling fee of 15%.

**COUNTOUR FACIAL CAPTURE & DATA DELIVERY ESTIMATE:** $ 144,375.

### IV. STAGE COST:

We have scheduled two (2) days at Giant Studios for facial capture of Jeff Bridges using Mova's Contour system. This includes one (1) day of Viper four camera dialogue reference photography and one (1) day of Mova Contour rehearsals and capture. Included in this cost are a Stage Manager, Assistant Director, Video Village Operator and equipment, a Grip, a Best Boy, a Gaffer, a Coordinator, two (2) Production Assistants, Craft Service and Catering.

**STAGE COST ESTIMATE:** $ 153,081.

Please note: Production is to provide Talent and talent related items such as transportation to and from set, trailer, and any other talent related contractual obligations.

### V. LIFE CAST:

Included are the costs to acquire a life cast of Jeff Bridges. The life cast is necessary in order to create the 3D mesh that is re-targeted to the points coming off the Contour capture. It is important for us to acquire the life cast at the same time the capture takes place. The estimate includes a handling fee of 15%.

**LIFE CAST ESTIMATE:** $ 28,875.

Please note this bid assumes Production will provide production insurance and special risks coverage for any live action shot by Production, as well as errors and omissions coverage.

HIGHLY CONFIDENTIAL
DIS-REARDEN-0033059

Please feel free to call me if you have any questions or comments. My direct line is (310) 314-2805. I look forward to speaking with you soon and moving forward as quickly as possible.

Sincerely,

Joanna Capitano

Cc   Sean Bailey
     Ed Ulbrich
     Mark Miller
     Terry Clotiaux

HIGHLY CONFIDENTIAL
DIS-REARDEN-0033060