Steve W. Berman (*pro hac vice*)
Mark S. Carlson (*pro hac vice*)
Jerrod C. Patterson (*pro hac vice*)
Garth Wojtanowicz, CBA No. 246510
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
garthw@hbsslaw.com
markc@hbsslaw.com
jerrodp@hbsslaw.com

Rio S. Pierce, CBA No. 298297
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
riop@hbsslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| REARDEN LLC, REARDEN MOVA LLC,<br><br>Plaintiffs,<br><br>v.<br><br>WALT DISNEY PICTURES, a California corporation,<br><br>Defendant. | Case No. 4:17-cv-04006-JST<br><br>**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DISGORGEMENT OF PROFITS**<br><br>**REDACTED PUBLIC VERSION**<br><br>Dept:   6 (2nd Floor)<br>Judge:  Hon. Jon S. Tigar |

**TABLE OF CONTENTS**

I. FINDINGS OF FACT ........................................................................................................... 1

    A. Causal nexus ............................................................................................................ 1

    B. Disney's gross revenue ............................................................................................ 2

    C. Disney's deductible expenses and net profit ........................................................... 2

        1. Distribution overhead expense. .................................................................... 3

        2. Production overhead expense. ..................................................................... 3

        3. Tax expense. ................................................................................................. 4

        4. Interest on pre-trial revenue and expense. ................................................... 4

    D. Elements of profit not attributable to the infringement ........................................... 5

II. CONCLUSIONS OF LAW ................................................................................................... 7

    A. Causal nexus between DD3's infringement and Disney's profits. .......................... 7

    B. Disgorgement of profits. .......................................................................................... 7

        1. Gross revenue, deductible expense, and profit. ........................................... 7

        2. Elements of profit that are not attributable to the infringement. ................................................................................................. 7

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Erickson Prods., Inc. v. Kast*,
  921 F.3d 822 (9th Cir. 2019) ............................................................................................ 7

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, (Frank Music I)
  772 F2d 505 (9th Cir. 1985) .................................................................................... 3, 4, 9

*Frank Music Corp. v. Metro–Goldwyn–Mayer Inc.*, (Frank Music II)
  886 F.2d 1545 (9th Cir.1989) ........................................................................................ 8, 9

*Kamar Int'l Inc. v. Russ Berrie & Co.*,
  752 F.2d 1326 (9th Cir. 1984) ....................................................................................... 4, 8

*Polar Bear Prods., Inc. v. Timex Corp.*,
  384 F.3d 700 (9th Cir. 2004) ............................................................................................ 7

*Three Boys Music Corp. v. Bolton*,
  212 F.3d 477 (9th Cir. 2000) ............................................................................................ 4

**Statutes**

17 U.S.C. § 504(b) ............................................................................................................ 7, 8

**Other Authorities**

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.01[A] ........................ 8

This copyright infringement case was tried to a jury beginning on December 6, 2023 and concluding with a verdict on December 21. Plaintiffs Rearden LLC and Rearden Mova LLC (collectively "Rearden") sought an award of actual damages and disgorgement of Defendant Walt Disney Pictures' profits from the film *Beauty and the Beast* ("*BATB*"). The jury returned a verdict finding that (1) Disney vicariously infringed Rearden's copyright when its vendor Digital Domain 3.0 ("DD3") used the MOVA software to animate the face of the film's computer graphics Beast character; and (2) Disney was liable for actual damages and disgorged profits. ECF No. 691. But the Court ruled on December 14 that there was no right to a jury trial on disgorgement of profits, and that the verdict on that issue would be advisory. ECF No. 672.

Having considered the evidence presented at trial and the parties' arguments, and good cause appearing, the Court now finds and concludes on disgorgement of profits as follows:

## I.    FINDINGS OF FACT

**A.    Causal nexus**

Disney's marketing of *BATB* described to audiences how the Beast's face was animated using MOVA software. Director Bill Condon, and actors Dan Stevens and Emma Watson, participated in press interviews (*see* TX148 (Paris), TX363 (Chinese Theater)), promoting Disney's use of MOVA to animate the Beast's face. And the *BATB* press kit includes a section titled "Behind the Magic on Screen," (TX247 at 14-17) emphasizing that "[t]o create a realistic looking Beast in a real-world environment while maintaining Dan Stevens' performance, a combination of physical performance capture and MOVA facial capture technology was used." TX247, at14. The press kit described the "MOVA facial capture sessions" and the way "[t]he MOVA customized hardware and software then converted the performance into data." *Id*. at 15.

MOVA was important for Disney to create a CG Beast that would invoke empathy. The *BATB* press kit states "[o]ne of the keys to a successful live-action adaptation of [the film] lay with the Beast" because he must "look somewhat believable and be someone with whom the audience will care for," but "the technology needed to pull off such a feat did not exist until recently," and describes the "MOVA facial capture technology [that] was used." TX247 at 14. The producer, David Hoberman, confirmed these statements. Trial Tr. ("Tr.") at 826:11-828:4,

1  829:16-830:6, 832:15-834:24. Rearden expert Alberto Menache testified that *BATB* could not
2  have been made before MOVA. Tr. 1001:3-16; 983:11-24. Mr. Condon stated in an interview in
3  the featurette on *BATB's* Blu-ray release "[t]here have been a lot of great CG performances, but
4  [the Beast] was a romantic hero, someone who was at the emotional center of the movie. I
5  always said that we could get everything else in this movie right, but if we didn't get a Beast that
6  people believed in then [the movie] wouldn't work. Tr. 1081:7-23; TX 142, at 25:36-25:50.

Disney promoted the Beast character as part of its worldwide *BATB* marketing campaign. Tr. 1435:8-12. And Disney's market research found that 70% of general attendees and teens reported that the Beast was their favorite character. Tr. 1439:22-1440:11. Mr. Menache testified that visual effects like MOVA drive audience attendance. Tr. 981:23-982:11, 983:11-985:6. And this testimony was confirmed by a National Research Group ("NRG") report on reasons audiences gave for attending *BATB* that Disney expert Kristie Kershaw relied upon, which lists visual effects as a response for 34%-41% of audiences. TX1039; Tr.1417:21-1418:9.

Rearden also introduced Mr. Condon's testimony that nine of the 11 clips of the Beast's face in the film's theatrical trailer were made using MOVA Contour (ECF No. 684, pp. 4-7 at 110:18-114:13), and Mr. Hoberman testified that "the purpose of the trailer is to induce audiences to come see the film," to "spark interest," and that "a successful, . . . widely seen trailer would motivate at least some people to come see a movie" Tr. 831:7-15.

The Court finds that Rearden proved a causal nexus between the infringement and some part of Disney's profit. The burden shifts to Disney to prove how much should be apportioned.

**B.   Disney's gross revenue**

The parties agree that Disney's gross revenue from *BATB* was ▮▮▮▮▮. Tr. 1156:11-17, 1169:21-24, 1170:6-1171:22; TX388.

**C.   Disney's deductible expenses and net profit**

The parties disagree on Disney's net profit on the film. Disney's expert Robert Wunderlich testified that Disney's net profit was ▮▮▮▮▮. Tr. 1561:8-1563:12. Rearden expert Phillip Fier testified that Disney's net profit was ▮▮▮▮▮. Tr. 1167:2-6. Mr. Wunderlich testified that the difference was attributable to the experts' disagreement on whether

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW RE: DISGORGEMENT OF PROFITS - 2
Case No. 4:17-cv-04006-JST

1  four expenses were properly deductible or treated: (1) distribution overhead, (2) production
2  overhead, (3) taxes, and (4) interest on profit earned before trial. Tr. 1565:12-1566:6.

### 1. Distribution overhead expense.

Disney deducted ▇▇▇▇▇▇ as "distribution overhead" expense. TX388. Mr. Wunderlich defined distribution overhead as "expenses that were necessary to distribute the film *but were not individually tracked in connection with the film*." Tr. 1568:24-1569:4. He described his studio license consulting work as an example of distribution overhead, where he is "not doing it for a single film at a time [but rather] for many films, maybe even hundreds of films at a time …." Tr. 1569:20-1570:15. He did not identify or quantify which or how much of the distribution overhead expenses were incurred for *BATB* versus Disney's other films.

Mr. Fier noted that in Disney's financial data, distribution overhead as a percentage of revenue was "exactly 10 percent, 10.0, not 9.8, not 10.3, but exactly 10.0," which he found unlikely because Disney's revenue varied, while distribution overhead remained the same. Tr. 1159:4-1160:8. Distribution overhead is "not a true third-party cost" because it is simply a number Disney assigns for "internal management." Tr. 1598:7-21. Mr. Fier explained that "Disney's executives have said that despite this being called distribution overhead, it's actually calculated on the overhead of the whole studio, so [it] includes even the production division, which really has nothing to do with the distribution of the film." Tr. 1161:19-23.

The infringer "bears the burden of explaining, at least in general terms, how claimed overhead actually contributed to the production of the infringing work." *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F2d 505, 516 (9th Cir. 1985) ("*Frank Music I*"). The record does not establish a link between Disney's claimed distribution overhead expense and the distribution of *BATB* apart from other films that Disney distributed.

### 2. Production overhead expense

Mr. Wunderlich deducted a "production overhead" expense as part of Disney's production expenses. Tr. 1571:13-1572:5. He calculated production expense as ▇▇▇▇▇▇ including production overhead. Tr. 1567:8-11. Mr. Fier excluded Disney's production overhead expense. *Id.* He calculated production expense to be ▇▇▇▇▇▇ TX1425. The Court finds

that the disputed "production overhead" expense is the difference of ▮▮▮.

Mr. Wunderlich testified that "production overhead" is "things that are necessary, in this case, to produce the film *but aren't specifically identified with the film*." Tr. 1571:20-23. As examples, he listed "people on production teams," "finance people," "lawyers and things like that." Tr. 1572:1-2. But he provided no testimony regarding which and how much of these overhead services were linked to production of *BATB* apart from Disney's other films.

The Court finds that the record does not establish the required link between Disney's "production overhead" expense and the production of *BATB*. *Frank Music I*, 772 F2d at 516.

### 3. Tax expense

Mr. Wunderlich deducted ▮▮▮ as a tax expense on *BATB* profits. TX1425. He testified that Disney calculated this sum by isolating income from the film and applying "Disney's corporate tax rate" to that income. Tr. 1572:14-1573:3. This resulted in a tax rate of 35% for 2015 through 2017, 25% for 2018, and 21% thereafter. TX388.

Mr. Fier calculated the *BATB* tax expense as ▮▮▮ Tr. 1163:10-19. He reviewed Disney's 10K annual reports to determine the marginal tax rate that Disney paid in each year from 1997 through 2022, then averaged those six years to derive a 9.8% tax rate. *Id.*

Neither methodology is without flaw. But it is Disney's burden to prove its methodology quantifies the tax that Disney *actually paid* on profits from *BATB* rather than what it *might have paid* if the highest corporate tax rate were applied without deductions. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir. 2000); *Kamar Int'l Inc. v. Russ Berrie & Co.*, 752 F.2d 1326 (9th Cir. 1984). The Court finds that Mr. Wunderlich's methodology does not consider the marginal tax rate that Disney actually paid. Therefore, Disney has not met its burden to prove its tax expense is deductible, and the Court adopts Mr. Fier's estimate of ▮▮▮.

### 4. Interest on pre-trial revenue and expense

For after tax profit earned in years prior to trial, Mr. Fier added interest at the rate of the prime interest rate plus two percent "to bring those prior costs and revenues to the present." Tr. 1163:25-1164:15. According to Mr. Fier, this methodology is conceptually similar to reducing future revenue streams to net present value by applying an appropriate discount rate. *Id.*; *see also*

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW RE: DISGORGEMENT OF PROFITS - 4
Case No. 4:17-cv-04006-JST

1  Tr. 1164:16-1165:8. This common practice is known as net present value, or NPV. *Id.*

2  Disney does not object to Mr. Fier discounting future revenue streams and costs related to *BATB*, but it objects to adding interest to past revenue streams and costs. Mr. Wunderlich protested that "what we're trying to determine today is Disney's profit from *BATB*." Tr. 1577:12-1578:5 (emphasis added). In his view, Mr. Fier inappropriately "adds on an additional about ▬ ▬ to Disney's profits from the film. Tr. 1578:6-10.

Disney's criticism merely restates the problem presented when profit includes elements of past and future revenue streams. If accepted, its criticism would reject the commonly applied concept of present value not just for past profits, but also for future profits. Mr. Fier's approach appropriately applies an interest rate to past profits, and discounts future profits to present value.

**D.      Elements of profit not attributable to the infringement**

Disney offered two approaches to discharge its burden to prove apportionment, which Mr. Wunderlich described as the Contribution Approach and the Investment Approach.

The Contribution Approach rests on the opinions of two other Disney experts, Kristie Kershaw and Stephen Lane. According to Mr. Wunderlich, Ms. Kershaw "determined that the entirety of the Beast's character was responsible for drawing no more than 2.5 percent of the audience to the film." Tr. 1580:2-7. He testified that Dr. Lane "determined that MOVA contributed between 4.6 to 12 percent of the images of the Beast's face and made no contributions to the rest of the Beast." Tr. 1580:8-12. Mr. Wunderlich multiplied Kershaw's 2.5 percent for the Beast's audience draw by Lane's range of 4.6-12 percent for MOVA's contribution to the Beast's face to derive an apportioned profit range of 0.12 to 0.3 percent. Tr. 1580:16-1581:9.

Ms. Kershaw testified that in the social media posts she considered, the Beast character was mentioned in only 2.5 percent of the posts. Tr. 1423:6-20. But she did not testify that 2.5 percent of the audience was drawn to the film because of the Beast character. And that conclusion is irreconcilable with the National Research Group ("NRG") report's audience interest survey, which Ms. Kershaw relied upon. Tr. 1417:16-1418:9; 1424:13-25. NRG found that 61-70 percent of audiences surveyed reported that the Beast was their favorite character. Tr.

1439:14-1440:11. And although Belle was the most popular character overall, "[t]he Beast was a relatively close second and was the favorite among dads and boys." Tr. 1438:4-17.

The Court finds the record does not support Wunderlich's claim that Kershaw found the "entirety of the Beast's character was responsible for drawing no more than 2.5 percent of the audience to the film." Consequently, his multiplication of Kershaw's 2.5 percent by Lane's findings is not supported by the record. And Lane testified "I'm just using the data provided from DD3" to estimate his range of 4.6-12 percent for MOVA's contribution to the Beast's face. Tr. 1514:21-22, Tr. 1499:20-1500:3, Tr. 1517:7-19, TX 1057. He relied on depositions of DD3 employees and DD3 business records. Tr. 1483:21-1484:6. He simply took DD3's evidence at face value, without considering whether DD3 was a credible and reliable source.

Mr. Wunderlich's Investment Approach to apportioning Disney's profit assumes that the price a buyer is willing to pay for a product or service reflects "how much the customers value that product or service." Tr. 1584:9-1585:3. He relied on "a rate card that Digital Domain had" that corresponded "to a Digital Domain charge for MOVA" of ▓▓▓. Tr. 1586:7-22. He then "considered all of the other products and services that Disney had to pay for in order to be able to produce and to market the film," which he estimated at ▓▓▓. Tr. 1586:23-1587:4. After calculating ▓▓▓ as a percentage of ▓▓▓ Mr. Wunderlich concluded that the "investment apportionment factor" was 0.153 percent of Disney's profit. Tr. 1587:5-12.

The Court finds that the Investment Approach is speculative. Mr. Wunderlich admits the DD3 rate card he relied on "was never used for anything." Tr. 1586:7-16. In fact, DD3's Gayle Munro testified DD3 did not charge Disney for MOVA. ECF No. 684, p. 121 at 158:24-159:12. It follows that the rate card cannot reflect "how much customers value that product or service." Mr. Wunderlich further admitted that the cost of a product or service may not be commensurate with the profit earned from that product or service. Tr. 1593:13-19. Nor could it be – the profit to be earned from a product or service is speculative at the time of purchase.

Rearden cited admissions by Darren Hendler and Dr. Lane on the percentage of shots in *BATB* that used MOVA as a measure of its contribution to the film's success. *BATB* was assembled from 2,304 shots; of those, 206—8.9% of the total shots in the film—used MOVA to

animate the Beast's face. Tr. 1546:18-1547:22. Rearden also introduced testimony from its V.P. Finance, Cindy Ievers, that *BATB's* runtime was "129 minutes, but if you exclude the credits at the end, it's 118" and the Beast's face was on screen for "17 minutes"—14.4% of the film. Tr. 798:22-799:8. Rearden argued it should receive at least 8.9% of Disney's profit.

## II.     CONCLUSIONS OF LAW

**A.     Causal nexus between DD3's infringement and Disney's profits.**

Vicarious infringement has three elements, one of which is whether Disney had directly benefited financially from the infringing activity of DD3. Tr. 1643:3-7. Disney directly benefited financially from the infringing activity if the availability of the infringing material acted as a draw to customers. *Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 829 (9th Cir. 2019); ECF No. 682, 9:12-16. In finding that Disney was liable for vicarious copyright infringement, the jury necessarily found that Disney directly benefited financially from DD3's infringement. ECF No. 691. This finding was supported by substantial evidence. The Court concludes that Rearden proved a causal nexus between Disney's infringement and some portion of its profit.

**B.     Disgorgement of profits.**

Disgorgement of an infringer's profits requires proof of three elements. The copyright owner bears the burden of proving the infringer's gross revenue. 17 U.S.C. § 504(b). Then the infringer bears the burden of proving both its deductible expenses and the elements of its profit attributable to factors other than the copyrighted work. *Id.*

**1.     Gross revenue, deductible expense, and profit.**

Rearden proved Disney's gross revenue from *BATB* was ████████ Applying the deductible expenses that Disney proved, Disney's profit was ████████.

**2.     Elements of profit that are not attributable to the infringement.**

Disney bears the burden to prove the elements of profit that are not attributable to the infringement. 17 USC § 504(b). A defendant's profits are awarded "to prevent the infringer from unfairly benefiting from a wrongful act." *Polar Bear Prods., Inc. v. Timex Corp.,* 384 F.3d 700, 708 (9th Cir. 2004), quoting H.R. REP. No. 94-1476 at 161 (1971). The rationale is to deter copyright infringement— "[t]o take away incentives for would-be infringers[.]" *Polar Bear,* 384

F.3d at 708; *Kamar Int'l,* 752 F.2 at 1332; 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.01[A], at 14–6.

Disney infringed Rearden's copyright when DD3 used MOVA to animate the Beast's face in 206 of the 2,304 shots that comprised *BATB*, which translates to 8.9 percent of the film. Tr. 1546:18-1547:22. However, MOVA was not entirely responsible for the finished shots in which it was used. Other software was used, in some of the 206 shots other characters appeared, actors played those other characters, they wore costumes created by costume designers and spoke dialogue written by screenwriters or sang songs composed by songwriters and completing the shots for inclusion in the film required effort and talent of digital artists. The Copyright Act requires that disgorged profits be apportioned among these different elements. 17 USC § 504(b).

The Ninth Circuit considered a similar apportionment problem where a single work included both infringing and non-infringing elements in *Frank Music Corp. v. Metro–Goldwyn–Mayer Inc.*, 886 F.2d 1545 (9th Cir.1989), cert. denied, 494 U.S. 1017 (1990) ("*Frank Music II*"). There, MGM performed a review of Hollywood musicals called *Hallelujah Hollywood* at its MGM Grand Hotel. *Id.* at 1548. Act IV included songs from the musical *Kismet*. *Id.* Frank Music owned the rights to *Kismet* and sued MGM for copyright infringement. *Id.* Frank Music prevailed at trial, and both parties appealed to the Ninth Circuit.

The District Court found that Act IV of *Hallelujah Hollywood* was one of ten acts, and a ten-minute segment of a 100-minute review. On that basis it concluded that ten percent of the profits from ticket sales were attributable to Act IV. *Frank Music II*, 886 F.2d at 1548. It then examined the elements of Act IV to apportion the infringing and non-infringing contributions:

> The infringing musical material was only one of several elements contributing to the [*Kismet*] segment. A portion of the profits attributable to Act IV must be allocated to other elements, including the creative talent of the producer and director, the talents of performers, composers, choreographers, costume designers and others who participated in creating Act IV, and the attraction of the unique Ziegfeld Theatre with its elaborate stage effects….

*Id.* at 1549. It found that "no precise mathematical formula can be applied," but concluded that "a fair approximation of the value of the infringing work to Act IV is twenty-five percent." *Id.*

The Ninth Circuit approved the district court's methodology, but ruled that it had overvalued the non-infringing contributions:

> While it was not inappropriate to consider the creativity of producers, performers and others involved in staging and adapting excerpts from Kismet for use in Hallelujah Hollywood, the district court erred in weighing these contributions so heavily. *In performing the apportionment, the benefit of the doubt must always be given to the plaintiff, not the defendant.*

*Frank Music II*, 886 F.2d at 1549. The court agreed that apportionment should take into account the role of other elements of a work in generating profits, but:

> the apportionment should not place too high a value on the defendants' staging of the work, at the expense of undervaluing the plaintiffs' more substantive creative contributions. <u>Production contributions involving expensive costumes and lavish sets will largely be taken into account when deducting the defendants' costs</u>.

*Id.* "[A] defendant's efforts in staging an infringing production will generally not support more than a *de minimis* deduction from the plaintiff's share of the profits…." *Id.* This is so, because:

> a producer's ability to stage a lavish presentation, or a performer's ability to fill a hall from the drawing power of her name alone, is not a license to use freely the copyrighted works of others.

*Id.* The court concluded after considering Act IV's non-infringing elements that the copyright owner's share of the profits should be reduced from 10 percent to 9 percent. *Id.* at 1557.

Applying *Frank Music II* here, the Court finds the portion of *BATB* that used MOVA was 8.9 percent of the film. Within that portion, the Court must consider the non-infringing elements, but the costs of the actors, costume designers, screen writers, songwriters, and visual effects artists were included in Disney's production expense and deducted from gross revenue before apportionable profit was determined. The Court must also consider that MOVA was used to animate the face of one of the film's two lead characters, a romantic hero at the center of the film's story. Finally, the Court must consider the deterrent purpose of the disgorgement remedy, and that "[i]n performing the apportionment, the benefit of the doubt must always be given to the plaintiff, not the defendant." *Frank Music II*, 886 F.2d at 1549. Here, as in *Frank Music*, "no precise mathematical formula can be applied." *Id.* After considering the above factors, the Court concludes that 8.9% is a reasonable apportionment of Disney's profit to its infringement of Rearden's copyright, and therefore the appropriate amount of disgorged profits is ███████.

| | | |
|---|---|---|
| 1 | DATED: February 29, 2024 | HAGENS BERMAN SOBOL SHAPIRO LLP |

By:   */s/ Mark S. Carlson*
      MARK S. CARLSON

Steve W. Berman (*pro hac vice*)
Jerrod S. Patterson (*pro hac vice*)
Garth Wojtanowicz, CBA No. 246510
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
markc@hbsslaw.com
steve@hbsslaw.com
jerrodp@hbsslaw.com
garthw@hbsslaw.com

Rio S. Pierce, CBA No. 298297
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
riop@hbsslaw.com

*Attorneys for Plaintiffs*

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW RE: DISGORGEMENT OF PROFITS - 10
Case No. 4:17-cv-04006-JST