Steve W. Berman (*pro hac vice*)
Mark S. Carlson (*pro hac vice*)
Jerrod C. Patterson (*pro hac vice*)
Garth Wojtanowicz, CBA No. 246510
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
markc@hbsslaw.com
jerrodp@hbsslaw.com
garthw@hbsslaw.com

Rio S. Pierce, CBA No. 298297
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
riop@hbsslaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| REARDEN LLC, REARDEN MOVA LLC, <br><br> Plaintiffs, <br><br> v. <br><br> WALT DISNEY PICTURES, a California corporation, <br><br> Defendant. | Case No. 4:17-cv-04006-JST <br><br> **PLAINTIFFS' RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br> Dept:  6 (2nd Floor) <br> Judge: Hon. Jon S. Tigar |

## I. RESPONSE TO DISNEY'S FINDINGS OF FACT

The primary theme in Disney's proposed findings regarding disgorgement is that MOVA contributed nothing to the Beast's facial animation. Its findings, including apportionment findings 6, 7, 9, 10, 11, 13, 21, 22, and 23, rely heavily if not exclusively on evidence provided by DD3 and DD3-associated witnesses.[1] But that evidence and those witnesses were not credible. DD3 was instrumental in the theft of Rearden's MOVA Assets, defied Court orders to avoid returning them, and violated this Court's injunction prohibiting use of the MOVA Assets. Further, as Disney's indemnitor, DD3 will have to pay all judgments, costs and attorney's fees Disney incurs, creating an incentive for DD3 and its witnesses to minimize MOVA's importance. This Court should not credit the testimony of any witness based on DD3 evidence.

***Finding 3***: Paragraph 3 recites the number of vendors and persons who worked on *Beauty and the Beast* ("BATB"). MOVA's audience draw is not diminished merely because it was one vendor or employed relatively few workers. Only one person, Emma Watson, played Belle. But Disney focused its marketing campaign partly on her "star power." Tr.1383:7-17.

***Finding 6***: Disney cites Mr. Menache for a finding that "the nuance in Stevens's facial movements was lost" after retargeting and adding hair to the Beast's face. The evidence confirmed that the performance MOVA captured was not "lost" after retargeting and adding hair, but rather served as the foundation and reference for all further animation. Mr. Menache testified animators "would exaggerate the same [MOVA] animation" to address this issue. Tr. 998:22-999:3. Dr. Lane agreed. Tr. 1493:5-1496:16 ("the animators would . . . add additional details to -- to have things match up more with Dan Stevens' performance.").

---

[1] Dr. Lane testified "I'm just using the data provided from DD3" to determine his range of 4.6-12 percent for MOVA's contribution to the Beast's face. Tr. 1514:21-22, 1499:20-1500:3, 1517:7-19, TX 1057. He relied on depositions of DD3 employees Darren Hendler, Greg LaSalle, and Ken Pearce, and DD3 business records. Tr. 1483:21-24, 1484:1-6. In "just using the data provided by DD3," Dr. Lane accepted DD3 evidence at face value, despite (a) the SHST Court's finding that LaSalle and Pearce perpetrated the MOVA Asset theft from Rearden, and (b) Mr. Hendler's admission that DD3 used MOVA in contempt of this Court's preliminary injunction. Tr. 1639:5-14, Tr. 1267:16-1269:17. Dr. Lane's testimony, dependent on evidence from DD3, informed the opinion of Disney's other apportionment expert Wunderlich. Tr. 1579:16-1582:8.

PLAINTIFFS' RESPONSE TO DEFENDANT'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1
CASE NO. 4:17-CV-04006-JST
005073-12/2448939 V1

***Findings 7-8***: Paragraph 7 recites that MOVA was only one of many steps in the process of animating the Beast's face. Paragraph 8 recites there were many hours required to finish Beast shots, but only 1% involved MOVA. Although Mr. Menache agreed that some of the steps were "important," he also emphasized that MOVA was unique: "The main thing is that everything else you described existed before MOVA, but if you wanted to do that movie before MOVA, you couldn't do it." Tr. 1001:10-16. Nor did Disney present any evidence that the number of steps or hours in the Beast's facial animation served as a draw to audiences. Rather, Disney promoted BATB by describing MOVA, but said nothing about the other steps in the process or hours spent in animating the Beast's face.  TX148, TX247, TX363; ECF No. 684-1, pp. 22-24.

***Finding 9***: Paragraph 9 recites that the Beast appeared in 19% of the shots in BATB, but MOVA tracked mesh was used in only 9% of the film's shots. These facts only underscore MOVA's importance to the success of the film: almost half of Beast shots were animated with MOVA. The Beast is a romantic hero at the center of the film's story (TX142, at 25:36-25:50). Disney's National Research Group ("NRG") report found that 70% of general attendees and teens reported that the Beast was their favorite character (Tr. 1439:14-1440:11), and although Belle was the most popular character overall, "[t]he Beast was a relatively close second and was the favorite among dads and boys" (Tr. 1438:4-17). Mr. Menache testified visual effects like MOVA drive audience attendance. Tr. 981:23-982:11, 983:11-985:6. The NRG report confirms that visual effects was a motivator for 34%-41% of audiences to attend BATB. TX1039 at 18.

***Finding 10***: Paragraph 10 recites Dr. Lane's tally of the total "tasks" performed on various scenes, and conclusion that only 4.6-12% of them were "MOVA-related." For example, Disney cites TX1057 as a list of such tasks, but provides no analysis for why tasks like "eye water," "mud," or "spit" (line 12) drew audiences to the film. The only one of these "tasks" that Disney used to promote BATB was MOVA. TX148, TX247, TX363; ECF No. 684-1, pp. 22-24.

***Finding 11***: Paragraph 11 recites Dr. Lane's opinion that the quality of shots with MOVA was indistinguishable from the quality of shots without, but the exhibits Disney relies on do not support this testimony. The first is the "Library Scene" that DD3 used to promote its facial animation capabilities to studios.  TX210; Tr. 1276:16-1277:14. It confirms that when

1  DD3 wanted to impress studios with its animation skills, it featured MOVA. In TX1012 and
2  TX1015, DD3 claims it did not use a MOVA tracked mesh, but the facial animation appears
3  wooden compared to the "Library Scene" in TX210. TX1176 and 1179 are snippets purporting
4  to compare the Beast's face before and after MOVA, but Mr. Hendler conceded there was not
5  much movement in the Beast's face in these shots. Tr. 1277:15-1278:17. The remainder of the
6  exhibits are thumbnail stills, and Dr. Lane conceded that a viewer cannot infer much about
7  MOVA's contribution to facial *animation* by viewing stills. Tr. 1540:8-1541:6.

8  Dr. Lane's opinion that there is no qualitative difference between shots with MOVA and
9  those without cannot be reconciled with DD3's continued use of MOVA. DD3 did not charge
10 Disney to use MOVA (ECF No. 684-1, p. 122), so it had no financial incentive to continue using
11 it.  And Disney denied that it cared about MOVA, so it would not have objected if DD3 stopped.
12 (Tr. 1189:5-16).  According to Dr. Lane, DD3 could have stopped using MOVA entirely and no
13 one would have noticed the difference, but DD3 continued to use MOVA for over a year in
14 almost half of the shots in which the Beast appeared, even after this Court issued an injunction
15 prohibiting its further use risking contempt rather than stopping. TX270; Tr. 1267:16-1269:17.

16 ***Finding 13***: Paragraph 13 recites Dr. Lane's conclusion that "MOVA contributed little to
17 no net value to the Beast's on-screen appearance." But the jury's liability verdict implicitly
18 rejected this conclusion. The direct financial benefit element of vicarious infringement is
19 satisfied if the availability of the infringing material acted as a draw to customers. *Erickson*
20 *Prods., Inc. v. Kast*, 921 F.3d 822, 829 (9th Cir. 2019); ECF No. 682, 9:12-16. In finding Disney
21 liable for vicarious infringement, the jury necessarily found that MOVA drew audiences to the
22 film and it could not have done so if audiences could perceive no difference. ECF No. 691.

23 ***Finding 16***: Paragraph 16 recites that the November 2016 trailer broke 24-hour viewing
24 records and included "some shots of the Beast but does not refer to MOVA." But 9 of the 11
25 shots of the Beast in the trailer used MOVA. ECF 684-1, pp. 4-7. Disney did not promote
26 MOVA in the trailer by saying what it is called, but rather by showing audiences what it does.

27 ***Finding 17***: Paragraph 17 recites Disney's promotion of BATB using MOVA in press
28 conferences, interviews with the cast and director Bill Condon, and other promotional events,

but notes that MOVA was not the only matter discussed at these events. Disney relies heavily on Emma Watson's star power, the original film, and the story as drivers of success. The fact that these drivers were emphasized collectively with many other drivers in Disney's marketing campaign, including the Yellow Dress, the songs and music, and MOVA, does not dilute each factor's importance to audiences. The fact that MOVA was singled out to promote the film, to the exclusion of every other aspect of special effects, speaks volumes, even as Disney now tries to disavow its own marketing campaign and trivialize MOVA's contribution to BATB's success.

*Finding 18.a.*: Paragraph 18.a. recites Ms. Kershaw's testimony based on a social media post data set she relied on for her opinion that 2.5 percent of social media posts mentioned the Beast character. Tr. 1410:13-15. Disney asserts that "Ms. Kershaw concluded the copying of MOVA software, to the extent it contributed anything, *could not have contributed to anything more than 2.5% of audience interest in BATB*." It cites pages 1417, and 1422-23 of the transcript for this conclusion, but no such testimony appears there or anywhere else. Ms. Kershaw did not testify to any correlation between social media posts on certain platforms and audience draw, nor did she describe any methodology that would have allowed her to reach that conclusion.

Furthermore, the data set was not reliable. The Infegy tool searches posts on Twitter and Instagram, but not Facebook or YouTube. Tr. 1412:5-25. Mr. Fier performed an analysis of the data set produced by Infegy by reviewing the 10,000 posts included with Ms. Kershaw's report. Tr. 1600:23-25. He found that over 25 percent of the posts were unrelated to BATB, and included junk email and multiple copies of the same post. Tr. 1601:1-15. At least 5% were originated by Disney. Tr. 1601:25-1602:2. He faulted Infegy's exclusion of Facebook and YouTube, because those platforms have over 2 billion users. Tr. 1601:16-24. The exclusion of YouTube was particularly surprising because it hosted the film's trailer, which was viewed 127 million times in the first 24 hours and should have generated significant online chatter. *Id*.

*Finding 18.b.*: Paragraph 18.b. recites Ms. Kershaw's opinions based on the results of the NRG survey of audience reasons for seeing BATB. The survey presented a long list of preselected "drivers" that were "designed to reflect [Disney's] priorities and [Disney's] areas of curiosity." Tr. 1420:15-1421:10. It was not designed to reflect the priorities or areas of curiosity

of the *audience*. Nor did the "drivers" include MOVA, so the survey was not designed to reflect audience desire to see the film because of MOVA. *Id.* The survey did offer visual effects as a "driver," which included MOVA. Tr. 1437:16-19. And 34-41% of participants responded that visual effects was one of their main reasons for attending the film, not far behind fanship of the original movie which NRG reported was the strongest single draw at 47-56%. TX1039 at 18.

But participants could select as many options as they wanted, so the collective responses necessarily sum to more than 100%. Tr. 1425:1-10. Ms. Kershaw made a pie chart that purported to somehow convert the survey responses to percentages that summed to 100%, but in so doing she reduced the 34-41% of respondents who responded that they saw the film because of its visual effects to 5-10%. Tr. 1426:18-21; DDX-640. She testified she "had to look at the data, to look at the amount of times things were chosen relative to each other to sort of determine the weight." Tr. 1425:1-10. And she "relied on what NRG said were the primary conclusions of the report" in some unspecified way. *Id.* Ms. Kershaw did not employ an identifiable methodology in estimating the percentages related to the drivers in her pie chart, and provided no explanation for how she arrived at her percentages. Her testimony that only 5-10% of the audience saw the film because of the film's visual effects is contradicted by the NRG report. TX1039 at 18. Thus, there was no basis grounded in objective fact for the percentages she assigned.

***Findings 19-22***: Paragraphs 19-20 recite BATB's gross revenue, deductible costs, and profit. Paragraph 21 describes Dr. Wunderlich's flawed "investment-based approach" to estimate the BATB profits that derive from infringement. And Paragraph 22 describes Dr. Wunderlich's equally flawed "contribution-based approach." Rearden addressed these subjects in its Proposed Findings of Fact and Conclusions of Law. ECF No. 722 at 2:21-5:10 and 5-6.

***Finding 23***: Paragraph 23 recites Dr. Wunderlich's opinion that a range from $345,098 to $676,663 represents a reasonable attribution of Disney's profits to DD3's use of MOVA to animate the Beast's face based on three "benchmarks." None of them is relevant to whether MOVA acted as a draw to audiences. Two "benchmarks" are Rearden's highest charge for the use of MOVA on a different film and estimates of what DD3 could have charged (but did not charge) for MOVA on BATB. And the third "benchmark," Mr. Stevens's compensation for

playing the Beast, is even farther from the mark. None of these "benchmarks" is relevant to *Disney's profits*, their relationship to infringement, or MOVA's draw to audiences.

## II.    RESPONSE TO DISNEY'S CONCLUSIONS OF LAW

***Conclusion of Law 2***:  The parties agree that in determining indirect profits, the Court "make[s] its own independent assessment of the issues." ECF No. 716 at 7:16-17.

***Conclusion of Law 3-4.a***: Disney's argument that Rearden did not prove a causal nexus between infringement and Disney's profit urges the Court to reject the jury's factual finding of a direct financial benefit. But "it would be a violation of the seventh amendment right to jury trial for the court to disregard a jury's finding of fact." *Los Angeles Police Protective League v. Gates,* 995 F.2d 1469, 1473 (9th Cir. 1993). Where legal claims are tried by a jury and equitable claims are tried by a judge, "the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations." *Id.* In finding that Disney received a direct financial benefit from DD3's infringing use of MOVA, the jury implicitly found a causal nexus between the infringement and at least some portion of Disney's profits. ECF No. 682 at 13:12-16.  Disney cannot relitigate this finding here in the apportionment bench trial. *LA Police*, 995 F.2d at 1473.

***Conclusions of Law 6-7***: Paragraph 6 recites Disney's evidence of deductible expenses and profit. Paragraph 7 recites a generic conclusion that Disney proved "the profits from *BATB* were substantially attributable to factors other than the infringement." Rearden addressed these issues in its Proposed Findings of Fact and Conclusions of Law.  ECF No. 722 at 2-5 and 7-9.

Paragraph 7 also asserts that "Rearden presented no competing apportionment opinion." Rearden in fact relied on testimony by Dr. Lane and Mr. Hendler that DD3 used MOVA to animate the Beast's face in 8.9 percent of the film. Disney asserts that this testimony—from its own witnesses—"was contrary to the record evidence" because "those shots included many elements other than the Beast's face; that MOVA alone cannot create a realistic CG character; and that the tracked mesh was a preliminary step in an extensive pipeline to animate the Beast's face." It was Disney's burden to quantify each of those other elements in the 8.9 percent of the shots that used MOVA, not Rearden's, and Disney failed to carry that burden for the reasons stated in pages 7-9 of Rearden's Proposed Findings of Fact and Conclusions of Law. *Id.*

| | | |
|---|---|---|
| 1 | DATED:  March 14, 2024 | HAGENS BERMAN SOBOL SHAPIRO LLP |
| 2 | | By:   /s/ Mark S. Carlson |
| 3 | | MARK S. CARLSON |

Steve W. Berman (*pro hac vice*)
Jerrod S. Patterson (*pro hac vice*)
Garth Wojtanowicz, CBA No. 246510
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
markc@hbsslaw.com
steve@hbsslaw.com
jerrodp@hbsslaw.com
garthw@hbsslaw.com

Rio S. Pierce, CBA No. 298297
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
riop@hbsslaw.com

*Attorneys for Plaintiffs*

PLAINTIFFS' RESPONSE TO DEFENDANT'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW - 7
CASE NO. 4:17-CV-04006-JST
005073-12/2448939 V1