UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REARDEN LLC, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>THE WALT DISNEY COMPANY, et al.,<br><br>    Defendants. | Case No. 17-cv-04006-JST<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>Re: ECF Nos. 682, 739 |

Pending before the Court is Defendant Walt Disney Pictures' ("Disney") renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). ECF No. 739. The Court will grant the motion.

## I. BACKGROUND

The factual and procedural background of this case is summarized in greater detail in the Court's prior orders. ECF Nos. 60, 85, 297, 555. In short, Plaintiff Rearden LLC developed and owns MOVA Contour Reality Capture ("MOVA")—a program for capturing the human face to create computer graphics ("CG") characters in motion pictures. MOVA has been used in the production of various motion pictures, including *The Curious Case of Benjamin Button* (Paramount Pictures 2008); *Harry Potter and the Deathly Hallows, Part I* (Warner Bros. Pictures 2010)*,* and *Pirates of the Caribbean: on Stranger Tides* (Walt Disney Pictures 2011). ECF No. 315 ¶¶ 38, 60.

The Court initially adjudicated a dispute between Rearden LLC and Shenzhenshi Haitiecheng Science and Technology Company ("SHST") concerning the ownership of equipment and intellectual property associated with MOVA ("Ownership Litigation"). SHST is a Chinese entity associated with Digital Domain 3.0, Inc. ("DD3"), a visual effects company with whom

Disney contracted to perform facial capture services for several of its motion pictures. ECF No. 315 ¶¶ 98–124; *see Shenzhenshi Haitiecheng Sci. and Tech. Co., LTD. v. Rearden LLC* ("*SHST"*), No. 15-cv-00797-JST, 2017 WL 3446585 at *2, *7. (N.D. Cal. Aug. 11, 2017). The facts of that case pertinent to the dispute at hand are as follows:

> Steve Perlman has founded a series of entities under the Rearden name that act as technology incubators by developing new technologies, assigning them to subsidiaries, and – if the technologies are successful – spinning the subsidiaries off as separate companies. In 2007, Perlman transferred the MOVA technology to OnLive, Inc., another one of Perlman's incubated companies. OnLive then began providing MOVA services to customers.
>
> In August 2012, OnLive went through an assignment for the benefit of creditors. As part of that process, OnLive was shut down and reborn as a new company called OL2. On February 11, 2013, OL2 transferred ownership of the MOVA Assets to MO2, LLC – an entity owned by Rearden LLC. At that time, Greg LaSalle, who had been involved with the development of MOVA and had at various times worked for Rearden and OnLive, was in the process of negotiating the sale of MOVA assets to DD3. Ultimately, LaSalle sold the assets to SHST rather than DD3, in an attempt to insulate DD3 from liability. The sale closed on May 8, 2013. DD3 then licensed the assets from SHST.

*Rearden LLC v. Crystal Dynamics, Inc.*, No. 17-cv-04187-JST, 2019 WL 8275254, at *2 (N.D. Cal. July 12, 2019) (citations omitted).

After a bench trial, however, the Court held that "Rearden, not . . . DD3, owns and at all relevant times has owned the MOVA Assets." *SHST*, 2017 WL 3446585, at *9. The Court found that LaSalle never owned the MOVA assets or possessed the authority to sell them such that the transfer of the assets to SHST was invalid. *Id.* The Court further ordered the return of those assets to Rearden, and appointed a special master to oversee the process and adjudicate all post-trial disputes. Order Regarding the Return of MOVA Assets 1, *SHST*, No. 15-cv-00797-JST (N.D. Cal. Oct. 2, 2017), ECF No. 449; Order Appointing Hon. Edward A. Infante (Ret.) as Special Master Pursuant to Federal Rule of Civil Procedure 53, at 1, *SHST*, No. 15-cv-00797-JST (N.D. Cal. June 17, 2019), ECF No. 529.

Contemporaneously, Plaintiffs Rearden LLC and Rearden MOVA LLC (collectively, "Rearden") filed a series of lawsuits, including the instant suit against Disney, bringing copyright

1   and trademark infringement claims against several motion picture studios that allegedly used
2   MOVA in producing motion pictures and video games. *See Rearden LLC v. Walt Disney*
3   *Company*, 293 F. Supp. 3d. 963, 967–68 (N.D. Cal. 2018).  In this case, Rearden brought claims
4   for contributory copyright infringement, vicarious copyright infringement, trademark
5   infringement, and patent infringement against Disney.  *See* ECF No. 63.  Rearden alleged that
6   each time DD3 used MOVA, "the computers made a copy of the . . . program in their CPU's RAM
7   without authorization from Rearden," thus infringing on Rearden's copyright.  ECF No. 63 ¶ 120.
8   Rearden then alleged that Disney was contributorily and vicariously liable for this infringing
9   conduct because Disney contracted with DD3 for DD3 to provide facial capture services using
10  MOVA in order to create CG characters in *Guardians of the Galaxy* (2014), *Avengers: Age of*
11  *Ultron* (2015), and *Beauty and the Beast* (2017) ("*BATB*").  *Id.* ¶¶ 96–185.

   Early in the case, Disney moved for summary judgment as to whether the profits from its films were available as a remedy for copyright infringement, arguing that Rearden could not show the required causal nexus between Disney's alleged infringement and the profits from its films under 17 U.S.C. § 504(b).  *See* ECF No. 249.  The Court ultimately granted Disney summary judgment as to Rearden's copyright infringement claims predicated on *Guardians of the Galaxy* and *Avengers: Age of Ultron* on the ground that Rearden failed to identify evidence showing a causal nexus between DD3's alleged infringement and the gross revenue generated by those films. *See* ECF Nos. 297, 304.  However, the Court found that Rearden had identified non-speculative evidence sufficient to create a triable issue of fact as to whether there was a causal nexus between the infringement of its copyright and the revenue generated by *BATB*, and thus denied Disney's summary judgment motion on those claims predicated on *BATB*.  *See* ECF No. 297.  The case thus proceeded with Rearden's trademark infringement claims, and its *BATB* copyright infringement claims.[1]

   After the close of discovery, Disney filed a second motion for summary judgment, this time seeking summary judgment on all of Rearden's remaining claims.  *See* ECF No. 421.  The

---

[1] Rearden's patent infringement claim was dismissed with prejudice.  *See* ECF No. 85.

Court granted summary judgment to Disney as to Rearden's claims for contributory copyright infringement and trademark infringement. *See* ECF No. 555 at 6–8, 15–20. As to Rearden's remaining claim of vicarious copyright infringement, the Court denied Disney's motion for summary judgment, finding that there was a genuine issue of material fact as to whether Disney had both the right and ability to control the infringing conduct and a direct financial interest in the infringing activity. *See id.* at 8–12. However, the Court granted Disney's motion as to any liability for DD3's use of MOVA after this Court's issuance of the preliminary injunction in the *SHST* litigation, on the ground that Rearden had failed to identify any evidence of direct financial benefit in connection with DD3's post-injunction use of MOVA. *See id.* at 12. The Court also granted summary judgment as to Rearden's claim to indirect profits from Disney's sale of *BATB* merchandise and music, finding no evidence of a causal nexus between such profits and DD3's infringement of the MOVA copyright. *See id.* at 13–15. Finally, the Court also initially granted Disney summary judgment as to the issue of actual damages, on the ground that the opinion of Rearden's expert witness Cindy Ievers was inadmissible under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). *See id*. at 13. However, upon reconsideration the Court reversed that exclusion as well as the grant of summary judgment as to actual damages. *See* ECF No. 609.

This case proceeded to a jury trial on Rearden's sole remaining claim—that Disney was vicariously liable for DD3's copyright infringement when it used MOVA to animate the Beast character, played by actor Dan Stevens, in *BATB*. After a two-week trial, the jury returned a verdict finding that: (1) Rearden owned the copyright in the MOVA Contour software program during the time DD3 used that software in connection with the Beast character in *BATB*; and (2) that Disney was vicariously liable for DD3's infringement of the copyright in the MOVA software program. *See* ECF No. 691. The jury awarded Rearden actual damages in an amount of $250,638 and returned an advisory verdict that Disney's profits attributable to the infringement amounted to $345,098. *See id.* Consistent with that verdict, the Court then issued Findings of Fact and Conclusions of Law awarding Rearden $345,098 of Disney's profits attributable to the infringement. *See* ECF No. 726.

Prior to the jury's verdict, Disney filed a motion for judgment as a matter of law under

4

Federal Rule of Civil Procedure 50(a).  *See* ECF No. 682.  In that motion, Disney sought judgment as a matter of law on the ground that Rearden had not presented legally sufficient evidence that a reasonable jury could find that: (1) Rearden owned the MOVA copyright at any point during DD3's alleged infringement in this case; (2) Disney had the practical ability to control DD3's alleged infringement; (3) Disney directly financially benefited from DD3's alleged infringement; (4) there was a causal nexus between DD3's alleged infringement and Disney's revenue from *BATB*; and (5) Rearden suffered any actual damages as a result of the infringement.  *See id*. at 5.  Disney now renews that motion pursuant to Federal Rule of Civil Procedure 50(b).  *See* ECF No. 739.

## II.  LEGAL STANDARD

A court may grant a motion for judgment as a matter of law against a party on a claim or issue where the party has been "fully heard on [that] issue during a jury trial" and the court finds that a "reasonable jury would not have a legally sufficient evidentiary basis" to find for that party.  Fed. R. Civ. P. 50(a).  Judgment as a matter of law is appropriate where "the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury."  *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002); *see also Lakeside-Scott v. Multnomah Cnty*., 556 F.3d 797, 803 (9th Cir. 2009) ("JMOL is appropriate when the jury could have relied only on speculation to reach its verdict."). "A jury's verdict must be upheld if it is supported by substantial evidence. Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence."  *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001) (citation omitted).

A motion for judgment as a matter of law made under Rule 50(a) may be renewed after the jury returns a verdict against the moving party.  Fed. R. Civ. P. 50(b).  A "proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion" and "a party cannot properly 'raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion.' "  *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quoting *Freund v. Nycomed Amersham*, 347

5

F.3d 752, 761 (9th Cir. 2003)).

## III. DISCUSSION

### A. Copyright Ownership

A requisite element of any claim for copyright infringement is ownership of the copyright at the time of the alleged infringement. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Disney argues that Rearden failed to introduce legally sufficient evidence at trial for a reasonable jury to find that Rearden owned the MOVA copyright at the time of DD3's alleged infringement. *See* ECF No. 739 at 7–9.

The Court disagrees. It is undisputed that between August 17, 2012 and February 11, 2013, ownership of all of the MOVA assets, including the copyright in the MOVA software, was held by OL2, Inc. ("OL2"), in which Rearden had no ownership interest. *See* ECF No. 679 at 20 (stipulated facts in jury instructions); Tr. 1176:11–20 (instructing the jury). It is likewise undisputed that in February 2013, OL2 transferred that copyright, along with all of the MOVA assets, to MO2, LLC ("MO2"). *See* ECF No. 679 at 20; Tr. 1176:11–20. Thus, the only dispute between the parties at trial related to whether MO2 was formed as a Rearden subsidiary, and that therefore, Rearden acquired ownership of the MOVA copyright when it was transferred from OL2 to MO2 in February 2013.

Disney argues that Rearden presented no evidence to support this theory. However, at trial, Rearden's CEO Steve Perlman testified that he instructed Greg LaSalle to form MO2 as a Rearden subsidiary. Perlman testified that Rearden formed MO2 for the purpose of reacquiring the MOVA assets (including the MOVA copyright) from OL2, and that he instructed his employee, Greg LaSalle, to work with Rearden's attorney Alan Kalin to form MO2 and complete the acquisition. Tr. at 566:6–571:18. Perlman further testified that Rearden paid all of Kalin's legal fees arising from MO2's formation and its acquisition of the MOVA assets. *Id.* at 568:2–23. Similarly, Rearden's Vice President of Finance, Cindy Ievers, testified that Rearden paid for LaSalle's expenses in connection with the transfer of assets from OL2 to MO2, including maintenance fees, corporate fees and taxes, insurance costs, and patent prosecution fees. *Id.* at 792:22–795:24. Both Ievers and Perlman testified that these actions were done with the intention

6

and mutual understanding that MO2 was formed as a Rearden subsidiary to acquire ownership of the MOVA assets.

Disney argues that "Rearden's theory that MO2 from its creation was a Rearden subsidiary had no contemporaneous documentary support, and the documents that did exist contradicted that theory." ECF No. 739 at 9. However, a lack of contemporaneous documentary evidence does not mean that Rearden produced no legally sufficient evidence. Perlman's and Ievers's testimony was evidence. The lack of corroborating, contemporary documentary evidence might weigh against the credibility of that testimony, but the Court "may not make credibility determinations or weigh the evidence" on a motion for judgment as a matter of law. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). Such determinations, "and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id*. at 150–51 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Here, the jury was presented with, and considered, the evidence at trial and credited Rearden's evidence in concluding that Rearden owned the MOVA copyright during the relevant time period. Disney gives the Court no reason to second-guess the jury's conclusion on this motion.

### B. Vicarious Copyright Infringement

For Rearden to prevail on its claim for vicarious copyright infringement, the jury must have had legally sufficient evidence to find "that the defendant exercise[d] the requisite control over the direct infringer and that the defendant derive[d] a direct financial benefit from the direct infringement." *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1173 (9th Cir. 2007). Disney argues that Rearden failed to introduce legally sufficient evidence at trial for either element.

#### 1. Right and Ability to Control Infringement

Under Ninth Circuit law, "a defendant exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Perfect 10*, 508 F.3d at 1173. Disney does not dispute that there was sufficient evidence at trial to establish its legal right to stop or limit DD3's infringing conduct, but argues that Rearden failed to introduce evidence sufficient for a reasonable jury to find that it had the practical ability to do so. ECF No. 739 at 10–14.

1  Disney's position rests on the argument that in order for a defendant to have the practical
2  ability to limit or stop infringing conduct, it must have the practical ability to observe the conduct
3  and recognize when that conduct is infringing.  In other words, in order to control infringing
4  conduct, one must be able to *identify* the infringing conduct.  Rearden argues that this principle is
5  unsupported by the case law.  *See* ECF No. 746 at 8.

6  The Court finds merit in Disney's argument, and support for its position in Ninth Circuit
7  case law.  In *A&M Recs., Inc. v. Napster, Inc. ("Napster")*, 239 F.3d 1004 (9th Cir. 2001), *as*
8  *amended* (Apr. 3, 2001), *aff'd sub nom. A&M Recs., Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir.
9  2002), *and aff'd sub nom. A&M Recs., Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002), for
10 example, the Ninth Circuit affirmed the district court's holding on a preliminary injunction that the
11 defendant Napster likely had the right and ability to control infringing conduct by its users because
12 it "ha[d] the ability to locate infringing material listed on its search indices, and the right to
13 terminate users' access to the system." *Napster*, 239 F.3d at 1024.  However, the *Napster* court
14 admonished the district court for "fail[ing] to recognize that the boundaries of the premises that
15 Napster 'controls and patrols' are limited." *Id.* at 1023.  The court found that "Napster's reserved
16 'right and ability' to police is cabined by the system's current architecture[,]" which only had the
17 ability to search through file name indices, and "does not 'read' the content of indexed files, other
18 than to check that they are in the proper MP3 format." *Id.* at 1024.  Accordingly, because
19 "Napster may be vicariously liable when it fails to affirmatively use its ability to patrol its system
20 and preclude access to potentially infringing files listed in its search index[,]" the court remanded
21 to the district court to narrow the injunction, with recognition "that Napster's system does not
22 currently appear to allow Napster access to users' MP3 files." *Id.* at 1027.  In so doing, the
23 *Napster* court approved the proposition that the scope of vicarious liability for copyright
24 infringement, and corresponding injunctive relief available to a plaintiff, must be "cabined" by
25 considerations of defendants' ability to identify infringing materials and/or conduct.  *See also id.*
26 at 1023 ("Turning a blind eye to *detectable* acts of infringement for the sake of profit gives rise to
27 [vicarious copyright] liability." (emphasis added)).

28 Subsequent Ninth Circuit cases accord with this principle.  In *Perfect 10*, again on a

8

1    preliminary injunction, the Ninth Circuit affirmed the district court's finding that plaintiff would
2    not likely prevail on its vicarious infringement claim. 508 F.3d at 1173–74. In evaluating the
3    defendant's right and ability to control infringing conduct, the Ninth Circuit found no error with
4    the district court's reasoning that Google "lack[ed] the practical ability to police the third-party
5    websites' infringing conduct" because "Google's software lacks the ability to analyze every image
6    on the Internet, compare each image to all the other copyrighted images that exist in the world . . .
7    and determine whether a certain image on the web infringes someone's copyright." 508 F.3d at
8    1174 (quotation and citation omitted). Accordingly, the Ninth Circuit agreed that "[w]ithout
9    image-recognition technology, Google lacks the practical ability to police the infringing activities
10   of third-party websites." *Id.* As in *Napster*, the *Perfect 10* court expressly adopted the reasoning
11   that, where a defendant lacks the ability to practically recognize infringing conduct or infringing
12   material, it cannot be found to have the practical ability to police or control such conduct.

13   More recently, in *VHT, Inc. v. Zillow Grp., Inc*., the Ninth Circuit affirmed a summary
14   judgment for a defendant on vicarious copyright infringement, again because the defendant lacked
15   the practical ability to identify, and therefore police, its users' infringing conduct. 918 F.3d 723,
16   746 (9th Cir. 2019). There, the court specifically referenced an inability to *identify* the infringing
17   conduct, reasoning that "there was insufficient evidence that [defendant] had the technical ability
18   to screen out or identify infringing VHT photos among the many photos that users saved or
19   uploaded daily to" the direct infringer's platform. *Id.*; *see also UMG Recordings, Inc. v. Shelter
20   Cap. Partners LLC*, 718 F.3d 1006, 1030 (9th Cir. 2013) (stating, in dicta, that the "vicarious
21   liability standard applied in *Napster* can be met by merely having the general ability to *locate
22   infringing material* and terminate users' access . . . ." (emphasis added)); *Atari Interactive, Inc. v.
23   Redbubble*, Inc., 515 F. Supp. 3d 1089, 1116 (N.D. Cal. 2021), *aff'd in part, appeal dismissed in
24   part*, No. 21-17062, 2023 WL 4704891 (9th Cir. July 24, 2023) ("Read together, the [Ninth
25   Circuit] cases require a relatively close relationship between the means for finding infringement
26   (music index, image URL, etc.) and the infringing content.").

27   Rearden counters that this principle is contradicted by established case law (and this
28   Court's prior summary judgment order) holding that vicarious copyright liability applies

9

regardless of knowledge or intention on the part of the defendant. *See, e.g.*, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 n.9 (2005) (stating that vicarious infringement "allows imposition of liability . . . even if the defendant initially lacks knowledge of the infringement"). This argument conflates actual knowledge of infringement, as required for contributory infringement, with the practical ability to identify, and therefore police, the infringing conduct. A defendant may be vicariously liable because it is able to locate and police infringing conduct—but does not do so—without having actual knowledge of infringement.

Applying the case law here, the Court considers whether Rearden introduced at trial sufficient evidence that Disney had the ability to identify, and therefore police, DD3's infringing conduct in using MOVA. Rearden argues that it did, pointing to (1) "the DD3/Disney contract, which designated three Disney representatives to supervise DD3's work and vested them with the authority to represent Disney in all matters related [to] the agreement[;]" (2) "testimony from DD3 and Disney witnesses confirming that they understood Disney had these rights[;]" (3) "evidence of the film's director Bill Condon and Visual Effects Supervisor Steve Gaub's involvement in the MOVA Contour facial performance capture process." ECF No. 746 at 9–10. Upon review, the Court concludes that this evidence is legally insufficient to prove Disney's ability to identify infringing conduct such as DD3's use of the MOVA software.

First, although evidence of the DD3/Disney contract (and Disney's understanding of that contract) demonstrates that Disney had both the legal right and practical ability to *terminate its contract* with DD3, a contractual right to terminate in the event of copyright infringement is not enough to satisfy the "requisite control" element of vicarious liability. Without the practical ability to learn of infringement, Disney would have no reason to exercise its right to terminate.

Rearden argues that Disney's practical ability to control was shown by Disney's legal right to review and approve DD3's work in progress, and Bill Condon and Steve Gaub's actual involvement in the MOVA facial motion capture process. ECF No. 746 at 9–10. But the evidence introduced at trial only demonstrated that Disney's agents such as Condon and Gaub were involved in making creative decisions such as directing Dan Stevens' performance of the Beast during MOVA capture sessions, and selecting captured shots for further animation work. *See* ECF

10

1    No. 684-1 at 2–13 (Condon); 56–59 (Gaub).  Rearden introduced no evidence to show that
2    Condon or Gaub—or any other Disney representative—was involved in the actual animation
3    process using the MOVA software, such that these individuals would have been in a position to
4    identify infringement of the kind that DD3 engaged in here—using software without a copyright
5    owner's permission.  Nor would such infringing conduct be apparent on any of the weekly reports
6    or shots in progress that Disney was contractually entitled to receive from DD3.  As in *Napster*,
7    Disney's "reserved 'right and ability' to police is cabined by" the supervisory role of its agents,
8    and the evidence introduced at trial is insufficient to show that Condon or Gaub had any ability to
9    identify DD3's use of MOVA Contour as infringing Rearden's copyright during the relevant time
10   period.  *Napster*, 239 F.3d at 1023–24.  And similar to the defendant in *Perfect 10*, Disney's
11   "supervisory power is limited" because the evidence at trial showed that its agents "lack[] the
12   ability" to review every piece of hardware or software that its vendors use, investigate whether
13   there might be competing ownership claims in the underlying intellectual property, and determine
14   whether a certain software infringes someone's copyright.  508 F.3d at 1174.
15            Rearden argues, now and at trial, that Disney could have just conducted "due diligence"
16   and confirmed whether DD3 owned the rights to MOVA.  *See* ECF No. 746 at 10–11.  Perlman
17   testified that movie studios contacted Rearden several times asking to confirm Rearden's
18   ownership of its MOVA rights, including by reviewing patent and trademark registrations.  Tr. at
19   488:13–489:15.  Rearden contends that because Disney could have made the same inquiries of its
20   vendors, it had the legal right and ability to control DD3's infringement.  However, this argument
21   conflates Disney's ability to confirm a claim of ownership of intellectual property with its ability
22   to identify and control infringement.  Even if Disney had conducted with DD3 the kind of due
23   diligence that Perlman described, Disney still would not have identified any indication that DD3
24   might be infringing Rearden's copyright through its use of MOVA; at best, such due diligence
25   would only confirm that the vendor in question could claim to have the right to operate its
26   software and/or hardware.  It also fails as a matter of practicality.  To uncover direct infringement
27   such as DD3's use of MOVA would require a movie studio to identify each piece of proprietary
28   software and/or hardware its vendors use, even when those vendors number in the hundreds, and

11

1  then identify and follow up on any possible claim to ownership in any intellectual property that
2  might be used in that software/hardware. Such a task would be "beyond hunting for a needle in a
3  haystack." *VHT*, 918 F.3d at 746.
4      Rearden argues that this conclusion runs contrary to the Court's prior order denying
5  Disney's summary judgment motion. "Once the case proceeds to trial, the full record developed
6  in court supersedes the record existing at the time of the summary-judgment motion." *Ortiz v.*
7  *Jordan*, 562 U.S. 180, 184 (2011). The Court's prior order on summary judgment was based on
8  Rearden's representations as to what evidence it *could* present at trial, much of which was
9  substantially narrowed at trial. This order considers the evidence that was actually introduced and
10 admitted at trial, and whether that evidence is sufficient to support the jury's verdict. In doing so,
11 the Court finds that Rearden failed to introduce legally sufficient evidence at trial that Disney had
12 the practical ability to identify, and therefore supervise or control, whether its vendors such as
13 DD3 were infringing copyright through the use of proprietary software and/or hardware.
14 Accordingly, the evidence, even construed in the light most favorable to Rearden as the non-
15 moving party, is insufficient for a reasonable jury to find that Disney had both the legal right and
16 practical ability to control such infringing conduct, and therefore Disney cannot be liable for
17 vicarious copyright infringement as a matter of law.

### 2. Direct Financial Benefit

19     Disney also moves for judgment as a matter of law as to the second element of vicarious
20 infringement—that it derived a direct financial benefit from DD3's direct infringement. *See* ECF
21 No. 739 at 14–17. Disney argues that there was no evidence of a causal relationship between the
22 infringing activity in question—DD3's usage of the MOVA software (and therefore copying the
23 code into RAM)—and any direct financial benefit to Disney. *See id.*
24     The Court is not persuaded. At trial, Rearden introduced ample evidence that DD3's use
25 of MOVA created a more realistic looking Beast, including Disney's own press kit and interviews
26 with Bill Condon, Dan Stevens, and Emma Watson promoting the benefits of using MOVA to
27 capture and animate the Beast's face. *See* TX 247 at 31–32 ("To create a realistic looking Beast in
28 a real-world environment while maintaining Dan Stevens' performance, a combination of physical

12

performance capture and MOVA facial capture technology was used."); TX142; TX148; TX 363. Rearden also introduced evidence that MOVA enabled DD3 to create a more realistic and believable character for the Beast. *See*, *e.g.*, ECF No. 684-1 at 53–54 (Gaub testifying that facial motion capture such as MOVA enabled something more lifelike than traditional animation); 95 (Taritero testifying as to the "unique" value of DD3's MOVA Contour and Direct Drive capabilities); 109 (Stevens testifying that the ability to interact with Emma Watson during MOVA capture sessions aided his performance of the Beast). Rearden introduced testimony from Condon that MOVA was used to animate the Beast's face in nine of the eleven clips of the Beast's face in *BATB's* theatrical trailer. *See id.* at 2–14. And Rearden introduced evidence from multiple witnesses as to the importance of visual effects and theatrical trailers in driving audience interest in a movie, and thereby driving ticket sales. *See* Tr. at 831:7-15 (Hoberman), 983:11–984:19 (Menache), 1602:4–19 (Fier). A reasonable jury, considering this evidence, could have found that DD3's infringing use of the MOVA software had a direct financial benefit to Disney, by driving more ticket sales for *BATB* at the box office.

Disney does not dispute that this evidence was introduced at trial, but argues that a reasonable jury could not have found a causal connection between the infringing conduct and any financial benefit, because "the evidence was undisputed that more than half the shots of the Beast in the movie were created without the use of MOVA output data, and those shots were indistinguishable from shots created with MOVA data." *See* ECF 739 at 15. The Court is not convinced. Just because other software could have been (and was) used to accomplish the effect of animating a realistic Beast does not mean that DD3's use of the MOVA software had no effect in driving consumer interest and ticket sales. To the contrary, it merely spotlights that DD3 had non-infringing alternatives available, but concluded they weren't as good as MOVA for those shots. At trial, the jury was presented with evidence that a realistic and empathetic Beast would likely have increased consumer interest in *BATB*, and that MOVA enabled DD3 to animate the Beast in a more realistic and believable way. This evidence, viewed in a light most favorable to Rearden, is legally sufficient for it to prevail on this element of vicarious copyright infringement.

Disney also argues that Rearden must have introduced evidence that audiences were drawn

13

1   to *BATB* "because DD3 copied MOVA Contour software into computer RAM" and "[i]t was
2   undisputed that no consumer ever saw (or could see) the ephemeral copies of MOVA Contour
3   software residing in RAM." *See* ECF No. 739 at 15. This Court finds no support in the case law
4   for such a strict requirement to prove vicarious infringement. As the Ninth Circuit has stated, "[a]
5   defendant is vicariously liable for copyright infringement if he enjoys a direct financial benefit
6   from another's infringing activity and 'has the right and ability to supervise' the infringing
7   activity." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (citing *Napster*, 239 F.3d at
8   1022) (emphasis omitted). There is no dispute here that DD3's use of MOVA was "infringing
9   activity" and thus the only question under this element is whether Rearden introduced evidence
10  sufficient for a reasonable jury to find that Disney "enjoy[ed] a direct financial benefit" from that
11  activity. As stated above, the Court finds sufficient evidence for a reasonable jury to find that it
12  has. Disney's position, that a copyright plaintiff must prove that consumers were able to observe
13  the infringing conduct or material, would effectively preclude any software copyright owner from
14  ever prevailing on vicarious copyright infringement.

### C.  Remedies

Disney also moves for judgment as a matter of law as to both of Rearden's damages theories that it presented at trial: actual damages it suffered as a result of the infringement, and the portion of Disney's profits from *BATB* attributable to the infringing conduct.

#### 1.  Actual Damages

Disney argues that Rearden also failed to introduce legally sufficient, non-speculative evidence to support the jury's award of actual damages. Such an award "must be upheld if it is supported by substantial evidence." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004), *as amended on denial of reh'g and reh'g en banc* (Oct. 25, 2004), *opinion amended on denial of reh'g*, No. 03-35188, 2004 WL 2376507 (9th Cir. Oct. 25, 2004). Accordingly, for Disney to prevail on its motion, it must prove that the evidence introduced at trial, when viewed in the light most favorable to Rearden, "permits only one reasonable conclusion, and that conclusion is contrary to the jury verdict[.]" *Id.*

Rearden's evidence of actual damages comes primarily from Ievers, who testified in her

14

1  capacity as an expert witness that Rearden would have incurred costs of approximately $2.9
2  million to provide MOVA services for *BATB*.  Tr. at 1103:23–25.  Ievers opined that Rearden
3  would have charged an additional 20% profit on top of those costs, which amounted to
4  approximately $581,611.  *Id.* at 1104:1–8.  On cross-examination, Ievers admitted that while
5  Rearden's spinoff OnLive was operating the MOVA business, it never made a profit.  *Id.* at
6  1125:12–14.  She further admitted that the most Rearden had ever charged for any MOVA project
7  was $386,746, which was for *Harry Potter and the Deathly Hallows, Part I* and *Part II*.  *Id.* at
8  1113:17–1114:2.  Finally, Ievers testified that the discrepancy between Rearden's historical
9  charges for MOVA services and its hypothetical charge for *BATB* could be explained by the
10 increased recognition and acclaim that MOVA had acquired since the *Harry Potter* films (*id.* at
11 1129:7–25) and the fact that *BATB* would be the first time Rearden had charged for continuous
12 capture using MOVA, which she testified to be up to ten times as costly as traditional FACS
13 captures (*id.* at 1130:1–18).
14         Having considered this evidence, the jury awarded Rearden actual damages of $250,638.
15 *See* ECF No. 691.  Disney argues that this award is speculative and unsupported by the evidence
16 presented at trial.  Disney also argues that Ievers' opinion cannot sustain the damages award as it
17 was unduly speculative.
18         While it is unclear how the jury reached its ultimate number of $250,638, that fact in itself
19 does not mean that the award is unduly speculative.  An award of actual damages may be rejected
20 if the fact of damages is uncertain or speculative, but uncertainty as to the *amount* of damages will
21 not preclude recovery.  *See Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 513
22 (9th Cir. 1985).  Here, Ievers testified that the cost to Rearden to provide MOVA services for
23 *BATB* would have been $2.9 million, whereas Disney's expert opined that cost would have been
24 $250,000.  *See* Tr. 1191:1–7.  Applying a 20% profit margin would result in a range of profits
25 from approximately $50,000 to $581,611.  With these opinions in mind, the jury's award of
26 $250,638 was within an acceptable range of the evidence, and not so speculative as to warrant
27 judgment as a matter of law.  *See Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't,* 447 F.3d
28 769, 787 (9th Cir. 2006) (affirming actual damages award that was within an acceptable range of

United States District Court
Northern District of California

expert opinion, even if "it is not clear how the jury calculated [the] award[.]").

Disney argues that Ievers' testimony does not adequately support the verdict, because Ievers did not consider the fair market value of the copyrighted work, and instead merely opined as to what Rearden hoped to have charged for its services. This repeats the argument Disney made in seeking to exclude Ievers' testimony, a motion Disney ultimately lost. *See* ECF No. 609; *see also Polar Bear*, 384 F.3d at 708 ("Actual damages are usually determined by the loss in the fair market value of the copyright, measured by the profits lost due to the infringement . . . ."); *Dash v. Mayweather*, 731 F.3d 303, 312 (4th Cir. 2013) ("The first possible measure [of actual damages] is the amount of revenue that the copyright holder lost as a result of infringement, such as his own lost sales of the work."). As evidence of the revenue Rearden lost as a result of DD3's infringement, Ievers was entitled to testify as to her opinion as to the costs Rearden would have incurred to provide MOVA services for *BATB*, and the reasonable profit margin it would have charged in addition to those costs.

Disney objects that the fair market value of the copyright must be measured by what a willing buyer would have paid a willing seller for the right to the copyrighted material. Substantial evidence was presented at trial as to that measure. The jury heard evidence from Ievers as to her opinion of what Rearden would have charged for MOVA services, and also heard evidence of Rearden's historical revenues and profits from providing MOVA services in the past. Disney's own expert also provided his competing opinion of what costs Rearden would have incurred to provide MOVA services for *BATB*. Having considered all of this evidence, the jury came to its own conclusion of what profits Rearden would hypothetically have gained if it had provided MOVA services for *BATB*, and therefore suffered as a result of DD3's infringement. Disney's criticisms of Ievers' opinion go to her credibility, but again, that is not a factor the Court considers on a motion for judgment as a matter of law. *Reeves*, 530 U.S. at 150; *see also Polar Bear*, 384 F.3d at 709 ("the jury was presented with a panoply of evidence and arguments, not all of them congruent or consistent. The jury was not required to adopt Timex's view, nor do we substitute our view for the jury's verdict where the award is supported by substantial evidence"). Accordingly, Disney's motion is denied as to the award of actual damages.

### 2. Defendants' Profits/Causal Nexus

Disney also argues that it is entitled to judgment as a matter of law on the award of defendants' profits, because there was insufficient non-speculative evidence for the Court to find a causal nexus between DD3's infringement and its profits from *BATB*. *See* ECF No. 739 at 17–19. Disney's motion is denied as to this issue, which was tried as a bench trial by the Court. Federal Rule of Civil Procedure 50 only permits a motion for judgment as a matter of law on issues that "a party has been fully heard on . . . during a *jury* trial" and where the court finds "that a reasonable *jury* would not have a legally sufficient evidentiary basis to find for the party on that issue[.]" Fed. R. Civ. P. 50(a) (emphasis added). Rule 50 therefore does not apply to the issue of causal nexus or the award of defendant's profits, which were equitable issues tried to the Court. *See Sullins v. Exxon/Mobil Corp.*, No. 08-04927 CW, 2011 WL 8077086, at *2 (N.D. Cal. Jan. 26, 2011) ("Because the claims at issue here are equitable and have been tried to the Court in a bench trial, Rule 50, which applies to jury trials, is not applicable. Therefore, Defendant's Rule 50 motion is denied."). Disney's motion is denied as to the issue of causal nexus and the award of defendant's profits.

## CONCLUSION

Because the Court finds that Rearden has failed to introduce legally sufficient evidence for a reasonable jury to find in its favor as to vicarious copyright infringement, the Court grants Disney's motion for judgment as a matter of law.

**IT IS SO ORDERED.**

Dated: August 26, 2024

JON S. TIGAR
United States District Judge